**No. 25-13631-C**

# United States Court of Appeals for the Eleventh Circuit

---

CITADEL SECURITIES LLC,

*Petitioner*,

v.

U.S. SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

---

On Petition for Review of an Order of the
Securities and Exchange Commission

## TIME-SENSITIVE MOTION TO EXPEDITE

Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201-2923
(214) 698-3100

Eugene Scalia
  *Counsel of Record*
Helgi C. Walker
John W. Tienken
Brandon Wolf
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioner*

October 31, 2025

*Citadel Securities LLC v. U.S. Securities & Exchange Commission*,
No. 25-1363-C

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-1, Petitioner Citadel Securities LLC provides the following certificate of interested persons:

1. **Citadel Securities GP LLC**, indirect, ultimate controlling entity of Citadel Securities LLC.

2. **Citadel Securities LLC**, Petitioner.

3. **Investors Exchange LLC**, Proponent of Proposed Rule.

4. **Richman, Brian A.**, counsel for Petitioner Citadel Securities LLC.

5. **Scalia, Eugene**, counsel for Petitioner Citadel Securities LLC.

6. **Securities and Exchange Commission**, Respondent.

7. **Tienken, John W.**, counsel for Petitioner Citadel Securities LLC.

8. **Walker, Helgi C.**, counsel for Petitioner Citadel Securities LLC.

C-1 of 3

*Citadel Securities LLC v. U.S. Securities & Exchange Commission,*
No. 25-1363-C

9.    **Wolf, Brandon**, counsel for Petitioner Citadel Securities LLC.

No publicly traded company or corporation has an interest in the outcome of the case. Petitioner will file an amended certificate of interested persons should it become aware of a change in interests that would affect the disclosures as required by Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-4.

Dated: October 31, 2025                  Respectfully submitted,

                                                    /s/ Eugene Scalia

Brian A. Richman                     Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP          Helgi C. Walker
2001 Ross Avenue, Suite 2100         John W. Tienken
Dallas, TX  75201                    Brandon Wolf
(214) 698-3100                       GIBSON, DUNN & CRUTCHER LLP
                                     1700 M Street, N.W.
                                     Washington, D.C.  20036
                                     (202) 955-8500
                                     escalia@gibsondunn.com

                                     *Counsel for Petitioner*
                                     *Citadel Securities LLC*

C-2 of 3

*Citadel Securities LLC v. U.S. Securities & Exchange Commission*,
No. 25-1363-C

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, the undersigned counsel hereby certify that Petitioner Citadel Securities LLC is an indirect subsidiary of Citadel Securities GP LLC.  Counsel further certify that no publicly held corporation has a 10% or greater ownership interest in Citadel Securities GP LLC.

Dated:  October 31, 2025

Respectfully submitted,

 */s/ Eugene Scalia*

Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Eugene Scalia
Helgi C. Walker
John W. Tienken
Brandon Wolf
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
escalia@gibsondunn.com

*Counsel for Petitioner*
*Citadel Securities LLC*

C-3 of 3

## INTRODUCTION

This case involves a Securities and Exchange Commission ("SEC") order that—unless expeditiously reviewed—will distort the U.S. options markets and compel every broker in America to route customer orders to a new exchange that is designed to disadvantage those customers.

On September 18, 2025, the SEC approved a proposal of the Investors Exchange LLC ("IEX") to launch an options exchange built around a trading mechanism called the Options Risk Parameter. Under that mechanism, an investor sees a displayed price for an options contract on, and sends her order to, IEX; IEX then freezes and holds the order for 350 microseconds while IEX determines whether its market-maker member who submitted the price should change or cancel it. This system gives IEX members a one-way advantage found nowhere else in the national options market.

