# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

CITADEL SECURITIES LLC,

*Petitioner*,

v.

U.S. SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

No. 25-13631-C

## DECLARATION OF STEPHEN BERGER

1.    I am a Managing Director and Global Head of Government & Regulatory Policy at Citadel Securities LLC.  I make this declaration in support of Petitioner Citadel Securities LLC's Motion to Expedite in *Citadel Securities LLC v. U.S. Securities and Exchange Commission*, No. 25-1363-C.  I have personal knowledge of the matters described below or knowledge gained through my responsibilities and review of information maintained by Citadel Securities in the ordinary course of its business, and I could competently testify to these matters if called as a witness.

2.  On September 18, 2025, the Securities and Exchange Commission ("Commission") approved an Investors Exchange LLC ("IEX") proposal to launch a new options exchange built around a trading mechanism known as the "Options Risk Parameter."  IEX has announced that its exchange will go live at the end of the first quarter of 2026.

3.  IEX's exchange will apply an intentional 350-microsecond delay to every incoming order before it can execute.  During that pause, IEX's systems analyze market data to decide whether the market-making member that posted the displayed quotation should honor, reprice, or cancel its quote.  The Commission also designated IEX's quotations as "protected" under the options order-protection framework, meaning that brokers such as Citadel Securities will be required to route customer and proprietary orders to IEX whenever its displayed price appears to be the most favorable.

4.  Once IEX's options exchange is operational, broker-dealers such as Citadel Securities will be required by the Commission's order-protection framework to route both customer and proprietary (Citadel Securities) orders to IEX when its displayed quote appears to offer the

most favorable price.  This obligation will also apply to portions of large orders, requiring that parts of those orders be routed to IEX even when doing so disrupts their overall execution strategy or pricing—and even when IEX is not actually offering the best executable price in the market. In practice, these requirements will result in a significant volume of orders being routed to IEX, including by Citadel Securities, in a market where millions of options contracts trade each day across the national market system.

5.    When orders are routed to IEX, many will execute on IEX at inferior prices relative to what Citadel Securities would otherwise have obtained for its customers or on its own proprietary orders if the Options Risk Parameter were not in operation.  This outcome is expected because, during the 350-microsecond delay,  IEX's systems may cancel and reprice its market-making members' displayed quotations if market conditions move against them.  As a result, orders in these circumstances will be executed on IEX when doing so benefits the IEX market maker, but not when prices move in the investor's favor.   Other orders may fail to execute altogether on IEX if, during IEX's 350-microsecond delay, the IEX

market maker' displayed quotation is cancelled, and those orders will have to be fulfilled on a different exchange, potentially at a worse price. Once such orders execute, the trades cannot be unwound. The adverse economic effects on Citadel Securities' customers and the company would therefore be permanent.

6. In addition, implementing the Commission's order will require Citadel Securities to modify multiple components of its trading infrastructure. For example, the firm will need to:

   a. update the platform that governs how orders are routed to exchanges, including revising the firm's smart-order-routing logic to incorporate IEX's venue and order types and modifying a large underlying software code base that governs routing decisions;

   b. build and test a new network connection to IEX's data center, which will require testing different order types and risk controls and validating market-access paths;

   c. subscribe to IEX data feeds; and

4

d. perform end-to-end testing in a simulated environment to ensure that routing, risk controls, and compliance systems function correctly.

7.      These projects typically require dedicated work by dozens of employees, including software engineers, network specialists, and others, and require the expenditure of substantial resources in the millions of dollars and hundreds of staff hours.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed this 31st day of October 2025 at Darien, Connecticut.

_____
Stephen Berger