No. 25-13631

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

CITADEL SECURITIES LLC,
*Petitioner*,

v.

U.S. SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

On Petition for Review of a Final Order
of the Securities and Exchange Commission

## UNOPPOSED MOTION OF INVESTORS EXCHANGE LLC
## FOR LEAVE TO INTERVENE

William Savitt
Won S. Shin
Tala A. Doumani
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Proposed Intervenor*
*Investors Exchange LLC*

No. 25-13631, *Citadel Securities LLC* v. *U.S. Securities & Exchange Commission*

## **CERTIFICATE OF INTERESTED PERSON AND CORPORATE DISCLOSURE STATEMENT (CIP)**

Pursuant to Eleventh Circuit Rules 26.1-1 through 26.1-3, Proposed Intervenor Investors Exchange LLC submits the following list of persons and entities with an interest in the outcome of this case as additions to the Certificate of Interested Persons filed with Petitioner Citadel Securities LLC's petition for review on October 17, 2025:

1. Doumani, Tala A., counsel for Proposed Intervenor Investors Exchange LLC

2. IEX Group, Inc., parent company of Proposed Intervenor Investors Exchange LLC

3. Investors Exchange LLC, Proposed Intervenor

4. Savitt, William, counsel for Proposed Intervenor Investors Exchange LLC

5. Shin, Won S., counsel for Proposed Intervenor Investors Exchange LLC

6. Wachtell, Lipton, Rosen & Katz, counsel for Proposed Intervenor Investors Exchange LLC

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Proposed Intervenor Investors Exchange LLC states that it is wholly

No. 25-13631, *Citadel Securities LLC* v. *U.S. Securities & Exchange Commission*

owned by IEX Group, Inc., and no publicly held corporation owns 10% or more of

its stock.

Dated:  October 31, 2025                    /s/ William Savitt
                                            William Savitt

## <u>UNOPPOSED MOTION OF INVESTORS EXCHANGE LLC<br>FOR LEAVE TO INTERVENE</u>

This case is about a securities trading practice known as "latency arbitrage." When a stock price changes, it takes time for that price information to travel between securities exchanges and market participants. Certain high-speed traders leverage technological and resource advantages to learn about a price change fractions of a second before other market participants. They then use that momentary advantage to trade at the stale price microseconds before other market participants can update their prices. The end result? High-speed traders extract profit for themselves at the expense of retail and institutional investors.

Investors Exchange LLC ("IEX") is a securities exchange that has, since its inception, sought to "combat[] latency arbitrage on its exchange." *Citadel Sec. LLC* v. *SEC*, 45 F.4th 27, 31 (D.C. Cir. 2022). IEX routes incoming orders through a hardware "speed bump" and applies a publicly disclosed formula that automatically updates certain types of equity orders during fleeting moments of market price transition. These tools are designed to level the playing field and prevent latency arbitrageurs from picking off orders at stale prices. IEX has repeatedly won regulatory and judicial approval of its approach.

Petitioner Citadel Securities LLC is a leading high-speed trader and—no surprise—dislikes IEX's innovations that limit latency arbitrage advantages. So Citadel has sought to thwart IEX at every turn. Citadel first opposed IEX's

registration as a national securities exchange, which the Securities and Exchange Commission approved in 2016 upon finding that IEX's efforts to combat latency arbitrage would protect investors and the public interest. Citadel then opposed IEX's effort to expand its coverage to reach additional equity order types, which the SEC again approved in the interest of investor protection. Over Citadel's objection, the U.S. Court of Appeals for the District of Columbia Circuit affirmed the SEC's decision to "allow IEX to innovate . . . in a way that offers new opportunities to long-term investors." *Citadel*, 45 F.4th at 32.

With this lawsuit, Citadel continues its campaign to impede IEX and preserve its competitive advantages. At issue here is IEX's proposed launch of a trading platform designed to protect investors from latency arbitrage and encourage more competition in options trading. Repeating its tried-and-rejected arguments, Citadel opposed IEX before the Commission. The SEC approved IEX's proposal over Citadel's objections, and Citadel now petitions for review of that decision. Having already lost decisively in the D.C. Circuit, Citadel has decided to try its luck in this Court instead.

Because IEX has a compelling interest in the options platform approval order that is the subject of the petition for review, it respectfully moves, pursuant to Federal Rule of Appellate Procedure 15(d) and Eleventh Circuit Rule 15-4, for leave to intervene. Citadel and the SEC do not oppose this motion.

