**No. 25-13631-C**

# United States Court of Appeals for the Eleventh Circuit

———————————————————

CITADEL SECURITIES LLC,

*Petitioner*,

v.

U.S. SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

———————————————————

On Petition for Review of an Order of the
Securities and Exchange Commission

## OPENING BRIEF FOR PETITIONER

Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201-2923
(214) 698-3100

Eugene Scalia
  *Counsel of Record*
Helgi C. Walker
John W. Tienken
Brandon Wolf
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioner*

December 19, 2025

*Citadel Securities LLC v. U.S. Securities & Exchange Commission*,
No. 25-13631-C

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-1, Petitioner Citadel Securities LLC provides the following certificate of interested persons:

1. **Citadel Securities GP LLC**, indirect, ultimate controlling entity of Citadel Securities LLC.

2. **Citadel Securities LLC**, Petitioner.

3. **Doumani, Tala**, counsel for Intervenor Investors Exchange LLC.

4. **Gibson, Dunn & Crutcher LLP**, counsel for Petitioner Citadel Securities LLC.

5. **Investors Exchange LLC**, Intervenor.

6. **Parise, Emily True**, counsel for Respondent Securities and Exchange Commission.

7. **Richman, Brian A.**, counsel for Petitioner Citadel Securities LLC.

*Citadel Securities LLC v. U.S. Securities & Exchange Commission*,
No. 25-13631-C

8. **Savitt, William**, counsel for Intervenor Investors Exchange LLC.

9. **Scalia, Eugene**, counsel for Petitioner Citadel Securities LLC.

10. **Securities and Exchange Commission**, Respondent.

11. **Shin, Won S.**, counsel for Intervenor Investors Exchange LLC.

12. **Tienken, John W.**, counsel for Petitioner Citadel Securities LLC.

13. **Wachtell, Lipton, Rosen & Katz**, counsel for Intervenor Investors Exchange LLC.

14. **Wagner, Brooke**, counsel for Respondent Securities and Exchange Commission.

15. **Walker, Helgi C.**, counsel for Petitioner Citadel Securities LLC.

16. **Wolf, Brandon**, counsel for Petitioner Citadel Securities LLC.

*Citadel Securities LLC v. U.S. Securities & Exchange Commission*,
No. 25-13631-C

No publicly traded company or corporation has an interest in the outcome of the case. Petitioner will file an amended certificate of interested persons should it become aware of a change in interests that would affect the disclosures as required by Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-4.

Dated: December 19, 2025      Respectfully submitted,

           */s/ Eugene Scalia*

Brian A. Richman           Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP    Helgi C. Walker
2001 Ross Avenue, Suite 2100     John W. Tienken
Dallas, TX 75201            Brandon Wolf
(214) 698-3100            GIBSON, DUNN & CRUTCHER LLP
                                1700 M Street, N.W.
                                Washington, D.C. 20036
                                (202) 955-8500
                                escalia@gibsondunn.com

                                *Counsel for Petitioner*
                                *Citadel Securities LLC*

*Citadel Securities LLC v. U.S. Securities & Exchange Commission*,
No. 25-13631-C

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, the undersigned counsel hereby certify that Petitioner Citadel Securities LLC is an indirect subsidiary of Citadel Securities GP LLC.  Counsel further certify that no publicly held corporation has a 10% or greater ownership interest in Citadel Securities GP LLC.

Dated:  December 19, 2025

Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Respectfully submitted,

 /s/ *Eugene Scalia*
Eugene Scalia
Helgi C. Walker
John W. Tienken
Brandon Wolf
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
escalia@gibsondunn.com

*Counsel for Petitioner*
*Citadel Securities LLC*

C-4 of 4

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner respectfully requests oral argument. This case concerns a new securities exchange that will have an undeniable, material impact on the nationwide market for options contracts. The exchange features a mechanism that will purposely delay customers' orders while the exchange—as a service to its members—evaluates the market and determines whether to stand by the offer posted by its member, or instead to withdraw or re-price the offer. Petitioner contends that this mechanism, and other elements of the order under review, violate the securities laws' prohibition on "unfair discrimination" by securities exchanges; other requirements of the securities laws and regulations; and are arbitrary and capricious under the Administrative Procedure Act. Petitioner respectfully submits that oral argument will materially assist the Court in resolving the consequential issues presented by the petition.

# TABLE OF CONTENTS

Page

STATEMENT REGARDING ORAL ARGUMENT ....................................i

TABLE OF CONTENTS ..........................................................................ii

TABLE OF CITATIONS ........................................................................iv

INTRODUCTION .....................................................................................1

JURISDICTIONAL STATEMENT ...........................................................6

STATEMENT OF THE ISSUES...............................................................6

STATEMENT OF THE CASE ..................................................................6

    A.    The Regulatory Framework.......................................................7

    B.    Options Contracts and the Options Market ..........................10

    C.    IEX's Proposal for a New Options Exchange.......................11

    D.    Industry Comments on IEX's Proposal ...............................13

    E.    The Commission's Approval and Reasoning .......................19

SUMMARY OF THE ARGUMENT ........................................................25

STANDARD OF REVIEW......................................................................28

ARGUMENT ..........................................................................................29

I.    The Commission's Order Violates the Exchange Act and Is Arbitrary and Capricious. ...........................................................29

    A.    The IEX Options Rule Violates the Exchange Act Because It Grants an Exclusive Privilege to Insiders and Forces All Others to Trade on Unequal Terms .............30

    B.    The Commission's Decision to Approve This Discriminatory Rule Was Not Reasoned or Evidence-Based ......................................................................................39

        1.    The Commission Approved a "Solution" Without Evidence of a Problem. .........................40

        2.    The Commission's "Narrow Tailoring" and "1 in 100,000" Findings Rest on

Meaningless Metrics That Conceal the
Rule's True Impact...............................................43

    3.    The Commission Ignored Readily Available
Data.......................................................................46

C.    The Commission's Decision to Adopt a Compulsory,
Anti-Competitive Design Instead of Less
Discriminatory Alternatives Was Unreasonable and
Unlawful....................................................................................50

    1.    The Commission Had No Basis In Law Or
Reason To Treat IEX's Cancelable "Pause-
and-Peek" Quotes as "Protected.".......................51

    2.    In Treating IEX Quotes As Protected, The
Commission Arbitrarily Imposed an
Unnecessary Burden on Competition.................56

II.    The Commission's Order Should Be Vacated. ..............................61

CONCLUSION .................................................................................64

# TABLE OF CITATIONS

Page(s)

## Cases

*Am. Pub. Gas Ass'n v. DOE,*
  22 F.4th 1018 (D.C. Cir. 2022)..........................................................45

*\*Am. Sec. Ass'n v. SEC,*
  147 F.4th 1264 (11th Cir. 2025) ..............................................28, 63

*In re Am. Stock Exch. LLC,*
  2007 WL 858743 (SEC Mar. 22, 2007)..............................................52

*Am. Equity Inv. Life Ins. Co. v. SEC,*
  613 F.3d 166 (D.C. Cir. 2010)..........................................................56

*\*Black Warrior Riverkeeper, Inc. v. U.S.*
  *Army Corps of Eng'rs,*
  781 F.3d 1271 (11th Cir. 2015)...................................................61, 62

*BNSF Ry. Co. v. Fed. R.R. Admin.,*
  105 F.4th 691 (5th Cir. 2024) ...........................................................54

*Bus. Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011)..........................................................28

*\*Carlson v. Postal Regul. Comm'n,*
  938 F.3d 337 (D.C. Cir. 2019)....................................................28, 37

*\*Chamber of Com. of U.S. v. SEC,*
  85 F.4th 760 (5th Cir. 2023) .......................................................37, 48

*Chamber of Com. of U.S. v. SEC,*
  412 F.3d 133 (D.C. Cir. 2005).........................................................49

*Citadel Secs. LLC v. SEC,*
  45 F.4th 27 (D.C. Cir. 2022) .................................... 17, 34, 41, 50, 55

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971).........................................................................61

iv

*In re Credit Suisse Secs. (USA) LLC (Light Pool),*
  2016 WL 683553 (SEC Feb. 1, 2016)..............................................9, 53

*Del. Dep't of Nat. Res. & Env't Control v. EPA,*
  785 F.3d 1 (D.C. Cir. 2015)...........................................................60

*Dist. Hosp. Partners, L.P. v. Burwell,*
  786 F.3d 46 (D.C. Cir. 2015)..........................................................47

*Dow Jones & Co. v. Int'l Sec. Exch.,*
  451 F.3d 295 (2d Cir. 2006) ...........................................................10

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009).......................................................................53

*Genuine Parts Co. v. EPA,*
  890 F.3d 304 (D.C. Cir. 2018).........................................................50

*Ins. Mktg. Coal. Ltd. v. FCC,*
  127 F.4th 303 (11th Cir. 2025) .......................................................62

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
  60 F.4th 956 (5th Cir. 2023) ..........................................................39

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983).........................................................................37

*Nat'l Ass'n of Priv. Fund Managers v. SEC,*
  103 F.4th 1097 (5th Cir. 2024) .......................................................41

*Nat'l Fuel Gas Supply Corp. v. FERC,*
  468 F.3d 831 (D.C. Cir. 2006) .............................................39, 40, 43

*Refrigerated Transp. Co. v. ICC,*
  663 F.2d 528 (5th Cir. 1981)...........................................................28

*Safe Extensions, Inc. v. FAA,*
  509 F.3d 593 (D.C. Cir. 2007) .................................................40, 59