What makes this rule extraordinary is not merely the discriminatory mechanism itself, but the compulsion behind it. If market participants wished to trade on IEX's terms, they could choose to do so. But IEX did not seek simply to *compete* for order flow—it sought to commandeer it by government fiat. IEX persuaded the Commission to bless its

1

design as covered by the SEC's options "order protection" rule—a regulation that, in ordinary circumstances, is meant to ensure investors receive the best displayed price in the market. That regulatory framework *requires* brokers to route orders to the exchange displaying the most competitive price. But by extending that protection to IEX's vanishing quotes, the Commission turned that safeguard into a forcible preference for market makers: every broker in America now has no choice but to route orders to IEX whenever its quotes appear at the top of the market— even when the broker knows those quotes may be retracted before the customer can complete the trade.

IEX has announced that its options exchange will go live at the end of the first quarter of 2026—that event will mark an irreversible turning point.[*] Once the exchange begins operations, brokers will be required to route orders in accordance with the new system. The resulting trades— and the disadvantageous price at which they were executed—cannot be unwound even if this Court later vacates the rule.

---

[*] *IEX Announces Planned Launch of Options Exchange End of Q1 2026*, IEX (Apr. 16, 2025), https://www.iex.io/article/iex-announces-planned-launch-of-options-exchange-end-of-q1-2026

Expedition is therefore essential.  Implementation of the rule will also require extensive industry preparation—rewriting routing systems, subscribing to new data feeds, and adding risk controls to accommodate IEX's new exchange.  But the greater harm lies not only in those substantial costs, which a prompt ruling could at least reduce, but in the fact that once IEX's exchange goes live, every options order nationwide—millions of contracts each day—will be subject to potential compelled routing to IEX under the new system.

To permit meaningful judicial review before that occurs, this Court should adopt an expedited schedule allowing a decision by March 16, 2026—approximately two weeks before IEX's planned launch at the end of Q1 2026.  Counsel for Petitioner conferred with Commission counsel seeking an agreed-upon expedited schedule; the Commission declined. To the extent the government responds to this motion by contending it cannot proceed on an expedited basis during the government shutdown, the Court should alternatively stay the rule's effectiveness pending review.

## BACKGROUND

IEX operates a national securities exchange registered under Section 6 of the Securities Exchange Act of 1934, 15 U.S.C. § 78f. This case concerns IEX's proposal to establish a new sub-exchange for options contracts. *See Order Approving a Proposed Rule Change*, 90 Fed. Reg. 45,861 (SEC Sept. 23, 2025). Exchanges—including this proposed IEX options exchange—are created through the promulgation of exchange rules, which must be approved by the SEC under Section 19(b) of the Act, 15 U.S.C. § 78s(b), before the exchange becomes operational. Once approved, an exchange's rules are binding on the exchange, its members, and all who transact on its market.

A central feature of IEX's new exchange is the participation of market makers—large, sophisticated trading firms that become "members" of exchanges and commit to provide substantial "liquidity" by continuously posting bids and offers to buy and sell options contracts. Because IEX earns revenue when trades are executed on its platform, it has a strong incentive to adopt rules that make market-maker membership attractive to these firms.

To that end, IEX's new rule offers market makers an exceptional inducement through its Options Risk Parameter ("ORP") trading mechanism. *See Order Approving a Proposed Rule Change*, 90 Fed. Reg. at 45,861. Under this design, every order entering the IEX options exchange is subjected to a 350-microsecond "speed bump"—an intentional delay that halts all incoming messages while IEX's system evaluates current market data. *Id.* at 45,866/1. During that intentional delay, IEX runs a proprietary algorithm to determine whether market conditions indicate an "imminent adverse price change" for its market-making member, based on movements in the price of the underlying security. *Id.* If the algorithm predicts such an "adverse" change (adverse to *the market maker*, that is), IEX automatically cancels any market-maker quotes that have elected ORP protection, even as incoming investor orders remain immobilized. In today's fast-moving markets, 350 microseconds is long enough for prices to shift across multiple exchanges—causing investors who were frozen on IEX to miss executions or receive inferior prices. *See* Nasdaq Comment Letter at 3–4 (May 20, 2025), https://tinyurl.com /nhk6p4u7; MEMX Comment Letter at 2–3 (May 14, 2025), https://ti-nyurl.com/bddtuk4z.