# BACKGROUND

## A.    Adverse Selection from Latency Arbitrage

A market participant that offers to buy or sell a security at a given price is a liquidity provider. A participant that accepts a provider's offer is a liquidity taker. When market prices move, "a race condition exists between liquidity providers who want to reprice their . . . liquidity to reflect the changing market prices and the liquidity takers who want to take before those updates can occur." *Order Approving a Proposed Rule Change to Add a New Discretionary Limit Order Type Called D-Limit*, Release No. 34-89686, 85 Fed. Reg. 54,438, 54,442 (Sept. 1, 2020). Each race lasts only the fraction of a second it takes for a pricing update to reach exchanges.

But the race exploits investors and liquidity providers. Some traders engage in predatory trading strategies that see and react to price changes more quickly through costly "low-latency systems, connectivity, and data sources." *Order Approving a Proposed Rule Change, as Modified by Amendment No. 3, To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options*, Release No. 34-103998, 90 Fed. Reg. 45,861, 45,871 (Sept. 23, 2025). Those high-speed traders use their advantages for "latency arbitrage": they take liquidity "at old, stale prices—just before updated prices reach the exchanges—and then turn around and trade those securities at the newly updated [price]." *Citadel*, 45 F.4th at 30-31. For example:

- 3 -

> A stock price may be in the process of changing from $10.00 to $10.01 across different exchanges. A high-speed trader might swoop in and buy at $10.00 from an investor that cannot update its quote fast enough, and then sell at $10.01—the price the investor could have received microseconds later if the arbitrageur had not intervened. That penny that would have gone to the investor goes instead to the arbitrageur.

*Id.* at 31 (quotation marks omitted). Ordinary liquidity providers are thus subject to the risk of "adverse selection" by arbitrageurs "when prices move and they are not able to see or react as fast to th[e] changing conditions." *Order Approving D-Limit*, 85 Fed. Reg. at 54,442. And high-speed traders engaged in latency arbitrage extract profits that otherwise would accrue to long-term retail and institutional investors.[1]

### B.    SEC Approval of IEX's Exchange

IEX uses two innovations that operate together to "counter latency arbitrage" for certain equity orders and thereby protect investors from the risk of orders executing at stale prices. *Application of Investors Exchange LLC for Registration as a National Securities Exchange; Findings, Opinion, and Order of the Commission*, Release No. 34-78101, 81 Fed. Reg. 41,142, 41,150 (June 23, 2016).

First, inbound orders from traders go through a 350-microsecond "speed bump"—about 1/11th the blink of an eye—consisting of a coiled optical fiber. *Id.* at 41,154; *Citadel*, 45 F.4th at 31. Data received by IEX from other exchanges,

---

[1] As the D.C. Circuit explained, traders engaged in latency arbitrage are "extreme short-term investors." *Citadel*, 45 F.4th at 31.

however, do not go through the speed bump. "The upshot is that IEX gets information from other exchanges about imminent changes to the [price] for securities a bit before it receives orders from traders." *Citadel*, 45 F.4th at 31.

Second, IEX uses a publicly disclosed formula, the Crumbling Quote Indicator (the "Indicator"), that detects when market prices are in transition based on publicly available data. When the Indicator is "on" for a particular security, for up to two milliseconds at a time, IEX automatically updates the price of the liquidity provider's order while incoming orders traverse the speed bump.

The time interval involved in these mechanisms is tiny. But the ability of these tools to facilitate market fairness is substantial. As a result, by the time a latency arbitrageur's order reaches IEX, the liquidity provider's offer will no longer be at the "stale" price that the arbitrageur seeks to exploit. *Id.* at 32. IEX thus makes it less likely that long-term investors and non-latency arbitrage participants will "fall prey to latency arbitrage." *Id.*

In 2016, the SEC approved IEX as a national securities exchange. Citadel opposed. But the Commission received many comments in support of IEX, including comments that recognized it could "help counter latency arbitrage." *Order Approving IEX Exchange*, 81 Fed. Reg. at 41,150. The SEC found that IEX's tools are designed to guard against "the possibility of adverse selection [by arbitrageurs] when the market moves to a new" price point, and thus IEX would provide

- 5 -

"protection" against "latency arbitrage by those market participants using very sophisticated latency-sensitive technology, who can rapidly aggregate market data feeds and react faster." *Id.* at 41,155, 41,157. The SEC thus concluded that IEX's exchange rules are designed to protect investors and the public interest. *Id.* at 41,155.