*SEC v. Chenery Corp.,*
  332 U.S. 194 (1947).......................................................................28

v

*Silver v. N.Y. Stock Exch.,
  373 U.S. 341 (1963)........................................................ 8, 30, 36

Simmons v. Block,
  782 F.2d 1545 (11th Cir. 1986)........................................................53

*Susquehanna Int'l Grp., LLP v. SEC,
  866 F.3d 442 (D.C. Cir. 2017)........................................................48

*Timpinaro v. SEC,
  2 F.3d 453 (D.C. Cir. 1993)........................................................34

United States v. Dougherty,
  754 F.3d 1353 (11th Cir. 2014)........................................................55

**Statutes**

5 U.S.C. § 706 ........................................................ 28, 61

15 U.S.C.
  § 78f ................................ 7, 25, 26, 27, 20, 30, 33, 35, 56, 60, 61, 62
  § 78k-1 ........................................................ 8
  § 78t ........................................................36
  § 78y........................................................ 6
  § 80b-2 ........................................................28

**Regulations**

17 C.F.R.
  § 242.600........................................................55
  § 242.602........................................................ 9, 36, 51

**Other Authorities**

70 Fed. Reg. 37,376 (June 29, 2005) ........................................................55

74 Fed. Reg. 15,010 (Apr. 2, 2009)........................................................56

74 Fed. Reg. 39,362 (Aug. 6, 2009)........................8, 9, 19, 26, 52, 54, 55

81 Fed. Reg. 23,536 (Apr. 21, 2016) ........................................................22, 38

vi

86 Fed. Reg. 37,376 (July 15, 2021) ........................................................ 22

H.R. Rep. No. 73-1383 (1934) ............................................................. 8, 30

## INTRODUCTION

This case concerns a new options exchange that is designed to favor the exchange's own members when other investors seek to trade with them. The Securities and Exchange Commission approved this exchange despite an express statutory prohibition on exchange rules that are "designed to permit unfair discrimination." And the Commission compounded its error by treating prices quoted on the exchange as "protected" under Commission rules, thereby *requiring* brokers to send customer orders to the exchange—even though prices quoted there may be illusory and withdrawn when in the members' interest to do so. In reaching these conclusions, the Commission gave short shrift to problems and alternatives identified by market participants, and relied on admittedly incomplete data and analogies that the record showed to be misplaced.

The central feature of this new options exchange operated by Investors Exchange ("IEX") is a built-in delay that pauses incoming customer orders while IEX re-evaluates market conditions on behalf of its members: If IEX's computers project that the market will move in a way that *disadvantages* the IEX member who offered to sell (or buy) the option at

1

a given price, IEX cancels the order or adjusts the price while the customer's order is paused. If the market is projected to *favor* the IEX member, the pause is lifted and the customer is allowed to buy (or sell) at the originally displayed price. Because IEX can cancel members' quotes *after* receiving incoming orders, the prices displayed to investors will often be illusory—appearing as the "best" price on a screen but disappearing before a trade can occur, like Lucy yanking the football just as Charlie Brown is about to kick.

No other options exchange permits displayed prices to be withdrawn in this way. On the contrary, a central requirement for exchanges is that their members' offers be "firm"—not subject to revision or withdrawal at the moment of execution. Yet the Commission not only approved IEX's new "pause and peek" feature; it declared these privileged quotes "protected" under Commission rules. The "order protection" rules, which are intended to help *customers*, compel brokers to route customer orders to the exchange that displays the best quoted price. Thus, every broker in the country will be required to route customer orders to IEX's new exchange whenever it appears to offer the best price—even though

2

the offer that attracted these orders may vanish, leaving customers with worse execution as a result.

For all its faults, this mechanism has obvious appeal to prospective IEX members, and to IEX itself. These members are sophisticated "market makers" who continually offer "liquidity"—meaning offers to buy and sell options contracts—on options exchanges. They know that when they post low prices to sell (or high prices to buy) on the IEX exchange, their offers will automatically attract customers. And the market makers know that IEX will protect them—by withdrawing or repricing the offer—if its computers determine that the offer was too advantageous to the customer. That all accrues to the benefit of IEX, since exchanges make money through the fees and other revenues generated by transactions that occur on their platform. By promising to give market makers the exclusive right to "pause and peek" at prices (and denying their counterparties the same right), IEX gives market makers powerful reason to become IEX members and to bring their liquidity—and the attendant revenues—to IEX.

In seeking SEC approval for its new exchange, IEX initially justified this one-sided delay mechanism as a protection against "excessive

3

risk." *See* A61.  Then, when the proposal came under criticism from a range of market participants, IEX began touting the delay as a protection against purported "latency arbitrage"—a practice through which high-speed traders may be able to identify and swiftly react to price movements on one exchange by trading the same security on another exchange before prices there update.  IEX claimed—and the SEC ultimately agreed—that the new options exchange simply replicated a delay mechanism IEX had already deployed against so-called latency arbitrage in the *equities* markets; the SEC reasoned that since it had approved that mechanism in an action ultimately upheld by the D.C. Circuit, a delay mechanism should be permitted for the options markets too.

Agency actions are judged, however, on the law and the record before the agency, not by superficial comparison to materially different circumstances.  In reviewing IEX's equities exchange, the D.C. Circuit found the exchange's repricing option to be available to every participant on equal terms.  And it was crucial, in the D.C. Circuit's view, that the Commission had developed substantial evidence that latency arbitrage existed in the equities market and that, once addressed, execution quality would improve for market participants broadly.

4

None of these elements is present here. The options market operates under a different framework than equities; IEX's new mechanism is an asymmetrical, "members only" advantage for market makers who bring liquidity (and fees and revenues) to IEX; and in this rulemaking, IEX and the Commission stubbornly refused commenters' request that they develop evidence of market behavior and the delay mechanism's anticipated impact akin to the evidence developed in the prior rulemaking.

The Commission's approval order was unreasonable—and unreasonably explained—in other ways, too. The Commission ignored key aspects of the problems inherent in the proposed exchange rule. It failed to respond to comments and the significant issues they raised. It relied on circular logic and bare assertions unsupported by the record. It refused to ascertain the actual impact of the rule being approved. And it failed to justify the rule's deviation from the Commission's own precedent and time-honored principles underlying the Nation's securities laws.

Because the Commission exceeded its statutory authority, disregarded its own precedents, and failed to provide a reasoned, evidence-based explanation for its action, the order must be vacated.

## JURISDICTIONAL STATEMENT

Jurisdiction and venue are proper in this Court under 15 U.S.C. § 78y(a)(1) because the petition challenges a "final order of the [Securities and Exchange] Commission" entered pursuant to the Securities Exchange Act of 1934, and because Citadel Securities LLC "resides or has [its] principal place of business" in Miami, Florida.

The petition is timely under 15 U.S.C. § 78y(a)(1) because it was filed on October 17, 2025—"within sixty days" of the order's entry on September 18, 2025.

## STATEMENT OF THE ISSUES

1.    Whether the Commission's approval of IEX's options rule—which grants IEX's market-making members an exclusive "pause-and-peek" repricing privilege and compels all brokers and investors to trade on those terms—violates the Securities Exchange Act of 1934 and is otherwise arbitrary and capricious under the Administrative Procedure Act.

2.    Whether the Commission's approval Order should be vacated.

## STATEMENT OF THE CASE

Petitioner Citadel Securities LLC is one of the nation's leading broker-dealers in equities and options.  A134.  It executes millions of investor

6

orders each day on behalf of retail and institutional customers, helping ensure those customers receive the best available prices in fast-moving markets. A134. As one of the largest participants in the options market, Citadel Securities—and the investors whose orders it executes—are directly affected by the Commission's approval of IEX's rule establishing a new options-trading platform.

## A.    The Regulatory Framework

In the Securities Exchange Act of 1934, Congress gave the SEC authority to oversee national securities exchanges and to approve exchanges' trading rules. *See* 15 U.S.C. § 78f. The Act requires that exchanges' rules be designed to prevent fraudulent and manipulative acts and practices, promote just and equitable principles of trade, and protect investors and the public interest; exchanges' rules must not be designed to permit unfair discrimination between customers, issuers, brokers, or dealers, *see id.* § 78f(b)(5); and must not impose burdens on competition that are not necessary or appropriate, *see id.* § 78f(b)(8).

Once the SEC approves an exchange's rules, those rules govern all trading on that market.

Congress and the Supreme Court have both described national exchanges as public institutions—not "private clubs"—and have said that accordingly, exchange rules must be for the benefit of investors and the public interest, rather than the exchange's own members. *Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 351 (1963). Congress endeavored to prevent exchanges from favoring insiders or granting select privileges "only in accordance with the interests of their members"; instead, exchanges are to operate as neutral marketplaces, applying the same standards to all participants. H.R. Rep. No. 73-1383, at 15 (1934).

In 1975 Congress amended the Act to reinforce those principles, directing the SEC to promote "fair competition" among exchanges and brokers and to create a unified "national market system" to ensure investors receive the best available prices regardless of where they trade. 15 U.S.C. § 78k-1(a)(1)(C)(ii), (a)(2). For the options market, the Commission implemented that directive through approval of the Options Order Protection and Locked/Crossed Market Plan. 74 Fed. Reg. 39,362 (Aug. 6, 2009) [hereinafter "Options Plan"]. The Options Plan is a binding agreement among all registered options exchanges; its central feature is the "order protection" requirement, which obligates brokers to route a

8

customer order to the market displaying the best available price. Options Plan §§ 2(15), 5.