IEX designed its market-maker membership program to highlight this feature. Only registered market makers—those large trading firms that supply most displayed liquidity in the options markets—may elect to use the ORP. By limiting the mechanism to these firms, IEX sought to attract their participation and ensure that its exchange would launch with significant liquidity and trading volume.

The IEX proposal drew widespread opposition across the securities industry. Exchanges, broker-dealers (including those who manage the execution of retail orders), and industry experts warned that the rule would distort prices, degrade execution quality, and force investors to route orders to IEX even when doing so was not in their best interests. *See, e.g.*, MEMX Comment Letter at 1–2; Nasdaq Comment Letter at 1–7; NYSE Comment Letter at 1–2 (June 17, 2025), https://tinyurl.com/46vr7jb7. Commenters explained that IEX's mechanism would compel brokers to route orders toward "phantom" prices that vanish before execution; disrupt price-improvement auctions that save retail investors billions each year; and upend the competitive balance among exchanges by guaranteeing IEX order flow through regulatory mandate. *See* IMC–Charles Schwab–Citadel Comment Letter at 1–2 (June 4,

2025), https://tinyurl.com/3jra2az4.    Nearly every major exchange group—including Nasdaq, NYSE, and MEMX—urged the Commission not to approve the proposal.  Market participants such as Charles Schwab, a leading retail broker-dealer, warned that the rule would force all investors to chase deceptive quotes, undermine market integrity, and harm retail investors. *See, e.g.*, IMC–Charles Schwab–Citadel Comment Letter at 2; *see also* Citadel Securities Comment Letter at 1–4 (June 23, 2025), https://tinyurl.com/fas8apmb.

IEX's request to receive "order protection" from the Commission magnified these concerns.  Order protection *requires* broker-dealers to route customer orders to the exchange that appears to offer the most competitive price.  In this case, it means that if a market maker posts the "best" available price on the IEX exchange, every broker in the country must route orders to IEX to execute at that price.  Once those orders arrive, however, IEX's system places them on hold while its algorithm determines whether the market-making member should stand by or retract its displayed quote.  Commenters warned that this combination of IEX's algorithmic "freeze," with the compulsory routing requirement of the order protection rule, would unfairly force brokers to pursue prices that

IEX's insiders could withdraw before execution. *See* IMC–Charles Schwab–Citadel Comment Letter at 2.

The Commission has long recognized that order protection should be reserved for firm, accessible quotes. *See, e.g.*, 74 Fed. Reg. 15,010, 15,011 (SEC Apr. 2, 2009). Without that foundation, the framework collapses. Yet in approving IEX's proposal, the Commission did not meaningfully address that problem. Instead, it relied on a single statistic supplied by IEX: that the ORP would affect its quotes for "less than 0.001% of the trading day." 90 Fed. Reg. at 45,870/2. Yet even IEX admitted elsewhere that, for the most actively traded options, the mechanism could engage for up to 0.2% of the trading day, *id.* at 45,881/3—a difference of more than two orders of magnitude, and because calculated at the microsecond level, enough to encompass hundreds of millions of quote cancellations each day. *See* SIFMA Comment Letter at 3 (June 30, 2025), https://tinyurl.com/44judwsr. The Commission never required IEX to provide data on how often its mechanism would activate, nor did it examine the rule's impact on investors. It simply accepted IEX's assertion of "narrow tailoring" without further analysis. *Cf. Susquehanna Int'l*

*Grp., LLP v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017) (SEC acted arbitrarily and capriciously by "merely accept[ing]" assertions from self-regulatory organization).

The Commission's omissions went further. It declined to test the rule's central premise—that "latency arbitrage" exists in the options markets and that the ORP was narrowly tailored to prevent it. The Commission cited no data, study, or analysis to support that assumption. *See* MEMX Comment Letter at 2. And it ignored calls to analyze its own Consolidated Audit Trail, a dataset that tracks every options order and could have demonstrated how the rule would operate in practice—even though the Commission has repeatedly described that system (including to this Court) as a landmark advance in its ability to analyze market structure and trading behavior. *See Am. Secs. Ass'n v. SEC*, 147 F.4th 1264 (11th Cir. 2025).