### C.  SEC Approval of the D-Limit Order Type

IEX's service was initially available only to certain equity order types that were not publicly displayed. In 2019, IEX proposed to expand its service to a new order type that could be displayed at the user's choosing. The purpose of this change was to combat latency arbitrage to reduce the risk that orders execute at stale prices, and thereby "encourage its members to submit more displayed limit orders to IEX." *Order Approving D-Limit*, 85 Fed. Reg. at 54,438, 54,440.

Here again, IEX's proposal received broad support. Dozens of market participants said they do not engage in latency arbitrage and are "unable to compete with the small number of firms" that do. *Id.* at 54,446 & n.116. Moreover, "a diverse group of agency brokers, institutional traders, asset managers, and pension funds that collectively manage trillions of dollars' worth of investor assets" confirmed that latency arbitrage "affects their trading and can dissuade them from posting liquidity." *Id.* at 54,448; *see also id.* at 54,451 (noting institutional traders' reluctance to post displayed liquidity because of experience with being "adversely selected by latency arbitrage traders with whom they cannot reasonably compete").

In 2020, the Commission approved IEX's proposal, once again over Citadel's opposition. The SEC concluded that by protecting against adverse selection resulting from latency arbitrage, the proposal "promotes the interest of long term investors in a narrowly tailored manner that will inure to the benefit of displayed markets, leading to increased displayed liquidity from which all market participants ultimately will benefit," and thus protects investors and the public interest. *Id.* at 54,443.

Citadel challenged the SEC order in the D.C. Circuit. The Court unanimously denied the petition for review, concluding that the SEC's approval order was supported by substantial evidence, was reasonable, and was reasonably explained. *Citadel*, 45 F.4th at 38. Along the way, the Court held that it was reasonable for the SEC to reject Citadel's contention that its orders "on behalf of retail investors" did not involve latency arbitrage: because Citadel buys shares for its own account and sells shares to the customer, it could still "employ latency arbitrage tactics [for those orders] as much as any other orders." *Id.* at 34. The Court also upheld the SEC's decisionmaking process, ruling that it independently analyzed "ample data" from IEX and commenters before reasonably concluding that the proposal "benefits all market participants by thwarting latency arbitrage." *Id.* (quotation marks omitted).

The D.C. Circuit thus resoundingly affirmed that IEX may "innovate . . . in a way that offers new opportunities to long-term investors." *Id.* at 32.[2]

### D.     SEC Approval of IEX Options

Earlier this year, IEX proposed rules for a planned options trading platform on its exchange ("IEX Options"). Options trading is heavily dependent on the ability of competing market makers (*i.e.*, liquidity providers) to set prices. IEX proposed to protect liquidity providers from the risk of order execution at stale prices by combating latency arbitrage in options trading as it has done for years in equities trading—with a 350-microsecond delay on incoming orders and an optional feature, the Options Risk Parameter ("ORP"), that will automatically reprice or cancel a liquidity provider's order in moments of price instability. *Order Approving IEX Options*, 90 Fed. Reg. at 45,869 (the "Options Order").

Yet again, IEX's proposal received widespread support. Options market makers commented that IEX Options would address the problem of latency arbitrage, allow "a larger universe of market makers to participate" in the options market, and "add[] new liquidity to the market." *Id.* at 45,872 & n.192, 45,876 & n.246. Pension plans and institutional investors said that IEX Options "will result in

---

[2] As Judge Walker observed at oral argument, by arguing that the SEC should have prevented IEX from innovating to combat latency arbitrage, Citadel was effectively "trying to . . . regulate [its] way into a market victory." Oral Argument at 55:35-56:02, *Citadel Sec. LLC* v. *SEC*, 45 F.4th 27 (D.C. Cir. 2022) (No. 20-1424), *at* https://media.cadc.uscourts.gov/recordings/docs/2021/10/20-1424.mp3.

fairer and more efficient options markets by reducing barriers to entry and encouraging price competition, which will directly benefit investors." *Id.* at 45,876 & n.234 (quotation marks and brackets omitted).[3] United States Senators from both political parties praised the proposal as a private-sector innovation that would enhance competition and benefit investors.[4] And a "large number of individual" investors wrote to make clear that opponents of the proposal "do not necessarily represent their interests." *Id.* at 45,875 & n.231. True to form, Citadel objected.