For a quote to be "protected" in this manner—and subject to preferential routing under the order protection rule—it must (among other things) be a "firm," immediately executable offer to trade at the displayed price. Options Plan §§ 2(15), 5. This requirement is enforced by exchange rules that require exchange members to honor their displayed prices up to the quoted size, and forbid backing away once an executable order arrives. *See* 17 C.F.R. § 242.602(b)(2). The SEC, in turn, has enforced the firm-quote rule through a simple principle: a displayed price must be honored. The Commission brings enforcement actions against firms that impermissibly "back away"—post a price and then refuse to trade at it. *See, e.g.*, *In re Credit Suisse Secs. (USA) LLC (Light Pool)*, 2016 WL 683553, at *5–6 (SEC Feb. 1, 2016).

The firm-quote rule thus ensures that a displayed price is real, and the order-protection rule uses those "firm" prices to determine where brokers must route customer orders. These protections work alongside brokers' duty of best execution, which requires brokers to seek the most favorable terms reasonably available for their customers. *See* A151

9

(90 Fed. Reg. at 45,869/3). When a particular exchange displays the "national best bid or offer," the broker is obligated to route customer trades to that exchange.

### B.    Options Contracts and the Options Market

Options are standardized contracts that give the contract holder the right (but not the obligation) to buy or sell a particular stock at a fixed price before a set expiration date. *See Dow Jones & Co. v. Int'l Sec. Exch.*, 451 F.3d 295, 297 (2d Cir. 2006). For example, an investor might buy an option giving it the right to purchase 100 shares of a company at $50 any time in the next month.

Options are traded on exchanges, each of which lists thousands of option series and continuously displays prices at which they can be bought or sold. A156 (90 Fed. Reg. at 45,874/1). Most displayed prices come from professional trading firms known as market makers—large, sophisticated, and well-capitalized firms that deploy advanced technology to price and manage risk across options series. *See* A64. Market makers quote both bids (prices to buy) and offers (prices to sell), and stand ready to trade at either, providing the liquidity that enables investors' orders to be filled quickly. *See* A63.

Exchanges are for-profit businesses. A129. They earn money through transaction fees that are charged on trades and by selling access to their "market-data" feeds, which display prices and volumes on the exchange. A129. Because many exchanges list the same options, they compete to display the best prices and attract the most order flow. A59. Competition among exchanges—and among brokers seeking best execution for customers on those exchanges—is a defining feature of the national market system.

### C.    IEX's Proposal for a New Options Exchange

In January 2025, Investors Exchange LLC applied for SEC approval to operate IEX Options, a new options exchange for trading standardized options. A1 (90 Fed. Reg. 7205/2). IEX's filing largely mirrored other exchanges' rules, with a significant exception: a 350-microsecond delay applied to all incoming orders, paired with an automated feature IEX dubbed an "Options Risk Parameter," or "ORP," which can cancel or reprice market-maker quotes during the built-in delay. A148 (90 Fed. Reg. at 45,866/1). Although 350 microseconds (about one-third of one-

thousandth of a second) sounds vanishingly small, it is a meaningful interval in modern electronic markets, where offers are made and accepted in microseconds. *See* A66.

During the delay that IEX imposes, its systems monitor the price of the stock that is the subject of the options contract. If the price of the underlying stock moves in a way that would make the options trade less favorable for the IEX market maker, the ORP cancels or adjusts the market maker's quote before the order executes. A144 (90 Fed. Reg. at 45,862/1–2). On every other exchange, once an order arrives, the displayed quote is firm and the trade executes automatically. *Cf.* A68. On IEX, the market maker can have its quote changed or withdrawn while the customer's order is paused. A148 (90 Fed. Reg. at 45,866/1).

This mechanism is used only for IEX's registered market-making members. Brokers and customers cannot use it, even when quoting on IEX, and market makers on other exchanges remain bound by the immediate firm-quote obligation. The SEC has acknowledged that the mechanism "will confer a direct benefit to Market Makers" on IEX and "not [to] other types of market participants." A160 (90 Fed. Reg. at 45,878/1).

In proposing its new options exchange, IEX claimed that this unprecedented mechanism would boost IEX's competitiveness by incentivizing market makers to bring liquidity to the exchange and offer aggressive pricing, since market makers would know that their quotes could be withdrawn or revised if the market moved against them. *See* A57. IEX also understood that when the SEC's "[o]rder [p]rotection" rules apply, protected quotations at the best price trigger compulsory routing; IEX hoped that attracting more members, who priced aggressively, would result in more customers, trades, and fee revenue for IEX. *See* A56.

## D.    Industry Comments on IEX's Proposal

The Commission received extensive comments from exchanges, broker-dealers, and other market participants describing how IEX's proposed rule would affect investors and competition. Commenters explained that the proposal would give IEX's own market-maker members a unique trading advantage, divert order flow to IEX through regulatory mandate rather than competition, and expose investors to unreliable prices and worse executions. Many objected that this was the kind of member-favoring rule the Exchange Act was enacted to prevent, and proffered less intrusive alternatives to IEX's proposal.

13

1. ***The mechanism and its incentive.*** As noted, when a market maker's posted price on an exchange is listed as the best price available, brokers are legally required to route customer orders to that exchange. A62. Each order routed in this way is an opportunity for the exchange to gain revenues through transaction and data fees. A129. IEX itself boasted that, because it would protect its members by canceling or repricing their quotes if the market moved against them as customer orders arrived, market makers would be incentivized to become IEX members and to price more aggressively (A25 (90 Fed. Reg. at 12,891/2))—thereby bringing more business to the exchange.

Commenters objected that these unique features would channel trading to IEX through regulatory compulsion rather than genuine market competition. *See* A59; A68 ("[E]very market participant . . . will be *compelled (by regulatory fiat)* to route orders (or have their orders routed) to Market Maker displayed quotations on IEX.").

2. ***Effects on investors and brokers.*** Commenters warned that this mechanism would harm investors by sending their orders to prices that often could not be executed. *See* A60; A83; A125; *see also* A123. And while the order is paused at IEX, other exchanges continue trading—by

14

the time IEX releases the order, the market price could be worse. A61; A136. Investors thus face slower executions, more cancellations, and higher costs. A62.

Nasdaq explained that brokers "will be forced to route to IEX as if it were a typical firm quote," even when the price is stale or inaccessible, leading to "less timely executions, no executions, and more costs for market participants." A62. MEMX explained that IEX's "maybe quotations" would require firms to move order flow to IEX "to satisfy regulatory obligations," even when the likelihood of execution was low. A59. The New York Stock Exchange cautioned that IEX's approach would hold the national market captive, forcing interaction with IEX first and imposing unnecessary burdens on other exchanges. A79. SIFMA, representing the U.S. securities industry, including broker-dealers and investment managers, stated that the rule would override brokers' best-execution obligations by compelling them to send orders to a venue with quotes that might vanish before execution. A120. And the Committee on Capital Markets Regulation described IEX's proposal as "[f]alse [l]iquidity"— prices that appear available but are withdrawn before investors can trade on them. A125.

15

***3. Broader market consequences and unfair discrimination.***

Many commenters objected that the proposal would distort competition and discriminate in favor of IEX's market-making members. *See* A60; A69; A84. Because those members could post prices they need not honor, IEX would appear to quote better than competitor exchanges even though its prices might not be available. A69; A81. This would shift the national best price toward IEX quotes and away from firm quotes on other exchanges, reducing transparency and impairing price discovery. *See* A56; A84; A89. A few market makers supported the proposal (*see, e.g.*, A71; A74; A139), but commenters said this support illustrated that the rule would benefit only that small subset of market participants, while disadvantaging all others (*see, e.g.*, A136–37).

***4. The unsubstantiated rationale for IEX's new rule, and available alternatives.*** IEX ultimately justified its new options mechanism as a response to "latency arbitrage." In the equities markets, that term refers to high-speed trading strategies that use small differences in data-transmission times among exchanges, under which traders will try to react to price changes and trade the same security on one exchange before corresponding prices update on another. To address that, the

16

Commission in 2020 approved IEX's "D-Limit" order type for trading stocks—a platform-wide delay mechanism in the equities market that was available to all participants on IEX. The D.C. Circuit upheld that decision in *Citadel Securities LLC v. SEC*, 45 F.4th 27 (D.C. Cir. 2022) ("*IEX Equities Rule*"), concluding that the Commission had relied on sufficient empirical evidence to support its finding that latency-arbitrage activity existed in the equities market.

Here, however, IEX invoked "latency arbitrage" only belatedly and in a markedly different sense. The term appeared just once in IEX's original filing but became the centerpiece of its later justification, even though the record contained no data showing that latency arbitrage occurs in the options market. A134. Commenters explained that IEX's expansive use of the term could apply to any trading that occurs while the price of the underlying security is moving—encompassing ordinary market activity rather than any specialized, high-speed strategy—and cautioned that, unlike D-Limit, the options proposal involved a different market and regulatory framework, a members-only repricing mechanism, and no comparable evidentiary record. *See* A134. They cautioned

17

that the rule was thus premised on a problem never shown to exist in the options market. *See* A136.

Commenters also explained that even if latency arbitrage were a genuine concern, IEX's one-sided repricing mechanism was not the only—or appropriate—way to address it. Market makers can address latency risk through competitive investment in faster data feeds, improved order-handling systems, or building the same low-latency infrastructure that competitors use, thereby competing the traditional way—on the quality of their technology instead of through an exchange-imposed repricing advantage. Hudson River Trading—itself a market maker—explained that firms can design systems to update their prices continuously without any exchange-mandated delay. A128–29. The only cost estimate in the record came from a market maker who said that maintaining latency competitiveness had cost it about $5 million annually. A140.