In refusing to develop any evidence of the problem the rule was meant to solve—or how IEX's mechanism was "narrowly tailored" to address it—the Commission failed to make the factual findings that the D.C. Circuit found critical when it upheld a different IEX mechanism, for equities. *See Citadel Securities LLC v. SEC*, 45 F.4th 27, 33 (D.C. Cir.

9

2022).  The Commission also brushed aside warnings that treating non-firm, inaccessible quotes as "protected" would violate the plain text of the options order-protection rule, which applies only to firm quotations. *See* 74 Fed. Reg. 39,362, 39,371/1–2 (SEC Aug. 6, 2009).

In the end, nearly every major exchange group and many leading market participants warned that the rule would tilt the playing field, mislead the investing public, and erode execution quality.  The Commission approved it nonetheless.

IEX plans to begin operating its new exchange at the end of the first quarter of 2026.  *See supra* n.*.  As that date approaches, Citadel Securities and firms across the industry will have no choice but to begin extensive implementation efforts to accommodate the new market.  *See* Declaration of Stephen Berger ¶ 6–7.  Among other things, broker-dealers must update order-routing algorithms and subscribe to costly new data feeds and exchange connectivity services. *Id.* ¶ 6.  These projects require months of engineering work and millions of dollars in sunk costs. *Id.* ¶ 7.  And if this Court has not ruled before the exchange goes live, millions of options contracts every day will be at risk of being forcibly routed to IEX, creating irreversible damage by producing transactions that can never be

unwound and entrenching the effects of the rule before its legality can be reviewed. *See id.* ¶¶ 4–5.

## ARGUMENT

This case readily meets the standard for expedition. This Court expedites challenges to agency rules "for good cause." 11th Cir. R. 27-1 I.O.P. 3; *see also* 28 U.S.C. § 1657(a) (requiring courts to "expedite the consideration of any action . . . if good cause therefor is shown"). That standard is satisfied where delay would cause irreparable harm, lock in unrecoverable industry-wide costs, or leave regulated parties in limbo over issues of national importance. *Cf. In re White-Lett*, 2024 WL 578122, at *2 n.5 (11th Cir. Feb. 13, 2024) (recognizing that expedition is warranted when delay risks frustrating the Court's ability to provide complete relief). All of that is true here. Without prompt judicial review, the structure of the U.S. options market will be transformed before the rule's legality can be determined.

The harm will become immediate and irreversible as the launch date approaches. Once IEX's options exchange begins operations at the end of the first quarter of 2026, brokers will be compelled to route orders, including customer orders, to IEX whenever its prices appear at the top

11

of the market; many of those trades will execute on IEX at worse prices than investors would otherwise receive. *See* Berger Decl. ¶¶ 4–5. Trades that are executed under this regime cannot be unwound; the resulting losses will be permanent. *See id.* ¶ 5. Preventing those irreversible consequences is itself good cause for expedition.

Prompt review would also mitigate significant unrecoverable costs across the industry. *See* Berger Decl. ¶¶ 6–7. For example, broker-dealers must reprogram routing algorithms and subscribe to costly new data feeds and exchange connectivity services to prepare for IEX's launch. *See id.* ¶ 6. Courts have long recognized that such unrecoverable compliance costs constitute irreparable harm warranting a stay or injunction pending appeal. *See, e.g.*, *Alabama v. U.S. Sec'y of Educ.*, 2024 WL 3981994, at *6 (11th Cir. Aug. 22, 2024) (finding irreparable harm where regulated entities would incur "substantial compliance costs in the form of time and money" if a rule took effect, and those costs "would be doubled" if the rule were later invalidated and prior systems had to be reimplemented). Such circumstances *a fortiori* constitute good cause for expediting briefing and argument. A timely decision would allow firms to adjust their implemen-

12

tation plans and lessen the millions of dollars in engineering and compliance work that would otherwise be duplicated if the rule is later invalidated. Expedition would thus prevent irreversible damage to investors and mitigate economic waste—precisely the circumstances which warrant expedited consideration.