After carefully reviewing the evidence in the administrative record—including data from IEX and the Options Price Reporting Authority—and considering hundreds of publicly filed comments, the Commission approved IEX's proposal in an exhaustive 89-page ruling issued September 18, 2025. The SEC found that the existence of latency arbitrage in the options market was "uncontroverted" and presented a "legitimate disadvantage" for liquidity providers—namely that "a faster market participant is able to execute against the old 'stale' price before the

---

[3] *See also* Letter from T. Rowe Price at 2 (Sept. 18, 2025) (commenting that by reducing latency arbitrage, IEX Options will "benefit the funds and accounts using listed options that T. Rowe Price manages as a fiduciary on behalf of institutional and retail investors"). The letters cited in this motion are available at the SEC's comment file: https://www.sec.gov/comments/sr-iex-2025-02/sriex202502.htm.

[4] *See* Letter from Sen. Roger Marshall at 1-2 (Aug. 1, 2025) (IEX Options will "encourage competition, empower market participants, and enhance investor outcomes"); Letter from Sen. Mark Warner at 1 (Aug. 22, 2025) (IEX Options "address[es] a market need through competitive private sector innovation" and can deliver "better outcomes for both institutional and retail investors").

market maker can update it." *Id.* at 45,871-72. Indeed, the problem "is especially acute for options compared to equities." *Id.* at 45,875. For example, the greater number of securities listed in the options market creates more opportunities for arbitrageurs to exploit price movements and adversely select against liquidity providers. *Id.* at 45,874-75. And the lack of an over-the-counter market for options means that market makers cannot avoid latency arbitrage through off-exchange venues as they can for equities. *Id.*

The SEC found that IEX Options will address this problem, as it is designed to "avoid stale quotes by updating or cancelling quotes when latency arbitrage conditions are present." *Id.* at 45,871. The proposal will, moreover, "facilitate competition between market makers by allowing market makers with less access to the most latency-sensitive technology to provide more liquidity at competitive prices alongside those market makers that have such access." *Id.* at 45,872. The SEC thus concluded that "the ORP and the access delay that effectuates it are designed" to protect investors and the public interest, and will increase competition and the provision of liquidity in the options market. *Id.* at 45,873, 45,878.

The SEC found Citadel's objections unpersuasive. The Commission rejected Citadel's unfounded accusation that IEX's proposal is an "unprecedented quote-

canceling scheme."[5] As the SEC explained, existing options exchanges have long offered "risk mitigation" that "allow[s] market makers and others to have the exchange automatically cancel their quotes and orders" based on certain triggers and market conditions. *Id.* at 45,868 & n.126.[6] What makes IEX's proposal meaningfully different, the SEC determined, is the use of a delay on inbound orders to permit repricing or cancellation "during periods where latency arbitrage may be present." *Id.* at 45,868. But as the SEC recognized—following the D.C. Circuit's reasoning— "an access delay paired with a mechanism to cancel or reprice orders is not novel for trading on an exchange in general as IEX already operates its equities market with the exact same access delay and an order type (D-Limit order) that can be repriced or cancelled by the Exchange." *Id.*

The SEC also dismissed Citadel's claim that IEX Options would harm retail investors. *Id.* at 45,875 & nn.225-26. As other commenters observed, retail investors do not trade in the "microsecond timeframes during which IEX's protections operate," and IEX's proposal would prevent a "wealth transfer from retail investors to high-frequency traders." *Id.* at 45,875 & nn.228-29, 232-33. The SEC found that

---

[5] Letter from Citadel Securities at 1 (Aug. 12, 2025); Letter from Citadel Securities at 1 (June 23, 2025).

[6] As a commenter observed, Citadel stated in 2020 that high cancellation rates in electronic markets are "'integral to the proper functioning of modern markets, resulting in greater efficiency, narrower bid-ask spreads, and more robust price discovery.'" Letter from Select Vantage at 2 (July 8, 2025).

there was only a 1 in 100,000 chance that a retail order would arrive while the ORP was on, and thus IEX would "make it more difficult for latency sensitive professional traders" but not for retail investors. *Id.* at 45,876.