Several commenters also urged the SEC to approve the IEX mechanism for *voluntary* use only, letting brokers and investors decide whether to interact with delayed quotes. *See* A70; A87. That approach, they explained, would let IEX operate its system without forcing brokers

and investors to participate through the order-protection rules. A70; A87.

### E.    The Commission's Approval and Reasoning

The Commission approved IEX's proposal. A144 (90 Fed. Reg. 45,862/1). It found the rule consistent with the Exchange Act and determined that IEX's delayed, cancelable quotations would nonetheless qualify as protected quotations under the Options Plan, thus compelling all market participants to use IEX. A156 (90 Fed. Reg. at 45,874/1).

In approving the rule, the agency reasoned that IEX's options rule, like the D-Limit rule for equities, would mitigate latency-arbitrage trading. In doing so, the Commission applied findings from the equities context, where the D-Limit mechanism was available for all participants and the court found it was supported by data showing that latency-arbitrage activity occurred in that market. The options record contained no comparable evidence, and IEX's ORP applies only to IEX's market-making members, allowing them—but not others—to cancel or reprice displayed quotations during the exchange's intentional delay. *See* A64. The Commission did not address these differences or explain how the equities findings nonetheless supported approval of the IEX Options rule.

19

In downplaying the rule's expected impact, the Commission relied almost entirely on IEX's estimate that the ORP mechanism would affect quotes for "less than 0.001% of the [trading] day," A156 (90 Fed. Reg. at 45,874 n.209), and that retail investors would encounter the ORP less than once in 100,000 orders, A158 (90 Fed. Reg. at 45,876/1). IEX arrived at these figures by estimating the total number of expected ORP activations, and dividing that by the number of microseconds in a trading day. *See* A116 (90 Fed. Reg. at 26,889/2–3). That methodology would suggest hundreds of millions of activations in actively traded options (*see* pp. 44–46, *infra*)—not the "narrow" impact IEX claimed. Commenters explained that IEX's calculation also grossly misrepresented the actual impact IEX would have on trading, because it assumed that incoming orders and ORP activations would occur independent of one another, at intervals spread evenly throughout the day. But in actuality, commenters explained, trading and ORP activations would both cluster around high-volume periods such as the market open, close, and when prices are in transition. *See* A121. The SEC recognized this too, saying that ORP would activate at "important points" when prices are in transition. A160 (90 Fed. Reg. at 45,878/1).

20

For this reason, when it first addressed the IEX proposal, the Commission observed that "[t]he expected frequency with which the ORP would cancel or reprice . . . [a] quote on IEX is unclear and difficult to assess, and the proposal does not yet provide any such estimate." A52 (90 Fed. Reg. at 17,477/1). The Commission thus sought "[a]dditional information about the ORP's operation" from IEX to confirm IEX's claim of minimal impact. A52 (90 Fed. Reg. at 17,477/1). Yet having identified the need for this information and requested that IEX provide it, the Commission proceeded without it when IEX failed to provide the requested data. Instead, the Commission approved the exchange based on IEX estimates that treated orders and activations as random and unrelated occurrences, even though the Commission knew they would typically occur in tandem.

In addition to pressing forward without the data it had asked IEX to provide, the Commission refused to examine the data available from its own Consolidated Audit Trail ("CAT"), which records every options order and identifies retail activity. CAT data would have shown how often investor orders would actually coincide with ORP repricing events.

21

*See* A52 (90 Fed. Reg. at 17,477/1).　Although the Commission has else-where described the CAT as "a critical market oversight tool" that ena-bles detailed analysis of trading behavior, *see* SEC Br. at 15, 19, *Am. Sec. Ass'n v. SEC*, No. 23-13396 (11th Cir. Apr. 15, 2024), it did not use that tool here.　Instead, it characterized such data as "misleading" and relied on IEX's admittedly inapposite estimate.　A164 (90 Fed. Reg. at 45,882/1).

The Commission also defended its approval by likening the ORP to ordinary exchange risk controls such as "purge ports" and "[k]ill [s]witche[s]."　A154; A165 (90 Fed. Reg. at 45,872/2, 45,883/1).　According to the Commission, those tools—like the ORP—allow market makers to manage risk during rapidly changing market conditions.　Every options exchange, including IEX itself, already provides such ex ante risk-man-agement tools to cancel orders or halt trading in the event of a systems failure or extreme volatility.　*See, e.g.*, 86 Fed. Reg. 37,376, 37,378/1 (July 15, 2021) (purge ports "only available for purging" orders and unrelated to pricing); 81 Fed. Reg. 23,536, 23,539/2 (Apr. 21, 2016) (kill-switch pro-tections "a last line of defense" for "severe trading problem[s]").　Those safeguards prevent errors before execution and never relieve firms of

22

their obligation to honor displayed quotes. The ORP, by contrast, operates at the moment of execution in conjunction with two other features the Commission's analogy ignores: the "pause" placed on the incoming order, and the "peek" by which IEX determines whether to cancel the quote or instead to re-price or honor it—options that a "kill switch" and "purge port" never present.

With respect to market makers' obligation to provide firm quotes from which they may not "back away," the Commission reasoned that the new exchange presented no problem because it is IEX's system—not the market maker itself—that cancels or reprices the quote during the delay period. A153 (90 Fed. Reg. at 45,871/3). Commenters challenged the Commission's supposition that an act forbidden to a market maker is permissible by an exchange acting at its member's behest; commenters explained that IEX's automation of quote withdrawals while incoming orders are intentionally delayed simply performs, on a larger and faster scale, what the firm-quote rule forbids a market maker from doing itself. *See* A63–64; A82–83. The Commission never addressed that objection or explained why conduct that would constitute unlawful "backing away" becomes permissible when executed by exchange software.

23

Finally, the Order did not meaningfully consider less intrusive alternatives to the rule proposed by IEX. Multiple commenters urged that IEX could implement its mechanism voluntarily—without "protected quote" status—allowing brokers and investors to decide whether to trade on those terms. *See* A70; A131. The Commission never engaged with that alternative. It made no finding that compulsory routing was needed to protect investors, ensure fair competition, or accomplish any other statutory goal. Nor did it identify any legal or technical obstacle to a voluntary rollout.

The Commission also did not dispute commenters' explanation that market makers concerned about so-called latency arbitrage could mitigate that risk the same way other firms already have—by upgrading their own systems and infrastructure. Instead, the Commission reasoned that IEX's discriminatory mechanism was justified because certain market makers were "unable or unwilling" to make those investments. A157 (90 Fed. Reg. at 45,875/2). The only cost estimate in the record suggested that such upgrades could be accomplished with annual investments as low as $5 million, A140, and the Commission never found that market makers were in fact "unable" to make such investments nor explained

why firms' stated "unwilling[ness]" to make technology investments would justify giving them a discriminatory trading preference that conflicted with longstanding Commission practices and requirements.

## SUMMARY OF THE ARGUMENT

**I. A.** The Commission's approval of the IEX Options Rule is irreconcilable with the Exchange Act and the Administrative Procedure Act.

**1.** Section 6(b)(5) of the Exchange Act forbids exchange rules "designed to permit unfair discrimination." The Commission flouted that mandate. It approved a rule that explicitly gives IEX's own market-making members a unique trading privilege—a pause-and-peek repricing mechanism that allows them to cancel or reprice their quotes while incoming orders are intentionally paused—and then compels all other brokers and investors to send their trades there, even if not in their economic interests to do so. That one-sided, systematic advantage for IEX insiders is a deliberate feature of IEX's options exchange, not a bug. The result is a market where IEX's insiders can avoid losing trades while everyone else must play by ordinary rules, and investors lose out.

**2**. The Commission compounded those substantive errors with a failure of reasoned analysis. Having approved a rule that favors IEX's

25

insiders, it justified that decision with assumptions it never tested, refusing to consider available data. The Commission claimed the rule was necessary to prevent "latency arbitrage," but the record contains no data showing that latency arbitrage exists in the options market. The Commission relied on meaningless statistics—elapsed-time percentages and "one-in-100,000" probabilities—that obscure rather than measure the rule's true impact. And it ignored the very data that could have validated those assumptions, including the Consolidated Audit Trail and aggregate data that it had explicitly requested (but never received) from IEX. The agency even dismissed evidence of harm as proof that the rule "works." The APA does not tolerate reasoning by assumption, analogy, and circular logic.

**B.** In making IEX's discriminatory platform mandatory for all customer orders, the agency exceeded its statutory authority and imposed burdens on competition that are neither necessary nor appropriate under Section 6(b)(8).

**1.** The governing regulations draw a bright line: only firm, immediately executable quotes may be "protected." Options Plan § 2(15). IEX's

26

quotes are not—they are delayed, re-priceable, and non-firm by definition. The Commission's decision cannot be squared with decades of precedent, including the agency's own enforcement actions against firms that withdrew displayed quotes at the moment of execution. What was once unlawful "backing away" is now sanctioned for an entire exchange.

**2.** Section 6(b)(8) of the Exchange Act bans exchange rules that restrain competition, except where necessary to advance the Act's purposes. The Order violates that proscription by forcing brokers to route customer trades to IEX's privileged quotes even when those trades will receive *worse* execution, turning on its head the duty of best execution integral to competition among brokers and exchanges alike. The agency never identified a market failure, investor benefit, or other reason why voluntary use of IEX's mechanism would not suffice. Nor did it assess the intensely competitive baseline of the options market before declaring new regulation "necessary." The result is a system in which order flow is based on legal compulsion, not price or performance.