If the government maintains that the ongoing federal shutdown prevents expedited briefing, the Court should stay the rule's effectiveness pending review. The "SEC cannot have it both ways," *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 778 (5th Cir. 2023), simultaneously claiming it is unable to litigate while allowing a rule of this magnitude to rework markets without regulatory oversight. On the current trajectory, a brand-new national options exchange will begin plans for trading options while the Commission is closed and its staff may be barred by law from performing typical supervisory and surveillance functions. *See* 31 U.S.C. §§ 1341-42. Expedition—or, if necessary, a stay—is essential to prevent the rollout of this untested market design.

The Commission will suffer no prejudice from an accelerated schedule. The administrative record is complete, the case presents purely legal issues, and this Court can adopt a similar expedited timetable used in

other major rule challenges.  *See, e.g.*, Order, *Nat'l Ass'n of Private Fund Managers v. SEC*, No. 23-60471 (5th Cir. Sept. 27, 2023), ECF Nos. 34-2 & 37 (ordering expedition and setting schedule).

Petitioner respectfully requests that this Court decide this case on the merits by March 16, 2026, roughly two weeks before the date IEX intends to launch the new exchange.  To that end, Petitioner suggests the following schedule for the Court's consideration:

| | |
|---|---|
| November 10, 2025 | Agency record / certified list |
| November 17, 2025 | Petitioner's opening brief |
| November 24, 2025 | Amicus briefs in support of Petitioner |
| December 22, 2025 | Respondent's brief |
| December 29, 2025 | Amicus and intervenor briefs in support of Respondent |
| January 13, 2026 | Petitioner's reply brief |
| January-February 2026 | Oral argument |
| March 16, 2026 | Requested decision date |

## CONCLUSION

The Court should expedite consideration of this case and adopt a schedule that permits a decision before the IEX options exchange begins

14

operations in late March 2026.  If the government contends it cannot proceed on an expedited basis during the shutdown, the Court should, in the alternative, stay the rule's effectiveness pending review.

Dated:  October 31, 2025

|  |  |
|---|---|
| | _/s/ Eugene Scalia_ |
| Brian A. Richman | Eugene Scalia |
| GIBSON, DUNN & CRUTCHER LLP | Helgi C. Walker |
| 2001 Ross Avenue, Suite 2100 | John W. Tienken |
| Dallas, TX  75201 | Brandon Wolf |
| (214) 698-3100 | GIBSON, DUNN & CRUTCHER LLP |
| | 1700 M Street, N.W. |
| | Washington, D.C.  20036 |
| | (202) 955-8500 |
| | escalia@gibsondunn.com |
| | |
| | *Counsel for Petitioner* |
| | *Citadel Securities LLC* |

## CERTIFICATE OF ELECTRONIC SUBMISSION

I certify that: (1) any required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of any corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.


Dated: October 31, 2025                Respectfully submitted,

                                        */s/ Eugene Scalia*
                                       Eugene Scalia

                                       *Counsel for Petitioner*
                                       *Citadel Securities LLC*


Certificate 1

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

**1.    Type Volume**

 __X__        This document complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 2,643 words.

**2.    Typeface and Type Style**

 __X__        This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Word 2019 in 14-point, New Century Schoolbook font.

Dated:  October 31, 2025                          /s/ *Eugene Scalia*
                                                                  Eugene Scalia

Certificate 2

## CERTIFICATE OF SERVICE

I hereby certify that, on this 31st day of October 2025, a true and correct copy of the foregoing was filed electronically and served on all counsel through this Court's CM/ECF system.

Dated: October 31, 2025          Respectfully submitted,

                               */s/ Eugene Scalia*
                               Eugene Scalia

                               *Counsel for Petitioner*
                               *Citadel Securities LLC*

Certificate 3