On October 17, 2025, Citadel filed a petition for review of the Options Order. Instead of returning to the D.C. Circuit, which denied Citadel's previous challenge to an SEC order approving IEX's rules, Citadel filed its petition in this Court.

## ARGUMENT

IEX moves for leave to intervene to protect its substantial interest in the subject of this proceeding, which will address the petition for review challenging the SEC's Options Order. IEX's interest in this proceeding is self-evident and overwhelming: IEX itself proposed the rules that the Options Order approves, and those rules specifically govern whether IEX will be able to offer options trading in a manner consistent with its history of "combating latency arbitrage on its exchange." *Citadel*, 45 F.4th at 31.

IEX is entitled to intervene as a matter of right because it satisfies Federal Rule of Appellate Procedure 15(d) and Federal Rule of Civil Procedure 24(a). Alternatively, IEX meets the standard for permissive intervention.

## I.     IEX Is Entitled to Intervene As a Matter of Right

IEX has satisfied the procedural requirements for intervention by timely filing this motion within 30 days of Citadel's petition for review and providing a "concise statement of [its] interest" and "the grounds for intervention." Fed. R. App. P. 15(d).

IEX's intervention in this case is also consistent with "the policies underlying intervention in the district courts," which courts consider "in deciding whether intervention on appeal should be allowed." *Cameron* v. *EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 276-77 (2022) (citing Fed. R. Civ. P. 24(a)(2)). A court "must permit anyone to intervene who" (1) makes a timely motion and (2) "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest," (3) "unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). IEX meets each requirement.

*Timeliness.* As noted above, this motion is timely because it was filed within 30 days of the petition for review.

*Interest in the subject of the action and impairment of ability to protect that interest.* IEX has a strong interest in the subject of this proceeding—its planned options trading platform and proposed rules to govern that platform, including rules that are designed to increase competition and protect liquidity providers from adverse selection resulting from latency arbitrage. IEX initiated the administrative

- 13 -

proceeding below specifically to seek approval of those proposed rules; the SEC adjudicated that proceeding in IEX's favor; and IEX is in the process of implementing the approved rules. Citadel's petition for review directly implicates IEX's interest by asking this Court to reject the Commission's well-reasoned decision approving the rules governing IEX Options. A ruling granting that relief would impair and impede IEX's ability to protect its interest in offering options trading on its exchange in a manner that combats latency arbitrage and helps market makers to compete. It is "appropriate" for a private party like IEX, which prevailed in federal administrative proceedings, to intervene in a petition for review proceeding to "defend its victory before the [agency]." *Sierra Club, Inc.* v. *EPA*, 358 F.3d 516, 518 (7th Cir. 2004).

That is precisely what happened just a few years ago in circumstances materially indistinguishable from this case. The D.C. Circuit permitted IEX to intervene when Citadel challenged the SEC's approval of IEX rules. *Citadel*, 45 F.4th 27. The same result is warranted here. Indeed, courts of appeals, including this Court, regularly allow intervention by private parties who sought, or are the subject of, agency orders under review. *E.g.*, *Am. Sec. Ass'n* v. *SEC*, 147 F.4th 1264 (11th Cir. 2025) (self-regulatory organizations affected by SEC order); *Autauga Cnty. Emergency Mgmt. Commc'n Dist.* v. *FCC*, 17 F.4th 88, 98 (11th Cir. 2021) (company that assertedly owed fees under challenged order).

- 14 -

*Inadequacy of representation by existing parties.* Finally, the existing parties may not adequately represent IEX's interests in this proceeding. This final requirement "present[s] proposed intervenors with only a minimal challenge." *Berger* v. *N.C. State Conf. of the NAACP*, 597 U.S. 179, 195 (2022). The standard is satisfied, and thus intervention is warranted, if the parties' representation of the proposed intervenor's interest merely "'*may be*' inadequate." *Trbovich* v. *United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (emphasis added).

IEX readily clears this bar because the Commission's status as a party "may be" inadequate to represent IEX's interests in this case. IEX is a private party with a "pecuniary interest" in the approval of its proposed rules for IEX Options that "is qualitatively different from [the SEC's] sovereign interests" as a regulator. *Huff* v. *Comm'r of IRS*, 743 F.3d 790, 800 (11th Cir. 2014). Put in commercial terms, IEX "attract[s] business from liquidity providers" by offering tools to combat latency arbitrage, *Citadel*, 45 F.4th at 31, and the government's participation in this case may be inadequate to represent that interest. *See Georgia* v. *U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1259 (11th Cir. 2002) ("We do not believe that a federal defendant with a primary interest in the management of a resource has interests identical to those of an entity with economic interests in the use of that resource.").