**II.** Because the Commission's Order is contrary to the Exchange Act and the APA and the new IEX exchange is not yet in operation, the Court should vacate the Order in its entirety.

27

## STANDARD OF REVIEW

Under the APA, this Court "shall . . . hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(C), (A).

This Court's review is "searching and careful," with questions of law reviewed de novo. *Refrigerated Transp. Co. v. ICC*, 663 F.2d 528, 530 (5th Cir. 1981). The Court ensures that the Commission's decisions are "reasonable and reasonably explained," *Am. Sec. Ass'n, Citadel Secs. LLC v. SEC*, 147 F.4th 1264, 1273 (11th Cir. 2025) (citation omitted), that the Commission responded to the "significant points" raised by the public comments while explaining "why [it] reacted to them as it did," *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019), and that the Commission fulfills its duty to account for rules' effects on "efficiency, competition, and capital formation," 15 U.S.C. § 80b-2(c); *see Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011). In conducting its review, the Court must "judge the propriety" of the Commission's order "solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

**ARGUMENT**

## I.    The Commission's Order Violates the Exchange Act and Is Arbitrary and Capricious.

The Commission approved an exchange rule that gives IEX's own market-making members a unique, at-execution repricing privilege and then forces all other brokers and investors to trade on those terms. That structure is the very definition of "unfair discrimination," which Section 6(b)(5) prohibits.

In concluding otherwise, the Commission accepted IEX's claim that the mechanism was needed to address "latency arbitrage," even though the record contains no evidence of such timing-exploitation in the options markets and IEX was expanding the term to encompass ordinary trading driven by movements in the underlying stock. And it relied on meaning-less microsecond-based statistics—including IEX's "0.001% of the trading day" and "1 in 100,000 orders" estimates—that commenters showed rested on a logical fallacy and did not measure real-world impact. IEX's own data implied hundreds of millions of ORP activations per day, yet the Commission never obtained the aggregate data needed to evaluate how often those activations would collide with investor orders.

29

The Commission also dismissed a straightforward, less discriminatory alternative: allowing IEX to offer its mechanism voluntarily, without "protected quote" status. And rather than require market makers to manage latency risk the way others already do—through competitive investment in technology—the Commission justified the rule by stating that some firms "may have been . . . unable" to make those upgrades, "or" were merely "unwilling" to do so.

Approving a discriminatory rule based on no evidence, misleading metrics, and an unwilling-to-invest rationale is neither permitted by the Exchange Act nor consistent with the APA.

### A.    The IEX Options Rule Violates the Exchange Act Because It Grants an Exclusive Privilege to Insiders and Forces All Others to Trade on Unequal Terms

Congress enacted the Exchange Act on a fundamental premise: the Nation's securities exchanges are not "private clubs." *Silver*, 373 U.S. at 353. Rather, exchanges are "public institutions," created to serve investors and the public interest, not their own members. H.R. Rep. No. 73-1383, at 15 (1934). Section 6(b)(5) enforces that principle by expressly forbidding any rule "designed to permit unfair discrimination between customers, issuers, brokers, or dealers." 15 U.S.C. § 78f(b)(5).

The Order under review here violates that provision by approving a rule that gives IEX's market-making members a built-in advantage, and compelling everyone else to trade on those terms.

IEX's rule builds a pause-and-peek delay into every trade.  When an investor sends an order, IEX holds it for 350 microseconds—a span that may seem vanishingly short, but in today's electronic markets is long enough for sophisticated systems to detect where the price of the option is about to move next.  During that pause, IEX evaluates—on behalf of its members—whether the price of the stock underlying the option has moved in a way that makes the member's quoted option price less favorable for the member.  If so, IEX cancels or reprices the member's quote before executing the investor's order.  A148 (90 Fed. Reg. at 45,866/1–2).  No one else gets that choice—not even other types of market participants that submit quotes to IEX, such as retail and institutional investors.  *See* A160 (90 Fed. Reg. at 45,878/1).  Investors and brokers must trade on the terms they offered when the order was sent, bound by prices that IEX can change at will.

As IEX itself explained, the ORP's "instability calculat[or]" triggers when it "identifies an imminent adverse price change" (A148 (90 Fed.

31

Reg. at 45,866/2))—adverse to the market maker, that is.  The mechanism thus tilts the market by design: it springs into action only when conditions threaten the market maker's position, pausing execution to protect insiders while offering no reciprocal protection when prices move against investors.

IEX's exclusive repricing privilege makes trading on IEX like playing poker at a table where the house hits pause mid-hand.  *Cf.* A148 (90 Fed. Reg. at 45,866/1–2).  During the pause, the house peeks at the next card—checking to see how the market has moved—before deciding whether the house's favored players will stay in or fold.  *Cf. id*.  If the next card helps the favored players, they play and take the pot.  *Cf. id*. If it hurts them, the house folds their hand immediately, canceling their quote before the investor's order can be played.  *Cf. id*.  Everyone else at the table has to keep their cards face-down, unable to react, stuck with whatever bet they originally made.  *Cf.* A160 (90 Fed. Reg. at 45,878/1). This is a rigged game, and investors are given no choice about whether to play in it—as the order protection rules require brokers to route their orders to IEX whenever its prices look best.  *See* A56.

That combination—exclusive benefit for insiders; compulsory participation for everyone else—is exactly what Section 6(b)(5) forbids. And it confers immense commercial value on IEX's market-making members (and hence on IEX, which seeks their business). *See* A81. Citadel explained in the rulemaking that such structural repricing advantages are worth tens of millions of dollars to market makers per exchange each year—a figure neither IEX nor the Commission disputed. A84. The Commission offered no analysis of the value of the privilege here, even though that value—measured in the tens of millions of dollars annually and undisputed in the record—is a measure of the rule's discriminatory effect: a privilege that transfers millions of dollars from investors to one class of insiders cannot be "narrowly-tailored" or insignificant. *See* A130. Rather, the Exchange Act forbids unfair discrimination precisely because even small structural advantages given only to certain market participants in a highly competitive market produce enormous financial consequences.

The Exchange Act allows exchanges to "innovate," no doubt (A161 (90 Fed. Reg. at 45,879/2))—but that innovation must always be con-

sistent with the statutory bar on unfair discrimination. Thus, in *Timpinaro v. SEC*, 2 F.3d 453 (D.C. Cir. 1993), the court upheld a NASDAQ rule that allowed participants to waive a 15-second protection period. The rule was not unfairly discriminatory, the court explained, because *all* market participants were free to accept or decline the 15-second period as they chose: "It would be peculiar indeed to force upon the market maker and its customer . . . a grace period that neither party wants." *Id.* at 457.

Similarly, in *IEX Equities Rule*, the court upheld IEX's "D-Limit" order because the mechanism was equally available to everyone. "*All* market participants" could use the D-Limit order type on the same terms. *See* 45 F.4th at 34 (emphasis added).

*Timpinaro* and *IEX Equities Rule* thus both involved rules available to all participants—indeed, in defending D-Limit, the Commission stressed that the rule avoided discrimination concerns precisely because it "is available to all market participants and does not provide such a special benefit" to market makers. SEC Br. at 54 n.12, *IEX Equities Rule*, No. 20-1424 (Apr. 5, 2021). The IEX Options Rule is fundamentally different—and unfairly discriminatory. The ORP is available only to IEX's

34

registered market-making members.  No customer, no retail investor, no institutional trader, and no non-market-making broker can use it.  Even a customer who posts liquidity on IEX cannot obtain the same protection or the same ability to withdraw or reprice a displayed quote.

The Commission defended this discriminatory mechanism with an artifice that merely highlights the rule's incompatibility with Section 6(b)(5)—and the arbitrariness of the Commission's action.  The Options Rule, it insisted, "will not offer a 'last look' to a Market Maker," because the market maker "has no ability to influence the operation of the [ORP]"; IEX's system, not the trader, "will effectuate the ORP without exercising subjective judgment."  A153 (90 Fed. Reg. at 45,871/3).  In other words, the Commission reasoned that the rule is fair because the cancellation is by IEX—acting as its insiders' agent—not by the insiders themselves.

That is a distinction without a difference.  The salient fact is that when it suits members' interests, their quotes are cancelled or repriced at the moment of execution; it is not relevant who undertakes that action on their behalf.  Indeed, this distinction only underscores how the new

exchange impermissibly serves as a "private clu[b]" for its members' benefit, *Silver*, 373 U.S. at 353, rather than a neutral venue for all market participants.

In any other context, the Commission has long treated actions by an agent or intermediary acting at a party's behest as attributable to that party. Indeed, Section 20(b) of the Exchange Act expressly prohibits any person from doing "through or by means of any other person" what it could not lawfully do itself. 15 U.S.C. § 78t(b). Yet the Commission spurned that principle here, asserting that because the exchange's computer "pulls the bid," the market maker gains no undue advantage. That rationale inverts both the statute's text and settled principles of attribution. When the exchange performs the act as a service to its members, the discrimination is not cured—it is institutionalized.