As a self-regulatory organization, IEX also has a strong interest in protecting investors—but that interest is naturally focused on protecting those that use IEX's

- 15 -

own exchange. *See* 15 U.S.C. § 78f(b)(5) (each national securities exchange approved based on "the rules of *the exchange*" (emphasis added)). The Commission's field of view is necessarily wider: it regulates dozens of exchanges, other self-regulatory organizations, and the U.S. securities market more generally—and thus "ha[s] to bear in mind broader public-policy implications." *Berger*, 597 U.S. at 196. Furthermore, as the agency whose decision is challenged in this proceeding, the SEC has an interest in "protect[ing] its decision making process" that IEX does not. *Georgia*, 302 F.3d at 1259.

Thus, IEX's interests are "narrower" than the SEC's, and those differing interests "may not always dictate precisely the same approach to the conduct of the litigation." *Trbovich*, 404 U.S. at 539. While IEX and the Commission may well have "related" or even "closely aligned" interests, they are "not identical." *Berger*, 597 U.S. at 195-96 (quotation marks omitted). IEX's need to protect its own interests favors intervention.

Because IEX satisfies all the requirements of Appellate Rule 15(d) and Civil Rule 24(a)(2), it is entitled to intervene as a matter of right.

## II.    Alternatively, IEX Satisfies the Requirements of Permissive Intervention

IEX also satisfies the less demanding standard for permissive intervention. For the same reasons that IEX has a substantial interest in the subject matter of this proceeding—IEX proposed the rules that the Commission approved and is the very

subject of the SEC's order—its position in this case depends on "common question[s] of law or fact" likely to be raised by the parties. Fed. R. Civ. P. 24(b)(1)(B). Furthermore, intervention by IEX will not "unduly delay or prejudice the adjudication of the . . . rights" of Citadel or the SEC. Fed. R. Civ. P. 24(b)(3). In fact, IEX's intervention will not delay the proceedings at all: the record on appeal has not yet been filed, and no briefing schedule has been set. *See Georgia*, 302 F.3d at 1259-60 (holding that motion to intervene was timely and did not prejudice parties where intervention "did not delay the proceedings and the court had yet to take significant action"). IEX's intervention will neither make the case substantially more complex nor cause procedural delay, as IEX intends to file its brief either at the same time as, or within seven days after, the filing of the SEC's brief, as the Court may order. *See* Fed. R. App. P. 29(a)(6) (amicus brief due no later than seven days after the principal brief of the party being supported).[7]

---

[7] IEX need not show Article III standing separate from meeting the requirements of Rule 24. *Chiles* v. *Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989) ("[A] party seeking to intervene need not demonstrate that he has standing in addition to meeting the requirements of Rule 24 as long as there exists a justiciable case and controversy between the parties already in the lawsuit."). Even if an independent showing of standing were required, it is satisfied where, as here, "a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit." *Crossroads Grassroots Pol'y Strategies* v. *Fed. Election Comm'n*, 788 F.3d 312, 317 (D.C. Cir. 2015).

## CONCLUSION

For the foregoing reasons, the Court should grant IEX's unopposed motion for leave to intervene.

Dated:  October 31, 2025

Respectfully submitted,

/s/ William Savitt
William Savitt
Won S. Shin
Tala A. Doumani
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Proposed Intervenor
Investors Exchange LLC*

- 18 -

## **<u>CERTIFICATE OF COMPLIANCE</u>**

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 27(a)(2)(B) and Federal Rule of Appellate Procedure 32(f), it contains 4,145 words.

This motion complies with the typeface and style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

Dated:  October 31, 2025

/s/ William Savitt
William Savitt

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 31, 2025, I caused the foregoing document to be filed electronically with the Clerk of Court of the United States Court of Appeals for the Eleventh Circuit via the CM/ECF system and that as a result, service was accomplished on all counsel of record by the CM/ECF system.

Dated:  October 31, 2025                                    /s/ William Savitt
                                                                              William Savitt