Commenters made precisely this point in the rulemaking, explaining that IEX's automation of quote withdrawals merely mechanized backing away on a market-wide scale. *See* A63–64; A82–83; *see also* 17 C.F.R. § 242.602(b) (requiring exchanges to enforce a firm-quote rule obligating brokers and dealers displaying a quotation to execute orders at the quoted price up to the quoted size and prohibiting "backing away" once

an executable order arrives); § I.B.1, *infra* at 40.  Yet the Commission never addressed that "challenge" to one of the "fundamental premise[s]" of its approval, thus violating its obligation to "consider all relevant factors raised by public comments." *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 774, 776 (5th Cir. 2023).  Nor did the Commission offer its reasons "why" backing away is permissible when carried out by an exchange's algorithm on a market maker's behalf, yet forbidden when done by a market participant alone.  *Id.*  At a minimum, the Commission needed to explain how this "major issue" was "ventilated" and why the Commission nonetheless approved the exchange.  *Carlson*, 938 F.3d at 344.  But the Commission offered nothing.  That lack of a "satisfactory explanation" was arbitrary and capricious.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Commission also sought to justify IEX's repricing privilege by likening it to ordinary exchange risk controls—purge ports, kill switches, and similar tools used to limit exposure in extreme circumstances.  A154 (90 Fed. Reg. at 45,872/2–3).  That comparison collapses on inspection.  Traditional risk tools are ex ante safeguards designed to prevent catastrophic error or system failure: they cancel orders without regard to

37

whether a particular quote is good or bad for the firm. A purge port allows a firm to cancel all outstanding orders in the event of a malfunction or sudden volatility spike. A152 (90 Fed. Reg. at 45,870/2–3). A kill switch halts trading when pre-set risk thresholds are breached. 81 Fed. Reg. at 23,539. These tools are, by the Commission's own description, a "last line of defense" for "severe trading problems," not part of ordinary execution. *Id*. And they cancel quotes; they do not permit quote-by-quote repricing to maximize profitability.

The ORP is nothing like these safeguards. Rather than preventing errors, it operates at the moment of execution, giving IEX's market makers the opportunity to withdraw or reprice their displayed quotes based on movements in the underlying stock. The only "risk" it manages is the risk that a displayed quote has become too favorable to the investor, not that it threatens market integrity.

And the ORP goes well beyond cancellation. Before canceling anything, IEX pauses an incoming order, evaluates market conditions, and then decides whether its insider's quote should be canceled, repriced, or honored—the choice that most benefits the member. The Commission focused narrowly on the fact that both systems may result in canceled

38

orders, while ignoring the features that set the ORP apart and were the focus of commenters' concerns. Agencies do not have "license" to "duck[] the hard questions." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023).

By conflating the ORP with legitimate risk tools, the Commission failed to confront the ORP's true character: a systematic, members-only repricing mechanism. And because this inapt comparison was a central basis for approval, the error alone warrants vacatur. *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841–43 (D.C. Cir. 2006).

### B.  The Commission's Decision to Approve This Discriminatory Rule Was Not Reasoned or Evidence-Based

The Commission's substantive error—approving an unfairly discriminatory rule—was the product of Commission errors in process and reasoning. The Commission justified its action with assumptions it never tested and data it never gathered. It treated a speculative problem— "latency arbitrage" in options trading—as a proven fact; relied on meaningless statistics that obscure the rule's real impact; ignored more meaningful data that was readily available; and dismissed contradictory evidence as confirmation somehow that the rule "works." Those defects—

unsupported premise, missing evidence, and pervasive illogic—independently render the Order arbitrary, capricious, and contrary to law.

### 1.    The Commission Approved a "Solution" Without Evidence of a Problem.

The Commission justified IEX's exclusive repricing privilege as necessary to protect IEX's market makers from "latency arbitrage" in options trading.  A154 (90 Fed. Reg. at 45,872).  But it never established that latency arbitrage exists in the options market at all.  No data in the record identifies such trading, measures its frequency, or shows that it has ever harmed liquidity providers or investors.  The agency simply assumed the problem was genuine, because IEX (belatedly) said so.

That assumption cannot support a federal rule—much less a rule that discriminates on its face in violation of clear statutory language. When an agency claims a rule is needed to address a problem, it must demonstrate that the problem actually exists.  *See Nat'l Fuel*, 468 F.3d at 841–43 (vacating rule adopted to solve an "industry problem" the record did not show existed).  Here, "[b]y contrast, the [Commission] offered no evidence whatsoever," *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 606 (D.C. Cir. 2007), and thus failed to provide substantial evidence for its action.

IEX's own filings confirm this evidentiary gap. Its initial proposal mentioned "latency arbitrage" only once—on the penultimate page—and offered no analysis or data. A22 (90 Fed. Reg. at 77,226/1). Only after widespread opposition to its proposal from exchanges, brokers, and others did IEX begin invoking "latency arbitrage"—61 times in a single response letter (*see* A134)—still without quantifying the alleged conduct or showing that it occurs in options trading at all. The sudden shift, unsupported by evidence, exposes "latency arbitrage" as a pretext for seeking favorable regulatory treatment, not a proven market failure so serious as to warrant discriminatory regulatory intervention. *See Nat'l Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1113 (5th Cir. 2024) (rejecting "pretextual" justifications offered after the fact).

The contrast with *IEX Equities Rule* is telling. There, it was crucial to the court's decision that the Commission approved IEX's equities delay only after assembling what the court found to be "ample data" showing that latency arbitrage was real and measurable in the equity market. 45 F.4th at 33–34; *see also id.* at 33. The "substantial evidence" collected by the Commission, the court said, "*resolves* [the] arbitrary-and-capricious claim." *Id.* (emphasis added).

41

Nothing comparable exists here. The Commission gathered no data, conducted no study, and cited no concrete evidence demonstrating that options markets suffer from the same phenomenon. The Commission did not even account for technological changes since 2019, the year the rule at issue in *IEX Equities Rule* was first proposed. *See* A66; A85. The Commission proceeded as if it could rely on the *IEX Equities Rule* precedent without developing the evidence that had been essential to the court's decision.

Compounding the problem, what IEX characterizes as latency arbitrage in the options market bears no resemblance to the phenomenon IEX described in the equities context. There, IEX had defined latency arbitrage as the exploitation of fleeting price discrepancies in the same security across different equities exchanges—a timing gap between identical instruments on competitor exchanges. In this rulemaking, IEX used the same label to describe something entirely different: ordinary price movement in one product (the underlying stock) that naturally affects the prices of a different product (the option). As commenters noted, reacting swiftly to that price change is not latency arbitrage at all; it is simply how options markets function. A134 n.15. The ORP thus targets traders

reacting to genuine changes in the underlying stock's value, not traders reacting to short-term price differences for the same security across competing venues.  IEX's shift in definition underscores both the absence of any real latency-arbitrage problem in options trading and the need for options-specific evidence, which the Commission never obtained.

By approving a sweeping new mechanism to "protect" against an unproven threat, the Commission "profess[ed] that an order ameliorates a real industry problem but then cit[ed] no evidence demonstrating that there is in fact an industry problem."  *Nat'l Fuel Gas*, 468 F.3d at 843.  That is not reasoned decisionmaking under the APA—and it cannot justify a discriminatory privilege under the Exchange Act.

### 2. The Commission's "Narrow Tailoring" and "1 in 100,000" Findings Rest on Meaningless Metrics That Conceal the Rule's True Impact.

After assuming a problem that it never proved, the Commission made matters worse by artificially minimizing the rule's effect.  It declared IEX's mechanism "narrowly tailored" because it would operate for "less than 0.001% of the [trading] day"; that figure translates, the Commission said, to affecting only "1 in 100,000" investor orders.  A156 (90 Fed. Reg. at 45,874 n.209); A158 (90 Fed. Reg. at 45876/1–2); *see* A121.

43

Those numbers formed the backbone of every statutory finding, appearing in nearly every section of the Order (*see* A152; A156; A158; A163 (90 Fed. Reg. at 45,870/2, 45,874 n.209, 45,876 n.237, 45,881/3))—but they are meaningless in a market measured in microseconds (*see* A121).

First, the 0.001-percent figure is not even representative of how the rule functions.  The figure is an average across approximately 1.5 million options series, many of which are rarely traded.  But IEX's own data show that for the most active products—such as SPY, the most heavily traded option in the market—the mechanism would trigger 0.2 percent of the trading day, two hundred times higher than the Commission's headline number.  A116 (90 Fed. Reg. at 26,889/3).  At the microsecond granularity IEX chose (more than 23 billion microseconds per day), 0.2 percent would correspond to hundreds of millions of ORP activations per day across the thousands of SPY options series alone, underscoring how little the Commission's percentages reveal about the real frequency or concentration of cancellations, particularly where IEX derived those percentages by dividing the number of ORP activations by the number of microseconds in a trading day while declining to disclose the activation count itself.

Second, the Commission's math rests on a basic error. It treated the ORP's activations as though they would be randomly scattered across the 23 billion microseconds in a trading day, making it seem sensible to average them into a "one-in-100,000" rate—a figure that simply restates the same flawed 0.001% estimate in different terms. But the ORP is not random; it is designed to trigger when the price of the underlying stock moves—during the busiest and most volatile moments of the trading day. Averaging those clustered bursts of cancellations over an entire day assumes an even distribution that does not exist. By resting on the false premise that ORP activations would occur randomly—rather than at specific moments that coincide with intense trading activity—the Commission's analysis turned concentrated, high-impact interventions into a statistical illusion of harmlessness. *See, e.g., Am. Pub. Gas Ass'n v. DOE*, 22 F.4th 1018, 1027–28 (D.C. Cir. 2022) (agency acted arbitrarily and capriciously by constructing an economic model based on "[r]andom assignment" that ignored the economic "reality" grounded in "the purchaser's rational decision making").

These mistakes go to the heart of the agency's reasoning. The Commission's "narrow tailoring" claim rests on the false assumption that the

45

ORP behaves randomly, when by design it fires at the very times investors are most active—and, for actively traded products, does so hundreds of millions of times each trading day. The result is a statistical sleight-of-hand that hides the real harm. It is like saying Lucy hardly ever pulls away the football, while ignoring that she pulls it away precisely at the moment Charlie Brown tries to kick, and that the "kick" occurs hundreds of millions of times each day.

No regulator can reasonably call that "narrowly tailored." The Commission's reliance on numbers it knew were unrepresentative, and on assumptions that are mathematically and economically false, renders its findings arbitrary, misleading, and unlawful.

### 3. The Commission Ignored Readily Available Data.

In electing to rely on the faux data provided by IEX, the Commission purposely declined to examine far more relevant data that the Commission itself collects to inform its regulatory decisionmaking. Charles Schwab, the New York Stock Exchange, Nasdaq, SIFMA, and other commenters urged the Commission to examine data from the CAT, which captures every options order across all exchanges and whether it originated from a retail customer. A136. That database gave the Commission

46

a ready-made means to test its own unsubstantiated assumptions: how often the ORP would trigger, how many quotes it would cancel or reprice, and how those activations would coincide with periods of retail investor activity in particular. *See* A52 (90 Fed. Reg. at 17,477/1). Yet the Commission never looked. It neither analyzed the CAT data nor required IEX to estimate the total number of activations per day—even though it initially acknowledged that such data were essential to assess whether the ORP was "narrowly tailored." *See* A52 (90 Fed. Reg. at 17,477/1).

This omission is especially puzzling because the Commission has repeatedly described the CAT—including to this Court—as "a critical market oversight tool" capable of "significantly improv[ing] [its] regulatory efforts" through detailed market-structure analysis. *See* SEC Br. 15, 19, *Am. Sec. Ass'n v. SEC*, No. 23-13396 (11th Cir. Apr. 15, 2024). Having held up the CAT as indispensable, the Commission cannot plausibly plead ignorance of its value here. Choosing not to consult the very dataset that could confirm or refute its assumptions is the definition of arbitrary decision-making. *See Dist. Hosp. Partners, L.P. v. Burwell*, 786

47

F.3d 46, 57 (D.C. Cir. 2015) (agency acted arbitrarily by failing to examine data that "could reveal . . . that the figures being used" were erroneous).

The same is true of the additional data that IEX itself could have provided. In its Order Instituting Proceedings, the Commission expressly requested figures showing the "expected frequency" of ORP activations and the "volume of incoming orders affected." A52 (90 Fed. Reg. at 17,478/1); A164 (90 Fed. Reg. at 45,882/1). Several commenters noted that IEX necessarily had access to the aggregate number of ORP activations that would occur per day because that figure is an input required to generate IEX's own time-based percentages. Yet IEX never produced that information and instead offered only elapsed-time percentages. The Commission did not press for the underlying data or attempt to verify the assumptions behind those percentages; it simply "accept[ed]" the proponent's assertions at face value. *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017). An agency that "ask[s] for—and then ignore[s]—already-existing data it did not want to consider" acts arbitrarily and capriciously. *Chamber of Com.*, 85 F.4th at 776.

48

Worse, the Commission tried to explain away the absence of this data by declaring that knowing the number of quotes that would be cancelled per day and the impact on investors' ability to transact would be "misleading" because "higher impacted volume and lower fill rates" would merely show the ORP was "working exactly as intended." A164 (90 Fed. Reg. at 45,882/1). That reasoning is circular: if few trades are affected, the rule is harmless; if many trades are affected, the rule is effective. Either way, the outcome is pre-ordained. The APA demands that the Commission "do what it can to apprise itself—and hence the public and Congress—of the economic consequences of a proposed regulation." *Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005). Here, it did the opposite: it *avoided* the evidence that would have revealed those consequences, reasoning that whatever its impact, the rule was good.

By refusing to analyze readily available data from CAT and IEX, the Commission abdicated its responsibility to base its conclusions on substantial evidence. And the absence of such evidence is especially striking because it was a principal basis on which the D-Limit order was upheld: In that proceeding, the Commission grounded its approval in

49

empirical analysis that the court found demonstrated both the existence of latency arbitrage in equities and the narrow, data-driven operation of the D-Limit order type. This "substantial evidence . . . resolve[d] [the] arbitrary-and-capricious claim." *IEX Equities Rule*, 45 F.4th at 33. But here, the agency turned a blind eye to the very data that could validate or refute its assumptions—including data it had expressly requested. That is not reasoned analysis; the APA requires more. *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (agency acted arbitrarily and capriciously when it "ignore[d] evidence that undercut[] its judgment" and "minimize[d] such evidence without adequate explanation").

## C. The Commission's Decision to Adopt a Compulsory, Anti-Competitive Design Instead of Less Discriminatory Alternatives Was Unreasonable and Unlawful.

After granting IEX's insiders a discriminatory trading privilege without any record evidence, the Commission then forced everyone else to participate in IEX's one-sided system. In practice, that means that whenever IEX appears to display the best price, brokers must route customer orders to IEX. Even when their own experience and order-flow data indicate that the IEX price is unlikely to execute because of the ORP, brokers are forbidden to route to any of the other eighteen exchanges that

50

they expect will offer more reliable execution. This compelled-routing regime fundamentally alters competition by allowing IEX to attract order flow based on quotes its members may never be required to honor.

That result follows directly from the Commission's decision to confer "protected" status on IEX's vanishing quotes—quotes that, by definition, are not firm—and to bind brokers to those quotes for routing purposes. This choice exceeded the Commission's legal authority and imposed burdens on competition that were neither appropriate under the Exchange Act, nor necessary in light of alternatives suggested by commenters.

> **1.      The Commission Had No Basis In Law Or Reason To Treat IEX's Cancelable "Pause-and-Peek" Quotes as "Protected."**

Under the Commission' own rules, every exchange must maintain and enforce a firm-quote rule, which obligates any broker or dealer displaying a quotation to execute customer orders at the quoted price up to the quoted size and forbids "backing away" once an executable order arrives. *See* 17 C.F.R. § 242.602(b). That requirement ensures that displayed prices are genuine commitments, not placeholders that vanish when the market moves. The Commission has described the firm-quote

51

rule as "one of the primary means of ensuring that investors receive the best price available for their orders." *In re Am. Stock Exch. LLC*, 2007 WL 858743, at *3 (SEC Mar. 22, 2007).

That obligation extends across the national options market through the Options Plan. *See* pp. 8–9, *supra*. The Plan requires brokers and exchanges to route orders to the best protected bid or offer—but only because protected quotations are understood to be *firm* and immediately executable. To preserve that integrity, the Plan limits protection to firm quotes and defines a "non-firm" quotation as one where "members of a Participant are relieved of their obligations under that Participant's firm-quote rule." Options Plan § 2(15). Once a market-making member is "relieved of [its] obligation," the quote ceases to be firm and therefore ceases to be protected. An order's being *firm* is an essential condition to its being *protected*.

IEX's pause-and-peek repricing privilege violates that rule outright. It authorizes IEX to cancel or reprice market-maker quotations during the delay before an order executes, thereby releasing its members from the duty to stand by their displayed prices. IEX's privileged quotes are thus non-firm under the Plan's own definition: They are not reliable

52

or accessible, and not eligible for protection. And yet while freed of the requirement to be held firm, the quotes are still graced with the protected status that ordinarily is conferred *in exchange for* the quote being firm.

The contradiction with the Commission's own enforcement history is stark. In *In re Credit Suisse Securities (USA) LLC (Light Pool)*, 2016 WL 683553 (SEC Feb. 1, 2016), the Commission fined a broker-dealer for violating the firm-quote rule by displaying quotations that it canceled rather than executed when market conditions moved against it. The Commission condemned that practice as unlawful "backing away"—displaying a price the trader was unwilling to honor. *Id.* at 5-6. Yet here, the Commission has approved a rule which automates that very conduct for an entire exchange.

Such a "failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct." *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986). It also falls short of an agency's obligation—when it does change course—to acknowledge it is doing so and provide a reasoned explanation. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Commission here never acknowledged its departure. On the contrary: In reciting the "three conditions" of a protected

53

quotation, the Commission simply omitted the most fundamental one—firmness.  A156 (90 Fed. Reg. at 45,874/2).  The agency also never provided an explanation for its change in approach, nor gave a cogent explanation of how IEX's cancelable, delayed quotes could be considered "firm."

The Commission erred further by invoking the wrong regulatory framework.  Rather than applying the governing provisions of the Options Plan and the options firm-quote rule, the Commission justified its decision almost entirely by reference to equities regulations and precedent—particularly Regulation NMS and *IEX Equities Rule*.  *See, e.g.*, A156–57; A163–64 (90 Fed. Reg. at 45,874–75, 45,881–82).  But those authorities do not control here.  The equities and options markets operate under distinct regimes: equities may trade off-exchange (A62), while every options order must execute on an exchange (A62); equities are governed by Regulation NMS's order-protection rule, while options are governed by the Options Plan adopted under Section 11A of the Exchange Act (A85).  By conflating those frameworks, the Commission applied standards written for a fundamentally different market structure.  "Applying the wrong statutory standard renders a rationale arbitrary and

54

capricious." *BNSF Ry. Co. v. Fed. R.R. Admin.*, 105 F.4th 691, 699 (5th Cir. 2024).

The Commission's decision cannot be sustained under either the equities framework it invoked or the options framework it was required to apply. Regulation NMS defines a "protected quotation" as one that "immediately" executes, 17 C.F.R. §§ 242.600(b)(6), 242.600(b)(81), 242.600(b)(82)—that is, executes with "the fastest response possible without any programmed delay," 70 Fed. Reg. 37,496, 37,519 (June 29, 2005). IEX's privileged quotes do not satisfy that definition: they are de-layed by design and subject to cancellation before execution. A quote that is intentionally paused (A148 (90 Fed. Reg. at 45,866/1–2)) does not exe-cute "immediately" under any ordinary or legal meaning of the term. *Cf. United States v. Dougherty*, 754 F.3d 1353, 1359 (11th Cir. 2014) (imme-diate means "without delay").* Consistent with that understanding, the Commission has explained in the Options Plan context that quotations

---

\*    In *IEX Equities Rule*, the D.C. Circuit concluded that "D-Limit or-ders execute immediately because they are subject to only a de minimis delay." 45 F.4th at 36–37 (citation omitted). By contrast, although IEX describes the time gap here as "tiny," it simultaneously touts the mecha-nism's impact as "substantial"—a concession that is irreconcilable with a de minimis delay. IEX Motion for Leave to Intervene at 5.

lacking immediate executability are akin to "manual quotations" under Regulation NMS, which do not immediately execute and are therefore not entitled to protected status. 74 Fed. Reg. 15,010, 15,013/3 (Apr. 2, 2009).

### 2. In Treating IEX Quotes As Protected, The Commission Arbitrarily Imposed an Unnecessary Burden on Competition.

Section 6(b)(8) of the Exchange Act forbids exchange rules that impose burdens on competition not "necessary or appropriate" to further the Act's purposes. 15 U.S.C. § 78f(b)(8). That standard demands more than a finding that a rule may have benefits; it requires the Commission to show why any competitive harm is necessary to achieve a legitimate goal. The Commission made no such showing here.

The Commission's analysis failed at the outset. Determining whether a burden on competition is "necessary or appropriate" under Section 6(b)(8) naturally requires assessing first the competitive conditions that already exist. That was the lesson of *American Equity Investment Life Insurance Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010), where an SEC rule was vacated because the agency had failed to "assess" the competitive "baseline" before imposing new restrictions. *Id.* at 178. Yet the Com-

56

mission replicated that error here; it established no baseline for competition in the options market. It made no findings about how many exchanges compete for order flow (there are currently eighteen), how concentrated the market is, or whether exchanges already compete aggressively on fees, technology, and liquidity. The options market is in fact one of the most competitive in the world, with every exchange continuously adjusting fees, rebates, and technology to attract market makers and investors. *See* A59.

By failing to examine the conditions of competition in the options market, the Commission deprived itself of the very context needed to determine whether IEX's one-sided repricing privilege addressed any real problem or instead distorted a functioning, highly competitive system.

The Commission likewise failed to establish that *mandatory* routing to IEX was necessary to promote fair access or market integrity. The Commission identified no market failure and no deficiency in competition among exchanges that required this regulatory intervention.

Hudson River Trading, itself a market maker, noted that firms can build and maintain low-latency systems to update their quotes and man-

57

age exposure without any exchange-imposed delay. A129. Citadel Securities and other leading market makers have made precisely those investments; in today's markets, which IEX characterizes as a "race" to secure the best price in which a "fraction of a second" can make a difference, state-of-the-art technology is an established part of the competitive landscape. IEX Motion for Leave to Intervene at 3.

Yet the Commission chose to relieve market makers from making such investments by approving three features—a purposeful delay; an ability to withdraw quotes; and a compulsion to route to those quotes anyway—that all conflict with the reigning statutory and regulatory requirements. The Commission itself estimated that latency could be materially reduced with technology upgrades costing as little as $5 million, but sided with market makers who purportedly were "unable" or merely "unwilling" to make that financial outlay. A157 (90 Fed. Reg. at 45,875/2). The Commission made no finding that a significant number of market makers were in fact unable to make the investment; indeed, it conflated being unable with simply being "unwilling." And it never bothered to ask whether market makers' preference to avoid new investments justifies an exchange where they can trade on a discriminatory basis.

58

Particularly given IEX's business plan—to gain new members and fees by offering a system that discriminates on its members' behalf—the Commission erred seriously by treating an "unsupported assertion" as if it were "substantial evidence." *Safe Extensions*, 509 F.3d at 606 (citation omitted). The Commission's decision—to subsidize market makers that decline to modernize—is unsupported in the record and is unsupportable, because it undermines the very principle of fair competition that Section 6(b)(8) and the Exchange Act were meant to preserve.

Commenters warned the Commission repeatedly that granting "protected" status to IEX's vanishing quotes would cause brokers to lose the ability to exercise their best-execution judgment—one of the market's core disciplines—thus distorting competition, harming investors, and challenging market integrity. But the Commission ignored those warnings. It claimed, without analysis, that IEX's rule was "narrowly tailored" and that investors "may benefit" if IEX attracts more market makers. A161 (90 Fed. Reg. at 45,879/2). But repetition is not reasoning. And this distortion undermines competition not only among brokers, but also among exchanges (and the market makers quoting on them). Other options exchanges cannot compete on equal terms when IEX's insiders

59

can advertise slightly better prices knowing it can cancel before execution, while its rivals on other exchanges must stand behind firm quotes. A56, A62, A80. But the Commission dismissed this concern, too—and its failure to "respond to [these] serious objections" was "arbitrary and capricious." *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 16 (D.C. Cir. 2015).

The Commission's erroneous argument that the absence of off-exchange venues in options trading further justifies IEX's mechanism because options must be executed on an exchange—making latency arbitrage harder for market makers to avoid (A157 (90 Fed. Reg. at 45,875/1–2))—inverts the statute's logic. The lack of off-exchange alternatives makes the need for even-handed exchange competition more, not less, critical. In the equities market, participants can bypass an exchange that offers unreliable quotes; in options, they cannot. A85. The Commission's attempt to use that structural difference as a reason to approve unequal treatment only underscores its error: when traders have nowhere else to go, the duty to maintain fair, firm, and nondiscriminatory markets is at its strongest.

60

In the end, the Commission never asked, let alone answered, the question Section 6(b)(8) demands: Why was it necessary to compel every broker in America to route orders to IEX instead of letting the market decide? Because the Commission replaced market choice with regulatory compulsion and never justified that choice, its Order violates Section 6(b)(8) and must be vacated.

## II.     The Commission's Order Should Be Vacated.

Because the Order is shot through with serious legal and analytical defects, this Court should vacate it in entirety.

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, the APA's plain text requires that "[i]n all cases," unlawful "agency action must be set aside." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971). Consistent with that directive, this Court recognizes that "vacatur . . . is the ordinary APA remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (citation omitted). Although this Court has exercised discretion to remand without vacatur in exceptional

61

cases, that leniency—if ever appropriate—is not granted when an agency's decision "was unlawful" at its core. *Am. Sec. Ass'n*, 147 F.4th at 1278–79.

In cases where it considers a remedy other than vacatur, the Court weighs "the seriousness of the order's deficiencies" and "the disruptive consequences of an interim change that may itself be changed." *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, 317 (11th Cir. 2025) (citation omitted). Both factors compel vacatur here.

First, the deficiencies in the Commission's order are profound and pervasive. The approval rests on multiple errors of law and reasoning that "incurably tainted the agency's decisionmaking process." *Black Warrior Riverkeeper*, 781 F.3d at 1290. The Commission approved a rule that violates Section 6(b)(5) by granting IEX insiders an exclusive, price-changing privilege that discriminates against all other market participants. *See* pp. 30–36, *supra*. On top of that, the agency failed to provide a reasoned or evidence-based justification for its decision—relying instead on conjecture, circular logic, and statistical sleight of hand, and separately violated the statutory ban on unnecessary burdens on competition. *See* pp. 39–46, 56–61, *supra*. Such fundamental defects cannot be

cured on remand; the whole point of IEX's proposal was to create a discriminatory system that intentionally holds customer orders while prices posted by market maker members can be walked back.  These errors thus strike at the heart of the agency's analysis and render its approval irredeemably unlawful.  The Commission's sharp departure from bedrock regulatory norms should not be permitted to go forward on the slight showing made by the Commission here.

Second, vacatur would cause no disruption.  The IEX Options Rule has not yet taken effect—it is currently scheduled to go live in the third quarter of 2026—and accordingly, vacating the order would simply preserve the status quo.  Maintaining existing conditions while the Commission reassesses its decision prejudices no one and prevents the market-wide disruption and investor harm that implementation of an impermissible rule would create.

This Court should therefore apply the "ordinary APA remedy"—the one prescribed by law—and vacate the Commission's approval order. *Am. Sec. Ass'n*, 147 F.4th at 1278.

## CONCLUSION

This Court should grant the petition for review and vacate the order on review.

Dated:  December 19, 2025

Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

  /s/ *Eugene Scalia*  
Eugene Scalia
Helgi C. Walker
John W. Tienken
Brandon Wolf
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
escalia@gibsondunn.com

*Counsel for Petitioner*
*Citadel Securities LLC*

64

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

**1.    Type Volume**

__X__        This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 12,241 words.

**2.    Typeface and Type Style**

__X__        This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Word 2019 in 14-point, New Century Schoolbook font.

Dated:  December 19, 2025              /s/ Eugene Scalia
                                                           Eugene Scalia

## CERTIFICATE OF SERVICE

I hereby certify that, on this 19th day of December 2025, a true and correct copy of the foregoing was filed electronically and served on all counsel through this Court's CM/ECF system.

/s/ Eugene Scalia
Eugene Scalia