**No. 25-13631-C**

# United States Court of Appeals for the Eleventh Circuit

_____

CITADEL SECURITIES LLC,

*Petitioner*,

v.

U.S. SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

_____

On Petition for Review of an Order of the
Securities and Exchange Commission

**APPENDIX**

Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201-2923
(214) 698-3100

Eugene Scalia
  *Counsel of Record*
Helgi C. Walker
John W. Tienken
Brandon Wolf
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioner*

December 19, 2025

# TABLE OF CONTENTS

| Admin. Record (Tab) | Document Description | Page |
|---|---|---|
| N/A | Certified Index of Administrative Record, 11th Cir. Docket No. 25 (Dec. 12, 2025)............................................................ | N/A |
| 1 | Investors Exchange LLC; Notice of Filing of a Proposed Rule Change to Adopt Rules to Govern the Trading of Options on the Exchange for a New Facility Called IEX Options, Exchange Act Release No. 102190 (Jan. 14, 2025), published at 90 Fed. Reg. 7205 (Jan. 21, 2025) .............................................. | A1 |
| 3 | Investors Exchange LLC; Notice of Filing of Amendment No. 1 to a Proposed Rule Change To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options, Exchange Act Release No. 102663 (Mar. 13, 2025), published at 90 Fed. Reg. 12890 (Mar. 19, 2025)...... | A24 |
| 4 | Investors Exchange LLC; Order Instituting Proceedings To Determine Whether To Approve or Disapprove a Proposed Rule Change, as Modified by Amendment No. 1, To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options, Exchange Act Release No. 102895 (Apr. 21, 2025), published at 90 Fed. Reg. 17424 (Apr. 25, 2025) ............................................................ | A49 |
| 9 | Letter from Adrian Griffiths, Head of Market Structure, MEMX LLC, to the Securities and Exchange Commission (May 14, 2025) .......................................................... | A54 |
| 10 | Letter from Angela Dunn, Principal Associate General Counsel, Nasdaq, to the Securities and Exchange Commission (May 20, 2025)....................................................... | A60 |

11    Letter from Andrew Stevens, Global General Counsel, IMC; Jeff Starr, Managing Director, Head of Operations, Charles Schwab & Co., Inc.; and Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities, to the Securities and Exchange Commission (June 4, 2025) ........................................................ A68

12    Letter from Mathieu Boivin-Carrier, Director, All Options USA LLC, to the Securities and Exchange Commission (June 12, 2025) ................................................................................. A71

13    Letter from Gregory Bayard, Electronic Options Market Making, HAP Trading LLC, to the Securities and Exchange Commission (June 16, 2025) ........................................................ A74

14    Letter from Jaime Klima, General Counsel, New York Stock Exchange, to the Securities and Exchange Commission (June 17, 2025) ................................................................................. A78

17    Letter from Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities, to the Securities and Exchange Commission (June 23, 2025) ........................................................................... A81

5[*]   Investors Exchange LLC; Notice of Filing of Amendment No. 3 To a Proposed Rule Change To Adopt Rules to Govern the Trading of Options on the Exchange for a New Facility Called IEX Options, Exchange Act Release No. 103290 (June 18, 2025), published at 90 Fed. Reg. 26865 (June 24, 2025) ...... A92

---

[*] The tab numbers correspond to the SEC's designations in its Certified Index; however, the documents are arranged chronologically by date of entry into the record, consistent with the Court's instructions.

20    Letter from Joseph Corcoran, Managing Director and Associate General Counsel, and Gerald O'Hara, Vice President and Assistant General Counsel, SIFMA, to the Securities and Exchange Commission (June 30, 2025)............ A119

22    Letter from Andrew R. Garbarino, Member of Congress, House of Representatives, to the Securities and Exchange Commission (July 3, 2025)...................................................... A123

24    Letter from R. Glenn Hubbard, Co-Chair, John L. Thornton, Co-Chair, and Hal S. Scott, President, Committee on Capital Markets Regulation, to the Securities and Exchange Commission (July 8, 2025) ....................................................... A124

120   Letter from Adam Nunes, Head of Risk, Hudson River Trading LLC, to the Securities and Exchange Commission (Aug. 8, 2025)................................................................. A128

123   Letter from Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities, to the Securities and Exchange Commission (Aug. 12, 2025) ... A130

124   Letter from James Cosentino, Head of Trading, Chicago, Maven Securities, to the Securities and Exchange Commission (Aug. 14, 2025)...................................................... A139

140   Investors Exchange LLC; Approving a Proposed Rule Change, as Modified by Amendment No. 3, To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options, Exchange Act Release No. 103998 (Sept. 18, 2025), published at 90 Fed. Reg. 45861 (Sept. 23, 2025)................................................................ A143

# Certified Index to Administrative Record

# 11th Cir. Doc. 25 (Dec. 12, 2025)

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CITADEL SECURITIES LLC,

 *Petitioner*,

 v.

U.S. SECURITIES AND EXCHANGE
COMMISSION,

 *Respondent*,

INVESTORS EXCHANGE LLC,

 *Intervenor*.

No. 25-13631

## CERTIFIED LIST DESCRIBING
## THE RECORD IN PROCEEDINGS
## <u>BEFORE THE SECURITIES AND EXCHANGE COMMISSION</u>

Pursuant to Section 25(a)(2) of the Securities Exchange Act of

1934, 15 U.S.C. 78y(a)(2), and Federal Rule of Appellate Procedure 17,

the Securities and Exchange Commission ("Commission") certifies that

the items listed below constitute the record upon which the order under

review in this Court was entered, with the exception of materials that

are publicly available such as statutes, rules, judicial decisions,

Commission orders and releases, books, treatises, and other similar

materials.

| Doc. No. | Description |
|---|---|

## Commission Releases

1.     Investors Exchange LLC; Notice of Filing of a Proposed Rule Change to Adopt Rules to Govern the Trading of Options on the Exchange for a New Facility Called IEX Options, Exchange Act Release No. 102190 (Jan. 14, 2025), published at 90 Fed. Reg. 7205 (Jan. 21, 2025).

2.     Investors Exchange LLC; Notice of Designation of a Longer Period for Commission Action on a Proposed Rule Change To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options, Exchange Act Release No. 102536 (Mar. 6, 2025), published at 90 Fed. Reg. 11866 (Mar. 12, 2025).

3.     Investors Exchange LLC; Notice of Filing of Amendment No. 1 to a Proposed Rule Change To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options, Exchange Act Release No. 102663 (Mar. 13, 2025), published at 90 Fed. Reg. 12890 (Mar. 19, 2025).

4.     Investors Exchange LLC; Order Instituting Proceedings To Determine Whether To Approve or Disapprove a Proposed Rule Change, as Modified by Amendment No. 1, To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options, Exchange Act Release No. 102895 (Apr. 21, 2025), published at 90 Fed. Reg. 17474 (Apr. 25, 2025).

5.     Investors Exchange LLC; Notice of Filing of Amendment No. 3 to a Proposed Rule Change To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options, Exchange Act Release No. 103290 (June 18, 2025), published at 90 Fed. Reg. 26865 (June 24, 2025).[1]

---

[1] On June 13, 2025, the Exchange filed Amendment No. 2 to the proposed rule change, which it withdrew to correct a non-substantive pagination issue and refiled as Amendment No. 3 on June 17, 2025.

| Doc. No. | Description |
|---|---|
| 6. | Investors Exchange LLC; Notice of Designation of a Longer Period for Commission Action on Proceedings To Determine Whether To Approve or Disapprove a Proposed Rule Change, as Modified by Amendment No. 3, To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options, Exchange Act Release No. 103480 (July 17, 2025), published at 90 Fed. Reg. 34532 (July 22, 2025). |

Comment Letters (https://www.sec.gov/comments/sr-iex-2025-02/sriex202502.htm#comments)

| | |
|---|---|
| 7. | Joanna Mallers, Secretary, FIA PTG, February 26, 2025. |
| 8. | Claudia Crowley, Chief Regulatory Officer, Investors Exchange LLC, March 12, 2025. |
| 9. | Adrian Griffiths, Head of Market Structure, MEMX LLC, May 14, 2025. |
| 10. | Angela Dunn, Principal Associate General Counsel, Nasdaq, May 20, 2025. |
| 11. | Andrew Stevens, Global General Counsel, IMC; Jeff Starr, Managing Director, Head of Operations, Charles Schwab & Co., Inc.; and Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities, June 4, 2025. |
| 12. | Mathieu Boivin-Carrier, Director, All Options USA LLC, June 12, 2025. |
| 13. | Gregory Bayard, Electronic Options Market Making, HAP Trading LLC, June 16, 2025. |
| 14. | Jaime Klima, General Counsel, New York Stock Exchange, June 17, 2025. |
| 15. | Claudia Crowley, Chief Regulatory Officer, Investors Exchange LLC, June 17, 2025. |

3

| Doc. No. | Description |
|---|---|
| 16. | John Ramsay, Chief Market Policy Officer, Investors Exchange LLC, June 19, 2025. |
| 17. | Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities, June 23, 2025. |
| 18. | J.W. Verret, Associate Professor, Antonin Scalia Law School, George Mason University, June 24, 2025. |
| 19. | Steve Crutchfield, Head of Business Development, CTC, LLC, June 28, 2025. |
| 20. | Joseph Corcoran, Managing Director and Associate General Counsel, and Gerald O'Hara, Vice President and Assistant General Counsel, SIFMA, June 30, 2025. |
| 21. | Dave Lauer, CTO, Urvin Finance and Co-Founder, We The Investors, July 3, 2025. |
| 22. | Andrew R. Garbarino, Member of Congress, House of Representatives, July 3, 2025. |
| 23. | Daniel Schlaepfer, President, and Mario Josipovic, Vice President, Regulatory Affairs and General Counsel, Select Vantage, July 8, 2025. |
| 24. | R. Glenn Hubbard, Co-Chair, John L. Thornton, Co-Chair, and Hal S. Scott, President, Committee on Capital Markets Regulation, July 8, 2025. |
| 25. | Stephen Sikes, Chief Executive Officer, Open to the Public Investing, Inc., July 9, 2025. |
| 26. | Iqbal Aasim, July 9, 2025. |
| 27. | Kelli McMorrow, Chief Advocacy Officer, American Securities Association, July 9, 2025. |

| **Doc.** | |
| :--- | :--- |
| **No.** | **Description** |

28.  Thomas M. Merritt, Deputy General Counsel, Virtu Financial, Inc., July 9, 2025.

29.  Anonymous, July 10, 2025.

30.  Al Vina, July 10, 2025.

31.  Jason Trezil, July 10, 2025.

32.  Matthew Davis, July 10, 2025.

33.  Carl Powlett, July 10, 2025.

34.  Karolis Pokvytis, July 10, 2025.

35.  Dean Cook, July 10, 2025.

36.  William Shields, July 10, 2025.

37.  Andrew Bailey, July 10, 2025.

38.  M. Degen, July 10, 2025.

39.  Gabriel Espinoza, July 10, 2025.

40.  Christy Sharn, July 10, 2025.

41.  Christoph Leimser, July 10, 2025.

42.  Jim, July 10, 2025.

43.  Jared Albert, July 10, 2025.

44.  Jeff Trotman, July 10, 2025.

45.  Austin Kuhn, July 11, 2025.

46.  Diego Cordero, July 11, 2025.

47.  Melanie Hughes, July 11, 2025.

| Doc. No. | Description |
|---|---|
| 48. | Terrell Adamson, July 11, 2025. |
| 49. | Landon William, July 11, 2025. |
| 50. | Michael Puleo, July 11, 2025. |
| 51. | Bud Lavin, July 11, 2025. |
| 52. | J B, July 12, 2025. |
| 53. | Kevin S., Norwegian retail investor, July 12, 2025. |
| 54. | Dhruva Sewar, July 12, 2025. |
| 55. | S. Anderson, July 12, 2025. |
| 56. | Jeremy Swope, July 12, 2025. |
| 57. | Aaron Kesler, July 12, 2025. |
| 58. | Bryce Mercado, July 12, 2025. |
| 59. | J B, July 12, 2025. |
| 60. | Dylan Willett, July 13, 2025. |
| 61. | Vivek Wilson, July 13, 2025. |
| 62. | Daniel Whelan, July 13, 2025. |
| 63. | Michael Stanton, July 14, 2025. |
| 64. | Anonymous, July 15, 2025. |
| 65. | Velos DaRaptor, July 16, 2025. |
| 66. | Keith Cohen, July 16, 2025. |
| 67. | Ryan Wigglesworth, July 17, 2025. |
| 68. | Blake Campos, July 18, 2025. |

| Doc. No. | Description |
| --- | --- |
| 69. | Alex Zhu, July 18, 2025. |
| 70. | Mike Trelski, July 18, 2025. |
| 71. | D Creviston, July 18, 2025. |
| 72. | Benjamin L. Schiffrin, Director of Securities Policy, Better Markets, Inc., July 18, 2025. |
| 73. | Andres Guerra Gonzalez, July 18, 2025. |
| 74. | Terry Newsome, July 18, 2025. |
| 75. | Ryan Brady-Toomey, July 18, 2025. |
| 76. | "BodySurf" Dan Ault, July 18, 2025. |
| 77. | Tom Lagona, July 18, 2025. |
| 78. | Brad Delmore, July 18, 2025. |
| 79. | James Mancini, July 18, 2025. |
| 80. | Timothy Esch, July 18, 2025. |
| 81. | Kerry Day, July 18, 2025. |
| 82. | Alexander Serechenko, July 19, 2025. |
| 83. | Richard Sotelo, July 19, 2025. |
| 84. | Raul Delgado, July 19, 2025. |
| 85. | Zykell O'Donnell, July 19, 2025. |
| 86. | Matt Walsh, July 19, 2025. |
| 87. | DC, July 19, 2025. |
| 88. | Dan Magnant, July 19, 2025. |

7

| **Doc. No.** | **Description** |
|---|---|
| 89. | Kevin May, July 19, 2025. |
| 90. | James Findley, July 19, 2025. |
| 91. | Dustin Ammann, July 19, 2025. |
| 92. | HM Winkler, July 19, 2025. |
| 93. | Michiel Escobar, July 19, 2025. |
| 94. | Sean Wiesner, July 19, 2025. |
| 95. | Dave Brodahl, July 19, 2025. |
| 96. | Anonymous, July 19, 2025. |
| 97. | Craig Kenny, July 19, 2025. |
| 98. | James Batten, July 19, 2025. |
| 99. | Jonathan Longacre, July 20, 2025. |
| 100. | Nicholas Hanson, July 20, 2025. |
| 101. | Edward Neill, July 20, 2025. |
| 102. | Anonymous, July 20, 2025. |
| 103. | Michael Slayton, July 20, 2025. |
| 104. | Chris Robinson, July 20, 2025. |
| 105. | Chester O'Malley, July 20, 2025. |
| 106. | Bryce Morrison, July 20, 2025. |
| 107. | Jason Danielson, July 21, 2025. |
| 108. | Joseph Michael Gugino, July 21, 2025. |
| 109. | Vincent Ashley, July 21, 2025. |

**Doc.**
**No.**                          **Description**

110.       Greg Linder, July 22, 2025.

111.       Nate Sharpinen, July 22, 2025.

112.       Jefferson Nunn, July 22, 2025.

113.       Travis M. Spaniel, July 22, 2025.

114.       Robert Turnbull, July 23, 2025.

115.       Anonymous, July 23, 2025.

116.       Josh Dobos, July 23, 2025.

117.       Jacob Legorreta, July 24, 2025.

118.       Jonatan, July 28, 2025.

119.       Roger Marshall, M.D., United States Senator, August 1, 2025.

120.       Adam Nunes, Head of Risk, Hudson River Trading LLC, August 8, 2025.

121.       Brian P. Donnelly, Founder, Volant Trading, August 8, 2025.

122.       Jonathan Stager, August 11, 2025.

123.       Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities, August 12, 2025.

124.       James Cosentino, Head of Trading, Chicago, Maven Securities, August 14, 2025.

125.       John Ramsay, Chief Market Policy Officer, Investors Exchange LLC, August 20, 2025.

126.       Mark R. Warner, United States Senator, August 22, 2025.

127.       Jaime Llano, Managing Director - Head of Multi-Asset Trading, Teacher Retirement System of Texas; Sam Masoudi,

9

| Doc. No. | Description |
|---|---|
| | Chief Investment Officer, Wyoming Retirement System; Zachary Davis, Head of US Equity Trading, Janus Henderson Investors; Michael C. Viteri, Chief Investment Officer, Arizona State Retirement System; Anthony W. Godonis, Principal, Director of Trading, Copeland Capital Management, LLC; Adam HJ Conn, Director, Head of Trading, Baillie Gifford Overseas LTD; Myriam Deslandes, Vice-President, Strategy, Execution and Portfolio Solutions, La Caisse; and Kevin Duggan, Senior Managing Director, Global Trading and Beta, Ontario Teachers' Pension Plan, September 3, 2025. |
| 128. | John J. Lothian, Executive Chairman & CEO, John J. Lothian & Company, Inc. and Publisher, John Lothian News, September 3, 2025. |
| 129. | Mehmet S. Kinak, Vice President & Global Head of Equity Trading, T. Rowe Price Associates, Inc.; Jonathan D. Siegel, Vice President & Managing Legal Counsel, Legislative & Regulatory Affairs, T. Rowe Price; and Tamara P. Wiggs, Vice President & Head of Trading, T. Rowe Price Investment Management, Inc, September 18, 2025. |
| 130. | KLI Limited, September 27, 2025. |
| 131. | Comments have been received from individuals and entities using the following Letter Type A: 514. |
| 132. | Comments have been received from individuals and entities using the following Letter Type B: 6. |

Meetings with SEC Officials (https://www.sec.gov/comments/sr-iex-2025-02/sriex202502.htm#meetings)

| 133. | Memorandum from the Division of Trading and Markets regarding a June 9, 2025 meeting with representatives of Citadel Securities, dated June 9, 2025. |

**Doc.
No.**                            **Description**

134.     Memorandum from the Office of Commissioner Caroline
         Crenshaw regarding a June 20, 2025 meeting with
         representatives of Investors Exchange LLC (IEX).

135.     Memorandum from the Office of Commissioner Mark T. Uyeda
         regarding a July 8, 2025 meeting with representatives of
         Investors Exchange (IEX), dated July 8, 2025.

136.     Memorandum from the Office of Commissioner Hester M.
         Peirce regarding a July 8, 2025 meeting with representatives
         of Investors Exchange (IEX).

137.     Memorandum from the Office of Commissioner Caroline
         Crenshaw regarding a July 9, 2025 meeting with
         representatives of Investors Exchange LLC (IEX).

138.     Memorandum from the Division of Trading and Markets
         regarding a July 30, 2025 meeting with representatives of
         MEMX LLC, dated July 30, 2025.

139.     Memorandum from the Division of Trading and Markets
         regarding an August 14, 2025 meeting with representatives of
         Citadel Securities, dated August 14, 2025.

11

**Doc.
No.**                              <u>Description</u>

<u>Order</u>

140.     Investors Exchange LLC; Order Approving a Proposed Rule
         Change, as Modified by Amendment No. 3, To Adopt Rules To
         Govern the Trading of Options on the Exchange for a New
         Facility Called IEX Options, Exchange Act Release No. 103998
         (Sept. 18, 2025), published at 90 Fed. Reg. 45861 (Sept. 23,
         2025).

For the Commission, by its Secretary, pursuant to delegated authority.

<u>/s/ Sherry R. Haywood</u>
Sherry R. Haywood
Assistant Secretary

Dated:  December 12, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2025, I electronically filed the foregoing Certified List Describing the Record in Proceedings Before the Securities and Exchange Commission using the Court's CM/ECF system, which will send notice to all the parties.

/s/ Brooke Wagner_____
Brooke Wagner
Securities and Exchange
Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-5292
wagnerbr@sec.gov

# ADMINISTRATIVE RECORD REFERENCE NO. 1

change is consistent with the Act.[5] Comments may be submitted electronically by using the Commission's internet comment form (*https://www.sec.gov/rules-regulations/ self-regulatory-organization- rulemaking/national-securities- exchanges?file_number=SR-BX-2025- 002*) or by sending an email to *rule- comments@sec.gov.* Please include file number SR–BX–2025–002 on the subject line. Alternatively, paper comments may be sent to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090. All submissions should refer to file number SR–BX–2025–002. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*https://www.sec.gov/rules-regulations/ self-regulatory-organization- rulemaking/national-securities- exchanges?file_number=SR-BX-2025- 002*). Do not include personal identifiable information in submissions; you should submit only information that you wish to make available publicly. We may redact in part or withhold entirely from publication submitted material that is obscene or subject to copyright protection. All submissions should refer to file number SR–BX–2025–002 and should be submitted on or before February 11, 2025.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[6]

**Sherry R. Haywood,**

*Assistant Secretary.*

[FR Doc. 2025–01293 Filed 1–17–25; 8:45 am]

**BILLING CODE 8011–01–P**

---

[5] Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549, on official business days between the hours of 10 a.m. and 3 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange.

[6] 17 CFR 200.30–3(a)(12).

## SECURITIES AND EXCHANGE COMMISSION

[Release No. 34–102190; File No. SR–IEX– 2025–02]

**Self-Regulatory Organizations; Investors Exchange LLC; Notice of Filing of a Proposed Rule Change to Adopt Rules to Govern the Trading of Options on the Exchange for a New Facility Called IEX Options**

January 14, 2025.

Pursuant to Section 19(b)(1) [1] of the Securities Exchange Act of 1934 ("Act") [2] and Rule 19b–4 thereunder,[3] notice is hereby given that, on January 10, 2025, the Investors Exchange LLC ("IEX" or "Exchange") filed with the Securities and Exchange Commission ("Commission") the proposed rule change as described in Items I and II below, which Items have been prepared by the self-regulatory organization. The Commission is publishing this notice to solicit comments on the proposed rule change from interested persons.

**I. Self-Regulatory Organization's Statement of the Terms of Substance of the Proposed Rule Change**

Pursuant to the provisions of Section 19(b)(1) under the Act,[4] and Rule 19b– 4 thereunder,[5] the Exchange is filing with the Commission a rule change proposal to adopt rules to govern the trading of options on IEX Options LLC, a facility of the Exchange that will be established in a separate rule filing (referred to herein as "IEX Options"). As proposed, the Exchange will operate IEX Options as a fully automated trading system built on the core functionality of the Exchange's approved equities platform, and in a manner similar to that of other options exchanges. In addition, IEX Options will utilize a de minimis delay on incoming order and quote messages designed to enable IEX to update its view of the market prior to processing orders and quotes, and an optional Market Maker quote parameter designed to protect Market Makers from excessive risk due to execution of stale quotes, in addition to other risk protections substantially similar to those offered by other options exchanges.

The text of the proposed rule change is available at the Exchange's website at *https://www.iexexchange.io/resources/ regulation/rule-filings,* at the principal

---

[1] 15 U.S.C. 78s(b)(1).

[2] 15 U.S.C. 78a.

[3] 17 CFR 240.19b–4.

[4] 15 U.S.C. 78s(b)(1).

[5] 17 CFR 240.19b–4.

office of the Exchange, and at the Commission's Public Reference Room.

**II. Self-Regulatory Organization's Statement of the Purpose of, and the Statutory Basis for, the Proposed Rule Change**

In its filing with the Commission, the self-regulatory organization included statements concerning the purpose of and basis for the proposed rule change and discussed any comments it received on the proposed rule change. The text of these statements may be examined at the places specified in Item IV below. The self-regulatory organization has prepared summaries, set forth in Sections A, B, and C below, of the most significant aspects of such statements.

*A. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change*

1. Purpose

Overview

The Exchange proposes to adopt a series of rules in connection with IEX Options, which will be a facility of the Exchange.[6] As proposed, the Exchange will operate IEX Options as a fully automated trading system built on the core functionality of the Exchange's approved equities platform, and in a manner similar to that of other options exchanges.[7]

As proposed, IEX Options will operate an electronic trading system to list and trade options issued by the Options Clearing Corporation ("Clearing Corporation" or "OCC"). Specifically, IEX proposes to operate a fully automated, pro-rata priority options market in a manner similar to that of other options exchanges. In addition, IEX Options will utilize a de minimis delay on incoming order and quote messages designed to enable IEX to update its view of the market prior to processing orders and quotes, and an optional Market Maker quote parameter designed to protect Market Makers from

---

[6] IEX will file a separate proposed rule change with the Commission pursuant to Section 19 of the Act to provide that IEX Options will be operated by IEX Options LLC, a Delaware limited liability company wholly owned by the Exchange, as a facility of the Exchange as that term is defined in Section 3(a)(2) of the Act.

[7] The IEX Options proposed rules are largely based on the rules of other options exchanges, as described herein. When a particular proposed rule is described as "substantively identical" to a rule(s) of another exchanges that means that the substance of the proposed IEX Options rule is identical to the referenced rule of the other exchange, with differences only to reflect terminology and numbering. When a particular proposed rule is described as "substantially similar" to a rule(s) of another exchange this rule filing describes the relevant differences.

USCA11 Case: 25-13631    Document: 27    Date Filed: 12/19/2025    Page: 21 of 205    A002

excessive risk due to execution of stale quotes, in addition to other risk protections substantially similar to those offered by other options exchanges.

The Exchange proposes to adopt rules applicable to IEX Options that are substantially similar to the approved rules of the MEMX, C1, MIAX, and NYSE Amex and Arca options exchanges, with the material proposed differences described herein.[8]

As provided in proposed Rule 17.110 (Applicability), existing Exchange Rules[9] applicable to the IEX equities market contained in Chapters 1 through 16 of the Exchange Rules will apply to Options Members unless a specific Exchange Rule applicable to the IEX Options market (in proposed Chapters 17 through 29 of the Exchange Rules) governs or unless the context otherwise requires.

The IEX Options Trading System[10] will provide for the electronic display and execution of orders on a pro-rata basis. All Exchange Members will be eligible to participate in IEX Options by qualifying as Options Members[11] and obtaining one or more trading permits for their activity on IEX Options, in accordance with applicable IEX Options rules. The IEX Options Trading System will provide an optional routing service for orders when trading interest is not present on IEX Options and will comply with all applicable securities laws and regulations and the obligations of the Options Order Protection and Locked/Crossed Market Plan.

IEX Options Members

Pursuant to the proposed rules in Chapter 18 (Participation on IEX Options), the Exchange will authorize any Exchange Member that meets certain enumerated qualification requirements (any such Member, an ''Options Member'') and any Options Member's Sponsored Participants to obtain access to, and transact business on, IEX Options.[12]

There will be three types of Options Members—Options Order Entry Firms (''OEFs''), Options Market Makers, and Options Clearing Members. Options Members may act in one, two, or all

such capacities. OEFs will be those Options Members representing Customer Orders as agent on IEX Options or trading as principal on IEX Options. Options Market Makers, in turn, will be eligible to participate as Registered Market Makers or Specialists, as set forth in Rule 23.100. Additionally, all Options Market Makers may participate as Directed Marker Makers.[13] Clearing Members will be those Options Members that have been admitted to membership in the Clearing Corporation pursuant to the provisions of the Rules of the Clearing Corporation and are self-clearing or that clear IEX Options Transactions for other Options Members.

IEX proposes to issue different types of Trading Permits to Options Members that allow the Trading Permit Holders to: (i) trade one or more products authorized for trading on the Exchange; (ii) act in one or more trading functions authorized by the Rules of IEX Options; and/or (iii) act as a Clearing Member.[14] Trading Permits shall be for the types and terms as shall be determined by the Exchange from time to time, and subject to effectiveness of one or more rule filings pursuant to Section 19(b) of the Act. The proposed rule governing IEX's Trading Permits, 18.140, is based on C1 Rule 3.1.[15]

The rules governing Registered Market Makers and Specialists are substantially based on MIAX and C1 rules.[16] To become an Options Market

Maker, an Options Member will be required to register by filing a written application and obtain any required trading permits.[17] The Exchange will not place any limit on the number of entities that may become Options Market Makers, the number of appointments an Options Market Maker may have, or the number of Options Market Makers that may have appointments in a class unless the Exchange determines to impose any such limit based on system constraints, capacity restrictions, or other factors relevant to protecting the integrity of the Trading System. The Exchange will not impose any such limitations until it has submitted objective standards for imposing the limits to the Commission for its review and approval.[18]

As proposed, the Exchange shall appoint Registered Market Makers to one or more classes of options contracts traded on the Exchange. In making such appointments the Exchange shall consider the financial resources available to the Registered Market Maker, the Registered Market Maker's experience and expertise in market making or options trading, the preferences of the Registered Market Maker to receive appointments in specific options classes, and the maintenance and enhancement of competition among Registered Market Makers in each class of options contracts to which they are appointed.[19]

While there may be several Registered Market Makers appointed to a particular class of options contracts, the Exchange may appoint only one Specialist to each options class traded on the Exchange.[20] To be appointed as a Specialist, an Options Member must first satisfy the criteria for appointment as a Registered Market Maker set forth in Rule 23.120(a)(1) and then must participate in the Specialist Qualification Process conducted by the Exchange and detailed in proposed Rule 23.130(b).[21] Factors to

---

[8] *See* rulebooks of MEMX LLC (''MEMX''), Cboe Exchange, Inc. (''C1''), Miami International Securities Exchange, LLC (''MIAX''), NYSE Arca, Inc. (''NYSE Arca Options''), and NYSE American LLC (''NYSE Amex Options''). However, IEX is not proposing to trade index options at this time and therefore is not proposing rules for the listing and trading of index options.

[9] *See* IEX Rule 1.160(jj).

[10] *See* proposed Rule 22.100(a).

[11] *See* proposed Rule 17.100.

[12] *See* proposed Rules 18.100, 18.110, 18.120, and 18.130.

[13] Directed Market Makers are subject to enhanced quoting obligations (as compared to Registered Market Makers) as set forth in proposed Rule 23.150(e)(3), which is substantively identical to NYSE Amex Options Rule 964.1NYP.

[14] *See* proposed Rule 18.140.

[15] On C1, part of the process of applying to be a Trading Permit Holder is for a broker-dealer to qualify as a participant or member of the exchange. IEX's proposed rule therefore differs from C1 Rule 3.1 because it does not include the membership qualification-related provisions that are addressed elsewhere in IEX's proposed Chapter 18. In particular, IEX is not proposing to incorporate C1 Rule 3.1(a)(3)'s language regarding jurisdiction over Trading Permit Holders because it is covered by Rule 2.120 (requiring all IEX Members to consent to the Exchange's jurisdiction) and proposed Rule 18.140(e) (applying the Exchange's jurisdictional authority to all Options Members). In addition, C1's rule includes limitations on the number of trading permits the exchange may issue. IEX is not proposing such limitations.

[16] *See* MIAX Rules 600–609 (regarding market maker qualifications and obligations) and MIAX Rules 514(d),(e), and (g) (regarding market maker quoting and priority). The primary differences between these MIAX rules and IEX's proposed Market Maker rules are: (1) MIAX has three tiers of market makers, while IEX proposes to have two tiers; (2) MIAX puts Market Makers at a priority level above other non-Priority Customer interest, while IEX will not (IEX's proposed rules are substantively identical to the priority rules in C1 Rule 5.32 as it pertains to C1's Preferred Market Makers); (3) IEX proposes to allocate participation

entitlements for Specialists with a priority quote based on the amount of non-Priority customer interest (which is how C1 Rule 5.32(a)(2)(B) allocates priority overlays), while MIAX only looks at the amount of other market maker interest; and (4) MIAX offers a Market Turner priority overlay which IEX is not proposing to adopt.

[17] *See* proposed Rules 23.100 and 18.140.

[18] This provision is substantively identical to MEMX Rule 22.2(c) and MIAX Rule 600(d).

[19] *See* proposed Rule 23.120(a)(1).

[20] *See* proposed Rule 23.130(g)(1)(A), which is substantively identical to NYSE Amex Options Rule 923NY(b). The language providing that the Exchange ''may'' appoint only one Specialist to each options class is based upon and substantively identical to NYSE Amex Options Rule 923NY(b).

[21] IEX based the proposed Specialist rule (23.130) on NYSE Amex Options Rules 927NY, 927.1NY, and 927.2NY because these rules provide clear instructions to prospective Specialist candidates

be considered for selection as a Specialist include, but are not limited to, representations regarding capital operations, personnel or technical resources.[22] After designating certain Market Makers as Specialists, the Exchange will conduct a process to determine which options classes to allocate to which Specialist, based upon which candidate appears best able to perform the functions of a Specialist in the designated options classes. Factors to be considered in the allocation of options classes to Specialists by the Exchange include, but are not limited to the following: experience with trading the options issue; adequacy of capital; willingness to promote the Exchange as a marketplace; operational capacity; support personnel; history of adherence to Exchange rules and securities laws; and evaluations made pursuant to Rule 23.130(f).[23] The Exchange will also consider the number and quality of issues that have been allocated, reallocated or transferred to a Specialist and the Specialist's willingness to promote the Exchange as a marketplace.[24]

The Exchange will also evaluate the performance of Specialists, and upon a finding that a Specialist failed to meet minimum performance standards, may take adverse action against the Specialist; Specialists shall have the right to appeal any adverse actions against them pursuant to IEX Rule Series 9.500, which governs adverse actions.[25]

Quotations may only be entered by a Market Maker and only in classes of options contracts to which the Market Maker is appointed.[26] Market Makers may also submit orders in classes of options contracts to which the Market Maker is appointed, which shall constitute a quote, and thus would help to satisfy the Market Maker's quoting obligation.[27] In addition, an Options

Market Maker with an OEF trading permit may submit orders in classes of options in which the Market Maker has no appointment, provided that the total number of such orders executed by the Market Maker do not exceed 25% of all contracts the Market Maker executes on the Exchange in any calendar quarter.[28]

Options Market Makers will be required to electronically engage in a course of dealing reasonably calculated to contribute to the maintenance of fair and orderly markets.[29] IEX does not propose to incorporate MIAX's requirement that Market Makers refrain from purchasing an option at a price more than $0.25 below parity,[30] because IEX does not believe the restriction is necessary to the maintenance of fair and orderly markets requirement, and notes that other exchanges do not include this restriction.[31] Market Makers will be required to maintain a two-sided market on a continuous basis [32] in at least 60% of the non-adjusted options series to which they are appointed as Registered Market Makers and at least 90% of the non-adjusted options series to which they are appointed as Specialists, provided the options classes have a time to expiration of less than nine months.[33] And, as noted above, Directed Market Makers are subject to enhanced quoting obligations compared to Registered Market Makers.[34] Market Makers and Specialists may use quotes and orders to meet the applicable quoting requirements. These obligations will not apply to an intra-day add-on series on the day during which such series was added for trading. Market Maker quotes must be firm quotes that comply with enumerated price and size rules.[35] These obligations also will not apply when an Options series is halted because the underlying security has entered a Limit or Straddle state.[36] Registered Market Makers and Specialists also must maintain minimum net capital in accordance with Commission and Exchange rules.[37]

Substantial or continued failure by an Options Market Maker to meet any of its obligations and duties will subject the Options Market Maker to disciplinary action, suspension, or revocation of the Market Maker's registration as such or its appointment in one or more of its appointed options classes.[38]

As on other exchanges, Options Market Makers receive certain benefits for carrying out their duties. For example, a lender may extend credit to a broker-dealer without regard to the restrictions in Regulation T of the Board of Governors of the Federal Reserve System if the credit is to be used to finance the broker-dealer's activities as a specialist or market maker on a national securities exchange. Thus, an Options Market Maker has a corresponding obligation to hold itself out as willing to buy and sell options for its own account on a regular or continuous basis to justify this favorable treatment.

Every Options Member shall at all times maintain membership in another registered options exchange that is not registered solely under Section 6(g) of the Exchange Act or in FINRA.[39] OEFs and other Options Members that transact business with Public Customers must at all times be members of FINRA. Pursuant to proposed Rule 18.110(h), every Options Member will be required to have at least one registered Options Principal who satisfies the criteria of that rule, including the satisfaction of a proper qualification examination. An OEF may only transact business with Public Customers if such Options Member also is an Options Member of another registered national securities exchange or association with which the Exchange has entered into an agreement under Rule 17d–2 under the Exchange Act [40] pursuant to which such other exchange or association shall be the designated options examining authority for the OEF.[41]

The proposed rules relating to qualification and participation on IEX Options as an Options Member (including as an OEF, Options Market

---

about the manner in which the Exchange selects and evaluates Specialists, and detailed rules about Specialist rights and obligations.

[22] *See* proposed Rule 23.130(b)(1). This rule is substantively identical to NYSE Amex Options Rule 927NY, with the exception that IEX is not proposing to obligate Specialists to make FLEX quotes, because those are not offered by the Exchange.

[23] *See* proposed Rule 23.130(g). This rule is substantively identical to NYSE Amex Options Rule 927.2NY

[24] *Id.*

[25] *See* proposed Rule 23.130(b)(2), and (f). These rules are substantively identical to NYSE Amex Options Rules 927NY(b)(2) and 927.1NY, respectively.

[26] *See* proposed Rule 23.150(a).

[27] *See* proposed Rule 17.100 (defining "Quote" to include orders entered by a Market Maker in the option series to which such Market Maker is registered).

[28] *See* proposed Rule 23.150(g).

[29] *See* proposed Rule 23.140(a).

[30] *See* MIAX rule 603(a).

[31] *See, e.g.,* NYSE Arca Options Rule 6.37–O.

[32] "Continuous quoting" is defined as 90% of the time. *See* proposed Rule 23.150(e).

[33] *See* proposed Rule 23.150(e)(2) and (e)(1). Proposed Rule 23.150(e)(1) is based upon and substantively identical to NYSE Amex Options Rule 925.1NYP(b) and proposed Rule 23.150(e)(2) is based upon and substantively identical to NYSE Amex Options Rule 925.1NYP(c).

[34] *See supra* note 13.

[35] *See* proposed Rule 23.150(b) and (d).

[36] *See* Supplementary Material .01 to proposed Rule 23.150(h), which is substantively identical to MIAX Rule 530(f)(1).

[37] *See* proposed Rule 23.180 ($200,000 net capital requirement for Registered Market Makers), which

is substantively identical to MEMX Rule 22.9 and proposed Rule 23.130(c)(1)(H) ($1,000,000 net capital requirement for Specialists), which is substantively identical to Amex Options Rule 927NY(c)(10).

[38] *See* proposed Rule 23.120(f). NYSE Amex Options Rule 927.1NY(1)(B) specifies that NYSE Amex Options provides its specialists information related to their market share in allocated issues on a monthly basis as part of the evaluation process. IEX is not proposing to include this provision because it understands that Specialist firms are well-equipped to monitor their market share and performance on IEX and other markets.

[39] *See* proposed Rule 18.110(g).

[40] 17 CFR 240.17d–2.

[41] *See* Rule 27.100.

Maker, or Clearing Member) are substantively identical to the relevant rules of MEMX Options.[42]

As provided in proposed Rule 17.110, existing Exchange Rules applicable to the IEX equities market contained in Chapters 1 through 16 of the Exchange Rules will apply to Options Members unless a specific Exchange Rule applicable to the IEX Options market (proposed Chapters 17 through 29 of the Exchange Rules) governs or unless the context otherwise requires. Options Members can therefore provide sponsored access to the IEX Options Exchange to a non-Member (*i.e.,* a Sponsored Participant) pursuant to Rule 11.130 of the Exchange Rules.

Definitions

The Exchange proposes to define a series of terms under proposed Rule 17.100 (Definitions), which are to be used in proposed Chapters 17 to 29 relating to the trading of options contracts on the Exchange. Unless otherwise indicated, all of the terms defined in proposed Rule 17.100 are either identical or substantially similar to definitions included in MEMX Rule 16.1. Any modifications to the MEMX definitions, or definitions based upon the rules of other exchanges are specifically indicated below.

The definitions under proposed Rule 17.100 are as follows:

• ABBO. The term "ABBO" or "Away Best Bid or Offer" means the best bid(s) or offer(s) disseminated by other Eligible Exchanges (as defined in Rule 28.100) and calculated by the Exchange based on market information the Exchange receives from OPRA.[43]

• Aggregate Exercise Price. The term "Aggregate Exercise Price" means the exercise price of an options contract multiplied by the number of units of the underlying security covered by the options contract.

• American-Style Option. The term "American-Style" option means an options contract that, subject to the provisions of Rule 24.100 (relating to the cutoff time for exercise instructions) and to the Rules of the Clearing Corporation, may be exercised at any time from its commencement time until its expiration.

• Associated Person and Person Associated with an Options Member. The terms "associated person" and "person associated with an Options Member" mean any partner, officer, director, or branch manager of an

Options Member (or any person occupying a similar status or performing similar functions), any person directly or indirectly controlling, controlled by, or under common control with an Options Member or any employee of an Options Member, except that any person associated with an Options Member whose functions are solely clerical or ministerial shall not be included in the meaning of such term for purposes of these Rules.

• Bid. The term "bid" means a Limit order to buy one or more options contracts.

• Board. The term "Board" means the Board of Directors of Investors' Exchange LLC.

• Call. The term "call" means an options contract under which the holder of the option has the right, in accordance with the terms of the option, to purchase from the Clearing Corporation the number of shares of the underlying security covered by the options contract.

• Capacity. The term "capacity" means the capacity in which a User submits an order, which the User specifies by applying the corresponding code to the order. The capacity codes available on IEX Options will be listed in publicly available specifications and published in a Regulatory Circular.

• Class of Options. The terms "class" or "class of options" mean all options contracts with the same unit of trading covering the same underlying security.

• Clearing Corporation and OCC. The terms "Clearing Corporation" and "OCC" mean The Options Clearing Corporation.

• Clearing Member. The term "Clearing Member" means an Options Member that is self-clearing or an Options Member that clears IEX Options Transactions for other Options Members.

• Closing Purchase Transaction. The term "closing purchase transaction" means an IEX Options Transaction that reduces or eliminates a short position in an options contract.

• Closing Writing Transaction. The term "closing writing transaction" means an IEX Options Transaction that reduces or eliminates a long position in an options contract.

• Control. The term "control" means the power to exercise a controlling influence over the management or policies of a person, unless such power is solely the result of an official position with such person. Any person who owns beneficially, directly or indirectly, more than 20% of the voting power in the election of directors of a corporation, or more than 25% of the voting power in the election of directors

of any other corporation which directly or through one or more affiliates owns beneficially more than 25% of the voting power in the election of directors of such corporation, shall be presumed to control such corporation.[44]

• Covered Short Position. The term "covered short position" means (i) an options position where the obligation of the writer of a call option is secured by a "specific deposit" or an "escrow deposit" meeting the conditions of Rules 610(f) or 610(g), respectively, of the Rules of the Clearing Corporation, or the writer holds in the same account as the short position, on a share-for-share basis, a long position either in the underlying security or in an options contract of the same class of options where the exercise price of the options contract in such long position is equal to or less than the exercise price of the options contract in such short position; and (ii) an options position where the writer of a put option holds in the same account as the short position, on a share-for-share basis, a long position in an options contract of the same class of options where the exercise price of the options contract in such long position is equal to or greater than the exercise price of the options contract in such short position.

• Customer. The term "Customer" means a Public Customer or a broker-dealer.

• Customer Order. The term "Customer order" means an agency order for the account of a Customer.

• Directed Order. The term "Directed Order" is an order entered into the Trading System by an Options Member with a designation for a Market Maker in that class (referred to as a "Directed Market Maker" or "DMM"). To qualify as a Directed Order, an order must be entered on behalf of a Priority Customer.[45]

• Discretion. The term "discretion" means the authority of a broker or dealer to determine for a Customer the type of

---

[42] *See* MEMX Rulebook Chapters 17 and 22.

[43] IEX notes that this definition differs from the MEMX definition of ABBO by spelling out the phrase "Away Best Bid or Offer" that ABBO refers to for added clarity.

[44] This definition is substantively identical to the definition in C1 Rule 1.1. IEX proposes to incorporate this definition, because the term is not specifically defined in the MEMX rulebook and IEX believes that term would provide helpful context to Options Members with respect to other rules that use the term, *e.g.,* proposed IEX Rule 19.200.

[45] This definition is based upon the definition in MIAX Options Exchange ("MIAX") Rule 100, with the distinction that IEX proposes to make any Market Maker eligible to receive a Directed Order, while MIAX only allows their Lead Market Makers (akin to IEX's proposed "Specialists") and Primary Lead Market Makers eligible; this aspect of IEX's proposed rule change is based upon and substantially similar to C1 Rule 5.32. Additionally, IEX proposes to include language in the last sentence of this definition based on NYSE Amex Rule 900.3NYP(i)(4) to clarify that an order submitted on behalf of a non-Priority Customer would be treated as a non-Directed Order.

option, the class or series of options, the number of contracts, or whether options are to be bought or sold.

• European-Style Option. The term ''European-style option'' means an options contract that, subject to the provisions of Rule 24.100 (relating to the cutoff time for exercise instructions) and to the Rules of the Clearing Corporation, can be exercised only on its expiration date.

• Exchange Act. The term ''Exchange Act'' or ''Act'' means the Securities Exchange Act of 1934, as amended, or Rules thereunder.

• Exercise Price. The term ''exercise price'' means the specified price per unit at which the underlying security may be purchased or sold upon the exercise of an options contract.

• He, Him, and His. The terms ''he,'' ''him'' and ''his'' are deemed to refer to persons of female as well as male gender, and to include organizations, as well as individuals, when the context so requires.

• IEX Exchange and Exchange. The terms ''IEX Exchange'' and ''Exchange'' mean Investors' Exchange LLC, a registered national securities exchange.

• IEX Options. The term ''IEX Options'' means IEX Options LLC, a Delaware limited liability company wholly owned by the Exchange, which operates as an options trading facility of the Exchange under Section 3(a)(2) of the Exchange Act.

• IEX Options Book. The term ''IEX Options Book'' means the electronic book of options orders maintained by the Trading System.[46]

• IEX Options Transaction. The term ''IEX Options Transaction'' means a transaction involving an options contract that is effected on or through IEX Options or its facilities or systems.[47]

• Individual Equity Option. The term ''individual equity option'' means an options contract which is an option on an equity security.

• Long Position. The term ''long position'' means a person's interest as the holder of one or more options contracts.

• Market Makers (and Options Market Makers). The terms ''Market Makers'' or ''Options Market Makers'' refer collectively to Options Members registered, pursuant to Rule 23.100, as either a ''Registered Market Maker'' or a ''Specialist''.[48]

• MPID. The term ''MPID'' means unique market participant identifier assigned to an Options Member.

• NBB, NBO, and NBBO. The term ''NBB'' means the national best bid, the term ''NBO'' means the national best offer, and the term ''NBBO'' means the national best bid or offer as calculated by IEX Options based on market information received by IEX Options from OPRA.

• Offer. The term ''offer'' means a Limit order to sell one or more options contracts.

• OPRA. The term ''OPRA'' means the Options Price Reporting Authority.

• Opening Purchase Transaction. The term ''opening purchase transaction'' means a IEX Options Transaction that creates or increases a long position in an options contract.

• Opening Writing Transaction. The term ''opening writing transaction'' means a IEX Options Transaction that creates or increases a short position in an options contract.

• Options Contracts. The term ''options contract'' means a put or a call issued, or subject to issuance by the Clearing Corporation pursuant to the Rules of the Clearing Corporation.

• Options Market Close and Market Close. The terms ''options market close'' and ''market close'' mean the time the Exchange specifies for the end of a trading session on the Exchange on that trading day.

• Options Market Open and Market Open. The terms ''options market open'' and ''market open'' mean the time the Exchange specifies for the beginning of a trading session on the Exchange on that trading day.

• Options Member. The term ''Options Member'' means a firm, or organization that is registered with the Exchange pursuant to Chapter 18 of these Rules for purposes of participating in options trading on IEX Options as an ''Options Order Entry Firm'', ''Options Market Maker'', or ''Clearing Member.''

• Options Member Agreement. The term ''Options Member Agreement'' means the agreement to be executed by Options Members to qualify to participate on IEX Options.

• Options Order Entry Firm, Order Entry Firm, and OEF. The terms ''Options Order Entry Firm'' and ''Order Entry Firm'' or ''OEF'' mean those

Options Members representing as agent Customer Orders on IEX Options and those non-Market Maker Members conducting proprietary trading.

• Options Principal. The term ''Options Principal'' means a person engaged in the management and supervision of the Options Member's business pertaining to options contracts that has responsibility for the overall oversight of the Options Member's options related activities on the Exchange.

• Order. The term ''order'' means a firm commitment to buy or sell options contracts as defined in Rule 22.100.

• Outstanding. The term ''outstanding'' means an options contract which has been issued by the Clearing Corporation and has neither been the subject of a closing writing transaction nor has reached its expiration date.

• Primary Market. The term ''primary market'' means the primary exchange on which an underlying security is listed.[49]

• Priority Customer and Priority Customer Order. The term ''Priority Customer'' means any person or entity that is not: (A) a broker or dealer in securities; or (B) a Professional. The term ''Priority Customer Order'' means an order for the account of a Priority Customer.

• Professional. The term ''Professional'' means any person or entity that (A) is not a broker or dealer in securities; and (B) places more than 390 orders in listed options per day on average during a calendar month for its own beneficial account(s). All Professional orders shall be appropriately marked by Options Members.[50]

• Protected Quotation. The term ''Protected Quotation'' has the meaning provided in Rule 28.100.

• Public Customer and Public Customer Order. The term ''Public Customer'' means a person that is not a broker or dealer in securities. The term ''Public Customer Order'' means an order for the account of a Public Customer.

• Put. The term ''put'' means an options contract under which the holder of the option has the right, in accordance with the terms and provisions of the option and the Rules of the OCC, to sell to the Clearing Corporation the number of units of the underlying security covered by the

---

[46] This definition is substantively identical to the equivalent definition in the MEMX rulebook, except that it refers to IEX, not MEMX.

[47] This definition is substantively identical to the equivalent definition in the MEMX rulebook, except that it refers to IEX, not MEMX.

[48] This definition is substantively identical to the definition in the MIAX rulebook, except that MIAX

has three classes of Market Makers (Registered Market Makers, Lead Market Makers, and Primary Lead Market Makers) while IEX proposes to have two classes of Market Makers: Registered Market Makers (equivalent to MIAX Registered Market Maker) and Specialists (which is based on MIAX's Lead Market Maker and Primary Lead Market Maker rules). IEX proposes to incorporate this definition, because the Market Maker rules proposed herein are substantially based upon the rules of MIAX.

[49] This definition is based on the definition in C1 Rule 1.1, because IEX believed the definition was easier to understand than the equivalent definition in the MEMX rulebook.

[50] *See* Proposed Supplementary Material .01 to Rule 17.100, which sets forth the methodology for calculation of Professional orders.

options contract, at a price per unit equal to the exercise price, upon the timely exercise of such option.

• Quarterly Options Series. The term ''Quarterly Options Series'' means a series in an options class that is approved for listing and trading on the Exchange in which the series is opened for trading on any business day and expires at the close of business on the last business day of a calendar quarter.

• Quote or Quotation. The terms ''quote'' or ''quotation'' means a bid or offer entered by a Market Maker as a firm order that updates the Market Maker's previous bid or offer, if any. When the term order is used in these Rules and a bid or offer is entered by the Market Maker in the options series to which such Market Maker is registered, such order shall, as applicable, constitute a quote or quotation for purposes of these Rules. A quote or quotation may be canceled or repriced in accordance with Rules 22.250, 22.260, or 23.150, if so designated by the Market Maker to assist in its risk management.

• Registered Market Maker. The term ''Registered Market Maker'' means an Options Member registered with the Exchange for the purpose of making markets in securities traded on the Exchange, who is vested with the rights and responsibilities specified in Chapter 23 of these Rules with respect to Registered Market Makers.[51]

• Responsible Person. The term ''Responsible Person'' means a U.S.-based officer, director, or management-level employee of an Options Member, who is registered with the Exchange as an Options Principal, responsible for the direct supervision and control of associated persons of that Options Member.

• Rules of IEX Options. The term ''Rules of IEX Options'' mean the rules contained in Chapters 17 to 29 of the Investors Exchange Rules governing the trading of options on the Exchange.

• Rules of the Clearing Corporation and Rules of the OCC. The terms ''Rules of the Clearing Corporation'' and ''Rules of the OCC'' mean the Certificate of Incorporation, the By-Laws and the Rules of the Clearing Corporation, and all written interpretations thereof, as may be in effect from time to time.

• SEC or Commission. The terms ''SEC'' or ''Commission'' mean the United States Securities and Exchange Commission.

• Series of Options. The terms ''series'' or ''series of options'' mean all options contracts of the same class that are the same type of options and have the same exercise price and expiration date.

• Short Position. The term ''short position'' means a person's interest as the writer of one or more options contracts.

• Short Term Options Series. The term ''Short Term Options Series'' means a series in an options class that is approved for listing and trading on the Exchange in which the series is opened for trading on any Monday, Tuesday, Wednesday, Thursday or Friday that is a business day and that expires on the Monday, Tuesday, Wednesday, Thursday or Friday of the next business week, or, in the case of a series that is listed on a Friday and expires on a Monday, is listed one business week and one business day prior to that expiration. If a Tuesday, Wednesday, Thursday or Friday is not a business day, the series may be opened (or shall expire) on the first business day immediately prior to that Tuesday, Wednesday, Thursday or Friday, respectively. For a series listed pursuant to this section for Monday expiration, if a Monday is not a business day, the series shall expire on the first business day immediately following that Monday.

• Specialist. The term ''Specialist'' means a Market Maker appointed by the Exchange to act as the primary lead Market Maker for the purpose of making markets in securities traded on the Exchange. The Specialist is vested with the rights and responsibilities specified in Chapter 23 of these Rules with respect to Specialists.[52]

• SRO. The term ''SRO'' means a self-regulatory organization as defined in Section 3(a)(26) of the Exchange Act.

• Timestamp. The term ''timestamp'' means the effective time sequence assigned to an order for purposes of determining its priority ranking.

• Trading Permit. The term ''Trading Permit'' means a license issued by the Exchange to an Options Member that grants the Trading Permit Holder (''TPH'') the right to access one or more of the facilities of the Exchange for the purpose of effecting transactions in options traded on the Exchange without

the services of another person acting as broker, and otherwise to access the facilities of the Exchange for purposes of trading or reporting transactions or transmitting orders or quotations in options traded on the Exchange, or to engage in other activities that, under the Rules of IEX Options, may only be engaged in by the TPH that satisfies any applicable qualification requirements to exercise those rights. A Trading Permit conveys no ownership interest in the Exchange, is only available through the Exchange, and is subject to the terms and conditions set forth in Rule 18.140.[53]

• Trading Permit Holder. The term ''Trading Permit Holder'' or ''TPH'' means the holder of a Trading Permit, as described in IEX Rule 18.140.[54]

• Trading System. The term ''Trading System'' means the automated trading system used by IEX Options for the trading of options contracts.

• Type of Option. The term ''type of option'' means the classification of an options contract as either a put or a call.

• Uncovered. The term ''uncovered'' means a short position in an options contract that is not covered.

• Underlying Security. The term ''underlying security'' means the security that the Clearing Corporation shall be obligated to sell (in the case of a call option) or purchase (in the case of a put option) upon the valid exercise of an options contract.

• User. The term ''User'' means any Options Member or Sponsored Participant who is authorized to obtain access to the Trading System pursuant to Rule 11.130 (Access).

Execution System

IEX Options will utilize a pro-rata allocation model with execution priority dependent on the size and capacity of an order; specifically, Priority Customer or non-Priority Customer, as well as status as a Registered Market Maker or Specialist, as applicable. The proposed pro-rata allocation model is similar to the MIAX and NYSE Amex options exchanges.[55]

The Exchange will become an exchange member of the OCC. The Trading System will be linked to OCC

---

[51] This definition is substantively identical to the definition in MIAX Rule 100. IEX proposes to incorporate this definition, because the Market Maker rules proposed herein are substantially based upon the rules of MIAX.

[52] This definition is substantively identical to the definition of Lead Market Makers and Primary Lead Market Makers in MIAX Rule 100. As discussed above, IEX proposes to incorporate the MIAX definitions for both Lead Market Makers and Primary Lead Market Makers into its definition for Specialists, because the Market Maker rules proposed herein are substantially based upon the rules of MIAX.

[53] This definition is substantively identical to the definition in C1 Rule 1.1. IEX proposes to incorporate this definition, because its proposed Trading Permit rule (Rule 18.140), is substantively similar to the equivalent C1 Rule (C1 Rule 3.1).

[54] This definition is substantively identical to the definition in C1 Rule 1.1. IEX proposes to incorporate this definition, because its proposed Trading Permit rule (Rule 18.140), is substantively similar to the equivalent C1 Rule (C1 Rule 3.1).

[55] See infra note 79.

for the Exchange to transmit locked-in trades for clearance and settlement.[56]

IEX Options will include a de minimis delay on incoming order and quote messages designed to enable IEX to update its view of the market prior to processing orders and quotes, and an optional Market Maker quote parameter designed to protect Market Makers from excessive risk due to execution of stale quotes, in addition to other risk protections substantially similar to those offered by other options exchanges.

Anonymity

As set forth in proposed Rule 22.190, aggregated and individual transaction reports produced by the Trading System will indicate the details of a User's transactions, including the contra party's unique market participant identifier ("MPID"), capacity, and clearing firm account number.[57]

Latency Mechanism [58]

IEX's proposal includes a de minimis hardware based latency mechanism (or speedbump) of up to 350 microseconds added to each incoming order and quote message [59] designed to enable IEX to update its view of the market prior to processing orders and quotes as well as to perform the Options Quote Indicator ("Indicator") calculation with current market data.[60] The specific amount of latency provided by the latency mechanism will be communicated by Trading Alert with at least 30 days prior notice; however, the amount of latency will not exceed 350 microseconds.[61] If

the Exchange determines to increase the duration of the maximum delay, it will do so only pursuant to an effective rule filing submitted to the Commission pursuant to Section 19 of the Exchange Act.[62]

Hours of Operation

As provided in proposed Rule 22.110(a), the IEX Options Trading System will begin accepting orders and quotes beginning at 8:00 a.m.[63] pursuant to the market opening procedures described in proposed Rule 22.160. Orders and bids and offers shall be open and available until 4:00 p.m. except for options contracts on Fund Shares, as defined in proposed Rule 20.120(i), which may close as of 4:15 p.m. The Proposed Hours of Operation rule is based on MEMX Rule 21.2, except that MEMX does not allow for submission of quotes before the market opens for trading; IEX notes that other exchanges begin accepting orders and quotes before the market opens, for example C1 begins accepting quotes at 7:30 a.m.[64] Except as set forth above, IEX Options shall operate during the normal business days and hours set forth in the rules of the primary market trading the securities underlying options traded on IEX Options, absent unusual conditions as may be determined by the Exchange.[65] IEX Options will not be open for business on any holiday observed by the Exchange.[66]

Units of Trading

As stated in proposed Rule 22.120, the unit of trading in each series of options traded on IEX Options will be the unit of trading established for that series by the OCC pursuant to the rules of the OCC and the agreements of the Exchange with the OCC. The proposed determination of the unit of trading for a series of options traded on IEX Options is the same as on MEMX Options pursuant to MEMX Rule 21.3.

Minimum Quotation and Trading Increments

As stated in proposed Rule 22.140(a), the Exchange is proposing to apply the following quotation increments: (1) if the options series is trading at less than $3.00, five (5) cents; (2) if the options series is trading at $3.00 or higher, ten (10) cents; and (3) if the options series is trading pursuant to the Penny Interval Program one (1) cent if the options series is trading at less than $3.00, five (5) cents if the options series is trading at $3.00 or higher, except for QQQ, SPY, or IWM where the minimum quoting increment will be one (1) cent for all series. In addition, as stated in proposed Rule 22.140(b), the Exchange is proposing that the minimum trading increment for options contracts traded on IEX Options will be one (1) cent for all series. Such proposed minimum quotation and trading increments are the same as on MEMX Options pursuant to MEMX Rules 21.5(a) and (b).

Penny Interval Program

As set forth in proposed Rule 22.140(c), the Exchange is proposing to adopt a Penny Interval Program that is substantially similar to the penny programs of other exchanges, including MEMX Options pursuant to MEMX Rule 21.5(d), which includes minimum quoting requirements for options classes listed under the Penny Interval Program. However, eligibility for inclusion in the Penny Interval Program will be limited to those classes already operating under penny programs of other options exchanges at the time IEX Options is launched. The list of options classes included in the Penny Interval Program will be announced by the Exchange via circular distributed to Options Members and published by the Exchange on its website.

Order Types and Handling Instructions

The Trading System will make available to Users two Order Types (as defined in proposed Rule 22.100(d))—Limit orders and Market orders—as well as various order instructions and modifiers that can be appended to such orders. The characteristics and functionality of each Order Type is substantially similar to what is currently approved for use in the Exchange's equities trading facility or on other options exchanges, including MEMX Options, except where described below.

IEX Options will support bulk messages for Options Market Makers as specified in the description of each Order Type or other instruction. Proposed Rule 22.100(d) includes the

---

[56] Proposed Rule 22.220(a) notes that all Options transactions shall be submitted for clearance to the Clearing Corporation, and the Exchange shall assume no responsibility with respect to any unmatched trade or for any delays or errors in the reporting to it of trade information. This provision is based upon and substantively identical to MIAX Rule 524.

[57] The Exchange shall also reveal a User's identity: (i) when a registered clearing agency ceases to act for a participant, or the User's clearing firm, and the registered clearing agency determines not to guarantee the settlement of the User's trades; and (ii) for regulatory purposes or to comply with an order of an arbitrator or court. See proposed Rule 22.190. The Exchange notes that proposed Rule 22.190 is identical to MEMX Rule 21.10.

[58] See proposed Rule 22.100(n).

[59] As it does for with equities trading (which applies a constant inbound latency of 350 microseconds), IEX will subject incoming order and quote messages to a *de minimis* delay using coiled optical fiber. *See* Rule 11.510(a).

[60] *See infra* for more information about Indicator.

[61] In determining the amount of latency, the Exchange will seek to achieve a healthy balance between liquidity providers and liquidity takers. Due to force majeure events and acts of third parties, the Exchange does not guarantee that the delay will always be consistent. The Exchange will periodically monitor such latency and will make adjustments to the latency as reasonably necessary

to achieve consistency with the target latency (*i.e.,* the latency that has been communicated) as soon as commercially practicable.

[62] The latency mechanism will not apply to outbound communications from the Exchange to a User, inbound and outbound communications between the Exchange and an Away Market regarding a routed order, inbound communications from data feeds, order processing and order execution on the IEX Options Order Book, outbound communications to the Exchange's proprietary data feeds or OPRA.

[63] All times in this filing refer to the Eastern time zone.

[64] *See* C1 Rule 5.7.

[65] *See* Proposed IEX Rule 22.110(b).

[66] *See* Proposed IEX Rule 22.110(c).

USCA11 Case: 25-13631    Document: 27    Date Filed: 12/19/2025    Page: 27 of 205    A008

following details with respect to Limit orders and Market orders:

• Limit order. Limit orders are orders (including bulk messages) to buy or sell an option at a specified price or better. A Limit order is marketable when, for a Limit order to buy, at the time it is entered into the Trading System, the order is priced at the current inside offer or higher, or for a Limit order to sell, at the time it is entered into the Trading System, the order is priced at the current inside bid or lower.

• Market order. Market orders are orders to buy or sell at the best price available at the time of execution. Market orders to buy or sell an option traded on IEX Options will be rejected if they are received when the underlying security is subject to a ''Limit State'' or ''Straddle State'' as defined in the Plan to Address Extraordinary Market Volatility Pursuant to Rule 608 of Regulation NMS under the Act (the ''Limit Up-Limit Down Plan''). Bulk messages may not be Market orders.

Pursuant to Rule 22.100(d)(3), Users have the option to designate an order as ''attributable'' to that User's MPID. Attributable orders are Market or Limit orders which display the User's MPID for purposes of trading on the Exchange. Use of attributable orders is voluntary. Attributable orders may not be available for all Exchange processes. The Exchange will distribute a circular to Options Members specifying the processes for which the attributable order-type shall be available.[67]

The Trading System will also make available to Users several additional instructions that can be designated on an order (''Handling Instructions''). A Handling Instruction applied to a bulk message applies to each bid and offer within that bulk message. The Handling Instructions available on IEX Options are described in proposed Rule 22.100(e) and will include the following:

• Book Only. Book Only is an instruction that an order is to be ranked and executed on the Exchange pursuant to proposed Rule 22.170 (Order Display and Book Processing) or to be repriced or cancelled, as appropriate, without routing away to another options exchange.

• Post Only. Post Only is an instruction that an order is to be ranked and executed on the Exchange pursuant to proposed Rule 22.170 (Order Display and Book Processing) or cancelled, as appropriate, without routing away to

another options exchange except that the order will not remove liquidity from the IEX Options Book. The Trading System reprices, cancels or rejects a bid (offer) designated as Post Only with a price that locks or crosses the Exchange's best offer (bid). A Market order cannot be designated as Post Only.

• Intermarket Sweep Order (''ISO''). ISOs are orders that shall have the meaning provided in proposed Rule 28.100, which relates to intermarket trading. Such orders may be executed at one or multiple price levels in the Trading System without regard to Protected Quotations at other options exchanges (*i.e.,* may trade through such quotations). The Exchange relies on the marking of an order as an ISO order when handling such order, and thus, it is the entering Options Member's responsibility, not the Exchange's responsibility, to comply with the requirements relating to ISOs. ISOs are not eligible for routing pursuant to proposed Rule 22.180. A Market order cannot be designated as an Intermarket Sweep Order. Users may not designate bulk messages as ISOs.

The Exchange notes that each of the proposed Order Types and Handling Instructions available on IEX Options are based upon and substantially similar to those of MEMX, with the exception of the Attributable Orders not offered by MEMX.

Time-in-Force (''TIF'') Designations

Users entering orders into the Trading System may designate such orders to remain in force and available for display and/or potential execution for varying periods of time. Unless cancelled earlier, once these time periods expire, the order (or the unexecuted portion thereof) is returned to the entering party. A TIF applied to a bulk message applies to each bid and offer within that bulk message. Unless otherwise specified in the Exchange Rules or the context indicates otherwise, the Exchange determines which of the following TIFs are available on a class or system basis. The TIF designations available on IEX Options are described in proposed Rule 22.100(g) and will include the following:

• Immediate Or Cancel (''IOC''). IOC means, for an order so designated, an order that is to be executed in whole or in part as soon as such order is received. The portion not so executed immediately on the Exchange or another options exchange is cancelled and is not posted to the IEX Options Book. IOC orders that are not designated as Book Only and that cannot be executed in accordance with proposed Rule 22.170 on the Trading System when reaching

the Exchange will be eligible for routing away pursuant to proposed Rule 22.180.

• Day. Day means, for an order so designated, an order to buy or sell which, if not executed expires at market close. Market Makers may designate bulk messages as Day.

The Exchange notes that each of the proposed TIF designations available on IEX Options is identical to the same TIF designations available on MEMX Options, except that they are applied differently in one respect. Specifically, MEMX Options allows bulk messages to have a TIF of IOC. IEX is proposing to only allow bulk messages to have a TIF of DAY so that Market Makers do not take liquidity with quotes submitted via bulk messages, and which are meant for liquidity provision by Market Makers, which by definition the Exchange believes constitutes orders resting on the Order Book.

Anti-Internalization Qualifier (''AIQ'') Modifiers

As with its equities market, the Exchange will allow Users to use certain AIQ modifiers, which are described in proposed Rule 22.100(h). Any incoming order designated with an AIQ modifier will be prevented from executing against a resting opposite side order also designated with an AIQ modifier and originating from the same MPID, Options Member identifier, trading group identifier, or Sponsored Participant identifier. The Exchange will offer the following AIQ modifiers: AIQ Cancel Newest, described in proposed Rule 22.100(h)(1); AIQ Cancel Oldest, described in proposed Rule 22.100(h)(2); AIQ Cancel Both, described in proposed Rule 22.100(h)(3); and AIQ Cancel Smallest, described in proposed Rule 22.100(h)(4). The Exchange notes that each of the proposed AIQ modifiers available on IEX Options is substantially similar to the same modifiers available on MEMX Options[68], with the distinction that on MEMX a market maker may include the AIQ modifier on bulk messages, while IEX is proposing to not allow AIQ modifiers to be included on bulk messages because it would be meaningless on IEX where bulk messages will only be for liquidity adding quotes, and the AIQ modifier that dictates the AIQ interaction is determined by the liquidity removing order.[69]

---

[67] The proposed definition is substantively identical to the definition in MIAX Rule 516(e). IEX proposes to incorporate this definition and functionality, because MEMX Options does not have Attributable Orders.

[68] MEMX does not offer an AIQ Cancel Smallest modifier, but it is offered by other exchanges such as C1. *See* C1 Rule 5.6 (Match Trade Prevention Modifier—MTP Cancel Smallest).

[69] MEMX calls them ''Match Trade Prevention'' modifiers. *See* MEMX Rule 21.1(h).

Re-Pricing Mechanism

Like other options exchanges, the Exchange proposes to offer a re-pricing mechanism to Users to comply with the order protection and trade through restrictions of the Options Order Protection and Locked/Crossed Market Plan.[70] This re-pricing mechanism, described in proposed Rule 22.100(i), is referred to by the Exchange as Price Adjust and is substantially similar to the Price Adjust mechanism offered by MEMX Options pursuant to MEMX Rule 21.1(i), with the exception that IEX will only allow the ranked price and displayed price of an order that has been repriced to be adjusted to a more aggressive price one additional time (unlike MEMX, which allows multiple adjustments).[71]

MPIDs

As proposed in Rule 22.100(j), the term "MPID" means the unique market participant identifier assigned to a User and shall refer to what the Trading System uses to identify the User and the clearing number for the execution of orders and quotes submitted to the Trading System with that MPID. Each MPID corresponds to a single User and a single clearing number of a Clearing Member with the Clearing Corporation. A User may obtain multiple MPIDs, which may be for the same or different clearing numbers. A User is able (in a form and manner determined by the Exchange) to designate which of its MPIDs may be used for each of its ports. If a User submits an order or quote through a port with an MPID not enabled for that port, the Trading System cancels or rejects the order or quote. The Exchange notes that its proposed Rule 22.100(j) is identical to MEMX Rule 21.1(j) except that MEMX uses the term EFID rather than MPID.

Ports and Bulk Messages

Proposed Rule 22.100(k) defines two types of ports: (1) a "physical port," which provides a physical connection to the Trading System and may provide access to multiple logical ports; and (2) a "logical port" or "application session," which provides Users with the ability within the Trading System to accomplish a specific function through a connection, such as order entry, data receipt, or access to information. The Exchange notes that each of the proposed types of ports available on IEX

Options is identical to the same types of ports on MEMX Options.

The term "bulk message" is proposed to mean a single electronic message a User submits with a Market Maker Capacity to the Exchange in which the User may enter, modify, or cancel up to an Exchange-specified number of bids and offers (which number the Exchange will announce via Exchange notice and publicly available technical specifications). The Trading System handles a bulk message in the same manner as it handles an order or quote, unless the Exchange Rules specify otherwise.

Only Market Makers may submit bulk messages through a logical port in a class in which the Market Maker has an appointment. In addition, bulk messages have a default TIF of Day and a default designation of Post Only. As proposed, the Trading System will cancel, reject, or reprice a Post Only bulk message bid (offer) with a price that locks or crosses the Exchange best offer (bid) or ABO (ABB).[72] These provisions are similar to the manner in which market maker bulk messages are handled by MEMX, which allows bulk messages to also have a TIF of IOC, a designation as book only, and post only bulk messages in unassigned classes.[73]

Cancel Back

The term "Cancel Back" is proposed to mean an instruction a User designates on an order (including bulk messages) to not be subject to the Price Adjust process pursuant to proposed Rule 22.100(i). The Trading System cancels or rejects an order with a Cancel Back instruction (immediately at the time the Trading System receives the order or upon return to the Trading System after being routed away) if displaying the order on the Book would create a violation of proposed Rule 28.120, or if the order cannot otherwise be executed or displayed in the Book at its limit price. The Trading System executes a Book Only—Cancel Back order against resting orders. The proposed definition of Cancel Back in proposed Rule 22.100(m) is substantively identical to a Cancel Back Order defined in MEMX Rule 21.1(m).

Market Opening Procedures

As proposed, the Trading System will accept quotes, Limit orders with a TIF of DAY and Market orders for inclusion in the opening process ("Opening Process") beginning at 8:00 a.m. or immediately upon trading being halted in an options series due to the primary listing market for the applicable underlying security declaring a regulatory trading halt, suspension, or pause with respect to such security (a "Regulatory Halt"), and will continue to accept Market and Limit orders and quotes until such time as the Opening Process is initiated in that options series (the "Pre-open state").[74]

After the first transaction on the primary listing market after 9:30 a.m. in the securities underlying the options as reported on the first print disseminated pursuant to an effective national market system plan or the Regulatory Halt has been lifted, the related options series will be opened automatically as described below. The Exchange will conduct its "Core Open Auction" for each series of options contracts upon receipt of an "Auction Trigger," *i.e.,* the moment that the Primary Market for the underlying security first disseminates both a two-sided quote and a trade of any size that is at or within the quote (in the case of reopening after a Regulatory Halt, the Auction Trigger also includes notification that the underlying stock is no longer halted).[75] The Exchange will disseminate a message to market participants indicating the initiation of the opening process, conduct the opening auction, and then transition to continuous trading for each series of options contracts.[76] The proposed market opening procedures are substantially similar to the market opening procedures specified in NYSE Arca Options Rule 6.64P–O, subject to several differences, most notably that any imbalance would be allocated on a pro rata basis.[77]

---

[70] *See* Securities Exchange Act Release No. 60405 (July 30, 2009), 74 FR 39362 (Aug. 6, 2009) (File No. 4–546).

[71] The Exchange notes that this behavior is substantially similar to the "single price adjust" behavior in C1 Rule 5.32(b)(2)(A).

[72] *See* proposed IEX Rule 22.100.

[73] *See* MEMX Rule 21.1(l). IEX notes that the ability of the Trading System to cancel or reject a post only order submitted on a bulk port with a price that locks or crosses the Exchange best offer (bid) or ABO (ABB) is substantively identical to MEMX Rule 21.1(l)(3); IEX will also allow the Trading System to reprice a post only order submitted on a bulk port with a price that locks or crosses the Exchange best offer (bid) or ABO (ABB), which is substantively identical to the functionality in C1 Rule 5.32(b)(1)(B).

[74] *See* proposed Rule 22.160(a)(13).

[75] *See* proposed Rule 22.160(a)(5) and (7).

[76] *See* proposed Rule 22.160. IEX notes that pursuant to proposed Rule 22.160(b)(3), the priority overlays specified in proposed Rule 22.170(f)(2) and (3) will not be available during an Auction, but will resume once the Exchange has transitioned to continuous trading.

[77] *See* proposed Rule 22.160(b). Other differences include: IEX will begin accepting orders for the opening auction at 8:00 a.m., while NYSE Arca begins accepting orders for their opening auction at 6:00 a.m. *See* proposed Rule 22.160(a)(13)(A) versus NYSE Arca Options Rule 6.64P–O(a)(12)(A). Additionally, IEX will begin disseminating Auction Imbalance Information at 8:30 a.m., while NYSE Arca begins disseminating imbalance information at 8:00 a.m. *See* proposed Rule 22.160(c)(1) versus NYSE Arca Options Rule 6.64P–O(c)(1). Further,

Continued

USCA11 Case: 25-13631    Document: 27    Date Filed: 12/19/2025    Page: 29 of 205 **A010**

Order Display/Matching System

The Trading System will be based upon functionality currently approved for use in the Exchange's equities trading system. Specifically, the Trading System will allow Users to enter Market orders and priced Limit orders to buy (bids) and sell (offers). All bids or offers made and accepted on IEX Options in accordance with the Exchange Rules shall constitute binding contracts, subject to applicable requirements of the Exchange Rules and the Rules of the Clearing Corporation. Such orders are executable against marketable contra-side orders in the Trading System.[78] Resting quotes and orders on the IEX Options Book will be prioritized according to price. If there are two or more quotes or orders at the best price, then the options contracts will be allocated proportionally according to size (in a pro-rata fashion), rounded down to the nearest contract. If there are residual options contracts to be filled, the quote or order with the largest remaining size (based on the pro rata calculation) will receive the first contract, and each successive contract (if any) will be allocated to each subsequent quote or order based on size (largest to smallest). If there are two or more quotes or orders with the same remaining size, then the quote or order with the first time priority will be allocated the next options contract. Each successive options contract (if any) will be allocated in the same manner.[79]

Routing

IEX Options will offer a simple optional routing functionality to facilitate compliance with applicable regulations and will not offer other complex routing strategies. Options Members can designate orders that have not been executed in full by the Trading System pursuant to Rule 22.170 above as either available for routing or not available for routing.[80] IEX Options will support orders that are designated to be routed to the NBBO as well as orders that will execute only within IEX Options. Orders that are designated to execute at the NBBO will be routed to other options markets to be executed when the Exchange is not at the NBBO[81] consistent with the Options

Order Protection and Locked/Crossed Market Plan.[82]

Subject to the exceptions contained in proposed Rule 28.110(b), the Trading System will ensure that an order will not be executed at a price that trades through another options exchange. An order that is designated by an Options Member as routable will be routed in compliance with applicable trade-through restrictions. Any order entered with a price that would lock or cross a Protected Quotation that is not eligible for either routing or the price adjust process as defined in proposed Rule 22.100(i) will be cancelled. Bulk messages are not eligible for routing.

IEX Options will route orders in options via IEX Services LLC ("IEX Services"), which serves as the Outbound Router of the Exchange, as defined in Rule 2.220 (IEX Services LLC as Outbound Router).[83] The function of the Outbound Router will be to route orders in options listed and open for trading on IEX Options by transmitting such orders to one or more routing brokers that are not affiliated with the Exchange to other options exchanges ("Routing Services") pursuant to the Exchange Rules on behalf of IEX Options.[84] The Outbound Router is subject to regulation as a facility of the Exchange, including the requirement to file proposed rule changes under Section 19 of the Exchange Act.[85] Parties that do not desire to use the Routing Services provided by the Exchange must designate orders as not available for routing.[86] The Exchange notes that the proposed rules relating to the routing of orders on IEX Options to away options markets are substantively identical to the MEMX Back-Up Order Routing Services described in MEMX Rule 21.9(e).[87]

Priority of Routed Orders

Orders that have been routed by the Trading System to other options exchanges are not ranked and maintained in the IEX Options Book pursuant to Rule 22.170, and therefore are not available to execute against incoming orders. Once routed by the Trading System, an order becomes

subject to the rules and procedures of the destination options exchange including, but not limited to, order cancellation. If a routed order is subsequently returned, in whole or in part, that order, or its remainder, shall receive a new time stamp reflecting the time of its return to the Trading System.[88]

Market Access

In connection with the proposed rules regarding routing to away options exchanges, proposed Rule 22.180(e) provides that IEX Services has, pursuant to Rule 15c3–5 under the Act,[89] implemented certain tests designed to mitigate the financial and regulatory risks associated with providing the Exchange's Users with access to such away options exchanges. Pursuant to the policies and procedures developed by IEX Services to comply with Rule 15c3–5, if an order or series of orders are deemed to be erroneous or duplicative, would cause the entering User's credit exposure to exceed a preset credit threshold, or are non-compliant with applicable pre-trade regulatory requirements (as defined in Rule 15c3–5), IEX Services will reject such orders prior to routing and/or seek to cancel any orders that have been routed. This is consistent with the routing implementation of other options exchanges, and the Exchange notes that proposed Rule 22.180(e) is substantively identical to MEMX Rule 21.9(f).

Order Priority

After the opening, trades on the Exchange will occur when a buy order/quote and a sell order/quote match on the Exchange's order book. The Trading System shall execute trading interest within the Trading System in price priority, meaning it will execute all trading interest at the best price level within the Trading System before executing trading interest at the next best price. Pursuant to proposed Rule 22.170, after considering price priority, all options contracts are allocated proportionally according to size (in a pro-rata fashion). If the executed quantity cannot be evenly allocated, the remaining options contracts will be distributed one at a time based upon price-size-time priority.

In addition, the Exchange supports multiple priority overlays that apply ahead of the default pro-rata allocation at a given price level. Pursuant to proposed Rule 22.170(f),[90] these priority

---

IEX does not define Far Clearing Price, because IEX does not propose to have Auction Only orders, to which the Far Clearing Price relates.

[78] *See* proposed Rule 22.170.

[79] *See* proposed Rule 22.170(b). This pro-rata allocation methodology is based upon the substantially similar methodology in MIAX Rule 514(c)(2) and NYSE Amex Rule 964NYP(i)(2).

[80] *See* proposed Rule 22.180(a).

[81] As described *infra,* if the order is eligible for the Step-Up Mechanism (set forth in proposed Rule

22.270), the Trading System will attempt to fill the order before routing it to an away market.

[82] *See supra* note 70.

[83] *See* proposed Rule 22.180(d).

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] MEMX also offers the option of using its outbound router, MEMX Execution Services to route directly to other exchanges. *See* MEMX Rule 21.9(d). IEX is not proposing to adopt this functionality, because it will only provide for routing through IEX Services to third party broker dealers.

[88] *See* proposed Rule 22.180(b).

[89] 17 CFR 240.15c3–5.

[90] Proposed Rule 22.170(f) is based upon and substantially similar to C1 Rule 5.32(a)(2), except is

overlays are made available at the Exchange's discretion on a class-by-class basis: (1) the Priority Customer overlay,[91] which provides resting interest from Priority Customers with priority over all non-Priority Customer interest at the same price, will always take priority over all other priority overlays; (2) the Specialist Participation Entitlement overlay,[92] which provides the Specialist with priority over interest from other non-Priority Customers for a certain percentage of contracts allocated at the same price (entitling the Specialist to 60% of the allocation if there is another non-Priority Customer at the NBBO or 40% if there are two or more other non-Priority Customers at the NBBO[93]) when quoting at the NBBO, inclusive of the case in which the order is directed to the Specialist; (3) the Directed Market Maker Participation Entitlement overlay,[94] which provides a Directed Market Maker with priority over interest from other non-Priority Customers for a certain percentage of contracts allocated at the same price (entitling the DMM to 60% of the allocation if there is another non-Priority Customer at the NBBO or 40% if there are two or more other non-Priority Customers at the NBBO[95]) when quoting at the NBBO and always applies in place of the Specialist Participation Entitlement overlay when both are in effect and the order is directed to a Directed Market Maker other than the Specialist;[96] and (4) the Small-Size Order Entitlement overlay,[97] which provides a Specialist quoting at the NBBO the priority to execute against the entire size of an order or quote of five or fewer contracts that does not first execute against any Priority Customer orders at that price, provided that if an order subject to the Small-Size Order Entitlement is directed to a Directed Market Maker who is not the Specialist quoting at the NBBO, and the Directed Market Maker priority overlay is enabled in the series, then the Directed Market Maker Participation Entitlement priority overlay will apply instead of the Small-Size Order Entitlement priority overlay[98], and in the case that an order subject to the Small-Size Order Entitlement is directed to the Specialist, the Small-Size Order Entitlement priority overlay will apply while the Specialist Participation Entitlement and Directed Market Maker Entitlement overlays will not.[99]

After executions resulting from the Priority Overlays described above, orders and quotes within the Trading System for the accounts of non-Priority Customers, including Professional Customers, have next priority. If there is more than one highest bid or more than one lowest offer on the Options Order Book for the account of a non-Priority Customer, then such bids or offers will be afforded priority on a size pro-rata basis, as described above.

Step Up Mechanism

IEX proposes to offer Options Members an optional Step Up Mechanism ("SUM"), which is a feature within the Trading System that provides automated order handling in designated classes trading for qualifying orders that are not automatically executed by the Trading System.[100] The Exchange will determine eligibility of an order for the SUM (including order size, type, capacity, handling instructions, as well as which classes of options contracts). The Exchange will not initiate the SUM process if the NBBO is crossed.[101] SUM automatically processes upon receipt of an eligible order that is marketable against the BBO that is not the NBBO; or an eligible order that would improve the Exchange's BBO and that is marketable against the ABBO. This proposed functionality is substantively identical to the Step-Up Mechanism offered by C1, with the exception that

IEX is not proposing to offer All or None orders.[102] IEX notes that the optional SUM mechanism is designed to benefit a routable order that is not immediately eligible for execution on the Exchange, but if routed to an away exchange might miss a potential execution on that exchange. And, because SUM is optional, a Member can choose not to have its order subject to the SUM mechanism if it determines that the functionality is not consistent with its objectives. Given the multitude of tradeable listed options securities (compared to listed equities) not all available liquidity is always reflected in an exchange's order book, and the SUM mechanism provides an opportunity to source such additional liquidity to the benefit of the order in question. Moreover, IEX notes as well that other options exchanges offer similar mechanisms, and order flow might be directed to such exchanges if IEX did not offer such a mechanism.

Upon receipt of a SUM eligible order, the Trading System will expose the order at the NBBO upon receipt for a period of time determined by the Exchange on a class-by-class basis, which period of time may not exceed one second. All Users may submit responses to the exposure message, which must be limited to the size of the order being exposed, may be modified, cancelled or replaced any time during the exposure period, and are cancelled back at the end of the exposure period if unexecuted. Responses priced at the prevailing NBBO or better will immediately trade against the order in time priority. If during the exposure period the Exchange receives an unrelated order (or quote) on the opposite side of the market from the exposed order that could trade against the exposed order at the prevailing NBBO price or better, then the orders will trade at the prevailing NBBO price. The exposure period will not terminate if a quantity remains on the exposed order after such trade.

Responses that are not immediately executable based on the prevailing NBBO may become executable during the exposure period based on changes to the NBBO. In the event of a change to the NBBO and at the conclusion of the exposure period, the Exchange will evaluate remaining responses as well as the ABBO and execute any remaining portion of the exposed order to the fullest extent possible at the best price(s) by executing against responses and unrelated orders.

Following the exposure period, the Exchange will route the remaining

different in one respect. Unlike C1, in the event that a Small-Size order is directed to a Specialist, the IEX Options trading system will apply the Small-Size Order Entitlement to the order and not the Directed Order guarantee, meaning the Specialist will have priority to execute against the entire size of the order that does not execute against any Priority Customer orders at that price.

[91] *See* proposed Rule 22.170(f)(1).

[92] *See* proposed Rule 22.170(f)(2). This overlay may only be in effect if the Priority Customer overlay is also in effect. *See* proposed Rule 22.170(f).

[93] These allocation entitlements are based on MIAX Rule 514(h)(1), after accounting for the additional priorities afforded market makers on MIAX, as set forth in MIAX Rule 514(e). *See supra* note 79 and accompanying text.

[94] *See* proposed Rule 22.170(f)(2). This overlay may only be in effect if the Priority Customer overlay is also in effect. *See* proposed Rule 22.170(f).

[95] These allocation entitlements are based on MIAX Rule 514(h)(1), after accounting for the additional priorities afforded market makers on MIAX, as set forth in MIAX Rule 514(e). *See supra* note 79 and accompanying text.

[96] Prioritizing the DMM entitlement over the Specialist entitlement in these circumstances is the same functionality offered by several other exchanges. *See, e.g.,* NYSE Amex Options Rule 964NYP(h)(1).

[97] *See* proposed Rule 22.170(f)(3).

[98] *See* proposed Rule 22.170(f)(3)(A).

[99] *See* proposed Rule 22.170(f)(3)(B). This is functionally identical to how NYSE Amex Options allocates small-size Directed Orders that are directed to a Specialist. *See* NYSE Amex Options Rule 965NYP(h)(2)(B).

[100] *See* proposed Rule 22.270. IEX's proposed Step-Up Mechanism is substantively identical to C1 Rule 5.35.

[101] *See* proposed Rule 22.270(a).

[102] *See* C1 Rule 5.35.

portion of the exposed order to other exchanges, unless otherwise instructed by the User. Any portion of a routed order that returns unfilled shall trade against the Exchange's best bid/offer unless another exchange is quoting at a better price in which case new orders shall be generated and routed to trade against such better prices.

Data Dissemination

The Exchange will disseminate to OPRA the highest bid and the lowest offer, and the aggregate quotation size associated therewith that is available, in accordance with the requirements of Rule 602 of Regulation NMS under the Act.[103] The Exchange will also offer three data products: (1) IEX Options DEEP: an uncompressed data feed that offers depth of book quotations and execution information based on options orders entered into the Trading System; (2) IEX Options TOPS: an uncompressed data feed that offers top of book quotations and execution information based on options orders entered into the Trading System; and (3) DROP: an uncompressed data feed that offers information regarding the options trading activity of a specific User.[104] DROP is only available to the User to whom the specific data relates and those recipients expressly authorized by the User.[105]

Risk Controls

The Exchange also proposes to offer to all Users of IEX Options the ability to establish certain risk control parameters and limits that are intended to assist Users in managing their market risk. The proposed risk controls are based, in part, on those of the NYSE Arca and C1 options exchanges, with certain additions and differences described below. The proposed risk controls are designed to offer Users protection from entering orders outside of certain size and price parameters, as well as certain standard or Exchange-established parameters based on order type and market conditions.

The proposed risk controls include: (i) pre-trade risk controls; (ii) activity-based risk controls; and (iii) global risk controls, as set forth in proposed Rule 22.250.[106] Pre-trade, activity-based, and global risk controls may be set before the beginning of a trading day.[107] Pre-trade, activity-based, and global risk controls can be set at the MPID or MPID

Group level,[108] or both, depending on the risk control.[109] Additionally, pre-trade risk controls to restrict the options class(es) transacted must be set per options class.[110] The following describes each category of risk protection mechanism:

Pre-Trade Risk Controls [111]

The pre-trade risk controls mechanism is a set of optional limits, each of which an Options Member may utilize with respect to its trading activity on the Exchange. These controls include controls related to the maximum dollar amount for a single order to be applied one time and the maximum number of contracts that may be included in a single order before it can be traded. Additionally, there are optional controls related to the price of an order or quote (including percentage-based and dollar-based controls), controls related to the order types or modifiers that can be utilized, controls to restrict the options classes transacted, and controls to prohibit duplicative orders.

Activity-Based Risk Controls [112]

The Exchange also proposes to offer activity-based risk limits that may be applied to orders and quotes in an options class (when acting as a Market Maker, an Options Member is required to select at least one of the following controls [113]) based on specified thresholds measured over the course of a configurable time period ("Interval"). The Exchange will offer the following activity-based risk controls: (i) transaction-based risk limits, which are pre-established limits on the number of an Options Member's orders and quotes executed in a specified class of options per Interval; (ii) volume-based risk limit, which are pre-established limits on the number of contracts of an Options Member's orders and quotes that can be executed in a specified class of options

per Interval; and (iii) percentage-based risk limits, which are pre-established limits on the percentage of contracts executed in a specified class of options as measured against the full size of an Options Member's orders and quotes executed per Interval. To determine whether an Options Member has breached the specified percentage limit, the Exchange calculates the percent of each order or quote in a specified class of options that is executed during an Interval (each, a "percentage"), and sums up those percentages. This risk limit will be breached if the sum of the percentages exceeds the pre-established limit.

Global Risk Control[114]

The Exchange also proposes to offer a global risk control, which is a pre-established limit on the number of times an Options Member may breach its activity-based risk controls per Interval.

Automated Breach Actions [115]

Proposed Rule 22.250(c) details the "automated breach actions" the Exchange will take if any of the three above-described risk controls are breached. Based on User preference, these actions can include blocking new orders and quotes, canceling orders and quotes on the Order Book, or notifying the Options Member of the breach. With respect to the activity-based and global risk controls (as well as Kill Switch Actions described below), in order to remain consistent with the firm quote obligations of a broker-dealer pursuant to Rule 602 of Regulation NMS, any marketable interest that is executable against an order or quote that is received [116] prior to the time the applicable threshold is triggered and processed by the Trading System will be automatically executed up to the size of the resting order or quote, regardless of whether the execution would cause the Member to exceed their pre-set risk threshold(s).[117]

---

[103] See proposed Rule 22.240(a).

[104] See proposed Rule 22.240(b).

[105] Data products will be subject to fees as specified in an effective Commission rule filing.

[106] Proposed Rule 22.250 is based upon and substantially similar to NYSE Arca Rule 6.40P–O.

[107] See proposed Rule 22.250(b)(1).

---

[108] MPID Groups, defined in proposed Rule 22.250(a)(5), are based upon C1 Rule 5.34(c)(4)(A), which allows for the setting of risk control limits for EFID Groups, which are equivalent to MPID Groups. IEX notes that it proposes to retain the right to limit the number of MPID Groups an Options Member can configure based upon potential technical limitations.

[109] See proposed Rule 22.250(b)(2). IEX notes that while it allows these risk controls to be set at MPID or MPID Group levels, NYSE Arca allows the equivalent controls to be set at either the MPID or the MPID Sub-ID level (a more granular level than the MPID).

[110] See proposed Rule 22.250(b)(2).

[111] See proposed Rule 22.250(a)(1), which is substantively identical to NYSE Arca Rule 6.40P–O(a)(2).

[112] See proposed Rule 22.250(a)(2), which is substantively identical to NYSE Arca Rule 6.40P–O(a)(3).

[113] See proposed Rule 22.250(c)(2)(A).

---

[114] See proposed Rule 22.250(a)(3), which is substantively identical to NYSE Arca Options Rule 6.40P–O(a)(4).

[115] See proposed Rule 22.250(c), which is substantively identical to NYSE Arca Options Rule 6.40P–O(c).

[116] The time of receipt for an order or quote is the time such message is processed by the Exchange's order book.

[117] Pre-trade risk controls are implemented prior to an order or quote resting on the order book (or being placed on the book again following an auction) and therefore do not implicate firm quote obligations.

## Kill Switch Actions [118]

Additionally, Options Members may direct the Exchange to operate a "kill switch" to either cancel all unexecuted orders and quotes on the Order Book, block the entry of any new order and quote messages, or both.

## Limit Order Price Protection [119]

The Exchange also proposes to offer price protection mechanisms, as set forth in proposed Rule 22.260.[120] These protections include Limit Order Price Protection, in which the Trading System will reject an order or quote upon entry, or cancel at the conclusion of an auction, if its price exceeds a pre-established, Exchange-defined "specified threshold" amount above or below the reference price. The Reference Price for calculating Limit Order Price Protection for an order or quote to buy (sell) will be the NBO (NBB), provided that, immediately following an auction, the reference price will be the price at which the auction match occurred, or, if none, the upper (lower) auction collar price, or, if none, the NBO (NBB).

## Market Orders in No-Bid (Offer) Series [121]

If the Trading System receives a sell Market order in a series after it is open for trading with an NBB of zero and an NBO less than or equal to $0.50, then the Trading System converts the Market order to a Limit order with a limit price equal to the minimum trading increment applicable to the series and enters the order into the IEX Options. If the Trading System receives a sell Market order in a series after it is open for trading with an NBB of zero and an NBO greater than $0.50, then the Trading System cancels or rejects the Market order, except if the sell Market order would be subject to the drill-through protection (as discussed below), in which case the order joins the ongoing drill-through process. If the Trading System receives a buy Market order in a series after it is open for trading with an NBO of zero, the Trading System cancels or rejects the Market order.

## Market Order NBBO Width Protection [122]

If a User submits a Market order to the Trading System when the NBBO width is greater than x% of the midpoint of the NBBO, subject to a minimum and maximum dollar value (the Exchange determines "x" and the minimum and maximum dollar values on a class-by-class basis), the Trading System cancels or rejects the Market order.

## Price Reasonability Checks [123]

Additionally, the Exchange will apply price reasonability checks to most Limit orders and quotes during continuous trading on each trading day. One price reasonability check, the "arbitrage check", will reject order or quote messages to buy put options if the price of the order is equal to or greater than the strike price of the option and will reject (or cancel, if resting) order or quote messages to buy call options if the price of the order is equal to or greater than the price of the last trade in the underlying security plus an Exchange-defined specified threshold.[124] Another price reasonability check, the "intrinsic value check", will assess the intrinsic value of an option based on the last sale price of the underlying security (for calls) or the strike price of the option (for puts), and reject or cancel certain orders or quotes if the price of the order is dislocated from the intrinsic value of the option by a certain Exchange-defined specified threshold.[125]

## Drill-Through Protection

Another proposed price protection mechanism is drill-through protection, which will prevent an order from executing beyond a "buffer amount" determined based on a drill-through price.[126] This rule is based upon and substantially similar to C1 Rule 5.34(a)(4), with the distinction that IEX's Drill-Through Protection will have a finite, Exchange-defined number of iterations, that are communicated by a Trading Alert with at least 30 days prior notice.[127] IEX notes that other exchanges have also set a finite number of iterations for their Drill-Through Protection.[128]

## Options Risk Parameter

In order to provide additional protection to Market Makers to address structural challenges [129] they face in the listed options market, IEX proposes to offer an optional quote parameter that would augment the standard risk tools that will be available to Options Market Makers referred to as the Options Risk Parameter ("ORP"). As proposed, the ORP will be a parameter that can be applied to a quotation that rests on the Order Book at the price designated by the Market Maker that entered the quotation. When the ORP is triggered based on pre-defined criteria, the relevant quotation(s) will be adjusted in a manner specified transparently in IEX's rules and related Trading Alerts, as described below.[130]

The ORP would leverage IEX's proprietary mathematical formula—the Options Quote Indicator (the "Indicator")—which is based on the preeminent Black-Scholes options pricing model. This Nobel-Prize-winning approach for evaluating the price of an options contract has been studied extensively, and is widely considered as a primary starting point for both academic and industrial options pricing applications.[131]

Proposed Rule 23.150(h) sets forth the application of the Indicator and optional ORP. As with the standard risk checks, the ORP is designed to enable Market Makers to provide tighter and deeper quotes on IEX by providing protection from execution against stale quotes by identifying when the best Protected Bid or best Protected Offer of the Away Markets (as defined in Proposed Rule 22.160(a)(8)) in a particular options series is sufficiently dislocated from the price of the underlying security to indicate that the best Protected Bid or best Protected Offer of the Away Markets in the options series is likely in transition.

---

[118] *See* proposed Rule 22.250(e), which is substantively identical to NYSE Arca Options Rule 6.40P–O(e).

[119] *See* proposed Rule 22.260(a), which is substantively identical to NYSE Arca Options Rule 6.62P–O(a)(3).

[120] IEX notes that these proposed risk control mechanisms are based on similar rules of other options exchanges, in particular: NYSE Arca Options Rules 6.62P–O(a)(3) and 6.41P–O and C1 Rules 5.34(a)(1), (2) and (4).

[121] *See* proposed Rule 22.260(b), which is substantively identical to C1 Rule 5.34(a)(1).

---

[122] *See* proposed Rule 22.260(c), which is substantively identical to C1 Rule 5.34(a)(2).

[123] *See* proposed Rule 22.260(d), which is substantively identical to NYSE Arca Options Rule 6.41P–O.

[124] *See* proposed Rule 22.260(d)(2), which is substantively identical to NYSE Arca Options Rule 6.41P–O(b).

[125] *See* proposed Rule 22.260(d)(3), which is substantively identical to NYSE Arca Options Rule 6.41P–O(c). IEX notes that like NYSE Arca Options, the term "Automated Breach Action" is used in two of its risk controls with different meanings: first with respect to the intrinsic value risk checks for market makers, *see* NYSE Arca Options Rule 6.40P–O(d) and proposed Rule 22.260(d)(3)(E); and also with respect to activity based risk controls. *See* NYSE Arca Options Rule 6.41P–O(d) and proposed Rule 22.250(c).

[126] *See* proposed Rule 22.260(e).

---

[127] IEX notes that other exchanges also have the ability to change any exchange-determined parameters with a trading alert. *See, e.g.,* C1 Rule 1.5.

[128] *See, e.g.,* Securities Exchange Act Release No. 86923 (September 10, 2019), 84 FR 48664 (September 16, 2019) (SR–CBOE–2019–057) with respect to C1 prior functionality.

[129] *See infra* note 135.

[130] *See* proposed IEX Rule 23.150(h).

[131] *See* Revolutionary Black-Scholes Option Pricing Model is Published by Fischer Black, Later a Partner at Goldman Sachs, available at *https://www.goldmansachs.com/our-firm/history/moments/1973-black-scholes.*

As proposed, the Exchange will utilize the Indicator, which is a fixed formula specified transparently in IEX's rules and related Trading Alerts, to assess the probability of an imminent change to the current best Protected Bid [132] of the Away Markets to a lower price or of an imminent change to the current best Protected Offer [133] of the Away Markets to a higher price for a particular listed options series (*i.e.,* an imminent adverse price change).[134] The Indicator utilizes real time relative quoting activity of protected quotations from Signal Exchanges (as defined in IEX Rule 11.190(g)) in securities underlying each listed options series and a proprietary mathematical calculation (the ''quote instability calculation''), as described in more detail below, to make such assessments. When the quote instability calculation identifies an imminent adverse price change to the best Protected Bid and/or best Protected Offer of the Away Markets in a particular listed options series, it will generate a quote instability determination. A quote instability determination may only be generated at least 200 microseconds after a prior quote instability determination for a particular options series on the same side of the market (*i.e.,* affecting resting bids or offers).

[132] *See supra* note 70 at 39370.

[133] *Id.*

[134] *See* proposed IEX Rule 23.150(h). Two aspects of the formula—including the frequency of calculation of implied volatility and the quote instability threshold—will be periodically determined by the Exchange and communicated by Trading Alert with at least 30 days' notice. The Exchange believes that providing at least 30 days' notice of these discrete identified aspects will provide appropriate notice to market participants and give the Exchange the ability to adapt to changing market conditions and optimize the protections provided. The Exchange further notes that other options exchanges specify various rule-based values by similar publication approaches, *see, e.g.,* NYSE Amex Rule 994NY (providing that the exposure period for its Broadcast Order Liquidity Delivery Mechanism is determined and released by the exchange); *see also* MIAX Rule 515(c)(1) (providing price protections where certain minimum price variations are determined by MIAX within a specified range and announced through regulatory circulars); *see also* Nasdaq Stock Market LLC Dynamic M–ELO algorithm (providing updates that include determining the holding period for impacted orders that are announced by trading alerts).

[135] *See* Staff Report on Equity and Options Market Structure Conditions in Early 2021, (Oct. 14, 2021) at 4 (explaining that options market structure is broadly similar to equities market structure and noting a key difference that displayed liquidity is primarily derived from market maker quotes), available at *https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf; see also* Lehoczky, Sandor and Woods, Ellen and Russell, Matthew and Nguyen, Mina and Somers, James, Dead Man's Switch: Making Options Markets Safer with Active Quote Protection (May 2020) at 2 (explaining that options markets ''depend

IEX believes that offering this optional risk protection for market makers is particularly important in the options markets where market makers are exposed to added risk given their continuous quoting obligations. Although equities and options exchanges share a number of similarities, a meaningful difference is that in the listed options market, liquidity is available only on-exchange and is primarily displayed and derived from market maker quotes, and options markets, when compared to equities markets, have a much higher quote to trade ratio.[135] Exchange market makers in the listed options market play an essential role in providing liquidity. Moreover, given the sheer difference in magnitude of tradeable instruments in listed options as compared to equities (approximately 1.5 million listed options series compared to approximately 11,000 listed equity securities), the options exchanges often do not have the same sources of natural liquidity of buyers and sellers for each tradeable instrument as is generally the case for equities exchanges. Thus, options market makers are tasked with affirmative obligations to support the provision of liquidity to options exchanges through continuous two-sided quotes in large numbers of listed options series. As a result, IEX understands that options market makers can be subject to excessive risk of one or more quotes being executed at stale prices compared to equities market makers or other liquidity providers.[136] Because options market makers maintain hundreds (and sometimes thousands) of quotes on options for a given underlying security at any one time, a sudden market move in the underlying security can leave an options market maker vulnerable to being executed across multiple quotes that are stale and dislocated from the price of the underlying securities. Liquidity takers can target one or more of these stale quotes, with limited risk should

especially on market makers—who account for 99.9% of open orders—to connect buyers and sellers, due to a combinatorial explosion of expirations and strike prices''), available at *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3675849.*

[136] *See, e.g.,* Protecting Liquidity in Options Markets, Market Structure, Optiver, July 12, 2023 (concluding that ''liquidity protection improves options markets'' by safeguarding market makers against ''excessive risk'' that results from ''liquidity providers maintain[ing] hundreds of quotes on a given underlying at any one time [and] a sudden market move can leave them vulnerable to showing stale, or outdated, quotes,'' thereby ''exposing them to potentially major losses'' if unable to amend or cancel quotes before executed), available at *https://optiver.com/insights/protecting-liquidity-in-options-markets/.*

they fail to execute (*i.e.,* lost opportunity vs. trading at a stale price), before the Market Makers are able to move their quotes (often hundreds or more for a given underlying) to reflect the price change in the underlying securities, thereby exposing those Market Makers to potentially major losses.

Without robust liquidity protection mechanisms to protect against these risks, Market Makers may be forced to widen their spreads, show less liquidity, or simply exit the market. Overall market quality could deteriorate as a result, and investors would suffer when it becomes too expensive to transact, or when there is insufficient liquidity to enable transacting altogether. Accordingly, liquidity protection mechanisms for market makers, which all options exchanges offer, and IEX proposes to offer, are vital for achieving a healthy balance between market makers and liquidity takers in the listed options market. These include, but are not limited to, activity-based risk controls, price reasonability checks, and functionality (such as bulk quoting and purge ports) to facilitate timely quoting, quote updates, and quote cancelation.

For each options series, the Trading System will maintain a real-time estimate of the sensitivity of the series to changes in the midpoint of the best Protected Bid and best Protected Offer of the Signal Exchanges for the underlying security (based on a Black-Scholes assessment). When there is a change in the best Protected Bid or best Protected Offer of the Signal Exchanges for the underlying security, the Trading System will use the quote instability calculation formula set forth in proposed IEX Rule 23.150(h) to calculate whether to generate a quote instability determination for each options series overlying the underlying security. The Trading System independently assesses whether to generate a quote instability determination affecting resting bids or offers for each options series. A quote instability determination is generated by the Trading System when, pursuant to the quote instability calculation, the quote instability factor is greater than the defined quote instability threshold.

If a Market Maker has opted to utilize the ORP and its quote in an options series that was the subject of a quote instability determination is at or above (below) the price level of the quote instability determination for the options series, the Trading System will either cancel the Market Maker's quote or reprice it to one MPV [137] below (above) the price level of the quote instability determination, pursuant to the Market

Maker's instruction. Notwithstanding this functionality, a Market Maker will be able to adjust the price of its quote in the same manner as other Market Maker quotes that have not opted into the ORP.

One Second Exposure Period

Proposed Rule 23.200 would require Options Members to expose their customers' orders on the Exchange for at least one second under certain circumstances before trading against such orders. During this one second exposure period, other Options Members will be able to enter orders to trade against the exposed order. In adopting a one second order exposure period, the Exchange is proposing a requirement that is consistent with the rules of other options exchanges.[138] Thus, the exposure period will allow Options Members that are members of other options exchanges to comply with proposed Rule 23.200 without programming separate time parameters into their systems for order entry or compliance purposes. The Exchange believes that market participants are sufficiently automated that a one second exposure period allows an adequate time for market participants to electronically respond to an order. Also, it is possible that market participants might wait until the end of the exposure period, no matter how long, before responding. Thus, the Exchange believes that any longer than one second would not further the protection of investors or market participants, but rather, would potentially increase market risk to investors and other market participants by creating a longer period of time for the exposed order to be subject to market risk.

*Options Order Protection and Locked/ Crossed Market Plan Rules*

The Exchange will participate in the Options Order Protection and Locked/ Crossed Market Plan (the ''Plan''),[139] and therefore will be required to comply with the obligations of Participants under the Plan. The Exchange proposes to adopt rules relating to the Plan that are substantially similar to the rules in place on all of the options exchanges that are Participants to the Plan. The Plan essentially applies the Regulation NMS price-protection provisions to the options markets. Similar to Regulation NMS, the Plan requires the Plan Participants to adopt rules ''reasonably designed to prevent Trade-Throughs'',

while exempting ISOs from that prohibition. The Plan's definition of an ISO is essentially the same as under Regulation NMS. The remaining exceptions to the trade-through prohibition, discussed more specifically below, either track those under Regulation NMS or correspond to unique aspects of the options market, or both.

The proposed rules in Chapter 28 (Options Order Protection and Locked and Crossed Markets Rules) conform to the requirements of the Plan. Proposed Rule 28.100 sets forth the defined terms for use under the Plan. Proposed Rule 28.110 prohibits trade-throughs and exempts ISOs from that prohibition. Proposed Rule 28.110 also contains additional exceptions to the trade-through prohibition that track the exceptions under Regulation NMS or correspond to unique aspects of the options market, or both.

Proposed Rule 28.120 sets forth the general prohibition against locking/ crossing other eligible exchanges as well as certain enumerated exceptions that permit locked markets in limited circumstances; such exceptions have been approved by the Commission for inclusion in the rules of other options exchanges. Specifically, the exceptions to the general prohibition on locking and crossing occur when: (1) the locking or crossing quotation was displayed at a time when the Exchange was experiencing a failure, material delay, or malfunction of its systems or equipment; (2) the locking or crossing quotation was displayed at a time when there is a Crossed Market; (3) the Options Member simultaneously routed an ISO to execute against the full displayed size of any locked or crossed Protected Bid or Protected Offer; or (4) with respect to a locking quotation, the order entered on the Exchange that will lock a Protected Bid or Protected Offer, is: (i) not a Customer order, and the Exchange can determine via identification available pursuant to the OPRA Plan that such Protected Bid or Protected Offer does not represent, in whole or in part, a Customer order; or (ii) a Customer order, and the Exchange can determine via identification available pursuant to the OPRA Plan that such Protected Bid or Protected Offer does not represent, in whole or in part, a Customer order, and, on a case-by-case basis, the Customer specifically authorizes the Member to lock such Protected Bid or Protected Offer.[140]

The Exchange notes that the proposed rules in Chapter 28 (Options Order Protection and Locked and Crossed

Markets Rules) are substantively identical to the rules of MEMX Options.[141]

*Securities Traded on IEX Options*

General Listing Standards

The Exchange proposes to adopt listing standards for options traded on IEX Options as described in Chapter 20 (Securities Traded on IEX Options), which are substantively identical to the equivalent MEMX Options rules,[142] with the exception of: (i) some language in Supplementary Material .02 to proposed Rule 20.140 concerning the $1 strike price program which is not included in the equivalent MEMX rule, and therefore borrowed from the equivalent MIAX rule; [143] and (ii) the addition of language allowing the Exchange to list for closing transactions an Options series that is listed but restricted to closing transactions on another exchange.[144] The Exchange will join the Options Listings Procedures Plan and will list and trade options already listed on other options exchanges. The Exchange will gradually phase-in its trading of options, beginning with a selection of actively traded options.

*Conduct and Operational Rules for Options Members*

The Exchange proposes to adopt rules in Chapter 19 for IEX Options that are substantively identical to the rules of MEMX Options regarding: exercises and deliveries as described in Chapter 24 (Exercises and Deliveries); records, reports and audits as described in Chapter 25 (Records, Reports and Audits); minor rule violations as described in Chapter 26 (Discipline and Summary Suspensions); doing business with the public as described in Chapter 27 (Doing Business With the Public); and margin as described in Chapter 29 (Margin Requirements).[145] The Exchange also proposes to adopt rules that are substantively similar to most of MEMX's Chapter 18 (Business Conduct), with the exception of proposed Rules 19.160 (Position Limits), 19.170 (Exemptions from Position Limits), 19.180 (Exercise Limits) that are

---

[137] *See* proposed IEX Rule 22.140(a).

[138] *See, e.g.,* MEMX Rule 22.11; C1 Rule 5.9; and MIAX Options Rule 520(b).

[139] *See supra* note 70.

[140] *See* proposed Rule 28.120(b).

[141] *See* MEMX Rule 27.1, 27.2, and 27.3.

[142] *See* MEMX Rules, Chapter 19. IEX notes that the MEMX Rules include Chapter 29: Index Rules. IEX is not proposing to adopt similar rules at this time, and any references to index options in MEMX Chapter 19 are not in proposed IEX Chapter 20.

[143] *See* MIAX Rule 404 Interpretation and Policy .01.

[144] *See* Supplementary Material .01 to proposed Rule 20.130, which mirrors MIAX Rule 403 Interpretation and Policy .01.

[145] *See* MEMX Rules, Chapters 23, 24, 25, 26 and 28.

USCA11 Case: 25-13631 Document: 27 Date Filed: 12/19/2025 Page: 35 of 205 A016

substantively similar to MIAX Rules 307, 308, and 309, respectively. IEX proposed to adopt MIAX's versions of these rules because they provided specificity about the types of position limits the Exchange will apply to Options Members (as opposed to the MEMX rules, which rely on position limits set by other exchanges).

*National Market System*

IEX Options will operate as a full and equal participant in the national market system for options trading established under Section 11A of the Exchange Act.[146] IEX Options will become a member of the Options Price Reporting Authority ("OPRA"), the Options Linkage Authority ("OLA"), the Options Regulatory Surveillance Authority ("ORSA"), and the Options Listing Procedures Plan ("OLPP"). The Exchange expects to participate in those plans on the same terms currently applicable to current members of those plans. The Exchange is in the process of contacting the leadership of each options-related national market system plan to begin the membership process.

*Regulation*

The Exchange will leverage many of the structures it established to operate a national securities exchange trading NMS equities securities, in compliance with Section 6 of the Exchange Act.[147] As described in more detail below, there will be three elements of that regulation: (1) the Exchange will join the existing options industry agreements pursuant to Section 17(d) of the Exchange Act prior to commencing operations,[148] as it did with respect to equities; (2) the Exchange's Regulatory Services Agreement ("RSA") with FINRA will be amended prior to commencing operations to provide that FINRA will perform regulatory surveillance, investigation, disciplinary and hearing services of options trading on IEX subject to oversight by IEX Regulation, just as it does for equities regulation; and (3) the Exchange will perform options listing regulation, as well as authorize Options Members to trade on IEX Options. Section 17(d) of the Exchange Act and the related Exchange Act rules permit SROs to allocate certain regulatory responsibilities to avoid duplicative oversight and regulation. Under Exchange Act Rule 17d–1,[149] the SEC designates one SRO to be the Designated Examining Authority, or DEA, for each broker-dealer that is a member of more than one SRO. The DEA is responsible for the financial aspects of that broker-dealer's regulatory oversight. Because IEX Options Members also must be members of at least one other SRO, the Exchange would generally not expect to be designated as the DEA for any of its members.[150]

Exchange Act Rule 17d–2 [151] permits SROs to file with the Commission plans under which the SROs allocate among each other the responsibility to receive regulatory reports from, and examine and enforce compliance with specified provisions of the Exchange Act and rules thereunder and SRO rules by, firms that are members of more than one SRO ("common members"). If such a plan is declared effective by the Commission, an SRO that is a party to the plan is relieved of regulatory responsibility as to any common member for whom responsibility is allocated under the plan to another SRO.

All of the options exchanges, FINRA, and NYSE have entered into the Options Sales Practices Agreement, a Rule 17d–2 agreement, and the Exchange intends to join this agreement prior to the commencement of operations for IEX Options. Under this Agreement, the examining SROs will examine firms that are common members of the Exchange and the particular examining SRO for compliance with certain provisions of the Exchange Act, certain of the rules and regulations adopted thereunder, certain examining SRO rules, and certain proposed IEX Options rules. In addition, the proposed IEX Options rules contemplate participation in this Agreement by requiring that any Options Member also be a member of at least one of the examining SROs. The Exchange and FINRA are also party to a bilateral Rule 17d–2 agreement that requires minor modifications due to the proposed launch of IEX Options. The Exchange intends to modify and seek Commission approval of the modified bilateral Rule 17d–2 agreement prior to commencing of operations for IEX Options. Additionally, all of the options exchanges and FINRA have entered into the Options-Related Market Surveillance Agreement, a Rule 17d–2 agreement, and the Exchange intends to join this agreement prior to the commencement of operations for IEX Options.

For those regulatory responsibilities that fall outside the scope of any Rule 17d–2 agreements, the Exchange will retain full regulatory responsibility under the Exchange Act. However, the Exchange has entered into an RSA with FINRA, as discussed above, pursuant to which FINRA personnel operate as agents for the Exchange in performing certain of these functions. The Exchange and FINRA will continue to operate under the RSA that is currently in place but with modifications as necessary to accommodate the expanded scope of the relationship. The necessary modifications will be implemented prior to the commencement of operations of IEX Options. As is the case with the Exchange's equities market, the Exchange will oversee FINRA and continue to bear ultimate regulatory responsibility with respect to regulatory functions not subject to allocation to FINRA or another SRO pursuant to a Rule 17d–2 Agreement for the IEX Options Exchange.

Consistent with the Exchange's existing regulatory structure, the Exchange's Chief Regulatory Officer, reporting to the Regulatory Oversight Committee of the Exchange's board of directors, shall have general supervision of the regulatory operations of IEX Options, including responsibility for overseeing the surveillance, examination, and enforcement functions and for administering all regulatory services agreements applicable to IEX Options. Similarly, the Exchange's existing Regulatory Oversight Committee will be responsible for overseeing the adequacy and effectiveness of Exchange's regulatory and self-regulatory organization responsibilities, including those applicable to IEX Options.

As it does with equities, the Exchange will monitor trading on IEX Options, both through internal reports and FINRA surveillances for the purpose of maintaining a fair and orderly market. As it does with its equities trading, the Exchange will monitor IEX Options to identify unusual trading patterns and determine whether particular trading activity requires further regulatory investigation by FINRA.

Finally, the Exchange will oversee the process for determining and implementing trade halts, identifying and responding to unusual market conditions, and administering the Exchange's process for identifying and remediating "obvious errors" by and among its Options Members.[152] The proposed rules in Chapter 21

---

[146] 15 U.S.C. 78k–1.

[147] 15 U.S.C. 78f.

[148] 15 U.S.C. 78q(d).

[149] 17 CFR 240.17d–1.

[150] If IEX were to be designated as the DEA for any of its members, FINRA would perform the DEA functions on behalf of IEX pursuant to the RSA.

[151] 17 CFR 240.17d–2.

[152] IEX notes that like MEMX Rule 20.6, proposed Rule 21.150 authorizes the proposed Error Panel to review decisions made under this rule, which includes decisions to classify a transaction as a Catastrophic Error.

(Regulation of Trading on IEX Options) regarding halts,[153] unusual market conditions, extraordinary market volatility, obvious errors, audit trail, and rules regarding prohibited and permissible transfers of options positions off the Exchange are substantively identical to the approved rules of MEMX Options.[154]

*Minor Rule Violation Plan*

The Exchange's disciplinary rules, including Exchange Rules applicable to "minor rule violations," are set forth in Chapter 9 of the Exchange's current Rules. Such disciplinary rules will apply to Options Members and their associated persons.

The Commission approved the Exchange's Minor Rule Violation Plan ("MRVP") in 2016.[155] The Exchange's MRVP specifies the uncontested minor rule violations that are included in the MRVP and have sanctions not exceeding $2,500. Any violations that are resolved under the MRVP would not be subject to the provisions of Rule 19d–1(c)(1) under the Act[156] requiring that an SRO promptly file notice with the Commission of any final disciplinary action taken with respect to any person or organization.[157] The Exchange's MRVP includes the policies and procedures included in Exchange Rule 9.216(b) and the violations included in Rule 9.218.

Under Rule 9.216(b), the Exchange may impose a fine (not to exceed $2,500) and/or a censure on any Member or associated person with respect to any rule listed in IEX Rule 9.218. If the Financial Industry Regulatory Authority Department of

Enforcement or the Department of Market Regulation, on behalf of the Exchange, has reason to believe a violation has occurred and if the Member or associated person does not dispute the violation, the Department of Enforcement or the Department of Market Regulation may prepare and request that the Member or associated person execute a minor rule violation plan letter accepting a finding of violation, consenting to the imposition of sanctions, and agreeing to waive the Member's or associated person's right to a hearing before a Hearing Panel or, if applicable, an Extended Hearing Panel, and any right of appeal to the IEX Appeals Committee, the Board, the Commission, and the courts, or to otherwise challenge the validity of the letter, if the letter is accepted. The letter must describe the act or practice engaged in or omitted, the rule, regulation, or statutory provision violated, and the sanction or sanctions to be imposed. Unless the letter states otherwise, the effective date of any sanction imposed will be a date to be determined by IEX Regulation staff. In the event the letter is not accepted by the Member or associated person, or is rejected by the Office of Disciplinary Affairs, the matter can proceed in accordance with the Exchange's disciplinary rules, which include hearing rights for formal disciplinary proceedings.

The Exchange proposes to amend its MRVP and Exchange Rule 9.218 to add certain rules relating to Options as set forth in proposed Rule 26.120 (Penalty for Minor Rule Violations) to the list of rules eligible for Minor Rule Violation Plan treatment.[158] The rules included in proposed Rule 26.120, as appropriate for disposition under the Exchange's MRVP, are: (a) position limit and exercise limit violations; (b) violations regarding the failure to accurately report position and account information; (c) Market Maker quoting obligations; (d) violations regarding expiring exercise declarations; (e) violations relating to the failure to respond to the Exchange's requests for the submission of trade data; and (f) violations relating to noncompliance with the Consolidated Audit Trail Compliance Rule requirements. The rule violations included in proposed Rule 26.120 are the same as the rule violations included

in the MRVPs of other options exchanges.[159]

Upon implementation of this proposal, the Exchange will include violations of the enumerated options trading rules, if any, in an applicable Exchange's quarterly report of any actions taken on minor rule violations under the MRVP.[160] A quarterly report would include: the Exchange's internal file number for the case, the name of the individual and/or organization, the nature of the violation, the specific rule provision violated, the sanction imposed, the number of times the rule violation has occurred, and the date of disposition. The Exchange's MRVP, as proposed to be amended herein, is consistent with Sections 6(b)(1), 6(b)(5) and 6(b)(6) of the Act, which require, in part, that an exchange have the capacity to enforce compliance with, and provide appropriate discipline for, violations of the rules of the Commission and of the exchange, 6(b)(6) provides that members and persons and associated members shall be appropriately disciplined for violation of the provisions of the rules of the exchange, by expulsion, suspension, limitation of activities, functions and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction.[161] Rule violations listed in proposed Rule 26.120 are minor in nature and will be more appropriately disciplined through the Exchange's MRVP and therefore proposes to add them to the list of rules eligible for minor rule fine disposition.

In addition, because Rule 9.216(b) offers procedural rights to a person sanctioned for a violation listed in proposed Rule 26.120, the Exchange will provide a fair procedure for the disciplining of members and associated persons, consistent with Section 6(b)(7) of the Act.[162]

This proposal to include the rules listed in proposed Rule 26.120 in the Exchange's MRVP is consistent with the public interest, the protection of investors, or otherwise in furtherance of the purposes of the Act, as required by Rule 19d–1(c)(2) under the Act,[163] because it should strengthen the Exchange's ability to carry out its oversight and enforcement

[153] Proposed Rule 21.120(b) states that during a trading halt, the Exchange shall process new and existing orders and quotes in a series in accordance with proposed Rule 22.160(g). Proposed Rule 22.160(g), which is substantively identical to NYSE Arca Options Rule 6.64P–O(g), states that during a trading halt, the Exchange will cancel all resting Market Maker quotes.

[154] *See* MEMX Rules, Chapter 20.

[155] *See* Securities Exchange Act Release No. 78474 (August 3, 2016), 81 FR 52717 (August 9, 2016) (Order Declaring Effective a Minor Rule Violation Plan) (File No. 4–701).

[156] 17 CFR 240.19d–1(c)(1).

[157] The Commission adopted amendments to paragraph (c) of Rule 19d–1 to allow SROs to submit for Commission approval plans for the abbreviated reporting of minor disciplinary infractions. *See* Release No. 34–21013 (June 1, 1984), 49 FR 23828 (June 8, 1984). Any disciplinary action taken by an SRO against any person for violation of a rule of the SRO which has been designated as a minor rule violation pursuant to such a plan filed with and declared effective by the Commission will not be considered "final" for purposes of Section 19(d)(1) of the Act if the sanction imposed consists of a fine not exceeding $2,500 and the sanctioned person has not sought an adjudication, including a hearing, or otherwise exhausted his administrative remedies.

[158] In its proposal to adopt the MRVP, the Exchange requested that, going forward, to the extent that there are any changes to the rules applicable to the Exchange's MRVP, the Exchange requests that the Commission deem such changes to be modifications to the Exchange's MRVP.

[159] *See, e.g.,* MEMX Rules, Chapter 25.

[160] To date, the Exchange has not taken any minor rule violation actions.

[161] 15 U.S.C. 78f(b)(1), 78f(b)(5) and 78f(b)(6).

[162] 15 U.S.C. 78f(b)(7). Rule 9.216(b) does not preclude an Options Member or person associated with an Options Member from contesting an alleged violation and receiving a hearing on the matter with the same procedural rights through a litigated disciplinary proceeding.

[163] 17 CFR 240.19d–1(c)(2).

responsibilities as an SRO in cases where full disciplinary proceedings are unsuitable in view of the minor nature of the particular violation. In requesting the proposed change to the MRVP, the Exchange in no way minimizes the importance of compliance with Exchange Rules and all other rules subject to the imposition of fines under the MRVP. Minor rule fines provide a meaningful sanction for minor or technical violations of rules when the conduct at issue does not warrant stronger, immediately reportable disciplinary sanctions. The inclusion of a rule in the Exchange's MRVP does not minimize the importance of compliance with the rule, nor does it preclude the Exchange from choosing to pursue violations of eligible rules through the Exchange's disciplinary rules if the nature of the violation or prior disciplinary history warrants more significant sanctions. However, the MRVP provides a reasonable means of addressing rule violations that do not rise to the level of requiring formal disciplinary proceedings, while providing greater flexibility in handling certain violations.[164] The Exchange will continue to conduct surveillance with due diligence and make a determination based on its findings, on a case-by-case basis, whether a fine of more or less than the recommended amount is appropriate for a violation under the MRVP or whether a violation requires a formal disciplinary action.

*Section 36 Exemption Request*

The Exchange proposes to incorporate by reference as IEX Options rules certain rules of the Cboe Exchange, Inc. ("CBOE"), the New York Stock Exchange ("NYSE"), and FINRA. Specifically, proposed Rule 27.250 proposes to incorporate by reference the applicable rules of FINRA with respect to Communications with Public Customers, and proposed Rule 29.120 proposes to incorporate by reference initial and maintenance margin requirements of either CBOE or NYSE. Thus, for certain IEX Options rules, Exchange members will comply with a IEX Options rule by complying with the CBOE, NYSE, or FINRA rule referenced. Using its authority under Section 36 of the Act, the Commission has previously exempted certain SROs from the requirement to file proposed rule changes under Section 19(b) of the Act when incorporating another SRO's rules by reference.[165] Each such exempt SRO

has agreed to be governed by the incorporated rules, as amended from time to time, but, has not been required to file a separate proposed rule change with the Commission each time the SRO whose rules are incorporated by reference seeks to modify its rules. In addition, each SRO incorporated by reference only regulatory rules (*e.g.,* margin, suitability, arbitration), not trading rules, and incorporated by reference whole categories of rules (*i.e.,* did not "cherry-pick" certain individual rules within a category). Last, each exempt SRO had reasonable procedures in place to provide written notice to its members each time a change is proposed to the incorporated rules of another SRO in order to provide its members with notice of a proposed rule change that affects their interests, so that they would have an opportunity to comment on it.

In connection with this proposal, the Exchange respectfully requests, pursuant to Rule 240.0–12 under the Act,[166] an exemption under Section 36 of the Act from the rule filing requirements of Section 19(b) of the Act for changes to those IEX Options rules that are effected solely by virtue of a change to a cross-referenced CBOE, NYSE, or FINRA rule. The Exchange proposes to incorporate by reference categories of rules (rather than individual rules within a category) that are not trading rules. The Exchange also agrees to provide written notice to Options Members prior to the launch of IEX Options of the specific CBOE, NYSE, and FINRA rules that it will incorporate by reference. In addition, the Exchange will notify Options Members whenever CBOE, NYSE, or FINRA proposes a change to a cross-referenced CBOE, NYSE, or FINRA rule.[167] For the foregoing reasons, the Exchange believes that its request for exemptive relief is consistent with prior requests for, and provision of, similar exemptive relief.

Nos. 57478 (March 12, 2008), 73 FR 14521, 14539–40 (March 18, 2008) (order approving SR–NASDAQ–2007–004 and SR–NASDAQ–2007–080) and 53128 (January 13, 2006), 71 FR 3550, 3565–66 (January 23, 2006) (File No. 10–131) (approving The NASDAQ Stock Market LLC's exchange application).

[166] 17 CFR 240.0–12.

[167] The Exchange will provide such notice through a posting on the same website location where the Exchange will post its own rule filings pursuant to Rule 19b–4(l) under Act, within the time frame required by that rule. The website posting will include a link to the location on the CBOE, NYSE, or FINRA websites where the proposed rule change is posted.

*Amendments to Existing Exchange Rules*

In addition to the rules of IEX Options proposed above, the Exchange proposes to amend certain of its existing Exchange Rules that currently apply to the Exchange's equities market in order to reflect the Exchange's proposed operation of IEX Options.

First, the Exchange proposes to amend Rule 2.160(i), which generally requires each Member to register at least two Principals with the Exchange subject to certain exceptions described therein, to provide that such paragraph (i) shall not apply to a Member that solely conducts business on the Exchange as an Options Member, however, Options Members must comply with the registration requirements set forth in proposed Rule 18.110. The Exchange notes that proposed Rule 18.110(h), which provides that every Options Member shall have at least one Options Principal and sets forth the Exchange's Options Principal registration requirements, is identical to MEMX Rule 17.2(g). In connection with this proposed change, the Exchange also proposes to amend Rule 2.160(n) to include Options Principal as a registration category and to set forth the Exchange's qualification requirements for an Options Principal, which are the same as those for an Options Principal on MEMX Options. Additionally, the Exchange proposes to amend Rule 2.160(p)(a)(4) to set forth the appropriate regulatory element continuing education module for reregistration as an Options Principal.

The Exchange also proposes to make three modifications to Rule 2.220 (IEX Services LLC as Outbound Router). First, IEX proposes to remove the word "directly" from the first sentence of subparagraph (a), because IEX Services will continue to route orders to away markets, but as described above, with respect to options routing, it will not route those order "directly" to the away markets. Second, consistent with the first change, IEX proposes to insert a new second sentence in subparagraph (a) that reads: "When routing options orders, as set forth in Rule 22.180, IEX Services will transmit such orders to one or more routing brokers that are not affiliated with the Exchange; the routing brokers will in turn route the applicable options orders to other securities exchanges that trade options." IEX proposes to make this change to reflect the different nature of how IEX Services will handle routing options orders from equities orders. And third, IEX proposes to modify subparagraph (a)(8) of this rule, which states that IEX Services

[164] *See supra* note 159.

[165] *See, e.g.,* Securities Exchange Act Release No. 49260 (February 17, 2004), 69 FR 8500 (February 24, 2004). *See also* Securities Exchange Act Release

shall maintain an error account for the purpose of addressing positions that are the result of an execution or executions that are not clearly erroneous under Rule 11.270 and result from a technical or systems issue at IEX Services, the Exchange, a routing destination, or a non-affiliate third-party routing broker that affects one or more orders ("Error Positions"). The proposed change to Rule 2.220(a)(8) would add a reference to the comparable provision to that which governs review and resolution of clearly erroneous equities transactions (*i.e.,* Rule 11.270) but for options transactions, namely Rule 21.150, which governs review and resolution of options transactions that may qualify as obvious errors.

The Exchange also proposes to adopt Rule 21.220 (Limitation of Liability), which is almost identical to the Rule 11.260, the Limitation of Liability rule in IEX's equities trading rules. The only difference is to reflect that proposed Rule 21.220 applies to IEX Options and options trading.

Lastly, the Exchange proposes to amend Rule 9.218 (Violations Appropriate for Disposition Under Plan Pursuant to Exchange Act Rule 19d–1(c)(2)), which contains the list of Exchange Rule violations and recommended fine schedule, to include a new paragraph (k) referencing proposed Rule 26.120 for the recommended fines for minor rule violations of the Exchange Rules appliable to IEX Options, which the Exchange notes are the same as those of MEMX Options.

### 2. Statutory Basis

The Exchange believes that the proposed rule change is consistent with Section 6(b) of the Act [168] in general, and furthers the objectives of Section 6(b)(5) of the Act [169] in particular, in that it is designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and is not designed to permit unfair discrimination between customers, issuers, brokers, or dealers.

As described above, the Exchange proposes to operate its options market much as it operates its equities market

today and in a manner similar to that of other options exchanges, while leveraging IEX's experience and expertise in understanding the needs of market makers to offer them additional tools designed to better manage risk and drive performance. As discussed in the Purpose section, IEX believes that the proposed enhanced liquidity protection mechanisms will result in market makers providing more competitive quotes which will benefit all market participants and thereby support the protection of investors and the public interest. Also as discussed in the Purpose section, most of the proposed IEX Options rules are based on the rules of other options exchanges, primarily MEMX, C1, MIAX, NYSE Amex, and NYSE Arca. Therefore, the Exchange does not believe these aspects of the proposed rule change that are substantively identical to other exchanges' rules raise any new or novel issues that have not been previously considered by the Commission. Moreover, the Exchange believes that the proposed functionality is consistent with Section 6(b)(5) of the Act because the Trading System is designed to be efficient and its operation transparent, thereby facilitating transactions in securities, removing impediments to and perfecting the mechanisms of a free and open national market system. As described above, the Exchange's proposed rules, including the proposed Order Types and Handling Instructions, opening procedures, routing services, and order matching process are designed to provide a simplified suite of conventional features and to comply with all applicable regulatory requirements, including the obligations of the Options Order Protection and Locked/Crossed Market Plan.[170]

As discussed in the Purpose section, IEX's proposal includes a de minimis latency mechanism (or speedbump) on incoming order and quote messages designed to enable IEX to update its view of the market prior to processing orders and quotes, and a robust suite of risk protections, including the ORP, which is designed to protect market makers from excessive risk due to execution of stale quotes.

IEX believes that the proposed latency mechanism will protect investors and the public interest in several respects. First, by enabling IEX to update its view of market data prior to executing an order or quote, it thereby would support IEX's ability to accurately account for contemporaneous market data. IEX notes that this aspect of its functionality is designed to facilitate market

participants executing at current (*i.e.,* not "stale") prices. Second, by enabling the Trading System to perform the Indicator calculation with current market data, it supports operation of the ORP (as discussed herein), which is designed to provide Market Makers with an optional tool to avoid excessive risk that can arise from execution of a stale quote. As discussed in detail above, IEX believes that this protection will encourage market makers to post aggressively priced and/or deeper quotes on the Exchange which will benefit all market participants. Thus, from a functional perspective, IEX believes that the operation of the latency mechanism is consistent with the Act.

Further, and as explained below, the proposed latency mechanism of up to a maximum of 350 microseconds is well within the geographic delays that exist among and between the data centers that IEX Options Members and other options exchanges use [171] and is consistent with the naturally occurring time indeterminism that exists in order processing.[172] And, as noted in the Purpose section, the Exchange will seek to achieve a healthy balance between the interests of liquidity providers and liquidity takers in determining the actual length of the latency, considering

---

[171] *See https://www.ice.com/publicdocs/ICE_Global_Network_Factsheet.pdf* for a description of latencies between various data centers.

[172] Accounting for the latency mechanism or speedbump is no different than accounting for other geographical distances between exchanges. *See* Securities Exchange Act Release No. 78101 (June 17, 2016), 81 FR 41142, 41161 (June 23, 2016) ("2016 SEC Approval Order") (approving IEX's 350 microsecond speed bump in the registration of the IEX Exchange as "well within the range of geographic and technological latencies that market participants experience today" such that "latency to and from IEX will be comparable to—and even less than—delays attributable to other markets that currently are included in the NBBO," and finding the delay to be de minimis, *i.e.,* so short as to not frustrate the purposes of the Exchange Act by impairing fair and efficient access to IEX's quotation); *see also* Securities and Exchange Act Release No. 34–89686 (August 26, 2020) ("2020 SEC Approval Order") at 15 (determining that IEX's de minimis speed bump when routing displayed equity orders is "just like accounting for any other technological or geographic latency" and doing so is consistent with applicable rules and regulations); *see also Citadel Securities LLC* v. *Securities and Exchange Commission,* 45 F.4th 27, 37 (D.C. Circuit 2022) (July 29, 2022) (ruling in favor of the SEC's approval of IEX's displayed equity order that traverses a speedbump and holding that IEX's displayed equity order's delay are "similar to the delay that traders' communications already experience when traveling between various other exchanges across the country.").

---

[168] 15 U.S.C. 78f(b).

[169] 15 U.S.C. 78f(b)(5).

[170] *See supra* note 70.

primarily markouts [173] and IEX fill rate [174] data.

IEX also believes that the latency mechanism is consistent with the Commission Interpretation Regarding Automated Quotations Under Regulation NMS ("de minimis delay interpretation").[175] Although options markets do not have the same automated quotation requirements as in equities, even if they were to apply, the Commission's reasoning in the de minimis delay interpretation in the context of NMS automated quotations is instructive, as the latency mechanism IEX is proposing for the options exchange is a de minimis delay that does not impair fair and efficient access to an exchange's quotation. Specifically, the Commission stated in issuing its interpretation that intentional delays that are well within the geographic and technological latencies experienced by market participants when routing orders are de minimis to the extent they would not impair a market participant's ability to access a displayed quotation consistent with the goals of NMS Rule 611.[176] The Commission also noted that an intentional delay of any duration must be fully disclosed and codified in a written rule of the exchange, which, as described below, the latency mechanism will be fully disclosed and codified in IEX's written rules.[177]

IEX believes that its proposed latency mechanism of up to 350 microseconds is fully consistent with the reasoning in the Commission's de minimis delay interpretation.[178] First, the maximum

delay is less than the existing geographic latencies experienced by market participants when routing orders. For example, latency between and among the data centers located in New Jersey range up to several hundred microseconds, with additional latency introduced by technology processing on both sides of an order or quote route between these data centers.[179] Accordingly, the proposed latency mechanism is consistent with this aspect of the Commission's de minimis interpretation.

The proposed latency mechanism also meets the additional prongs of the de minimis interpretation, that it be fully disclosed and codified in a written rule of the exchange that has become effective pursuant to Section 19 of the Act (or in a publicly-issued Trading Alert); and that the exchange articulates how the purpose, operation, and application of the delay is consistent with the Act and the rules and regulations thereunder applicable to the exchange. The latency mechanism's operation, as proposed, would be disclosed and codified in detail in IEX Rules 22.100(n) and 22.170(g). Those provisions specify that the latency mechanism shall mean a delay that is equivalent to up to 350 microseconds of latency that is added to each incoming order and quote message from a User prior to processing by the Trading System, with the specific amount of latency communicated by Trading Alert (with at least 30 days prior notice), and that will not apply to other communications between the Exchange and Users, Away Markets, data feeds, order processing and order execution on the IEX Options Book, and outbound communications to the Exchange's proprietary data feeds and OPRA. As discussed above, the purpose of the latency mechanism is to provide adequate time for the IEX Trading System to update its view of market data to enable it to accurately price orders as well as to perform the Indicator calculation with current market data.

Consequently, based on the foregoing, the Exchange believes that the latency mechanism is both de minimis and otherwise consistent with the Act.

The Exchange believes that the proposed ORP is consistent with

Section 6(b) of the Act [180] in general, including furthering the objectives of Section 6(b)(5) of the Act,[181] as the proposed optional risk protection mechanism would remove impediments to and perfect the mechanism of a free and open market and a national market system and promote just and equitable principles of trade by providing an optional quote parameter, available to all IEX Options market makers, that is designed to identify when a quote is likely mispriced so that the Trading System can effectuate the advance trading instructions provided by the Market Maker to cancel or reprice its quote, as selected by the Market Maker. The ORP is an optional, narrowly tailored approach designed to provide protection from excessive risk of execution of stale quotes and thereby enable market makers to make tighter and larger quotes (*i.e.,* quotes at narrower spreads with greater size) thus enhancing the quality of IEX Options markets to the benefit of all market participants. The Exchange believes it is appropriate to provide market makers with the choice to utilize this reasonable quote protection, particularly given the continuous quoting obligations specific to market makers and their importance in providing liquidity in the listed options market. The Exchange further believes this risk functionality will encourage market makers to provide additional depth and liquidity to the Exchange's markets, thereby removing impediments to and perfecting the mechanisms of a free and open market and a national market system and, in general, protecting investors and the public interest.

The Exchange believes that the ORP supports the protection of investors and public interest goals of the Act. As described in the Purpose section, based on the structural differences between equities and listed options markets, the options exchanges often do not have the same natural liquidity of buyers and sellers for each tradeable instrument (*i.e.,* options series) as is generally the case in equities. As a result, market makers with affirmative obligations play a central role in providing liquidity to options exchanges through continuous two-sided quotes in large numbers of listed options series, thereby enabling investors to transact in listed options in accordance with their investment objectives. Because options market makers are required to maintain hundreds (and sometimes thousands) of quotes on options overlying underlying securities at any one time, a sudden

[173] Markouts measure the direction and degree to which the market moved after an execution, and are often measured as the difference between the execution price and the midpoint of the NBBO at various time intervals after a trade. Markouts are typically used as a way to measure the "quality" of a trade. In particular, short-term markouts of several milliseconds after the time of execution, are often used to assess whether an order was subject to "adverse selection" that can occur when a liquidity providing order is executed at a price that was about to become stale as a result of certain speed-based trading strategies.

[174] Fill rate data measures the degree to which incoming orders are able to execute against a resting order on a venue, and are a measure of the percent of shares of an order that are filled (or executed) by such venue, adjusting for factors such as the size of the order compared to the size of a venue's displayed quote. The maximum fill rate for an order is 100%.

[175] *See* Commission Interpretation Regarding Automated Quotations Under Regulation NMS, Exchange Act Release No. 34–78102, 81 FR 40785, 40792 (June 23, 2016).

[176] *Id.*

[177] *Id.*

[178] IEX notes that the D.C. Circuit Court also agreed with the Commission's interpretation. The Court ruled entirely in favor of the SEC's approval of IEX's system that includes applying a speedbump and quote indicator to displayed equity orders. *See Citadel Securities,* 45 F.4th at 36 (concluding the SEC's approval of a 350 microseconds intentional

access delay for displayed orders to be "de minimis—*i.e.,* a delay so short as to not frustrate the purposes of Rule 611 by impairing fair and efficient access to an exchange's quotations"); *see also id.* ("The SEC's conclusion that mere de minimis delays do not cause an order to violate Regulation NMS's immediacy requirement was therefore reasonable.")

[179] *See https://www.ice.com/publicdocs/ICE_Global_Network_Factsheet.pdf.*

[180] 15 U.S.C. 78f(b).

[181] 15 U.S.C. 78f(b)(5).

market move in the underlying security can leave them vulnerable to being executed on quotes that are stale and dislocated from the price of the underlying security.[182] Liquidity takers can target these stale quotes, with limited risk should they fail, before the market maker has time to move its quotes to reflect the price change in the underlying security exposing them to potentially major losses.

The ORP is designed to supplement the standard proposed risk checks to provide augmented protection to address the inherent risks faced by market makers. IEX believes that the operation of the ORP is similar to activity-based and price reasonability risk checks offered by other options exchanges (and proposed by IEX herein), in terms of its objective and impact on a resting quote.[183] Each of these risk controls will cancel an order when the control is triggered based on a determination that the price of the market maker's quote is "unreasonable" because it is no longer reflective of the price of the underlying security and therefore likely stale (price reasonability check) or that the execution activity of a market maker's quotes exceeds the market maker's risk tolerance (activity-based controls). Additionally, the trading collar and limit order protection rules of other options exchanges and those similarly proposed by IEX provide for orders to be repriced.

However, IEX notes that the proposed ORP would be more transparent than the activity-based controls in determining when a market maker quote is potentially subject to cancelation (or adjustment) because it is based on a transparent formula specified in IEX's rules and related Trading Alerts. In contrast, those triggers for an activity-based control are nonpublic and set by each exchange member.

As discussed above, because of the lack of natural sources of liquidity across the multitude of listed options series, market makers are subject to affirmative obligations to maintain continuous two-sided quotes on hundreds or thousands of individual options series. While IEX proposes to offer bulk quoting and purge port functionality to market makers (in the same manner as other options exchanges), in a fast-moving market, their quotes can nonetheless become stale almost instantaneously. In those times, a sophisticated liquidity taker can target one or more stale market maker quotes before the market maker can update its quotes, thereby exposing the market maker to potentially major losses. The ORP is designed to assist market makers with an option to manage this risk, similar to the other risk controls. While some overlap is expected, IEX believes that the Indicator would potentially identify additional instances of stale quotes beyond those identified by the other price reasonability checks.

Further, IEX notes that the operation of the Options Quote Indicator is similar to the manner in which IEX's equities market (the "Equities System") utilizes a "crumbling quote indicator" to encourage the provision of displayed liquidity by providing reasonably tailored protections against adverse executions.[184] As with the crumbling quote indicator, the Indicator will be a transparent formula based on a pre-determined objective set of circumstances that will be specified in IEX's rules to identify when the Protected Bid and/or Protected Offer in a particular options series is likely to move to a less aggressive price.

Moreover, the Options Trading System will use the ORP in a manner similar to the way in which the Equities System applies the crumbling quote indicator to resting displayed liquidity, which reprices the applicable order or quote. The functional differences between the crumbling quote indicator and the Indicator reflect that options pricing is derivative.[185] Thus, the Indicator will trigger when it identifies that a Protected Bid or Protected Offer is likely to move to a less aggressive price, based on a price change in the underlying security, thereby exposing the market maker to excessive risk, but, unlike the crumbling quote indicator, would reprice or cancel the impacted quote and not remain "on" for a period of time after triggering. IEX believes that this approach is appropriate in view of the derivative pricing of options and that it will contribute to more displayed liquidity through improved execution quality, enhance the public price discovery process, and promote just and equitable principles of trade.[186]

Further, the ORP would be available, as a quote parameter, only to market makers and on an optional basis, because the Exchange believes that it is most appropriate as a tool to address market maker risk. IEX believes that this approach is appropriate because market

---

[182] *See, e.g.,* Lehoczky, Sandor and Woods, Ellen and Russell, Matthew and Nguyen, Mina and Somers, James, Dead Man's Switch: Making Options Markets Safer with Active Quote Protection (May 2020) at 2–3, 6, available at *https:// papers.ssrn.com/sol3/papers.cfm?abstract_ id=3675849* (discussing the need for quote protection for market makers to allow for a deep and liquid listed options market and explaining that "race conditions" negatively impact pricing efficiency, "as market makers have been shown to quote wider spreads or step back instead of continually updating with price moves for fear of being "picked off."); *see also* Citadel Securities, Market Lens, July 2020, available at *https:// www.citadel.com/securities/wp-content/uploads/ sites/2/2020/07/Market-Lens-Order-Cancellation-White-Paper_FINAL.pdf* (explaining the need for risk management in electronic trading given that "traders who place limit orders—the foundation of public price discovery—are exposed to the risk that their quotations will be executed at an inopportune time, leading to potential losses" and that the "greater the risk of an inopportune execution, the more compensation is required, which leads to wider bid-ask spreads. Conversely, anything the trader can do to lower the risk of an inopportune execution will lower the compensation required, which leads to narrower bid-ask spreads.").

[183] *See, e.g.,* Market-Maker Protections, Market Structure, Optiver, July 17, 2023, available at *https://optiver.com/insights/market-maker-protections/* (explaining that exchanges implement robust market-maker protections to "assist market makers in coping with the risks of posting continuous, two-sided quotes in thousands of financial instruments" and to provide the ability to automatically pull or amend their quotes so that "all quotes falling within the scope of protection still resting on the book are prohibited from further execution").

[184] In 2016, IEX received SEC approval of the IEX's exchange system that provides a similar quote indicator for equities. *See* Securities Exchange Act Release No. 78101 (June 17, 2016), 81 FR 41142, 41161 (June 23, 2016) ("2016 SEC Approval Order") (approving IEX's exchange system in its registration as a national securities exchange, which included the approval of IEX's crumbling quote indicator that assesses quote instability by utilizing a real-time, based on pre-determined, objective set of conditions that protects orders from unfavorable executions when the market is moving against them). In 2020, IEX received SEC approval to apply the quote indicator to displayed orders in equities. *See* 2020 SEC Approval Order, supra note 172, at 6–7 (receiving unanimous support and concluding that the Exchange's displayed order proposal that included a similar quote indicator is consistent with the requirements of the Exchange Act and the rules and regulations thereunder applicable to a national securities exchange and that is designed to improve market quality, enhance price discovery, and promote just and equitable principles of trade).

[185] Because of this difference, the Indicator is designed to identify when the Protected Bid and/ or Protected Offer in an option is dislocated from the price of the underlying based on a price change in the underlying and therefore likely to be in transition to a less aggressive price, while the Crumbling Quote Indicator utilizes changes in the protected quote in the security itself to make such a prediction.

[186] *See, e.g.,* 2020 SEC Approval Order, supra note 172, at 19 (concluding that IEX's exchange functionality protects against adverse selection and incentivizes more displayed liquidity through improved execution quality for liquidity providers, which contributes "to fair and orderly markets" and supports "the public price discovery process"); at 26 (finding that the Exchange's speedbump and crumbling quote indicator promotes the interest of long term investors and inures to the "benefit of displayed markets, leading to increased displayed liquidity from which all market participants ultimately will benefit"); at 52 (concluding that the Exchange's order protection functionality "is designed to encourage market participants to post more priced limit orders, including displayed orders, on IEX, and thereby promotes just and equitable principles of trade, removes impediments to and perfects the mechanism of a free and open market and a national market, and, in general, protects investors and the public interest.").

makers are subject to affirmative obligations to provide continuous two-sided quotes and cannot back away or unduly widen their quotes during periods of price volatility, as can other liquidity providers.[187] By offering market makers this narrowly-tailored, optional tool, IEX believes it will attract additional displayed liquidity that will be available to all market participants.

IEX also believes that use of the Indicator in determining when to trigger the ORP is consistent with the protection of investors and the public interest because the Indicator is based on the well-recognized Black-Scholes options pricing model, which IEX believes is an appropriate methodology to identify when a market maker's quote in an option is dislocated from the price of the underlying security based on the mathematical relationship between the price of the underlying security and the overlying options. Moreover, IEX believes that the access delay [188] (as discussed above) will serve to enhance the accuracy of the Indicator by providing adequate time for the IEX Trading System to update its Indicator calculation with current market data. In this regard, as discussed earlier, IEX notes that the proposed access delay of up to a maximum of 350 microseconds is well within the geographic delays that exist among and between the data centers that IEX Options Members, and other options exchanges, use and is consistent with the naturally occurring time indeterminism that exists in order processing.

Further, IEX believes that limiting the availability of the ORP to resting market maker quotes is consistent with the Act for several reasons. As discussed in depth above, market makers are integral to providing liquidity on options exchanges, and at the same time subject to a potentially excessive level of risk from execution of one or more stale quotes. Additionally, Market Makers' obligations apply across all series in their appointed class. Other liquidity providers are free to concentrate their efforts in a select number of series. Thus, Market Makers have greater exposure to latency arbitrage, take on greater risk, and incur more related capital charges than other liquidity

providers. IEX determined to apply the functionality to resting quotes only as this approach will best achieve the purpose of protecting market markets from the excessive risk of executions at stale prices without disrupting market makers' ability to update their quotations.

Moreover, IEX notes that the Commission has previously recognized the utility of IEX providing protection to liquidity providers through order types that leverage its crumbling quote indicator to appropriately protect market participants from the risks of transacting when the market is in transition and thereby incentivize the entry of liquidity providing orders. The Exchange believes that the proposed ORP is consistent with this history and is in furtherance of driving tighter and deeper displayed markets to the benefit of investors.[189]

IEX also believes that the proposal is consistent with the firm quote obligations of a broker-dealer pursuant to Rule 602 of Regulation NMS.[190] Specifically, any marketable interest that is executable against a market maker's quote that has been received by the Trading System prior to the time that a quote instability determination is received by Trading System will be automatically executed, subject to processing of any prior messages, at the price and up to the size of the market maker's quote.

IEX believes that the proposed ORP is consistent with the protection of investors and the public interest, and is consistent with the Exchange Act, including furthering the objectives of Section 6(b)(5) of the Act,[191] because it is a narrowly-tailored approach designed to appropriately balance the risks faced by market makers with the legitimate objectives of liquidity takers by providing additional optional risk protection to market makers and thereby encourage aggressive quoting. The Exchange further believes that offering more risk management protections to Market Makers would mitigate their exposure to excessive risk. As discussed in detail above, Market Makers are required to continuously provide two-sided quotes in substantial numbers of listed options series that can create large, unintended positions exposing market makers to excessive risk. Market Maker quotes are critical to provide liquidity to the market and contribute to price discovery for investors. Without robust liquidity protection, market

makers may be forced to widen their spreads, show less liquidity or simply exit the market, which can result in deterioration of market quality and adversely impact investors' and other liquidity takers' ability to transact in the options markets. In sum, liquidity protection for options market makers is vital for achieving a healthy balance between liquidity providers and liquidity takers in the options market that will promote more displayed liquidity from which all market participants ultimately will benefit.

The Exchange believes that the proposed rules of IEX Options, as well as the proposed method of monitoring for compliance with and enforcing such rules is also consistent with the Act, particularly Sections 6(b)(1), 6(b)(5) and 6(b)(6) of the Act, which require, in part, that an exchange have the capacity to enforce compliance with, and provide appropriate discipline for, violations of the rules of the Commission and of the exchange. The Exchange has proposed to adopt rules necessary to regulate Options Members that are nearly identical to the approved rules of other options exchanges, as described above. The Exchange proposes to regulate activity on IEX Options in the same way it regulates activity on its equities market (and comparable to other options exchanges), through various Exchange specific functions, an RSA with FINRA, as well as participation in industry plans, including plans pursuant to Rule 17d–2 under the Exchange Act.

In conclusion, for the reasons discussed above, IEX believes that the proposed rule change is consistent with the investor protection and public interest purposes of Section 6 of the Act. Additionally, IEX believes that establishing a new options market that participates in all the current (and any future) national market system plans governing options trading is consistent with Section 11A of the Act relating to the establishment of the national market system for securities.[192] As proposed, IEX Options will offer a simple alternative to existing options exchanges that is designed to support competitive quoting to the benefit of all market participants.

*B. Self-Regulatory Organization's Statement on Burden on Competition*

The Exchange does not believe that the proposed rule change will result in any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act. To the contrary, the proposed rule change is designed to enhance competition by

---

[187] *See, e.g.,* Protecting Liquidity in Options Markets, Market Structure, Optiver, July 12, 2023, available at *https://optiver.com/insights/protecting-liquidity-in-options-markets/* (explaining that without robust liquidity protection mechanisms for market makers to protect against the risks of displaying stale or outdated quotes, "market makers may be forced to widen their spreads, show less liquidity or simply exit the market" and overall "market quality can deteriorate" with the result of investors suffering).

[188] *See* proposed IEX Rule 22.170(g).

[189] *See supra* notes 184 and 186 and accompanying text.

[190] *See* proposed IEX Rule 23.140(d).

[191] 15 U.S.C. 78f(b)(5).

[192] 15 U.S.C. 78k–1.

providing for an additional exchange market for the trading of listed options.

IEX believes that this proposal will enhance competition by allowing the Exchange to leverage its existing robust technology platform to provide a resilient, deterministic, and transparent execution platform for options. The proposed rule change will insert an additional competitive dynamic to the options landscape by allowing the Exchange to compete with existing options exchanges and will promote further initiative and innovation among market centers and market participants.

Further, the Exchange does not believe that the latency mechanism or optional Market Maker quote parameter aspect of the proposed rule change will impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act. To the contrary, these features are designed to enhance IEX Option's competitiveness by incentivizing the entry of increased Market Maker liquidity.

The Exchange does not believe that the proposed rule change will impose any burden on intra-market competition because it will apply to all Options Members in the same manner and any Options Member can perform any specified function subject to meeting applicable requirements.

The Exchange also does not believe that the proposed latency mechanism will impose any burden on intra-market competition that is not necessary or appropriate because it will apply in the same manner to all incoming orders and quotes. Further, as noted in the Purpose section, the Exchange will determine the length of the latency mechanism with a view towards achieving a healthy balance between liquidity providers and liquidity takers.

The Exchange also does not believe that the proposed ORP will impose any burden on intra-market competition that is not necessary or appropriate because it will be available in the same manner to all Market Makers and any Options Member could become a Market Maker, subject to meeting applicable requirements. The ORP is designed to mitigate Market Makers' exposure to excessive risk and thereby enable them to provide more competitive quotes to the benefit of all market participants. The Exchange also believes that limiting the ORP functionality to Market Makers will not impose any burden on intra-market competition that is not necessary and appropriate because Market Makers are subject to robust affirmative quoting obligations and thus can uniquely benefit from the protections to be provided by the ORP. The Exchange thus believes it is reasonable to provide

Market Makers with an additional tool to manage their risk parameters, particularly given their unique and critical role in the listed options market and the obligations that Market Makers must satisfy. As discussed in the Purpose and Statutory Basis sections, the proposed ORP will protect resting market-maker quotes (which are subject to quoting obligations) from executions at potentially stale prices, which the Exchange believes will reduce their risk and encourage Market Makers to provide more competitive markets on the Exchange, thereby benefitting all market participants through additional execution opportunities at prices that reflect the then-current market conditions. The Exchange expects the proposed rule change to increase liquidity and enhance competition in the market because Market Makers may be able to quote more aggressively with added productions from exposure to execution risk, thereby remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest.

The Exchange also does not believe that the proposal will impose any burden on inter-market competition that is not necessary or appropriate. Competing exchanges are free to adopt similar functionality, subject to the Commission rule filing process.

*C. Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received From Members, Participants, or Others*

Written comments were neither solicited nor received.

### III. Date of Effectiveness of the Proposed Rule Change and Timing for Commission Action

Within 45 days of the date of publication of this notice in the **Federal Register** or within such longer period up to 90 days (i) as the Commission may designate if it finds such longer period to be appropriate and publishes its reasons for so finding or (ii) as to which the self-regulatory organization consents, the Commission will:

(A) by order approve or disapprove the proposed rule change, or

(B) institute proceedings to determine whether the proposed rule change should be disapproved.

### IV. Solicitation of Comments

Interested persons are invited to submit written data, views and arguments concerning the foregoing, including whether the proposed rule change is consistent with the Act.

Comments may be submitted by any of the following methods:

*Electronic Comments*

• Use the Commission's internet comment form (*https://www.sec.gov/ rules/sro.shtml*); or

• Send an email to *rule-comments@ sec.gov.* Please include file number SR–IEX–2025–02 on the subject line.

*Paper Comments*

• Send paper comments in triplicate to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090.

All submissions should refer to file number SR–IEX–2025–02. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*https://www.sec.gov/ rules/sro.shtml*). Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549, on official business days between the hours of 10 a.m. and 3 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange. Do not include personal identifiable information in submissions; you should submit only information that you wish to make available publicly. We may redact in part or withhold entirely from publication submitted material that is obscene or subject to copyright protection. All submissions should refer to file number SR–IEX–2025–02 and should be submitted on or before February 11, 2025.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[193]

**Sherry R. Haywood,**

*Assistant Secretary.*

[FR Doc. 2025–01290 Filed 1–17–25; 8:45 am]

**BILLING CODE 8011–01–P**

---

[193] 17 CFR 200.30–3(a)(12).

# ADMINISTRATIVE RECORD REFERENCE NO. 3

In sum, the Exchange believes that this proposal is consistent with the requirements of Section 6(b)(5) of the Act, that on the whole the manipulation concerns previously articulated by the Commission are sufficiently mitigated to the point that they are outweighed by investor protection issues that would be resolved by approving this proposal.

The Exchange believes that the proposal is, in particular, designed to protect investors and the public interest. The investor protection issues for U.S. investors has grown significantly over the last several years, through premium/discount volatility and management fees for OTC XRP Funds. As discussed throughout, this growth investor protection concerns need to be re-evaluated and rebalanced with the prevention of fraudulent and manipulative acts and practices concerns that previous disapproval orders have relied upon.

For the above reasons, the Exchange believes that the proposed rule change is consistent with the requirements of Section 6(b)(5) of the Act.

### B. Self-Regulatory Organization's Statement on Burden on Competition

The Exchange does not believe that the proposed rule change will impose any burden on competition that is not necessary or appropriate in furtherance of the purpose of the Act. The Exchange notes that the proposed rule change, rather will facilitate the listing and trading of an additional exchange-traded product that will enhance competition among both market participants and listing venues, to the benefit of investors and the marketplace.

### C. Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received From Members, Participants, or Others

The Exchange neither solicited nor received comments on the proposed rule change.

### III. Date of Effectiveness of the Proposed Rule Change and Timing for Commission Action

Within 45 days of the date of publication of this notice in the **Federal Register** or within such longer period up to 90 days (i) as the Commission may designate if it finds such longer period to be appropriate and publishes its reasons for so finding or (ii) as to which the Exchange consents, the Commission will:

A. by order approve or disapprove such proposed rule change, or

B. institute proceedings to determine whether the proposed rule change should be disapproved.

### IV. Solicitation of Comments

Interested persons are invited to submit written data, views and arguments concerning the foregoing, including whether the proposed rule change is consistent with the Act. Comments may be submitted by any of the following methods:

*Electronic Comments*

• Use the Commission's internet comment form (*https://www.sec.gov/rules/sro.shtml*); or

• Send an email to *rule-comments@sec.gov.* Please include file number SR–CboeBZX–2025–040 on the subject line.

*Paper Comments*

• Send paper comments in triplicate to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090.

All submissions should refer to file number SR–CboeBZX–2025–040. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*https://www.sec.gov/rules/sro.shtml*). Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549, on official business days between the hours of 10 a.m. and 3 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange. Do not include personal identifiable information in submissions; you should submit only information that you wish to make available publicly. We may redact in part or withhold entirely from publication submitted material that is obscene or subject to copyright protection. All submissions should refer to file number SR–CboeBZX–2025–040 and should be submitted on or before April 9, 2025.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[34]

**Vanessa A. Countryman,**

*Secretary.*

[FR Doc. 2025–04509 Filed 3–18–25; 8:45 am]

**BILLING CODE 8011–01–P**

---

### SECURITIES AND EXCHANGE COMMISSION

[Release No. 34–102663; File No. SR–IEX–2025–02]

### Self-Regulatory Organizations: Investors Exchange LLC; Notice of Filing of Amendment No. 1 to a Proposed Rule Change To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options

March 13, 2025.

On January 10, 2025, the Investors Exchange LLC ("IEX" or "Exchange") filed with the Securities and Exchange Commission ("Commission"), pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act")[1] and Rule 19b–4 thereunder,[2] a proposed rule change to adopt rules to govern the trading of options on IEX Options LLC, a facility of the Exchange that will be established in a separate rule filing. The proposed rule change was published for comment in the **Federal Register** on January 21, 2025.[3] On March 6, 2025, the Commission designated a longer period within which to take action on the proposed rule change.[4] On March 12, 2025, the Exchange filed Amendment No. 1 to the proposed rule change.[5] The Commission has received comments on the proposed rule change.[6] The Commission is publishing this notice to solicit comments on the proposed rule change, as amended by Amendment No. 1, from interested persons. Items I and II below have been prepared by the Exchange.

---

[34] 17 CFR 200.30–3(a)(12).

[1] 15 U.S.C. 78s(b)(1).

[2] 17 CFR 240.19b–4.

[3] *See* Securities Exchange Act Release No. 102190 (Jan. 14, 2025), 90 FR 7205.

[4] *See* Securities Exchange Act Release No. 102536, 90 FR 11866 (Mar. 12, 2025). The Commission designated April 21, 2025 as the date by which it should either approve, disapprove, or institute proceedings to determine whether to disapprove the proposed rule change. *See id.*

[5] Amendment No. 1 is publicly available on the Commission's website at: sriex202502–580115–1667463.pdf. *See infra,* notes 9—12 and accompanying text for a further explanation of the proposed revisions to the proposed rule change set forth in Amendment No. 1.

[6] Comments on the proposed rule change are available at *https://www.sec.gov/comments/sr-iex-2025-02/sriex202502.htm.*

## I. Self-Regulatory Organization's Statement of the Terms of Substance of the Proposed Rule Change

On January 10, 2025, IEX, pursuant to the provisions of Section 19(b)(1) under the Act and Rule 19b–4 thereunder, filed with the Commission proposed rule change SR–IEX–2025–02 (the "Initial Proposal").[7] As described in the Initial Proposal, IEX is proposing to adopt rules to govern the trading of options on IEX Options LLC, a facility of the Exchange that will be established in a separate rule filing (referred to herein as "IEX Options"). The Exchange is filing this proposal ("Amendment No. 1") to amend the Initial Proposal as described herein. Amendment No. 1 replaces and supersedes the Initial Proposal in its entirety.

As proposed, the Exchange will operate IEX Options as a fully automated trading system built on the core functionality of the Exchange's approved equities platform, and in a manner similar to that of other options exchanges. In addition, IEX Options will utilize a de minimis delay on incoming order and quote messages designed to enable IEX to update its view of the market prior to processing orders and quotes, and an optional Market Maker quote parameter designed to protect Market Makers from excessive risk due to execution of stale quotes, in addition to other risk protections substantially similar to those offered by other options exchanges.

The text of the proposed rule change is available at the Exchange's website at *https://www.iexexchange.io/resources/regulation/rule-filings,* at the principal office of the Exchange, and at the Commission's Public Reference Room.

## II. Self-Regulatory Organization's Statement of the Purpose of, and the Statutory Basis for, the Proposed Rule Change

In its filing with the Commission, the self-regulatory organization included statements concerning the purpose of and basis for the proposed rule change and discussed any comments it received on the proposed rule change. The text of these statements may be examined at the places specified in Item IV below. The self-regulatory organization has prepared summaries, set forth in Sections A, B, and C below, of the most significant aspects of such statements.

### A. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

1. Purpose

Overview

The Commission published the proposed rule change for comment in the **Federal Register** on January 21, 2025,[8] and on March 6, 2025, extended the review period to April 21, 2025.[9]

The Exchange is filing this Amendment No. 1 to the Initial Proposal in order to provide increased clarity and modify certain aspects of the Initial Filing. First, IEX proposes that the duration of the latency mechanism (*i.e.,* the de minimis delay on incoming order and quote messages) set forth in proposed Rule 22.100(n) would be a fixed duration of 350 microseconds rather than being configurable by the Exchange. Second, as described herein, IEX proposes changes to more narrowly tailor the application of the proposed Options Risk Parameter ("ORP"),[10] the optional Market Maker quote parameter designed to protect Market Makers from excessive risk due to execution of stale quotes. Specifically, IEX proposes to amend language pertaining to the ORP to refine and clarify its function, as follows: (i) revise proposed Rule 23.150(h)(1) to provide that the Exchange will determine on a class-by-class basis whether to apply the ORP, which determination will be communicated by Trading Alert; (ii) revise proposed Rule 23.150(h)(1)(C) to specify that if a quote instability determination is generated for an options series being quoted by a Market Maker and the quote is above (below) the price level of the quote instability determination, the quote will be cancelled or repriced to the price level of the quote instability determination, as selected by the Market Maker; (iii) revise the Indicator formula specified in Supplementary Material .04 to proposed Rule 23.150 ("quote instability calculation") to provide that the formula will assess price changes in the underlying security in the context of the value of the options series (rather than the value of the underlying) when determining whether to issue a quote instability determination; and (iv) provide that the Exchange would introduce a new variable to the quote instability determination formula, a

delta [11] bound band, that would prevent quote instability determinations for those options series with deltas outside of the band, in order to more narrowly tailor application of the ORP to those options series that present the greatest risk of adverse selection to Market Makers.

In addition, as described herein, this Amendment 1 clarifies that the quote instability threshold range of 0–1, set forth in subsection (2)(e) of the quote instability calculation, reflects a scale from 0% to 100%, referencing the extent of the anticipated change in the quoted option price compared to the then-current price of the option. The quote instability threshold thus operates as a measure of whether the value of the quote instability determination price change is sufficiently meaningful enough to warrant generation of a quote instability determination. Additionally, the Exchange proposes several minor non-substantive stylistic edits and corrections to typographical errors in the Exhibit 5 to the Initial Proposal.[12]

The Exchange proposes to adopt a series of rules in connection with IEX Options, which will be a facility of the Exchange.[13] As proposed, the Exchange will operate IEX Options as a fully automated trading system built on the core functionality of the Exchange's approved equities platform, and in a manner similar to that of other options exchanges.[14]

As proposed, IEX Options will operate an electronic trading system to

---

[7] *See* Securities Exchange Act Release No. 102190 (January 14, 2025), 90 FR 7205 (January 21, 2025) ("Initial Filing"), available at *https://www.iexexchange.io/resources/regulation/rule-filings.*

[8] *Id.*

[9] *See* Securities Exchange Act Release No. 102536 (March 6, 2025), 90 FR 11866 (March 12, 2025).

[10] *See* proposed Rule 23.150(h)(1).

[11] Delta is a measure of how sensitive an options series price is to changes in the price of the underlying security.

[12] *See* proposed Rule 23.120, Supplementary Material .01 (text corrected to be formatted in italics), proposed Rule 23.130(g)(2)(B) (was denoted as (A) incorrectly), proposed Rule 23.150(h) (intro language misspelled "cancellation"), proposed Rule 23.150(h)(1)(C) (misspelled "cancelled"). In addition, in proposed Supplementary Material .04 to Rule 23.150, IEX replaced brackets around several formula inputs with parentheses to avoid confusion with the use of brackets to indicate deleted text. Further, IEX confirmed the capitalization of the word "proposed" in several places.

[13] IEX will file a separate proposed rule change with the Commission pursuant to Section 19 of the Act to provide that IEX Options will be operated by IEX Options LLC, a Delaware limited liability company wholly owned by the Exchange, as a facility of the Exchange as that term is defined in Section 3(a)(2) of the Act.

[14] The IEX Options proposed rules are largely based on the rules of other options exchanges, as described herein. When a particular proposed rule is described as "substantively identical" to a rule(s) of another exchanges that means that the substance of the proposed IEX Options rule is identical to the referenced rule of the other exchange, with differences only to reflect terminology and numbering. When a particular proposed rule is described as "substantially similar" to a rule(s) of another exchange this rule filing describes the relevant differences.

list and trade options issued by the Options Clearing Corporation ("Clearing Corporation" or "OCC"). Specifically, IEX proposes to operate a fully automated, pro-rata priority options market in a manner similar to that of other options exchanges. In addition, IEX Options will utilize a de minimis delay on incoming order and quote messages designed to enable IEX to update its view of the market prior to processing orders and quotes, and an optional Market Maker quote parameter designed to protect Market Makers from excessive risk due to execution of stale quotes, in addition to other risk protections substantially similar to those offered by other options exchanges.

The Exchange proposes to adopt rules applicable to IEX Options that are substantially similar to the approved rules of the MEMX, C1, MIAX, and NYSE Amex and Arca options exchanges, with the material proposed differences described herein.[15]

As provided in proposed Rule 17.110 (Applicability), existing Exchange Rules[16] applicable to the IEX equities market contained in Chapters 1 through 16 of the Exchange Rules will apply to Options Members unless a specific Exchange Rule applicable to the IEX Options market (in proposed Chapters 17 through 29 of the Exchange Rules) governs or unless the context otherwise requires.

The IEX Options Trading System[17] will provide for the electronic display and execution of orders on a pro-rata basis. All Exchange Members will be eligible to participate in IEX Options by qualifying as Options Members[18] and obtaining one or more trading permits for their activity on IEX Options, in accordance with applicable IEX Options rules. The IEX Options Trading System will provide an optional routing service for orders when trading interest is not present on IEX Options and will comply with all applicable securities laws and regulations and the obligations of the Options Order Protection and Locked/Crossed Market Plan.

IEX Options Members

Pursuant to the proposed rules in Chapter 18 (Participation on IEX Options), the Exchange will authorize

any Exchange Member that meets certain enumerated qualification requirements (any such Member, an "Options Member") and any Options Member's Sponsored Participants to obtain access to, and transact business on, IEX Options.[19]

There will be three types of Options Members—Options Order Entry Firms ("OEFs"), Options Market Makers, and Options Clearing Members. Options Members may act in one, two, or all such capacities. OEFs will be those Options Members representing Customer Orders as agent on IEX Options or trading as principal on IEX Options. Options Market Makers, in turn, will be eligible to participate as Registered Market Makers or Specialists, as set forth in Rule 23.100. Additionally, all Options Market Makers may participate as Directed Marker Makers.[20] Clearing Members will be those Options Members that have been admitted to membership in the Clearing Corporation pursuant to the provisions of the Rules of the Clearing Corporation and are self-clearing or that clear IEX Options Transactions for other Options Members.

IEX proposes to issue different types of Trading Permits to Options Members that allow the Trading Permit Holders to: (i) trade one or more products authorized for trading on the Exchange; (ii) act in one or more trading functions authorized by the Rules of IEX Options; and/or (iii) act as a Clearing Member.[21] Trading Permits shall be for the types and terms as shall be determined by the Exchange from time to time, and subject to effectiveness of one or more rule filings pursuant to Section 19(b) of the Act. The proposed rule governing IEX's Trading Permits, 18.140, is based on C1 Rule 3.1.[22]

The rules governing Registered Market Makers and Specialists are

substantially based on MIAX and C1 rules.[23] To become an Options Market Maker, an Options Member will be required to register by filing a written application and obtain any required trading permits.[24] The Exchange will not place any limit on the number of entities that may become Options Market Makers, the number of appointments an Options Market Maker may have, or the number of Options Market Makers that may have appointments in a class unless the Exchange determines to impose any such limit based on system constraints, capacity restrictions, or other factors relevant to protecting the integrity of the Trading System. The Exchange will not impose any such limitations until it has submitted objective standards for imposing the limits to the Commission for its review and approval.[25]

As proposed, the Exchange shall appoint Registered Market Makers to one or more classes of options contracts traded on the Exchange. In making such appointments the Exchange shall consider the financial resources available to the Registered Market Maker, the Registered Market Maker's experience and expertise in market making or options trading, the preferences of the Registered Market Maker to receive appointments in specific options classes, and the maintenance and enhancement of competition among Registered Market Makers in each class of options contracts to which they are appointed.[26]

While there may be several Registered Market Makers appointed to a particular class of options contracts, the Exchange may appoint only one Specialist to each options class traded on the Exchange.[27]

---

[15] See rulebooks of MEMX LLC ("MEMX"), Cboe Exchange, Inc. ("C1"), Miami International Securities Exchange, LLC ("MIAX"), NYSE Arca, Inc. ("NYSE Arca Options"), and NYSE American LLC ("NYSE Amex Options"). However, IEX is not proposing to trade index options at this time and therefore is not proposing rules for the listing and trading of index options.

[16] See IEX Rule 1.160(jj).

[17] See proposed Rule 22.100(a).

[18] See proposed Rule 17.100.

[19] See proposed Rules 18.100, 18.110, 18.120, and 18.130.

[20] Directed Market Makers are subject to enhanced quoting obligations (as compared to Registered Market Markers) as set forth in proposed Rule 23.150(e)(3), which is substantively identical to NYSE Amex Options Rule 964.1NYP.

[21] See proposed Rule 18.140.

[22] On C1, part of the process of applying to be a Trading Permit Holder is for a broker-dealer to qualify as a participant or member of the exchange. IEX's proposed rule therefore differs from C1 Rule 3.1 because it does not include the membership qualification-related provisions that are addressed elsewhere in IEX's proposed Chapter 18. In particular, IEX is not proposing to incorporate C1 Rule 3.1(a)(3)'s language regarding jurisdiction over Trading Permit Holders because it is covered by Rule 2.120 (requiring all IEX Members to consent to the Exchange's jurisdiction) and proposed Rule 18.140(e) (applying the Exchange's jurisdictional authority to all Options Members). In addition, C1's rule includes limitations on the number of trading permits the exchange may issue. IEX is not proposing such limitations.

[23] See MIAX Rules 600–609 (regarding market maker qualifications and obligations) and MIAX Rules 514(d), (e), and (g) (regarding market maker quoting and priority). The primary differences between these MIAX rules and IEX's proposed Market Maker rules are: (1) MIAX has three tiers of market makers, while IEX proposes to have two tiers; (2) MIAX puts Market Makers at a priority level above other non-Priority Customer interest, while IEX will not (IEX's proposed rules are substantively identical to the priority rules in C1 Rule 5.32 as it pertains to C1's Preferred Market Makers); (3) IEX proposes to allocate participation entitlements for Specialists with a priority quote based on the amount of non-Priority customer interest (which is how C1 Rule 5.32(a)(2)(B) allocates priority overlays), while MIAX only looks at the amount of other market marker interest; and (4) MIAX offers a Market Turner priority overlay which IEX is not proposing to adopt.

[24] See proposed Rules 23.100 and 18.140.

[25] This provision is substantively identical to MEMX Rule 22.2(c) and MIAX Rule 600(d).

[26] See proposed Rule 23.120(a)(1).

[27] See proposed Rule 23.130(g)(1)(A), which is substantively identical to NYSE Amex Options Rule 923NY(b). The language providing that the Exchange "may" appoint only one Specialist to

To be appointed as a Specialist, an Options Member must first satisfy the criteria for appointment as a Registered Market Maker set forth in Rule 23.120(a)(1) and then must participate in the Specialist Qualification Process conducted by the Exchange and detailed in proposed Rule 23.130(b).[28] Factors to be considered for selection as a Specialist include, but are not limited to, representations regarding capital operations, personnel or technical resources.[29] After designating certain Market Makers as Specialists, the Exchange will conduct a process to determine which options classes to allocate to which Specialist, based upon which candidate appears best able to perform the functions of a Specialist in the designated options classes. Factors to be considered in the allocation of options classes to Specialists by the Exchange include, but are not limited to the following: experience with trading the options issue; adequacy of capital; willingness to promote the Exchange as a marketplace; operational capacity; support personnel; history of adherence to Exchange rules and securities laws; and evaluations made pursuant to Rule 23.130(f).[30] The Exchange will also consider the number and quality of issues that have been allocated, reallocated or transferred to a Specialist and the Specialist's willingness to promote the Exchange as a marketplace.[31]

The Exchange will also evaluate the performance of Specialists, and upon a finding that a Specialist failed to meet minimum performance standards, may take adverse action against the Specialist; Specialists shall have the right to appeal any adverse actions against them pursuant to IEX Rule Series 9.500, which governs adverse actions.[32]

Quotations may only be entered by a Market Maker and only in classes of options contracts to which the Market Maker is appointed.[33] Market Makers may also submit orders in classes of options contracts to which the Market Maker is appointed, which shall constitute a quote, and thus would help to satisfy the Market Maker's quoting obligation.[34] In addition, an Options Market Maker with an OEF trading permit may submit orders in classes of options in which the Market Maker has no appointment, provided that the total number of such orders executed by the Market Maker do not exceed 25% of all contracts the Market Maker executes on the Exchange in any calendar quarter.[35]

Options Market Makers will be required to electronically engage in a course of dealing reasonably calculated to contribute to the maintenance of fair and orderly markets.[36] IEX does not propose to incorporate MIAX's requirement that Market Makers refrain from purchasing an option at a price more than $0.25 below parity,[37] because IEX does not believe the restriction is necessary to the maintenance of fair and orderly markets requirement, and notes that other exchanges do not include this restriction.[38] Market Makers will be required to maintain a two-sided market on a continuous basis [39] in at least 60% of the non-adjusted options series to which they are appointed as Registered Market Makers and at least 90% of the non-adjusted options series to which they are appointed as Specialists, provided the options classes have a time to expiration of less than nine months.[40] And, as noted above, Directed Market Makers are subject to enhanced quoting obligations compared to Registered Market Makers.[41] Market Makers and Specialists may use quotes and orders to meet the applicable quoting requirements. These obligations will not apply to an intra-day add-on series on the day during which such series was added for trading. Market Maker quotes must be firm quotes that comply with enumerated price and size rules.[42]

These obligations also will not apply when an Options series is halted because the underlying security has entered a Limit or Straddle state.[43] Registered Market Makers and Specialists also must maintain minimum net capital in accordance with Commission and Exchange rules.[44] Substantial or continued failure by an Options Market Maker to meet any of its obligations and duties will subject the Options Market Maker to disciplinary action, suspension, or revocation of the Market Maker's registration as such or its appointment in one or more of its appointed options classes.[45]

As on other exchanges, Options Market Makers receive certain benefits for carrying out their duties. For example, a lender may extend credit to a broker-dealer without regard to the restrictions in Regulation T of the Board of Governors of the Federal Reserve System if the credit is to be used to finance the broker-dealer's activities as a specialist or market maker on a national securities exchange. Thus, an Options Market Maker has a corresponding obligation to hold itself out as willing to buy and sell options for its own account on a regular or continuous basis to justify this favorable treatment.

Every Options Member shall at all times maintain membership in another registered options exchange that is not registered solely under Section 6(g) of the Exchange Act or in FINRA.[46] OEFs and other Options Members that transact business with Public Customers must at all times be members of FINRA. Pursuant to proposed Rule 18.110(h), every Options Member will be required to have at least one registered Options Principal who satisfies the criteria of that rule, including the satisfaction of a proper qualification examination. An OEF may only transact business with Public Customers if such Options Member also is an Options Member of another registered national securities

---

each options class is based upon and substantively identical to NYSE Amex Options Rule 923NY(b).

[28] IEX based the proposed Specialist rule (23.130) on NYSE Amex Options Rules 927NY, 927.1NY, and 927.2NY because these rules provide clear instructions to prospective Specialist candidates about the manner in which the Exchange selects and evaluates Specialists, and detailed rules about Specialist rights and obligations.

[29] *See* proposed Rule 23.130(b)(1). This rule is substantively identical to NYSE Amex Options Rule 927NY, with the exception that IEX is not proposing to obligate Specialists to make FLEX quotes, because those are not offered by the Exchange.

[30] *See* proposed Rule 23.130(g). This rule is substantively identical to NYSE Amex Options Rule 927.2NY

[31] *Id.*

[32] *See* proposed Rule 23.130(b)(2), and (f). These rules are substantively identical to NYSE Amex Options Rules 927NY(b)(2) and 927.1NY, respectively.

[33] *See* proposed Rule 23.150(a).

[34] *See* proposed Rule 17.100 (defining "Quote" to include orders entered by a Market Maker in the option series to which such Market Maker is registered).

[35] *See* proposed Rule 23.150(g).

[36] *See* proposed Rule 23.140(a).

[37] *See* MIAX rule 603(a).

[38] *See, e.g.,* NYSE Arca Options Rule 6.37–O.

[39] "Continuous quoting" is defined as 90% of the time. *See* proposed Rule 23.150(e).

[40] *See* proposed Rule 23.150(e)(2) and (e)(1). Proposed Rule 23.150(e)(1) is based upon and substantively identical to NYSE Amex Options Rule 925.1NYP(b) and proposed Rule 23.150(e)(2) is based upon and substantively identical to NYSE Amex Options Rule 925.1NYP(c).

[41] *See supra* note 20.

[42] *See* proposed Rule 23.150(b) and (d).

[43] *See* Supplementary Material .01 to proposed Rule 23.150(h), which is substantively identical to MIAX Rule 530(f)(1).

[44] *See* proposed Rule 23.180 ($200,000 net capital requirement for Registered Market Makers), which is substantively identical to MEMX Rule 22.9 and proposed Rule 23.130(c)(1)(H) ($1,000,000 net capital requirement for Specialists), which is substantively identical to Amex Options Rule 927NY(c)(10).

[45] *See* proposed Rule 23.120(f). NYSE Amex Options Rule 927.1NY(1)(B) specifies that NYSE Amex Options provides its specialists information related to their market share in allocated issues on a monthly basis as part of the evaluation process. IEX is not proposing to include this provision because it understands that Specialist firms are well-equipped to monitor their market share and performance on IEX and other markets.

[46] *See* proposed Rule 18.110(g).

exchange or association with which the Exchange has entered into an agreement under Rule 17d-2 under the Exchange Act [47] pursuant to which such other exchange or association shall be the designated options examining authority for the OEF.[48]

The proposed rules relating to qualification and participation on IEX Options as an Options Member (including as an OEF, Options Market Maker, or Clearing Member) are substantively identical to the relevant rules of MEMX Options.[49]

As provided in proposed Rule 17.110, existing Exchange Rules applicable to the IEX equities market contained in Chapters 1 through 16 of the Exchange Rules will apply to Options Members unless a specific Exchange Rule applicable to the IEX Options market (proposed Chapters 17 through 29 of the Exchange Rules) governs or unless the context otherwise requires. Options Members can therefore provide sponsored access to the IEX Options Exchange to a non-Member (*i.e.,* a Sponsored Participant) pursuant to Rule 11.130 of the Exchange Rules.

Definitions

The Exchange proposes to define a series of terms under proposed Rule 17.100 (Definitions), which are to be used in proposed Chapters 17 to 29 relating to the trading of options contracts on the Exchange. Unless otherwise indicated, all of the terms defined in proposed Rule 17.100 are either identical or substantially similar to definitions included in MEMX Rule 16.1. Any modifications to the MEMX definitions, or definitions based upon the rules of other exchanges are specifically indicated below.

The definitions under proposed Rule 17.100 are as follows:

• ABBO. The term "ABBO" or "Away Best Bid or Offer" means the best bid(s) or offer(s) disseminated by other Eligible Exchanges (as defined in Rule 28.100) and calculated by the Exchange based on market information the Exchange receives from OPRA.[50]

• Aggregate Exercise Price. The term "Aggregate Exercise Price" means the exercise price of an options contract multiplied by the number of units of the underlying security covered by the options contract.

• American-Style Option. The term "American-Style" option means an options contract that, subject to the provisions of Rule 24.100 (relating to the cutoff time for exercise instructions) and to the Rules of the Clearing Corporation, may be exercised at any time from its commencement time until its expiration.

• Associated Person and Person Associated with an Options Member. The terms "associated person" and "person associated with an Options Member" mean any partner, officer, director, or branch manager of an Options Member (or any person occupying a similar status or performing similar functions), any person directly or indirectly controlling, controlled by, or under common control with an Options Member or any employee of an Options Member, except that any person associated with an Options Member whose functions are solely clerical or ministerial shall not be included in the meaning of such term for purposes of these Rules.

• Bid. The term "bid" means a Limit order to buy one or more options contracts.

• Board. The term "Board" means the Board of Directors of Investors' Exchange LLC.

• Call. The term "call" means an options contract under which the holder of the option has the right, in accordance with the terms of the option, to purchase from the Clearing Corporation the number of shares of the underlying security covered by the options contract.

• Capacity. The term "capacity" means the capacity in which a User submits an order, which the User specifies by applying the corresponding code to the order. The capacity codes available on IEX Options will be listed in publicly available specifications and published in a Regulatory Circular.

• Class of Options. The terms "class" or "class of options" mean all options contracts with the same unit of trading covering the same underlying security.

• Clearing Corporation and OCC. The terms "Clearing Corporation" and "OCC" mean The Options Clearing Corporation.

• Clearing Member. The term "Clearing Member" means an Options Member that is self-clearing or an Options Member that clears IEX Options Transactions for other Options Members.

• Closing Purchase Transaction. The term "closing purchase transaction" means an IEX Options Transaction that reduces or eliminates a short position in an options contract.

• Closing Writing Transaction. The term "closing writing transaction" means an IEX Options Transaction that reduces or eliminates a long position in an options contract.

• Control. The term "control" means the power to exercise a controlling influence over the management or policies of a person, unless such power is solely the result of an official position with such person. Any person who owns beneficially, directly or indirectly, more than 20% of the voting power in the election of directors of a corporation, or more than 25% of the voting power in the election of directors of any other corporation which directly or through one or more affiliates owns beneficially more than 25% of the voting power in the election of directors of such corporation, shall be presumed to control such corporation.[51]

• Covered Short Position. The term "covered short position" means (i) an options position where the obligation of the writer of a call option is secured by a "specific deposit" or an "escrow deposit" meeting the conditions of Rules 610(f) or 610(g), respectively, of the Rules of the Clearing Corporation, or the writer holds in the same account as the short position, on a share-for-share basis, a long position either in the underlying security or in an options contract of the same class of options where the exercise price of the options contract in such long position is equal to or less than the exercise price of the options contract in such short position; and (ii) an options position where the writer of a put option holds in the same account as the short position, on a share-for-share basis, a long position in an options contract of the same class of options where the exercise price of the options contract in such long position is equal to or greater than the exercise price of the options contract in such short position.

• Customer. The term "Customer" means a Public Customer or a broker-dealer.

• Customer Order. The term "Customer order" means an agency order for the account of a Customer.

• Directed Order. The term "Directed Order" is an order entered into the Trading System by an Options Member with a designation for a Market Maker in that class (referred to as a "Directed Market Maker" or "DMM"). To qualify as a Directed Order, an order must be

---

[47] 17 CFR 240.17d–2.

[48] *See* Rule 27.100.

[49] *See* MEMX Rulebook Chapters 17 and 22.

[50] IEX notes that this definition differs from the MEMX definition of ABBO by spelling out the phrase "Away Best Bid or Offer" that ABBO refers to for added clarity.

[51] This definition is substantively identical to the definition in C1 Rule 1.1. IEX proposes to incorporate this definition, because the term is not specifically defined in the MEMX rulebook and IEX believes that term would provide helpful context to Options Members with respect to other rules that use the term, *e.g.,* proposed IEX Rule 19.200.

entered on behalf of a Priority Customer.[52]

• Discretion. The term ''discretion'' means the authority of a broker or dealer to determine for a Customer the type of option, the class or series of options, the number of contracts, or whether options are to be bought or sold.

• European-Style Option. The term ''European-style option'' means an options contract that, subject to the provisions of Rule 24.100 (relating to the cutoff time for exercise instructions) and to the Rules of the Clearing Corporation, can be exercised only on its expiration date.

• Exchange Act. The term ''Exchange Act'' or ''Act'' means the Securities Exchange Act of 1934, as amended, or Rules thereunder.

• Exercise Price. The term ''exercise price'' means the specified price per unit at which the underlying security may be purchased or sold upon the exercise of an options contract.

• He, Him, and His. The terms ''he,'' ''him'' and ''his'' are deemed to refer to persons of female as well as male gender, and to include organizations, as well as individuals, when the context so requires.

• IEX Exchange and Exchange. The terms ''IEX Exchange'' and ''Exchange'' mean Investors' Exchange LLC, a registered national securities exchange.

• IEX Options. The term ''IEX Options'' means IEX Options LLC, a Delaware limited liability company wholly owned by the Exchange, which operates as an options trading facility of the Exchange under Section 3(a)(2) of the Exchange Act.

• IEX Options Book. The term ''IEX Options Book'' means the electronic book of options orders maintained by the Trading System.[53]

• IEX Options Transaction. The term ''IEX Options Transaction'' means a transaction involving an options contract that is effected on or through IEX Options or its facilities or systems.[54]

• Individual Equity Option. The term ''individual equity option'' means an options contract which is an option on an equity security.

• Long Position. The term ''long position'' means a person's interest as the holder of one or more options contracts.

• Market Makers (and Options Market Makers). The terms ''Market Makers'' or ''Options Market Makers'' refer collectively to Options Members registered, pursuant to Rule 23.100, as either a ''Registered Market Maker'' or a ''Specialist''.[55]

• MPID. The term ''MPID'' means unique market participant identifier assigned to an Options Member.

• NBB, NBO, and NBBO. The term ''NBB'' means the national best bid, the term ''NBO'' means the national best offer, and the term ''NBBO'' means the national best bid or offer as calculated by IEX Options based on market information received by IEX Options from OPRA.

• Offer. The term ''offer'' means a Limit order to sell one or more options contracts.

• OPRA. The term ''OPRA'' means the Options Price Reporting Authority.

• Opening Purchase Transaction. The term ''opening purchase transaction'' means a IEX Options Transaction that creates or increases a long position in an options contract.

• Opening Writing Transaction. The term ''opening writing transaction'' means a IEX Options Transaction that creates or increases a short position in an options contract.

• Options Contracts. The term ''options contract'' means a put or a call issued, or subject to issuance by the Clearing Corporation pursuant to the Rules of the Clearing Corporation.

• Options Market Close and Market Close. The terms ''options market close'' and ''market close'' mean the time the Exchange specifies for the end of a trading session on the Exchange on that trading day.

• Options Market Open and Market Open. The terms ''options market open'' and ''market open'' mean the time the Exchange specifies for the beginning of a trading session on the Exchange on that trading day.

• Options Member. The term ''Options Member'' means a firm, or organization that is registered with the Exchange pursuant to Chapter 18 of these Rules for purposes of participating in options trading on IEX Options as an ''Options Order Entry Firm'', ''Options Market Maker'', or ''Clearing Member.''

• Options Member Agreement. The term ''Options Member Agreement'' means the agreement to be executed by Options Members to qualify to participate on IEX Options.

• Options Order Entry Firm, Order Entry Firm, and OEF. The terms ''Options Order Entry Firm'' and ''Order Entry Firm'' or ''OEF'' mean those Options Members representing as agent Customer Orders on IEX Options and those non-Market Maker Members conducting proprietary trading.

• Options Principal. The term ''Options Principal'' means a person engaged in the management and supervision of the Options Member's business pertaining to options contracts that has responsibility for the overall oversight of the Options Member's options related activities on the Exchange.

• Order. The term ''order'' means a firm commitment to buy or sell options contracts as defined in Rule 22.100.

• Outstanding. The term ''outstanding'' means an options contract which has been issued by the Clearing Corporation and has neither been the subject of a closing writing transaction nor has reached its expiration date.

• Primary Market. The term ''primary market'' means the primary exchange on which an underlying security is listed.[56]

• Priority Customer and Priority Customer Order. The term ''Priority Customer'' means any person or entity that is not: (A) a broker or dealer in securities; or (B) a Professional. The term ''Priority Customer Order'' means an order for the account of a Priority Customer.

• Professional. The term ''Professional'' means any person or entity that (A) is not a broker or dealer in securities; and (B) places more than 390 orders in listed options per day on average during a calendar month for its own beneficial account(s). All Professional orders shall be appropriately marked by Options Members.[57]

---

[52] This definition is based upon the definition in MIAX Options Exchange (''MIAX'') Rule 100, with the distinction that IEX proposes to make any Market Maker eligible to receive a Directed Order, while MIAX only allows their Lead Market Makers (akin to IEX's proposed ''Specialists'') and Primary Lead Market Makers eligible; this aspect of IEX's proposed rule change is based upon and substantially similar to C1 Rule 5.32. Additionally, IEX proposes to include language in the last sentence of this definition based on NYSE Amex Rule 900.3NYP(i)(4) to clarify that an order submitted on behalf of a non-Priority Customer would be treated as a non-Directed Order.

[53] This definition is substantively identical to the equivalent definition in the MEMX rulebook, except that it refers to IEX, not MEMX.

[54] This definition is substantively identical to the equivalent definition in the MEMX rulebook, except that it refers to IEX, not MEMX.

[55] This definition is substantively identical to the definition in the MIAX rulebook, except that MIAX has three classes of Market Makers (Registered Market Makers, Lead Market Makers, and Primary Lead Market Makers) while IEX proposes to have two classes of Market Makers: Registered Market Makers (equivalent to MIAX Registered Market Maker) and Specialists (which is based on MIAX's Lead Market Maker and Primary Lead Market Maker rules). IEX proposes to incorporate this definition, because the Market Maker rules proposed herein are substantially based upon the rules of MIAX.

[56] This definition is based on the definition in C1 Rule 1.1, because IEX believed the definition was easier to understand than the equivalent definition in the MEMX rulebook.

[57] *See* Proposed Supplementary Material .01 to Rule 17.100, which sets forth the methodology for calculation of Professional orders.

• Protected Quotation. The term ''Protected Quotation'' has the meaning provided in Rule 28.100.

• Public Customer and Public Customer Order. The term ''Public Customer'' means a person that is not a broker or dealer in securities. The term ''Public Customer Order'' means an order for the account of a Public Customer.

• Put. The term ''put'' means an options contract under which the holder of the option has the right, in accordance with the terms and provisions of the option and the Rules of the OCC, to sell to the Clearing Corporation the number of units of the underlying security covered by the options contract, at a price per unit equal to the exercise price, upon the timely exercise of such option.

• Quarterly Options Series. The term ''Quarterly Options Series'' means a series in an options class that is approved for listing and trading on the Exchange in which the series is opened for trading on any business day and expires at the close of business on the last business day of a calendar quarter.

• Quote or Quotation. The terms ''quote'' or ''quotation'' means a bid or offer entered by a Market Maker as a firm order that updates the Market Maker's previous bid or offer, if any. When the term order is used in these Rules and a bid or offer is entered by the Market Maker in the options series to which such Market Maker is registered, such order shall, as applicable, constitute a quote or quotation for purposes of these Rules. A quote or quotation may be canceled or repriced in accordance with Rules 22.250, 22.260, or 23.150, if so designated by the Market Maker to assist in its risk management.

• Registered Market Maker. The term ''Registered Market Maker'' means an Options Member registered with the Exchange for the purpose of making markets in securities traded on the Exchange, who is vested with the rights and responsibilities specified in Chapter 23 of these Rules with respect to Registered Market Makers.[58]

• Responsible Person. The term ''Responsible Person'' means a U.S.-based officer, director, or management-level employee of an Options Member, who is registered with the Exchange as an Options Principal, responsible for the direct supervision and control of associated persons of that Options Member.

• Rules of IEX Options. The term ''Rules of IEX Options'' mean the rules contained in Chapters 17 to 29 of the Investors Exchange Rules governing the trading of options on the Exchange.

• Rules of the Clearing Corporation and Rules of the OCC. The terms ''Rules of the Clearing Corporation'' and ''Rules of the OCC'' mean the Certificate of Incorporation, the By-Laws and the Rules of the Clearing Corporation, and all written interpretations thereof, as may be in effect from time to time.

• SEC or Commission. The terms ''SEC'' or ''Commission'' mean the United States Securities and Exchange Commission.

• Series of Options. The terms ''series'' or ''series of options'' mean all options contracts of the same class that are the same type of options and have the same exercise price and expiration date.

• Short Position. The term ''short position'' means a person's interest as the writer of one or more options contracts.

• Short Term Options Series. The term ''Short Term Options Series'' means a series in an options class that is approved for listing and trading on the Exchange in which the series is opened for trading on any Monday, Tuesday, Wednesday, Thursday or Friday that is a business day and that expires on the Monday, Tuesday, Wednesday, Thursday or Friday of the next business week, or, in the case of a series that is listed on a Friday and expires on a Monday, is listed one business week and one business day prior to that expiration. If a Tuesday, Wednesday, Thursday or Friday is not a business day, the series may be opened (or shall expire) on the first business day immediately prior to that Tuesday, Wednesday, Thursday or Friday, respectively. For a series listed pursuant to this section for Monday expiration, if a Monday is not a business day, the series shall expire on the first business day immediately following that Monday.

• Specialist. The term ''Specialist'' means a Market Maker appointed by the Exchange to act as the primary lead Market Maker for the purpose of making markets in securities traded on the Exchange. The Specialist is vested with the rights and responsibilities specified in Chapter 23 of these Rules with respect to Specialists.[59]

• SRO. The term ''SRO'' means a self-regulatory organization as defined in Section 3(a)(26) of the Exchange Act.

• Timestamp. The term ''timestamp'' means the effective time sequence assigned to an order for purposes of determining its priority ranking.

• Trading Permit. The term ''Trading Permit'' means a license issued by the Exchange to an Options Member that grants the Trading Permit Holder (''TPH'') the right to access one or more of the facilities of the Exchange for the purpose of effecting transactions in options traded on the Exchange without the services of another person acting as broker, and otherwise to access the facilities of the Exchange for purposes of trading or reporting transactions or transmitting orders or quotations in options traded on the Exchange, or to engage in other activities that, under the Rules of IEX Options, may only be engaged in by the TPH that satisfies any applicable qualification requirements to exercise those rights. A Trading Permit conveys no ownership interest in the Exchange, is only available through the Exchange, and is subject to the terms and conditions set forth in Rule 18.140.[60]

• Trading Permit Holder. The term ''Trading Permit Holder'' or ''TPH'' means the holder of a Trading Permit, as described in IEX Rule 18.140.[61]

• Trading System. The term ''Trading System'' means the automated trading system used by IEX Options for the trading of options contracts.

• Type of Option. The term ''type of option'' means the classification of an options contract as either a put or a call.

• Uncovered. The term ''uncovered'' means a short position in an options contract that is not covered.

• Underlying Security. The term ''underlying security'' means the security that the Clearing Corporation shall be obligated to sell (in the case of a call option) or purchase (in the case of a put option) upon the valid exercise of an options contract.

• User. The term ''User'' means any Options Member or Sponsored Participant who is authorized to obtain access to the Trading System pursuant to Rule 11.130 (Access).

---

[58] This definition is substantively identical to the definition in MIAX Rule 100. IEX proposes to incorporate this definition, because the Market Maker rules proposed herein are substantially based upon the rules of MIAX.

[59] This definition is substantively identical to the definition of Lead Market Makers and Primary Lead Market Makers in MIAX Rule 100. As discussed above, IEX proposes to incorporate the MIAX definitions for both Lead Market Makers and Primary Lead Market Makers into its definition for Specialists, because the Market Maker rules

proposed herein are substantially based upon the rules of MIAX.

[60] This definition is substantively identical to the definition in C1 Rule 1.1. IEX proposes to incorporate this definition, because its proposed Trading Permit rule (Rule 18.140), is substantively similar to the equivalent C1 Rule (C1 Rule 3.1).

[61] This definition is substantively identical to the definition in C1 Rule 1.1. IEX proposes to incorporate this definition, because its proposed Trading Permit rule (Rule 18.140), is substantively similar to the equivalent C1 Rule (C1 Rule 3.1).

Execution System

IEX Options will utilize a pro-rata allocation model with execution priority dependent on the size and capacity of an order; specifically, Priority Customer or non-Priority Customer, as well as status as a Registered Market Maker or Specialist, as applicable. The proposed pro-rata allocation model is similar to the MIAX and NYSE Amex options exchanges.[62]

The Exchange will become an exchange member of the OCC. The Trading System will be linked to OCC for the Exchange to transmit locked-in trades for clearance and settlement.[63]

IEX Options will include a de minimis delay on incoming order and quote messages designed to enable IEX to update its view of the market prior to processing orders and quotes, and an optional Market Maker quote parameter designed to protect Market Makers from excessive risk due to execution of stale quotes, in addition to other risk protections substantially similar to those offered by other options exchanges.

*Anonymity.* As set forth in proposed Rule 22.190, aggregated and individual transaction reports produced by the Trading System will indicate the details of a User's transactions, including the contra party's unique market participant identifier ("MPID"), capacity, and clearing firm account number.[64]

*Latency Mechanism.*[65] IEX's proposal includes a de minimis hardware based latency mechanism (or speedbump) of 350 microseconds added to each incoming order and quote message[66] designed to enable IEX to update its

---

[62] *See infra* note 86.

[63] Proposed Rule 22.220(a) notes that all Options transactions shall be submitted for clearance to the Clearing Corporation, and the Exchange shall assume no responsibility with respect to any unmatched trade or for any delays or errors in the reporting to it of trade information. This provision is based upon and substantively identical to MIAX Rule 524.

[64] The Exchange shall also reveal a User's identity: (i) when a registered clearing agency ceases to act for a participant, or the User's clearing firm, and the registered clearing agency determines not to guarantee the settlement of the User's trades; and (ii) for regulatory purposes or to comply with an order of an arbitrator or court. *See* proposed Rule 22.190. The Exchange notes that proposed Rule 22.190 is identical to MEMX Rule 21.10.

[65] *See* proposed Rule 22.100(n).

[66] As it does for with equities trading (which also applies an inbound latency of 350 microseconds), IEX will subject incoming order and quote messages to a *de minimis* delay using coiled optical fiber. *See* Rule 11.510(a). Due to force majeure events and acts of third parties, the Exchange does not guarantee that the delay will always be consistent. The Exchange will periodically monitor such latency and will make adjustments to the latency as reasonably necessary to achieve consistency with the latency targets as soon as commercially practicable.

---

view of the market prior to processing orders and quotes as well as to perform the Options Quote Indicator ("Indicator") calculation with current market data.[67] If the Exchange determines to change the duration of the delay, it will do so only pursuant to an effective rule filing submitted to the Commission pursuant to Section 19 of the Exchange Act.[68]

*Hours of Operation.* As provided in proposed Rule 22.110(a), the IEX Options Trading System will begin accepting orders and quotes beginning at 8:00 a.m.[69] pursuant to the market opening procedures described in proposed Rule 22.160. Orders and bids and offers shall be open and available until 4:00 p.m. except for options contracts on Fund Shares, as defined in proposed Rule 20.120(i), which may close as of 4:15 p.m. The Proposed Hours of Operation rule is based on MEMX Rule 21.2, except that MEMX does not allow for submission of quotes before the market opens for trading; IEX notes that other exchanges begin accepting orders and quotes before the market opens, for example C1 begins accepting quotes at 7:30 a.m.[70] Except as set forth above, IEX Options shall operate during the normal business days and hours set forth in the rules of the primary market trading the securities underlying options traded on IEX Options, absent unusual conditions as may be determined by the Exchange.[71] IEX Options will not be open for business on any holiday observed by the Exchange.[72]

*Units of Trading.* As stated in proposed Rule 22.120, the unit of trading in each series of options traded on IEX Options will be the unit of trading established for that series by the OCC pursuant to the rules of the OCC and the agreements of the Exchange with the OCC. The proposed determination of the unit of trading for a series of options traded on IEX Options is the same as on MEMX Options pursuant to MEMX Rule 21.3.

*Minimum Quotation and Trading Increments.* As stated in proposed Rule

---

[67] *See infra* for more information about the Indicator.

[68] The latency mechanism will not apply to outbound communications from the Exchange to a User, inbound and outbound communications between the Exchange and an Away Market regarding a routed order, inbound communications from data feeds, order processing and order execution on the IEX Options Order Book, outbound communications to the Exchange's proprietary data feeds or OPRA.

[69] All times in this filing refer to the Eastern time zone.

[70] *See* C1 Rule 5.7.

[71] *See* proposed IEX Rule 22.110(b).

[72] *See* proposed IEX Rule 22.110(c).

---

22.140(a), the Exchange is proposing to apply the following quotation increments: (1) if the options series is trading at less than $3.00, five (5) cents; (2) if the options series is trading at $3.00 or higher, ten (10) cents; and (3) if the options series is trading pursuant to the Penny Interval Program one (1) cent if the options series is trading at less than $3.00, five (5) cents if the options series is trading at $3.00 or higher, except for QQQ, SPY, or IWM where the minimum quoting increment will be one (1) cent for all series. In addition, as stated in proposed Rule 22.140(b), the Exchange is proposing that the minimum trading increment for options contracts traded on IEX Options will be one (1) cent for all series. Such proposed minimum quotation and trading increments are the same as on MEMX Options pursuant to MEMX Rules 21.5(a) and (b).

*Penny Interval Program.* As set forth in proposed Rule 22.140(c), the Exchange is proposing to adopt a Penny Interval Program that is substantially similar to the penny programs of other exchanges, including MEMX Options pursuant to MEMX Rule 21.5(d), which includes minimum quoting requirements for options classes listed under the Penny Interval Program. However, eligibility for inclusion in the Penny Interval Program will be limited to those classes already operating under penny programs of other options exchanges at the time IEX Options is launched. The list of options classes included in the Penny Interval Program will be announced by the Exchange via circular distributed to Options Members and published by the Exchange on its website.

*Order Types and Handling Instructions.* The Trading System will make available to Users two Order Types (as defined in proposed Rule 22.100(d))—Limit orders and Market orders—as well as various order instructions and modifiers that can be appended to such orders. The characteristics and functionality of each Order Type is substantially similar to what is currently approved for use in the Exchange's equities trading facility or on other options exchanges, including MEMX Options, except where described below.

IEX Options will support bulk messages for Options Market Makers as specified in the description of each Order Type or other instruction. Proposed Rule 22.100(d) includes the following details with respect to Limit orders and Market orders:

• Limit order. Limit orders are orders (including bulk messages) to buy or sell an option at a specified price or better.

A Limit order is marketable when, for a Limit order to buy, at the time it is entered into the Trading System, the order is priced at the current inside offer or higher, or for a Limit order to sell, at the time it is entered into the Trading System, the order is priced at the current inside bid or lower.

• Market order. Market orders are orders to buy or sell at the best price available at the time of execution. Market orders to buy or sell an option traded on IEX Options will be rejected if they are received when the underlying security is subject to a ''Limit State'' or ''Straddle State'' as defined in the Plan to Address Extraordinary Market Volatility Pursuant to Rule 608 of Regulation NMS under the Act (the ''Limit Up-Limit Down Plan''). Bulk messages may not be Market orders.

Pursuant to Rule 22.100(d)(3), Users have the option to designate an order as ''attributable'' to that User's MPID. Attributable orders are Market or Limit orders which display the User's MPID for purposes of trading on the Exchange. Use of attributable orders is voluntary. Attributable orders may not be available for all Exchange processes. The Exchange will distribute a circular to Options Members specifying the processes for which the attributable order-type shall be available.[73]

The Trading System will also make available to Users several additional instructions that can be designated on an order (''Handling Instructions''). A Handling Instruction applied to a bulk message applies to each bid and offer within that bulk message. The Handling Instructions available on IEX Options are described in proposed Rule 22.100(e) and will include the following:

• Book Only. Book Only is an instruction that an order is to be ranked and executed on the Exchange pursuant to proposed Rule 22.170 (Order Display and Book Processing) or to be repriced or cancelled, as appropriate, without routing away to another options exchange.

• Post Only. Post Only is an instruction that an order is to be ranked and executed on the Exchange pursuant to proposed Rule 22.170 (Order Display and Book Processing) or cancelled, as appropriate, without routing away to another options exchange except that the order will not remove liquidity from the IEX Options Book. The Trading System reprices, cancels or rejects a bid (offer) designated as Post Only with a

price that locks or crosses the Exchange's best offer (bid). A Market order cannot be designated as Post Only.

• Intermarket Sweep Order (''ISO''). ISOs are orders that shall have the meaning provided in proposed Rule 28.100, which relates to intermarket trading. Such orders may be executed at one or multiple price levels in the Trading System without regard to Protected Quotations at other options exchanges (*i.e.,* may trade through such quotations). The Exchange relies on the marking of an order as an ISO order when handling such order, and thus, it is the entering Options Member's responsibility, not the Exchange's responsibility, to comply with the requirements relating to ISOs. ISOs are not eligible for routing pursuant to proposed Rule 22.180. A Market order cannot be designated as an Intermarket Sweep Order. Users may not designate bulk messages as ISOs.

The Exchange notes that each of the proposed Order Types and Handling Instructions available on IEX Options are based upon and substantially similar to those of MEMX, with the exception of the Attributable Orders not offered by MEMX.

*Time-in-Force (''TIF'') Designations.* Users entering orders into the Trading System may designate such orders to remain in force and available for display and/or potential execution for varying periods of time. Unless cancelled earlier, once these time periods expire, the order (or the unexecuted portion thereof) is returned to the entering party. A TIF applied to a bulk message applies to each bid and offer within that bulk message. Unless otherwise specified in the Exchange Rules or the context indicates otherwise, the Exchange determines which of the following TIFs are available on a class or system basis. The TIF designations available on IEX Options are described in proposed Rule 22.100(g) and will include the following:

• Immediate Or Cancel (''IOC''). IOC means, for an order so designated, an order that is to be executed in whole or in part as soon as such order is received. The portion not so executed immediately on the Exchange or another options exchange is cancelled and is not posted to the IEX Options Book. IOC orders that are not designated as Book Only and that cannot be executed in accordance with proposed Rule 22.170 on the Trading System when reaching the Exchange will be eligible for routing away pursuant to proposed Rule 22.180.

• Day. Day means, for an order so designated, an order to buy or sell which, if not executed expires at market

close. Market Makers may designate bulk messages as Day.

The Exchange notes that each of the proposed TIF designations available on IEX Options is identical to the same TIF designations available on MEMX Options, except that they are applied differently in one respect. Specifically, MEMX Options allows bulk messages to have a TIF of IOC. IEX is proposing to only allow bulk messages to have a TIF of DAY so that Market Makers do not take liquidity with quotes submitted via bulk messages, and which are meant for liquidity provision by Market Makers, which by definition the Exchange believes constitutes orders resting on the Order Book.

*Anti-Internalization Qualifier (''AIQ'') Modifiers.* As with its equities market, the Exchange will allow Users to use certain AIQ modifiers, which are described in proposed Rule 22.100(h). Any incoming order designated with an AIQ modifier will be prevented from executing against a resting opposite side order also designated with an AIQ modifier and originating from the same MPID, Options Member identifier, trading group identifier, or Sponsored Participant identifier. The Exchange will offer the following AIQ modifiers: AIQ Cancel Newest, described in proposed Rule 22.100(h)(1); AIQ Cancel Oldest, described in proposed Rule 22.100(h)(2); AIQ Cancel Both, described in proposed Rule 22.100(h)(3); and AIQ Cancel Smallest, described in proposed Rule 22.100(h)(4). The Exchange notes that each of the proposed AIQ modifiers available on IEX Options is substantially similar to the same modifiers available on MEMX Options,[74] with the distinction that on MEMX a market maker may include the AIQ modifier on bulk messages, while IEX is proposing to not allow AIQ modifiers to be included on bulk messages because it would be meaningless on IEX where bulk messages will only be for liquidity adding quotes, and the AIQ modifier that dictates the AIQ interaction is determined by the liquidity removing order.[75]

*Re-Pricing Mechanism.* Like other options exchanges, the Exchange proposes to offer a re-pricing mechanism to Users to comply with the order protection and trade through restrictions of the Options Order Protection and Locked/Crossed Market

---

[73] The proposed definition is substantively identical to the definition in MIAX Rule 516(e). IEX proposes to incorporate this definition and functionality, because MEMX Options does not have Attributable Orders.

[74] MEMX does not offer an AIQ Cancel Smallest modifier, but it is offered by other exchanges such as C1. *See* C1 Rule 5.6 (Match Trade Prevention Modifier—MTP Cancel Smallest).

[75] MEMX calls them ''Match Trade Prevention'' modifiers. *See* MEMX Rule 21.1(h).

Plan.[76] This re-pricing mechanism, described in proposed Rule 22.100(i), is referred to by the Exchange as Price Adjust and is substantially similar to the Price Adjust mechanism offered by MEMX Options pursuant to MEMX Rule 21.1(i), with the exception that IEX will only allow the ranked price and displayed price of an order that has been repriced to be adjusted to a more aggressive price one additional time (unlike MEMX, which allows multiple adjustments).[77]

*MPIDs.* As proposed in Rule 22.100(j), the term "MPID" means the unique market participant identifier assigned to a User and shall refer to what the Trading System uses to identify the User and the clearing number for the execution of orders and quotes submitted to the Trading System with that MPID. Each MPID corresponds to a single User and a single clearing number of a Clearing Member with the Clearing Corporation. A User may obtain multiple MPIDs, which may be for the same or different clearing numbers. A User is able (in a form and manner determined by the Exchange) to designate which of its MPIDs may be used for each of its ports. If a User submits an order or quote through a port with an MPID not enabled for that port, the Trading System cancels or rejects the order or quote. The Exchange notes that its proposed Rule 22.100(j) is identical to MEMX Rule 21.1(j) except that MEMX uses the term EFID rather than MPID.

*Ports and Bulk Messages.* Proposed Rule 22.100(k) defines two types of ports: (1) a "physical port," which provides a physical connection to the Trading System and may provide access to multiple logical ports; and (2) a "logical port" or "application session," which provides Users with the ability within the Trading System to accomplish a specific function through a connection, such as order entry, data receipt, or access to information. The Exchange notes that each of the proposed types of ports available on IEX Options is identical to the same types of ports on MEMX Options.

The term "bulk message" is proposed to mean a single electronic message a User submits with a Market Maker Capacity to the Exchange in which the User may enter, modify, or cancel up to an Exchange-specified number of bids and offers (which number the Exchange will announce via Exchange notice and

publicly available technical specifications). The Trading System handles a bulk message in the same manner as it handles an order or quote, unless the Exchange Rules specify otherwise.

Only Market Makers may submit bulk messages through a logical port in a class in which the Market Maker has an appointment. In addition, bulk messages have a default TIF of Day and a default designation of Post Only. As proposed, the Trading System will cancel, reject, or reprice a Post Only bulk message bid (offer) with a price that locks or crosses the Exchange best offer (bid) or ABO (ABB).[78] These provisions are similar to the manner in which market maker bulk messages are handled by MEMX, which allows bulk messages to also have a TIF of IOC, a designation as book only, and post only bulk messages in unassigned classes.[79]

*Cancel Back.* The term "Cancel Back" is proposed to mean an instruction a User designates on an order (including bulk messages) to not be subject to the Price Adjust process pursuant to proposed Rule 22.100(i). The Trading System cancels or rejects an order with a Cancel Back instruction (immediately at the time the Trading System receives the order or upon return to the Trading System after being routed away) if displaying the order on the Book would create a violation of proposed Rule 28.120, or if the order cannot otherwise be executed or displayed in the Book at its limit price. The Trading System executes a Book Only—Cancel Back order against resting orders. The proposed definition of Cancel Back in proposed Rule 22.100(m) is substantively identical to a Cancel Back Order defined in MEMX Rule 21.1(m).

*Market Opening Procedures.* As proposed, the Trading System will accept quotes, Limit orders with a TIF of DAY and Market orders for inclusion in the opening process ("Opening Process") beginning at 8:00 a.m. or immediately upon trading being halted in an options series due to the primary listing market for the applicable underlying security declaring a regulatory trading halt, suspension, or pause with respect to such security (a "Regulatory Halt"), and will continue to

accept Market and Limit orders and quotes until such time as the Opening Process is initiated in that options series (the "Pre-open state").[80]

After the first transaction on the primary listing market after 9:30 a.m. in the securities underlying the options as reported on the first print disseminated pursuant to an effective national market system plan or the Regulatory Halt has been lifted, the related options series will be opened automatically as described below. The Exchange will conduct its "Core Open Auction" for each series of options contracts upon receipt of an "Auction Trigger", *i.e.,* the moment that the Primary Market for the underlying security first disseminates both a two-sided quote and a trade of any size that is at or within the quote (in the case of reopening after a Regulatory Halt, the Auction Trigger also includes notification that the underlying stock is no longer halted).[81] The Exchange will disseminate a message to market participants indicating the initiation of the opening process, conduct the opening auction, and then transition to continuous trading for each series of options contracts.[82] The proposed market opening procedures are substantially similar to the market opening procedures specified in NYSE Arca Options Rule 6.64P–O, subject to several differences, most notably that any imbalance would be allocated on a pro rata basis.[83]

*Order Display/Matching System.* The Trading System will be based upon functionality currently approved for use in the Exchange's equities trading system. Specifically, the Trading System will allow Users to enter Market orders and priced Limit orders to buy (bids) and sell (offers). All bids or offers made and accepted on IEX Options in accordance with the Exchange Rules shall constitute binding contracts, subject to applicable requirements of the

---

[76] *See* Securities Exchange Act Release No. 60405 (July 30, 2009), 74 FR 39362 (Aug. 6, 2009) (File No. 4–546).

[77] The Exchange notes that this behavior is substantially similar to the "single price adjust" behavior in C1 Rule 5.32(b)(2)(A).

[78] *See* proposed IEX Rule 22.100.

[79] *See* MEMX Rule 21.1(l). IEX notes that the ability of the Trading System to cancel or reject a post only order submitted on a bulk port with a price that locks or crosses the Exchange best offer (bid) or ABO (ABB) is substantively identical to MEMX Rule 21.1(l)(3); IEX will also allow the Trading System to reprice a post only order submitted on a bulk port with a price that locks or crosses the Exchange best offer (bid) or ABO (ABB), which is substantively identical to the functionality in C1 Rule 5.32(b)(1)(B).

[80] *See* proposed Rule 22.160(a)(13).

[81] *See* proposed Rule 22.160(a)(5) and (7).

[82] *See* proposed Rule 22.160. IEX notes that pursuant to proposed Rule 22.160(b)(3), the priority overlays specified in proposed Rule 22.170(f)(2) and (3) will not be available during an Auction, but will resume once the Exchange has transitioned to continuous trading.

[83] *See* proposed Rule 22.160(b). Other differences include: IEX will begin accepting orders for the opening auction at 8:00 a.m., while NYSE Arca begins accepting orders for their opening auction at 6:00 a.m. *See* proposed Rule 22.160(a)(13)(A) versus NYSE Arca Options Rule 6.64P–O(a)(12)(A). Additionally, IEX will begin disseminating Auction Imbalance Information at 8:30 a.m., while NYSE Arca begins disseminating imbalance information at 8:00 a.m. *See* proposed Rule 22.160(c)(1) versus NYSE Arca Options Rule 6.64P–O(c)(1). Further, IEX does not define Far Clearing Price, because IEX does not propose to have Auction Only orders, to which the Far Clearing Price relates.

Exchange Rules and the Rules of the Clearing Corporation. Such orders are executable against marketable contra-side orders in the Trading System.[84] Resting quotes and orders on the IEX Options Book will be prioritized according to price. If there are two or more quotes or orders at the best price, then the options contracts will be allocated proportionally according to size (in a pro-rata fashion), rounded down to the nearest contract. If there are residual options contracts to be filled, the quote or order with the largest remaining size (based on the pro rata calculation) will receive the first contract, and each successive contract (if any) will be allocated to each subsequent quote or order based on size (largest to smallest). If there are two or more quotes or orders with the same remaining size, then the quote or order with the first time priority will be allocated the next options contract. Each successive options contract (if any) will be allocated in the same manner.[85]

*Routing.* IEX Options will offer a simple optional routing functionality to facilitate compliance with applicable regulations and will not offer other complex routing strategies. Options Members can designate orders that have not been executed in full by the Trading System pursuant to Rule 22.170 above as either available for routing or not available for routing.[86] IEX Options will support orders that are designated to be routed to the NBBO as well as orders that will execute only within IEX Options. Orders that are designated to execute at the NBBO will be routed to other options markets to be executed when the Exchange is not at the NBBO[87] consistent with the Options Order Protection and Locked/Crossed Market Plan.[88]

Subject to the exceptions contained in proposed Rule 28.110(b), the Trading System will ensure that an order will not be executed at a price that trades through another options exchange. An order that is designated by an Options Member as routable will be routed in compliance with applicable trade-through restrictions. Any order entered with a price that would lock or cross a Protected Quotation that is not eligible for either routing or the price adjust process as defined in proposed Rule 22.100(i) will be cancelled. Bulk messages are not eligible for routing.

IEX Options will route orders in options via IEX Services LLC ("IEX Services"), which serves as the Outbound Router of the Exchange, as defined in Rule 2.220 (IEX Services LLC as Outbound Router).[89] The function of the Outbound Router will be to route orders in options listed and open for trading on IEX Options by transmitting such orders to one or more routing brokers that are not affiliated with the Exchange to other options exchanges ("Routing Services") pursuant to the Exchange Rules on behalf of IEX Options.[90] The Outbound Router is subject to regulation as a facility of the Exchange, including the requirement to file proposed rule changes under Section 19 of the Exchange Act.[91] Parties that do not desire to use the Routing Services provided by the Exchange must designate orders as not available for routing.[92] The Exchange notes that the proposed rules relating to the routing of orders on IEX Options to away options markets are substantively identical to the MEMX Back-Up Order Routing Services described in MEMX Rule 21.9(e).[93]

*Priority of Routed Orders.* Orders that have been routed by the Trading System to other options exchanges are not ranked and maintained in the IEX Options Book pursuant to Rule 22.170, and therefore are not available to execute against incoming orders. Once routed by the Trading System, an order becomes subject to the rules and procedures of the destination options exchange including, but not limited to, order cancellation. If a routed order is subsequently returned, in whole or in part, that order, or its remainder, shall receive a new time stamp reflecting the time of its return to the Trading System.[94]

*Market Access.* In connection with the proposed rules regarding routing to away options exchanges, proposed Rule 22.180(e) provides that IEX Services has, pursuant to Rule 15c3–5 under the Act,[95] implemented certain tests designed to mitigate the financial and regulatory risks associated with providing the Exchange's Users with access to such away options exchanges. Pursuant to the policies and procedures developed by IEX Services to comply with Rule 15c3–5, if an order or series of orders are deemed to be erroneous or duplicative, would cause the entering User's credit exposure to exceed a preset credit threshold, or are non-compliant with applicable pre-trade regulatory requirements (as defined in Rule 15c3–5), IEX Services will reject such orders prior to routing and/or seek to cancel any orders that have been routed. This is consistent with the routing implementation of other options exchanges, and the Exchange notes that proposed Rule 22.180(e) is substantively identical to MEMX Rule 21.9(f).

*Order Priority.* After the opening, trades on the Exchange will occur when a buy order/quote and a sell order/quote match on the Exchange's order book. The Trading System shall execute trading interest within the Trading System in price priority, meaning it will execute all trading interest at the best price level within the Trading System before executing trading interest at the next best price. Pursuant to proposed Rule 22.170, after considering price priority, all options contracts are allocated proportionally according to size (in a pro-rata fashion). If the executed quantity cannot be evenly allocated, the remaining options contracts will be distributed one at a time based upon price-size-time priority.

In addition, the Exchange supports multiple priority overlays that apply ahead of the default pro-rata allocation at a given price level. Pursuant to proposed Rule 22.170(f),[96] these priority overlays are made available at the Exchange's discretion on a class-by-class basis: (1) the Priority Customer overlay,[97] which provides resting interest from Priority Customers with priority over all non-Priority Customer interest at the same price, will always take priority over all other priority overlays; (2) the Specialist Participation Entitlement overlay,[98] which provides the Specialist with priority over interest

---

[84] *See* proposed Rule 22.170.

[85] *See* proposed Rule 22.170(b). This pro-rata allocation methodology is based upon the substantially similar methodology in MIAX Rule 514(c)(2) and NYSE Amex Rule 964NYP(i)(2).

[86] *See* proposed Rule 22.180(a).

[87] As described *infra,* if the order is eligible for the Step-Up Mechanism (set forth in proposed Rule 22.270), the Trading System will attempt to fill the order before routing it to an away market.

[88] *See supra* note 77.

[89] *See* proposed Rule 22.180(d).

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] MEMX also offers the option of using its outbound router, MEMX Execution Services to route directly to other exchanges. *See* MEMX Rule 21.9(d). IEX is not proposing to adopt this functionality, because it will only provide for routing through IEX Services to third party broker dealers.

[94] *See* proposed Rule 22.180(b).

[95] 17 CFR 240.15c3–5.

[96] Proposed Rule 22.170(f) is based upon and substantially similar to C1 Rule 5.32(a)(2), except is different in one respect. Unlike C1, in the event that a Small-Size order is directed to a Specialist, the IEX Options trading system will apply the Small-Size Order Entitlement to the order and not the Directed Order guarantee, meaning the Specialist will have priority to execute against the entire size of the order that does not execute against any Priority Customer orders at that price.

[97] *See* proposed Rule 22.170(f)(1).

[98] *See* proposed Rule 22.170(f)(2). This overlay may only be in effect if the Priority Customer overlay is also in effect. *See* proposed Rule 22.170(f).

from other non-Priority Customers for a certain percentage of contracts allocated at the same price (entitling the Specialist to 60% of the allocation if there is another non-Priority Customer at the NBBO or 40% if there are two or more other non-Priority Customers at the NBBO)[99] when quoting at the NBBO, inclusive of the case in which the order is directed to the Specialist; (3) the Directed Market Maker Participation Entitlement overlay,[100] which provides a Directed Market Maker with priority over interest from other non-Priority Customers for a certain percentage of contracts allocated at the same price (entitling the DMM to 60% of the allocation if there is another non-Priority Customer at the NBBO or 40% if there are two or more other non-Priority Customers at the NBBO)[101] when quoting at the NBBO and always applies in place of the Specialist Participation Entitlement overlay when both are in effect and the order is directed to a Directed Market Maker other than the Specialist;[102] and (4) the Small-Size Order Entitlement overlay,[103] which provides a Specialist quoting at the NBBO the priority to execute against the entire size of an order or quote of five or fewer contracts that does not first execute against any Priority Customer orders at that price, provided that if an order subject to the Small-Size Order Entitlement is directed to a Directed Market Maker who is not the Specialist quoting at the NBBO, and the Directed Market Maker priority overlay is enabled in the series, then the Directed Market Maker Participation Entitlement priority overlay will apply instead of the Small-Size Order Entitlement priority overlay,[104] and in the case that an order subject to the Small-Size Order Entitlement is directed to the Specialist, the Small-Size Order Entitlement priority overlay will apply while the Specialist Participation

Entitlement and Directed Market Maker Entitlement overlays will not.[105]

After executions resulting from the Priority Overlays described above, orders and quotes within the Trading System for the accounts of non-Priority Customers, including Professional Customers, have next priority. If there is more than one highest bid or more than one lowest offer on the Options Order Book for the account of a non-Priority Customer, then such bids or offers will be afforded priority on a size pro-rata basis, as described above.

*Step Up Mechanism.* IEX proposes to offer Options Members an optional Step Up Mechanism (''SUM''), which is a feature within the Trading System that provides automated order handling in designated classes trading for qualifying orders that are not automatically executed by the Trading System.[106] The Exchange will determine eligibility of an order for the SUM (including order size, type, capacity, handling instructions, as well as which classes of options contracts). The Exchange will not initiate the SUM process if the NBBO is crossed.[107] SUM automatically processes upon receipt of an eligible order that is marketable against the BBO that is not the NBBO; or an eligible order that would improve the Exchange's BBO and that is marketable against the ABBO. This proposed functionality is substantively identical to the Step-Up Mechanism offered by C1, with the exception that IEX is not proposing to offer All or None orders.[108] IEX notes that the optional SUM mechanism is designed to benefit a routable order that is not immediately eligible for execution on the Exchange, but if routed to an away exchange might miss a potential execution on that exchange. And, because SUM is optional, a Member can choose not to have its order subject to the SUM mechanism if it determines that the functionality is not consistent with its objectives. Given the multitude of tradeable listed options securities (compared to listed equities) not all available liquidity is always reflected in an exchange's order book, and the SUM mechanism provides an opportunity to source such additional liquidity to the benefit of the order in question. Moreover, IEX notes as well that other

options exchanges offer similar mechanisms, and order flow might be directed to such exchanges if IEX did not offer such a mechanism.

Upon receipt of a SUM eligible order, the Trading System will expose the order at the NBBO upon receipt for a period of time determined by the Exchange on a class-by-class basis, which period of time may not exceed one second. All Users may submit responses to the exposure message, which must be limited to the size of the order being exposed, may be modified, cancelled or replaced any time during the exposure period, and are cancelled back at the end of the exposure period if unexecuted. Responses priced at the prevailing NBBO or better will immediately trade against the order in time priority. If during the exposure period the Exchange receives an unrelated order (or quote) on the opposite side of the market from the exposed order that could trade against the exposed order at the prevailing NBBO price or better, then the orders will trade at the prevailing NBBO price. The exposure period will not terminate if a quantity remains on the exposed order after such trade.

Responses that are not immediately executable based on the prevailing NBBO may become executable during the exposure period based on changes to the NBBO. In the event of a change to the NBBO and at the conclusion of the exposure period, the Exchange will evaluate remaining responses as well as the ABBO and execute any remaining portion of the exposed order to the fullest extent possible at the best price(s) by executing against responses and unrelated orders.

Following the exposure period, the Exchange will route the remaining portion of the exposed order to other exchanges, unless otherwise instructed by the User. Any portion of a routed order that returns unfilled shall trade against the Exchange's best bid/offer unless another exchange is quoting at a better price in which case new orders shall be generated and routed to trade against such better prices.

*Data Dissemination.* The Exchange will disseminate to OPRA the highest bid and the lowest offer, and the aggregate quotation size associated therewith that is available, in accordance with the requirements of Rule 602 of Regulation NMS under the Act.[109] The Exchange will also offer three data products: (1) IEX Options DEEP: an uncompressed data feed that offers depth of book quotations and execution information based on options

---

[99] These allocation entitlements are based on MIAX Rule 514(h)(1), after accounting for the additional priorities afforded market makers on MIAX, as set forth in MIAX Rule 514(e). *See supra* note 86 and accompanying text.

[100] *See* proposed Rule 22.170(f)(2). This overlay may only be in effect if the Priority Customer overlay is also in effect. *See* proposed Rule 22.170(f).

[101] These allocation entitlements are based on MIAX Rule 514(h)(1), after accounting for the additional priorities afforded market makers on MIAX, as set forth in MIAX Rule 514(e). *See supra* note 86 and accompanying text.

[102] Prioritizing the DMM entitlement over the Specialist entitlement in these circumstances is the same functionality offered by several other exchanges. *See, e.g.,* NYSE Amex Options Rule 964NYP(h)(1).

[103] *See* proposed Rule 22.170(f)(3).

[104] *See* proposed Rule 22.170(f)(3)(A).

[105] *See* proposed Rule 22.170(f)(3)(B). This is functionally identical to how NYSE Amex Options allocates small-size Directed Orders that are directed to a Specialist. *See* NYSE Amex Options Rule 965NYP(h)(2)(B).

[106] *See* proposed Rule 22.270. IEX's proposed Step-Up Mechanism is substantively identical to C1 Rule 5.35.

[107] *See* proposed Rule 22.270(a).

[108] *See* C1 Rule 5.35.

[109] *See* proposed Rule 22.240(a).

orders entered into the Trading System; (2) IEX Options TOPS: an uncompressed data feed that offers top of book quotations and execution information based on options orders entered into the Trading System; and (3) DROP: an uncompressed data feed that offers information regarding the options trading activity of a specific User.[110] DROP is only available to the User to whom the specific data relates and those recipients expressly authorized by the User.[111]

*Risk Controls.* The Exchange also proposes to offer to all Users of IEX Options the ability to establish certain risk control parameters and limits that are intended to assist Users in managing their market risk. The proposed risk controls are based, in part, on those of the NYSE Arca and C1 options exchanges, with certain additions and differences described below. The proposed risk controls are designed to offer Users protection from entering orders outside of certain size and price parameters, as well as certain standard or Exchange-established parameters based on order type and market conditions.

The proposed risk controls include: (i) pre-trade risk controls; (ii) activity-based risk controls; and (iii) global risk controls, as set forth in proposed Rule 22.250.[112] Pre-trade, activity-based, and global risk controls may be set before the beginning of a trading day.[113] Pre-trade, activity-based, and global risk controls can be set at the MPID or MPID Group level,[114] or both, depending on the risk control.[115] Additionally, pre-trade risk controls to restrict the options class(es) transacted must be set per options class.[116] The following describes each category of risk protection mechanism:

*Pre-Trade Risk Controls.*[117] The pre-trade risk controls mechanism is a set of optional limits, each of which an Options Member may utilize with respect to its trading activity on the Exchange. These controls include controls related to the maximum dollar amount for a single order to be applied one time and the maximum number of contracts that may be included in a single order before it can be traded. Additionally, there are optional controls related to the price of an order or quote (including percentage-based and dollar-based controls), controls related to the order types or modifiers that can be utilized, controls to restrict the options classes transacted, and controls to prohibit duplicative orders.

*Activity-Based Risk Controls.*[118] The Exchange also proposes to offer activity-based risk limits that may be applied to orders and quotes in an options class (when acting as a Market Maker, an Options Member is required to select at least one of the following controls)[119] based on specified thresholds measured over the course of a configurable time period (''Interval''). The Exchange will offer the following activity-based risk controls: (i) transaction-based risk limits, which are pre-established limits on the number of an Options Member's orders and quotes executed in a specified class of options per Interval; (ii) volume-based risk limits, which are pre-established limits on the number of contracts of an Options Member's orders and quotes that can be executed in a specified class of options per Interval; and (iii) percentage-based risk limits, which are pre-established limits on the percentage of contracts executed in a specified class of options as measured against the full size of an Options Member's orders and quotes executed per Interval. To determine whether an Options Member has breached the specified percentage limit, the Exchange calculates the percent of each order or quote in a specified class of options that is executed during an Interval (each, a ''percentage''), and sums up those percentages. This risk limit will be breached if the sum of the percentages exceeds the pre-established limit.

*Global Risk Control.*[120] The Exchange also proposes to offer a global risk control, which is a pre-established limit on the number of times an Options Member may breach its activity-based risk controls per Interval.

*Automated Breach Actions.*[121] Proposed Rule 22.250(c) details the ''automated breach actions'' the Exchange will take if any of the three above-described risk controls are breached. Based on User preference, these actions can include blocking new orders and quotes, canceling orders and quotes on the Order Book, or notifying the Options Member of the breach. With respect to the activity-based and global risk controls (as well as Kill Switch Actions described below), in order to remain consistent with the firm quote obligations of a broker-dealer pursuant to Rule 602 of Regulation NMS, any marketable interest that is executable against an order or quote that is received[122] prior to the time the applicable threshold is triggered and processed by the Trading System will be automatically executed up to the size of the resting order or quote, regardless of whether the execution would cause the Member to exceed their pre-set risk threshold(s).[123]

*Kill Switch Actions.*[124] Additionally, Options Members may direct the Exchange to operate a ''kill switch'' to either cancel all unexecuted orders and quotes on the Order Book, block the entry of any new order and quote messages, or both.

*Limit Order Price Protection.*[125] The Exchange also proposes to offer price protection mechanisms, as set forth in proposed Rule 22.260.[126] These protections include Limit Order Price Protection, in which the Trading System will reject an order or quote upon entry, or cancel at the conclusion of an auction, if its price exceeds a pre-established, Exchange-defined ''specified threshold'' amount above or below the reference price. The Reference Price for calculating Limit Order Price Protection for an order or quote to buy (sell) will be the NBO (NBB), provided that, immediately

---

[110] *See* proposed Rule 22.240(b).

[111] Data products will be subject to fees as specified in an effective Commission rule filing.

[112] Proposed Rule 22.250 is based upon and substantially similar to NYSE Arca Rule 6.40P–O.

[113] *See* proposed Rule 22.250(b)(1).

[114] MPID Groups, defined in proposed Rule 22.250(a)(5), are based upon C1 Rule 5.34(c)(4)(A), which allows for the setting of risk control limits for EFID Groups, which are equivalent to MPID Groups. IEX notes that it proposes to retain the right to limit the number of MPID Groups an Options Member can configure based upon potential technical limitations.

[115] *See* proposed Rule 22.250(b)(2). IEX notes that while it allows these risk controls to be set at MPID or MPID Group levels, NYSE Arca allows the equivalent controls to be set at either the MPID or the MPID Sub-ID level (a more granular level than the MPID).

[116] *See* proposed Rule 22.250(b)(2).

[117] *See* proposed Rule 22.250(a)(1), which is substantively identical to NYSE Arca Rule 6.40P–O(a)(2).

[118] *See* proposed Rule 22.250(a)(2), which is substantively identical to NYSE Arca Rule 6.40P–O(a)(3).

[119] *See* proposed Rule 22.250(c)(2)(A).

[120] *See* proposed Rule 22.250(a)(3), which is substantively identical to NYSE Arca Options Rule 6.40P–O(a)(4).

[121] *See* proposed Rule 22.250(c), which is substantively identical to NYSE Arca Options Rule 6.40P–O(c).

[122] The time of receipt for an order or quote is the time such message is processed by the Exchange's order book.

[123] Pre-trade risk controls are implemented prior to an order or quote resting on the order book (or being placed on the book again following an auction) and therefore do not implicate firm quote obligations.

[124] *See* proposed Rule 22.250(e), which is substantively identical to NYSE Arca Options Rule 6.40P–O(e).

[125] *See* proposed Rule 22.260(a), which is substantively identical to NYSE Arca Options Rule 6.62P–O(a)(3).

[126] IEX notes that these proposed risk control mechanisms are based on similar rules of other options exchanges, in particular: NYSE Arca Options Rules 6.62P–O(a)(3) and 6.41P–O and C1 Rules 5.34(a)(1), (2) and (4).

following an auction, the reference price will be the price at which the auction match occurred, or, if none, the upper (lower) auction collar price, or, if none, the NBO (NBB).

*Market Orders in No-Bid (Offer) Series.*[127] If the Trading System receives a sell Market order in a series after it is open for trading with an NBB of zero and an NBO less than or equal to $0.50, then the Trading System converts the Market order to a Limit order with a limit price equal to the minimum trading increment applicable to the series and enters the order into the IEX Options. If the Trading System receives a sell Market order in a series after it is open for trading with an NBB of zero and an NBO greater than $0.50, then the Trading System cancels or rejects the Market order, except if the sell Market order would be subject to the drill-through protection (as discussed below), in which case the order joins the ongoing drill-through process. If the Trading System receives a buy Market order in a series after it is open for trading with an NBO of zero, the Trading System cancels or rejects the Market order.

*Market Order NBBO Width Protection.*[128] If a User submits a Market order to the Trading System when the NBBO width is greater than x% of the midpoint of the NBBO, subject to a minimum and maximum dollar value (the Exchange determines ''x'' and the minimum and maximum dollar values on a class-by-class basis), the Trading System cancels or rejects the Market order.

*Price Reasonability Checks.*[129] Additionally, the Exchange will apply price reasonability checks to most Limit orders and quotes during continuous trading on each trading day. One price reasonability check, the ''arbitrage check'', will reject order or quote messages to buy put options if the price of the order is equal to or greater than the strike price of the option and will reject (or cancel, if resting) order or quote messages to buy call options if the price of the order is equal to or greater than the price of the last trade in the underlying security plus an Exchange-defined specified threshold.[130] Another price reasonability check, the ''intrinsic value check'', will assess the intrinsic

value of an option based on the last sale price of the underlying security (for calls) or the strike price of the option (for puts), and reject or cancel certain orders or quotes if the price of the order is dislocated from the intrinsic value of the option by a certain Exchange-defined specified threshold.[131]

*Drill-Through Protection.* Another proposed price protection mechanism is drill-through protection, which will prevent an order from executing beyond a ''buffer amount'' determined based on a drill-through price.[132] This rule is based upon and substantially similar to C1 Rule 5.34(a)(4), with the distinction that IEX's Drill-Through Protection will have a finite, Exchange-defined number of iterations, that are communicated by a Trading Alert with at least 30 days prior notice.[133] IEX notes that other exchanges have also set a finite number of iterations for their Drill-Through Protection.[134]

*Options Risk Parameter.* In order to provide additional protection to Market Makers to address structural challenges [135] they face in the listed options market, IEX proposes to offer an optional quote parameter that would augment the standard risk tools that will be available to Options Market Makers referred to as the Options Risk Parameter (''ORP''). As proposed, the ORP will be a parameter that can be applied to a quotation that rests on the Order Book at the price designated by the Market Maker that entered the quotation. When the ORP is triggered based on pre-defined criteria, the relevant quotation(s) will be adjusted in a manner specified transparently in IEX's rules and related Trading Alerts, as described below.[136]

The ORP would leverage IEX's proprietary mathematical formula—the Options Quote Indicator (the ''Indicator'')—which is based on the preeminent Black-Scholes options

pricing model. This Nobel-Prize-winning approach for evaluating the price of an options contract has been studied extensively, and is widely considered as a primary starting point for both academic and industrial options pricing applications.[137]

Proposed Rule 23.150(h) sets forth the application of the Indicator and optional ORP.[138] As with the standard risk checks, the ORP is designed to enable Market Makers to provide tighter and deeper quotes on IEX by providing protection from execution against stale quotes by identifying when the best Protected Bid or best Protected Offer of the Away Markets (as defined in Proposed Rule 22.160(a)(8)) in a particular options series is sufficiently dislocated from the price of the underlying security to indicate that the best Protected Bid or best Protected Offer of the Away Markets in the options series is likely in transition. The Exchange will determine on a class-by-class basis whether to make the ORP available, which determination will be communicated by Trading Alert.[139] Offering the Indicator on a class-by-class basis would enable the Exchange to utilize the ORP for classes with a high potential for adverse selection, while excluding classes presenting lower risk of adverse selection (such as classes with relatively lower volumes). This flexibility will therefore allow the Exchange to ensure the ORP is available for those classes where its use will achieve its intended purpose, while excluding its use where it would likely provide little additional value and could introduce unnecessary complexity (for example, for classes that are subject to a pending corporate action or other nonstandard characteristic).[140]

As proposed, the Exchange will utilize the Indicator, which is a fixed formula specified transparently in IEX's rules and related Trading Alerts, to assess the probability of an imminent change to the current best Protected Bid [141] of the Away Markets to a lower price or of an imminent change to the

---

[127] *See* proposed Rule 22.260(b), which is substantively identical to C1 Rule 5.34(a)(1).

[128] *See* proposed Rule 22.260(c), which is substantively identical to C1 Rule 5.34(a)(2).

[129] *See* proposed Rule 22.260(d), which is substantively identical to NYSE Arca Options Rule 6.41P–O.

[130] *See* proposed Rule 22.260(d)(2), which is substantively identical to NYSE Arca Options Rule 6.41P–O(b).

[131] *See* proposed Rule 22.260(d)(3), which is substantively identical to NYSE Arca Options Rule 6.41P–O(c). IEX notes that like NYSE Arca Options, the term ''Automated Breach Action'' is used in two of its risk controls with different meanings: first with respect to the intrinsic value risk checks for market makers, *see* NYSE Arca Options Rule 6.40P–O(d) and proposed Rule 22.260(d)(3)(E); and also with respect to activity based risk controls. *See* NYSE Arca Options Rule 6.41P–O(d) and proposed Rule 22.250(c).

[132] *See* proposed Rule 22.260(e).

[133] IEX notes that other exchanges also have the ability to change any exchange-determined parameters with a trading alert. *See, e.g.,* C1 Rule 1.5.

[134] *See, e.g.,* Securities Exchange Act Release No. 86923 (September 10, 2019), 84 FR 48664 (September 16, 2019) (SR–CBOE–2019–057) with respect to C1 prior functionality.

[135] *See infra* note 150.

[136] *See* proposed IEX Rule 23.150(h).

---

[137] *See* Revolutionary Black-Scholes Option Pricing Model is Published by Fischer Black, Later a Partner at Goldman Sachs, available at *https://www.goldmansachs.com/our-firm/history/moments/1973-black-scholes.*

[138] The quote instability calculation is set forth in Supplementary Material .04 to proposed Rule 23.150(h); the calculation of implied volatility is set forth in Supplementary Material .05 to proposed Rule 23.150(h).

[139] *See* proposed IEX Rule 23.150(h)(1).

[140] The Exchange notes that it is not an equities listing exchange. The Exchange does not believe that making class-by-class determinations in this context or otherwise creates a conflict of interest.

[141] *See supra* note 77 at 39370.

current best Protected Offer [142] of the Away Markets to a higher price for a particular listed options series (*i.e.,* an imminent adverse price change).[143]

As discussed above, the Exchange will periodically determine two aspects of the formula—the frequency of calculation of implied volatility [144] and the quote instability threshold.[145] In determining the frequency of the implied volatility calculation and the quote instability threshold, the Exchange will consider the distribution of quote instability determinations, the precision of quote instability determinations, system capacity and performance, and client feedback. The Exchange believes that these factors are relevant to setting the initial values. Once the Options Trading System begins operation (subject to Commission approval of this rule proposal), the Exchange expects to also consider attributes like fill rates (resting and taking) [146] and markout data,[147] as well as other factors it determines are relevant based on operational experience in order to optimize how both variables are set. In periodically adjusting each variable, the Exchange will consider each variable with a view towards appropriately balancing the interests of both liquidity takers and makers, as well as the need to optimize system capacity and performance. The Exchange will communicate any changes to the quote instability threshold and the implied volatility calculation frequency by Trading Alert with at least 30 days' notice.

---

[142] *Id.*

[143] *See* proposed IEX Rule 23.150(h).

[144] *See* proposed IEX Rule 23.150(h)(1) Supplementary Material .05.

[145] *See* proposed IEX Rule 23.150(h)(1) Supplementary Material .04(2)(e). The quote instability threshold will be within a range of 0–1. For example, a quote instability threshold of 1 would indicate that the expected price change in the option resulting from price movement in the underlying would be 100% of the current price of the option.

[146] Fill rate data measures the degree to which incoming orders are able to execute against a resting order on a venue and are a measure of the percent of shares of an order that are filled (or executed) by such venue, adjusting for factors such as the size of the order compared to the size of a venue's displayed quote. The maximum fill rate for an order is 100%.

[147] Markouts measure the direction and degree to which the market moved after an execution, and are often measured as the difference between the execution price and the midpoint of the NBBO at various time intervals after a trade. Markouts are typically used as a way to measure the "quality" of a trade. In particular, short-term markouts of several milliseconds after the time of execution, are often used to assess whether an order was subject to "adverse selection" that can occur when a liquidity providing order is executed at a price that was about to become stale as a result of certain speed-based trading strategies.

The Indicator utilizes real time relative quoting activity of protected quotations from Signal Exchanges (as defined in IEX Rule 11.190(g)) in securities underlying each listed options series and a proprietary mathematical calculation (the "quote instability calculation"), as described in more detail below, to assess the probability of an adverse price change in a particular options series. When the quote instability calculation identifies an imminent adverse price change to the best Protected Bid and/or best Protected Offer of the Away Markets in a particular listed options series, it will generate a quote instability determination. A quote instability determination may only be generated at least 200 microseconds after a prior quote instability determination for a particular options series on the same side of the market (*i.e.,* affecting resting bids or offers). If a quote instability determination is generated for an options series quoted by a Market Maker and the quote is above (below) the price level of the quote instability determination, the quote will be either cancelled or repriced to the price level of the quote instability determination, as instructed by the Market Maker.

IEX believes that offering this optional risk protection for market makers is particularly important in the options markets where market makers are exposed to added risk given their continuous quoting obligations. Although equities and options exchanges share a number of similarities, a meaningful difference is that in the listed options market, liquidity is available only on-exchange and is primarily displayed and derived from market maker quotes, and options markets, when compared to equities markets, have a much higher quote to trade ratio.[148] Exchange market makers in the listed options market play an essential role in providing liquidity. Moreover, given the sheer difference in magnitude of tradeable instruments in

---

[148] *See* Staff Report on Equity and Options Market Structure Conditions in Early 2021, (Oct. 14, 2021) at 4 (explaining that options market structure is broadly similar to equities market structure and noting a key difference that displayed liquidity is primarily derived from market maker quotes), available at *https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf; see also* Lehoczky, Sandor and Woods, Ellen and Russell, Matthew and Nguyen, Mina and Somers, James, Dead Man's Switch: Making Options Markets Safer with Active Quote Protection (May 2020) at 2 (explaining that options markets "depend especially on market makers—who account for 99.9% of open orders—to connect buyers and sellers, due to a combinatorial explosion of expirations and strike prices"), available at *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3675849.*

listed options as compared to equities (approximately 1.5 million listed options series compared to approximately 11,000 listed equity securities), the options exchanges often do not have the same sources of natural liquidity of buyers and sellers for each tradeable instrument as is generally the case for equities exchanges. Thus, options market makers are tasked with affirmative obligations to support the provision of liquidity to options exchanges through continuous two-sided quotes in large numbers of listed options series. As a result, IEX understands that options market makers can be subject to excessive risk of one or more quotes being executed at stale prices compared to equities market makers or other liquidity providers.[149] Because options market makers maintain hundreds (and sometimes thousands) of quotes on options for a given underlying security at any one time, a sudden market move in the underlying security can leave an options market maker vulnerable to being executed across multiple quotes that are stale and dislocated from the price of the underlying securities. Liquidity takers can target one or more of these stale quotes, with limited risk should they fail to execute (*i.e.,* lost opportunity vs. trading at a stale price), before the Market Makers are able to move their quotes (often hundreds or more for a given underlying) to reflect the price change in the underlying securities, thereby exposing those Market Makers to potentially major losses.

Without robust liquidity protection mechanisms to protect against these risks, Market Makers may be forced to widen their spreads, show less liquidity, or simply exit the market. Overall market quality could deteriorate as a result, and investors would suffer when it becomes too expensive to transact, or when there is insufficient liquidity to enable transacting altogether. Accordingly, liquidity protection mechanisms for Market makers, which all options exchanges offer, and IEX proposes to offer, are vital for achieving a healthy balance between market makers and liquidity takers in the listed

---

[149] *See, e.g.,* Protecting Liquidity in Options Markets, Market Structure, Optiver, July 12, 2023 (concluding that "liquidity protection improves options markets" by safeguarding market makers against "excessive risk" that results from "liquidity providers maintain[ing] hundreds of quotes on a given underlying at any one time [and] a sudden market move can leave them vulnerable to showing stale, or outdated, quotes," thereby "exposing them to potentially major losses" if unable to amend or cancel quotes before executed), available at *https://optiver.com/insights/protecting-liquidity-in-options-markets/.*

options market. These include, but are not limited to, activity-based risk controls, price reasonability checks, and functionality (such as bulk quoting and purge ports) to facilitate timely quoting, quote updates, and quote cancellation.

For each options series, the Trading System will maintain a real-time estimate of the sensitivity of the series to changes in the midpoint of the best Protected Bid and best Protected Offer of the Signal Exchanges for the underlying security (based on a Black-Scholes assessment). When there is a change in the best Protected Bid or best Protected Offer of the Signal Exchanges for the underlying security, the Trading System will use the quote instability calculation formula set forth in proposed IEX Rule 23.150(h) to calculate whether to generate a quote instability determination for each options series overlying the underlying security. The Trading System independently assesses whether to generate a quote instability determination affecting resting bids or offers for each options series. A quote instability determination is generated by the Trading System when, pursuant to the quote instability calculation, the quote instability factor is greater than the defined quote instability threshold and the delta absolute value is within the delta bound band.[150] As proposed, the delta bound band would be uniformly applied across all options in order to more narrowly tailor deployment of the ORP to options series at the greatest risk of adverse selection based on the Exchange's assessment of relevant factors.

If a Market Maker has opted to utilize the ORP and its quote in an options series that was the subject of a quote instability determination is at or above (below) the price level of the quote instability determination the Trading System will either cancel the Market Maker's quote or reprice it to the price level of the quote instability determination, pursuant to the Market Maker's instruction.[151] Regardless of whether it chooses to use the ORP, a Market Maker will be able to adjust the price of its quote in the same manner as other Market Makers' quotes that have not opted to use the ORP.

*One Second Exposure Period.* Proposed Rule 23.200 would require Options Members to expose their customers' orders on the Exchange for at least one second under certain circumstances before trading against such orders. During this one second exposure period, other Options Members will be able to enter orders to trade against the exposed order. In adopting a one second order exposure period, the Exchange is proposing a requirement that is consistent with the rules of other options exchanges.[152] Thus, the exposure period will allow Options Members that are members of other options exchanges to comply with proposed Rule 23.200 without programming separate time parameters into their systems for order entry or compliance purposes. The Exchange believes that market participants are sufficiently automated that a one second exposure period allows an adequate time for market participants to electronically respond to an order. Also, it is possible that market participants might wait until the end of the exposure period, no matter how long, before responding. Thus, the Exchange believes that any longer than one second would not further the protection of investors or market participants, but rather, would potentially increase market risk to investors and other market participants by creating a longer period of time for the exposed order to be subject to market risk.

Options Order Protection and Locked/Crossed Market Plan Rules

The Exchange will participate in the Options Order Protection and Locked/Crossed Market Plan (the ''Plan''),[153] and therefore will be required to comply with the obligations of Participants under the Plan. The Exchange proposes to adopt rules relating to the Plan that are substantially similar to the rules in place on all of the options exchanges that are Participants to the Plan. The Plan essentially applies the Regulation NMS price-protection provisions to the options markets. Similar to Regulation NMS, the Plan requires the Plan Participants to adopt rules ''reasonably designed to prevent Trade-Throughs'', while exempting ISOs from that prohibition. The Plan's definition of an ISO is essentially the same as under Regulation NMS. The remaining exceptions to the trade-through prohibition, discussed more specifically below, either track those under Regulation NMS or correspond to unique aspects of the options market, or both.

The proposed rules in Chapter 28 (Options Order Protection and Locked and Crossed Markets Rules) conform to the requirements of the Plan. Proposed Rule 28.100 sets forth the defined terms for use under the Plan. Proposed Rule 28.110 prohibits trade-throughs and exempts ISOs from that prohibition. Proposed Rule 28.110 also contains additional exceptions to the trade-through prohibition that track the exceptions under Regulation NMS or correspond to unique aspects of the options market, or both.

Proposed Rule 28.120 sets forth the general prohibition against locking/crossing other eligible exchanges as well as certain enumerated exceptions that permit locked markets in limited circumstances; such exceptions have been approved by the Commission for inclusion in the rules of other options exchanges. Specifically, the exceptions to the general prohibition on locking and crossing occur when: (1) the locking or crossing quotation was displayed at a time when the Exchange was experiencing a failure, material delay, or malfunction of its systems or equipment; (2) the locking or crossing quotation was displayed at a time when there is a Crossed Market; (3) the Options Member simultaneously routed an ISO to execute against the full displayed size of any locked or crossed Protected Bid or Protected Offer; or (4) with respect to a locking quotation, the order entered on the Exchange that will lock a Protected Bid or Protected Offer, is: (i) not a Customer order, and the Exchange can determine via identification available pursuant to the OPRA Plan that such Protected Bid or Protected Offer does not represent, in whole or in part, a Customer order; or (ii) a Customer order, and the Exchange can determine via identification available pursuant to the OPRA Plan that such Protected Bid or Protected Offer does not represent, in whole or in part, a Customer order, and, on a case-by-case basis, the Customer specifically authorizes the Member to lock such Protected Bid or Protected Offer.[154]

The Exchange notes that the proposed rules in Chapter 28 (Options Order Protection and Locked and Crossed Markets Rules) are substantively identical to the rules of MEMX Options.[155]

Securities Traded on IEX Options

*General Listing Standards.* The Exchange proposes to adopt listing standards for options traded on IEX Options as described in Chapter 20 (Securities Traded on IEX Options), which are substantively identical to the

---

[150] As specified in Supplementary Material .04(1)(q) to proposed Rule 23.150(m), the delta bound band will be set at a value that is periodically determined by the Exchange to be at or within a range of 0–1, which determination will be communicated by Trading Alert.

[151] *See* proposed IEX Rule 23.150(h)(1)(c).

[152] *See, e.g.,* MEMX Rule 22.11; C1 Rule 5.9; and MIAX Options Rule 520(b).

[153] *See supra* note 77.

[154] *See* proposed Rule 28.120(b).

[155] *See* MEMX Rule 27.1, 27.2, and 27.3.

equivalent MEMX Options rules,[156] with the exception of: (i) some language in Supplementary Material .02 to proposed Rule 20.140 concerning the $1 strike price program which is not included in the equivalent MEMX rule, and therefore borrowed from the equivalent MIAX rule;[157] and (ii) the addition of language allowing the Exchange to list for closing transactions an Options series that is listed but restricted to closing transactions on another exchange.[158] The Exchange will join the Options Listings Procedures Plan and will list and trade options already listed on other options exchanges. The Exchange will gradually phase-in its trading of options, beginning with a selection of actively traded options.

Conduct and Operational Rules for Options Members

The Exchange proposes to adopt rules in Chapter 19 for IEX Options that are substantively identical to the rules of MEMX Options regarding: exercises and deliveries as described in Chapter 24 (Exercises and Deliveries); records, reports and audits as described in Chapter 25 (Records, Reports and Audits); minor rule violations as described in Chapter 26 (Discipline and Summary Suspensions); doing business with the public as described in Chapter 27 (Doing Business With the Public); and margin as described in Chapter 29 (Margin Requirements).[159] The Exchange also proposes to adopt rules that are substantively similar to most of MEMX's Chapter 18 (Business Conduct), with the exception of proposed Rules 19.160 (Position Limits), 19.170 (Exemptions from Position Limits), 19.180 (Exercise Limits) that are substantively similar to MIAX Rules 307, 308, and 309, respectively. IEX proposed to adopt MIAX's versions of these rules because they provided specificity about the types of position limits the Exchange will apply to Options Members (as opposed to the MEMX rules, which rely on position limits set by other exchanges).

National Market System

IEX Options will operate as a full and equal participant in the national market system for options trading established under Section 11A of the Exchange Act.[160] IEX Options will become a member of the Options Price Reporting Authority ("OPRA"), the Options Linkage Authority ("OLA"), the Options Regulatory Surveillance Authority ("ORSA"), and the Options Listing Procedures Plan ("OLPP"). The Exchange expects to participate in those plans on the same terms currently applicable to current members of those plans. The Exchange is in the process of contacting the leadership of each options-related national market system plan to begin the membership process.

Regulation

The Exchange will leverage many of the structures it established to operate a national securities exchange trading NMS equities securities, in compliance with Section 6 of the Exchange Act.[161] As described in more detail below, there will be three elements of that regulation: (1) the Exchange will join the existing options industry agreements pursuant to Section 17(d) of the Exchange Act prior to commencing operations,[162] as it did with respect to equities; (2) the Exchange's Regulatory Services Agreement ("RSA") with FINRA will be amended prior to commencing operations to provide that FINRA will perform regulatory surveillance, investigation, disciplinary and hearing services of options trading on IEX subject to oversight by IEX Regulation, just as it does for equities regulation; and (3) the Exchange will perform options listing regulation, as well as authorize Options Members to trade on IEX Options. Section 17(d) of the Exchange Act and the related Exchange Act rules permit SROs to allocate certain regulatory responsibilities to avoid duplicative oversight and regulation. Under Exchange Act Rule 17d–1,[163] the SEC designates one SRO to be the Designated Examining Authority, or DEA, for each broker-dealer that is a member of more than one SRO. The DEA is responsible for the financial aspects of that broker-dealer's regulatory oversight. Because IEX Options Members also must be members of at least one other SRO, the Exchange would generally not expect to be designated as the DEA for any of its members.[164]

Exchange Act Rule 17d–2 [165] permits SROs to file with the Commission plans under which the SROs allocate among each other the responsibility to receive regulatory reports from, and examine and enforce compliance with specified provisions of the Exchange Act and rules thereunder and SRO rules by, firms that are members of more than one SRO ("common members"). If such a plan is declared effective by the Commission, an SRO that is a party to the plan is relieved of regulatory responsibility as to any common member for whom responsibility is allocated under the plan to another SRO.

All of the options exchanges, FINRA, and NYSE have entered into the Options Sales Practices Agreement, a Rule 17d–2 agreement, and the Exchange intends to join this agreement prior to the commencement of operations for IEX Options. Under this Agreement, the examining SROs will examine firms that are common members of the Exchange and the particular examining SRO for compliance with certain provisions of the Exchange Act, certain of the rules and regulations adopted thereunder, certain examining SRO rules, and certain proposed IEX Options rules. In addition, the proposed IEX Options rules contemplate participation in this Agreement by requiring that any Options Member also be a member of at least one of the examining SROs. The Exchange and FINRA are also party to a bilateral Rule 17d–2 agreement that requires minor modifications due to the proposed launch of IEX Options. The Exchange intends to modify and seek Commission approval of the modified bilateral Rule 17d–2 agreement prior to commencing of operations for IEX Options. Additionally, all of the options exchanges and FINRA have entered into the Options-Related Market Surveillance Agreement, a Rule 17d–2 agreement, and the Exchange intends to join this agreement prior to the commencement of operations for IEX Options.

For those regulatory responsibilities that fall outside the scope of any Rule 17d–2 agreements, the Exchange will retain full regulatory responsibility under the Exchange Act. However, the Exchange has entered into an RSA with FINRA, as discussed above, pursuant to which FINRA personnel operate as agents for the Exchange in performing certain of these functions. The Exchange and FINRA will continue to operate under the RSA that is currently in place but with modifications as necessary to accommodate the expanded scope of the

---

[156] See MEMX Rules, Chapter 19. IEX notes that the MEMX Rules include Chapter 29: Index Rules. IEX is not proposing to adopt similar rules at this time, and any references to index options in MEMX Chapter 19 are not in proposed IEX Chapter 20.

[157] See MIAX Rule 404 Interpretation and Policy .01.

[158] See Supplementary Material .01 to proposed Rule 20.130, which mirrors MIAX Rule 403 Interpretation and Policy .01.

[159] See MEMX Rules, Chapters 23, 24, 25, 26 and 28.

[160] 15 U.S.C. 78k–1.

[161] 15 U.S.C. 78f.

[162] 15 U.S.C. 78q(d).

[163] 17 CFR 240.17d–1.

[164] If IEX were to be designated as the DEA for any of its members, FINRA would perform the DEA functions on behalf of IEX pursuant to the RSA.

[165] 17 CFR 240.17d–2.

relationship. The necessary modifications will be implemented prior to the commencement of operations of IEX Options. As is the case with the Exchange's equities market, the Exchange will oversee FINRA and continue to bear ultimate regulatory responsibility with respect to regulatory functions not subject to allocation to FINRA or another SRO pursuant to a Rule 17d–2 Agreement for the IEX Options Exchange.

Consistent with the Exchange's existing regulatory structure, the Exchange's Chief Regulatory Officer, reporting to the Regulatory Oversight Committee of the Exchange's board of directors, shall have general supervision of the regulatory operations of IEX Options, including responsibility for overseeing the surveillance, examination, and enforcement functions and for administering all regulatory services agreements applicable to IEX Options. Similarly, the Exchange's existing Regulatory Oversight Committee will be responsible for overseeing the adequacy and effectiveness of Exchange's regulatory and self-regulatory organization responsibilities, including those applicable to IEX Options.

As it does with equities, the Exchange will monitor trading on IEX Options, both through internal reports and FINRA surveillances for the purpose of maintaining a fair and orderly market. As it does with its equities trading, the Exchange will monitor IEX Options to identify unusual trading patterns and determine whether particular trading activity requires further regulatory investigation by FINRA.

Finally, the Exchange will oversee the process for determining and implementing trade halts, identifying and responding to unusual market conditions, and administering the Exchange's process for identifying and remediating ''obvious errors'' by and among its Options Members.[166] The proposed rules in Chapter 21 (Regulation of Trading on IEX Options) regarding halts,[167] unusual market conditions, extraordinary market volatility, obvious errors, audit trail, and rules regarding prohibited and

permissible transfers of options positions off the Exchange are substantively identical to the approved rules of MEMX Options.[168]

Minor Rule Violation Plan

The Exchange's disciplinary rules, including Exchange Rules applicable to ''minor rule violations,'' are set forth in Chapter 9 of the Exchange's current Rules. Such disciplinary rules will apply to Options Members and their associated persons.

The Commission approved the Exchange's Minor Rule Violation Plan (''MRVP'') in 2016.[169] The Exchange's MRVP specifies the uncontested minor rule violations that are included in the MRVP and have sanctions not exceeding $2,500. Any violations that are resolved under the MRVP would not be subject to the provisions of Rule 19d–1(c)(1) under the Act[170] requiring that an SRO promptly file notice with the Commission of any final disciplinary action taken with respect to any person or organization.[171] The Exchange's MRVP includes the policies and procedures included in Exchange Rule 9.216(b) and the violations included in Rule 9.218.

Under Rule 9.216(b), the Exchange may impose a fine (not to exceed $2,500) and/or a censure on any Member or associated person with respect to any rule listed in IEX Rule 9.218. If the Financial Industry Regulatory Authority Department of Enforcement or the Department of Market Regulation, on behalf of the Exchange, has reason to believe a violation has occurred and if the Member or associated person does not dispute the violation, the Department of Enforcement or the Department of Market Regulation may prepare and request that the Member or associated person execute a minor rule violation plan letter accepting a finding of violation, consenting to the imposition

of sanctions, and agreeing to waive the Member's or associated person's right to a hearing before a Hearing Panel or, if applicable, an Extended Hearing Panel, and any right of appeal to the IEX Appeals Committee, the Board, the Commission, and the courts, or to otherwise challenge the validity of the letter, if the letter is accepted. The letter must describe the act or practice engaged in or omitted, the rule, regulation, or statutory provision violated, and the sanction or sanctions to be imposed. Unless the letter states otherwise, the effective date of any sanction imposed will be a date to be determined by IEX Regulation staff. In the event the letter is not accepted by the Member or associated person, or is rejected by the Office of Disciplinary Affairs, the matter can proceed in accordance with the Exchange's disciplinary rules, which include hearing rights for formal disciplinary proceedings.

The Exchange proposes to amend its MRVP and Exchange Rule 9.218 to add certain rules relating to Options as set forth in proposed Rule 26.120 (Penalty for Minor Rule Violations) to the list of rules eligible for Minor Rule Violation Plan treatment.[172] The rules included in proposed Rule 26.120, as appropriate for disposition under the Exchange's MRVP, are: (a) position limit and exercise limit violations; (b) violations regarding the failure to accurately report position and account information; (c) Market Maker quoting obligations; (d) violations regarding expiring exercise declarations; (e) violations relating to the failure to respond to the Exchange's requests for the submission of trade data; and (f) violations relating to noncompliance with the Consolidated Audit Trail Compliance Rule requirements. The rule violations included in proposed Rule 26.120 are the same as the rule violations included in the MRVPs of other options exchanges.[173]

Upon implementation of this proposal, the Exchange will include violations of the enumerated options trading rules, if any, in an applicable Exchange's quarterly report of any actions taken on minor rule violations under the MRVP.[174] A quarterly report would include: the Exchange's internal file number for the case, the name of the

---

[166] IEX notes that like MEMX Rule 20.6, proposed Rule 21.150 authorizes the proposed Error Panel to review decisions made under this rule, which includes decisions to classify a transaction as a Catastrophic Error.

[167] Proposed Rule 21.120(b) states that during a trading halt, the Exchange shall process new and existing orders and quotes in a series in accordance with proposed Rule 22.160(g). Proposed Rule 22.160(g), which is substantively identical to NYSE Arca Options Rule 6.64P–O(g), states that during a trading halt, the Exchange will cancel all resting Market Maker quotes.

[168] See MEMX Rules, Chapter 20.

[169] See Securities Exchange Act Release No. 78474 (August 3, 2016), 81 FR 52717 (August 9, 2016) (Order Declaring Effective a Minor Rule Violation Plan) (File No. 4–701).

[170] 17 CFR 240.19d–1(c)(1).

[171] The Commission adopted amendments to paragraph (c) of Rule 19d–1 to allow SROs to submit for Commission approval plans for the abbreviated reporting of minor disciplinary infractions. See Release No. 34–21013 (June 1, 1984), 49 FR 23828 (June 8, 1984). Any disciplinary action taken by an SRO against any person for violation of a rule of the SRO which has been designated as a minor rule violation pursuant to such a plan filed with and declared effective by the Commission will not be considered ''final'' for purposes of Section 19(d)(1) of the Act if the sanction imposed consists of a fine not exceeding $2,500 and the sanctioned person has not sought an adjudication, including a hearing, or otherwise exhausted his administrative remedies.

[172] In its proposal to adopt the MRVP, the Exchange requested that, going forward, to the extent that there are any changes to the rules applicable to the Exchange's MRVP, the Exchange requests that the Commission deem such changes to be modifications to the Exchange's MRVP.

[173] See, e.g., MEMX Rules, Chapter 25.

[174] To date, the Exchange has not taken any minor rule violation actions.

individual and/or organization, the nature of the violation, the specific rule provision violated, the sanction imposed, the number of times the rule violation has occurred, and the date of disposition. The Exchange's MRVP, as proposed to be amended herein, is consistent with Sections 6(b)(1), 6(b)(5) and 6(b)(6) of the Act, which require, in part, that an exchange have the capacity to enforce compliance with, and provide appropriate discipline for, violations of the rules of the Commission and of the exchange, 6(b)(6) provides that members and persons and associated members shall be appropriately disciplined for violation of the provisions of the rules of the exchange, by expulsion, suspension, limitation of activities, functions and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction.[175] Rule violations listed in proposed Rule 26.120 are minor in nature and will be more appropriately disciplined through the Exchange's MRVP and therefore proposes to add them to the list of rules eligible for minor rule fine disposition

In addition, because Rule 9.216(b) offers procedural rights to a person sanctioned for a violation listed in proposed Rule 26.120, the Exchange will provide a fair procedure for the disciplining of members and associated persons, consistent with Section 6(b)(7) of the Act.[176]

This proposal to include the rules listed in proposed Rule 26.120 in the Exchange's MRVP is consistent with the public interest, the protection of investors, or otherwise in furtherance of the purposes of the Act, as required by Rule 19d–1(c)(2) under the Act,[177] because it should strengthen the Exchange's ability to carry out its oversight and enforcement responsibilities as an SRO in cases where full disciplinary proceedings are unsuitable in view of the minor nature of the particular violation. In requesting the proposed change to the MRVP, the Exchange in no way minimizes the importance of compliance with Exchange Rules and all other rules subject to the imposition of fines under the MRVP. Minor rule fines provide a meaningful sanction for minor or technical violations of rules when the conduct at issue does not warrant stronger, immediately reportable

disciplinary sanctions. The inclusion of a rule in the Exchange's MRVP does not minimize the importance of compliance with the rule, nor does it preclude the Exchange from choosing to pursue violations of eligible rules through the Exchange's disciplinary rules if the nature of the violation or prior disciplinary history warrants more significant sanctions. However, the MRVP provides a reasonable means of addressing rule violations that do not rise to the level of requiring formal disciplinary proceedings, while providing greater flexibility in handling certain violations.[178] The Exchange will continue to conduct surveillance with due diligence and make a determination based on its findings, on a case-by-case basis, whether a fine of more or less than the recommended amount is appropriate for a violation under the MRVP or whether a violation requires a formal disciplinary action.

Section 36 Exemption Request

The Exchange proposes to incorporate by reference as IEX Options rules certain rules of the Cboe Exchange, Inc. ("CBOE"), the New York Stock Exchange ("NYSE"), and FINRA. Specifically, proposed Rule 27.250 proposes to incorporate by reference the applicable rules of FINRA with respect to Communications with Public Customers, and proposed Rule 29.120 proposes to incorporate by reference initial and maintenance margin requirements of either CBOE or NYSE. Thus, for certain IEX Options rules, Exchange members will comply with a IEX Options rule by complying with the CBOE, NYSE, or FINRA rule referenced. Using its authority under Section 36 of the Act, the Commission has previously exempted certain SROs from the requirement to file proposed rule changes under Section 19(b) of the Act when incorporating another SRO's rules by reference.[179] Each such exempt SRO has agreed to be governed by the incorporated rules, as amended from time to time, but, has not been required to file a separate proposed rule change with the Commission each time the SRO whose rules are incorporated by reference seeks to modify its rules. In addition, each SRO incorporated by reference only regulatory rules (*e.g.,*

margin, suitability, arbitration), not trading rules, and incorporated by reference whole categories of rules (*i.e.,* did not "cherry-pick" certain individual rules within a category). Last, each exempt SRO had reasonable procedures in place to provide written notice to its members each time a change is proposed to the incorporated rules of another SRO in order to provide its members with notice of a proposed rule change that affects their interests, so that they would have an opportunity to comment on it.

In connection with this proposal, the Exchange respectfully requests, pursuant to Rule 240.0–12 under the Act,[180] an exemption under Section 36 of the Act from the rule filing requirements of Section 19(b) of the Act for changes to those IEX Options rules that are effected solely by virtue of a change to a cross-referenced CBOE, NYSE, or FINRA rule. The Exchange proposes to incorporate by reference categories of rules (rather than individual rules within a category) that are not trading rules. The Exchange also agrees to provide written notice to Options Members prior to the launch of IEX Options of the specific CBOE, NYSE, and FINRA rules that it will incorporate by reference. In addition, the Exchange will notify Options Members whenever CBOE, NYSE, or FINRA proposes a change to a cross-referenced CBOE, NYSE, or FINRA rule.[181] For the foregoing reasons, the Exchange believes that its request for exemptive relief is consistent with prior requests for, and provision of, similar exemptive relief.

Amendments to Existing Exchange Rules

In addition to the rules of IEX Options proposed above, the Exchange proposes to amend certain of its existing Exchange Rules that currently apply to the Exchange's equities market in order to reflect the Exchange's proposed operation of IEX Options.

First, the Exchange proposes to amend Rule 2.160(i), which generally requires each Member to register at least two Principals with the Exchange subject to certain exceptions described therein, to provide that such paragraph (i) shall not apply to a Member that solely conducts business on the

---

[175] 15 U.S.C. 78f(b)(1), 78f(b)(5) and 78f(b)(6).

[176] 15 U.S.C. 78f(b)(7). Rule 9.216(b) does not preclude an Options Member or person associated with an Options Member from contesting an alleged violation and receiving a hearing on the matter with the same procedural rights through a litigated disciplinary proceeding.

[177] 17 CFR 240.19d–1(c)(2).

[178] *See supra* note 176.

[179] *See, e.g.,* Securities Exchange Act Release No. 49260 (February 17, 2004), 69 FR 8500 (February 24, 2004). *See also* Securities Exchange Act Release Nos. 57478 (March 12, 2008), 73 FR 14521, 14539–40 (March 18, 2008) (order approving SR–NASDAQ–2007–004 and SR–NASDAQ–2007–080) and 53128 (January 13, 2006), 71 FR 3550, 3565–66 (January 23, 2006) (File No. 10–131) (approving The NASDAQ Stock Market LLC's exchange application).

[180] 17 CFR 240.0–12.

[181] The Exchange will provide such notice through a posting on the same website location where the Exchange will post its own rule filings pursuant to Rule 19b-4(l) under Act, within the time frame required by that rule. The website posting will include a link to the location on the CBOE, NYSE, or FINRA websites where the proposed rule change is posted.

Exchange as an Options Member, however, Options Members must comply with the registration requirements set forth in proposed Rule 18.110. The Exchange notes that proposed Rule 18.110(h), which provides that every Options Member shall have at least one Options Principal and sets forth the Exchange's Options Principal registration requirements, is identical to MEMX Rule 17.2(g). In connection with this proposed change, the Exchange also proposes to amend Rule 2.160(n) to include Options Principal as a registration category and to set forth the Exchange's qualification requirements for an Options Principal, which are the same as those for an Options Principal on MEMX Options. Additionally, the Exchange proposes to amend Rule 2.160(p)(a)(4) to set forth the appropriate regulatory element continuing education module for reregistration as an Options Principal.

The Exchange also proposes to make three modifications to Rule 2.220 (IEX Services LLC as Outbound Router). First, IEX proposes to remove the word "directly" from the first sentence of subparagraph (a), because IEX Services will continue to route orders to away markets, but as described above, with respect to options routing, it will not route those order "directly" to the away markets. Second, consistent with the first change, IEX proposes to insert a new second sentence in subparagraph (a) that reads: "When routing options orders, as set forth in Rule 22.180, IEX Services will transmit such orders to one or more routing brokers that are not affiliated with the Exchange; the routing brokers will in turn route the applicable options orders to other securities exchanges that trade options." IEX proposes to make this change to reflect the different nature of how IEX Services will handle routing options orders from equities orders. And third, IEX proposes to modify subparagraph (a)(8) of this rule, which states that IEX Services shall maintain an error account for the purpose of addressing positions that are the result of an execution or executions that are not clearly erroneous under Rule 11.270 and result from a technical or systems issue at IEX Services, the Exchange, a routing destination, or a non-affiliate third-party routing broker that affects one or more orders ("Error Positions"). The proposed change to Rule 2.220(a)(8) would add a reference to the comparable provision to that which governs review and resolution of clearly erroneous equities transactions (i.e., Rule 11.270) but for options transactions, namely Rule 21.150, which governs review and resolution of

options transactions that may qualify as obvious errors.

The Exchange also proposes to adopt Rule 21.220 (Limitation of Liability), which is almost identical to the Rule 11.260, the Limitation of Liability rule in IEX's equities trading rules. The only difference is to reflect that proposed Rule 21.220 applies to IEX Options and options trading.

Lastly, the Exchange proposes to amend Rule 9.218 (Violations Appropriate for Disposition Under Plan Pursuant to Exchange Act Rule 19d-1(c)(2)), which contains the list of Exchange Rule violations and recommended fine schedule, to include a new paragraph (k) referencing proposed Rule 26.120 for the recommended fines for minor rule violations of the Exchange Rules appliable to IEX Options, which the Exchange notes are the same as those of MEMX Options.

2. Statutory Basis

The Exchange believes that the proposed rule change is consistent with Section 6(b) of the Act [182] in general, and furthers the objectives of Section 6(b)(5) of the Act [183] in particular, in that it is designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and is not designed to permit unfair discrimination between customers, issuers, brokers, or dealers.

As described above, the Exchange proposes to operate its options market much as it operates its equities market today and in a manner similar to that of other options exchanges, while leveraging IEX's experience and expertise in understanding the needs of market makers to offer them additional tools designed to better manage risk and drive performance. As discussed in the Purpose section, IEX believes that the proposed enhanced liquidity protection mechanisms will result in market makers providing more competitive quotes which will benefit all market participants and thereby support the protection of investors and the public interest. Also as discussed in the Purpose section, most of the proposed IEX Options rules are based on the rules

of other options exchanges, primarily MEMX, C1, MIAX, NYSE Amex, and NYSE Arca. Therefore, the Exchange does not believe these aspects of the proposed rule change that are substantively identical to other exchanges' rules raise any new or novel issues that have not been previously considered by the Commission. Moreover, the Exchange believes that the proposed functionality is consistent with Section 6(b)(5) of the Act because the Trading System is designed to be efficient and its operation transparent, thereby facilitating transactions in securities, removing impediments to and perfecting the mechanisms of a free and open national market system. As described above, the Exchange's proposed rules, including the proposed Order Types and Handling Instructions, opening procedures, routing services, and order matching process are designed to provide a simplified suite of conventional features and to comply with all applicable regulatory requirements, including the obligations of the Options Order Protection and Locked/Crossed Market Plan.[184]

As discussed in the Purpose section, IEX's proposal includes a de minimis latency mechanism (or speedbump) on incoming order and quote messages designed to enable IEX to update its view of the market prior to processing orders and quotes, and a robust suite of risk protections, including the ORP, which is designed to protect market makers from excessive risk due to execution of stale quotes. IEX believes that the proposed latency mechanism will protect investors and the public interest in several respects. First, by enabling IEX to update its view of market data prior to executing an order or quote, it thereby would support IEX's ability to accurately account for contemporaneous market data. IEX notes that this aspect of its functionality is designed to facilitate market participants executing at current (*i.e.,* not "stale") prices. Second, by enabling the Trading System to perform the Indicator calculation with current market data, it supports operation of the ORP (as discussed herein), which is designed to provide Market Makers with an optional tool to avoid excessive risk that can arise from execution of a stale quote. As discussed in detail above, IEX believes that this protection will encourage market makers to post aggressively priced and/or deeper quotes on the Exchange which will benefit all market participants. Thus, from a functional perspective, IEX believes that the operation of the latency

---

[182] 15 U.S.C. 78f(b).
[183] 15 U.S.C. 78f(b)(5).

[184] *See supra* note 77.

mechanism is consistent with the Act. Further, and as explained below, the proposed latency mechanism of 350 microseconds is well within the geographic delays that exist among and between the data centers that IEX Options Members and other options exchanges use [185] and is consistent with the naturally occurring time indeterminism that exists in order processing.[186]

IEX also believes that the latency mechanism is consistent with the Commission Interpretation Regarding Automated Quotations Under Regulation NMS ("de minimis delay interpretation").[187] Although options markets do not have the same automated quotation requirements as in equities, even if they were to apply, the Commission's reasoning in the de minimis delay interpretation in the context of NMS automated quotations is instructive, as the latency mechanism IEX is proposing for the options exchange is a de minimis delay that does not impair fair and efficient access to an exchange's quotation. Specifically, the Commission stated in issuing its interpretation that intentional delays that are well within the geographic and technological latencies experienced by market participants when routing orders are de minimis to the extent they would not impair a market participant's ability to access a displayed quotation

consistent with the goals of NMS Rule 611.[188] The Commission also noted that an intentional delay of any duration must be fully disclosed and codified in a written rule of the exchange, which, as described below, the latency mechanism will be fully disclosed and codified in IEX's written rules.[189]

IEX believes that its proposed latency mechanism of 350 microseconds is fully consistent with the reasoning in the Commission's de minimis delay interpretation.[190] First, the delay is less than the existing geographic latencies experienced by market participants when routing orders. For example, latency between and among the data centers located in New Jersey range up to several hundred microseconds, with additional latency introduced by technology processing on both sides of an order or quote route between these data centers.[191] Accordingly, the proposed latency mechanism is consistent with this aspect of the Commission's de minimis interpretation.

The proposed latency mechanism also meets the additional prongs of the de minimis interpretation, that it be fully disclosed and codified in a written rule of the exchange that has become effective pursuant to Section 19 of the Act; and that the exchange articulates how the purpose, operation, and application of the delay is consistent with the Act and the rules and regulations thereunder applicable to the exchange. The latency mechanism's operation, as proposed, would be disclosed and codified in detail in IEX Rules 22.100(n) and 22.170(g). Those provisions specify that the latency mechanism shall mean a delay of 350 microseconds that is added to each incoming order and quote message from a User prior to processing by the Trading System, and that will not apply to other communications between the Exchange and Users, Away Markets, data feeds, order processing and order execution on the IEX Options Book, and

outbound communications to the Exchange's proprietary data feeds and OPRA. As discussed above, the purpose of the latency mechanism is to provide adequate time for the IEX Trading System to update its view of market data to enable it to accurately price orders as well as to perform the Indicator calculation with current market data.

Consequently, based on the foregoing, the Exchange believes that the latency mechanism is both de minimis and otherwise consistent with the Act.

The Exchange believes that the proposed ORP is consistent with Section 6(b) of the Act [192] in general, including furthering the objectives of Section 6(b)(5) of the Act,[193] as the proposed optional risk protection mechanism would remove impediments to and perfect the mechanism of a free and open market and a national market system and promote just and equitable principles of trade by providing an optional quote parameter, available to all IEX Options Market Makers, that is designed to assess the probability of an adverse price change in a particular options series so that the Trading System can effectuate the advance trading instructions provided by the Market Maker to cancel or reprice its quote to the price level of the quote instability determination, as selected by the Market Maker. The ORP is an optional, narrowly tailored approach designed to provide protection from excessive risk of execution of stale quotes and thereby enable market makers to make tighter and larger quotes (*i.e.,* quotes at narrower spreads with greater size) thus enhancing the quality of the IEX Options market, to the benefit of all market participants. The Exchange believes it is appropriate to provide market makers with the choice to utilize this reasonable quote protection, particularly given the continuous quoting obligations specific to market makers and their importance in providing liquidity in the listed options market. The Exchange further believes this risk functionality will encourage market makers to provide additional depth and liquidity to the Exchange's markets, thereby removing impediments to and perfecting the mechanisms of a free and open market and a national market system and, in general, protecting investors and the public interest.

The Exchange believes that the ORP supports the protection of investors and public interest goals of the Act. As described in the Purpose section, based on the structural differences between

---

[185] See *https://www.ice.com/publicdocs/ICE_Global_Network_Factsheet.pdf* for a description of latencies between various data centers.

[186] Accounting for the latency mechanism or speedbump is no different than accounting for other geographical distances between exchanges. *See* Securities Exchange Act Release No. 78101 (June 17, 2016), 81 FR 41142, 41161 (June 23, 2016) ("2016 SEC Approval Order") (approving IEX's 350 microsecond speed bump in the registration of the IEX Exchange as "well within the range of geographic and technological latencies that market participants experience today" such that "latency to and from IEX will be comparable to—and even less than—delays attributable to other markets that currently are included in the NBBO," and finding the delay to be de minimis, *i.e.,* so short as to not frustrate the purposes of the Exchange Act by impairing fair and efficient access to IEX's quotation); *see also* Securities and Exchange Act Release No. 34–89686 (August 26, 2020) ("2020 SEC Approval Order") at 15 (determining that IEX's de minimis speed bump when routing displayed equity orders is "just like accounting for any other technological or geographic latency" and doing so is consistent with applicable rules and regulations); *see also Citadel Securities LLC* v. *Securities and Exchange Commission,* 45 F.4th 27, 37 (D.C. Circuit 2022) (July 29, 2022) (ruling in favor of the SEC's approval of IEX's displayed equity order that traverses a speedbump and holding that IEX's displayed equity order's delay are "similar to the delay that traders' communications already experience when traveling between various other exchanges across the country.").

[187] *See* Commission Interpretation Regarding Automated Quotations Under Regulation NMS, Exchange Act Release No. 34–78102, 81 FR 40,785, 40,792 (June 23, 2016).

[188] *Id.*

[189] *Id.*

[190] IEX notes that the D.C. Circuit Court also agreed with the Commission's interpretation. The Court ruled entirely in favor of the SEC's approval of IEX's system that includes applying a speedbump and quote indicator to displayed equity orders. *See Citadel Securities,* 45 F.4th at 36 (concluding the SEC's approval of a 350 microseconds intentional access delay for displayed orders to be "de minimis—*i.e.,* a delay so short as to not frustrate the purposes of Rule 611 by impairing fair and efficient access to an exchange's quotations"); *see also id.* ("The SEC's conclusion that mere de minimis delays do not cause an order to violate Regulation NMS's immediacy requirement was therefore reasonable.")

[191] *See https://www.ice.com/publicdocs/ICE_Global_Network_Factsheet.pdf.*

[192] 15 U.S.C. 78f(b).

[193] 15 U.S.C. 78f(b)(5).

equities and listed options markets, the options exchanges often do not have the same natural liquidity of buyers and sellers for each tradeable instrument (i.e., options series) as is generally the case in equities. As a result, market makers with affirmative obligations play a central role in providing liquidity to options exchanges through continuous two-sided quotes in large numbers of listed options series, thereby enabling investors to transact in listed options in accordance with their investment objectives. Because options market makers are required to maintain hundreds (and sometimes thousands) of quotes on options overlying underlying securities at any one time, a sudden market move in the underlying security can leave them vulnerable to being executed on quotes that are stale and dislocated from the price of the underlying security.[194] Liquidity takers can target these stale quotes, with limited risk should they fail, before the market maker has time to move its quotes to reflect the price change in the underlying security exposing them to potentially major losses.

The ORP is designed to supplement the standard proposed risk checks to provide augmented protection to address the inherent risks faced by market makers. IEX believes that the operation of the ORP is similar to activity-based and price reasonability risk checks offered by other options exchanges (and proposed by IEX herein), in terms of its objective and impact on a resting quote.[195] Each of

these risk controls will cancel an order when the control is triggered based on a determination that the price of the market maker's quote is "unreasonable" because it is no longer reflective of the price of the underlying security and therefore likely stale (price reasonability check) or that the execution activity of a market maker's quotes exceeds the market maker's risk tolerance (activity-based controls). Additionally, the trading collar and limit order protection rules of other options exchanges and those similarly proposed by IEX provide for orders to be repriced.

However, IEX notes that the proposed ORP would be more transparent than the activity-based controls in determining when a market maker quote is potentially subject to cancelation (or adjustment) because it is based on a transparent formula specified in IEX's rules and related Trading Alerts. In contrast, those triggers for an activity-based control are nonpublic and set by each exchange member.

As discussed above, because of the lack of natural sources of liquidity across the multitude of listed options series, market makers are subject to affirmative obligations to maintain continuous two-sided quotes on hundreds or thousands of individual options series. While IEX proposes to offer bulk quoting and purge port functionality to market makers (in the same manner as other options exchanges), in a fast-moving market, their quotes can nonetheless become stale almost instantaneously. In those times, a sophisticated liquidity taker can target one or more stale market maker quotes before the market maker can update its quotes, thereby exposing the market maker to potentially major losses. The ORP is designed to assist market makers with an option to manage this risk, similar to the other risk controls. While some overlap is expected, IEX believes that the Indicator would potentially identify additional instances of stale quotes beyond those identified by the other price reasonability checks.

Further, IEX notes that the operation of the Indicator is similar to the manner in which IEX's equities market (the "Equities System") utilizes a "crumbling quote indicator" to encourage the provision of displayed liquidity by providing reasonably tailored protections against adverse

executions.[196] As with the crumbling quote indicator, the Indicator will be a transparent formula based on a pre-determined objective set of circumstances that will be specified in IEX's rules to identify when the Protected Bid and/or Protected Offer in a particular options series is likely to move to a less aggressive price.

Moreover, the Options Trading System will use the ORP in a manner similar to the way in which the Equities System applies the crumbling quote indicator to resting displayed liquidity, which reprices the applicable order or quote. The functional differences between the crumbling quote indicator and the Indicator reflect that options pricing is derivative.[197] Thus, the Indicator will trigger when it identifies that a Protected Bid or Protected Offer is likely to move to a less aggressive price, based on a price change in the underlying security, thereby exposing the market maker to excessive risk, but, unlike the crumbling quote indicator, would reprice the quote to the price level of the quote instability determination or cancel the impacted quote and not remain "on" for a period of time after triggering. IEX believes that this approach is appropriate in view of the derivative pricing of options and that it will contribute to more displayed liquidity through improved execution quality, enhance the public price discovery process, and promote just and equitable principles of trade.[198]

---

[194] *See, e.g.,* Lehoczky, Sandor and Woods, Ellen and Russell, Matthew and Nguyen, Mina and Somers, James, Dead Man's Switch: Making Options Markets Safer with Active Quote Protection (May 2020) at 2–3, 6, available at *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3675849* (discussing the need for quote protection for market makers to allow for a deep and liquid listed options market and explaining that "race conditions" negatively impact pricing efficiency, "as market makers have been shown to quote wider spreads or step back instead of continually updating with price moves for fear of being "picked off."); *see also* Citadel Securities, Market Lens, July 2020, available at *https://www.citadel.com/securities/wp-content/uploads/sites/2/2020/07/Market-Lens-Order-Cancellation-White-Paper_FINAL.pdf* (explaining the need for risk management in electronic trading given that "traders who place limit orders—the foundation of public price discovery—are exposed to the risk that their quotations will be executed at an inopportune time, leading to potential losses" and that the "greater the risk of an inopportune execution, the more compensation is required, which leads to wider bid-ask spreads. Conversely, anything the trader can do to lower the risk of an inopportune execution will lower the compensation required, which leads to narrower bid-ask spreads.").

[195] *See, e.g.,* Market-Maker Protections, Market Structure, Optiver, July 17, 2023, available at *https://optiver.com/insights/market-maker-protections/* (explaining that exchanges implement robust market-maker protections to "assist market

makers in coping with the risks of posting continuous, two-sided quotes in thousands of financial instruments" and to provide the ability to automatically pull or amend their quotes so that "all quotes falling within the scope of protection still resting on the book are prohibited from further execution").

[196] In 2016, IEX received SEC approval of the IEX's exchange system that provides a similar quote indicator for equities. *See* 2016 SEC Approval Order (approving IEX's exchange system in its registration as a national securities exchange, which included the approval of IEX's crumbling quote indicator that assesses quote instability by utilizing a real-time, based on pre-determined, objective set of conditions that protects orders from unfavorable executions when the market is moving against them). In 2020, IEX received SEC approval to apply the quote indicator to displayed orders in equities. *See* 2020 SEC Approval Order, supra note 189, at 6–7 (receiving unanimous support and concluding that the Exchange's displayed order proposal that included a similar quote indicator is consistent with the requirements of the Exchange Act and the rules and regulations thereunder applicable to a national securities exchange and that is designed to improve market quality, enhance price discovery, and promote just and equitable principles of trade).

[197] Because of this difference, the Indicator is designed to identify when the Protected Bid and/or Protected Offer in an option series is dislocated from the price of the underlying based on a price change in the underlying and therefore likely to be in transition to a less aggressive price, while the crumbling quote indicator utilizes changes in the protected quote in the security itself to make such a prediction.

[198] *See, e.g.,* 2020 SEC Approval Order, *supra* note 189, at 19 (concluding that IEX's exchange functionality protects against adverse selection and incentivizes more displayed liquidity through improved execution quality for liquidity providers, which contributes "to fair and orderly markets" and
Continued

Further, the ORP would be available, as a quote parameter, only to market makers and on an optional basis, because the Exchange believes that it is most appropriate as a tool to address market maker risk. IEX believes that this approach is appropriate because market makers are subject to affirmative obligations to provide continuous two-sided quotes and cannot back away or unduly widen their quotes during periods of price volatility, as can other liquidity providers.[199] By offering market makers this narrowly-tailored, optional tool, IEX believes it will attract additional displayed liquidity that will be available to all market participants.

IEX also believes that use of the Indicator in determining when to trigger the ORP is consistent with the protection of investors and the public interest because the Indicator is based on the well-recognized Black-Scholes options pricing model, which IEX believes is an appropriate methodology to identify when a Market Maker's quote in an option is dislocated from the price of the underlying security based on the mathematical relationship between the price of the underlying security and the overlying options. Moreover, IEX believes that the latency mechanism [200] (as discussed above) will serve to enhance the accuracy of the Indicator by providing adequate time for the IEX Trading System to update its Indicator calculation with current market data. In this regard, as discussed earlier, IEX notes that the proposed latency of 350 microseconds is well within the geographic delays that exist among and between the data centers that IEX Options Members, and other options exchanges, use and is consistent with the naturally occurring time

indeterminism that exists in order processing.

Further, IEX believes that limiting the availability of the ORP to resting market maker quotes is consistent with the Act for several reasons. As discussed in depth above, market makers are integral to providing liquidity on options exchanges, and at the same time subject to a potentially excessive level of risk from execution of one or more stale quotes. Additionally, Market Makers' obligations apply across all series in their appointed class. Other liquidity providers are free to concentrate their efforts in a select number of series. Thus, Market Makers have greater exposure to latency arbitrage, take on greater risk, and incur more related capital charges than other liquidity providers. IEX determined to apply the functionality to resting quotes only as this approach will best achieve the purpose of protecting market markets from the excessive risk of executions at stale prices without disrupting market makers' ability to update their quotations.

The Exchange also believes that applying the Indicator on a class-by-class basis would remove impediments to, and perfect the mechanism of, a free and open market and a national market system and promote just and equitable principles of trade. As discussed in the Purpose section, applying the Indicator on a class-by-class basis would enable the Exchange to appropriately utilize the ORP for classes with a high potential for adverse selection, while excluding classes presenting lower risk of adverse selection (such as classes with relatively lower volumes). This flexibility will therefore allow the Exchange to ensure the ORP is available for those classes with a high potential for adverse selection and where its use will achieve its intended purpose, while excluding its use where it would likely provide little additional value and could introduce unnecessary complexity (for example, for classes that are subject to a pending corporate action or other nonstandard characteristic).

Moreover, IEX notes that the Commission has previously recognized the utility of IEX providing protection to liquidity providers through order types that leverage its crumbling quote indicator to appropriately protect market participants from the risks of transacting when the market is in transition and thereby incentivize the entry of liquidity providing orders. The Exchange believes that the proposed ORP is consistent with this history and is in furtherance of driving tighter and

deeper displayed markets to the benefit of investors.[201]

IEX also believes that the proposal is consistent with the firm quote obligations of a broker-dealer pursuant to Rule 602 of Regulation NMS.[202] Specifically, any marketable interest that is executable against a market maker's quote that has been received by the Trading System prior to the time that a quote instability determination is received by Trading System will be automatically executed, subject to processing of any prior messages, at the price and up to the size of the market maker's quote.

IEX believes that the proposed ORP is consistent with the protection of investors and the public interest, and is consistent with the Exchange Act, including furthering the objectives of Section 6(b)(5) of the Act,[203] because it is a narrowly-tailored approach designed to appropriately balance the risks faced by market makers with the legitimate objectives of liquidity takers by providing additional optional risk protection to market makers and thereby encourage aggressive quoting. The Exchange further believes that offering more risk management protections to Market Makers would mitigate their exposure to excessive risk. As discussed in detail above, Market Makers are required to continuously provide two-sided quotes in substantial numbers of listed options series that can create large, unintended positions exposing market makers to excessive risk. Market Maker quotes are critical to provide liquidity to the market and contribute to price discovery for investors. Without robust liquidity protection, market makers may be forced to widen their spreads, show less liquidity or simply exit the market, which can result in deterioration of market quality and adversely impact investors' and other liquidity takers' ability to transact in the options markets. In sum, liquidity protection for options market makers is vital for achieving a healthy balance between liquidity providers and liquidity takers in the options market that will promote more displayed liquidity from which all market participants ultimately will benefit.

The Exchange believes that the notice requirements specified for the variable values related to operation of the ORP and the Indicator formula appropriately differentiate those values that require the Exchange to respond to rapidly changing market conditions or system

---

supports "the public price discovery process"); at 26 (finding that the Exchange's speedbump and crumbling quote indicator promotes the interest of long term investors and inures to the "benefit of displayed markets, leading to increased displayed liquidity from which all market participants ultimately will benefit"); at 52 (concluding that the Exchange's order protection functionality "is designed to encourage market participants to post more priced limit orders, including displayed orders, on IEX, and thereby promotes just and equitable principles of trade, removes impediments to and perfects the mechanism of a free and open market and a national market, and, in general, protects investors and the public interest.").

[199] *See, e.g.,* Protecting Liquidity in Options Markets, Market Structure, Optiver, July 12, 2023, available at *https://optiver.com/insights/protecting-liquidity-in-options-markets/* (explaining that without robust liquidity protection mechanisms for market makers to protect against the risks of displaying stale or outdated quotes, "market makers may be forced to widen their spreads, show less liquidity or simply exit the market" and overall "market quality can deteriorate" with the result of investors suffering).

[200] *See* proposed IEX Rule 22.170(g).

[201] *See supra* notes 201 and 203 and accompanying text.

[202] *See* proposed IEX Rule 23.140(d).

[203] 15 U.S.C. 78f(b)(5).

issues (*i.e.,* determination of delta bound bands and class-by-class determinations) from those for which rapid Exchange decision-making is not necessary and for which more advance notice can be provided (*i.e.,* quote instability threshold and frequency of calculation of implied volatility), thereby removing impediments to and perfecting the mechanisms of a free and open market and a national market system and, in general, protecting investors and the public interest.[204] The Exchange believes that the proposed rules of IEX Options, as well as the proposed method of monitoring for compliance with and enforcing such rules is also consistent with the Act, particularly Sections 6(b)(1), 6(b)(5) and 6(b)(6) of the Act, which require, in part, that an exchange have the capacity to enforce compliance with, and provide appropriate discipline for, violations of the rules of the Commission and of the exchange. The Exchange has proposed to adopt rules necessary to regulate Options Members that are nearly identical to the approved rules of other options exchanges, as described above. The Exchange proposes to regulate activity on IEX Options in the same way it regulates activity on its equities market (and comparable to other options exchanges), through various Exchange specific functions, an RSA with FINRA, as well as participation in industry plans, including plans pursuant to Rule 17d–2 under the Exchange Act.

In conclusion, for the reasons discussed above, IEX believes that the proposed rule change is consistent with the investor protection and public interest purposes of Section 6 of the Act. Additionally, IEX believes that establishing a new options market that participates in all the current (and any future) national market system plans governing options trading is consistent with Section 11A of the Act relating to the establishment of the national market system for securities.[205] As proposed, IEX Options will offer a simple alternative to existing options exchanges that is designed to support competitive

quoting to the benefit of all market participants.

*B. Self-Regulatory Organization's Statement on Burden on Competition*

The Exchange does not believe that the proposed rule change will result in any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act. To the contrary, the proposed rule change is designed to enhance competition by providing for an additional exchange market for the trading of listed options.

IEX believes that this proposal will enhance competition by allowing the Exchange to leverage its existing robust technology platform to provide a resilient, deterministic, and transparent execution platform for options. The proposed rule change will insert an additional competitive dynamic to the options landscape by allowing the Exchange to compete with existing options exchanges and will promote further initiative and innovation among market centers and market participants.

Further, the Exchange does not believe that the latency mechanism or optional Market Maker quote parameter aspect of the proposed rule change will impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act. To the contrary, these features are designed to enhance IEX Option's competitiveness by incentivizing the entry of increased Market Maker liquidity.

The Exchange does not believe that the proposed rule change will impose any burden on intra-market competition because it will apply to all Options Members in the same manner and any Options Member can perform any specified function subject to meeting applicable requirements.

The Exchange also does not believe that the proposed latency mechanism will impose any burden on intra-market competition that is not necessary or appropriate because it will apply in the same manner to all incoming orders and quotes. Further, as noted in the Purpose section, the Exchange will determine the length of the latency mechanism with a view towards achieving a healthy balance between liquidity providers and liquidity takers.

The Exchange also does not believe that the proposed ORP will impose any burden on intra-market competition that is not necessary or appropriate because it will be available in the same manner to all Market Makers and any Options Member could become a Market Maker, subject to meeting applicable requirements. The ORP is designed to mitigate Market Makers' exposure to excessive risk and thereby enable them

to provide more competitive quotes to the benefit of all market participants. The Exchange also believes that limiting the ORP functionality to Market Makers will not impose any burden on intra-market competition that is not necessary and appropriate because Market Makers are subject to robust affirmative quoting obligations and thus can uniquely benefit from the protections to be provided by the ORP. The Exchange thus believes it is reasonable to provide Market Makers with an additional tool to manage their risk parameters, particularly given their unique and critical role in the listed options market and the obligations that Market Makers must satisfy. As discussed in the Purpose and Statutory Basis sections, the proposed ORP will protect resting market-maker quotes (which are subject to quoting obligations) from executions at potentially stale prices, which the Exchange believes will reduce their risk and encourage Market Makers to provide more competitive markets on the Exchange, thereby benefitting all market participants through additional execution opportunities at prices that reflect the then-current market conditions. The Exchange expects the proposed rule change to increase liquidity and enhance competition in the market because Market Makers may be able to quote more aggressively with added productions from exposure to execution risk, thereby remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest.

The Exchange also does not believe that the proposal will impose any burden on inter-market competition that is not necessary or appropriate. Competing exchanges are free to adopt similar functionality, subject to the Commission rule filing process.

*C. Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received From Members, Participants, or Others*

Written comments were neither solicited nor received.

**III. Date of Effectiveness of the Proposed Rule Change and Timing for Commission Action**

Within 45 days of the date of publication of the original notice in the **Federal Register** or within such longer period up to 90 days (i) as the Commission may designate if it finds such longer period to be appropriate and publishes its reasons for so finding or (ii) as to which the self-regulatory

---

[204] The Exchange further notes that other options exchanges specify various rule-based values by similar publication approaches, *see, e.g.,* NYSE Amex Rule 994NY (providing that the exposure period for its Broadcast Order Liquidity Delivery Mechanism is determined and released by the exchange); *see also* MIAX Rule 515(c)(1) (providing price protections where certain minimum price variations are determined by MIAX within a specified range and announced through regulatory circulars); *see also* Nasdaq Stock Market LLC Dynamic M–ELO algorithm (providing updates that include determining the holding period for impacted orders that are announced by trading alerts).

[205] 15 U.S.C. 78k–1.

organization consents, the Commission will:

(A) by order approve or disapprove the proposed rule change, or

(B) institute proceedings to determine whether the proposed rule change should be disapproved.[206]

## IV. Solicitation of Comments

Interested persons are invited to submit written data, views and arguments concerning Amendment No. 1, including whether the proposed rule change as modified by Amendment No. 1 is consistent with the Act. Comments may be submitted by any of the following methods:

*Electronic Comments*

• Use the Commission's internet comment form (*https://www.sec.gov/ rules/sro.shtml*); or

• Send an email to *rule-comments@ sec.gov.* Please include file number SR– IEX–2025–02 on the subject line.

*Paper Comments*

• Send paper comments in triplicate to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090.

All submissions should refer to file number SR–IEX–2025–02. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*https://www.sec.gov/ rules/sro.shtml*). Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549, on official business days between the hours of 10 a.m. and 3 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange. Do not include personal identifiable information in submissions; you should submit only information that you wish to make available

publicly. We may redact in part or withhold entirely from publication submitted material that is obscene or subject to copyright protection. All submissions should refer to file number SR–IEX–2025–02 and should be submitted on or before April 9, 2025.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[207]

**Vanessa A. Countryman,**

*Secretary.*

[FR Doc. 2025–04515 Filed 3–18–25; 8:45 am]

**BILLING CODE 8011–01–P**

---

## SECURITIES AND EXCHANGE COMMISSION

**[Release No. 34–102648; File No. SR– CboeBZX–2025–034]**

**Self-Regulatory Organizations; Cboe BZX Exchange, Inc.; Notice of Filing of a Proposed Rule Change To Amend Rule 19.3 To Permit the Listing of Options on Commodity-Based Trust Shares**

March 13, 2025.

Pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act"),[1] and Rule 19b–4 thereunder,[2] notice is hereby given that on March 5, 2025, Cboe BZX Exchange, Inc. (the "Exchange" or "BZX") filed with the Securities and Exchange Commission ("Commission") the proposed rule change as described in Items I, II, and III below, which Items have been prepared by the Exchange. The Commission is publishing this notice to solicit comments on the proposed rule change from interested persons.

## I. Self-Regulatory Organization's Statement of the Terms of Substance of the Proposed Rule Change

Cboe BZX Exchange, Inc. (the "Exchange" or "BZX Options") proposes to amend Rule 19.3 to permit the listing of options on Commodity-Based Trust Shares. The text of the proposed rule change is provided in Exhibit 5.

The text of the proposed rule change is also available on the Exchange's website (*http://markets.cboe.com/us/ equities/regulation/rule_filings/bzx/*), at the Exchange's Office of the Secretary, and at the Commission's Public Reference Room.

## II. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

In its filing with the Commission, the Exchange included statements concerning the purpose of and basis for the proposed rule change and discussed any comments it received on the proposed rule change. The text of these statements may be examined at the places specified in Item IV below. The Exchange has prepared summaries, set forth in sections A, B, and C below, of the most significant aspects of such statements.

*A. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change*

1. Purpose

The Exchange proposes to amend Rules 19.3 regarding the criteria for underlying securities. Specifically, the Exchange proposes to amend Rule 19.3(i) to allow the Exchange to list and trade options on Fund Shares [3] that

---

[206] *See* supra note 4 (designating April 21, 2025 as the date by which it should either approve, disapprove, or institute proceedings to determine whether to disapprove the proposed rule change).

[207] 17 CFR 200.30–3(a)(12).

[1] 15 U.S.C. 78s(b)(1).

[2] 17 CFR 240.19b–4.

[3] Rule 19.3(i) states that securities deemed appropriate for options trading shall include shares or other securities ("Fund Shares"), including but not limited to Partnership Units as defined in this Rule, that are principally traded on a national securities exchange and are defined as an "NMS stock" under Rule 600 of Regulation NMS, and that (1) represent interests in registered investment companies (or series thereof) organized as open-end management investment companies, unit investment trusts or similar entities, and that hold portfolios of securities comprising or otherwise based on or representing investments in indexes or portfolios of securities (or that hold securities in one or more other registered investment companies that themselves hold such portfolios of securities) ("Funds ") and/or financial instruments including, but not limited to, stock index futures contracts, options on futures, options on securities and indexes, equity caps, collars and floors, swap agreements, forward contracts, repurchase agreements and reverse repurchase agreements (the "Financial Instruments"), and money market instruments, including, but not limited to, U.S. government securities and repurchase agreements (the "Money Market Instruments") constituting or otherwise based on or representing an investment in an index or portfolio of securities and/or Financial Instruments and Money Market Instruments, or (2) represent commodity pool interests principally engaged, directly or indirectly, in holding and/or managing portfolios or baskets of securities, commodity futures contracts, options on commodity futures contracts, swaps, forward contracts and/or options on physical commodities and/or non-U.S. currency ("Commodity Pool ETFs") or (3) represent interests in a trust or similar entity that holds a specified non-U.S. currency or currencies deposited with the trust or similar entity when aggregated in some specified minimum number may be surrendered to the trust by the beneficial owner to receive the specified non-U.S. currency or currencies and pays the beneficial owner interest and other distributions on the deposited non-U.S. currency or currencies, if any, declared and paid by the trust ("Currency Trust Shares"), or (4) represent interests in the SPDR Gold Trust or are issued by the iShares COMEX Gold

# ADMINISTRATIVE RECORD REFERENCE NO. 4

*Friday, May 9, 2025, at 10 a.m. (Open)*

1. Remarks of the Chairwoman of the Board of Governors.
2. Remarks of the Postmaster General and CEO.
3. Approval of the Meeting Minutes.
4. Committee Reports.
5. Quarterly Financial Report.
6. Quarterly Service Performance Report.
7. Approval of Tentative Agenda for August 7 Open Meeting.

*General Counsel Certification:* The General Counsel of the United States Postal Service has certified that the meeting may be closed under the Government in the Sunshine Act.

**CONTACT PERSON FOR MORE INFORMATION:** Lucy C. Trout, Acting Secretary of the Board of Governors, U.S. Postal Service, 475 L'Enfant Plaza SW, Washington, DC 20260–1000. Telephone: (202) 268–4800.

**Lucy C. Trout,**
*Acting Secretary.*
[FR Doc. 2025–07307 Filed 4–23–25; 4:15 pm]
**BILLING CODE 7710–12–P**

---

# POSTAL SERVICE

## Sunshine Act Meetings

**TIME AND DATE:** Tuesday, April 22, 2025, at 5 p.m. EST.

**PLACE:** Washington, DC, at U.S. Postal Service Headquarters, 475 L'Enfant Plaza, SW.

**STATUS:** Closed.

**MATTERS CONSIDERED:** On April 22, 2025, the members of the Board of Governors of the United States Postal Service voted unanimously to hold and to close to public observation a special meeting in Washington, DC. The Board determined that no earlier public notice was practicable. The Board considered the below matters.

1. Administrative Matters.
2. Executive Session.
3. Personnel Matters.

*General Counsel Certification:* The General Counsel of the United States Postal Service has certified that the meeting may be closed under the Government in the Sunshine Act.

**CONTACT PERSON FOR MORE INFORMATION:** Lucy C. Trout, Acting Secretary of the Board of Governors, U.S. Postal Service, 475 L'Enfant Plaza SW, Washington, DC 20260–1000. Telephone: (202) 268–4800.

**Lucy C. Trout,**
*Acting Secretary.*
[FR Doc. 2025–07306 Filed 4–23–25; 4:15 pm]
**BILLING CODE 7710–12–P**

---

# SECURITIES AND EXCHANGE COMMISSION

**[Release No. 34–102895; File No. SR–IEX–2025–02]**

**Self-Regulatory Organizations; Investors Exchange LLC; Order Instituting Proceedings To Determine Whether To Approve or Disapprove a Proposed Rule Change, as Modified by Amendment No. 1, To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options**

April 21, 2025.

## I. Introduction

On January 10, 2025, the Investors Exchange LLC ("IEX" or "Exchange") filed with the Securities and Exchange Commission (the "Commission"), pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act")[1] and Rule 19b–4 thereunder,[2] a proposed rule change to adopt rules to govern the trading of options on IEX Options LLC ("IEX Options"), a new facility of the Exchange that would be established in a separate rule filing. The proposed rule change was published for comment in the **Federal Register** on January 21, 2025.[3] On March 6, 2025, pursuant to Section 19(b)(2)(A)(ii)(I) of the Act,[4] the Commission designated a longer period within which to approve the proposed rule change, disapprove the proposed rule change, or institute proceedings to determine whether to disapprove the proposed rule change.[5] On March 12, 2025, the Exchange filed Amendment No. 1 to the proposed rule change.[6] The proposed rule change as modified by Amendment No. 1 was published for comment in the **Federal Register** on March 19, 2025.[7] The Commission has received comments on the proposed rule change.[8] Pursuant to Section 19(b)(2)(B) of the Act,[9] the Commission is hereby instituting

proceedings to determine whether to approve or disapprove the proposed rule change, as modified by Amendment No. 1.

## II. Description of the Proposed Rule Change, as Modified by Amendment No. 1

The Exchange proposes to adopt rules in connection with its proposed launch of IEX Options, which would be "a fully automated trading system built on the core functionality of the Exchange's approved equities platform, and [operated] in a manner similar to that of other options exchanges" for the listing and trading of options issued by the Options Clearing Corporation.[10] As discussed in the proposal, as modified by Amendment No. 1, the Exchange proposes to operate IEX Options as a pro-rata options market with an access delay.[11] Specifically, IEX proposes "to utilize a de minimis delay on incoming order and quote messages designed to enable IEX to update its view of the market prior to processing orders and quotes" to support an optional Options Risk Parameter ("ORP") that would be "designed to protect [registered market makers on IEX] from excessive risk due to execution of stale quotes. . . ."[12]

With the notable exception of the novel options access delay and ORP, the proposed rules for IEX Options are similar to the rules of other options exchanges.[13] The Exchange's rules applicable to the IEX equities market contained in Chapters 1 through 16 of its rulebook would apply to Options Members[14] unless a proposed rule in proposed Chapters 17 through 29,

---

[1] 15 U.S.C. 78s(b)(1).

[2] 17 CFR 240.19b–4.

[3] *See* Securities Exchange Act Release No. 102190 (Jan. 14, 2025), 90 FR 7205 ("Notice").

[4] 15 U.S.C. 78s(b)(2)(A)(ii)(I).

[5] *See* Securities Exchange Act Release No. 102536, 90 FR 11866 (Mar. 12, 2025). The Commission designated April 21, 2025, as the date by which the Commission shall approve or disapprove, or institute proceedings to determine whether to disapprove, the proposed rule change.

[6] Amendment No. 1 is available on the Commission's website at: *https://www.sec.gov/comments/sr-iex-2025-02/sriex202502-580115-1667463.pdf.*

[7] *See* Securities Exchange Act Release No. 102663 (Mar. 13, 2025), 90 FR 12890 ("Amendment No. 1").

[8] Comments on the proposed rule change are available at *https://www.sec.gov/comments/sr-iex-2025-02/sriex202502.htm.*

[9] 15 U.S.C. 78s(b)(2)(B).

[10] Amendment No. 1, *supra* note 7, at 12891.

[11] *See id.* at 12891–92.

[12] *Id.* at 12891.

[13] Specifically, the proposed rules for IEX Options are substantially similar or substantively identical to rules of MEMX LLC ("MEMX Options"), Cboe Exchange, Inc. ("Cboe"), Miami International Securities Exchange, LLC ("MIAX"), NYSE American LLC ("NYSE Amex") and NYSE Arca, Inc. ("NYSE Arca") options exchanges, with material differences discussed in Amendment No. 1. When the Exchange describes in its proposal a proposed rule as being "substantively identical" to a rule of another exchange, the Exchange states that means that the substance of the proposed IEX Options rule is identical to the referenced rule of the other exchange, with differences only to reflect terminology and numbering. *See id.* at n. 14. When it describes a proposed rule as "substantially similar" to a rule of another exchange, the proposal describes the relevant differences. *See id.*

[14] IEX proposes to define an "Options Member" as "a firm, or organization that is registered with the Exchange pursuant to Chapter 18 of [the Exchange's] Rules for purposes of participating in options trading on IEX Options as an Options Order Entry Firm, Options Market Maker, or Clearing Member." Proposed Rule 17.100 (defining "Options Member").

applicable to the IEX Options market, applies.[15]

## Chapters 17 Through 21

The Exchange proposes to define relevant terms in proposed Rule 17.100, all of which are substantially similar to definitions included in MEMX Options Rule 16.1.[16] The Exchange proposes to set forth rules governing participation on IEX Options in Chapter 18, which are substantially similar to rules of MEMX Options and Cboe.[17] In addition, the Exchange proposes to adopt rules in Chapter 19 regarding business conduct that are substantively identical to MEMX Options rules and MIAX rules,[18] rules in Chapter 20 regarding listing standards for options traded on IEX Options that are substantively identical to MEMX Options rules,[19] and rules in Chapter 21 regarding halts, unusual market conditions, extraordinary market volatility, obvious errors, audit trails, and rules regarding prohibited and permissible transfers of options positions off the Exchange that are substantially similar to MEMX Options rules.[20]

## Chapter 22—Trading System

The Exchange proposes to adopt rules in Chapter 22 regarding IEX Options' trading system that are substantially similar or substantively identical to rules from MEMX Options, NYSE Arca, and Cboe, with material differences discussed in the proposal, as modified by Amendment No. 1.[21]

*Latency Mechanism.* Notably, the Exchange proposes a de minimis hardware-based latency mechanism of 350 microseconds that would be added to each incoming order and quote message as set forth in proposed Rule 22.100(n).[22] This latency mechanism is designed to allow the Exchange to "update its view of the market prior to processing orders and quotes" and to perform a quote instability calculation for the ORP using that current market data.[23]

*Order Priority.* IEX Options would have a pro-rata allocation model with execution priority dependent on the size and capacity of an order.[24] Resting quotes and orders would be prioritized according to price, after which contracts would be allocated proportionally according to size (in a pro-rata fashion), rounded down to the nearest whole contract.[25] Residual options contracts would be filled one at a time based on price-size-time priority.[26]

The Exchange also proposes to support priority overlays discussed in proposed Rule 22.170(f),[27] including Priority Customer priority.[28] The Specialist Participation Entitlement overlay would provide a Specialist with priority over interest from other non-Priority Customers for a certain percentage of contracts allocated at the same price (entitling Specialists to a 60% allocation if there is one other non-Priority Customer at the National Best Bid or National Best Offer ("NBBO") or 40% if there are two or more other non-Priority Customers at the NBBO[29]) when quoting at the NBBO.[30] The Directed Market Maker Participation Entitlement overlay[31] would provide a Directed Market Maker with priority over interest from other non-Priority Customers for a certain percentage of contracts allocated at the same price (entitling the Directed Market Maker to a 60% allocation if there is one other non-Priority Customer at the NBBO or 40% if there are two or more other non-Priority Customers at the NBBO) when quoting at the NBBO. The Small-Size Order Entitlement overlay[32] would provide a Specialist quoting at the NBBO with priority to execute against the entire size of an order or quote of five or fewer contracts that does not first execute against any Priority Customer orders at that price, subject to certain conditions.[33]

## Chapter 23—Market Participants

Chapter 23 would govern registration and obligations of market participants and includes rules that are substantially similar or substantively identical to rules from MIAX, NYSE Amex, MEMX Options, and Cboe, with the notable exception of the proposed ORP.[34]

An Options Member would be able to apply to register with the Exchange as an Options market maker ("Market Maker" or "Options Market Maker") for the purpose of making transactions as a dealer-specialist.[35] Options Market Makers would be eligible to participate on IEX Options as a Registered Market Maker or Specialist.[36] Among other things, a Registered Market Maker must provide continuous two-sided quotations throughout the trading day in its appointed classes for 60% of the time the Exchange is open for trading in the issue,[37] while a Specialist must provide continuous two-sided quotations throughout the trading day in its appointed classes for 90% of the time the Exchange is open for trading in each issue,[38] provided in both instances that the options classes have a time to expiration of less than nine months.[39] Specialists would be subject to obligations in addition to those applicable to Registered Market Makers.[40] Both Specialists and Registered Market Makers could also participate as Directed Market Makers. Directed Market Makers would be subject to enhanced quoting obligations compared to Registered Market Makers.[41]

*Options Risk Parameter.* The Exchange proposes to offer a novel options access delay and the ORP as an optional risk parameter that would

---

[15] *See, e.g.,* Exchange Rules 2.160 and 2.220.

[16] *See, e.g.,* Amendment No. 1, *supra* note 7, at 12894–96.

[17] *See* Amendment No. 1, *supra* note 7, at 12892.

[18] *See id.* at 12906.

[19] *See id.* at 12905–06.

[20] *See id.* at 12907.

[21] *See id.* starting at 12897.

[22] *See id.* at 12897. The Exchange will subject incoming order and quote messages to a de minimis delay using coiled optical fiber. *See* proposed Rule 11.510(a). *See also* Amendment No. 1, *supra* note 7, at 12897, n. 66.

[23] *See* Amendment No. 1, *supra* note 7, at 12897. *See also infra* notes 45–49 and accompanying text for a discussion of the quote instability calculation.

[24] *See* Amendment No. 1, *supra* note 7, at 12897. The proposed pro-rata model is similar to the MIAX and NYSE Amex options exchanges. *See id.*

[25] *See id.* at 12900.

[26] *See id.*

[27] Proposed Rule 22.170(f) is substantially similar to Cboe Rule 5.32(a)(2), except that, unlike Cboe, in the event that a Small-Size order is directed to a Specialist, the IEX Options trading system would apply the Small-Size Order Entitlement to the order and not the Directed Order guarantee, meaning the Specialist will have priority to execute against the entire size of the order that does not execute against any Priority Customer orders at that price. *See id.* at 12900, n. 96.

[28] *See* Amendment No. 1, *supra* note 7, at 12900.

[29] These allocation entitlements are based on MIAX Rule 514(h)(1), after accounting for the additional priorities afforded market makers on MIAX, as set forth in MIAX Rule 514(e).

[30] *See* proposed Rule 22.170(f)(2). This overlay may only be in effect if the Priority Customer overlay is also in effect. *See* proposed Rule 22.170(f).

[31] *See* proposed Rule 22.170(f)(2). This overlay may only be in effect if the Priority Customer overlay is also in effect. *See* proposed Rule 22.170(f).

[32] *See* proposed Rule 22.170(f)(3).

[33] *See* proposed Rule 22.170(f)(3)(A).

[34] *See generally* Amendment No. 1, *supra* note 7, at 12903–05.

[35] *See* proposed Rule 23.100(a) and proposed Rule 17.100 (defining "Market Makers (and Options Market Makers)" as referring collectively to Options Members registered as either a Registered Market Maker or as a Specialist).

[36] *See* Amendment No. 1, *supra* note 7, at 12892.

[37] *See* proposed Rule 23.150(e)(2)(A).

[38] *See* proposed Rule 23.150(e)(1)(A).

[39] *See* proposed Rule 23.150, Supplementary Material .01 and Amendment No. 1, *supra* note 7, at 12893.

[40] *See* Amendment No. 1, *supra* note 7, at 12892–92.

[41] *See id.* at 12892, n. 20. While a Registered Market Maker must provide continuous two-sided quotations through the trading day in its appointed issues for 60% of the time the Exchange is open for trading in each issue, a Directed Market Maker would be required to provide continuous two-sided quotations throughout the trading day in issues for which it receives Directed Orders for 90% of the time the Exchange is open for trading in each issue.

supplement the standard risk tools available to Options Market Makers.[42] The Exchange would offer the ORP on a class-by-class basis, which "would enable the Exchange to utilize the ORP for classes with a high potential for adverse selection, while excluding classes presenting lower risk of adverse selection (such as classes with relatively lower volumes)."[43] According to IEX, "the ORP is designed to enable Market Makers to provide tighter and deeper quotes on IEX by providing protection from execution against stale quotes by identifying when the best Protected Bid or best Protected Offer of the Away Markets (as defined in Proposed Rule 22.160(a)(8)) in a particular options series is sufficiently dislocated from the price of the underlying security to indicate that the best Protected Bid or best Protected Offer of the Away Markets in the options series is likely in transition."[44]

The ORP would be informed by the Options Quote Indicator ("Indicator") based on the Black-Scholes options pricing model, which would "assess the probability of an imminent change to the current best Protected Bid of the Away Markets to a lower price or of an imminent change to the current best Protected Offer of the Away Markets to a higher price for a particular listed options series (i.e., an imminent adverse price change)."[45] To perform this assessment, the Indicator would use both real time relative quoting activity of protected quotations from eleven exchanges[46] and a proprietary quote instability calculation.[47]

According to the Exchange, when the quote instability calculation "identifies an imminent adverse price change to the best Protected Bid and/or best Protected Offer of the Away Markets in a particular listed options series, it will generate a quote instability determination" that "may only be generated at least 200 microseconds after a prior quote instability determination for a particular options series on the same side of the market (i.e., affecting resting bids or offers)."[48] Further, "[i]f a quote instability determination is generated for an options series quoted by a Market Maker and the quote is above (below) the price level of the quote instability determination, the quote will be either cancelled or repriced to the price level

of the quote instability determination, as instructed by the Market Maker" in advance on its quote.[49]

The Exchange proposes to periodically determine three aspects of the Indicator's formula—the frequency of calculation of implied volatility,[50] the quote instability threshold,[51] and the delta bound band that would determine which series are eligible for the ORP.[52] When determining the first two of these factors, the Exchange states that it would consider "the distribution of quote instability determinations, the precision of quote instability determinations, system capacity and performance, and client feedback."[53] The Exchange also would consider "attributes like fill rates (resting and taking)[54] and markout data,[55] as well as other factors it determines are relevant based on operational experience in order to optimize how both variables are set" once the IEX Options trading system begins operating.[56] Any changes to the quote instability threshold and the implied volatility calculation frequency would be communicated by Trading Alert with at least 30 days' notice.[57] In addition, the Exchange proposes to periodically determine within a range of 0 to 1, and announce

---

[49] Id.

[50] See proposed IEX Rule 23.150(h)(1), Supplementary Material .05.

[51] See proposed IEX Rule 23.150(h)(1), Supplementary Material .04(2)(e). The quote instability threshold would be within a range of 0–1. For example, a quote instability threshold of 1 would indicate that the expected price change in the option resulting from price movement in the underlying would be 100% of the current price of the option. See Amendment No. 1, supra note 7, at 12904.

[52] See proposed IEX Rule 23.150(h), Supplementary Material .04(1)(q). The delta bound band would be within a range of 0–1. See Amendment No. 1, supra note 7, at 12905.

[53] Amendment No. 1, supra note 7, at 12904.

[54] The Exchange states that "[f]ill rate data measures the degree to which incoming orders are able to execute against a resting order on a venue and are a measure of the percent of shares of an order that are filled (or executed) by such venue, adjusting for factors such as the size of the order compared to the size of a venue's displayed quote." Id. at n. 146.

[55] The Exchange states that "[m]arkouts measure the direction and degree to which the market moved after an execution, and are often measured as the difference between the execution price and the midpoint of the NBBO at various time intervals after a trade. Markouts are typically used as a way to measure the 'quality' of a trade. In particular, short-term markouts of several milliseconds after the time of execution, are often used to assess whether an order was subject to 'adverse selection' that can occur when a liquidity providing order is executed at a price that was about to become stale as a result of certain speed-based trading strategies." Id. at n. 147.

[56] Id. at 12904.

[57] See id.

by Trading Alert, the delta bound band.[58]

*Chapters 24 Through 29*

The Exchange proposes to adopt several chapters of rules that are substantively identical to MEMX Options rules, including Chapter 24 regarding exercises and deliveries,[59] Chapter 25 regarding records, reports, and audits,[60] Chapter 26 regarding discipline and summary suspension,[61] Chapter 27 regarding doing business with the public,[62] Chapter 28 regarding options order protection and locked and crossed markets[63] and Chapter 29 regarding margin requirements.[64]

### III. Proceedings To Determine Whether To Approve or Disapprove the Proposed Rule Change

The Commission hereby institutes proceedings pursuant to Section 19(b)(2)(B) of the Act[65] to determine whether the Exchange's proposed rule change, as modified by Amendment No. 1, should be approved or disapproved. Institution of proceedings does not indicate that the Commission has reached any conclusions with respect to any of the issues involved. Rather, the Commission seeks and encourages interested persons to provide additional comment on the proposed rule change to inform the Commission's analysis of whether to approve or disapprove the proposed rule change.

Pursuant to Section 19(b)(2)(B) of the Act,[66] the Commission is providing notice of the grounds for possible disapproval under consideration:

• Whether the Exchange has demonstrated how its proposal is consistent with Section 6(b)(5) of the Act,[67] which requires that the rules of a national securities exchange be designed, among other things, to promote just and equitable principles of trade, to remove impediments to and

---

[58] See proposed IEX Rule 23.150(h), Supplementary Material .04(1)(q). See also Amendment No. 1, supra note 7, at 12905, n. 150.

[59] See Amendment No. 1, supra note 7, at 12906.

[60] See id.

[61] See id.

[62] See id.

[63] See id.

[64] See id.

[65] 15 U.S.C. 78s(b)(2)(B).

[66] 15 U.S.C. 78s(b)(2)(B). Section 19(b)(2)(B) of the Act also provides that proceedings to determine whether to disapprove a proposed rule change must be concluded within 180 days of the date of publication of notice of the filing of the proposed rule change. See id. The time for conclusion of the proceedings may be extended for up to 60 days if the Commission finds good cause for such extension and publishes its reasons for so finding, or if the exchange consents to the longer period. See id.

[67] 15 U.S.C. 78f(b)(5).

---

[42] See Amendment No. 1, supra note 7, at 12903.

[43] Id.

[44] Id.

[45] Id. at 12903–04.

[46] IEX refers to these exchanges as "Signal Exchanges." See IEX Rule 11.190(g).

[47] See Amendment No. 1, supra note 7, at 12904.

[48] Id.

perfect the mechanism of a free and open market and a national market system and, in general, to protect investors and the public interest, and not be designed to permit unfair discrimination between customers, issuers, brokers, or dealers;

• Whether the Exchange has demonstrated how its proposal is consistent with Section 6(b)(8) of the Act,[68] which requires that the rules of a national securities exchange not impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act; and

• Whether the Exchange has demonstrated how its proposal is consistent with Section 19(b) of the Act,[69] which requires, among other things that each self-regulatory organization file with the Commission copies of any proposed rule or any proposed change in, addition to, or deletion from the rules of such self-regulatory organization accompanied by a concise general statement of the basis and purpose of such proposed rule change.

Of particular note, and as described above, the Exchange proposes to offer the ORP as an optional risk parameter that would supplement the standard risk tools available to Options Market Makers. The Exchange describes the ORP as "a narrowly-tailored approach designed to appropriately balance the risks faced by market makers with the legitimate objectives of liquidity takers by providing additional optional risk protection to market makers and thereby encourage aggressive quoting."[70] The expected frequency with which the ORP would cancel or reprice an NBBO quote on IEX is unclear and difficult to assess, and the proposal does not yet provide any such estimate. Accordingly, the characterization of ORP as a "narrowly-tailored approach" merits further consideration as it is unclear how often the ORP would be expected to cancel or change quotes. Additional information about the ORP's operation can help inform whether the ORP would contribute to fair and orderly markets and remove impediments to and perfect the mechanism of a free and open market and a national market system.

As discussed above, the Exchange also proposes to give itself discretion in its rules to change the values of three components of the Indicator formula through Trading Alerts: (1) the quote instability threshold,[71] (2) the measuring period for calculating implied volatility,[72] and (3) the delta bound band.[73] Both the quote instability threshold and the delta bound band would be periodically determined by the Exchange and set at a value within a range of 0 to 1.[74] The measuring period for calculating implied volatility would be a half-hour, though the Exchange could to pick a different, shorter time-frame. The initial values selected by the Exchange for these components would not be codified in the Exchange's proposed rule text, and changes made to these values would not be filed with the Commission as proposed rule changes. Instead, the changes would be communicated by a Trading Alert.[75] Nevertheless, the Exchange states that the proposed latency mechanism is "fully disclosed and codified in a written rule of the exchange that has become effective pursuant to Section 19 of the Act"[76] and that the proposed ORP "is based on a transparent formula specified in IEX's rules and related Trading Alerts."[77] How those components are periodically evaluated and communicated publicly merits further consideration.[78]

Under the Commission's Rules of Practice, the "burden to demonstrate that a proposed rule change is consistent with the [Act] and the rules and regulations issued thereunder . . . is on the [SRO] that proposed the rule change."[79] The description of a proposed rule change, its purpose and operation, its effect, and a legal analysis of its consistency with applicable requirements must all be sufficiently detailed and specific to support an affirmative Commission finding,[80] and any failure of an SRO to provide this information may result in the Commission not having a sufficient basis to make an affirmative finding that a proposed rule change is consistent with the Act and the applicable rules and regulations.[81]

The Commission is instituting proceedings to allow for additional consideration and comment on the issues raised herein, including as to whether the proposal is consistent with the Act.[82]

## IV. Commission's Solicitation of Comments

The Commission requests written views, data, and arguments with respect to the concerns identified above as well as any other relevant concerns. Such comments should be submitted by May 16, 2025. Rebuttal comments should be submitted by May 30, 2025. Although there do not appear to be any issues relevant to approval or disapproval that would be facilitated by an oral presentation of views, data, and arguments, the Commission will consider, pursuant to Rule 19b–4, any request for an opportunity to make an oral presentation.[83]

The Commission asks that commenters address the sufficiency and merit of the Exchange's statements in support of the proposal, in addition to any other comments they may wish to submit about the proposed rule change.

Interested persons are invited to submit written data, views and arguments concerning the foregoing, including whether the proposed rule change is consistent with the Act. Comments may be submitted by any of the following methods:

*Electronic Comments*

• Use the Commission's internet comment form (*https://www.sec.gov/rules/sro.shtml*); or
• Send an email to *rule-comments@sec.gov*. Please include file number SR–IEX–2025–02 on the subject line.

*Paper Comments*

• Send paper comments in triplicate to Secretary, Securities and Exchange

---

[68] 15 U.S.C. 78f(b)(8).

[69] 15 U.S.C. 78s(b)(1).

[70] Amendment No. 1, *supra* note 7, at 12912.

[71] *See* proposed IEX Rule 23.150(h)(1), Supplementary Material .04(2)(e).

[72] *See* proposed IEX Rule 23.150(h)(1), Supplementary Material .05. As discussed above, the Exchange has proposed to calculate implied volatility for all options series with the same underlying whenever it receives an update to the best Protected Bid or best Protected Offer of the Signal Exchanges for the underlying security. The Exchange would perform this calculation "[u]pon the first such update of each half-hour of system operation (or such shorter time-frame as communicated by Trading Alert with at least 30 days prior notice)." *See* proposed IEX Rule 23.150(h)(1) Supplementary Material .05.

[73] *See* proposed IEX Rule 23.150(h)(1), Supplementary Material .04(1)(q).

[74] *See* proposed IEX Rule 23.150(h)(1), Supplementary Material .04(1)(q), .04(2)(e).

[75] Unlike the changes to the quote instability threshold and the measuring period for calculating implied volatility, which both require at least 30 days of notice, the Exchange did not propose a fixed advance notice period for changes to the delta bound band.

[76] Amendment No. 1, *supra* note 7, at 12910.

[77] *Id.* at 12911.

[78] 15 U.S.C. 78s(b)(1).

[79] 17 CFR 201.700(b)(3).

[80] *See id.*

[81] *See id.*

[82] *See* 15 U.S.C. 78f(b)(5) and (8).

[83] 15 U.S.C. 78s(b)(2). Section 19(b)(2) of the Act grants the Commission flexibility to determine what type of proceeding—either oral or notice and opportunity for written comments—is appropriate for consideration of a particular proposal by an SRO. *See* Securities Acts Amendments of 1975, Report of the Senate Committee on Banking, Housing and Urban Affairs to Accompany S. 249, S. Rep. No. 75, 94th Cong., 1st Sess. 30 (1975).

Commission, 100 F Street NE, Washington, DC 20549–1090.

All submissions should refer to file number SR–IEX–2025–02. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*https://www.sec.gov/rules/sro.shtml*). Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549, on official business days between the hours of 10 a.m. and 3 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange. Do not include personal identifiable information in submissions; you should submit only information that you wish to make available publicly. We may redact in part or withhold entirely from publication submitted material that is obscene or subject to copyright protection. All submissions should refer to file number SR–IEX–2025–02 and should be submitted on or before May 16, 2025.

Rebuttal comments should be submitted by May 30, 2025.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[84]

**Sherry R. Haywood,**
*Assistant Secretary.*
[FR Doc. 2025–07105 Filed 4–24–25; 8:45 am]
**BILLING CODE 8011–01–P**

---

[84] 17 CFR 200.30–3(a)(57).

## SECURITIES AND EXCHANGE COMMISSION

**[Release No. 34–102892; File No. SR–CboeBZX–2025–053]**

**Self-Regulatory Organizations; Cboe BZX Exchange, Inc.; Notice of Filing of a Proposed Rule Change To List and Trade Shares of the Canary SUI ETF Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares**

April 21, 2025.

Pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 (the "Act"),[1] and Rule 19b–4 thereunder,[2] notice is hereby given that on April 8, 2025, Cboe BZX Exchange, Inc. (the "Exchange" or "BZX") filed with the Securities and Exchange Commission (the "Commission") the proposed rule change as described in Items I, II, and III below, which Items have been prepared by the Exchange. The Commission is publishing this notice to solicit comments on the proposed rule change from interested persons.

### I. Self-Regulatory Organization's Statement of the Terms of Substance of the Proposed Rule Change

Cboe BZX Exchange, Inc. ("BZX" or the "Exchange") is filing with the Securities and Exchange Commission ("Commission" or "SEC") a proposed rule change to list and trade shares of the Canary SUI ETF (the "Trust"),[3] under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares.

The text of the proposed rule change is also available on the Exchange's website (*http://markets.cboe.com/us/equities/regulation/rule_filings/bzx/*), at the Exchange's Office of the Secretary, and at the Commission's Public Reference Room.

### II. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

In its filing with the Commission, the Exchange included statements concerning the purpose of and basis for the proposed rule change and discussed any comments it received on the proposed rule change. The text of these statements may be examined at the places specified in Item IV below. The Exchange has prepared summaries, set forth in sections A, B, and C below, of the most significant aspects of such statements.

---

[1] 15 U.S.C. 78s(b)(1).
[2] 17 CFR 240.19b–4.
[3] The Trust was formed as a Delaware statutory trust on February 27, 2025, and is operated as a C corporation. The Trust has no fixed termination date.

### A. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

1. Purpose

The Exchange proposes to list and trade the Shares under BZX Rule 14.11(e)(4),[4] which governs the listing and trading of Commodity-Based Trust Shares on the Exchange.[5] Canary Capital Group LLC is the sponsor of the Trust (the "Sponsor"). The Shares will be registered with the Commission by means of the Trust's registration statement on Form S–1 (the "Registration Statement").[6] According to the Registration Statement, the Trust is neither an investment company registered under the Investment Company Act of 1940, as amended,[7] nor a commodity pool for purposes of the Commodity Exchange Act ("CEA"), and neither the Trust nor the Sponsor is subject to regulation as a commodity pool operator or a commodity trading adviser in connection with the Shares.

Since 2017, the Commission has approved or disapproved exchange filings to list and trade series of Trust Issued Receipts, including spot-based Commodity-Based Trust Shares, on the basis of whether the listing exchange has in place a comprehensive surveillance sharing agreement with a regulated market of significant size related to the underlying commodity to be held (the "Winklevoss Test").[8] The

---

[4] The Commission approved BZX Rule 14.11(e)(4) in Securities Exchange Act Release No. 65225 (August 30, 2011), 76 FR 55148 (September 6, 2011) (SR–BATS–2011–018).

[5] Any of the statements or representations regarding the index composition, the description of the portfolio or reference assets, limitations on portfolio holdings or reference assets, dissemination and availability of index, reference asset, and intraday indicative values, or the applicability of Exchange listing rules specified in this filing to list a series of Other Securities (collectively, "Continued Listing Representations") shall constitute continued listing requirements for the Shares listed on the Exchange.

[6] *See* the Registration Statement on Form S–1, dated March 17, 2025, submitted by the Sponsor on behalf of the Trust. The descriptions of the Trust, the Shares, and the Pricing Benchmark (as defined below) contained herein are based, in part, on information in the Registration Statement. The Registration Statement is not yet effective, and the Shares will not trade on the Exchange until such time that the Registration Statement is effective.

[7] 15 U.S.C. 80a–1.

[8] *See* Securities Exchange Act Release Nos. 78262 (July 8, 2016), 81 FR 78262 (July 14. 2016) (the "Winklevoss Proposal"). The Winklevoss Proposal was the first exchange rule filing proposing to list and trade shares of an ETP that would hold spot bitcoin (a "Spot Bitcoin ETP"). It was subsequently disapproved by the Commission. *See* Securities Exchange Act Release No. 83723 (July 26, 2018), 83 FR 37579 (August 1, 2018) (the "Winklevoss Order"); 99306 (January 10, 2024), 89 FR 3008 (January 17, 2024) (Self-Regulatory Organizations;

# ADMINISTRATIVE RECORD REFERENCE NO. 9



May 14, 2025

*Submitted electronically*

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-1090

Re:    Securities Exchange Act Release No. 34-102895 (SR-IEX-2025-02)

Dear Ms. Countryman:

MEMX LLC ("MEMX") appreciates the opportunity to provide comments to the U.S. Securities and Exchange Commission ("Commission") on the above-referenced proposed rule change filed by the Investors Exchange, LLC ("IEX").  As described in IEX's filing, the proposed rule change would introduce a new equity options platform ("IEX Options") that incorporates certain controversial features similar to those used on its equities exchange. These include a 350-microsecond speed bump and an Options Risk Parameter ("ORP") that would prevent the execution of incoming orders against displayed and protected quotations in certain circumstances. The introduction of these "maybe quotations" – i.e., purportedly firm protected quotations subject to quote fading based on logic implemented within the exchange's matching infrastructure – would be a significant development for the U.S. options market and one that the Commission must approach with appropriate skepticism.

1

As the Commission states in the Order Instituting Proceedings, "[t]he expected frequency with which the ORP would cancel or reprice an NBBO quote is unclear and difficult to assess, and the proposal does not yet provide any such estimate."[1] The Commission goes on to state that "[a]ccordingly, the characterization of ORP as a 'narrowly-tailored approach' merits further consideration."[2] MEMX agrees. IEX's filing would introduce a novel exchange with no data whatsoever that would allow the Commission to evaluate whether its purportedly firm quotations would in fact be firm.[3] This has serious implications for U.S. options market structure as these "maybe quotations" would be subject to the provisions of the Options Order Protection and Locked/Crossed Markets Plan.[4] In effect, IEX is asking the Commission to approve a platform that would display protected quotes that market participants are required to access without providing any information whatsoever that would allow the Commission to determine that those protected quotations represent firm quotations and not mere indications of interest that may or may not be accessible.

This would have a material impact on market participants that would be required to route to protected quotations displayed by IEX Options irrespective of whether their orders

---

[1]    See Securities Exchange Act Release No. 102895 (April 21, 2025), 90 FR 17474, 17477 (April 25, 2025) (SR-IEX-2025-02) (Order Instituting Proceedings).

[2]    Id.

[3]    As the Commission notes in the Order Instituting Proceedings, the "burden to demonstrate that a proposed rule change is consistent with the [Act] and the rules and regulations issued thereunder . . . is on the [SRO] that proposed the rule change." Id.

[4]    See Options Order Protection and Locked/Crossed Markets Plan, *available at* https://www.theocc.com/getmedia/7fc629d9-4e54-4b99-9f11-c0e4db1a2266/options_order_protection_plan.pdf.

2

are likely to be filled at those displayed prices. That is, if IEX Options is successful in attracting quotes displayed at the national best bid or offer ("NBBO"), market participants would have to route their marketable orders there regardless of whether the likelihood of obtaining a fill at that price is 99%, 50%, 25%, or even 10% or less. And, unlike prior filings submitted by IEX with respect to its equities trading platform, IEX has offered not one iota of data that would allow a meaningful assessment of the impact of the ORP on fill rates.

For this same reason, the ORP mechanism would also have significant implications for competing exchanges as firms are forced to direct their orders to IEX Options when better execution opportunities may in fact exist on other exchanges. If fill rates on IEX Options are low, market participants may rationally prefer a higher likelihood of obtaining a fill on another exchange even if it means missing out on some probabilistic opportunity of obtaining a slightly better price. However, under the Options Order Protection and Locked/Crossed Markets Plan, if IEX Options quotes are considered "firm," market participants would not be able to make this choice and instead would have to route their orders to IEX Options.[5]

In effect, ORP would serve as an opaque and unquantified incentive for market makers quoting on IEX Options. It's therefore unsurprising that IEX claims that such market makers may be able to quote more aggressively if its filing is approved by the Commission. However, what IEX fails to mention is that unlike risk controls offered by other options

---

[5]     Id. The Options Order Protection and Locked/Crossed Markets Plan includes an exception for quotations that are deemed "non-firm." See Section 5(b)(vii). We understand from IEX's filing that the exchange expects that IEX Options quotations would be considered "firm" for the purposes of this exception.

exchanges, this inducement is actually paid for by market participants seeking liquidity who will have to route to these "better prices" whether they reflect real opportunities to trade or not. If market makers are assured that their IEX Options quotations will only execute when posted at favorable prices (based on IEX Options' Black Scholes calculation and its view of underlying security prices, aided by the operation of the speed bump) then the ORP may very well "encourage aggressive quoting."[6] However, the value of those quotes to the marketplace is entirely dependent on the likelihood of receiving a fill at those prices. That is, a displayed quote is only valuable if market participants can actually trade at the displayed price.

When routing customer orders, broker-dealer best execution obligations require firms to consider a range of factors, including the "accessibility of the quotation."[7] These rules serve to protect investors and enhance investor confidence in our capital markets. Allowing IEX Options to display inaccessible protected quotations would override these critical investor protections based solely on the "self-serving views of the regulated entit[y]"[8] rather than a fulsome assessment of the tradeoff between the opportunity for price improvement and the likelihood of obtaining a fill. This may harm investor confidence

---

[6] See Securities Exchange Act Release No. 102663 (March 13, 2025), 90 FR 12890, 12911 (March 19, 2025) (SR-IEX-2025-02) (Amendment #1).

[7] See FINRA Rule 5310(a)(1)(D). In conducting best execution reviews, broker-dealers are also required to consider, among other factors, the availability of "price improvement opportunities." See Supplementary Material .09(b)(1) to FINRA Rule 5310. These factors are interconnected as firms must often consider the tradeoff between the potential for price improvement and the probability of obtaining a fill.

[8] See *Susquehanna v. SEC,* 866 F.3d 442 (D.C. Cir. 2017).

4

regardless of whether IEX Options quotations may sometimes provide a small amount of price improvement relative to firm quotations displayed by competing exchanges.

No matter how aggressively priced IEX Options' quotations may ultimately be, allowing IEX to degrade the quality of published quotations by displaying liquidity that may or may not be accessible is unlikely to be the boon to the U.S. options market that IEX claims. The rest of the market should not have to participate in this experiment. And an experiment it undoubtedly is. While IEX's filing repeatedly asserts that the ORP is "narrowly tailored" to the risk that market makers face when quote changes in the underlying security render their displayed options quotations stale, it has not backed up that assertion with any data.

In fact, IEX's filing suggests that the exchange may not itself know how ORP would operate in practice. This appears to be why several key parameters used in the ORP calculation are not provided in the filing. These parameters would instead be set by IEX at a later date and communicated to members in a separate Trading Alert that is not subject to Commission review and approval.[9] Consider the "quote instability threshold" and "delta bound band." Both parameters directly impact how frequently IEX Options would make a quote instability determination. However, IEX has simply stated that it would determine the actual production values for those parameters within a range of 0 – 1. Yet, based on the limited information communicated in IEX's filing, the difference between a 0 and 1 appears

---

[9]     The lack of Commission review and approval is significant. As filed, even if IEX were to supply the Commission with data about the expected frequency of quote fading on IEX Options, the filing would give IEX carte blanche to modify such parameters in a way that could render any such analysis immediately stale.

to be the difference between always making a quote instability determination and never doing so.[10] This is akin to advertising tailored shirts with a disclaimer that actual sizes will vary within a range between XS and XXL at the discretion of the tailor.

U.S. options exchanges compete vigorously on the basis of quote quality. And risk management certainly plays an important role in ensuring high quality quotations. In fact, it is for this very reason that MEMX introduced innovative new active risk controls when we launched our U.S. options exchange in September 2023. However, the ORP is a risk control in name only. MEMX is concerned that the ORP would litter the national market system with "maybe quotations" that are not truly accessible but that would require firms to move order flow to IEX Options to satisfy regulatory obligations. While this may be good for IEX's business, it would have material negative implications for both market participants and competing exchanges. For this reason, the proposed rule change should be disapproved.

Sincerely,

/s/ Adrian Griffiths

Adrian Griffiths
Head of Market Structure

---

[10]    For example, IEX states in Amendment #1 that "[t]he quote instability threshold... operates as a measure of whether the value of the quote instability determination price change is sufficiently meaningful to warrant generation of a quote instability determination." Id. However, in the immediately preceding sentence IEX explains that the accepted range of values for this threshold reflect "a scale from 0% to 100%." Id.

# ADMINISTRATIVE RECORD REFERENCE NO. 10



May 20, 2025

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F. Street NE.
Washington, DC 20549

Re: **SR-IEX-2025-02, IEX Options**

Dear Ms. Countryman:

The Nasdaq Options Market LLC ("NOM"), Nasdaq PHLX LLC ("Phlx"), Nasdaq BX, Inc. ("BX"), Nasdaq ISE, LLC ("ISE"), Nasdaq GEMX, LLC ("GEMX"), and Nasdaq MRX, LLC ("MRX") options markets (collectively "Nasdaq") respectfully submit this comment in response to Investors' Exchange LLC's ("IEX") proposal to adopt rules to govern the trading of options on IEX Options LLC ("Proposal").[1]  While Nasdaq supports competition and innovation, it has concerns regarding the delay on incoming order and quote messages[2] ("Delay") and the Options Risk Parameter[3] ("ORP") proposed by IEX.  When these concepts are integrated into approved options market structure, they create burdens on competition for market participants and other options markets and should be disapproved.

Specifically, IEX's Proposal creates burdens on competition for other options markets that would be obligated to honor quotes that would likely be stale.  In honoring these quotes, customer orders would be routed to IEX and likely not be filled, and auctions would not be able to commence, thereby denying customers executions and potential price improvement.  IEX's Proposal also permits IEX to prioritize the protection of IEX market maker quotes against unfavorable price movements at the expense of other market participants.

---

[1] See Securities Exchange Act Release No. 102663 (March 13, 2025), 90 FR 12890 (March 19, 2025) (SR-IEX-2025-02) (Notice of Filing of Amendment No. 1 to a Proposed Rule Change To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options) ("Amendment No. 1").

[2] See IEX proposed Rule 22.100(n).

[3] See IEX proposed Rule 23.150(h)(1).

1

Finally, while a similar delay was approved by the Commission in 2016,[4] when IEX entered the market, technologies have evolved and continue to evolve such that a 350 microsecond Delay in options is unfairly discriminatory and inconsistent with the Act.

*IEX's Proposal*

IEX's Proposal to adopt rules to govern the trading of options provides that it, "…will operate IEX Options as a fully automated trading system built on the core functionality of the Exchange's approved equities platform, and in a manner similar to that of other options exchanges."[5]  Specifically, IEX notes that it "…will utilize a de minimis delay on incoming order and quote messages designed to enable IEX to update its view of the market prior to processing orders and quotes, and an optional Market Maker quote parameter designed to protect Market Makers from excessive risk due to execution of stale quotes...".[6]  Further, IEX's Proposal states that it "…proposes to adopt rules applicable to IEX Options that are substantially similar to the approved rules of the MEMX, C1, MIAX, and NYSE Amex and Arca options exchanges, with the material proposed differences described herein."[7]

Nasdaq disagrees that IEX's Proposal is substantially similar to the rules of MEMX, C1, MIAX, NYSE Amex, or NYSE Arca as none of these options exchanges have a delay on incoming order and quote messages.  Overlaying a Delay on the rules of other options markets requires a thorough analysis of the impact of the Delay (1) on the adoption of proposed options rules that have no similar delay, and (2) on other options markets.  Nasdaq believes that IEX's Proposal creates both intra-market and inter-market burdens on competition and should be disapproved as explained in greater detail below.

**Options Market Structure Differs from Equities Market Structure**

At the outset, it is important to distinguish options market structure from equities market structure as these markets differ in material respects.  First, unlike equities markets, all options trading for listed options are conducted on national securities exchanges.  Second, there are far more series of listed options than NMS stocks, which contributes to a market structure in which market makers dominate liquidity provision (a "quote-driven" market), rather than the "order-driven" market that characterizes NMS stocks in an equities market.  Third, options markets offer several intra-day auctions that may result in price improvement,[8] unlike in equities markets. These differences in options market structure create important distinctions in the operability of a

---

[4]     See Securities Exchange Act Release No. 78101 (June 17, 2016), 81 FR 41142 (June 23, 2016) (File No. 10-222) (In the Matter of the Application of: Investors' Exchange, LLC for Registration as a National Securities Exchange; Findings, Opinion, and Order of the Commission).

[5]     Id. at 12891.

[6]     Id. at 12891.

[7]     See Amendment No. 1 at 12892.

[8]     See price improvement auctions at Phlx, BX, ISE, GEMX and MRX Options 3, Section 13.  See also facilitation mechanisms and solicited order mechanisms at ISE, GEMX and MRX at Options 3, Section 11.

Delay and the ORP on established options rules.  Below are examples of how applying the Proposal to options trading harms market participants as well as other options markets.

### I.      *All Options Transactions Must Be Compliant With Regulation NMS*

IEX's proposed Delay may result in a less reliable displayed NBBO.  IEX's Proposal creates a 350 microsecond Delay before processing incoming orders which results in a delay in transmitting quotation updates to the Options Price Reporting Authority ("OPRA").[9]  In a case where the price of a particular options class declines and IEX continues to display the last quote while other options markets quotations are immediately updated (presumably reflecting the market movement), IEX likely will find itself at the NBBO displaying a stale quote.  Options markets are required to route orders to markets displaying the NBBO, in this case IEX.  If IEX updates its quote in the interim, a market participant's routed order may arrive at IEX only to receive no fill.  This could result in less timely executions, no executions, and more costs for market participants.  Unlike equities, all options trading for listed options is conducted on national securities exchanges.  Further, all options exchanges are Participants of the Options Order Protection and Locked/Crossed Market Plan.[10]  In contrast, approximately 50%[11] of equities transactions occur off-exchange where the venue is not subject to Regulation NMS.  The impact of IEX's proposed Delay to options infrastructure is very different as compared to equities particularly since 100% of options transactions would be transacted in compliance with Regulation NMS.

IEX's proposed Delay and ORP may have a negative impact with respect to other option exchanges if order routers elect to place IEX at the top of their routing tables to mitigate receiving cancels due to cancelled quotes.  Order routers will likely experience more cancels and lower fill rates due to IEX adjusting their markets according to their ORP during the 350 microsecond Delay.  Despite the inefficiency that IEX is creating, firms will be forced to route to IEX as if it were a typical firm quote to avoid trade-through and best execution violations.

Further, Nasdaq notes that if all options markets adopted a similar delay on incoming order and quote messages, to remain competitive when routing orders, the concept of firm quote may cease to exist in options markets.  Options markets have a history of copying new trading rules and products approved on other options markets in order to remain competitive in their offerings because all options exchanges are subject to Regulation NMS and must route to another exchange when they are not at the NBBO.  Options markets are highly competitive and similar in their offerings today.  If every options market were to adopt a delay similar to IEX then no options market would display timely quotes.  The NBBO would no longer be relied upon to

---

[9]      OPRA disseminates consolidated last sale and quotation information originating from the national securities exchanges that have been approved by the Commission to provide markets for the listing and trading of exchange-traded securities options.

[10]      See Options Order Protection and Locked/Crossed Markets Plan, available at https://www.theocc.com/getmedia/7fc629d9-4e54-4b99-9f11-c0e4db1a2266/options_order_protection_plan.pdf.

[11]      As of May 14, 2025, 50.53% of equities transactions occurred off-exchange.

reflect the current market for trading because it would be stale and, therefore, a less relevant data point.

### II. Options Markets Are Quote Driven

While IEX does acknowledge in its Proposal that market makers in the listed options market play an essential role in providing liquidity and that there is a meaningful difference between equities and options markets where liquidity is only available on-exchange,[12] Nasdaq believes that the impact of IEX's proposed Delay and ORP would serve to degrade this liquidity.

First, market makers are subject to quoting obligations[13] as members of options markets. As the only market participants who are permitted to submit quotes, the options markets are reliant on market makers to supply liquidity. In recognition of the overall contributions made by market makers to a listed options market, options exchanges reward market makers who comply with these obligations with enhanced allocations[14] on executed options transactions on the order book and in various auction mechanisms. Additionally, market makers tend to receive more favorable pricing as compared to other non-customer market participants in acknowledgment of their essential role in the market. Incentivizing market makers to provide greater liquidity benefits all market participants through the quality of order interaction. While IEX's Proposal states that it seeks to require market makers to abide by similar quoting obligations,[15] Nasdaq believes that counting quotes toward market maker obligations where the quotes became stale due to the Delay, or were marketable and cancelled due to the ORP, does not meet the intent of the quoting obligations. Quoting obligations are designed to ensure liquidity is being provided in the market. IEX's infrastructure could result in an IEX market maker receiving an enhanced allocation while not providing true liquidity to the market. Rewarding IEX market makers with enhanced allocations for stale quotes does not align with the risk/reward models in place at other options markets. Moreover, the resulting phantom liquidity disenfranchises market participants on IEX that rely on that liquidity.

Second, pursuant to IEX's Proposal, if a market maker has opted to utilize the ORP and its quote in an options series that was the subject of a quote instability determination, is at or above (below) the price level of the quote instability determination, IEX's trading system will either cancel the market maker's quote or reprice it to the price level of the quote instability determination, pursuant to the market maker's instruction.[16] IEX's Amendment No. 1 indicated that IEX was revising "… the Indicator formula specified in Supplementary Material .04 to proposed Rule 23.150 (''quote instability calculation'') to provide that the formula will assess price changes in the underlying security in the context of the value of the options series (rather than the value of the underlying) when determining whether to issue a quote instability

---

[12]    See Amendment No. 1 at 12904.

[13]    See Phlx, NOM, ISE, GEMX and MRX Options 2, Section 4, and BX Options 2, Sections 4 and 5.

[14]    See Phlx, BX, ISE, GEMX and MRX Options 3, Section 10.

[15]    See IEX proposed Rule 23.150(e).

[16]    See Amendment No. 1 at 12905.

4

determination provide that the Exchange would introduce a new variable to the quote instability determination formula, a delta bound band, that would prevent quote instability determinations for those options series with deltas outside of the band, in order to more narrowly tailor application of the ORP to those options series that present the greatest risk of adverse selection to Market Makers."[17]

Today, other options markets offer market makers various types of risk protections; however, those risk protections are not similar to IEX's proposed ORP.  Other market maker risk protections currently available on options exchanges typically rely on the size of a market maker's quote executed as compared to the market maker's quote size available at the time of execution, number of contracts executed, purchased and sold contracts, or whether the quote locks or crosses resting order.  These protections, which honor displayed quotes, are compliant with firm quote.  In contrast, IEX's proposed ORP is designed to protect the IEX market maker from market movements by not requiring the market maker to be firm, regardless of the amount of liquidity that is being provided in the market.

IEX's Proposal also states that "[w]ithout robust liquidity protection mechanisms to protect against these risks, Market Makers may be forced to widen their spreads, show less liquidity, or simply exit the market.  Overall market quality could deteriorate as a result, and investors would suffer when it becomes too expensive to transact, or when there is insufficient liquidity to enable transacting altogether."[18]  Today, many market makers have their own risk protections built into their systems to manage their risk profile.  Further, options markets offer a variety of risk protections today that are robust and do not result in significant stale quotes.  Finally, unlike equities, market makers are the only market participants permitted to quote on options markets.  These market makers must qualify to be assigned an options symbol demonstrating compliance with stringent requirements.[19]  Market makers are required to meet certain obligations related to providing liquidity on options exchanges[20] and are limited in the

---

[17]    See Amendment No. 1 at 12891.  IEX notes that a quote instability determination may only be generated at least 200 microseconds after a prior quote instability determination for a particular options series on the same side of the market (i.e., affecting resting bids or offers).  See Amendment No. 1 at 12904.

[18]    See Amendment No. 1 at 12904.

[19]    Phlx Options 2, Section 1 requires market makers to demonstrate significant market-making and/or Lead Market Maker experience in a broad array of securities; Superior resources, including capital, technology and personnel; demonstrated history of stability, superior electronic capacity, and superior operational capacity; proven ability to interact with order flow in all types of markets; existence of order flow commitments; willingness to accept allocations as an RSQT in options overlying 400 or more securities; and willingness and ability to make competitive markets on the exchange and otherwise to promote the exchange in a manner that is likely to enhance the ability of the Exchange to compete successfully for order flow in the options it trades.

[20]    Transactions of a Market Maker should constitute a course of dealings reasonably calculated to contribute to the maintenance of a fair and orderly market, and Market Makers should not make bids or offers or enter into transactions that are inconsistent with such a course of dealings.  Without limiting the foregoing, a Market Maker is expected to perform the following activities in the course of maintaining a fair and orderly market: (1) to compete with other Market Makers to improve the market in all series of options classes to which the Market Maker is appointed; (2) to make markets that, absent changed market conditions, will be honored for the number of contracts entered into the Exchange's System in all series of options classes to

amount of orders that may be placed on an exchange.[21]  Further, as noted above, market makers receive certain enhanced allocations on options markets.  Market makers assume a certain amount of risk in return for the opportunity to be allocated ahead of other non-customer market participants.  Nasdaq disagrees with IEX's assertion in its Proposal that without the ORP, market makers may be forced to widen their spreads, show less liquidity, or simply exit the market Creating a market that permits market makers to execute at better prices and limit their risk in such a way as to degrade firm quote ensures better executions for these market participants at the expense of customer and non-customer market participants.

Finally, IEX's proposed ORP includes parameters that would be set by IEX and modified without additional Commission approvals.  As proposed, the ORP would place IEX in control of parameters that could vastly amend the operation of the ORP.  The amount of discretion proposed to be provided to IEX with respect to the ORP, combined with the likely outcome that ORP introduces significant quote fading, should result in the Commission finding that IEX's Proposal does not promote just and equitable principles of trade.

### III. Options Market Offer Intra-Day Auctions

As noted above, unlike equities, options markets offer several intra-day auctions that may result in price improvement.  These auctions have entry-checks that may require the auction to start at $0.01 better than the NBBO.  IEX's proposed Delay and ORP have the potential to prevent intra-day price improvement auctions on other option exchanges as well as other intra-day auctions from commencing due to a better displayed quote on IEX that may not be accessible once an order is routed to IEX.  Utilizing Phlx's price improvement PIXL Auction[22] as an example, a PIXL Order for the account of a Public Customer for 50 option contracts or more, would not commence unless the PIXL Order is equal to or better than the NBBO or Phlx's BBO on the opposite side of the market from the PIXL Order, and on the same side of the market as the PIXL Order: (i) at least $0.01 better than any Limit Order on the Limit Order book, (ii) at or better than the PIXL Order's limit price (if the order is a Limit Order), and (iii) equal to or better than the NBBO.[23]  If an IEX market maker quote updated to $0.01 better than the NBBO in the options series where a PIXL Order was attempting to commence, the PIXL Order could not start a PIXL Auction because IEX was displaying better priced liquidity.  However, because of the Delay, the IEX quote may be stale, or cancelled by the ORP in the interim, and not accessible to the market participant.  Preventing other options markets from commencing auctions by displaying liquidity that is not firm or accessible creates an inter-market burden on competition.  In this scenario, a market participant could be denied price improvement that may

---

which the Market Maker is appointed; and (3) to update market quotations in response to changed market conditions in all series of options classes to which the Market Maker is appointed.  See ISE, GEMX and MRX Options 2, Section 4.

[21]    Generally, the total number of contracts executed during a quarter by a market maker in options classes to which it is not appointed may not exceed twenty-five percent (25%) of the total number of contracts traded by such market maker in classes to which it is appointed and with respect to which it was quoting.  See Phlx, NOM, BX, ISE, GEMX and MRX Options 2, Section 6.

[22]    See Phlx Options 3, Section 13.

[23]    See Phlx Options 3, Section 13(a)(2).

6

have been available in an auction or the possibility for any execution at a price that was previously available in the PIXL Auction, and in some cases, solely for the purposes of blocking an auction on another exchange from commencing.

### IV. Market Technology Has Evolved Since 2016

Nasdaq notes that IEX's delay was approved in 2016.  In 2025, almost ten years later, IEX's fill rate as compared to other equity markets is low.[24]  A low fill rate is attributed to the inability of market participants to access previously displayed quotes on that market.

If the Commission were to consider approving the Delay, despite the concerns raised by Nasdaq, the 350 microsecond time is inappropriate.  IEX does not justify why that amount of delay is appropriate given current options market structure.  Nasdaq believes that a Delay of 350 microseconds would impair fair and efficient access to an exchange's quotations.  Since nearly ten years ago when the Delay was approved, market technology and market structure has evolved.  It is questionable whether a 350 microsecond Delay on IEX's equity market continues to constitute a Delay that does not frustrate the purposes of Rule 611 given the evolution in technology.  In short, things move faster than in 2016.[25]  Nasdaq believes a 350 microsecond Delay in options is unfairly discriminatory and not consistent with the Act.  A 350 microsecond Delay is not within geographic and technological latencies experienced today for options.[26]

\* \* \*

In summary, IEX's Proposal does not consider key differences between equities and options markets and does not explain how its Proposal does not create burdens on competition among market participants on IEX or among options markets.  Nasdaq believes that IEX's Proposal could create potentially adverse consequences for both IEX market participants and other options markets.  Additionally, while Nasdaq welcomes innovation, IEX's Proposal fails to acknowledge the passage of time since its initial approval and the differences in speed and market structure in options.  Any innovation that compromises existing efficiencies and market structure and seeks to displace existing protections for investors, in favor of benefitting a particular class of market participant, must be weighed heavily.  For the reasons above, Nasdaq does not believe that IEX's current Proposal should be approved.

---

[24]    Nasdaq routes a significant amount of equity orders across the markets and it finds IEX's fill rate to be the lowest among equity venues to which it routes.

[25]    See Mackintosh, P., *How Trades Speed Between Venues.*  https://www.nasdaq.com/articles/how-trades-speed-between-venues.  Among other things, this article examines how long it should take for messages to travel around U.S. stock markets.

[26]    In Nasdaq's experience as an exchange operator of 6 options exchanges, its testing has revealed a slightly greater than 50% improvement in end to end quote message roundtrip time between 2016 and 2024 within its system.

Nasdaq appreciates the opportunity to comment.  If you have any additional questions, please do not hesitate to contact us.

Sincerely,

Angela Dunn
Principal Associate General Counsel

# ADMINISTRATIVE RECORD REFERENCE NO. 11



June 4, 2025

Ms. Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

**Re:    IEX Options**

IMC, Charles Schwab & Co., Inc., and Citadel Securities are pleased to present a consensus position to the Securities and Exchange Commission (the "Commission") on one discrete aspect of the IEX proposal to launch a new options trading facility.  Together, our firms represent a significant portion of the overall U.S. options market (and a significant percentage of retail orders).  While we welcome market innovation and competition, we are extremely concerned about introducing a novel mechanism into the US options market that is explicitly designed to facilitate the fading of Market Maker displayed quotations, while nonetheless continuing to treat those displayed quotations as "protected."  This means that every market participant, including retail investors, will be *compelled (by regulatory fiat)* to route orders (or have their orders routed) to Market Maker displayed quotations on IEX, despite individual assessments of whether the novel IEX quote fading functionality is harmful to their execution quality.

We are concerned that this will be particularly harmful for retail investors.  Not only will retail investors experience quote fading when attempting to execute on IEX, the novel quote fading mechanism may disrupt the initiation of "price improvement auctions" on *all* exchanges, which are used to deliver significant amounts of price improvement to retail investors.  The IEX proposal fails to acknowledge these concerns or otherwise consider the impact on retail investors.  Indeed, the potential disruption to price improvement auctions and the impact on retail investors is an area that warrants further study.

Specifically, IEX is proposing to implement an intentional delay on incoming orders, coupled with functionality that enables Market Maker displayed quotations to be immediately repriced (without being subject to the delay) when advantageous for the Market Maker.  This inherent asymmetry – where incoming orders are delayed (thus preventing an immediate execution) while Market Maker displayed quotations may be *immediately* repriced during this delay – is novel for the US options market and creates significant concern.  In addition, notwithstanding this novel quote fading mechanism, IEX proposes to treat these Market Maker displayed quotations as protected quotations under the "Options Order Protection and Locked/Crossed Market Plan," thus compelling market participants, including retail investors, to route orders to IEX irrespective of the impact the novel quote fading mechanism may have on execution quality.

1



We thus urge the Commission to reject this filing and request additional analysis from IEX, including with respect to:

- **Unfairly Discriminates and Harms Retail Investors**.  Given that this novel quote fading mechanism explicitly benefits Market Makers, there is no doubt that it alters the existing competitive balance between Market Makers and liquidity takers (such as retail investors).  However, there is no discussion of the economic impact of altering this balance – *e.g.* what will be the negative commercial impacts for retail investors specifically?

  In considering this question, it is important to note that the novel quote fading mechanism may negatively impact retail investors more broadly than just when they route order flow to IEX (and experience quote fading that results in worse execution quality).  This is because, to the extent that IEX is correct that the novel quote fading mechanism will allow "Market Makers to provide tighter and deeper quotes"[1] (because they know that those quotes will be automatically repriced when advantageous for the Market Maker), it could result in IEX setting the market-wide best price for many options series (as no other exchange provides Market Makers with this type of advantage).  To the extent Market Makers seek to match the IEX price on other options exchanges, they will be at a competitive disadvantage as there is no similar mechanism to reprice their quotations.

  Retail investor orders typically receive price improvement above and beyond the market-wide best price through "price improvement auctions" that are initiated on US options exchanges.  However, to initiate such an auction, a liquidity provider must be willing to trade at the existing market-wide best price or better.  Furthermore, such auctions may be restricted for small-sized orders when the NBBO is only a penny wide.  Hence the problem – to the extent the market-wide best price is set by a Market Maker on IEX (and is a better price because of the quote fading mechanism available to the Market Maker on IEX), liquidity providers on other exchanges will be less likely to be willing (or able) to provide retail investors with additional price improvement (as the market-wide best price is already artificially aggressive).  And yet the IEX price may not actually be accessible in practice.  IEX must assess the impact its novel quote fading mechanism could have on the execution of retail investor orders generally, including the estimated reduction in "price improvement auctions" and associated price improvement more broadly.

- **Magnitude of the Benefit Being Offered to Market Makers**.  IEX explicitly acknowledges that the novel quote fading mechanism will benefit Market Makers,[2] but fails to provide

---

[1] *See, e.g.,* IEX Proposal at page 45 (https://www.sec.gov/files/rules/sro/iex/2025/34-102663.pdf).

[2] *Id.*



sufficient information regarding the magnitude of this benefit and the impact on everyone else.  For example:

- How many Market Maker displayed quotations are expected to be repriced on a given day?

- What is the estimated impact on fill rates for marketable orders routed to IEX (from the perspective of incoming liquidity taking orders, such as those submitted by retail investors)?

We close by noting that the concerns above are particularly pronounced given unique characteristics of US options market structure.

- First, unlike the US equities market, all orders must be executed on exchange.  This means that there is no alternative method for executing retail investor orders (and providing price improvement), subjecting each and every order to the harms detailed above.

- Second, the combination of far more options quotations (given the number of unique series) and far more repricing opportunities (given that IEX's quote fading mechanism is based on price movements in the underlying security) means that overall quote fading may be far more damaging compared to equities if this type of mechanism were implemented, with severe consequences for execution quality and overall market integrity and efficiency.

In the end, each market participant should have the ability to evaluate for itself whether this type of novel quote fading mechanism is helpful or harmful to its execution quality.  However, by treating Market Maker displayed quotations on IEX as "protected" – even though they benefit from a mechanism designed to facilitate quote fading – the Commission would be removing the ability of the marketplace to decide and would instead be *requiring* market participants to use something that is untested and could be a deeply problematic.  IEX has not provided the necessary level of detail to support such a drastic change and for that reason the Commission should not approve the proposal.

Respectfully,

/s/ Andrew Stevens
Global General Counsel
IMC

/s/ Jeff Starr
Managing Director,
Head of Operations
Charles Schwab & Co., Inc.

/s/ Stephen John Berger
Managing Director, Global
Head of Government &
Regulatory Policy
Citadel Securities

3

# ADMINISTRATIVE RECORD REFERENCE NO. 12



Ms. Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

Austin, TX, June 12, 2025

**Comments on IEX Rulemaking – File No. SR-IEX-2025-02**

## Introduction

All Options appreciates the opportunity to comment on IMC's, Citadel's and Charles Schwab's observations regarding IEX's proposed launch of its options market. We respectfully disagree with the comments presented by these firms, which appear to mainly revolve around IEX's design factors that challenge their incumbent dominance in an ultra-low latency and PFOF driven market structure.

The arguments they present are refuted by a thorough PLP pilot by Eurex, Europe's largest derivatives exchange, which we will discuss below. We are cognizant that U.S. and European market structure have innate differences. Regardless, Eurex's precedent and findings are also valid in light of U.S. market structure as they bring meaningful improvements to market quality, benefiting end-investors.

We support innovations that foster healthy competition among market participants, such as the protection on quotes proposed by IEX. We believe this mechanism will drive meaningful improvements in liquidity, transparency, and overall market competitiveness. By reducing the advantage of speed, it broadens access to a wider range of liquidity providers, resulting in deeper markets and tighter spreads. Crucially, it enables new market maker entrants like ourselves to participate on the basis of price competitiveness rather than speed alone.

Founded in Amsterdam in 1998, All Options is a leading European options market maker. In 2023, we expanded to the U.S., where we now quote single stock options. Our competitive edge lies in pricing proficiency, and we are committed to delivering the best possible prices to end-investors. We believe this approach benefits the broader market, unlike the speed race, which increases the cost of liquidity and reduces competition.

## European Experience with PLP

European markets have already embraced passive liquidity protection (**PLP**) mechanisms similar to those proposed by IEX. These modest speed bumps have proven highly effective in enhancing market quality, liquidity, and competitiveness.

Eurex, Europe's largest derivatives exchange, piloted a 1.5-millisecond speed bump on the German flagship DAX index options in 2020[1]. This initiative was carefully designed and calibrated in consultation with the trading community. Following its success, Eurex implemented a 1-millisecond delay on Eurostoxx 50 index options,[2] Europe's leading stock index, in 2022. Cboe Europe followed suit, launching its pan-European options exchange with a 3-millisecond delay[3], extending it to single stock options in 2023. We expect other exchanges to adopt similar measures.

## Benefits of PLP[4]

### 1. Reduction in Latency Arbitrage

Eurex's DAX PLP pilot showed a 17–20% reduction in market maker interaction and a 34–36% drop in the share of latency-driven trades in the three and six months after launch. This is significant: latency arbitrage discourages participation from capable liquidity providers who lack ultra-low-latency infrastructure, thereby reducing competition. Such a significant drop shows markets have become more vibrant and pluriform, promoting liquidity provision by a wider range of market makers instead of penalizing it.

### 2. Improved Liquidity

Quoted spreads and offered sizes improved immediately upon PLP activation. After three and six months, quoted spread shrunk 17-18% and offered sizes grew from 10-34%. Most non-executed orders were overwhelmingly between professional liquidity providers and takers, showing deepened liquidity. Importantly, client trading was unaffected. There was no evidence of ghost liquidity impeding retail or institutional access.

### 3. Enhanced Market Competition

PLP attracted new participants to the top of the DAX index options order book and increased the number of firms quoting at the best price level (+10-14% in the three to six months after launch). Those new quotes come from newly entering market makers, like ourselves, who are able to provide better and more competitive quotes but were previously forced to quote wider because of latency arbitragers. The Herfindahl Index dropped by 11–15% during the same period. These metrics indicate reduced market concentration and greater competition.

## Why IEX's Proposal Matters

IEX's proposal mirrors elements of the proven Eurex PLP model and promises similar benefits for U.S. markets: reduced latency arbitrage, tighter spreads, deeper liquidity, and increased competition at the best bid and offer. These improvements would particularly benefit retail investors, who gain from more robust and transparent liquidity and are currently caught in an increasingly oligopolistic market structure, driven by PFOF and ultra-low latency strategies.

---

[1] Eurex's pilot has been methodically consulted, calibrated and evaluated with the proprietary trading community over a multi-year period. See https://www.eurex.com/resource/blob/2716274/9efc6eedbaa741093e84f923b86c1bdc/data/PLP_in_the_dax_index_option_case_study.pdf and https://www.eurex.com/resource/blob/2716266/f139149fe08ef13fbe787ea361089b20/data/Whitepaper_Eurex_Passive_Liquidity_Protection.pdf

[2] https://www.eurex.com/ex-en/find/news-center/news/Enhancing-the-level-playing-field-Eurex-adds-EURO-STOXX-50-Options-to-PLP-3231106

[3] https://cdn.cboe.com/resources/participant_resources/Cboe_CEDX-European-Derivatives.pdf

[4] Data from https://www.eurex.com/resource/blob/2716274/9efc6eedbaa741093e84f923b86c1bdc/data/PLP_in_the_dax_index_option_case_study.pdf



Importantly, concerns about ghost liquidity have been disproven. Eurex found that 96% of orders blocked by PLP originated from market makers, not retail or institutional investors[4]. Quotes are not fading. They are available to liquidity takers whose strategies are not focused on sniping option quotes within 350 milliseconds of a significant move in the underlying asset. As a result, liquidity-seeking features such as price improvement mechanisms and order routing will not be negatively impacted. In fact, they will benefit from the tighter, more liquid quotes on IEX.

PLP does not unfairly advantage market makers. Instead, it levels the playing field by reducing the need for costly latency investments and allowing firms to focus on providing competitive, stable quotes benefiting retail and institutional investors. It helps in dismantling potential oligopolies by lowering barriers to entry for additional market makers in the U.S. options market which is overly influenced by PFOF, Designated Market Maker status and ultra-low-latency.

It allows new parties contributing to price discovery and market depth to fully leverage their expertise without investing tens of millions of dollars to protect themselves from latency arbitragers. Such an investment discourages new market makers from entering the market but also diverging resources from what really matters, providing better prices at a higher volume.

While we acknowledge the significant structural differences between the European and U.S. options markets, we believe the benefits observed in Europe can be successfully translated across the Atlantic. In fact, given the scale and interconnectedness of the U.S. options market, we anticipate even greater potential advantages for U.S. investors.

## Conclusion

We respectfully urge the Commission to consider the European experience with PLP when assessing the innovation and benefits of IEX's market structure proposal. The data is clear: PLP improves liquidity, enhances competition, and attracts a broader range of market makers. There is no need for speculation or fear. Eurex's well-designed pilot and well-documented results provide compelling evidence in favor of a valid challenge to incumbent latency arbitrageurs.

We believe U.S. investors deserve a fair, competitive, and transparent market structure, rethinking the impact of traditional concepts like PFOF, Designated Market Maker status and ultra-low latency on market quality as they reduce transparency and broad competition. IEX's proposal is a meaningful step in that direction and deserves serious consideration.

With kind regards,

All Options USA LLC


_____
Mathieu Boivin Carrier
Director



# ADMINISTRATIVE RECORD REFERENCE NO. 13

June 16, 2025

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F. Street NE.
Washington, DC 20549

**Comments on IEX Rulemaking - File No. SR-IEX-2025-02**

Dear Ms. Countryman:

HAP Trading LLC appreciates the opportunity to comment on IEX's rulemaking and respectfully submits this comment letter in support of IEX's proposal to launch a novel equity options exchange. We also appreciate the time and consideration other market participants took to share their concerns on IEX's innovative proposal, but we disagree with their comments and wanted to share HAP's unique perspective. Contrary to the opinions in some of the other comment letters, the proposal enhances market fairness and is likely to enable additional competition by addressing latency driven inefficiencies which will yield improved option market quality for investors.

Numerous comment letters already submitted on this proposal raise concerns about the de-minimis 350 microsecond speedbump causing IEX quotes to be inaccessible for other market participants relative to existing option exchange quotes. The reality is delays accessing quotes already exist. We observe similar delays and quote inaccessibility resulting from the current market structure. The existing option exchanges are in the three following locations: Mahwah, Secaucus, and Carteret. Existing latency between the co-locations on fiber optic paths is roughly 140 - 310 microseconds which is comparable to the speedbump IEX is proposing ("How Trades Speed Between Venues"). The vast majority of order handlers and exchange order protection mechanisms are using OPRA to view exchange quotes, so the latency of quotes being used to route orders is actually significantly higher since a quote from an options exchange in Carteret must propagate by fiber optics to Mahwah (310 microseconds) where it is consolidated into OPRA (average latency 30 microseconds ("OPRA SIP Metrics")) and propagated back to Secaucus (185 microseconds) where most order handling is done for a total latency of about 525 microseconds (albeit this is often exceeded significantly in practice). Faster paths such as microwaves and lasers are generally not used to transmit option data by order handlers such as wholesalers due to their expense and the vast bandwidth required for options data relative to equities or futures data.

The relative difference of the 350 microsecond speedbump is further marginalized when considered in the context of IEX's aim to prevent stale quotes from being traded because they are stale relative to the option greek "delta" or the change in the underlying stock price. Changes to the option price due to movements in the underlying stock price are generally first transmitted on the equity feeds and then processed into quote purge requests or quote

replacements which are transmitted back to the option exchanges and then published to OPRA and the downstream market data consumers.  Existing participants with the most resources are able to use expensive speed advantages such as NASDAQ TotalView ITCH FPGA ("NASDAQ TotalView ITCH"), Quincy Data feeds ("Quincy Data"), and customized hardware ("STAC Research FPGA Benchmark") to both take liquidity from slower market makers and cancel their own quotes before other participants can access them in the existing ecosystem.  All but the fastest market makers are then required to reduce the competitiveness of their quoting to avoid the costs of trades executed at stale prices because of underlying stock price movement.

IEX's proposal is designed to allow new participants to provide competitive liquidity in listed equity options without the tremendous technical cost imposed by interacting with faster market makers instead of liquidity seeking customers.  The exchange is simply providing the same service the largest market makers already enjoy from their access to the fastest feeds and hardware to other participants by moving the latency sensitive underlying price driven reprice logic from proprietary systems to the IEX exchange system.  IEX's speedbump protection still requires market makers to build quick and efficient quoting systems but protects them from pure underlying security price latency arbitrage which can only be mitigated with the costliest latency solutions.  In the current structure, customers may be absorbing most of the costs of such systems via worse execution outcomes.

The options market structure already allows exchange systems that automatically make displayed quotes inaccessible due to various trigger events.  Exchanges will automatically purge all of a market maker's quotes due to triggers such as a maximum number of trades or traded contracts in a specified time window ("NYSE Pillar Risk Controls - 5.9 Activity Based Controls").  IEX's proposal simply expands this to be aware of the "delta" risk component of the option and automatically adjusts (or cancels) option prices accordingly to similarly mitigate option market maker latency arbitrage risks.  IEX's design is simply an extension of this existing framework.

Existing option exchange infrastructure also already implements advantages for market makers which are not transparently disclosed in exchange rules.  Exchange binary order entry and bulk-quoting are often provided exclusively to market-makers ("Nasdaq PHLX (PHLX) - Connectivity") and can significantly outperform the order entry gateway ports provided to other participants.  Other participants can be restricted to FIX order entry ports on certain exchanges and other exchanges use dedicated hardware for bulk quote and purge handling while order entry ports are on over-subscribed shared hardware ("Cboe Unveils New Brand for Exchange Technology Platform, Marking New Chapter in Technology Innovation and Growth").  When exchanges restrict the high-performance ports from taking liquidity from other market makers, large market maker participants can still take advantage of this market structure by using upwards of 30 or 40 order entry ports to send the same order at once and thus statistically guarantee a speed advantage versus smaller market makers operating with fewer ports.  The cost of such ports is tiered and capped at some exchanges thus making such a strategy only feasible for the participants with the greatest scale ("NYSE AMERICAN OPTIONS FEE SCHEDULE - V.A. Port Fees").

Exchanges already use mechanisms such as "flash" and "step-up" to mitigate routing to quotes they do not wish to interact with ("NYSE American Options | BOLD").  These mechanisms typically expose a customer order which would otherwise be routed to another better priced market center for a set period of time (NASDAQ MRX Order Exposure Period is currently 200,000 microseconds) to local participants so they can facilitate the order before it is sent to the exchange with the competing quote.  Wholesalers and retail brokers already have systems in place to route customer orders correctly when these mechanisms occasionally fail to execute the customer's order.

HAP Trading would also like to emphasize that the speedbump's 350 microsecond timing pales in comparison to any measurement of the latency from a retail trader's web browser to their trade being reported to the Options Price Reporting Authority (OPRA).  Recent tests we conducted against numerous large retail broker websites using multiple internet service providers (ISPs) from New York, NY showed typical HTTP request to response latencies in the 10s of thousands of microseconds.  This latency only reflects the cost of the communication between the broker's web server and the client's web browser and does not include the costs of the broker's own systems, the wholesaler systems, and the exchange systems that undoubtedly increase the amount of time it takes for a user to gather a market data snapshot and transmit an order.  The latency of retail order processing is likely even worse on mobile platforms such as phones which are now commonly being used to trade options.  Our observations suggest retail brokers take well beyond 100 times more time than the speedbump to process and route a retail order instruction.

Recent exchange developments continue to be characterized by a race for speed as desired by the largest market participants to increase their internalization, reduce existing competition, and prevent new entrants.  HAP has firsthand experience with this market evolution and our firm's ability to improve markets and stay on the inside of the market have been reduced significantly over the last decade.  IEX is proposing a new model which seeks to cap the technical costs of speed and encourage new market-making participants to compete on price and size rather than speed.  The latency arbitrage mitigation tool IEX proposes would cause us to reinvest in our competitive quoting efforts, set more new NBBOs, and spend more time using our quote to augment available liquidity at the inside of the market.  HAP believes the SEC has a unique opportunity to enable this innovation and substantially reduce costs for retail investors and we urge the Commission to approve the proposal without delay.

Respectfully submitted,

Gregory Bayard
Electronic Options Market Making
HAP Trading LLC

References

"Cboe Unveils New Brand for Exchange Technology Platform, Marking New Chapter in Technology

Innovation and Growth." *Investor Relations*, 15 January 2025,

https://ir.cboe.com/news/news-details/2025/Cboe-Unveils-New-Brand-for-Exchange-Technology-

Platform-Marking-New-Chapter-in-Technology-Innovation-and-Growth/default.aspx. Accessed 17

June 2025.

"How Trades Speed Between Venues." *Nasdaq*,

https://www.nasdaq.com/articles/how-trades-speed-between-venues. Accessed 17 June 2025.

"Nasdaq PHLX (PHLX) - Connectivity." *Nasdaq*, https://www.nasdaq.com/solutions/nasdaq-phlx.

Accessed 17 June 2025.

"NASDAQ TotalView ITCH."

https://data.nasdaq.com/price-list?category=U.S.+Equities&subcategory=Nasdaq+TotalView.

"NYSE American Options | BOLD." *NYSE*,

https://www.nyse.com/markets/american-options/bold-broadcast-order-delivery-mechanism.

Accessed 17 June 2025.

"NYSE AMERICAN OPTIONS FEE SCHEDULE - V.A. Port Fees." *NYSE*,

https://www.nyse.com/publicdocs/nyse/markets/american-options/NYSE_American_Options_Fee

_Schedule.pdf. Accessed 17 June 2025.

"NYSE Pillar Risk Controls - 5.9 Activity Based Controls." *NYSE*, 28 March 2025,

https://www.nyse.com/publicdocs/nyse/NYSE_Pillar_Risk_Controls.pdf. Accessed 17 June 2025.

"OPRA SIP Metrics." https://cdn.opraplan.com/documents/OPRA_SIP_Metrics.pdf.

"Quincy Data." *Quincy Data*, https://www.quincy-data.com/raw-data-qrdqpd/. Accessed 17 June 2025.

"STAC Research FPGA Benchmark." https://www.stacresearch.com/LMS240510b.

# ADMINISTRATIVE RECORD REFERENCE NO. 14



**Jaime Klima**
General Counsel
New York Stock Exchange
11 Wall Street
New York, NY 10005
T: 212.656.2006
Jaime.Klima@nyse.com

June 17, 2025

<u>**Via Email**</u>

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-1090

Re: <u>**Securities Exchange Act Release No. 34-102895 (SR-IEX-2025-02)**</u>

Dear Ms. Countryman:

NYSE American LLC and NYSE Arca, Inc. (together, the "Exchanges") appreciate the opportunity to comment on the proposed rule change (the "Proposal") filed by Investors Exchange LLC ("IEX") to launch a new equity options exchange ("IEX Options").[1] While IEX asserts that IEX Options will operate "in a manner similar to that of other options exchanges," the Exchanges believe that key aspects of IEX's proposed "core functionality" would in fact result in operations that are materially dissimilar from existing options exchanges.[2] These differences could raise significant competitive concerns and inject uncertainty and instability into the operations of the market. Because the Proposal lacks meaningful analysis of such impacts, it should not be approved.

IEX Options would rely on a 350-microsecond delay (or "speed bump"), which it characterizes as "de minimis," that is designed to enable IEX to "update its view of the market prior to processing orders and quotes."[3] But it is unclear how IEX will maintain a real-time calculation of over 1.2 million unique listed options series.[4] Despite IEX's assertions, the Proposal lacks any empirical evidence or data to support the claim that this delay will not impair price discovery or execution quality. In addition, IEX does not provide data demonstrating that the delay will not cause market participants to miss favorable pricing opportunities. This lack of support is particularly concerning given the scale and speed of today's options markets. According to the

---

[1]   <u>See</u> Securities Exchange Act Release No. 102663 (March 13, 2025), 90 FR 12890 (March 19, 2025) (SR-IEX-2025-02) (Notice of Filing of Amendment No. 1 to a Proposed Rule Change To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options) ("Amendment No. 1").

[2]   <u>Id.</u> at 12891.

[3]   <u>See</u> Amendment No. 1 at 12891. To account for this delay, IEX offers market makers an Options Risk Parameter ("ORP") tool that it asserts helps them avoid having their quotes executed against just as the market is moving away, resulting in trades at prices that no longer reflect fair value. <u>See</u> <u>id.</u>

[4]   Allowing IEX to act as arbiter of fair value -- even assuming it could maintain real-time calculations -- would fundamentally disrupt the established market structure, where market makers and traders determine fair value through competitive price discovery.

Vanessa Countryman
June 17, 2025
Page 2 of 3

Options Price Reporting Authority (OPRA), peak message rates -- including quotes and trade updates -- have exceeded 100 million messages per second in recent years.  Allowing a single exchange to interject an intentional delay into such a high-speed, high-volume market would impose unnecessary burdens on market participants who must adjust their processes to account for this delay, with any benefit from such a disruption accruing solely to IEX.

The Proposal extends IEX's self-serving approach to competition to the options market: design a system that holds the national market quote captive unless market participants interact with IEX first, under the guise that this delay promotes "order protection."  IEX's claims to the contrary notwithstanding, the speed bump would incentivize market participants to interact with IEX first before trading on other markets triggers IEX to fade its existing quote.  For example, currently, if an investor believes the price of an underlying stock is about to increase and would like to buy calls ahead of such a move, the investor can trade across multiple options exchanges at roughly the same time and can continue trading even if the price rises through several price levels.  Under the Proposal, an investor in the same situation may feel obligated to trade with IEX before making any other trades because, as the investor begins to buy across exchanges, the underlying's price may rise.  This change in price could trigger IEX's ORP, which would result in displayed interest on IEX being re-priced while the investor's order is held up by IEX's intentional delay mechanism.  The result of subjecting options investors to this delay and the associated re-pricing of displayed liquidity is that the investor could accumulate fewer contracts than desired at the best-available price.

The following execution scenarios demonstrate the negative impact of IEX's proposal on options trading.

*Scenario A*

Assume Investor A wants to buy 100 calls and is willing to pay $5.00.  NYSE Arca, CBOE, and MEMX are each offering 100 contracts at the National Best Offer (NBO) price of $5.00.  In today's marketplace, Investor A would buy 100 contracts at $5.00 across NYSE Arca, CBOE, and MEMX, at a distribution of their choice.

*Scenario B*

Assume the same initial conditions as Scenario A, adding IEX Options operating per the Proposal, and quoting 100 contracts at $5.00.  Should Investor A route 25 contracts to each of the 4 quoting venues, NYSE Arca, CBOE, and MEMX would fill the orders immediately, but IEX would hold the incoming order in its delay mechanism.  While the order is waiting (and inaccessible to Investor A), the underlying price could begin rising based on the trades at NYSE Arca, CBOE, and MEMX.  IEX's ORP would record the underlying price change and remove the market maker quote of 100 contracts to sell at $5.00.  Investor A's order would then exit the delay mechanism unfilled since the quote was re-priced by IEX.  The order would be returned to Investor A.  While Investor A was waiting, the underlying price change caused an increase in the NBO price, forcing Investor A to either maintain a smaller-than-desired position in the call or pay more than the desired price.

*Scenario C*

Assume the same initial conditions as Scenario B:  Investor A wants to buy 100 calls and is willing to pay $5.00, and NYSE Arca, CBOE, MEMX, and IEX are all offering 100 contracts

Vanessa Countryman
June 17, 2025
Page 3 of 3

at the NBO price of $5.00.  Investor A decides to send all 100 contracts to IEX and is filled at $5.00.  This means Investor A is ignoring other venues that may offer better execution (and, by definition, offer a faster response than IEX).  However, by sending the entire order to IEX, the order would get filled before the associated underlying price change triggers the ORP.  Ironically, such behavior would result in exactly the situation IEX purports to address: the execution will cause the underlying price to rise and result in immediate negative P&L for the quoting market maker.

Moreover, IEX proposes to subject options market participants to this radical, unproven, and unmeasured delay mechanism without offering any empirical evidence to validate that the mechanism works as described.  For example, IEX fails to include an assessment of the impact the delay would have on all market participants -- especially retail investors -- in a market where quotes are otherwise instantly accessible.  Furthermore, the Proposal fails to demonstrate that IEX has the ability to incorporate real-time, intra-day events and news that drive the theoretical implied volatility surfaces of all optionable underlying instruments.[5]  Without the necessary infrastructure, IEX's approach risks systematic mispricing and market instability.  Proposing novel functionality without including results from vigorous testing provides an insufficient basis for the Commission to determine that the proposal is consistent with the Act.

The U.S. options market has experienced unprecedented growth over the last five years.  This growth has been facilitated by highly robust and resilient exchange systems all operating under a national market system establishing clear rules of engagement.  In the absence of evidence from IEX to the contrary, we believe the Proposal would disrupt this ecosystem.  Given the importance of immediately-accessible quotations in the options market, the Exchanges urge the Commission not to approve the Proposal in its current form.

Sincerely,

Jaime Klima

---

[5]    For example, economic data releases, changes to earning date, and dividend announcements would require IEX to model, track, and incorporate implied volatility pricing adjustments.

An Intercontinental Exchange Company

# ADMINISTRATIVE RECORD REFERENCE NO. 17

**CITADEL | Securities**

June 23, 2025

Ms. Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549–1090

**Re:    IEX Options (File No. SR-IEX-2025-02)**

Dear Ms. Countryman:

IEX proposes to introduce an unprecedented quote canceling scheme in the U.S. options market to enrich its shareholders and its select cadre of market makers – all at the expense of millions of American investors.[1]  Rather than innovating or competing on merit, IEX asks the Commission to effectively *force* all investors to chase after fleeting quotes that can be canceled and repriced *after* an investor order has been sent to IEX.  The Commission should not be complicit and should reject this unlawful scheme.

Simply put, IEX's patently self-serving scheme would:

- Subsidize artificially attractive but routinely inaccessible quotes from IEX market makers;

- Compel all investors to chase those fleeting quotes due to the "order protection rule";

- Halt incoming investor orders from immediately executing against those quotes; and

- Aid and abet the opportunistic canceling and repricing of quotes during the halt.

This scheme will unquestionably harm investors, frequently leaving them with either an unfilled order or an order filled at a worse price than advertised.  And despite losing money in the process, investors will be unable to move business to competing options exchanges due to the "order protection rule."  Further, requiring orders to be sent to IEX will deprive retail investors of the price improvement opportunities otherwise available on other exchanges.

The losses suffered by investors under this scheme will go directly into the pockets of IEX's shareholders, through increased exchange revenue, and IEX's market makers, who will opportunistically honor their advertised quotes only when profitable to do so (and otherwise have IEX cancel quotes on their behalf).  IEX's "heads we win, tails you lose" scheme to take market share by regulatory mandate is irreconcilable with the statement of then-Commissioner, now-Chair Atkins that "competitive forces, rather than unnecessary regulation"[2] should guide market development.

---

[1] Release No. 34-103290 (June 18, 2025), available at: https://www.sec.gov/files/rules/sro/iex/2025/34-103290.pdf (the "IEX Options Proposal" and the "IEX MMs")

[2] Regulation NMS, 70 Fed. Reg. 37,496, 37,633 (June 29, 2005) (Glassman & Atkins, Comm'rs, dissenting).

**CITADEL | Securities**

Despite assertions to the contrary, there is absolutely no legal or regulatory precedent for the IEX Options Proposal.  The Commission has never approved this type of nefarious scheme in the U.S. options market, and must not conflate what IEX has implemented in the equities market with what it proposes here.  Specifically, as compared to the equities market:

- The number of listed options series dwarfs the number of equities by a factor of over 135x, meaning that the IEX scheme will result in significantly more canceled quotations.

- All options orders, including those of millions of retail investors, must be executed on-exchange, dramatically increasing the number of orders that will be adversely impacted.

- The legal and regulatory framework is different – with "order protection" implemented via a separate NMS Plan in options as opposed to via Commission regulation in equities.

The Commission's three-part mission is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation.  The latest amended IEX filing represents IEX's third unsuccessful attempt to comply with the requirements of the Exchange Act.  Procedurally, given that this latest amended filing contains material changes and was made over 150 days after IEX's initial proposal, the Commission must consider it as a new filing, subject to a full review timeline, in order to ensure that all market participants have an opportunity to analyze it and provide feedback and that the Commission has time to carefully consider it.  Ultimately, this unprecedented and unlawful scheme runs directly counter to the Commission's three-part mission and Exchange Act requirements and must be rejected.

## I.  IEX's Scheme Will Have Far-Reaching Negative Consequences

### A.  IEX's Scheme Provides An Unfair Advantage to IEX Market Makers

The IEX quote cancellation scheme has no place in today's open and competitive U.S. options market – instead it is simply designed to put more money in the pockets of IEX's shareholders and market makers by:

1. Requiring All Investors to Send Orders to IEX

    IEX asks the Commission to endorse *compelling every market participant* (including millions of retail investors) to send orders to IEX Options by designating its IEX MM displayed quotes as "protected."  So, for example, when an investor is looking to buy an option on Amazon (strike of $210 with 8/15/25 expiry), and IEX is displaying what looks to be the best price, then the investor order is *required to be routed to IEX*.

    > **IEX – Market Maker Displayed Quotes**
    > **AMZN – Aug 15, 2025 – $210 | Offer – $11**

**CITADEL | Securities**

2. <u>Preventing Investor Orders From Immediately Executing</u>

Instead of permitting the investor order to immediately match against the IEX MM displayed quote for the Amazon option (as is the case for all other "protected" quotes on other options exchanges), IEX implements an intentional delay (misleadingly called a "speedbump" to diminish its nefarious impact) that stops the incoming order from executing for a period of time.



3. <u>Aiding and Abetting Market Maker Quote Cancelling</u>

While incoming orders are prevented from immediately executing, IEX operates an algorithm that determines whether the Market Maker will be more profitable (at the expense of the investor) if its cancels (and reprices) its displayed quote for the Amazon option. Importantly, if the IEX algorithm cancels the IEX MM displayed quote, such cancellation will occur *immediately*. This means that, by the time the investor order has been released from the intentional delay, the displayed quote will have changed and the investor ends-up with either an unfilled order or an order filled at a worse price than was advertised.



It is imperative that the Commission consider these three elements together when determining whether the IEX Options Proposal is consistent with the Exchange Act.[3] The combination provides IEX MMs with a commercial benefit that mimics asymmetric speedbump proposals that have previously been rejected by the Commission as unlawful.[4] Supporters of the IEX Options Proposal openly acknowledge this fact.[5] The only minor distinction is that, in those proposals, the

---

[3] In practice, the quote cancellation scheme combines the three elements to work as follows: (i) Market Makers can post artificially aggressive prices on IEX because of the added protection provided by the quote cancellation scheme, (ii) these artificially aggressive prices result in more order flow being routed to IEX (and those Market Makers) because they will "appear" to be the best price available in the market overall and the order protection rule thus requires participants to attempt to access them, and (iii) the Market Makers only end-up honoring those displayed prices when it is commercially advantageous for them to do so; otherwise, the quote cancellation scheme will kick-in to cancel their displayed quote before it is executed.

[4] *See* Release No. 34-88261 (Feb. 21, 2020), available at: https://www.sec.gov/rules/sro/cboeedga/2020/34-88261.pdf (the "EDGA Disapproval Order").

[5] *See, e.g.,* Comment from All Options equating this proposal to the Eurex "Passive Liquidity Protection" mechanism, which is indisputably an asymmetric speedbump that closely mimics the Cboe EDGA proposal the Commission disapproved in 2020. *See* https://www.sec.gov/comments/sr-iex-2025-02/sriex202502-612247-1793634.pdf ("European markets have already embraced passive liquidity protection (PLP) mechanisms similar to those proposed by IEX") and https://www.eurex.com/ex-en/trade/market-models/eurex-plp ("With PLP activated, all *aggressive* orders [. . .] will be delayed") (emphasis added).

3

CITADEL | Securities

market maker operates its own algorithm to determine whether to cancel displayed quotes, whereas here, IEX operates the quote cancellation algorithm on behalf of the market maker. Estimates suggest these types of proposals in the equities market are worth tens of millions of dollars per exchange for market makers.[6] In light of the unique aspects of U.S. options market structure (detailed in Section I.C below), as well as the ability for IEX to change variables that determine when and how the quote cancellation scheme applies, we estimate that the wealth transfer proposed here by IEX is far larger, and thus will significantly affect order routing behavior and execution quality.

### B. IEX's Scheme Harms Investors and Other Liquidity Takers While Enriching IEX's Shareholders and Market Makers

IEX's quote cancellation scheme is explicitly designed to increase IEX MM profitability – automatically canceling quotes and compelling investors to pay worse prices. This will directly harm those on the other side of the transaction – i.e. those seeking to access displayed liquidity – as customers will repeatedly attempt (but fail) to execute against displayed prices on IEX and will end-up executing at a worse price. And yet, despite these negative effects, market participants will be *required* to route orders to IEX due to the "order protection" rule, enriching IEX's shareholders through increased exchange revenue.

Retail investors (designated non-professional "Priority Customers" under the IEX rules) are among those who will be hurt the most by IEX's scheme. Not only are retail investors typically seeking to access displayed liquidity (and thus will be severely impacted when routing orders to IEX), but they are also often able to secure additional price improvement from liquidity providers through the operation of "price improvement auctions" on other options exchanges. However, to initiate a price improvement auction, a liquidity provider must be willing to trade at the existing market-wide best price or better. If IEX MMs post artificially aggressive prices to lure incoming orders (knowing they have the backstop protection of the quote cancellation scheme), then other liquidity providers will be less likely to initiate price improvement auctions knowing that the artificially aggressive IEX quote is often illusory. This means that "price improvement auctions" could become less common on other exchanges, forcing even more retail orders to be routed to the illusory prices on IEX. Such an outcome would negatively impact retail execution quality across all U.S. options exchanges.

### C. IEX's Scheme Is Unprecedented

The proposed quote cancellation scheme is an issue of first impression for the Commission. Never before has the Commission approved a proposal that simultaneously contains *all three of the elements* detailed above (i.e. (i) an intentional delay stopping incoming orders, (ii) a quote cancellation algorithm for displayed quotations that operates while incoming orders are stopped, and (iii) treating these routinely inaccessible displayed quotations as "protected").[7]

---

[6] *See* https://www.sec.gov/comments/sr-finra-2022-032/srfinra2022032-598135-1737782.pdf at page 2.

[7] In the equities market, the Commission approved an IEX proposal in 2016 that included two of the three elements (an intentional delay with "protected" displayed quotations). However, in doing so, the Commission specifically

Furthermore, this is the first intentional delay and quote cancellation scheme proposed in the U.S. options market. That is significant for several reasons:

- **The legal framework is different**. With respect to the key question as to whether IEX MM displayed quotes can be considered "protected," the Commission's 2016 re-interpretation of the Regulation NMS definition of an "automated quotation"[8] (issued in response to IEX's equities exchange application) is not applicable. That defined term, part of the "order protection" rule for equities under Regulation NMS, does not directly apply in the U.S. options market. Instead, "order protection" in the U.S. options market is established not by Commission regulation, but pursuant to a separate NMS Plan, and the Commission has never before approved this type of nefarious scheme under that plan.

- **The IEX Options Proposal is far less narrowly tailored**. First, unlike equities, *all* options orders (including those of millions of retail investors) must be executed on-exchange in the options market.

  Second, there are far more quotations that will be canceled under this options scheme compared to equities: ~1.5 million different listed option series compared to ~11,000 equity securities and peak message traffic on the options consolidated tape is over 80 times greater than in equities (up to ~350 billion messages per day).[9]

  Third, this quote cancellation scheme operates based on price movements in the security that underlies a given options contract, and each such change in the underlier will impact many options contracts simultaneously (for example, there are over 10,000 options series on the SPY ETF alone).

---

noted that the last element (the operation of an algorithm that, while incoming orders are stopped by the intentional delay, predicts whether it will be advantageous for a market maker to cancel its displayed quote) was not being proposed. *See* IEX Approval Order, 81 FR 41142 (June 23, 2016) at 41156, FN 216, available at: https://www.govinfo.gov/content/pkg/FR-2016-06-23/pdf/2016-14875.pdf ("[A]n access delay that does not allow the repricing of displayed orders does not impact an exchange's displayed quotation, and cannot be said to lead to 'maybe' quotations.").

In 2020, the Commission approved such a quote cancellation algorithm on IEX equities, but made clear that it was considering this in isolation, given its prior approval of the other two elements noted above. *See* IEX D-Limit Approval Order, Release No. 34-89686 (Aug. 26, 2020) at 37, available at: https://www.sec.gov/files/rules/sro/iex/2020/34-89686.pdf ("Because IEX is not introducing any new delay or modifying its speed bump in connection with D-Limit orders, IEX's quote can continue to be an "automated quotation" that is "protected" under Rule 611 even if it contains a D-Limit order."). Thus, the Commission has never specifically addressed whether a proposal containing all three elements detailed above is lawful.

[8] *See* Commission Interpretation Regarding Automated Quotations Under Regulation NMS, 81 Fed. Reg. 40785 (June 23, 2016). Furthermore, technology has changed significantly since 2016; intentional delays are now more significant than they were then, almost a decade ago.

[9] *Compare* https://cdn.opraplan.com/documents/OPRA_SIP_Metrics.pdf with https://www.ctaplan.com/publicdocs/ctaplan/CTAPLAN_Processor_Metrics_1Q2025.pdf and https://www.ctaplan.com/publicdocs/ctaplan/CTAPLAN_Processor_Metrics_1Q2025.pdf.

**CITADEL | Securities**

All of these factors suggest that far more displayed quotations will be canceled by IEX MMs in the options market and a much greater percentage of incoming orders will be adversely impacted by IEX's scheme. The IEX quote cancellation scheme will also be particularly pernicious and destabilizing during episodes of market volatility by creating a vicious cycle where investors are required to unsuccessfully chase fleeting quotes in a fast-moving market.

These important differences further highlight the lack of any legal precedent to support the IEX Options Proposal.

## II. IEX's Scheme Should Be Rejected

### A. IEX Has Not Provided Sufficient Data and Analysis

IEX has not satisfied its burden under the Exchange Act to demonstrate that the proposal is consistent with applicable law. Unanswered questions include:

- What is the estimated dollar value of the wealth transfer to IEX's MMs and shareholders?

- How much artificially "tighter and deeper"[10] will IEX MMs be able to quote due to the scheme?

- How many times will the repricing mechanism be triggered per day on average? How many displayed quotations will IEX cancel on behalf of its MMs as a result of this scheme and how many incoming orders will be prevented from executing at the originally displayed price (per day on average)?[11]

---

[10] *See* IEX Options Proposal at 49 ("The ORP is designed to enable Market Makers to provide tighter and deeper quotes on IEX"). A market is not actually "tighter and deeper" if the quotes are often illusory, but this assertion by IEX highlights why the proposal is far different than the standard risk controls available on other options exchanges; otherwise, there would be no reason that IEX MMs would be able to provide "tighter and deeper quotes" on IEX versus other exchanges.

[11] IEX attempts to avoid these central questions by instead providing data purporting to show that the scheme will only be activated during a very small percentage of the trading day. *See* IEX Options Proposal at 86-7. This "data" is meaningless in the context of considering the potential harms of this scheme detailed herein – trading is not continuous, and even if there was a repricing trigger prior to *every trade* in a given options series, IEX's time-based measurement would still likely result in a very small percentage (IEX also attempts to obscure this fact by failing to provide the length of time assigned to each repricing trigger. Taking SPY as an example – when IEX asserts "ORP would impact an IEX Market Maker's quote for less than 0.2% of the trading day" – how many separate repricing triggers does that represent?). In contrast, IEX must provide data showing the impact of the scheme when trading is actually happening, as market prices move when trades happen and the IEX scheme triggers when the market moves. For example, IEX completely ignores how many incoming orders will be prevented from executing at the originally displayed price, how many market maker quotations will be canceled as a result of the scheme, and how will incoming retail investor orders be impacted in particular.

**CITADEL | Securities**

- What will be the impact on incoming retail investor (i.e. Priority Customers) orders specifically?

- What will be the impact on fill rates (from the perspective of those seeking to access displayed quotes)?

- How does IEX's scheme impact the incentives of liquidity providers to quote competitively on other options exchanges?

On top of that, IEX maintains the discretion to change – through immediately effective filings – variables that determine when and how the quote cancellation scheme applies, even while acknowledging in prior filings that altering these variables will affect the "balance" between liquidity takers and makers.[12]  So even if answers to these questions were known, IEX could shift the playing field further at any time.

**B. IEX Displayed Quotations Should Not Be "Protected"**

In no event should the Commission succumb to IEX's plea to *require* market participants to route orders to IEX and become subject to the whims of the quote cancellation scheme.  IEX's unreliable and inaccessible quotations are precisely the type of "non-firm" and "maybe" quotations that the Commission has long held do not satisfy the basic requirements to receive "order protection."   The Commission must ensure that the Options NMS Plan governing "order protection" applies this standard as required by applicable law.

(i) *IEX Displayed Quotations Are Not "Protected" Under the Options NMS Plan*

IEX's unreliable and inaccessible quotations should be "non-firm" and unprotected under the Options NMS Plan governing "order protection."  The Commission explained in approving the Options NMS Plan that its prohibition on trade-throughs "is virtually identical to the requirement in Rule 611(a) of Regulation NMS."[13]  Thus, when considering the Options NMS Plan – including the specific exclusion from order protection for "non-firm quotes"[14] – it is important to take into account the order protection rule for equities when Regulation NMS was promulgated in 2005.

The equities order protection rule distinguishes between automated quotations and manual (non-automated) quotations in order to ensure that market participants are *not required* to route orders to access manual quotations.  In doing so, the Commission noted that manual quotations were not immediately accessible, and that any delay in responding could result in "'maybe'

---

[12] *See* IEX Options Proposal at page 51 and Release No. 34-102663 (Mar. 13, 2025), available at: https://www.sec.gov/files/rules/sro/iex/2025/34-102663.pdf ("In periodically adjusting each variable, the Exchange will consider each variable with a view towards appropriately balancing the interests of both liquidity takers and makers.").

[13] Joint Industry Plan; Order Approving the National Market System Plan Relating to Options Order Protection and Locked/Crossed Markets, 74 Fed. Reg. 39362, 39365 (Aug. 6, 2009), https://www.sec.gov/files/rules/sro/nms/2009/34-60405.pdf ("Options NMS Plan").

[14] *Id.* at 39367.

CITADEL | Securities

quotations" that did not provide market participants with execution certainty (resulting in worse execution outcomes).[15]  In addition, the Commission noted the prevailing sentiment that "requiring [automated markets] to provide [such] outbound access to a non-automated market to reach the better price displayed on that other market, no matter how marginal that better price is and how long it takes the other market to execute the order (if at all), not only compromises the basic structure of their markets but also effectively grants an option to that slower market during the time period before the order is executed.  This option has value, as there is a risk that the market for the stock may move before the order is executed."[16]  As a result, the Commission made clear that the order protection rule protected only "quotations that are truly firm and fully accessible."[17]

The Options NMS Plan achieves the same result by excluding "non-firm" quotes from order protection.  Just like the "manual" quotations discussed by the Commission in Regulation NMS, "non-firm" quotations are "maybe" quotations that do not provide market participants with execution certainty.  And this is exactly what happens under the IEX Options Proposal, as IEX has designed a scheme with artificially attractive but fleeting quotes that can be canceled and repriced *after* an investor order has been sent to IEX.  Further, the IEX Options Proposal is far less "narrowly-tailored" than what IEX has implemented in the equities market as detailed in Section I.C above.  The Options NMS Plan, therefore, does not permit the Commission or IEX to treat its displayed quotations as "protected."  Instead, IEX must append an indicator to its displayed quotations to designate them as "non-firm."[18]

(ii) *If the Option NMS Plan Allowed IEX to Deem Its Displayed Quotations "Protected," the Plan Would Be Unlawful.*

If the Options NMS Plan *did* permit IEX to treat its displayed quotations as "protected" (it does not), the Plan itself would be unlawful.  By statute, the Commission is allowed to approve or require a joint plan only if that plan furthers the "public interest, the protection of investors, and the maintenance of fair and orderly markets."[19]  Congress itself found that "[i]t is in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure," among other things, "economically efficient execution of securities transactions," "fair competition," and "the availability . . . of information with respect to quotations."[20]  In addition, by regulation, the Commission "shall disapprove a national market system plan" unless it finds that the plan or amendment "is necessary or appropriate in the public interest, for the protection of investors and the maintenance of fair and orderly markets, to remove impediments to, and perfect the mechanisms of, a national market system."[21]

---

[15] Regulation NMS, 70 Fed. Reg. 37496 (June 29, 2005) at 37527.

[16] 69 FR 11126 (March 9, 2004) at 11134, available at: https://www.sec.gov/rules/proposed/34-49325.pdf.

[17] Regulation NMS at 37518.

[18] Options NMS Plan at FN 96.

[19] 15 U.S.C. § 78k-1(a)(2), (3)(B).

[20] *Id.* § 78k-1(a)(1)(C).

[21] 17 C.F.R. § 242.608(b)(2).

**CITADEL | Securities**

As explained, it would not be fair or efficient to investors or the market system as a whole to *require* those seeking to access liquidity to route orders to IEX given its unprecedented and harmful quote cancellation scheme.[22] Those features would render liquidity displayed on IEX "maybe" quotations at best, and provide IEX MMs with unfair advantages that the Exchange Act does not allow. In addition, if it considered IEX quotations as "protected," the NMS Plan would confer on IEX an unfair advantage over other exchanges. IEX could attract liquidity based not on the services it offers, but instead based on subsidizing its IEX MMs to post artificially attractive but fleeting quotes to lure incoming orders (knowing they have the backstop protection of the quote cancellation scheme). Moreover, the Options NMS Plan would discourage quoting on other exchanges (as liquidity providers are at a competitive disadvantage without similar protection). This cannot be permitted by the Exchange Act.

### C. The IEX Options Proposal Does Not Comply with the Exchange Act

Under 15 U.S.C. § 78f(b)(5) and (b)(8), an exchange's rules must "promote just and equitable principles of trade," "remove impediments to and perfect the mechanism of a free and open market and a national market system," and "protect investors and the public interest"; they must *not* "permit unfair discrimination between customers, issuers, brokers, or dealers" or "impose any burden on competition not necessary or appropriate." The IEX Options Proposal does not comply with the Exchange Act for several reasons:

- **Unfair Discrimination**. The proposal explicitly promotes unfair discrimination – favoring IEX MMs over (i) everyone else submitting displayed quotations on IEX (as only IEX MMs are eligible to use the quote cancellation scheme) and (ii) those seeking to access displayed liquidity (such as retail investors).[23] For instance, IEX has not proposed comparable mechanisms to reprice incoming retail investor orders; instead, their sole focus is on IEX MMs. There is no doubt that the proposal significantly increases IEX MM expected profitability at the expense of all other market participants.

  IEX does not dispute that its proposal confers a significant wealth transfer to IEX MMs and alters the competitive balance between IEX MMs and those seeking to access displayed liquidity.[24] It is important to note that, when evaluating a proposal that grants market makers a significant new benefit, the Commission typically requires a

---

[22] We incorporate by reference our comments regarding SR-FINRA-2022-032, which explain the unfairness and inefficiencies caused by asymmetric intentional delays. *See* https://www.sec.gov/comments/sr-finra-2022-032/srfinra2022032-286679-699882.pdf.

[23] IEX acknowledges that the implementation of the quote cancellation scheme will affect the "balance between liquidity providers and liquidity takers." IEX Options Proposal at page 87.

[24] In its prior filing, IEX specifically acknowledged that it will be dictating competitive dynamics between liquidity providers and liquidity takers. *See* Release No. 34-102663 (Mar. 13, 2025), available at: https://www.sec.gov/files/rules/sro/iex/2025/34-102663.pdf at page 80 ("the Exchange will determine the length of the latency mechanism *with a view towards achieving a healthy balance* between liquidity providers and liquidity takers") (emphasis added).

**CITADEL | Securities**

commensurate obligation.[25]  Here, IEX is not proposing to impose any additional obligations on its IEX MMs beyond those already standard in the U.S. options market.

In addition, this admission by IEX that it will be dictating competitive dynamics between liquidity providers and liquidity takers highlights why the quote cancellation scheme is very different than a geographic delay resulting from physical distance between data centers.  A geographic delay is non-discriminatory and an exchange cannot develop an order type to "bypass" a geographic delay to explicitly benefit one specific type of market participant.  In contrast, IEX's quote cancellation scheme bypasses its own intentional delay to cancel IEX MM quotes *immediately* while incoming orders are stopped – a discriminatory asymmetry that results in a significant wealth transfer to IEX MMs.  If IEX's mechanism was truly the same as a geographic delay, then there would be no reason that IEX MMs would be able to provide "tighter and deeper quotes"[26] on IEX versus other exchanges.

- **Undue Burdens on the Free Market and Competition**.  The proposal also imposes inappropriate burdens on competition that contravene the objectives of the Exchange Act.  IEX states that the quote cancellation scheme will "enable Market Makers to provide tighter and deeper quotes on IEX"[27] compared to other options exchanges and is "designed to enhance IEX Option's competitiveness."[28]  These statements reflect the competitive impact of this opaque wealth transfer to IEX's shareholders and IEX MMs, as the "order protection" rule dictates that order flow must be routed to IEX (and away from other exchanges) based on the resulting artificially attractive quotes, irrespective of whether those quotes will actually be honored.  As explained, this will negatively impact investors, including by (i) lowering fill rates for those accessing liquidity, making it harder and more expensive to trade, (ii) discouraging quoting on other exchanges (as liquidity providers are at a competitive disadvantage without similar protection), and (iii) destabilizing markets during periods of volatility, as the combination of the quote cancellation scheme and a fast-moving market creates a vicious cycle.  The IEX Options Proposal also allows IEX (and IEX MMs) to free-ride on bona fide bids and offers provided by liquidity providers on other exchanges.  These factors will lead to significant pressure on other exchanges to adopt a similar mechanism, which would effectively destroy the concept of the NBBO in the options markets and lead to chaos during periods of market turmoil.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

---

[25] *See, e.g.,* 73 FR 64379, 64388 (October 29, 2008), available at: https://www.govinfo.gov/content/pkg/FR-2008-10-29/pdf/E8-25797.pdf ("we have assessed whether the rewards granted to DMMs [. . .] are commensurate with their obligations").

[26] IEX Options Proposal at page 49.

[27] *Id.*

[28] *Id.* at page 89.

10

**CITADEL | Securities**

IEX's unprecedented quote canceling scheme to effectively *force* all investors to chase after fleeting quotes cannot be allowed in the U.S. options market.  With all options orders required to be executed on-exchange, the Commission must carefully consider the consequences of this extraordinary proposal and ultimately reject the unlawful scheme designed to enrich IEX's shareholders and a select cadre of market makers at the expense of millions of retail investors.

We thank the Commission for considering our comments.

Please feel free to call the undersigned with any questions regarding these comments.

Respectfully,

/s/ Stephen John Berger

Managing Director

Global Head of Government & Regulatory Policy

11

# ADMINISTRATIVE RECORD REFERENCE NO. 5

## SECURITIES AND EXCHANGE COMMISSION

[Release No. 34–103290; File No. SR–IEX–2025–02]

**Self-Regulatory Organizations; Investors Exchange LLC; Notice of Filing of Amendment No. 3 to a Proposed Rule Change To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options**

June 18, 2025.

On January 10, 2025, the Investors Exchange LLC (''IEX'' or ''Exchange'') filed with the Securities and Exchange Commission (''Commission''), pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 (''Act'')[1] and Rule 19b–4 thereunder,[2] a proposed rule change to adopt rules to govern the trading of options on IEX Options LLC, a facility of the Exchange that will be established in a separate rule filing. The proposed rule change was published for comment in the **Federal Register** on January 21, 2025.[3] On March 6, 2025, the Commission designated a longer period within which to take action on the proposed rule change.[4] On March 12, 2025, the Exchange filed Amendment No. 1 to the proposed rule change,[5] and Amendment No. 1 was published for comment in the **Federal Register** on March 19, 2025.[6] On April 21, 2025, the Commission instituted proceedings to determine whether to approve or disapprove the proposed rule change (''OIP'').[7] On June 13, 2025, the Exchange filed Amendment No. 2 to the proposed rule change, which it withdrew to correct a nonsubstantive pagination issue and refiled as Amendment No. 3 on June 17, 2025.[8] The Commission has received comments on the proposed rule

---

[1] 15 U.S.C. 78s(b)(1).

[2] 17 CFR 240.19b–4.

[3] *See* Securities Exchange Act Release No. 102190 (Jan. 14, 2025), 90 FR 7205.

[4] *See* Securities Exchange Act Release No. 102536, 90 FR 11866 (Mar. 12, 2025). The Commission designated April 21, 2025 as the date by which it should approve, disapprove, or institute proceedings to determine whether to disapprove the proposed rule change. *See id.*

[5] Amendment No. 1 is publicly available on the Commission's website at: *https://www.sec.gov/comments/sr-iex-2025-02/sriex202502-580115-1667463.pdf.*

[6] *See* Securities Exchange Act Release No. 102663 (Mar. 13, 2025), 90 FR 12890.

[7] *See* Securities Exchange Act Release No. 102895, 90 FR 17474 (April 25, 2025).

[8] Amendment No. 3 is publicly available on the Commission's website at *https://www.sec.gov/comments/sr-iex-2025-02/sriex202502.htm. See infra* notes 17–19 and accompanying text for a further explanation of the proposed revisions to the proposed rule change set forth in Amendment No. 3.

change.[9] The Commission is publishing this notice to solicit comments on the proposed rule change, as amended by Amendment No. 3, from interested persons. Items I and II below have been prepared by the Exchange.

### I. Self-Regulatory Organization's Statement of the Terms of Substance of the Proposed Rule Change

On January 10, 2025, IEX, pursuant to the provisions of Section 19(b)(1) under the Act[10] and Rule 19b–4 thereunder,[11] filed with the Commission proposed rule change SR–IEX–2025–02 (the ''Initial Proposal'').[12] As described in the Initial Proposal, IEX is proposing to adopt rules to govern the trading of options on IEX Options LLC, a facility of the Exchange that will be established in a separate rule filing (referred to herein as ''IEX Options''). On March 12, 2025, the Exchange filed with the SEC Amendment No. 1, which replaced and superseded the Initial Proposal in its entirety in order to provide increased clarity and modify certain aspects of the Initial Proposal as described therein (''Amendment No. 1 Proposal''). The Exchange is filing this Amendment No. 3 to provide increased clarity and modify certain aspects of the Amendment No. 1 Proposal as described herein. Amendment No. 3 replaces and supersedes Amendment No. 1 in its entirety. The Exchange previously filed Amendment No. 2 but withdrew it to correct a nonsubstantive pagination issue.

As proposed, the Exchange will operate IEX Options as a fully automated trading system built on the core functionality of the Exchange's approved equities platform, and in a manner similar to that of other options exchanges. In addition, IEX Options will utilize a de minimis delay on incoming order and quote messages designed to enable IEX to obtain the most accurate view of the market prior to processing orders and quotes, and an optional Market Maker quote parameter designed to protect IEX Market Makers from excessive risk due to execution of quotes at stale prices (*i.e.,* before the market maker can update them in response to changed market data) that can be exploited by latency arbitrage strategies (as described below), in

---

[9] Comments on the proposed rule change are available at *https://www.sec.gov/comments/sr-iex-2025-02/sriex202502.htm.*

[10] 15 U.S.C. 78s(b)(1).

[11] 17 CFR 240.19b–4.

[12] *See* Securities Exchange Act Release No. 102190 (January 14, 2025), 90 FR 7205 (January 21, 2025) (''Initial Filing''), available at *https://www.iexexchange.io/resources/regulation/rule-filings.*

addition to other risk protections substantially similar to those offered by other options exchanges.

The text of the proposed rule change is available at the Exchange's website at *https://www.iexexchange.io/resources/regulation/rule-filings* and at the principal office of the Exchange.

### II. Self-Regulatory Organization's Statement of the Purpose of, and the Statutory Basis for, the Proposed Rule Change

In its filing with the Commission, the self-regulatory organization included statements concerning the purpose of and basis for the proposed rule change and discussed any comments it received on the proposed rule change. The text of these statements may be examined at the places specified in Item IV below. The self-regulatory organization has prepared summaries, set forth in Sections A, B, and C below, of the most significant aspects of such statements.

*A. Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change*

1. Purpose

Overview

The Commission published the proposed rule change for comment in the **Federal Register** on January 21, 2025,[13] and on March 6, 2025, extended the review period to April 21, 2025.[14] The Commission published Amendment No. 1 for comment in the **Federal Register** on March 19, 2025.[15] On April 21, 2025 the Commission instituted proceedings to determine whether to approve or disapprove the proposed rule change, as modified by Amendment No. 1 (''OIP'').[16]

The Exchange is filing Amendment No. 3 to the Amendment No. 1 Proposal in order to provide increased clarity and modify certain aspects of Amendment No. 1, including to address the issues raised by the Commission in the OIP.

First, IEX proposes to revise the Options Risk Parameter (''ORP'') Indicator[17] formula specified in Supplementary Material .04 (Quote instability calculation) and Supplementary Material .05 (Calculation of implied volatility) to

---

[13] *Id.*

[14] *See* Securities Exchange Act Release No. 102536 (March 6, 2025), 90 FR 11866 (March 12, 2025).

[15] *See* Securities Exchange Act Release No. 102663 (March 13, 2025), 90 FR 12890 (March 19, 2025).

[16] *See* Securities Exchange Act Release No. 102895 (April 21, 2025); 90 FR 17474 (April 25, 2025).

[17] *See* proposed Rule 23.150(h)(1).

proposed Rule 23.150 to more narrowly tailor the parameters of the calculation and provide greater clarity with respect to the variable values included therein. Specifically, IEX proposes to revise proposed Supplementary Material .04(1)(q) and (2)(e), and Supplementary Material .05 to codify the initial value for each of three variables used in the application of the ORP: (1) Delta Bound Band; (2) Quote Instability Threshold; and (3) the frequency of the calculation of implied volatility, respectively, and provide that, if the Exchange determines to change any of the codified values within the specified ranges or values, as applicable, it will do so by submitting a rule filing pursuant to Rule 19b–4(f)(1) under the Exchange Act or other appropriate rule filing type.

Second, the Exchange provides data analysis estimating that the ORP would only have a de minimis impact on market maker quotes on IEX thus evidencing that its benefit is designed to be narrowly tailored to protect against latency arbitrage strategies. As described herein, IEX expects that for significantly more than 99% of the trading day the ORP would not impact a quote on IEX.

Third, IEX provides clarifications and additional support for certain aspects of its proposed rule change as described herein.

Fourth, IEX proposes to revise proposed Rule 19.160 concerning when accounts should be aggregated when determining position limits, substantially similar to provisions in CBOE's rules.[18]

Finally, IEX makes several non-substantive terminology revisions to enhance clarity.[19]

The Exchange proposes to adopt a series of rules in connection with IEX Options, which will be a facility of the Exchange.[20] As proposed, the Exchange will operate IEX Options as a fully automated trading system built on the core functionality of the Exchange's approved equities platform, and in a manner similar to that of other options exchanges.[21]

As proposed, IEX Options will operate an electronic trading system to list and trade options issued by the Options Clearing Corporation ("Clearing Corporation" or "OCC"). Specifically, IEX proposes to operate a fully automated, pro-rata priority options market in a manner similar to that of other options exchanges. In addition, IEX Options will utilize a de minimis delay on incoming order and quote messages designed to enable IEX to obtain the most accurate view of the market prior to processing orders and quotes, and an optional Market Maker quote parameter designed to protect Market Makers from excessive risk due to execution of quotes at stale prices, in addition to other risk protections substantially similar to those offered by other options exchanges.

The Exchange proposes to adopt rules applicable to IEX Options that are substantially similar to the approved rules of the MEMX, CBOE, MIAX, and NYSE Amex and Arca options exchanges, with the material proposed differences described herein.[22]

As provided in proposed Rule 17.110 (Applicability), existing Exchange Rules[23] applicable to the IEX equities market contained in Chapters 1 through 16 of the Exchange Rules will apply to Options Members unless a specific Exchange Rule applicable to the IEX Options market (in proposed Chapters 17 through 29 of the Exchange Rules) governs or unless the context otherwise requires.

The IEX Options System[24] will provide for the electronic display and execution of orders on a pro-rata basis. All Exchange Members will be eligible to participate in IEX Options by qualifying as Options Members[25] and obtaining one or more trading permits for their activity on IEX Options, in accordance with applicable IEX Options rules. The IEX Options System will provide an optional routing service for orders when trading interest is not present on IEX Options and will comply with all applicable securities laws and regulations and the obligations of the Options Order Protection and Locked/Crossed Market Plan.

**Background**

IEX began operation as a national securities exchange in 2016, introducing an innovative market design that includes a 350-microsecond speed bump and an indicator.[26] These features were designed to protect resting liquidity generally, as well as to increase displayed liquidity, which enhances price discovery and the quality of markets overall. These innovations have been successful in counteracting the ability of market participants to exploit speed-based advantages when the market is in transition.

Latency arbitrage is a high-speed trading strategy that exploits microsecond resolution differences in market data dissemination and trade reaction times. In essence, it involves detecting price changes (or inconsistencies) in one market and racing to trade on another market before those prices fully update. Typical latency arbitrageurs trade with their own capital and invest heavily in highly sophisticated technology and connectivity to facilitate said strategies. They leverage these technological and speed advantages to execute rapidly against passive resting orders and quotes at outdated "stale" prices, microseconds before a liquidity provider has had a fair opportunity to modify or cancel (or is in the process of modifying or cancelling) its orders to reflect updated market conditions. Given the exponential growth in options tradeable instruments (over 1.5 million individual series) and the quote-driven nature of options markets, market makers are uniquely susceptible to such strategies. This essentially represents a risk-free profit for the taker whose true cost flows to all participants as market makers price such activity into their quoted spreads. This results in artificially wide markets that reduce trading opportunities to the detriment of all market participants.[27]

---

[18] Specifically, IEX proposes to adopt language from CBOE Rule 8.30 Interpretation and Policy .03(c)(4) in new subsection (f)(2)(D) to proposed Rule 19.160 and from CBOE Rule 8.30 Interpretation and Policy .09 in new Supplementary Material .03 to proposed Rule 19.160.

[19] Specifically, in this Amendment No. 3 references to Cboe Exchange, Inc. are to CBOE rather than C1, and the Options trading system is referred to as the "System" rather than the "Trading System."

[20] IEX will file a separate proposed rule change with the Commission pursuant to Section 19 of the Act to provide that IEX Options will be operated by IEX Options LLC, a Delaware limited liability company wholly owned by the Exchange, as a facility of the Exchange as that term is defined in Section 3(a)(2) of the Act.

[21] The IEX Options proposed rules are largely based on the rules of other options exchanges, as described herein. When a particular proposed rule is described as "substantively identical" to a rule(s) of another exchanges that means that the substance of the proposed IEX Options rule is identical to the referenced rule of the other exchange, with differences only to reflect terminology and numbering. When a particular proposed rule is described as "substantially similar" to a rule(s) of another exchange this rule filing describes the relevant differences.

[22] See rulebooks of MEMX LLC ("MEMX"), Cboe Exchange, Inc. ("CBOE"), Miami International Securities Exchange, LLC ("MIAX"), NYSE Arca, Inc. ("NYSE Arca Options"), and NYSE American LLC ("NYSE Amex Options"). However, IEX is not proposing to trade index options at this time and therefore is not proposing rules for the listing and trading of index options.

[23] See IEX Rule 1.160(jj).

[24] See proposed Rule 22.100(a).

[25] See proposed Rule 17.100.

[26] See infra notes 206 and 208 and accompanying text.

[27] As the Commission has explained, latency arbitrage occurs in the securities markets "[i]n those rare moments when market prices are in transition, a race condition exists between liquidity providers who want to reprice their on-exchange displayed liquidity to reflect the changing market prices and

Since Commission approval as an exchange, and more recently of its D-Limit order type, IEX has grown in quote presence and market share as market participants increasingly choose to trade on its exchange, drawn by its innovative technology designed to protect all participants, including liquidity providers, from latency arbitrage. Comparing the third quarter of 2020 to the second quarter of 2025, IEX has experienced a dramatic increase in the time and size in which quotes entered on IEX are displayed on both sides of the NBBO (time increased from 1.1% to 27.9% while size increased from 0.6% to 11.6%), as well as a significant increase in traded volume and market share. IEX believes that these increases evidence that market participants value its protective innovations. Further, markouts for resting D-Limit orders on IEX, which measure the magnitude and direction of price moves after a trade, are substantially better when compared to other exchanges with at least 1% market share, evidencing D-Limit's narrowly tailored protection from latency arbitrage ($0.0017 per share compared to − $0.0030 per share).[28] And fill rates for orders attempting to trade with displayed orders on IEX have remained consistent.

In today's options marketplace, liquidity is primarily derived from market maker quotes and there are vastly more securities listed and traded than on equities exchanges; more than 1.5 million options series compared to approximately 10,000 National Market System (''NMS'') securities. Because of the large number of options series, there are less likely to be investor limit orders resting displayed on an exchange in any one series at any given time, so prices are commonly set by registered market makers' quotes. Thus, the need for such protections is paramount to maintaining and increasing liquidity available in the marketplace. Options market makers, even more so than equities market

makers, are left highly vulnerable, particularly given the number of securities they are quoting, to latency arbitrage which has an impact on their quoting activity in each security.

IEX believes that implementing the proposed protective measures would enhance the fairness and orderliness of the market, support the integrity of the public price discovery process, and mitigate competitive imbalances consistent with Exchange Act goals.[29] The measures are designed to improve the execution quality experience of market participants that are affected by adverse selection and this improved execution quality could encourage more displayed liquidity and contribute to tighter spreads.[30] IEX further believes that the innovations, that have been proven to increase displayed liquidity in the equity markets, would be equally, if not more beneficial to the options market given the market structure described above.

Various tools provided by all options exchanges are designed to enable market makers to manage risks, including those presented by latency arbitrage, and to enhance quote accuracy on their markets (as described below). In IEX's continuing efforts to find innovative solutions to assist liquidity providers in managing risk, IEX seeks to extend its proven, innovative technology to further assist options market makers in managing such risks and thereby promote fairer markets and mitigate speed-based advantages on its platform. This business choice in exchange offerings supports the fostering of technological innovation and dynamic competition in the options markets, as envisioned by the Exchange Act.

**IEX Options Members**

Pursuant to the proposed rules in Chapter 18 (Participation on IEX Options), the Exchange will authorize any Exchange Member that meets certain enumerated qualification requirements (any such Member, an ''Options Member'') and any Options Member's Sponsored Participants to obtain access to, and transact business on, IEX Options.[31]

There will be three types of Options Members—Options Order Entry Firms (''OEFs''), Options Market Makers, and Options Clearing Members. Options Members may act in one, two, or all such capacities. OEFs will be those Options Members representing Customer Orders as agent on IEX Options or trading as principal on IEX Options. Options Market Makers, in turn, will be eligible to participate as Registered Market Makers or Specialists, as set forth in Rule 23.100. Additionally, all Options Market Makers may participate as Directed Marker Makers.[32] Clearing Members will be those Options Members that have been admitted to membership in the Clearing Corporation pursuant to the provisions of the Rules of the Clearing Corporation and are self-clearing or that clear IEX Options Transactions for other Options Members.

IEX proposes to issue different types of Trading Permits to Options Members that allow the Trading Permit Holders to: (i) trade one or more products authorized for trading on the Exchange; (ii) act in one or more trading functions authorized by the Rules of IEX Options; and/or (iii) act as a Clearing Member.[33] Trading Permits shall be for the types and terms as shall be determined by the Exchange from time to time, and subject to effectiveness of one or more rule filings pursuant to Section 19(b) of the Act. The proposed rule governing IEX's Trading Permits, Rule 18.140, is based on CBOE Rule 3.1.[34]

The rules governing Registered Market Makers and Specialists are substantially based on MIAX and CBOE rules.[35] To become an Options Market

---

the liquidity takers who want to take before those updates can occur.'' *See* Securities Exchange Act Release No. 89686 (August 26, 2020), 85 FR 54438, at 54442 (September 1, 2020) (SR–IEX–2019–15) (''2020 SEC Approval Order''). Those liquidity providers who cannot react as fast to changing market conditions are subject to adverse selection of executions at stale prices. *See id.; see also Citadel Securities LLC* v. *Securities and Exchange Commission,* 45 F.4th 27, 31 (D.C. Cir. 2022) (explaining that exchanges experience latency whereby certain high-frequency traders can take securities at old-stale prices just before updated prices reach the exchange).

[28] Markouts are measured by comparing the trade price to the midpoint of the NBBO one second after the trade, expressed in mils/share, excluding any fees/rebates. (Source: NYSE Trade and Quote data and IEX market data.)

[29] *See infra* note 163 discussing structural challenges facing market makers.

[30] *See, e.g.,* Citadel Securities, *Market Lens,* July 2020 (''Market Lens'') (explaining that ''a wide array of market participants seek to lower their risk of inopportune executions by constantly updating their orders to reflect changing market conditions'' and this can lead to higher quote cancellation rates and frequent quote updates to reflect accurate prices), available at *https://www.citadel.com/ securities/wp-content/uploads/sites/2/2020/07/ Market-Lens-Order-Cancellation-White-Paper_ FINAL.pdf).*

[31] *See* proposed Rules 18.100, 18.110, 18.120, and 18.130.

[32] Directed Market Makers would be subject to enhanced quoting obligations (as compared to Registered Market Markers) as set forth in proposed Rule 23.150(e)(3), which is substantively identical to NYSE Amex Options Rule 964.1NYP.

[33] *See* proposed Rule 18.140.

[34] On CBOE, part of the process of applying to be a Trading Permit Holder is for a broker-dealer to qualify as a participant or member of the exchange. IEX's proposed rule therefore differs from CBOE Rule 3.1 because it does not include the membership qualification-related provisions that are addressed elsewhere in IEX's proposed Chapter 18. In particular, IEX is not proposing to incorporate CBOE Rule 3.1(a)(3)'s language regarding jurisdiction over Trading Permit Holders because it is covered by Rule 2.120 (requiring all IEX Members to consent to the Exchange's jurisdiction) and proposed Rule 18.140(e) (applying the Exchange's jurisdictional authority to all Options Members). In addition, CBOE's rule includes limitations on the number of trading permits the exchange may issue. IEX is not proposing such limitations.

[35] *See* MIAX Rules 600–609 (regarding market maker qualifications and obligations) and MIAX Rules 514(d), (e), and (g) (regarding market maker quoting and priority). The primary differences between these MIAX rules and IEX's proposed

Continued

Maker, an Options Member will be required to register by filing a written application and obtain any required trading permits.[36] The Exchange will not place any limit on the number of entities that may become Options Market Makers, the number of appointments an Options Market Maker may have, or the number of Options Market Makers that may have appointments in a class unless the Exchange determines to impose any such limit based on system constraints, capacity restrictions, or other factors relevant to protecting the integrity of the System. The Exchange will not impose any such limitations until it has submitted objective standards for imposing the limits to the Commission for its review and approval.[37]

As proposed, the Exchange shall appoint Registered Market Makers to one or more classes of options contracts traded on the Exchange. In making such appointments the Exchange shall consider the financial resources available to the Registered Market Maker, the Registered Market Maker's experience and expertise in market making or options trading, the preferences of the Registered Market Maker to receive appointments in specific options classes, and the maintenance and enhancement of competition among Registered Market Makers in each class of options contracts to which they are appointed.[38]

While there may be several Registered Market Makers appointed to a particular class of options contracts, the Exchange may appoint only one Specialist to each options class traded on the Exchange.[39] To be appointed as a Specialist, an Options Member must first satisfy the criteria for appointment as a Registered Market Maker set forth in Rule 23.120(a)(1) and then must participate

in the Specialist Qualification Process conducted by the Exchange and detailed in proposed Rule 23.130(b).[40] Factors to be considered for selection as a Specialist include, but are not limited to, representations regarding capital operations, personnel or technical resources.[41] After designating certain Market Makers as Specialists, the Exchange will conduct a process to determine which options classes to allocate to which Specialist, based upon which candidate appears best able to perform the functions of a Specialist in the designated options classes. Factors to be considered in the allocation of options classes to Specialists by the Exchange include, but are not limited to the following: experience with trading the options issue; adequacy of capital; willingness to promote the Exchange as a marketplace; operational capacity; support personnel; history of adherence to Exchange rules and securities laws; and evaluations made pursuant to proposed Rule 23.130(f).[42] The Exchange will also consider the number and quality of issues that have been allocated, reallocated or transferred to a Specialist and the Specialist's willingness to promote the Exchange as a marketplace.[43]

The Exchange will also evaluate the performance of Specialists, and upon a finding that a Specialist failed to meet minimum performance standards, may take adverse action against the Specialist; Specialists shall have the right to appeal any adverse actions against them pursuant to IEX Rule Series 9.500, which governs adverse actions.[44]

Quotations may only be entered by a Market Maker and only in classes of options contracts to which the Market Maker is appointed.[45] Market Makers may also submit orders in classes of options contracts to which the Market Maker is appointed, which shall

constitute a quote, and thus would help to satisfy the Market Maker's quoting obligation.[46] In addition, an Options Market Maker with an OEF trading permit may submit orders in classes of options in which the Market Maker has no appointment, provided that the total number of such orders executed by the Market Maker do not exceed 25% of all contracts the Market Maker executes on the Exchange in any calendar quarter.[47]

Options Market Makers will be required to electronically engage in a course of dealing reasonably calculated to contribute to the maintenance of fair and orderly markets.[48] IEX does not propose to incorporate MIAX's requirement that Market Makers refrain from purchasing an option at a price more than $0.25 below parity,[49] because IEX does not believe the restriction is necessary to the maintenance of fair and orderly markets requirement, and notes that other exchanges do not include this restriction.[50] Market Makers will be required to maintain a two-sided market on a continuous basis [51] in at least 60% of the non-adjusted options series to which they are appointed as Registered Market Makers and at least 90% of the non-adjusted options series to which they are appointed as Specialists, provided the options classes have a time to expiration of less than nine months.[52] And, as noted above, Directed Market Makers are subject to enhanced quoting obligations compared to Registered Market Makers.[53] Market Makers and Specialists may use quotes and orders to meet the applicable quoting requirements. These obligations will not apply to an intra-day add-on series on the day during which such series was added for trading. Market Maker quotes must be firm quotes that comply with enumerated price and size rules.[54] These obligations also will not apply when an Options series is halted because the underlying security has entered a Limit or Straddle state.[55]

---

Market Maker rules are: (1) MIAX has three tiers of market makers, while IEX proposes to have two tiers; (2) MIAX puts Market Makers at a priority level above other non-Priority Customer interest, while IEX will not (IEX's proposed rules are substantively identical to the priority rules in CBOE Rule 5.32 as it pertains to CBOE's Preferred Market Makers); (3) IEX proposes to allocate participation entitlements for Specialists with a priority quote based on the amount of non-Priority customer interest (which is how CBOE Rule 5.32(a)(2)(B) allocates priority overlays), while MIAX only looks at the amount of other market marker interest; and (4) MIAX offers a Market Turner priority overlay which IEX is not proposing to adopt.

[36] *See* proposed Rules 23.100 and 18.140.

[37] This provision is substantively identical to MEMX Rule 22.2(c) and MIAX Rule 600(d).

[38] *See* proposed Rule 23.120(a)(1).

[39] *See* proposed Rule 23.130(g)(1)(A), which is substantively identical to NYSE Amex Options Rule 923NY(b). The language providing that the Exchange "may" appoint only one Specialist to each options class is based upon and substantively identical to NYSE Amex Options Rule 923NY(b).

[40] IEX based the proposed Specialist rule (23.130) on NYSE Amex Options Rules 927NY, 927.1NY, and 927.2NY because these rules provide clear instructions to prospective Specialist candidates about the manner in which the Exchange selects and evaluates Specialists, and detailed rules about Specialist rights and obligations.

[41] *See* proposed Rule 23.130(b)(1). This rule is substantively identical to NYSE Amex Options Rule 927NY, with the exception that IEX is not proposing to obligate Specialists to make FLEX quotes, because those are not offered by the Exchange.

[42] *See* proposed Rule 23.130(g). This rule is substantively identical to NYSE Amex Options Rule 927.2NY.

[43] *Id.*

[44] *See* proposed Rule 23.130(b)(2), and (f). These rules are substantively identical to NYSE Amex Options Rules 927NY(b)(2) and 927.1NY, respectively.

[45] *See* proposed Rule 23.150(a).

[46] *See* proposed Rule 17.100 (defining "Quote" to include orders entered by a Market Maker in the option series to which such Market Maker is registered).

[47] *See* proposed Rule 23.150(g).

[48] *See* proposed Rule 23.140(a).

[49] *See* MIAX rule 603(a).

[50] *See, e.g.,* NYSE Arca Options Rule 6.37–O.

[51] "Continuous quoting" is defined as 90% of the time. *See* proposed Rule 23.150(e).

[52] *See* proposed Rule 23.150(e)(2) and (e)(1). Proposed Rule 23.150(e)(1) is based upon and substantively identical to NYSE Amex Options Rule 925.1NYP(b) and proposed Rule 23.150(e)(2) is based upon and substantively identical to NYSE Amex Options Rule 925.1NYP(c).

[53] *See supra* note 29.

[54] *See* proposed Rule 23.150(b) and (d).

[55] *See* Supplementary Material .01 to proposed Rule 23.150(h), which is substantively identical to MIAX Rule 530(f)(1).

Registered Market Makers and Specialists also must maintain minimum net capital in accordance with Commission and Exchange rules.[56] Substantial or continued failure by an Options Market Maker to meet any of its obligations and duties will subject the Options Market Maker to disciplinary action, suspension, or revocation of the Market Maker's registration as such or its appointment in one or more of its appointed options classes.[57]

As on other exchanges, Options Market Makers receive certain benefits for carrying out their duties. For example, a lender may extend credit to a broker-dealer without regard to the restrictions in Regulation T of the Board of Governors of the Federal Reserve System if the credit is to be used to finance the broker-dealer's activities as a specialist or market maker on a national securities exchange. Thus, an Options Market Maker has a corresponding obligation to hold itself out as willing to buy and sell options for its own account on a regular or continuous basis to justify this favorable treatment.

Every Options Member shall at all times maintain membership in another registered options exchange that is not registered solely under Section 6(g) of the Exchange Act or in the Financial Industry Regulatory Association ("FINRA").[58] OEFs and other Options Members that transact business with Public Customers must at all times be members of FINRA. Pursuant to proposed Rule 18.110(h), every Options Member will be required to have at least one registered Options Principal who satisfies the criteria of that rule, including the satisfaction of a proper qualification examination. An OEF may only transact business with Public Customers if such Options Member also is an Options Member of another registered national securities exchange or association with which the Exchange has entered into an agreement under Rule 17d–2 under the Exchange Act [59] pursuant to which such other exchange

or association shall be the designated options examining authority for the OEF.[60]

The proposed rules relating to qualification and participation on IEX Options as an Options Member (including as an OEF, Options Market Maker, or Clearing Member) are substantively identical to the relevant rules of MEMX Options.[61]

As provided in proposed Rule 17.110, existing Exchange Rules applicable to the IEX equities market contained in Chapters 1 through 16 of the Exchange Rules will apply to Options Members unless a specific Exchange Rule applicable to the IEX Options market (proposed Chapters 17 through 29 of the Exchange Rules) governs or unless the context otherwise requires. Options Members can therefore provide sponsored access to the IEX Options Exchange to a non-Member (*i.e.,* a Sponsored Participant) pursuant to Rule 11.130 of the Exchange Rules.

Definitions

The Exchange proposes to define a series of terms under proposed Rule 17.100 (Definitions), which are to be used in proposed Chapters 17 to 29 relating to the trading of options contracts on the Exchange. Unless otherwise indicated, all of the terms defined in proposed Rule 17.100 are either identical or substantially similar to definitions included in MEMX Rule 16.1. Any modifications to the MEMX definitions, or definitions based upon the rules of other exchanges are specifically indicated below.

The definitions under proposed Rule 17.100 are as follows:

• ABBO. The term "ABBO" or "Away Best Bid or Offer" means the best bid(s) or offer(s) disseminated by other Eligible Exchanges (as defined in Rule 28.100) and calculated by the Exchange based on market information the Exchange receives from OPRA.[62]

• Aggregate Exercise Price. The term "Aggregate Exercise Price" means the exercise price of an options contract multiplied by the number of units of the underlying security covered by the options contract.

• American-Style Option. The term "American-Style" option means an options contract that, subject to the provisions of Rule 24.100 (relating to the cutoff time for exercise instructions) and to the Rules of the Clearing Corporation, may be exercised at any

time from its commencement time until its expiration.

• Associated Person and Person Associated with an Options Member. The terms "associated person" and "person associated with an Options Member" mean any partner, officer, director, or branch manager of an Options Member (or any person occupying a similar status or performing similar functions), any person directly or indirectly controlling, controlled by, or under common control with an Options Member or any employee of an Options Member, except that any person associated with an Options Member whose functions are solely clerical or ministerial shall not be included in the meaning of such term for purposes of these Rules.

• Bid. The term "bid" means a Limit order to buy one or more options contracts.

• Board. The term "Board" means the Board of Directors of Investors' Exchange LLC.

• Call. The term "call" means an options contract under which the holder of the option has the right, in accordance with the terms of the option, to purchase from the Clearing Corporation the number of shares of the underlying security covered by the options contract.

• Capacity. The term "capacity" means the capacity in which a User submits an order, which the User specifies by applying the corresponding code to the order. The capacity codes available on IEX Options will be listed in publicly available specifications and published in a Regulatory Circular.

• Class of Options. The terms "class" or "class of options" mean all options contracts with the same unit of trading covering the same underlying security.

• Clearing Corporation and OCC. The terms "Clearing Corporation" and "OCC" mean The Options Clearing Corporation.

• Clearing Member. The term "Clearing Member" means an Options Member that is self-clearing or an Options Member that clears IEX Options Transactions for other Options Members.

• Closing Purchase Transaction. The term "closing purchase transaction" means an IEX Options Transaction that reduces or eliminates a short position in an options contract.

• Closing Writing Transaction. The term "closing writing transaction" means an IEX Options Transaction that reduces or eliminates a long position in an options contract.

• Control. The term "control" means the power to exercise a controlling influence over the management or

---

[56] *See* proposed Rule 23.180 ($200,000 net capital requirement for Registered Market Makers), which is substantively identical to MEMX Rule 22.9 and proposed Rule 23.130(c)(1)(H) ($1,000,000 net capital requirement for Specialists), which is substantively identical to Amex Options Rule 927NY(c)(10).

[57] *See* proposed Rule 23.120(f). NYSE Amex Options Rule 927.1NY(1)(B) specifies that NYSE Amex Options provides its specialists information related to their market share in allocated issues on a monthly basis as part of the evaluation process. IEX is not proposing to include this provision because it understands that Specialist firms are well-equipped to monitor their market share and performance on IEX and other markets.

[58] *See* proposed Rule 18.110(g).

[59] 17 CFR 240.17d–2.

[60] *See* proposed Rule 27.100.

[61] *See* MEMX Rulebook Chapters 17 and 22.

[62] IEX notes that this definition differs from the MEMX definition of ABBO by spelling out the phrase "Away Best Bid or Offer" that ABBO refers to for added clarity.

policies of a person, unless such power is solely the result of an official position with such person. Any person who owns beneficially, directly or indirectly, more than 20% of the voting power in the election of directors of a corporation, or more than 25% of the voting power in the election of directors of any other corporation which directly or through one or more affiliates owns beneficially more than 25% of the voting power in the election of directors of such corporation, shall be presumed to control such corporation.[63]

• Covered Short Position. The term "covered short position" means (i) an options position where the obligation of the writer of a call option is secured by a "specific deposit" or an "escrow deposit" meeting the conditions of Rules 610(f) or 610(g), respectively, of the Rules of the Clearing Corporation, or the writer holds in the same account as the short position, on a share-for-share basis, a long position either in the underlying security or in an options contract of the same class of options where the exercise price of the options contract in such long position is equal to or less than the exercise price of the options contract in such short position; and (ii) an options position where the writer of a put option holds in the same account as the short position, on a share-for-share basis, a long position in an options contract of the same class of options where the exercise price of the options contract in such long position is equal to or greater than the exercise price of the options contract in such short position.

• Customer. The term "Customer" means a Public Customer or a broker-dealer.

• Customer Order. The term "Customer order" means an agency order for the account of a Customer.

• Directed Order. The term "Directed Order" is an order entered into the System by an Options Member with a designation for a Market Maker in that class (referred to as a "Directed Market Maker" or "DMM"). To qualify as a Directed Order, an order must be entered on behalf of a Priority Customer.[64]

• Discretion. The term "discretion" means the authority of a broker or dealer to determine for a Customer the type of option, the class or series of options, the number of contracts, or whether options are to be bought or sold.

• European-Style Option. The term "European-style option" means an options contract that, subject to the provisions of Rule 24.100 (relating to the cutoff time for exercise instructions) and to the Rules of the Clearing Corporation, can be exercised only on its expiration date.

• Exchange Act. The term "Exchange Act" or "Act" means the Securities Exchange Act of 1934, as amended, or Rules thereunder.

• Exercise Price. The term "exercise price" means the specified price per unit at which the underlying security may be purchased or sold upon the exercise of an options contract.

• He, Him, and His. The terms "he," "him" and "his" are deemed to refer to persons of female as well as male gender, and to include organizations, as well as individuals, when the context so requires.

• IEX Exchange and Exchange. The terms "IEX Exchange" and "Exchange" mean Investors' Exchange LLC, a registered national securities exchange.

• IEX Options. The term "IEX Options" means IEX Options LLC, a Delaware limited liability company wholly owned by the Exchange, which operates as an options trading facility of the Exchange under Section 3(a)(2) of the Exchange Act.

• IEX Options Book. The term "IEX Options Book" means the electronic book of options orders maintained by the System.[65]

• IEX Options Transaction. The term "IEX Options Transaction" means a transaction involving an options contract that is effected on or through IEX Options or its facilities or systems.[66]

• Individual Equity Option. The term "individual equity option" means an options contract which is an option on an equity security.

• Long Position. The term "long position" means a person's interest as the holder of one or more options contracts.

• Market Makers (and Options Market Makers). The terms "Market Makers" or "Options Market Makers" refer collectively to Options Members registered, pursuant to Rule 23.100, as either a "Registered Market Maker" or a "Specialist".[67]

• MPID. The term "MPID" means unique market participant identifier assigned to an Options Member.

• NBB, NBO, and NBBO. The term "NBB" means the national best bid, the term "NBO" means the national best offer, and the term "NBBO" means the national best bid or offer as calculated by IEX Options based on market information received by IEX Options from OPRA.

• Offer. The term "offer" means a Limit order to sell one or more options contracts.

• OPRA. The term "OPRA" means the Options Price Reporting Authority.

• Opening Purchase Transaction. The term "opening purchase transaction" means a IEX Options Transaction that creates or increases a long position in an options contract.

• Opening Writing Transaction. The term "opening writing transaction" means a IEX Options Transaction that creates or increases a short position in an options contract.

• Options Contracts. The term "options contract" means a put or a call issued, or subject to issuance by the Clearing Corporation pursuant to the Rules of the Clearing Corporation.

• Options Market Close and Market Close. The terms "options market close" and "market close" mean the time the Exchange specifies for the end of a trading session on the Exchange on that trading day.

• Options Market Open and Market Open. The terms "options market open" and "market open" mean the time the Exchange specifies for the beginning of a trading session on the Exchange on that trading day.

• Options Member. The term "Options Member" means a firm, or organization that is registered with the Exchange pursuant to Chapter 18 of these Rules for purposes of participating in options trading on IEX Options as an "Options Order Entry Firm", "Options Market Maker", or "Clearing Member."

---

[63] This definition is substantively identical to the definition in CBOE Rule 1.1. IEX proposes to incorporate this definition, because the term is not specifically defined in the MEMX rulebook and IEX believes that term would provide helpful context to Options Members with respect to other rules that use the term, *e.g.,* proposed IEX Rule 19.200.

[64] This definition is based upon the definition in MIAX Options Exchange ("MIAX") Rule 100, with the distinction that IEX proposes to make any Market Maker eligible to receive a Directed Order, while MIAX only allows their Lead Market Makers (akin to IEX's proposed "Specialists") and Primary Lead Market Makers eligible; this aspect of IEX's

proposed rule change is based upon and substantially similar to CBOE Rule 5.32. Additionally, IEX proposes to include language in the last sentence of this definition based on NYSE Amex Rule 900.3NYP(i)(4) to clarify that an order submitted on behalf of a non-Priority Customer would be treated as a non-Directed Order.

[65] This definition is substantively identical to the equivalent definition in the MEMX rulebook, except that it refers to IEX, not MEMX.

[66] This definition is substantively identical to the equivalent definition in the MEMX rulebook, except that it refers to IEX, not MEMX.

[67] This definition is substantively identical to the definition in the MIAX rulebook, except that MIAX has three classes of Market Makers (Registered Market Makers, Lead Market Makers, and Primary Lead Market Makers) while IEX proposes to have two classes of Market Makers: Registered Market Makers (equivalent to MIAX Registered Market Maker) and Specialists (which is based on MIAX's Lead Market Maker and Primary Lead Market Maker rules). IEX proposes to incorporate this definition, because the Market Maker rules proposed herein are substantially based upon the rules of MIAX.

• Options Member Agreement. The term ''Options Member Agreement'' means the agreement to be executed by Options Members to qualify to participate on IEX Options.

• Options Order Entry Firm, Order Entry Firm, and OEF. The terms ''Options Order Entry Firm'' and ''Order Entry Firm'' or ''OEF'' mean those Options Members representing as agent Customer Orders on IEX Options and those non-Market Maker Members conducting proprietary trading.

• Options Principal. The term ''Options Principal'' means a person engaged in the management and supervision of the Options Member's business pertaining to options contracts that has responsibility for the overall oversight of the Options Member's options related activities on the Exchange.

• Order. The term ''order'' means a firm commitment to buy or sell options contracts as defined in Rule 22.100.

• Outstanding. The term ''outstanding'' means an options contract which has been issued by the Clearing Corporation and has neither been the subject of a closing writing transaction nor has reached its expiration date.

• Primary Market. The term ''primary market'' means the primary exchange on which an underlying security is listed.[68]

• Priority Customer and Priority Customer Order. The term ''Priority Customer'' means any person or entity that is not: (A) a broker or dealer in securities; or (B) a Professional. The term ''Priority Customer Order'' means an order for the account of a Priority Customer.

• Professional. The term ''Professional'' means any person or entity that (A) is not a broker or dealer in securities; and (B) places more than 390 orders in listed options per day on average during a calendar month for its own beneficial account(s). All Professional orders shall be appropriately marked by Options Members.[69]

• Protected Quotation. The term ''Protected Quotation'' has the meaning provided in Rule 28.100.

• Public Customer and Public Customer Order. The term ''Public Customer'' means a person that is not a broker or dealer in securities. The term ''Public Customer Order'' means an order for the account of a Public Customer.

• Put. The term ''put'' means an options contract under which the holder of the option has the right, in accordance with the terms and provisions of the option and the Rules of the OCC, to sell to the Clearing Corporation the number of units of the underlying security covered by the options contract, at a price per unit equal to the exercise price, upon the timely exercise of such option.

• Quarterly Options Series. The term ''Quarterly Options Series'' means a series in an options class that is approved for listing and trading on the Exchange in which the series is opened for trading on any business day and expires at the close of business on the last business day of a calendar quarter.

• Quote or Quotation. The terms ''quote'' or ''quotation'' means a bid or offer entered by a Market Maker as a firm order that updates the Market Maker's previous bid or offer, if any. When the term order is used in these Rules and a bid or offer is entered by the Market Maker in the options series to which such Market Maker is registered, such order shall, as applicable, constitute a quote or quotation for purposes of these Rules. A quote or quotation may be canceled or repriced in accordance with Rules 22.250, 22.260, or 23.150, if so designated by the Market Maker to assist in its risk management.

• Registered Market Maker. The term ''Registered Market Maker'' means an Options Member registered with the Exchange for the purpose of making markets in securities traded on the Exchange, who is vested with the rights and responsibilities specified in Chapter 23 of these Rules with respect to Registered Market Makers.[70]

• Responsible Person. The term ''Responsible Person'' means a U.S.-based officer, director, or management-level employee of an Options Member, who is registered with the Exchange as an Options Principal, responsible for the direct supervision and control of associated persons of that Options Member.

• Rules of IEX Options. The term ''Rules of IEX Options'' mean the rules contained in Chapters 17 to 29 of the Investors Exchange Rules governing the trading of options on the Exchange.

• Rules of the Clearing Corporation and Rules of the OCC. The terms ''Rules of the Clearing Corporation'' and ''Rules of the OCC'' mean the Certificate of Incorporation, the By-Laws and the Rules of the Clearing Corporation, and all written interpretations thereof, as may be in effect from time to time.

• SEC or Commission. The terms ''SEC'' or ''Commission'' mean the United States Securities and Exchange Commission.

• Series of Options. The terms ''series'' or ''series of options'' mean all options contracts of the same class that are the same type of options and have the same exercise price and expiration date.

• Short Position. The term ''short position'' means a person's interest as the writer of one or more options contracts.

• Short Term Options Series. The term ''Short Term Options Series'' means a series in an options class that is approved for listing and trading on the Exchange in which the series is opened for trading on any Monday, Tuesday, Wednesday, Thursday or Friday that is a business day and that expires on the Monday, Tuesday, Wednesday, Thursday or Friday of the next business week, or, in the case of a series that is listed on a Friday and expires on a Monday, is listed one business week and one business day prior to that expiration. If a Tuesday, Wednesday, Thursday or Friday is not a business day, the series may be opened (or shall expire) on the first business day immediately prior to that Tuesday, Wednesday, Thursday or Friday, respectively. For a series listed pursuant to this section for Monday expiration, if a Monday is not a business day, the series shall expire on the first business day immediately following that Monday.

• Specialist. The term ''Specialist'' means a Market Maker appointed by the Exchange to act as the primary lead Market Maker for the purpose of making markets in securities traded on the Exchange. The Specialist is vested with the rights and responsibilities specified in Chapter 23 of these Rules with respect to Specialists.[71]

• SRO. The term ''SRO'' means a self-regulatory organization as defined in Section 3(a)(26) of the Exchange Act.

• System. The term ''System'' means the automated trading system used by IEX Options for the trading of options contracts.

---

[68] This definition is based on the definition in CBOE Rule 1.1, because IEX believed the definition was more streamlined than the equivalent definition in the MEMX rulebook.

[69] See Supplementary Material .01 to proposed Rule 17.100, which sets forth the methodology for calculation of Professional orders.

[70] This definition is substantively identical to the definition in MIAX Rule 100. IEX proposes to incorporate this definition, because the Market Maker rules proposed herein are substantially based upon the rules of MIAX.

[71] This definition is substantively identical to the definition of Lead Market Makers and Primary Lead Market Makers in MIAX Rule 100. As discussed above, IEX proposes to incorporate the MIAX definitions for both Lead Market Makers and Primary Lead Market Makers into its definition for Specialists, because the Market Maker rules proposed herein are substantially based upon the rules of MIAX.

• Timestamp. The term "timestamp" means the effective time sequence assigned to an order for purposes of determining its priority ranking.

• Trading Permit. The term "Trading Permit" means a license issued by the Exchange to an Options Member that grants the Trading Permit Holder ("TPH") the right to access one or more of the facilities of the Exchange for the purpose of effecting transactions in options traded on the Exchange without the services of another person acting as broker, and otherwise to access the facilities of the Exchange for purposes of trading or reporting transactions or transmitting orders or quotations in options traded on the Exchange, or to engage in other activities that, under the Rules of IEX Options, may only be engaged in by the TPH that satisfies any applicable qualification requirements to exercise those rights. A Trading Permit conveys no ownership interest in the Exchange, is only available through the Exchange, and is subject to the terms and conditions set forth in Rule 18.140.[72]

• Trading Permit Holder. The term "Trading Permit Holder" or "TPH" means the holder of a Trading Permit, as described in IEX Rule 18.140.[73]

• Type of Option. The term "type of option" means the classification of an options contract as either a put or a call.

• Uncovered. The term "uncovered" means a short position in an options contract that is not covered.

• Underlying Security. The term "underlying security" means the security that the Clearing Corporation shall be obligated to sell (in the case of a call option) or purchase (in the case of a put option) upon the valid exercise of an options contract.

• User. The term "User" means any Options Member or Sponsored Participant who is authorized to obtain access to the System pursuant to Rule 11.130 (Access).

Execution System

IEX Options will utilize a pro-rata allocation model with execution priority dependent on the size and capacity of an order; specifically, Priority Customer or non-Priority Customer, as well as status as a Registered Market Maker or Specialist, as applicable. The proposed pro-rata allocation model is similar to the MIAX and NYSE Amex options exchanges.[74]

The Exchange will become an exchange member of the OCC. The System will be linked to OCC for the Exchange to transmit locked-in trades for clearance and settlement.[75]

IEX Options will include a de minimis delay on incoming order and quote messages designed to enable IEX to obtain the most accurate view of the market prior to processing orders and quotes, and an optional Market Maker quote parameter designed to protect Market Makers from excessive risk due to execution of quotes at stale prices, in addition to other risk protections substantially similar to those offered by other options exchanges.

*Anonymity.* As set forth in proposed Rule 22.190, aggregated and individual transaction reports produced by the System will indicate the details of a User's transactions, including the contra party's unique market participant identifier ("MPID"), capacity, and clearing firm account number.[76]

*Latency Mechanism.*[77] IEX's proposal includes a de minimis hardware based latency mechanism (or speedbump) of 350 microseconds added to each incoming order and quote message[78] designed to enable IEX to obtain the most accurate view of the market prior to processing orders and quotes as well as to perform the Options Quote Indicator ("Indicator") calculation, and effectuate any action, with current market data.[79] If the Exchange

determines to change the duration of the delay, it will do so only pursuant to an effective rule filing submitted to the Commission pursuant to Section 19 of the Exchange Act.[80]

*Hours of Operation.* As provided in proposed Rule 22.110(a), the IEX Options System will begin accepting orders and quotes beginning at 8:00 a.m.[81] pursuant to the market opening procedures described in proposed Rule 22.160. Orders and bids and offers shall be open and available until 4:00 p.m. except for options contracts on Fund Shares, as defined in proposed Rule 20.120(i), which may close as of 4:15 p.m. The Proposed Hours of Operation rule is based on MEMX Rule 21.2, except that MEMX does not allow for submission of quotes before the market opens for trading; IEX notes that other exchanges begin accepting orders and quotes before the market opens, for example CBOE begins accepting quotes at 7:30 a.m.[82] Except as set forth above, IEX Options shall operate during the normal business days and hours set forth in the rules of the primary market trading the securities underlying options traded on IEX Options, absent unusual conditions as may be determined by the Exchange.[83] IEX Options will not be open for business on any holiday observed by the Exchange.[84]

*Units of Trading.* As stated in proposed Rule 22.120, the unit of trading in each series of options traded on IEX Options will be the unit of trading established for that series by the OCC pursuant to the rules of the OCC and the agreements of the Exchange with the OCC. The proposed determination of the unit of trading for a series of options traded on IEX Options is the same as on MEMX Options pursuant to MEMX Rule 21.3.

*Minimum Quotation and Trading Increments.* As stated in proposed Rule 22.140(a), the Exchange is proposing to apply the following quotation increments: (1) if the options series is trading at less than $3.00, five (5) cents; (2) if the options series is trading at $3.00 or higher, ten (10) cents; and (3) if the options series is trading pursuant

---

[72] This definition is substantively identical to the definition in CBOE Rule 1.1. IEX proposes to incorporate this definition, because its proposed Trading Permit rule (Rule 18.140), is substantively similar to the equivalent CBOE Rule (CBOE Rule 3.1).

[73] This definition is substantively identical to the definition in CBOE Rule 1.1. IEX proposes to incorporate this definition, because its proposed Trading Permit rule (Rule 18.140), is substantively similar to the equivalent CBOE Rule (CBOE Rule 3.1).

[74] *See infra* note 96.

[75] Proposed Rule 22.220(a) notes that all Options transactions shall be submitted for clearance to the Clearing Corporation, and the Exchange shall assume no responsibility with respect to any unmatched trade or for any delays or errors in the reporting to it of trade information. This provision is based upon and substantively identical to MIAX Rule 524.

[76] The Exchange shall also reveal a User's identity: (i) when a registered clearing agency ceases to act for a participant, or the User's clearing firm, and the registered clearing agency determines not to guarantee the settlement of the User's trades; and (ii) for regulatory purposes or to comply with an order of an arbitrator or court. *See* proposed Rule 22.190. The Exchange notes that proposed Rule 22.190 is identical to MEMX Rule 21.10.

[77] *See* proposed Rule 22.100(n).

[78] As it does for equities trading (which also applies an inbound latency of 350 microseconds), IEX will subject incoming order and quote messages to a *de minimis* delay using coiled optical fiber. *See* Rule 11.510(a). Due to force majeure events and acts of third parties, the Exchange does not guarantee that the delay will always be consistent. The Exchange will periodically monitor such latency and will make adjustments to the latency as reasonably necessary to achieve consistency with the latency targets as soon as commercially practicable.

[79] *See infra* for more information about the Indicator.

[80] The latency mechanism will not apply to outbound communications from the Exchange to a User, inbound and outbound communications between the Exchange and an Away Market regarding a routed order, inbound communications from data feeds, order processing and order execution on the IEX Options Order Book, outbound communications to the Exchange's proprietary data feeds or OPRA.

[81] All times in this filing refer to the Eastern time zone.

[82] *See* CBOE Rule 5.7.

[83] *See* proposed IEX Rule 22.110(b).

[84] *See* proposed IEX Rule 22.110(c).

to the Penny Interval Program one (1) cent if the options series is trading at less than $3.00, five (5) cents if the options series is trading at $3.00 or higher, except for QQQ, SPY, or IWM where the minimum quoting increment will be one (1) cent for all series. In addition, as stated in proposed Rule 22.140(b), the Exchange is proposing that the minimum trading increment for options contracts traded on IEX Options will be one (1) cent for all series. Such proposed minimum quotation and trading increments are the same as on MEMX Options pursuant to MEMX Rules 21.5(a) and (b).

*Penny Interval Program.* As set forth in proposed Rule 22.140(c), the Exchange is proposing to adopt a Penny Interval Program that is substantially similar to the penny programs of other exchanges, including MEMX Options pursuant to MEMX Rule 21.5(d), which includes minimum quoting requirements for options classes listed under the Penny Interval Program. However, eligibility for inclusion in the Penny Interval Program will be limited to those classes already operating under penny programs of other options exchanges at the time IEX Options is launched. The list of options classes included in the Penny Interval Program will be announced by the Exchange via circular distributed to Options Members and published by the Exchange on its website.

*Order Types and Handling Instructions.* The System will make available to Users two Order Types (as defined in proposed Rule 22.100(d))— Limit orders and Market orders—as well as various order instructions and modifiers that can be appended to such orders. The characteristics and functionality of each Order Type is substantially similar to what is currently approved for use in the Exchange's equities trading facility or on other options exchanges, including MEMX Options, except where described below.

IEX Options will support bulk messages for Options Market Makers as specified in the description of each Order Type or other instruction. Proposed Rule 22.100(d) includes the following details with respect to Limit orders and Market orders:

• Limit order. Limit orders are orders (including bulk messages) to buy or sell an option at a specified price or better. A Limit order is marketable when, for a Limit order to buy, at the time it is entered into the System, the order is priced at the current inside offer or higher, or for a Limit order to sell, at the time it is entered into the System, the order is priced at the current inside bid or lower.

• Market order. Market orders are orders to buy or sell at the best price available at the time of execution. Market orders to buy or sell an option traded on IEX Options will be rejected if they are received when the underlying security is subject to a ''Limit State'' or ''Straddle State'' as defined in the Plan to Address Extraordinary Market Volatility Pursuant to Rule 608 of Regulation NMS under the Act (the ''Limit Up-Limit Down Plan''). Bulk messages may not be Market orders.

Pursuant to Rule 22.100(d)(3), Users have the option to designate an order as ''attributable'' to that User's MPID. Attributable orders are Market or Limit orders which display the User's MPID for purposes of trading on the Exchange. Use of attributable orders is voluntary. Attributable orders may not be available for all Exchange processes. The Exchange will distribute a circular to Options Members specifying the processes for which the attributable order-type shall be available.[85]

The System will also make available to Users several additional instructions that can be designated on an order (''Handling Instructions''). A Handling Instruction applied to a bulk message applies to each bid and offer within that bulk message. The Handling Instructions available on IEX Options are described in proposed Rule 22.100(e) and will include the following:

• Book Only. Book Only is an instruction that an order is to be ranked and executed on the Exchange pursuant to proposed Rule 22.170 (Order Display and Book Processing) or to be repriced or cancelled, as appropriate, without routing away to another options exchange.

• Post Only. Post Only is an instruction that an order is to be ranked and executed on the Exchange pursuant to proposed Rule 22.170 (Order Display and Book Processing) or cancelled, as appropriate, without routing away to another options exchange except that the order will not remove liquidity from the IEX Options Book. The System reprices, cancels or rejects a bid (offer) designated as Post Only with a price that locks or crosses the Exchange's best offer (bid). A Market order cannot be designated as Post Only.

• Intermarket Sweep Order (''ISO''). ISOs are orders that shall have the meaning provided in proposed Rule 28.100, which relates to intermarket trading. Such orders may be executed at

one or multiple price levels in the System without regard to Protected Quotations at other options exchanges (*i.e.,* may trade through such quotations). The Exchange relies on the marking of an order as an ISO order when handling such order, and thus, it is the entering Options Member's responsibility, not the Exchange's responsibility, to comply with the requirements relating to ISOs. ISOs are not eligible for routing pursuant to proposed Rule 22.180. A Market order cannot be designated as an Intermarket Sweep Order. Users may not designate bulk messages as ISOs.

The Exchange notes that each of the proposed Order Types and Handling Instructions available on IEX Options are based upon and substantially similar to those of MEMX, with the exception of the Attributable Orders not offered by MEMX.

*Time-in-Force (''TIF'') Designations.* Users entering orders into the System may designate such orders to remain in force and available for display and/or potential execution for varying periods of time. Unless cancelled earlier, once these time periods expire, the order (or the unexecuted portion thereof) is returned to the entering party. A TIF applied to a bulk message applies to each bid and offer within that bulk message. Unless otherwise specified in the Exchange Rules or the context indicates otherwise, the Exchange determines which of the following TIFs are available on a class or system basis. The TIF designations available on IEX Options are described in proposed Rule 22.100(g) and will include the following:

• Immediate Or Cancel (''IOC''). IOC means, for an order so designated, an order that is to be executed in whole or in part as soon as such order is received. The portion not so executed immediately on the Exchange or another options exchange is cancelled and is not posted to the IEX Options Book. IOC orders that are not designated as Book Only and that cannot be executed in accordance with proposed Rule 22.170 on the System when reaching the Exchange will be eligible for routing away pursuant to proposed Rule 22.180.

• Day. Day means, for an order so designated, an order to buy or sell which, if not executed expires at market close. Market Makers may designate bulk messages as Day.

The Exchange notes that each of the proposed TIF designations available on IEX Options is identical to the same TIF designations available on MEMX Options, except that they are applied differently in one respect. Specifically, MEMX Options allows bulk messages to

---

[85] The proposed definition is substantively identical to the definition in MIAX Rule 516(e). IEX proposes to incorporate this definition and functionality, because MEMX Options does not have Attributable Orders.

have a TIF of IOC. IEX is proposing to only allow bulk messages to have a TIF of DAY so that Market Makers do not take liquidity with quotes submitted via bulk messages, and which are meant for liquidity provision by Market Makers, which by definition the Exchange believes constitutes orders resting on the Order Book.

*Anti-Internalization Qualifier ("AIQ") Modifiers.* As with its equities market, the Exchange will allow Users to use certain AIQ modifiers, which are described in proposed Rule 22.100(h). Any incoming order designated with an AIQ modifier will be prevented from executing against a resting opposite side order also designated with an AIQ modifier and originating from the same MPID, Options Member identifier, trading group identifier, or Sponsored Participant identifier. The Exchange will offer the following AIQ modifiers: AIQ Cancel Newest, described in proposed Rule 22.100(h)(1); AIQ Cancel Oldest, described in proposed Rule 22.100(h)(2); AIQ Cancel Both, described in proposed Rule 22.100(h)(3); and AIQ Cancel Smallest, described in proposed Rule 22.100(h)(4). The Exchange notes that each of the proposed AIQ modifiers available on IEX Options is substantially similar to the same modifiers available on MEMX Options,[86] with the distinction that on MEMX a market maker may include the AIQ modifier on bulk messages, while IEX is proposing to not allow AIQ modifiers to be included on bulk messages because it would be meaningless on IEX where bulk messages will only be for liquidity adding quotes, and the AIQ modifier that dictates the AIQ interaction is determined by the liquidity removing order.[87]

*Re-Pricing Mechanism.* Like other options exchanges, the Exchange proposes to offer a re-pricing mechanism to Users to comply with the order protection and trade through restrictions of the Options Order Protection and Locked/Crossed Market Plan.[88] This re-pricing mechanism, described in proposed Rule 22.100(i), is referred to by the Exchange as Price Adjust and is substantially similar to the Price Adjust mechanism offered by MEMX Options pursuant to MEMX Rule 21.1(i), with the exception that IEX will only allow the ranked price and displayed price of an order that has been repriced to be adjusted to a more aggressive price one additional time (unlike MEMX, which allows multiple adjustments).[89]

*MPIDs.* As proposed in Rule 22.100(j), the term "MPID" means the unique market participant identifier assigned to a User and shall refer to what the System uses to identify the User and the clearing number for the execution of orders and quotes submitted to the System with that MPID. Each MPID corresponds to a single User and a single clearing number of a Clearing Member with the Clearing Corporation. A User may obtain multiple MPIDs, which may be for the same or different clearing numbers. A User is able (in a form and manner determined by the Exchange) to designate which of its MPIDs may be used for each of its ports. If a User submits an order or quote through a port with an MPID not enabled for that port, the System cancels or rejects the order or quote. The Exchange notes that its proposed Rule 22.100(j) is identical to MEMX Rule 21.1(j) except that MEMX uses the term EFID rather than MPID.

*Ports and Bulk Messages.* Proposed Rule 22.100(k) defines two types of ports: (1) a "physical port," which provides a physical connection to the System and may provide access to multiple logical ports; and (2) a "logical port" or "application session," which provides Users with the ability within the System to accomplish a specific function through a connection, such as order entry, data receipt, or access to information. The Exchange notes that each of the proposed types of ports available on IEX Options is identical to the same types of ports on MEMX Options.

The term "bulk message" is proposed to mean a single electronic message a User submits with a Market Maker Capacity to the Exchange in which the User may enter, modify, or cancel up to an Exchange-specified number of bids and offers (which number the Exchange will announce via Exchange notice and publicly available technical specifications). The System handles a bulk message in the same manner as it handles an order or quote, unless the Exchange Rules specify otherwise.

Only Market Makers may submit bulk messages through a logical port in a class in which the Market Maker has an appointment. In addition, bulk messages have a default TIF of Day and a default designation of Post Only. As proposed, the System will cancel, reject, or reprice a Post Only bulk message bid (offer) with a price that locks or crosses the Exchange best offer (bid) or ABO [90] (ABB [91]).[92] These provisions are similar to the manner in which market maker bulk messages are handled by MEMX, which allows bulk messages to also have a TIF of IOC, a designation as book only, and post only bulk messages in unassigned classes.[93]

*Cancel Back.* The term "Cancel Back" is proposed to mean an instruction a User designates on an order (including bulk messages) to not be subject to the Price Adjust process pursuant to proposed Rule 22.100(i). The System cancels or rejects an order with a Cancel Back instruction (immediately at the time the System receives the order or upon return to the System after being routed away) if displaying the order on the Book would create a violation of proposed Rule 28.120, or if the order cannot otherwise be executed or displayed in the Book at its limit price. The System executes a Book Only—Cancel Back order against resting orders. The proposed definition of Cancel Back in proposed Rule 22.100(m) is substantively identical to a Cancel Back Order defined in MEMX Rule 21.1(m).

*Market Opening Procedures.* As proposed, the System will accept quotes, Limit orders with a TIF of DAY and Market orders for inclusion in the opening process ("Opening Process") beginning at 8:00 a.m. or immediately upon trading being halted in an options series due to the primary listing market for the applicable underlying security declaring a regulatory trading halt, suspension, or pause with respect to such security (a "Regulatory Halt"), and will continue to accept Market and Limit orders and quotes until such time as the Opening Process is initiated in

---

[86] MEMX does not offer an AIQ Cancel Smallest modifier, but it is offered by other exchanges such as CBOE. *See* CBOE Rule 5.6 (Match Trade Prevention Modifier—MTP Cancel Smallest).

[87] MEMX calls them "Match Trade Prevention" modifiers. *See* MEMX Rule 21.1(h).

[88] *See* Securities Exchange Act Release No. 60405 (July 30, 2009), 74 FR 39362 (Aug. 6, 2009) (File No. 4–546).

[89] The Exchange notes that this behavior is substantially similar to the "single price adjust" behavior in CBOE Rule 5.32(b)(2)(A).

[90] The term "ABO" means the best offer(s) disseminated by other Eligible Exchanges (as defined in proposed Rule 28.100) and calculated by the Exchange based on market information the Exchange receives from OPRA.

[91] The term "ABB" means the best bid(s) disseminated by other Eligible Exchanges (as defined in proposed Rule 28.100) and calculated by the Exchange based on market information the Exchange receives from OPRA.

[92] *See* proposed Rule 22.100.

[93] *See* MEMX Rule 21.1(l). IEX notes that the ability of the System to cancel or reject a post only order submitted on a bulk port with a price that locks or crosses the Exchange best offer (bid) or ABO (ABB) is substantively identical to MEMX Rule 21.1(l)(3); IEX will also allow the System to reprice a post only order submitted on a bulk port with a price that locks or crosses the Exchange best offer (bid) or ABO (ABB), which is substantively identical to the functionality in CBOE Rule 5.32(b)(1)(B).

that options series (the "Pre-open state").[94]

After the first transaction on the primary listing market after 9:30 a.m. in the securities underlying the options as reported on the first print disseminated pursuant to an effective national market system plan or the Regulatory Halt has been lifted, the related options series will be opened automatically as described below. The Exchange will conduct its "Core Open Auction" for each series of options contracts upon receipt of an "Auction Trigger", *i.e.,* the moment that the Primary Market for the underlying security first disseminates both a two-sided quote and a trade of any size that is at or within the quote (in the case of reopening after a Regulatory Halt, the Auction Trigger also includes notification that the underlying stock is no longer halted).[95] The Exchange will disseminate a message to market participants indicating the initiation of the opening process, conduct the opening auction, and then transition to continuous trading for each series of options contracts.[96] The proposed market opening procedures are substantially similar to the market opening procedures specified in NYSE Arca Options Rule 6.64P–O, subject to several differences, most notably that any imbalance would be allocated on a pro rata basis.[97]

*Order Display/Matching System.* The System will be based upon functionality currently approved for use in the Exchange's equities trading system. Specifically, the System will allow Users to enter Market orders and priced Limit orders to buy (bids) and sell (offers). All bids or offers made and accepted on IEX Options in accordance with the Exchange Rules shall constitute binding contracts, subject to applicable requirements of the Exchange Rules and the Rules of the Clearing Corporation. Such orders are executable against

marketable contra-side orders in the System.[98] Resting quotes and orders on the IEX Options Book will be prioritized according to price. If there are two or more quotes or orders at the best price, then the options contracts will be allocated proportionally according to size (in a pro-rata fashion), rounded down to the nearest contract. If there are residual options contracts to be filled, the quote or order with the largest remaining size (based on the pro rata calculation) will receive the first contract, and each successive contract (if any) will be allocated to each subsequent quote or order based on size (largest to smallest). If there are two or more quotes or orders with the same remaining size, then the quote or order with the first time priority will be allocated the next options contract. Each successive options contract (if any) will be allocated in the same manner.[99]

*Routing.* IEX Options will offer a simple optional routing functionality to facilitate compliance with applicable regulations and will not offer other complex routing strategies. Options Members can designate orders that have not been executed in full by the System pursuant to proposed Rule 22.170 above as either available for routing or not available for routing.[100] IEX Options will support orders that are designated to be routed to the NBBO as well as orders that will execute only within IEX Options. Orders that are designated to execute at the NBBO will be routed to other options markets to be executed when the Exchange is not at the NBBO[101] consistent with the Options Order Protection and Locked/Crossed Market Plan.[102]

Subject to the exceptions contained in proposed Rule 28.110(b), the System will ensure that an order will not be executed at a price that trades through another options exchange. An order that is designated by an Options Member as routable will be routed in compliance with applicable trade-through restrictions. Any order entered with a price that would lock or cross a Protected Quotation that is not eligible for either routing or the price adjust process as defined in proposed Rule 22.100(i) will be cancelled. Bulk messages are not eligible for routing.

IEX Options will route orders in options via IEX Services LLC ("IEX Services"), which serves as the Outbound Router of the Exchange, as defined in Rule 2.220 (IEX Services LLC as Outbound Router).[103] The function of the Outbound Router will be to route orders in options listed and open for trading on IEX Options by transmitting such orders to one or more routing brokers that are not affiliated with the Exchange to other options exchanges ("Routing Services") pursuant to the Exchange Rules on behalf of IEX Options.[104] The Outbound Router is subject to regulation as a facility of the Exchange, including the requirement to file proposed rule changes under Section 19 of the Exchange Act.[105] Parties that do not desire to use the Routing Services provided by the Exchange must designate orders as not available for routing.[106] The Exchange notes that the proposed rules relating to the routing of orders on IEX Options to away options markets are substantively identical to the MEMX Back-Up Order Routing Services described in MEMX Rule 21.9(e).[107]

*Priority of Routed Orders.* Orders that have been routed by the System to other options exchanges are not ranked and maintained in the IEX Options Book pursuant to proposed Rule 22.170, and therefore are not available to execute against incoming orders. Once routed by the System, an order becomes subject to the rules and procedures of the destination options exchange including, but not limited to, order cancellation. If a routed order is subsequently returned, in whole or in part, that order, or its remainder, shall receive a new time stamp reflecting the time of its return to the System.[108]

*Market Access.* In connection with the proposed rules regarding routing to away options exchanges, proposed Rule 22.180(e) provides that IEX Services has, pursuant to Rule 15c3–5 under the Act,[109] implemented certain tests designed to mitigate the financial and regulatory risks associated with providing the Exchange's Users with access to such away options exchanges. Pursuant to the policies and procedures developed by IEX Services to comply

---

[94] *See* proposed Rule 22.160(a)(13).

[95] *See* proposed Rule 22.160(a)(5) and (7).

[96] *See* proposed Rule 22.160. IEX notes that pursuant to proposed Rule 22.160(b)(3), the priority overlays specified in proposed Rule 22.170(f)(2) and (3) will not be available during an Auction, but will resume once the Exchange has transitioned to continuous trading.

[97] *See* proposed Rule 22.160(b). Other differences include: IEX will begin accepting orders for the opening auction at 8:00 a.m., while NYSE Arca begins accepting orders for their opening auction at 6:00 a.m. *See* proposed Rule 22.160(a)(13)(A) versus NYSE Arca Options Rule 6.64P–O(a)(12)(A). Additionally, IEX will begin disseminating Auction Imbalance Information at 8:30 a.m., while NYSE Arca begins disseminating imbalance information at 8:00 a.m. *See* proposed Rule 22.160(c)(1) versus NYSE Arca Options Rule 6.64P–O(c)(1). Further, IEX does not define Far Clearing Price, because IEX does not propose to have Auction Only orders, to which the Far Clearing Price relates.

[98] *See* proposed Rule 22.170.

[99] *See* proposed Rule 22.170(b). This pro-rata allocation methodology is based upon the substantially similar methodology in MIAX Rule 514(c)(2) and NYSE Amex Rule 964NYP(i)(2).

[100] *See* proposed Rule 22.180(a).

[101] As described *infra,* if the order is eligible for the Step-Up Mechanism (set forth in proposed Rule 22.270), the System will attempt to fill the order before routing it to an away market.

[102] *See supra* note 85.

[103] *See* proposed Rule 22.180(d).

[104] *Id.*

[105] *Id.*

[106] *Id.*

[107] MEMX also offers the option of using its outbound router, MEMX Execution Services, to route directly to other exchanges. *See* MEMX Rule 21.9(d). IEX is not proposing to adopt this functionality because it will only provide for routing through IEX Services to third party broker dealers.

[108] *See* proposed Rule 22.180(b).

[109] 17 CFR 240.15c3–5.

with Rule 15c3–5, if an order or series of orders are deemed to be erroneous or duplicative, would cause the entering User's credit exposure to exceed a preset credit threshold, or are non-compliant with applicable pre-trade regulatory requirements (as defined in Rule 15c3–5), IEX Services will reject such orders prior to routing and/or seek to cancel any orders that have been routed. This is consistent with the routing implementation of other options exchanges, and the Exchange notes that proposed Rule 22.180(e) is substantively identical to MEMX Rule 21.9(f).

*Order Priority.* After the opening, trades on the Exchange will occur when a buy order/quote and a sell order/quote match on the Exchange's order book. The System shall execute trading interest within the System in price priority, meaning it will execute all trading interest at the best price level within the System before executing trading interest at the next best price. Pursuant to proposed Rule 22.170, after considering price priority, all options contracts are allocated proportionally according to size (in a pro-rata fashion). If the executed quantity cannot be evenly allocated, the remaining options contracts will be distributed one at a time based upon price-size-time priority.

In addition, the Exchange supports multiple priority overlays that apply ahead of the default pro-rata allocation at a given price level. Pursuant to proposed Rule 22.170(f),[110] these priority overlays are made available at the Exchange's discretion on a class-by-class basis: (1) the Priority Customer overlay,[111] which provides resting interest from Priority Customers with priority over all non-Priority Customer interest at the same price, will always take priority over all other priority overlays; (2) the Specialist Participation Entitlement overlay,[112] which provides the Specialist with priority over interest from other non-Priority Customers for a certain percentage of contracts allocated at the same price (entitling the Specialist to 60% of the allocation if there is another non-Priority Customer

at the NBBO or 40% if there are two or more other non-Priority Customers at the NBBO[113]) when quoting at the NBBO, inclusive of the case in which the order is directed to the Specialist; (3) the Directed Market Maker Participation Entitlement overlay,[114] which provides a Directed Market Maker with priority over interest from other non-Priority Customers for a certain percentage of contracts allocated at the same price (entitling the DMM to 60% of the allocation if there is another non-Priority Customer at the NBBO or 40% if there are two or more other non-Priority Customers at the NBBO[115]) when quoting at the NBBO and always applies in place of the Specialist Participation Entitlement overlay when both are in effect and the order is directed to a Directed Market Maker other than the Specialist;[116] and (4) the Small-Size Order Entitlement overlay,[117] which provides a Specialist quoting at the NBBO the priority to execute against the entire size of an order or quote of five or fewer contracts that does not first execute against any Priority Customer orders at that price, provided that if an order subject to the Small-Size Order Entitlement is directed to a Directed Market Maker who is not the Specialist quoting at the NBBO, and the Directed Market Maker priority overlay is enabled in the series, then the Directed Market Maker Participation Entitlement priority overlay will apply instead of the Small-Size Order Entitlement priority overlay,[118] and in the case that an order subject to the Small-Size Order Entitlement is directed to the Specialist, the Small-Size Order Entitlement priority overlay will apply while the Specialist Participation Entitlement and Directed Market Maker Entitlement overlays will not.[119]

After executions resulting from the Priority Overlays described above, orders and quotes within the System for the accounts of non-Priority Customers, including Professional Customers, have next priority. If there is more than one highest bid or more than one lowest offer on the Options Order Book for the account of a non-Priority Customer, then such bids or offers will be afforded priority on a size pro-rata basis, as described above.

*Step Up Mechanism.* IEX proposes to offer Options Members an optional Step Up Mechanism ("SUM"), which is a feature within the System that provides automated order handling in designated classes trading for qualifying orders that are not automatically executed by the System.[120] The Exchange will determine eligibility of an order for the SUM (including order size, type, capacity, handling instructions, as well as which classes of options contracts). The Exchange will not initiate the SUM process if the NBBO is crossed.[121] SUM automatically processes upon receipt of an eligible order that is marketable against the BBO that is not the NBBO; or an eligible order that would improve the Exchange's BBO and that is marketable against the ABBO. This proposed functionality is substantively identical to the Step-Up Mechanism offered by CBOE, with the exception that IEX is not proposing to offer All or None orders.[122] IEX notes that the optional SUM mechanism is designed to benefit a routable order that is not immediately eligible for execution on the Exchange, but if routed to an away exchange might miss a potential execution on that exchange. And, because SUM is optional, a Member can choose not to have its order subject to the SUM mechanism if it determines that the functionality is not consistent with its objectives. Given the multitude of tradeable listed options securities (compared to listed equities) not all available liquidity is always reflected in an exchange's order book, and the SUM mechanism provides an opportunity to source such additional liquidity to the benefit of the order in question. Moreover, IEX notes as well that other options exchanges offer similar mechanisms, and order flow might be directed to such exchanges if IEX did not offer such a mechanism.

Upon receipt of a SUM eligible order, the System will expose the order at the NBBO upon receipt for a period of time

---

[110] Proposed Rule 22.170(f) is based upon and substantially similar to CBOE Rule 5.32(a)(2), except is different in one respect. Unlike CBOE, in the event that a Small-Size order is directed to a Specialist, the IEX Options trading system will apply the Small-Size Order Entitlement to the order and not the Directed Order guarantee, meaning the Specialist will have priority to execute against the entire size of the order that does not execute against any Priority Customer orders at that price.

[111] *See* proposed Rule 22.170(f)(1).

[112] *See* proposed Rule 22.170(f)(2). This overlay may only be in effect if the Priority Customer overlay is also in effect. *See* proposed Rule 22.170(f).

[113] These allocation entitlements are based on MIAX Rule 514(h)(1), after accounting for the additional priorities afforded market makers on MIAX, as set forth in MIAX Rule 514(e). *See supra* note 96 and accompanying text.

[114] *See* proposed Rule 22.170(f)(2). This overlay may only be in effect if the Priority Customer overlay is also in effect. *See* proposed Rule 22.170(f).

[115] These allocation entitlements are based on MIAX Rule 514(h)(1), after accounting for the additional priorities afforded market makers on MIAX, as set forth in MIAX Rule 514(e). *See supra* note 96 and accompanying text.

[116] Prioritizing the DMM entitlement over the Specialist entitlement in these circumstances is the same functionality offered by several other exchanges. *See, e.g.,* NYSE Amex Options Rule 964NYP(h)(1).

[117] *See* proposed Rule 22.170(f)(3).

[118] *See* proposed Rule 22.170(f)(3)(A).

[119] *See* proposed Rule 22.170(f)(3)(B). This is functionally identical to how NYSE Amex Options allocates small-size Directed Orders that are directed to a Specialist. *See* NYSE Amex Options Rule 965NYP(h)(2)(B).

[120] *See* proposed Rule 22.270. IEX's proposed Step-Up Mechanism is substantively identical to CBOE Rule 5.35.

[121] *See* proposed Rule 22.270(a).

[122] *See* CBOE Rule 5.35.

determined by the Exchange on a class-by-class basis, which period of time may not exceed one second. All Users may submit responses to the exposure message, which must be limited to the size of the order being exposed, may be modified, cancelled or replaced any time during the exposure period, and are cancelled back at the end of the exposure period if unexecuted. Responses priced at the prevailing NBBO or better will immediately trade against the order in time priority. If during the exposure period the Exchange receives an unrelated order (or quote) on the opposite side of the market from the exposed order that could trade against the exposed order at the prevailing NBBO price or better, then the orders will trade at the prevailing NBBO price. The exposure period will not terminate if a quantity remains on the exposed order after such trade.

Responses that are not immediately executable based on the prevailing NBBO may become executable during the exposure period based on changes to the NBBO. In the event of a change to the NBBO and at the conclusion of the exposure period, the Exchange will evaluate remaining responses as well as the ABBO and execute any remaining portion of the exposed order to the fullest extent possible at the best price(s) by executing against responses and unrelated orders.

Following the exposure period, the Exchange will route the remaining portion of the exposed order to other exchanges, unless otherwise instructed by the User. Any portion of a routed order that returns unfilled shall trade against the Exchange's best bid/offer unless another exchange is quoting at a better price in which case new orders shall be generated and routed to trade against such better prices.

*Data Dissemination.* The Exchange will disseminate to OPRA the highest bid and the lowest offer, and the aggregate quotation size associated therewith that is available, in accordance with the requirements of Rule 602 of Regulation NMS under the Act.[123] The Exchange will also offer three data products: (1) IEX Options DEEP: an uncompressed data feed that offers depth of book quotations and execution information based on options orders entered into the System; (2) IEX Options TOPS: an uncompressed data feed that offers top of book quotations and execution information based on options orders entered into the System; and (3) DROP: an uncompressed data feed that offers information regarding

the options trading activity of a specific User.[124] DROP is only available to the User to whom the specific data relates and those recipients expressly authorized by the User.[125]

*Risk Controls.* The Exchange also proposes to offer to all Users of IEX Options the ability to establish certain risk control parameters and limits that are intended to assist Users in managing their market risk. All options exchanges recognize the essential role of risk controls in managing market maker exposure and IEX intends to offer comparable controls to allow for these risk management protections. The proposed risk controls are based, in part, on those of the NYSE Arca and CBOE options exchanges, with certain additions and differences described below. The proposed risk controls are designed to offer Users protection from entering orders outside of certain size and price parameters, as well as certain standard or Exchange-established parameters based on order type and market conditions.

The proposed risk controls include: (i) pre-trade risk controls; (ii) activity-based risk controls; and (iii) global risk controls, as set forth in proposed Rule 22.250.[126] Pre-trade, activity-based, and global risk controls may be set before the beginning of a trading day.[127] Pre-trade, activity-based, and global risk controls can be set at the MPID or MPID Group level,[128] or both, depending on the risk control.[129] Additionally, pre-trade risk controls to restrict the options class(es) transacted must be set per options class.[130] The following describes each category of risk protection mechanism:

*Pre-Trade Risk Controls.*[131] The pre-trade risk controls mechanism is a set of optional limits, each of which an Options Member may utilize with respect to its trading activity on the

Exchange. These controls include controls related to the maximum dollar amount for a single order to be applied one time and the maximum number of contracts that may be included in a single order before it can be traded. Additionally, there are optional controls related to the price of an order or quote (including percentage-based and dollar-based controls), controls related to the order types or modifiers that can be utilized, controls to restrict the options classes transacted, and controls to prohibit duplicative orders.

*Activity-Based Risk Controls.*[132] The Exchange also proposes to offer activity-based risk limits that may be applied to orders and quotes in an options class (when acting as a Market Maker, an Options Member is required to select at least one of the following controls [133]) based on specified thresholds measured over the course of a configurable time period ("Interval"). The Exchange will offer the following activity-based risk controls: (i) transaction-based risk limits, which are pre-established limits on the number of an Options Member's orders and quotes executed in a specified class of options per Interval; (ii) volume-based risk limits, which are pre-established limits on the number of contracts of an Options Member's orders and quotes that can be executed in a specified class of options per Interval; and (iii) percentage-based risk limits, which are pre-established limits on the percentage of contracts executed in a specified class of options as measured against the full size of an Options Member's orders and quotes executed per Interval. To determine whether an Options Member has breached the specified percentage limit, the Exchange calculates the percent of each order or quote in a specified class of options that is executed during an Interval (each, a "percentage"), and sums up those percentages. This risk limit will be breached if the sum of the percentages exceeds the pre-established limit.

*Global Risk Control.*[134] The Exchange also proposes to offer a global risk control, which is a pre-established limit on the number of times an Options Member may breach its activity-based risk controls per Interval.

*Automated Breach Actions.*[135] Proposed Rule 22.250(c) details the

---

[123] *See* proposed Rule 22.240(a).

[124] *See* proposed Rule 22.240(b).

[125] Data products will be subject to fees as specified in an effective Commission rule filing.

[126] Proposed Rule 22.250 is based upon and substantially similar to NYSE Arca Rule 6.40P–O.

[127] *See* proposed Rule 22.250(b)(1).

[128] MPID Groups, defined in proposed Rule 22.250(a)(5), are based upon CBOE Rule 5.34(c)(4)(A), which allows for the setting of risk control limits for EFID Groups, which are equivalent to MPID Groups. IEX notes that it proposes to retain the right to limit the number of MPID Groups an Options Member can configure based upon potential technical limitations.

[129] *See* proposed Rule 22.250(b)(2). IEX notes that while it allows these risk controls to be set at MPID or MPID Group levels, NYSE Arca allows the equivalent controls to be set at either the MPID or the MPID Sub-ID level (a more granular level than the MPID).

[130] *See* proposed Rule 22.250(b)(2).

[131] *See* proposed Rule 22.250(a)(1), which is substantively identical to NYSE Arca Rule 6.40P–O(a)(2).

[132] *See* proposed Rule 22.250(a)(2), which is substantively identical to NYSE Arca Rule 6.40P–O(a)(3).

[133] *See* proposed Rule 22.250(c)(2)(A).

[134] *See* proposed Rule 22.250(a)(3), which is substantively identical to NYSE Arca Options Rule 6.40P–O(a)(4).

[135] *See* proposed Rule 22.250(c), which is substantively identical to NYSE Arca Options Rule 6.40P–O(c).

''automated breach actions'' the Exchange will take if any of the three above-described risk controls are breached. Based on User preference, these actions can include blocking new orders and quotes, canceling orders and quotes on the Order Book, or notifying the Options Member of the breach. With respect to the activity-based and global risk controls (as well as Kill Switch Actions described below), in order to remain consistent with the firm quote obligations of a broker-dealer pursuant to Rule 602 of Regulation NMS, any marketable interest that is executable against an order or quote that is received [136] prior to the time the applicable threshold is triggered and processed by the System will be automatically executed up to the size of the resting order or quote, regardless of whether the execution would cause the Options Member to exceed their pre-set risk threshold(s).[137]

*Kill Switch Actions.*[138] Additionally, Options Members may direct the Exchange to operate a ''kill switch'' to either cancel all unexecuted orders and quotes on the Order Book, block the entry of any new order and quote messages, or both.

*Limit Order Price Protection.*[139] The Exchange also proposes to offer price protection mechanisms, as set forth in proposed Rule 22.260.[140] These protections include Limit Order Price Protection, in which the System will reject an order or quote upon entry, or cancel at the conclusion of an auction, if its price exceeds a pre-established, Exchange-defined ''specified threshold'' amount above or below the reference price. The Reference Price for calculating Limit Order Price Protection for an order or quote to buy (sell) will be the NBO (NBB), provided that, immediately following an auction, the reference price will be the price at which the auction match occurred, or, if none, the upper (lower) auction collar price, or, if none, the NBO (NBB).

*Market Orders in No-Bid (Offer) Series.*[141] If the System receives a sell Market order in a series after it is open for trading with an NBB of zero and an NBO less than or equal to $0.50, then the System converts the Market order to a Limit order with a limit price equal to the minimum trading increment applicable to the series and enters the order into the IEX Options. If the System receives a sell Market order in a series after it is open for trading with an NBB of zero and an NBO greater than $0.50, then the System cancels or rejects the Market order, except if the sell Market order would be subject to the drill-through protection (as discussed below), in which case the order joins the ongoing drill-through process. If the System receives a buy Market order in a series after it is open for trading with an NBO of zero, the System cancels or rejects the Market order.

*Market Order NBBO Width Protection.*[142] If a User submits a Market order to the System when the NBBO width is greater than x% of the midpoint of the NBBO, subject to a minimum and maximum dollar value (the Exchange determines ''x'' and the minimum and maximum dollar values on a class-by-class basis), the System cancels or rejects the Market order.

*Price Reasonability Checks.*[143] Additionally, the Exchange will apply price reasonability checks to most Limit orders and quotes during continuous trading on each trading day. One price reasonability check, the ''arbitrage check,'' will reject order or quote messages to buy put options if the price of the order is equal to or greater than the strike price of the option and will reject (or cancel, if resting) order or quote messages to buy call options if the price of the order is equal to or greater than the price of the last trade in the underlying security plus an Exchange-defined specified threshold.[144] Another price reasonability check, the ''intrinsic value check,'' will assess the intrinsic value of an option based on the last sale price of the underlying security (for calls) or the strike price of the option (for puts), and reject or cancel certain orders or quotes if the price of the order is dislocated from the intrinsic value of

the option by a certain Exchange-defined specified threshold.[145]

*Drill-Through Protection.* Another proposed price protection mechanism is drill-through protection, which will prevent an order from executing beyond a ''buffer amount'' determined based on a drill-through price.[146] This rule is based upon and substantially similar to CBOE Rule 5.34(a)(4), with the distinction that IEX's Drill-Through Protection will have a finite, Exchange-defined number of iterations, that are communicated by a Trading Alert with at least 30 days prior notice.[147] IEX notes that other exchanges have also set a finite number of iterations for their Drill-Through Protection.[148]

*Options Risk Parameter.* In order to address structural challenges [149] that Market Makers face in the listed options market, and thereby incentivize deeper and tighter liquidity, IEX proposes to offer an optional quote parameter that would augment the standard risk tools that will be available to Options Market Makers referred to as the Options Risk Parameter, or ORP. Further, IEX believes that in addition to mitigating market maker risks from latency arbitrage strategies (irrespective of whether spreads tighten), the ORP can also help to reduce barriers to entry for market maker participation and thereby support competition and reduce market maker concentration risk. This is particularly important given the options markets' reliance on market maker provision of liquidity. As proposed, the ORP will be a parameter that can be applied to a quotation that rests on the Order Book at the price designated by the Market Maker that entered the quotation. When the ORP is triggered based on pre-defined criteria, the relevant quotation(s) will be adjusted or canceled in a manner specified transparently in IEX's rules, as described below.[150]

The ORP would leverage IEX's proprietary mathematical formula—the

---

[136] The time of receipt for an order or quote is the time such message is processed by the Exchange's order book.

[137] Pre-trade risk controls are implemented prior to an order or quote resting on the order book (or being placed on the book again following an auction) and therefore do not implicate firm quote obligations.

[138] *See* proposed Rule 22.250(e), which is substantially identical to NYSE Arca Options Rule 6.40P–O(e).

[139] *See* proposed Rule 22.260(a), which is substantially identical to NYSE Arca Options Rule 6.62P–O(a)(3).

[140] IEX notes that these proposed risk control mechanisms are based on similar rules of other options exchanges, in particular: NYSE Arca Options Rules 6.62P–O(a)(3) and 6.41P–O and CBOE Rules 5.34(a)(1), (2) and (4).

[141] *See* proposed Rule 22.260(b), which is substantially identical to CBOE Rule 5.34(a)(1).

[142] *See* proposed Rule 22.260(c), which is substantially identical to CBOE Rule 5.34(a)(2).

[143] *See* proposed Rule 22.260(d), which is substantially identical to NYSE Arca Options Rule 6.41P–O.

[144] *See* proposed Rule 22.260(d)(2), which is substantially identical to NYSE Arca Options Rule 6.41P–O(b).

[145] *See* proposed Rule 22.260(d)(3), which is substantially identical to NYSE Arca Options Rule 6.41P–O(c). IEX notes that like NYSE Arca Options, the term ''Automated Breach Action'' is used in two of its risk controls with different meanings: first with respect to the intrinsic value risk checks for market makers, *see* NYSE Arca Options Rule 6.40P–O(d) and proposed Rule 22.260(d)(3)(E); and also with respect to activity based risk controls. *See* NYSE Arca Options Rule 6.41P–O(d) and proposed Rule 22.250(c).

[146] *See* proposed Rule 22.260(e).

[147] IEX notes that other exchanges also have the ability to change any exchange-determined parameters with a trading alert. *See, e.g.,* CBOE Rule 1.5.

[148] *See, e.g.,* Securities Exchange Act Release No. 86923 (September 10, 2019), 84 FR 48664 (September 16, 2019) (SR–CBOE–2019–057) with respect to CBOE's prior functionality.

[149] *See infra* note 160.

[150] *See* proposed Rule 23.150(h).

Options Quote Indicator (the "Indicator")—which is based on the preeminent Black-Scholes options pricing model. This Nobel-Prize-winning approach for evaluating the price of an options contract has been studied extensively, and is widely considered as a primary starting point for both academic and industrial options pricing applications.[151]

Proposed Rule 23.150(h) sets forth the application of the Indicator and optional ORP.[152] The ORP is designed to enable Market Makers to provide tighter and deeper quotes on IEX by providing protection from execution against quotes at stale prices by identifying when the best Protected Bid or best Protected Offer of the Away Markets (as defined in Proposed Rule 22.160(a)(8)) in a particular options series is sufficiently dislocated from the price of the underlying security to indicate that the best Protected Bid or best Protected Offer of the Away Markets in the options series is likely in transition. The Exchange believes that the protection provided by the ORP will thus enable market makers to provide tighter and deeper quotes on IEX to the benefit of all market participants.

The Exchange will determine on a class-by-class basis whether to make the ORP available, which determination will be communicated by Trading Alert.[153] This flexibility will therefore allow the Exchange to focus its technology resources in an impactful manner to ensure the ORP is available for those classes where its use will achieve its intended purpose, while excluding its use where it would likely provide minimal incremental value (for example, for classes with nonstandard characteristics).[154]

As proposed, the Exchange will utilize the Indicator, which is a fixed formula specified transparently in IEX's rules, to assess the materiality of an imminent change to the current best Protected Bid [155] of the Away Markets to a lower price or of an imminent change to the current best Protected Offer [156] of the Away Markets to a higher price for

a particular listed options series (*i.e.,* an imminent adverse price change).[157]

The Indicator utilizes real time relative quoting activity of protected quotations from Signal Exchanges (as defined in IEX Rule 11.190(g)) in securities underlying each listed options series and a proprietary mathematical calculation (the "quote instability calculation"), as described in more detail below, to assess the impact of a price change in the underlying on the price of a particular options series. When the quote instability calculation identifies an imminent adverse price change to the best Protected Bid and/or best Protected Offer of the Away Markets in a particular listed options series, it will generate a quote instability determination. A quote instability determination may only be generated at least 200 microseconds after a prior quote instability determination for a particular options series on the same side of the market (*i.e.,* affecting resting bids or offers). If a quote instability determination is generated for an options series quoted by a Market Maker and the quote is above (below) the price level of the quote instability determination, the quote will be either cancelled or repriced to the price level of the quote instability determination, as instructed by the Market Maker.

As proposed, for two aspects of the formula –the Delta Bound Band [158] and the Quote Instability Threshold [159]—the Exchange will specify the possible range of values the Exchange may use for each aspect as well as the initial value for each aspect. The Exchange may determine to change such values, within the applicable specified range, based on

its assessment of factors that could optimize effectiveness of the ORP. In such an event, the Exchange will submit a rule filing pursuant to Rule 19b–4(f)(1) under the Exchange Act [160] (or other appropriate rule filing type) specifying the new value, within the range of possible values specified in the applicable rule.[161] Such change to a value that falls within the range of possible values would constitute an interpretation with respect to the meaning of an existing rule, and IEX understands therefore that a filing pursuant to Rule 19b–4(f)(1) under the Exchange Act would be appropriate. When determining to modify values within the specified ranges, the Exchange will consider (as relevant) factors such as the distribution of quote instability determinations, the precision of quote instability determinations, system capacity and performance, fill rates, markout data, and client feedback. In modifying a value, the Exchange will aim to balance the interests of both liquidity takers and makers.

Similarly, as proposed, the frequency of calculation of implied volatility, which is used to calculate Delta will be calculated each half-hour of system operation.[162] If the Exchange determines to update the implied volatility computation more frequently, based on its assessment of relevant factors discussed above that would optimize application of the ORP, it will submit a rule filing pursuant to Rule 19b–4(f)(1) under the Exchange Act (or other appropriate rule filing type) specifying the new timing for implied volatility computation.

IEX believes that offering this optional risk protection for market makers is particularly important in the options markets where market makers are exposed to added risk given their continuous quoting obligations. Although equities and options exchanges share a number of similarities, a meaningful difference is that in the listed options market, liquidity is available only on-exchange and is primarily displayed and derived from market maker quotes, and options markets, when compared to equities markets, have a much higher quote to

---

[151] *See Revolutionary Black-Scholes Option Pricing Model is Published by Fischer Black, Later a Partner at Goldman Sachs,* available at *https://www.goldmansachs.com/our-firm/history/moments/1973-black-scholes.*

[152] The quote instability calculation is set forth in Supplementary Material .04 to proposed Rule 23.150(h); the calculation of implied volatility is set forth in Supplementary Material .05 to proposed Rule 23.150(h).

[153] *See* proposed Rule 23.150(h)(1).

[154] The Exchange notes that it is not an equities listing exchange. The Exchange does not believe that making class-by-class determinations in this context or otherwise creates a conflict of interest.

[155] *See* proposed Rule 28.100(a)(19).

[156] *Id.*

[157] *See* proposed Rule 23.150(h).

[158] *See* Supplementary Material .04(1)(q) to proposed Rule 23.150(h). Delta is a key metric in options trading that measures the sensitivity of an option's price to changes in the price of the underlying asset. As proposed, the Delta Bound Band would restrict the ORP from triggering unless the option's Delta is within the specified band. The initial value for the Delta Bound Band would be between 0—1, with the possible range of values between 0—1.

[159] *See* Supplementary Material .04(2)(e) to proposed Rule 23.150(h). As proposed, the possible Quote Instability Threshold range will be within a range of 0%–100%. If the Quote Instability Threshold is set at 100%, the expected change in the NBB/NBO of the option resulting from price movement in the underlying must be at least 100% of the current value of the NBB/NBO of the option for the ORP to trigger. If the Quote Instability Threshold is set at 0%, ORP would trigger if there is any expected change to the NBB/NBO of the option resulting from price movement in the underlying. As proposed, the initial value for the Quote Instability Threshold would be 0.1%. When triggered, ORP will only result in the repricing or cancellation of quotes if the change to the NBB/NBO of the option resulting from price movement in the underlying is to a different price level than the current NBB/NBO after rounding to the nearest minimum price variation.

[160] *See* 17 CFR 240.19b–4(f)(1). A rule filing pursuant to Rule 19b–4(f)(1) under the Exchange Act takes effect upon filing with the Commission.

[161] Should IEX determine that it needs to apply a value that falls outside of the range of values that are approved by the Commission pursuant to this rule filing and disclosed in the rule book, it would seek to change such value via a filing made pursuant to either Section 19(b)(3)(A) or Section 19(b)(2) of the Act.

[162] *See* Supplementary Material .05 to proposed Rule 23.150(h).

trade ratio.[163] Exchange market makers in the listed options market play an essential role in providing liquidity. Moreover, given the sheer difference in magnitude of tradeable instruments in listed options as compared to equities (approximately 1.5 million listed options series compared to approximately 11,000 listed equity securities), the options exchanges often do not have the same sources of natural liquidity of buyers and sellers for each tradeable instrument as is generally the case for equities exchanges. Thus, options market makers are tasked with affirmative obligations to support the provision of liquidity to options exchanges through continuous two-sided quotes in large numbers of listed options series. As a result, IEX understands that options market makers can be subject to excessive risk of one or more quotes being executed at stale prices compared to equities market makers or other liquidity providers.[164] Because options market makers maintain hundreds (and sometimes thousands) of quotes on options for a given underlying security at any one time, a sudden market move in the underlying security can leave an options market maker vulnerable to being executed across multiple quotes that are stale and dislocated from the price of the underlying securities. Liquidity takers engaged in latency arbitrage can target one or more of these quotes at stale prices, with limited risk should they fail to execute (*i.e.,* lost opportunity vs. trading at a stale price), before the Market Makers are able to move their quotes (often hundreds or

more for a given underlying) to reflect the price change in the underlying securities, thereby exposing those Market Makers to potentially major losses. IEX understands that incurring such losses over time reduces a market maker's willingness to provide narrow and deep quotes, which decreases liquidity and price discovery in the market. Moreover, to the extent that such losses result in market making firms being less profitable (or unprofitable), they may cease market making activity or limit the options classes in which they compete, which can, over time, decrease competition and increase market maker concentration. IEX believes that by providing incremental risk reduction, the ORP could help to counter these impacts.[165]

More specifically, as discussed above, traders using these specific strategies can leverage technological and speed advantages to identify when options prices are in transition and react in microseconds before others and rapidly execute against resting orders at outdated, stale prices, before those orders can be modified or cancelled to reflect updated market conditions, and before others have a fair opportunity to adjust them. However, these technological and speed advantages are expensive and challenging to achieve and maintain, and therefore not readily available to all market participants. The optional ORP is designed to augment these risk protections with a transparent, rules-based formula that identifies when a market maker's quote is clearly mispriced based on a price change in the underlying security and reprice or cancel the quote in a manner with effects that are predictable to both market makers and other participants, who expect the price of an option to change in response to a material change in price of the underlying security because options are derivative securities whose prices are based in part on the price of their underlying security.

Without robust liquidity protection mechanisms to protect against these risks, market makers may be forced to widen their spreads, show less liquidity, or simply exit the market. Overall market quality could deteriorate as a result, and investors would suffer when it becomes too expensive to transact, or when there is insufficient liquidity to enable transacting altogether. Accordingly, liquidity protection mechanisms for market makers, which all options exchanges offer, and IEX proposes to offer, are vital for achieving a healthy balance between market makers and liquidity takers in the listed options market. These include, but are not limited to, activity-based risk controls, price reasonability checks, and functionality (such as bulk quoting and purge ports) to facilitate timely quoting, quote updates, and quote cancellation.

For each options series, the System will maintain a real-time estimate of the sensitivity of the series to changes in the midpoint of the best Protected Bid and best Protected Offer of the Signal Exchanges for the underlying security (based on a Black-Scholes assessment). When there is a change in the best Protected Bid or best Protected Offer of the Signal Exchanges for the underlying security, the System will use the quote instability calculation formula set forth in proposed IEX Rule 23.150(h) to calculate whether to generate a quote instability determination for each options series overlying the underlying security. The System independently assesses whether to generate a quote instability determination affecting resting bids or offers for each options series. A quote instability determination is generated by the System when, pursuant to the quote instability calculation, the quote instability factor is greater than the defined Quote Instability Threshold and the delta absolute value is within the Delta Bound Band.[166] As proposed, the Delta Bound Band would be uniformly applied across all options in order to more narrowly tailor deployment of the ORP to options series at the greatest risk of adverse selection based on the Exchange's assessment of relevant factors.

If a Market Maker has opted to utilize the ORP and its quote in an options series that was the subject of a quote instability determination is at or above (below) the price level of the quote instability determination the System will either cancel the Market Maker's quote or reprice it to the price level of the quote instability determination,

---

[163] *See* Staff Report on Equity and Options Market Structure Conditions in Early 2021 (Oct. 14, 2021) at 4 (explaining that options market structure is broadly similar to equities market structure and noting a key difference that displayed liquidity is primarily derived from market maker quotes), available at *https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf; see also* Lehoczky, Sandor and Woods, Ellen and Russell, Matthew and Nguyen, Mina and Somers, James, *Dead Man's Switch: Making Options Markets Safer with Active Quote Protection* (May 2020) ("Dead Man's Switch"), at 2 (explaining that options markets "depend especially on market makers—who account for 99.9% of open orders—to connect buyers and sellers, due to a combinatorial explosion of expirations and strike prices").

[164] *See, e.g., Protecting Liquidity in Options Markets,* Market Structure, Optiver, July 12, 2023 ("Protecting Liquidity"), (concluding that "liquidity protection improves options markets" by safeguarding market makers against "excessive risk" that results from "liquidity providers maintain[ing] hundreds of quotes on a given underlying at any one time [and] a sudden market move can leave them vulnerable to showing stale, or outdated, quotes," thereby "exposing them to potentially major losses" if unable to amend or cancel quotes before executed), available at *https://optiver.com/insights/protecting-liquidity-in-options-markets/.*

[165] IEX notes that such trends have been in place for some time. *See, e.g.,* Joint letter from CBOE, SIFMA and The STA to Brett Redfearn (Director, Division of Trading and Markets, Commission) dated June 4, 2018, available at Cboe_Joint_Letter_with_SIFMA_and_The_STA_on_Options_Market_Structure.pdf, noting that ". . .[i]n particular over the past several years, there has been wide discussion in the options industry regarding market metrics and it has been shown that quoted liquidity has decreased and spreads have widened. Further many market makers have consolidated their businesses, reduced their participation, or stopped making options markets entirely—there are approximately half as many registered market makers actively participating in the U.S. options markets than there were five years ago. This trend obviously has impacted market quality in the U.S. options markets."

[166] See discussion *supra* on how modifications to these values will be made.

pursuant to the Market Maker's instruction.[167] Regardless of whether it chooses to use the ORP, a Market Maker will be able to adjust the price of its quote in the same manner as other Market Makers' quotes that have not opted to use the ORP.[168]

*One Second Exposure Period.* Proposed Rule 23.200 would require Options Members to expose their customers' orders on the Exchange for at least one second under certain circumstances before trading against such orders. During this one second exposure period, other Options Members will be able to enter orders to trade against the exposed order. In adopting a one second order exposure period, the Exchange is proposing a requirement that is consistent with the rules of other options exchanges.[169] Thus, the exposure period will allow Options Members that are members of other options exchanges to comply with proposed Rule 23.200 without programming separate time parameters into their systems for order entry or compliance purposes. The Exchange believes that market participants are sufficiently automated that a one second exposure period allows an adequate time for market participants to electronically respond to an order. Also, it is possible that market participants might wait until the end of the exposure period, no matter how long, before responding. Thus, the Exchange believes that any longer than one second would not further the protection of investors or market participants, but rather, would potentially increase market risk to investors and other market participants by creating a longer period of time for the exposed order to be subject to market risk.

Options Order Protection and Locked/Crossed Market Plan Rules

The Exchange will participate in the Options Order Protection and Locked/Crossed Market Plan (the ''Plan''),[170] and therefore will be required to comply with the obligations of Participants under the Plan. The Exchange proposes to adopt rules relating to the Plan that are substantially similar to the rules in place on all of the options exchanges that are Participants to the Plan. The Plan essentially applies the Regulation NMS price-protection provisions to the options markets. Similar to Regulation NMS, the Plan requires the Plan

Participants to adopt rules ''reasonably designed to prevent Trade-Throughs'', while exempting ISOs from that prohibition. The Plan's definition of an ISO is essentially the same as under Regulation NMS. The remaining exceptions to the trade-through prohibition, discussed more specifically below, either track those under Regulation NMS or correspond to unique aspects of the options market, or both.

The proposed rules in Chapter 28 (Options Order Protection and Locked and Crossed Markets Rules) conform to the requirements of the Plan. Proposed Rule 28.100 sets forth the defined terms for use under the Plan. Proposed Rule 28.110 prohibits trade-throughs and exempts ISOs from that prohibition. Proposed Rule 28.110 also contains additional exceptions to the trade-through prohibition that track the exceptions under Regulation NMS or correspond to unique aspects of the options market, or both.

Proposed Rule 28.120 sets forth the general prohibition against locking/crossing other eligible exchanges as well as certain enumerated exceptions that permit locked markets in limited circumstances; such exceptions have been approved by the Commission for inclusion in the rules of other options exchanges. Specifically, the exceptions to the general prohibition on locking and crossing occur when: (1) the locking or crossing quotation was displayed at a time when the Exchange was experiencing a failure, material delay, or malfunction of its systems or equipment; (2) the locking or crossing quotation was displayed at a time when there is a Crossed Market; (3) the Options Member simultaneously routed an ISO to execute against the full displayed size of any locked or crossed Protected Bid or Protected Offer; or (4) with respect to a locking quotation, the order entered on the Exchange that will lock a Protected Bid or Protected Offer, is: (i) not a Customer order, and the Exchange can determine via identification available pursuant to the OPRA Plan that such Protected Bid or Protected Offer does not represent, in whole or in part, a Customer order; or (ii) a Customer order, and the Exchange can determine via identification available pursuant to the OPRA Plan that such Protected Bid or Protected Offer does not represent, in whole or in part, a Customer order, and, on a case-by-case basis, the Customer specifically authorizes the Member to lock such Protected Bid or Protected Offer.[171]

The Exchange notes that the proposed rules in Chapter 28 (Options Order Protection and Locked and Crossed Markets Rules) are substantively identical to the rules of MEMX Options.[172]

Securities Traded on IEX Options

*General Listing Standards.* The Exchange proposes to adopt listing standards for options traded on IEX Options as described in Chapter 20 (Securities Traded on IEX Options), which are substantively identical to the equivalent MEMX Options rules,[173] with the exception of: (i) some language in Supplementary Material .02 to proposed Rule 20.140 concerning the $1 strike price program which is not included in the equivalent MEMX rule, and therefore borrowed from the equivalent MIAX rule;[174] and (ii) the addition of language allowing the Exchange to list for closing transactions an Options series that is listed but restricted to closing transactions on another exchange.[175] The Exchange will join the Options Listings Procedures Plan and will list and trade options already listed on other options exchanges. The Exchange will gradually phase-in its trading of options, beginning with a selection of actively traded options.

Conduct and Operational Rules for Options Members

The Exchange proposes to adopt rules in Chapter 19 for IEX Options that are substantively identical to the rules of MEMX Options regarding: exercises and deliveries as described in Chapter 24 (Exercises and Deliveries); records, reports and audits as described in Chapter 25 (Records, Reports and Audits); minor rule violations as described in Chapter 26 (Discipline and Summary Suspensions); doing business with the public as described in Chapter 27 (Doing Business With the Public); and margin as described in Chapter 29 (Margin Requirements).[176] The Exchange also proposes to adopt rules that are substantively similar to most of MEMX's Chapter 18 (Business Conduct), with the exception of proposed Rules 19.160 (Position Limits), 19.170

---

[167] *See* proposed Rule 23.150(h)(1)(c).

[168] The Exchange will comply with Consolidated Audit Trail reporting requirements in accordance with applicable technical specifications.

[169] *See, e.g.,* MEMX Rule 22.11; CBOE Rule 5.9; and MIAX Options Rule 520(b).

[170] *See supra* note 85.

[171] *See* proposed Rule 28.120(b).

[172] *See* MEMX Rule 27.1, 27.2, and 27.3.

[173] *See* MEMX Rules, Chapter 19. IEX notes that the MEMX Rules include Chapter 29: Index Rules. IEX is not proposing to adopt similar rules at this time, and any references to index options in MEMX Chapter 19 are not in proposed IEX Chapter 20.

[174] *See* MIAX Rule 404 Interpretation and Policy .01.

[175] *See* Supplementary Material .01 to proposed Rule 20.130, which mirrors MIAX Rule 403 Interpretation and Policy .01.

[176] *See* MEMX Rules, Chapters 23, 24, 25, 26 and 28.

(Exemptions from Position Limits), 19.180 (Exercise Limits) that are substantively similar to MIAX Rules 307, 308, and 309, respectively.[177] IEX proposed to adopt MIAX's versions of these rules because they provided specificity about the types of position limits the Exchange will apply to Options Members (as opposed to the MEMX rules, which rely on position limits set by other exchanges).

National Market System

IEX Options will operate as a full and equal participant in the national market system for options trading established under Section 11A of the Exchange Act.[178] IEX Options will become a member of the Options Price Reporting Authority ("OPRA"), the Options Order Protection and Locked/Crossed Market Plan, the Options Regulatory Surveillance Authority ("ORSA"), and the Options Listing Procedures Plan ("OLPP"). The Exchange expects to participate in those plans on the same terms currently applicable to current members of those plans. The Exchange is in the process of contacting the leadership of each options-related national market system plan to begin the membership process.

Regulation

The Exchange will leverage many of the structures it established to operate a national securities exchange trading NMS equities securities, in compliance with Section 6 of the Exchange Act.[179] As described in more detail below, there will be three elements of that regulation: (1) the Exchange will join the existing options industry agreements pursuant to Section 17(d) of the Exchange Act prior to commencing operations,[180] as it did with respect to equities; (2) the Exchange's Regulatory Services Agreement ("RSA") with FINRA will be amended prior to commencing operations to provide that FINRA will perform regulatory surveillance, investigation, disciplinary and hearing services of options trading on IEX subject to oversight by IEX Regulation, just as it does for equities regulation; and (3) the Exchange will perform

options listing regulation, as well as authorize Options Members to trade on IEX Options. Section 17(d) of the Exchange Act and the related Exchange Act rules permit SROs to allocate certain regulatory responsibilities to avoid duplicative oversight and regulation. Under Exchange Act Rule 17d–1,[181] the SEC designates one SRO to be the Designated Examining Authority, or DEA, for each broker-dealer that is a member of more than one SRO. The DEA is responsible for the financial aspects of that broker-dealer's regulatory oversight. Because IEX Options Members also must be members of at least one other SRO, the Exchange would generally not expect to be designated as the DEA for any of its members.[182]

Exchange Act Rule 17d–2 [183] permits SROs to file with the Commission plans under which the SROs allocate among each other the responsibility to receive regulatory reports from, and examine and enforce compliance with specified provisions of the Exchange Act and rules thereunder and SRO rules by, firms that are members of more than one SRO ("common members"). If such a plan is declared effective by the Commission, an SRO that is a party to the plan is relieved of regulatory responsibility as to any common member for whom responsibility is allocated under the plan to another SRO.

All of the options exchanges, FINRA, and NYSE have entered into the Options Sales Practices Agreement, a Rule 17d–2 agreement, and the Exchange intends to join this agreement prior to the commencement of operations for IEX Options. Under this Agreement, the examining SROs will examine firms that are common members of the Exchange and the particular examining SRO for compliance with certain provisions of the Exchange Act, certain of the rules and regulations adopted thereunder, certain examining SRO rules, and certain proposed IEX Options rules. In addition, the proposed IEX Options rules contemplate participation in this Agreement by requiring that any Options Member also be a member of at least one of the examining SROs. The Exchange and FINRA are also party to a bilateral Rule 17d–2 agreement that requires minor modifications due to the proposed launch of IEX Options. The Exchange intends to modify and seek Commission approval of the modified

bilateral Rule 17d–2 agreement prior to commencing of operations for IEX Options. Additionally, all of the options exchanges and FINRA have entered into the Options-Related Market Surveillance Agreement, a Rule 17d–2 agreement, and the Exchange intends to join this agreement prior to the commencement of operations for IEX Options.

For those regulatory responsibilities that fall outside the scope of any Rule 17d–2 agreements, the Exchange will retain full regulatory responsibility under the Exchange Act. However, the Exchange has entered into an RSA with FINRA, as discussed above, pursuant to which FINRA personnel operate as agents for the Exchange in performing certain of these functions. The Exchange and FINRA will continue to operate under the RSA that is currently in place but with modifications as necessary to accommodate the expanded scope of the relationship. The necessary modifications will be implemented prior to the commencement of operations of IEX Options. As is the case with the Exchange's equities market, the Exchange will oversee FINRA and continue to bear ultimate regulatory responsibility with respect to regulatory functions not subject to allocation to FINRA or another SRO pursuant to a Rule 17d–2 Agreement for the IEX Options Exchange.

Consistent with the Exchange's existing regulatory structure, the Exchange's Chief Regulatory Officer, reporting to the Regulatory Oversight Committee of the Exchange's board of directors, shall have general supervision of the regulatory operations of IEX Options, including responsibility for overseeing the surveillance, examination, and enforcement functions and for administering all regulatory services agreements applicable to IEX Options. Similarly, the Exchange's existing Regulatory Oversight Committee will be responsible for overseeing the adequacy and effectiveness of Exchange's regulatory and self-regulatory organization responsibilities, including those applicable to IEX Options.

As it does with equities, the Exchange will monitor trading on IEX Options, both through internal reports and FINRA surveillances for the purpose of maintaining a fair and orderly market. As it does with its equities trading, the Exchange will monitor IEX Options to identify unusual trading patterns and determine whether particular trading activity requires further regulatory investigation by FINRA.

Finally, the Exchange will oversee the process for determining and

---

[177] The Exchange also proposes to adopt provisions comparable to CBOE Rule 8.30 Interpretation .03(c)(4) in proposed Rule 19.160(f)(2)(D) (regarding control for purposes aggregating positions held by different accounts for purposes of applying the position limit rules) and CBOE Rule 8.30 Interpretation .09 in Supplementary Material .03 to proposed Rule 19.160 (regarding aggregation of positions in options contacts on the same underlying security for purposes of position limit rules).

[178] 15 U.S.C. 78k–1.

[179] 15 U.S.C. 78f.

[180] 15 U.S.C. 78q(d).

[181] 17 CFR 240.17d–1.

[182] If IEX were to be designated as the DEA for any of its members, FINRA would perform the DEA functions on behalf of IEX pursuant to the RSA.

[183] 17 CFR 240.17d–2.

implementing trade halts, identifying and responding to unusual market conditions, and administering the Exchange's process for identifying and remediating ''obvious errors'' by and among its Options Members.[184] The proposed rules in Chapter 21 (Regulation of Trading on IEX Options) regarding halts,[185] unusual market conditions, extraordinary market volatility, obvious errors, audit trail, and rules regarding prohibited and permissible transfers of options positions off the Exchange are substantively identical to the approved rules of MEMX Options.[186]

Minor Rule Violation Plan

The Exchange's disciplinary rules, including Exchange Rules applicable to ''minor rule violations,'' are set forth in Chapter 9 of the Exchange's current Rules. Such disciplinary rules will apply to Options Members and their associated persons.

The Commission approved the Exchange's Minor Rule Violation Plan (''MRVP'') in 2016.[187] The Exchange's MRVP specifies the uncontested minor rule violations that are included in the MRVP and have sanctions not exceeding $2,500. Any violations that are resolved under the MRVP would not be subject to the provisions of Rule 19d–1(c)(1) under the Act [188] requiring that an SRO promptly file notice with the Commission of any final disciplinary action taken with respect to any person or organization.[189] The Exchange's

MRVP includes the policies and procedures included in Exchange Rule 9.216(b) and the violations included in Rule 9.218.

Under Rule 9.216(b), the Exchange may impose a fine (not to exceed $2,500) and/or a censure on any Member or associated person with respect to any rule listed in IEX Rule 9.218. If the FINRA Department of Enforcement or the Department of Market Regulation, on behalf of the Exchange, has reason to believe a violation has occurred and if the Member or associated person does not dispute the violation, the Department of Enforcement or the Department of Market Regulation may prepare and request that the Member or associated person execute a minor rule violation plan letter accepting a finding of violation, consenting to the imposition of sanctions, and agreeing to waive the Member's or associated person's right to a hearing before a Hearing Panel or, if applicable, an Extended Hearing Panel, and any right of appeal to the IEX Appeals Committee, the Board, the Commission, and the courts, or to otherwise challenge the validity of the letter, if the letter is accepted. The letter must describe the act or practice engaged in or omitted, the rule, regulation, or statutory provision violated, and the sanction or sanctions to be imposed. Unless the letter states otherwise, the effective date of any sanction imposed will be a date to be determined by IEX Regulation staff. In the event the letter is not accepted by the Member or associated person, or is rejected by the Office of Disciplinary Affairs, the matter can proceed in accordance with the Exchange's disciplinary rules, which include hearing rights for formal disciplinary proceedings.

The Exchange proposes to amend its MRVP and Exchange Rule 9.218 to add certain rules relating to Options as set forth in proposed Rule 26.120 (Penalty for Minor Rule Violations) to the list of rules eligible for Minor Rule Violation Plan treatment.[190] The rules included in proposed Rule 26.120, as appropriate for disposition under the Exchange's MRVP, are: (a) position limit and exercise limit violations; (b) violations regarding the failure to accurately report position and account information; (c) Market Maker quoting obligations; (d) violations regarding expiring exercise declarations; (e) violations relating to

the failure to respond to the Exchange's requests for the submission of trade data; and (f) violations relating to noncompliance with the Consolidated Audit Trail Compliance Rule requirements. The rule violations included in proposed Rule 26.120 are the same as the rule violations included in the MRVPs of other options exchanges.[191]

Upon implementation of this proposal, the Exchange will include violations of the enumerated options trading rules, if any, in an applicable Exchange's quarterly report of any actions taken on minor rule violations under the MRVP.[192] A quarterly report would include: the Exchange's internal file number for the case, the name of the individual and/or organization, the nature of the violation, the specific rule provision violated, the sanction imposed, the number of times the rule violation has occurred, and the date of disposition. The Exchange's MRVP, as proposed to be amended herein, is consistent with Sections 6(b)(1), 6(b)(5) and 6(b)(6) of the Act, which require, in part, that an exchange have the capacity to enforce compliance with, and provide appropriate discipline for, violations of the rules of the Commission and of the exchange, 6(b)(6) provides that members and persons and associated members shall be appropriately disciplined for violation of the provisions of the rules of the exchange, by expulsion, suspension, limitation of activities, functions and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction.[193] Rule violations listed in proposed Rule 26.120 are minor in nature and will be more appropriately disciplined through the Exchange's MRVP and therefore proposes to add them to the list of rules eligible for minor rule fine disposition.

In addition, because Rule 9.216(b) offers procedural rights to a person sanctioned for a violation listed in proposed Rule 26.120, the Exchange will provide a fair procedure for the disciplining of members and associated persons, consistent with Section 6(b)(7) of the Act.[194]

This proposal to include the rules listed in proposed Rule 26.120 in the Exchange's MRVP is consistent with the

---

[184] IEX notes that, like MEMX Rule 20.6, proposed Rule 21.150 authorizes the proposed Error Panel to review decisions made under this rule, which includes decisions to classify a transaction as a Catastrophic Error.

[185] Proposed Rule 21.120(b) states that during a trading halt, the Exchange shall process new and existing orders and quotes in a series in accordance with proposed Rule 22.160(g). Proposed Rule 22.160(g), which is substantively identical to NYSE Arca Options Rule 6.64P–O(g), states that during a trading halt, the Exchange will cancel all resting Market Maker quotes.

[186] *See* MEMX Rules, Chapter 20.

[187] *See* Securities Exchange Act Release No. 78474 (August 3, 2016), 81 FR 52717 (August 9, 2016) (Order Declaring Effective a Minor Rule Violation Plan) (File No. 4–701).

[188] 17 CFR 240.19d–1(c)(1).

[189] The Commission adopted amendments to paragraph (c) of Rule 19d–1 to allow SROs to submit for Commission approval plans for the abbreviated reporting of minor disciplinary infractions. *See* Release No. 34–21013 (June 1, 1984), 49 FR 23828 (June 8, 1984). Any disciplinary action taken by an SRO against any person for violation of a rule of the SRO which has been designated as a minor rule violation pursuant to such a plan filed with and declared effective by the Commission will not be considered ''final'' for purposes of Section 19(d)(1) of the Act if the sanction imposed consists of a fine not exceeding $2,500 and the sanctioned person has not sought an adjudication, including a hearing, or otherwise exhausted his administrative remedies.

[190] In its proposal to adopt the MRVP, the Exchange requested that, going forward, to the extent that there are any changes to the rules applicable to the Exchange's MRVP, the Exchange requests that the Commission deem such changes to be modifications to the Exchange's MRVP.

[191] *See, e.g.,* MEMX Rules, Chapter 25.

[192] To date, the Exchange has not taken any minor rule violation actions.

[193] 15 U.S.C. 78f(b)(1), 78f(b)(5) and 78f(b)(6).

[194] 15 U.S.C. 78f(b)(7). Rule 9.216(b) does not preclude an Options Member or person associated with an Options Member from contesting an alleged violation and receiving a hearing on the matter with the same procedural rights through a litigated disciplinary proceeding.

public interest, the protection of investors, or otherwise in furtherance of the purposes of the Act, as required by Rule 19d–1(c)(2) under the Act,[195] because it should strengthen the Exchange's ability to carry out its oversight and enforcement responsibilities as an SRO in cases where full disciplinary proceedings are unsuitable in view of the minor nature of the particular violation. In requesting the proposed change to the MRVP, the Exchange in no way minimizes the importance of compliance with Exchange Rules and all other rules subject to the imposition of fines under the MRVP. Minor rule fines provide a meaningful sanction for minor or technical violations of rules when the conduct at issue does not warrant stronger, immediately reportable disciplinary sanctions. The inclusion of a rule in the Exchange's MRVP does not minimize the importance of compliance with the rule, nor does it preclude the Exchange from choosing to pursue violations of eligible rules through the Exchange's disciplinary rules if the nature of the violation or prior disciplinary history warrants more significant sanctions. However, the MRVP provides a reasonable means of addressing rule violations that do not rise to the level of requiring formal disciplinary proceedings, while providing greater flexibility in handling certain violations.[196] The Exchange will continue to conduct surveillance with due diligence and make a determination based on its findings, on a case-by-case basis, whether a fine of more or less than the recommended amount is appropriate for a violation under the MRVP or whether a violation requires a formal disciplinary action.

Section 36 Exemption Request

The Exchange proposes to incorporate by reference as IEX Options rules certain rules of the Cboe Exchange, Inc. ("CBOE"), the New York Stock Exchange ("NYSE"), and FINRA. Specifically, proposed Rule 27.250 proposes to incorporate by reference the applicable rules of FINRA with respect to Communications with Public Customers, and proposed Rule 29.120 proposes to incorporate by reference initial and maintenance margin requirements of either CBOE or NYSE. Thus, for certain IEX Options rules, Exchange members will comply with a IEX Options rule by complying with the CBOE, NYSE, or FINRA rule referenced. Using its authority under Section 36 of the Act, the Commission has previously

exempted certain SROs from the requirement to file proposed rule changes under Section 19(b) of the Act when incorporating another SRO's rules by reference.[197] Each such exempt SRO has agreed to be governed by the incorporated rules, as amended from time to time, but, has not been required to file a separate proposed rule change with the Commission each time the SRO whose rules are incorporated by reference seeks to modify its rules. In addition, each SRO incorporated by reference only regulatory rules (*e.g.,* margin, suitability, arbitration), not trading rules, and incorporated by reference whole categories of rules (*i.e.,* did not "cherry-pick" certain individual rules within a category). Last, each exempt SRO had reasonable procedures in place to provide written notice to its members each time a change is proposed to the incorporated rules of another SRO in order to provide its members with notice of a proposed rule change that affects their interests, so that they would have an opportunity to comment on it.

In connection with this proposal, the Exchange respectfully requests, pursuant to Rule 240.0–12 under the Act,[198] an exemption under Section 36 of the Act from the rule filing requirements of Section 19(b) of the Exchange Act for changes to those IEX Options rules that are effected solely by virtue of a change to a cross-referenced CBOE, NYSE, or FINRA rule. The Exchange proposes to incorporate by reference categories of rules (rather than individual rules within a category) that are not trading rules. The Exchange also agrees to provide written notice to Options Members prior to the launch of IEX Options of the specific CBOE, NYSE, and FINRA rules that it will incorporate by reference. In addition, the Exchange will notify Options Members whenever CBOE, NYSE, or FINRA proposes a change to a cross-referenced CBOE, NYSE, or FINRA rule.[199] For the foregoing reasons, the

Exchange believes that its request for exemptive relief is consistent with prior requests for, and provision of, similar exemptive relief.

Amendments to Existing Exchange Rules

In addition to the rules of IEX Options proposed above, the Exchange proposes to amend certain of its existing Exchange Rules that currently apply to the Exchange's equities market in order to reflect the Exchange's proposed operation of IEX Options.

First, the Exchange proposes to amend Rule 2.160(i), which generally requires each Member to register at least two Principals with the Exchange subject to certain exceptions described therein, to provide that such paragraph (i) shall not apply to a Member that solely conducts business on the Exchange as an Options Member, however, Options Members must comply with the registration requirements set forth in proposed Rule 18.110. The Exchange notes that proposed Rule 18.110(h), which provides that every Options Member shall have at least one Options Principal and sets forth the Exchange's Options Principal registration requirements, is identical to MEMX Rule 17.2(g). In connection with this proposed change, the Exchange also proposes to amend Rule 2.160(n) to include Options Principal as a registration category and to set forth the Exchange's qualification requirements for an Options Principal, which are the same as those for an Options Principal on MEMX Options. Additionally, the Exchange proposes to amend Rule 2.160(p)(a)(4) to set forth the appropriate regulatory element continuing education module for reregistration as an Options Principal.

The Exchange also proposes to make three modifications to Rule 2.220 (IEX Services LLC as Outbound Router). First, IEX proposes to remove the word "directly" from the first sentence of subparagraph (a), because IEX Services will continue to route orders to away markets, but as described above, with respect to options routing, it will not route those order "directly" to the away markets. Second, consistent with the first change, IEX proposes to insert a new second sentence in subparagraph (a) that reads: "When routing options orders, as set forth in proposed Rule 22.180, IEX Services will transmit such orders to one or more routing brokers that are not affiliated with the Exchange; the routing brokers will in turn route the applicable options orders to other

---

[195] 17 CFR 240.19d–1(c)(2).

[196] *See supra* note 188 and accompanying text.

[197] *See, e.g.,* Securities Exchange Act Release No. 49260 (February 17, 2004), 69 FR 8500 (February 24, 2004). *See also* Securities Exchange Act Release Nos. 57478 (March 12, 2008), 73 FR 14521, 14539–40 (March 18, 2008) (order approving SR–NASDAQ–2007–004 and SR–NASDAQ–2007–080) and 53128 (January 13, 2006), 71 FR 3550, 3565–66 (January 23, 2006) (File No. 10–131) (approving The NASDAQ Stock Market LLC's exchange application).

[198] 17 CFR 240.0–12.

[199] The Exchange will provide such notice through a posting on the same website location where the Exchange will post its own rule filings pursuant to Rule 19b–4(f)(l) under the Exchange Act (or other appropriate rule filing type), within the time frame required by that rule. The website posting will include a link to the location on the

CBOE, NYSE, or FINRA websites where the proposed rule change is posted.

securities exchanges that trade options.'' IEX proposes to make this change to reflect the different nature of how IEX Services will handle routing options orders from equities orders. And third, IEX proposes to modify subparagraph (a)(8) of this rule, which states that IEX Services shall maintain an error account for the purpose of addressing positions that are the result of an execution or executions that are not clearly erroneous under Rule 11.270 and result from a technical or systems issue at IEX Services, the Exchange, a routing destination, or a non-affiliate third-party routing broker that affects one or more orders ("Error Positions"). The proposed change to Rule 2.220(a)(8) would add a reference to the comparable provision to that which governs review and resolution of clearly erroneous equities transactions (*i.e.,* Rule 11.270) but for options transactions, namely proposed Rule 21.150, which governs review and resolution of options transactions that may qualify as obvious errors.

The Exchange also proposes to adopt Rule 21.220 (Limitation of Liability), which is almost identical to the Rule 11.260, the Limitation of Liability rule in IEX's equities trading rules. The only difference is to reflect that proposed Rule 21.220 applies to IEX Options and options trading.

Lastly, the Exchange proposes to amend Rule 9.218 (Violations Appropriate for Disposition Under Plan Pursuant to Exchange Act Rule 19d–1(c)(2)), which contains the list of Exchange Rule violations and recommended fine schedule, to include a new paragraph (k) referencing proposed Rule 26.120 for the recommended fines for minor rule violations of the Exchange Rules appliable to IEX Options, which the Exchange notes are the same as those of MEMX Options.

2. Statutory Basis

The Exchange believes that the proposed rule change is consistent with Section 6(b) of the Act [200] in general, and furthers the objectives of Section 6(b)(5) of the Act [201] in particular, in that it is designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in

general, to protect investors and the public interest; and is not designed to permit unfair discrimination between customers, issuers, brokers, or dealers.

As described above, the Exchange proposes to operate its options market much as it operates its equities market today and in a manner similar to that of other options exchanges, while leveraging IEX's experience and expertise in understanding the needs of market makers to offer them additional tools designed to better manage risk and drive performance. As discussed in the Purpose section, IEX believes that the proposed enhanced liquidity protection mechanisms will result in market makers providing more competitive quotes which will benefit all market participants and thereby support the protection of investors and the public interest. Also as discussed in the Purpose section, most of the proposed IEX Options rules are based on the rules of other options exchanges, primarily MEMX, CBOE, MIAX, NYSE Amex, and NYSE Arca. Therefore, the Exchange does not believe these aspects of the proposed rule change that are substantively identical to other exchanges' rules raise any new or novel issues that have not been previously considered by the Commission. Moreover, the Exchange believes that the proposed functionality is consistent with Section 6(b)(5) of the Act because the System is designed to be efficient and its operation transparent, thereby facilitating transactions in securities, removing impediments to and perfecting the mechanisms of a free and open national market system. As described above, the Exchange's proposed rules, including the proposed Order Types and Handling Instructions, opening procedures, routing services, and order matching process are designed to provide a simplified suite of conventional features and to comply with all applicable regulatory requirements, including the obligations of the Options Order Protection and Locked/Crossed Market Plan.[202]

As discussed in the Purpose section, IEX's proposal includes a de minimis latency mechanism (or speedbump) on incoming order and quote messages designed to enable IEX to obtain the most accurate view of the market prior to processing orders and quotes, and a robust suite of risk protections, including the ORP, which is designed to protect market makers from excessive risk due to execution of quotes at stale prices. IEX believes that the proposed latency mechanism will protect investors and the public interest in

several respects. First, by enabling IEX to obtain the most accurate view of market data prior to executing an order or quote, it thereby would support IEX's ability to accurately account for contemporaneous market data. IEX notes that this aspect of its functionality is designed to facilitate market participants executing at current (*i.e.,* not ''stale'') prices. Second, by enabling the System to perform the Indicator calculation with current market data, it supports operation of the ORP (as discussed herein), which is designed to provide Market Makers with an optional tool to avoid excessive risk that can arise from execution of a quote at a stale price. As discussed in detail above, IEX believes that this protection will encourage market makers to post aggressively priced and/or deeper quotes on the Exchange which will benefit all market participants. Thus, from a functional perspective, IEX believes that the operation of the latency mechanism is consistent with the Act. Further, and as explained below, the proposed latency mechanism of 350 microseconds is well within the geographic delays that exist among and between the data centers that IEX Options Members and other options exchanges use [203] and is consistent with the naturally occurring time indeterminism that exists in order processing.[204]

IEX also believes that the latency mechanism is consistent with the Commission Interpretation Regarding Automated Quotations Under Regulation NMS (''de minimis delay

---

[200] 15 U.S.C. 78f(b).

[201] 15 U.S.C. 78f(b)(5).

[202] *See supra* note 85.

[203] *See https://www.ice.com/publicdocs/ICE_Global_Network_Factsheet.pdf* for a description of latencies between various data centers.

[204] Accounting for the latency mechanism or speedbump is no different than accounting for other geographical distances between exchanges. *See* Securities Exchange Act Release No. 78101 (June 17, 2016), 81 FR 41142, 41161 (June 23, 2016) (''2016 SEC Approval Order'') (approving IEX's 350 microsecond speed bump in the registration of the IEX Exchange as ''well within the range of geographic and technological latencies that market participants experience today'' such that ''latency to and from IEX will be comparable to—and even less than—delays attributable to other markets that currently are included in the NBBO,'' and finding the delay to be de minimis, *i.e.,* so short as to not frustrate the purposes of the Exchange Act by impairing fair and efficient access to IEX's quotation); *see also* 2020 SEC Approval Order, supra note 27, at 54441 (determining that IEX's de minimis speed bump when routing displayed equity orders is ''just like accounting for any other technological or geographic latency'' and doing so is consistent with applicable rules and regulations); *see also Citadel,* 45 F.4th at 37 *supra* note 27 (ruling in favor of the SEC's approval of IEX's displayed equity order that traverses a speedbump and holding that IEX's displayed equity order's delay are ''similar to the delay that traders' communications already experience when traveling between various other exchanges across the country.'').

interpretation'').[205] Although options markets do not have the same automated quotation requirements as in equities, even if they were to apply, the Commission's reasoning in the de minimis delay interpretation in the context of NMS automated quotations is instructive, as the latency mechanism IEX is proposing for the options exchange is a de minimis delay that does not impair fair and efficient access to an exchange's quotation. Specifically, the Commission stated in issuing its interpretation that intentional delays that are well within the geographic and technological latencies experienced by market participants when routing orders are de minimis to the extent they would not impair a market participant's ability to access a displayed quotation consistent with the goals of NMS Rule 611.[206] The Commission also noted that an intentional delay of any duration must be fully disclosed and codified in a written rule of the exchange, which, as described below, the latency mechanism will be fully disclosed and codified in IEX's written rules.[207]

IEX believes that its proposed latency mechanism of 350 microseconds is fully consistent with the reasoning in the Commission's de minimis delay interpretation.[208] First, the delay is less than the existing geographic latencies experienced by market participants when routing orders. For example, latency between and among the data centers located in New Jersey range up to several hundred microseconds, with additional latency introduced by technology processing on both sides of an order or quote route between these data centers.[209] Accordingly, the proposed latency mechanism is consistent with this aspect of the Commission's de minimis interpretation.

The proposed latency mechanism also meets the additional prongs of the de

minimis interpretation, that it be fully disclosed and codified in a written rule of the exchange that has become effective pursuant to Section 19 of the Act; and that the exchange articulates how the purpose, operation, and application of the delay is consistent with the Act and the rules and regulations thereunder applicable to the exchange. The latency mechanism's operation, as proposed, would be disclosed and codified in detail in IEX Rules 22.100(n) and 22.170(g). Those provisions specify that the latency mechanism shall mean a delay of 350 microseconds that is added to each incoming order and quote message from a User prior to processing by the System, and that will not apply to other communications between the Exchange and Users, Away Markets, data feeds, order processing and order execution on the IEX Options Book, and outbound communications to the Exchange's proprietary data feeds and OPRA. As discussed above, the purpose of the latency mechanism is to provide adequate time for the IEX System to obtain the most accurate view of market data to enable it to accurately price orders as well as to perform the Indicator calculation with current market data.

Consequently, based on the foregoing, the Exchange believes that the latency mechanism is both de minimis and otherwise consistent with the Act.

The Exchange believes that the proposed ORP is consistent with Section 6(b) of the Act [210] in general, including furthering the objectives of Section 6(b)(5) of the Act,[211] as the proposed optional risk protection mechanism would remove impediments to and perfect the mechanism of a free and open market and a national market system and promote just and equitable principles of trade by providing an optional quote parameter, available to all IEX Options Market Makers, that is designed to assess the materiality of an adverse price change in a particular options series so that the System can effectuate the advance trading instructions provided by the Market Maker to cancel or reprice its quote to the price level of the quote instability determination, as selected by the Market Maker. The ORP is an optional, narrowly tailored approach designed to provide protection from excessive risk of execution of quotes at stale prices and thereby enable market makers to make tighter and larger quotes (*i.e.,* quotes at narrower spreads with greater size) thus enhancing the quality of the IEX

Options market, to the benefit of all market participants. The Exchange believes it is appropriate to provide market makers with the choice to utilize this reasonable quote protection, particularly given the continuous quoting obligations specific to market makers and their importance in providing liquidity in the listed options market. The Exchange further believes this risk functionality will encourage market makers to provide additional depth and liquidity to the Exchange's markets, thereby removing impediments to and perfecting the mechanisms of a free and open market and a national market system and, in general, protecting investors and the public interest.

The Exchange believes that the ORP supports the protection of investors and public interest goals of the Act. As described in the Purpose section, based on the structural differences between equities and listed options markets, the options exchanges often do not have the same natural liquidity of buyers and sellers for each tradeable instrument (*i.e.,* options series) as is generally the case in equities. As a result, market makers with affirmative obligations play a central role in providing liquidity to options exchanges through continuous two-sided quotes in large numbers of listed options series, thereby enabling investors to transact in listed options in accordance with their investment objectives. Because options market makers are required to maintain hundreds (and sometimes thousands) of quotes on options overlying underlying securities at any one time, a sudden market move in the underlying security can leave them vulnerable to being executed on quotes at stale prices and dislocated from the price of the underlying security.[212] Liquidity takers engaged in latency arbitrage can target these quotes at stale prices, with limited risk should they fail, before the market maker has time to move its quotes to reflect the price change in the

---

[205] *See* Commission Interpretation Regarding Automated Quotations Under Regulation NMS, Exchange Act Release No. 34–78102, 81 FR 40,785, 40,792 (June 23, 2016).

[206] *Id.*

[207] *Id.*

[208] IEX notes that the D.C. Circuit Court also agreed with the Commission's interpretation. The Court ruled entirely in favor of the SEC's approval of IEX's system that includes applying a speedbump and quote indicator to displayed equity orders. *See Citadel Securities,* 45 F.4th at 36, *supra* note 27 (concluding the SEC's approval of a 350 microseconds intentional access delay for displayed orders to be ''de minimis—*i.e.,* a delay so short as to not frustrate the purposes of Rule 611 by impairing fair and efficient access to an exchange's quotations''); *see also id.* (''The SEC's conclusion that mere de minimis delays do not cause an order to violate Regulation NMS's immediacy requirement was therefore reasonable.'').

[209] *See https://www.ice.com/publicdocs/ICE_Global_Network_Factsheet.pdf.*

[210] 15 U.S.C. 78f(b).

[211] 15 U.S.C. 78f(b)(5).

[212] *See, e.g., Dead Man's Switch, supra* note 154 (discussing the need for quote protection for market makers to allow for a deep and liquid listed options market and explaining that ''race conditions'' negatively impact pricing efficiency, ''as market makers have been shown to quote wider spreads or step back instead of continually updating with price moves for fear of being ''picked off.''); *see also Market Lens, supra* note 21 (explaining the need for risk management in electronic trading given that ''traders who place limit orders—the foundation of public price discovery—are exposed to the risk that their quotations will be executed at an inopportune time, leading to potential losses'' and that the ''greater the risk of an inopportune execution, the more compensation is required, which leads to wider bid-ask spreads. Conversely, anything the trader can do to lower the risk of an inopportune execution will lower the compensation required, which leads to narrower bid-ask spreads.'').

underlying security exposing them to potentially major losses. Even high-speed market makers, due to the large number of quotes they are required to maintain, are susceptible to the risk of being unable to adjust their quotes fast enough to protect against strategies that can choose to send "aggressive" orders in specific options when they detect changing market conditions.[213]

The ORP is designed to supplement the standard proposed risk checks to provide augmented protection to address the inherent risks faced by market makers. The Exchange notes that, as proposed, ORP would be an incremental step in providing further risk protections to market makers consistent with exchanges' long-standing practice of offering targeted risk protections to market makers in recognition of their obligations and the unique risks they face. IEX believes that the operation of the ORP is similar to price reasonability and activity-based risk checks offered by other options exchanges (and proposed by IEX herein), in terms of its impact on a resting quote.[214] Each of these risk controls provide that the exchange will cancel an order or quote pursuant to the member's instructions when the control is triggered based on a determination that the price of the market maker's quote is "unreasonable" because it is no longer reflective of the price of the underlying security and therefore likely stale (price reasonability check) or that the execution activity of a market maker's quotes exceeds the market maker's risk tolerance (activity-based controls). Additionally, the trading collar and limit order protection rules of other options exchanges and those similarly proposed by IEX provide for orders to be repriced.

Similarly, the ORP will enable IEX to cancel or reprice a Market Maker's quote based on a trigger in the discrete moments when the mathematical relationship between the options quote and the underlying security's price become substantially disconnected, as per the Indicator formula. However, IEX notes that the proposed ORP would be more transparent than the activity-based controls in determining when a market

maker quote is potentially subject to cancelation (or adjustment) because it is based on a transparent formula specified in IEX's rules. Participants will know that any change in an options quote based on the ORP will only occur in the circumstances that are defined and in a predictable way based on the transparent formula. In contrast, those triggers for an activity-based control are nonpublic and set by each exchange member. Importantly, the ORP would not impact the effectiveness of these other risk tools. However, if Market Makers can better control the risks from latency arbitrage strategies through the narrowly tailored ORP, they may need to rely less on these other less transparent tools.

As discussed above, because of the lack of natural sources of liquidity across the multitude of listed options series, market makers are subject to affirmative obligations to maintain continuous two-sided quotes on hundreds or thousands of individual options series. While IEX proposes to offer bulk quoting and purge port functionality to market makers (in the same manner as other options exchanges), in a fast-moving market, the prices of their quotes can nonetheless become stale almost instantaneously. In those times, a sophisticated liquidity taker can target one or more market maker quotes at stale prices before the market maker can update its quotes, thereby exposing the market maker to potentially major losses. The ORP is designed to assist market makers with an option to manage this risk, similar to the other risk controls. While some overlap is expected, IEX believes that the Indicator would potentially identify additional instances of quotes at stale prices beyond those identified by the other price reasonability checks.

Further, IEX notes that the operation of the Indicator is similar to the manner in which IEX's equities market (the "Equities System") utilizes a "crumbling quote indicator" to encourage the provision of displayed liquidity by providing reasonably tailored protections against adverse executions.[215] As with the crumbling

quote indicator, the Indicator will be a transparent formula based on a pre-determined objective set of circumstances that will be specified in IEX's rules to identify when the Protected Bid and/or Protected Offer in a particular options series is likely to move to a less aggressive price.

Moreover, the Options System will use the ORP in a manner similar to the way in which the Equities System applies the crumbling quote indicator to resting displayed liquidity, which reprices the applicable order or quote. The functional differences between the crumbling quote indicator and the Indicator reflect that options pricing is derivative.[216] Thus, the Indicator will trigger when it identifies that a Protected Bid or Protected Offer is likely to move to a less aggressive price, based on a price change in the underlying security, thereby exposing the market maker to excessive risk, but, unlike the crumbling quote indicator, would reprice the quote to the price level of the quote instability determination or cancel the impacted quote and not remain "on" for a period of time after triggering. IEX believes that this approach is appropriate in view of the derivative pricing of options and that it will contribute to more displayed liquidity through improved execution quality, enhance the public price discovery process, and promote just and equitable principles of trade.[217]

---

[213] See id.

[214] See, e.g., Market-Maker Protections, Market Structure, Optiver, July 17, 2023 ("Market Maker Protections"), available at *https://optiver.com/insights/market-maker-protections/* (explaining that exchanges implement robust market-maker protections to "assist market makers in coping with the risks of posting continuous, two-sided quotes in thousands of financial instruments" and to provide the ability to automatically pull or amend their quotes so that "all quotes falling within the scope of protection still resting on the book are prohibited from further execution").

[215] In 2016, IEX received SEC approval of the IEX's exchange system that provides a similar quote indicator for equities. See 2016 SEC Approval Order (approving IEX's exchange system in its registration as a national securities exchange, which included the approval of IEX's crumbling quote indicator that assesses quote instability by utilizing a real-time, based on pre-determined, objective set of conditions that protects orders from unfavorable executions when the market is moving against them), *supra* note 195. In 2020, IEX received SEC approval to apply the quote indicator to displayed orders in equities. See 2020 SEC Approval Order, *supra* note 18 (receiving unanimous support and concluding

that the Exchange's displayed order proposal that included a similar quote indicator is consistent with the requirements of the Exchange Act and the rules and regulations thereunder applicable to a national securities exchange and that is designed to improve market quality, enhance price discovery, and promote just and equitable principles of trade).

[216] Because of this difference, the Indicator is designed to identify when the Protected Bid and/or Protected Offer in an option series is dislocated from the price of the underlying based on a price change in the underlying and therefore likely to be in transition to a less aggressive price, while the crumbling quote indicator utilizes changes in the protected quote in the security itself to make such a prediction.

[217] See, e.g., 2020 SEC Approval Order, *supra* note 18, at 54443 (concluding that IEX's exchange functionality protects against adverse selection and incentivizes more displayed liquidity through improved execution quality for liquidity providers, which contributes "to fair and orderly markets" and supports "the public price discovery process"); at 54443 (finding that the Exchange's speedbump and crumbling quote indicator promotes the interest of long term investors and inures to the "benefit of displayed markets, leading to increased displayed liquidity from which all market participants ultimately will benefit"); at 54451 (concluding that the Exchange's order protection functionality "is designed to encourage market participants to post more priced limit orders, including displayed orders, on IEX, and thereby promotes just and equitable principles of trade, removes impediments to and perfects the mechanism of a free and open market and a national market, and, in general, protects investors and the public interest.").

Further, the ORP would be available, as a quote parameter, only to market makers and on an optional basis, because the Exchange believes that it is most appropriate as a tool to address market maker risk. IEX believes that this approach is appropriate because market makers are subject to affirmative obligations to provide continuous two-sided quotes and cannot back away or unduly widen their quotes during periods of price volatility, as can other liquidity providers.[218] By offering market makers this narrowly-tailored, optional tool, IEX believes it will attract additional displayed liquidity that will be available to all market participants.

IEX also believes that use of the Indicator in determining when to trigger the ORP is consistent with the protection of investors and the public interest because the Indicator is based on the well-recognized Black-Scholes options pricing model, which IEX believes is an appropriate methodology to identify when a Market Maker's quote in an option is dislocated from the price of the underlying security based on the mathematical relationship between the price of the underlying security and the overlying options. Thus, when the ORP is triggered, and IEX changes or cancels a Market Maker quote, such action would be in the expected time frame and direction based on a change that has already occurred in the price of the underlying security. ORP action would not be arbitrary or unexpected but would simply enable the Market Maker's quote to reflect the most accurate prices available in the market, which is what they endeavor to do themselves. The ORP action therefore will likely be more predictable than other risk-based tools, like ''purge ports'' that can result in wholesale canceling of quotes for reasons specific to the market maker. Further, the ORP action should not ''surprise'' market participants and if a potential contra-party is unable to trade with the quote, they should not have expected a guaranteed execution in a narrow time frame when other factors, including risk mitigation functionality alternatives, are available on other options exchanges.

Moreover, IEX believes that the latency mechanism[219] (as discussed above) will serve to enhance the accuracy of the Indicator by providing adequate time for the IEX System to update its Indicator calculation with current market data and to enable IEX to obtain the most accurate view of the market prior to processing orders and quotes. In this regard, as discussed earlier, IEX notes that the proposed latency of 350 microseconds is well within the geographic delays that exist among and between the data centers that IEX Options Members, and other options exchanges, use and is consistent with the naturally occurring time indeterminism that exists in order processing.

Further, IEX believes that limiting the availability of the ORP to resting market maker quotes is consistent with the Act for several reasons. As discussed in depth above, market makers are integral to providing liquidity on options exchanges, and at the same time subject to a potentially excessive level of risk from execution of one or more quotes at stale prices. Additionally, market makers' obligations apply across all series in their appointed class. Other liquidity providers are free to concentrate their efforts in a select number of series. Thus, market makers have greater exposure to latency arbitrage, take on greater risk, and incur more related capital charges than other liquidity providers. IEX determined to apply the functionality to resting quotes only as this approach will best achieve the purpose of protecting market markets from the excessive risk of executions at stale prices without disrupting market makers' ability to update their quotations.

IEX further believes that it is consistent with the fair access and nondiscriminatory standards of Section 6(b)(5) of the Exchange Act to offer the ORP for IEX Market Makers' quotes. As discussed above, only market makers are subject to affirmative quoting obligations which create unique risks of adverse selection. Market makers play a central role in the options markets and account for over 99% of all open orders and quotes.[220] Market makers, as opposed to proprietary traders as well as retail and institutional customers, are subject to disproportionate risk as a consequence of maintaining quotes in a large number of options. In contrast, IEX understands that retail customers' market risk is generally a function of individual trading strategies, without any broader market wide implications on liquidity in the market. Indeed, the Commission has recognized in a number of contexts that it is appropriate and consistent with the Act for exchanges to enhance market quality by providing

functionality specific to market makers to help protect them from these risks in a manner that is balanced against the obligations to which market makers commit themselves.[221]

IEX further notes that market makers typically manage their financial exposure risks resulting from their continuous quoting obligations in very short-term time frames, often measured in micro-seconds. As such, consistent with the long-standing precedent of exchanges offering specific tools and benefits to market makers in recognition of their quoting obligations and concomitant significant risk exposure, the ORP is designed to mitigate these risks that are relevant in such high-speed environments. IEX also believes that because the ORP is designed specifically to mitigate systemic adverse selection risks faced by market makers that are subject to continuous quoting obligations in hundreds (and sometimes thousands) of options, the manner in which it would operate by repricing or canceling quotes would not generally be beneficial for customers who do not enter orders in the same scale.

The ORP has been designed as a risk tool for options market makers based on the unique risks they face in today's options market structure. Their decisions on whether and when to use the ORP may vary by class and will be affected by price of the option, the volatility of the option and underlying, the NBBO spread, and many other factors. Consequently, as is the case with other risk tools provided by exchanges, retail investors would not be positioned to determine whether or when to use the ORP or to monitor the impact of that decision on their executions. IEX believes that retail investors will benefit, however, from the availability of any additional liquidity and competition that results from the use of the ORP by market makers.

The Exchange also believes that applying the Indicator on a class-by-class basis would remove impediments to, and perfect the mechanism of, a free and open market and a national market system and promote just and equitable principles of trade. As discussed in the

---

[218] See, e.g., Protecting Liquidity, supra note 155 (explaining that without robust liquidity protection mechanisms for market makers to protect against the risks of displaying quotes at stale or outdated prices, ''market makers may be forced to widen their spreads, show less liquidity or simply exit the market'' and overall ''market quality can deteriorate'' with the result of investors suffering).

[219] See proposed Rule 22.170(g).

[220] See Dead Man's Switch, supra note 163.

[221] See discussion supra on prevalence of purge ports and activity-based risk controls for market makers. See also ''Commission Guidance and Amendment to the Rules Relating to Organization and Program Management Concerning Proposed Rule Changes Filed by Self-Regulatory Organizations,'' Securities Exchange Act Release No. 34–58092 (July 3, 2008), 73 FR 40144, at 40148 (July 11, 2008) noting that ''[m]arket makers can play an important role in providing liquidity to the market, and an exchange can appropriately reward them for that as well as the services they provide to the exchange's market, so long as the rewards are not disproportionate to the services provided.''

Purpose section, applying the Indicator on a class-by-class basis would enable the Exchange to appropriately utilize the ORP for classes with a high potential for adverse selection, while excluding classes presenting lower risk of adverse selection (such as classes with relatively lower volumes). This flexibility will therefore allow the Exchange to focus its technology resources in an impactful manner to ensure the ORP is available for those classes where its use will achieve its intended purpose, while excluding its use where it would likely provide minimal incremental value (for example, for classes with nonstandard characteristics).

Moreover, IEX notes that the Commission has previously recognized the utility of IEX providing protection to liquidity providers through order types that leverage its crumbling quote indicator to appropriately protect market participants from the risks of transacting when the market is in transition and thereby incentivize the entry of liquidity providing orders. The Exchange believes that the proposed ORP is consistent with this history and is in furtherance of driving tighter and deeper displayed markets to the benefit of investors, as well as reducing barriers to entry for market maker participation and thereby support competition and reduce market maker concentration risk as discussed in the Purpose section.[222]

IEX also believes that the proposal is consistent with the firm quote obligations of a broker-dealer pursuant to Rule 602 of Regulation NMS.[223] Specifically, any marketable interest that is executable against a market maker's quote that has been received by the System prior to the time that a quote instability determination is received by System will be automatically executed, subject to processing of any prior messages, at the price and up to the size of the market maker's quote. When enabled by a Market Maker, the ORP will operate automatically when triggered, based on the publicly disclosed formula without input from the market maker.

IEX believes that the proposed ORP is consistent with the protection of investors and the public interest, fair and orderly markets, promotion of competition and innovation, and with the Exchange Act, including furthering the objectives of Section 6(b)(5) of the Act,[224] because it is a narrowly-tailored approach designed to appropriately balance the risks faced by market makers with the legitimate objectives of liquidity takers by providing additional optional risk protection to market makers and thereby encourage aggressive quoting, reduce barriers to entry for market maker participation, support competition, and reduce market maker concentration risk.

IEX conducted data analysis on the expected frequency with which it estimates that the ORP would impact a quote on IEX. The Exchange replayed OPRA data through its system for all series of over a thousand options classes of varying levels of volume and activity for various dates in February 2025 to estimate how often the ORP would impact a quote on IEX. Among the dates reviewed in February were: the day with the highest volume, the day with the lowest volume, the day with the highest CBOE Volatility Index® [225] (''VIX'') level, the two days with the largest interday change in VIX, and Fridays with monthly and non-monthly settlements.

The analysis set the ORP parameters to their most aggressive to maximize potential impact. Specifically, the Exchange set the Quote Instability Threshold to 0, the Delta Bound Band to its full range of 0–1, and assumed ORP was enabled across all options classes. Further, the analysis assumed that: (1) IEX's displayed quote in the options classes assessed was at the NBBO 100% of the time, (2) IEX's displayed quote in such options classes was composed exclusively of Market Maker quotes, and (3) all of those Market Maker quotes were enabled to be subject to ORP.[226] Based on the results of this analysis, the Exchange expects that the ORP would have a *de minimis* impact, but an impact that is narrowly tailored to provide protection from latency arbitrage strategies.

Across all classes reviewed, the Exchange estimates that the ORP would impact IEX Market Maker quotes on average per series significantly less than 0.001% of the trading day during regular trading hours (*i.e.,* between 9:30 a.m. to 4:00 p.m.). For options classes in the Penny Interval Program,[227] the analysis shows that the ORP would impact an IEX Market Maker's quote on average for less than 0.01% of the trading day per series. ORP impact for options classes not in the Penny Interval Program averaged 0.0005% per option. Applying the analysis to the most active options class, the SPDR® S&P 500® ETF Trust (''SPY''),[228] ORP would impact an IEX Market Maker's quote for less than 0.2% of the trading day. Thus, the ORP is designed to be nearly imperceptible to all market participants who are not specifically seeking to engage in latency arbitrage to execute against a market maker's quote at a stale price, based on its speed-based advantage that enables the most technologically low-latency view of market prices. IEX believes that this analysis supports that the ORP is a narrowly tailored approach designed to provide appropriate protection to market makers.

The Exchange further believes that offering more risk management protections to Market Makers would mitigate their exposure to excessive risk. As discussed in detail above, Market Makers are required to continuously provide two-sided quotes in substantial numbers of listed options series that can create large, unintended positions exposing market makers to excessive risk. Market Maker quotes are critical to provide liquidity to the market and contribute to price discovery for investors. Without robust liquidity protection, market makers may be forced to widen their spreads, show less liquidity or simply exit the market, which can result in deterioration of market quality and adversely impact investors' and other liquidity takers' ability to transact in the options markets.[229] In sum, liquidity protection for options market makers is vital for achieving a healthy balance between liquidity providers and liquidity takers in the options market that will promote more displayed liquidity from which all market participants ultimately will benefit.

The Exchange believes that the manner in which it will determine certain of the values related to the Indicator formula (*i.e.,* Delta Bound Bands, the Quote Instability Threshold, and the frequency of calculation of implied volatility) provides an appropriate degree of transparency coupled with the ability to modify those values to respond to rapidly changing market conditions or system issues in a manner designed to enable the Exchange to optimize effectiveness of the ORP. All applicable values and potential ranges will be transparently

[222] *See supra* notes 212 and 214 and accompanying text.

[223] *See* proposed Rule 23.140(d).

[224] 15 U.S.C. 78f(b)(5).

[225] The VIX is a benchmark index designed to measure the market's expectation of future volatility.

[226] This assumption overstates the estimated ORP impact because IEX does not believe that any options exchange has quotes at the NBBO 100% of the trading day in all underlying classes, nor are such quotes that are in effect comprised exclusively of market maker quotes. Additionally, IEX does not believe that all IEX Market Makers would necessarily enable ORP on all of their quotes.

[227] Excluding SPY, whose impact is described separately.

[228] SPY was also the class with the greatest observed ORP impact.

[229] *See supra* note 215.

specified in IEX rules with any modifications within such ranges effectuated through a rule filing pursuant to Rule 19b–4(f)(1) under the Exchange Act (or other appropriate rule filing type), thereby removing impediments to and perfecting the mechanisms of a free and open market and a national market system and, in general, protecting investors and the public interest.

The Exchange believes that the proposed rules of IEX Options, as well as the proposed method of monitoring for compliance with and enforcing such rules is also consistent with the Act, particularly Sections 6(b)(1), 6(b)(5) and 6(b)(6) of the Act, which require, in part, that an exchange have the capacity to enforce compliance with, and provide appropriate discipline for, violations of the rules of the Commission and of the exchange. The Exchange has proposed to adopt rules necessary to regulate Options Members that are nearly identical to the approved rules of other options exchanges, as described above. The Exchange proposes to regulate activity on IEX Options in the same way it regulates activity on its equities market (and comparable to other options exchanges), through various Exchange specific functions, an RSA with FINRA, as well as participation in industry plans, including plans pursuant to Rule 17d–2 under the Exchange Act.

In conclusion, for the reasons discussed above, IEX believes that the proposed rule change is consistent with the investor protection and public interest purposes of Section 6 of the Act. Additionally, IEX believes that establishing a new options market that participates in all the current (and any future) national market system plans governing options trading is consistent with Section 11A of the Act relating to the establishment of the national market system for securities.[230] As proposed, IEX Options will offer a simple alternative to existing options exchanges that is designed to support competitive quoting to the benefit of all market participants.

*B. Self-Regulatory Organization's Statement on Burden on Competition*

The Exchange does not believe that the proposed rule change will result in any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act. To the contrary, the proposed rule change is designed to enhance competition by providing for an additional exchange market for the trading of listed options.

IEX believes that this proposal will enhance competition by allowing the Exchange to leverage its existing robust technology platform to provide a resilient, deterministic, and transparent execution platform for options. The proposed rule change will insert an additional competitive dynamic to the options landscape by allowing the Exchange to compete with existing options exchanges and will promote further initiative and innovation among market centers and market participants.

Further, the Exchange does not believe that the latency mechanism or optional Market Maker quote parameter aspect of the proposed rule change will impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act. To the contrary, these features are designed to enhance IEX Options' competitiveness by incentivizing the entry of increased Market Maker liquidity. Also, because the proposed ORP would provide Market Makers with an additional risk management mechanism, it would potentially increase competition among market makers by encouraging more market makers to provide liquidity in the market, as discussed above.

The Exchange does not believe that the proposed rule change will impose any burden on intra-market competition because it will apply to all Options Members in the same manner and any Options Member can perform any specified function subject to meeting applicable requirements.

The Exchange also does not believe that the proposed latency mechanism will impose any burden on intra-market competition that is not necessary or appropriate because it will apply in the same manner to all incoming orders and quotes.

The Exchange also does not believe that the proposed ORP will impose any burden on intra-market competition that is not necessary or appropriate because it will be available in the same manner to all Market Makers and any Options Member could become a Market Maker, subject to meeting applicable requirements. The ORP is designed to mitigate Market Makers' exposure to excessive risk and thereby enable them to provide more competitive quotes to the benefit of all market participants. The Exchange also believes that limiting the ORP functionality to Market Makers will not impose any burden on intra-market competition that is not necessary and appropriate because Market Makers are subject to robust affirmative quoting obligations and thus can uniquely benefit from the protections to be provided by the ORP. The Exchange thus believes it is reasonable to provide

Market Makers with an additional tool to manage their risk parameters, particularly given their unique and critical role in the listed options market and the obligations that Market Makers must satisfy. As discussed in the Purpose and Statutory Basis sections, the proposed ORP will protect resting market-maker quotes (which are subject to quoting obligations) from executions at potentially stale prices, which the Exchange believes will reduce their risk and encourage Market Makers to provide more competitive markets on the Exchange, thereby benefitting all market participants through additional execution opportunities at prices that reflect the then-current market conditions. The Exchange expects the proposed rule change to increase liquidity and enhance competition in the market because Market Makers may be able to quote more aggressively with added productions from exposure to execution risk, thereby remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest.

The Exchange also does not believe that the proposal will impose any burden on inter-market competition that is not necessary or appropriate. Competing exchanges are free to adopt similar functionality, subject to the Commission rule filing process.

*C. Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received From Members, Participants, or Others*

Written comments were neither solicited nor received.

**III. Date of Effectiveness of the Proposed Rule Change and Timing for Commission Action**

Within 45 days of the date of publication of the original notice in the **Federal Register** or within such longer period up to 90 days (i) as the Commission may designate if it finds such longer period to be appropriate and publishes its reasons for so finding or (ii) as to which the self-regulatory organization consents, the Commission will:

(A) by order approve or disapprove the proposed rule change, or

(B) institute proceedings to determine whether the proposed rule change should be disapproved.[231]

---

[230] 15 U.S.C. 78k–1.

[231] *See* supra note 7 (citing to the Commission's order instituting proceedings to determine whether to disapprove the proposed rule change). July 20, 2025 is the date by which the Commission shall issue an order approving, disapproving, or

## IV. Solicitation of Comments

Interested persons are invited to submit written data, views and arguments concerning Amendment No. 3, including whether the proposed rule change as modified by Amendment No. 3 is consistent with the Act. Comments may be submitted by any of the following methods:

*Electronic Comments*

• Use the Commission's internet comment form (*https://www.sec.gov/rules/sro.shtml*); or

• Send an email to *rule-comments@sec.gov.* Please include file number SR–IEX–2025–02 on the subject line.

*Paper Comments*

• Send paper comments in triplicate to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090.

All submissions should refer to file number SR–IEX–2025–02. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*https://www.sec.gov/rules/sro.shtml*). Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549, on official business days between the hours of 10 a.m. and 3 p.m. Copies of the filing also will be available for inspection and copying at the principal office of the Exchange. Do not include personal identifiable information in submissions; you should submit only information that you wish to make available publicly. We may redact in part or withhold entirely from publication submitted material that is obscene or subject to copyright protection. All submissions should refer to file number SR–IEX–2025–02 and should be submitted on or before July 9, 2025.

extending the period for not more than 60 days. *See* 15 U.S.C. 78s(b)(2)(B)(ii).

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[232]

**Sherry R. Haywood,**
*Assistant Secretary.*
[FR Doc. 2025–11525 Filed 6–23–25; 8:45 am]
**BILLING CODE 8011–01–P**

---

## SECURITIES AND EXCHANGE COMMISSION

**[OMB Control No. 3235–0391]**

**Submission for OMB Review; Comment Request; Extension: Form T–6**

*Upon Written Request, Copies Available From:* Securities and Exchange Commission, Office of FOIA Services, 100 F Street NE, Washington, DC 20549–2736

Notice is hereby given that, pursuant to the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*), the Securities and Exchange Commission ("Commission") has submitted to the Office of Management and Budget this request for extension of the previously approved collection of information discussed below.

Form T–6 (17 CFR 269.9) is an application for eligibility for a corporation or other person organized under the laws of a foreign government to act as trustee under an indenture qualified under the Trust Indenture Act of 1939 (15 U.S.C. 77aaa *et seq.*). Form T–6 provides the basis for determining whether a corporation or other person organized under the laws of a foreign government is eligible to serve as a trustee for a qualified indenture. The information required by Form T–6 is mandatory. This information is publicly available on EDGAR. We estimate that Form T–6 takes approximately 17 hours per response and that there is an average of one response annually. We estimate that 25% of the 17 burden hours per response is prepared by the filer for an internal burden of 4 hours ((0.25 × 17) hours per response × 1 response).

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

*Written comments are invited on:* (a) whether this proposed collection of information is necessary for the proper performance of the functions of the SEC, including whether the information will have practical utility; (b) the accuracy of the SEC's estimate of the burden imposed by the proposed collection of information, including the validity of

the methodology and the assumptions used; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated, electronic collection techniques or other forms of information technology.

The public may view and comment on this information collection request at: *https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202502-3235-011* or email comment to *MBX.OMB.OIRA.SEC_desk_officer@omb.eop.gov* within 30 days of the day after publication of this notice, by July 25, 2025.

Dated: June 18, 2025.
**Sherry R. Haywood,**
*Assistant Secretary.*
[FR Doc. 2025–11516 Filed 6–23–25; 8:45 am]
**BILLING CODE 8011–01–P**

---

## SECURITIES AND EXCHANGE COMMISSION

**[Release No. 34–103289; File No. SR–LCH SA–2025–005]**

**Self-Regulatory Organizations; LCH SA; Order Approving Proposed Rule Change Relating To Revisions to Its Rule Book and FCM/BD Regulations Related To Clearing Member Testing Requirements**

June 18, 2025.

### I. Introduction

On April 17, 2025, Banque Centrale de Compensation, which conducts business under the name LCH SA ("LCH SA"), filed with the Securities and Exchange Commission ("Commission"), pursuant to Section 19(b) of the Securities Exchange Act of 1934 ("Exchange Act")[1] and Rule 19b–4[2] thereunder, a proposed rule change to amend its CDS Clearing Rule Book ("Rule Book") and Futures Commission Merchants and Broker-Dealer ("FCM/BD") CDS Clearing Regulations ("FCM/BD Regulations") (the "Proposed Rule Change"). The Proposed Rule Change was published for comment in the **Federal Register** on May 5, 2025.[3] The Commission did not receive comments regarding the Proposed Rule Change. For the reasons discussed below, the

[1] 15 U.S.C. 78s(b)(1).
[2] 17 CFR 240.19b–4.
[3] Self-Regulatory Organizations; LCH SA; Notice of Filing of Proposed Rule Change Relating to Revisions to Its Rule Book and FCM/BD Regulations Related To Clearing Member Testing Requirements, Exchange Act Release No. 102955 (Apr. 29, 2025), 90 FR 19020 (May 5, 2025) ("Notice").

[232] 17 CFR 200.30–3(a)(12).

# ADMINISTRATIVE RECORD REFERENCE NO. 20



*Invested in America*

June 30, 2025

Ms. Vanessa Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549-1090

> **RE:    File No. SR-IEX-2025-02; Order Instituting Proceedings to Determine Whether to Approve or Disapprove a Proposed Rule Change, Modified by Amendment No. 1, to Adopt Rules to Govern the Trading of Options on the Exchange for a New Facility Called IEX Options**

Dear Ms. Countryman:

The Securities Industry and Financial Markets Association ("SIFMA")[1] submits this comment letter to the Securities and Exchange Commission (the "Commission") in response to the Commission's order instituting proceedings ("OIP")[2] regarding a proposal, as modified by Amendment No. 1,[3] by the Investors Exchange LLC ("IEX" or "Exchange") to adopt rules to govern the trading of options on IEX Options LLC, a facility of the Exchange that is proposed to be established in a separate rule filing ("Proposal").  Under the Proposal, the Exchange will utilize a 350-microsecond delay (i.e., a "speed bump") "on incoming order and quote messages designed to enable IEX to update its view of the market prior to processing orders and quotes."[4] IEX Options will also offer an optional market maker quote parameter, known as the Options Risk Parameter ("ORP"), that would rely on this delay to allow the Exchange to either cancel or update a market maker's quotes based on an IEX algorithm that assesses the probability of an "an imminent adverse price change" for the market maker.[5]  As described below, SIFMA does

---

[1] SIFMA is the leading trade association for broker-dealers, investment banks and asset managers operating in the U.S. and global capital markets. On behalf of our industry's one million employees, we advocate on legislation, regulation and business policy affecting retail and institutional investors, equity and fixed income markets and related products and services. We serve as an industry coordinating body to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency. We also provide a forum for industry policy and professional development. SIFMA, with offices in New York and Washington, D.C., is the U.S. regional member of the Global Financial Markets Association (GFMA).  For more information, visit http://www.sifma.org.

[2] See Release No. 34-102895 (Apr. 21, 2025), 90 FR 17474 (Apr. 25, 2025).

[3] See Release No. 34-102663 (Mar. 13, 2025), 90 FR 12890 (Mar. 19, 2025).

[4] Id. at 12891.

[5] Id. at 12904.

Ms. Vanessa Countryman
Secretary
U.S. Securities and Exchange Commission
June 30, 2025

not believe that IEX has so far met its burden of demonstrating that the Proposal is consistent with the Securities Exchange Act of 1934 ("Exchange Act") and the rules thereunder.[6]

As noted in the Proposal, IEX has established a unique market model in the equities market. However, as the Commission knows, the equity and listed options markets have certain structural differences that warrant close Commission scrutiny of IEX's Proposal to establish IEX Options, particularly when order protection obligations will require market participants to route orders to the top-of-book quotes displayed on IEX Options (with no alternative to execute orders off-exchange unlike the equities market).

SIFMA has long supported innovation in the U.S. equity and listed options markets. However, like other commenters,[7] we have concerns about IEX utilizing this type of quote cancellation model in the listed options market. In this market, since all customer orders must be executed on-exchange, if displayed quotes at IEX are inaccessible in practice (due to displayed quotes that are cancelled by the IEX algorithm), the impact of missed fills could be greater. This issue is compounded by the order protection obligation in the listed options market that requires order routing firms to execute against the best displayed bid and offer price at each exchange, as well as the structure of the listed options market in which market makers are the primary source of liquidity.[8] In other words, even if an order routing firm in the listed options market believed that an order routed to IEX Options may not be executed at the displayed price due to the combination of IEX's speed bump and quote cancellation mechanism (ORP), the firm would still be obligated to send that order to IEX Options when its top-of-book quote is better than the order price (or as part of executing a large order when sweeping liquidity). Moreover, because all executions in listed options must occur on-exchange, such a scenario could lead to customer executions at worse prices if the market moves away from the unavailable IEX price.

As the Commission noted in its OIP, "[t]he expected frequency with which the ORP would cancel or reprice an NBBO quote on IEX is unclear and difficult to assess, and the proposal does not yet provide any such estimate," and accordingly, "the characterization of ORP as a 'narrowly-tailored approach' merits further consideration as it is unclear how often the ORP would be expected to cancel or change quotes."[9] IEX should provide more data to respond to this question as it is critical in helping to evaluate the potential impact of the proposal – e.g. how many market maker displayed quotes are expected to be cancelled and what will be the impact on fill rates from the perspective of liquidity takers. Although the ORP would be optional, market makers that utilize it will display quotes on IEX Options that may be cancelled or repriced during the time market participants are routing orders to those quotes, consistent with their order protection obligations. The Commission must consider whether this would favor

---

[6] See 17 CFR 201.700(b)(3).

[7] See (https://www.sec.gov/comments/sr-iex-2025-02/sriex202502.htm).

[8] See the "Options Order Protection and Locked/Crossed Market Plan" (https://www.theocc.com/getmedia/7fc629d9-4e54-4b99-9f11-c0e4db1a2266/options_order_protection_plan.pdf).

[9] OIP supra n. 2, 90 FR at 17477 (quoting from IEX's amended filing).

2

Ms. Vanessa Countryman
Secretary
U.S. Securities and Exchange Commission
June 30, 2025

market makers at the expense of other market participants, including retail investors, and the magnitude of this potential benefit.

In its recent amendment to the filing, IEX provided "data analysis on the expected frequency with which it estimates that the ORP would impact a quote on IEX."[10]  According to the data analysis, IEX "estimate[d] that the ORP would impact IEX Market Maker quotes on average per series significantly less than 0.001% of the trading day during regular trading hours (i.e., between 9:30 a.m. to 4:00 p.m.)."[11]  However, IEX's use of time to measure the "frequency" of impact provides limited information.  The number or percentage of market maker quotes cancelled or repriced, including the volume and depth of such quotes, and the impact on fill rates as a result of those cancellations or repricings, would be more useful information to answer the Commission's question regarding "the expected frequency with which the ORP would cancel or reprice an NBBO quote on IEX."  Although the aggregate total amount of time when the ORP would trigger in a single options series may be de minimis compared with the entire trading day, the number of quotes cancelled and the number of resulting missed contract fills during these windows could still be meaningful depending on when the cancellations occur (e.g., if the windows happen at the open or close, when volumes are typically higher, or during periods of high volatility when the ORP likely would trigger more frequently).

Under the Commission's Rules of Practice, IEX has the burden to demonstrate that a proposed rule change is consistent with the Exchange Act.  The Commission noted in the OIP that, "[t]he description of a proposed rule change, its purpose and operation, its effect, and a legal analysis of its consistency with applicable requirements must all be sufficiently detailed and specific to support an affirmative Commission finding, and any failure of an SRO to provide this information may result in the Commission not having a sufficient basis to make an affirmative finding that a proposed rule change is consistent with the [Exchange] Act and the applicable rules and regulations."[12]  So far, SIFMA does not believe IEX has met this burden with regard to the Proposal.

*          *          *

---

[10] See Release No. 34-103290 (June 18, 2025); 90 FR 26865, 26889 (June 24, 2025).

[11] Id.

[12] OIP, supra n. 2, 90 FR at 17477.

3

Ms. Vanessa Countryman
Secretary
U.S. Securities and Exchange Commission
June 30, 2025

       SIFMA appreciates the opportunity to submit this letter to the Commission regarding IEX's Proposal. As discussed above, SIFMA does not believe that IEX has so far met its burden of demonstrating that the Proposal is consistent with the Exchange Act and the rules thereunder. If you have any questions or need any additional information, please contact Joe Corcoran at (202) 962-7383 or Gerald O'Hara at (202) 962-7343.

Sincerely,

Joseph Corcoran
Managing Director and Associate
General Counsel

Gerald O'Hara
Vice President and
Assistant General Counsel

4

# ADMINISTRATIVE RECORD REFERENCE NO. 22

ANDREW R. GARBARINO
2ND DISTRICT, NEW YORK

GARBARINO.HOUSE.GOV

2344 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225–7896

31 OAK STREET SUITE 20
PATCHOGUE, NY 11772
(631) 541–4225

GARBARINO.HOUSE.GOV

**Congress of the United States**

**House of Representatives**

**Washington, DC 20515–3202**

July 3, 2025
Chairman Paul S. Atkins
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

Dear Chairman Atkins:

U.S. securities markets are the best in the world, supporting innovative companies and contributing greatly our nation's economic strength. A hallmark of our markets is the transparency and predictability provided by our national securities exchanges — where the displayed prices are real and immediately accessible by all investors.

I am concerned that a recent proposal by the IEX options exchange may undermine this core element of market functioning by permitting displayed prices to be canceled *after* an investor sees and attempts to access the price. This would be accomplished by implementing an artificial delay that stops incoming orders from immediately executing, and operating an algorithm during that delay to cancel displayed prices if it would increase the market maker's profitability.

This proposal raises the possibility that investors could lose confidence in the accuracy and reliability of prices displayed on our national securities exchanges. Importantly, even if negative impacts were observed, the proposal would not permit investors to skip this particular exchange; instead, all investors would be compelled by regulation to continue to send orders here, even if the prices proved to be unreliable.

While I am aware that the Commission permitted a similar proposal to be implemented by this exchange in the U.S. equities market nearly a decade ago, I urge the Commission to carefully scrutinize this proposal before requiring all investors to use an untested and unproven mechanism in the U.S. options market, in light of (i) the critical feedback from many commenters, including on behalf of retail investors, (ii) unique aspects of options market structure (such as the fact that all retail options orders must be executed on an exchange), and (iii) the market structure changes that have occurred over the past decade that may affect the analysis.

Thank you for your prompt attention to this matter.

Sincerely,

Andrew R. Garbarino
Member of Congress

# ADMINISTRATIVE RECORD REFERENCE NO. 24

July 8, 2025

Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-1090

**VIA ELECTRONIC MAIL:** rule-comments@sec.gov

Re: File No. SR-IEX-2025-02: Self-Regulatory Organizations; Investors Exchange LLC; Notice of Filing of Amendment No. 3 to a Proposed Rule Change To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options

Dear Sir or Madam:

The Committee on Capital Markets Regulation (the "**Committee**") appreciates the opportunity to comment on a proposed rule change filing (the "**Proposal**") by the Investors Exchange LLC ("**IEX**") with the Securities and Exchange Commission (the "**SEC**").[1] The Proposal would govern the operation of a new options exchange and would introduce an asymmetric speed bump to options markets. The Committee recommends that the SEC should not approve IEX's Proposal.

Founded in 2006, the Committee is dedicated to enhancing the competitiveness of U.S. capital markets and ensuring the stability of the U.S. financial system. Our membership includes forty-two leaders drawn from the finance, investment, business, law, accounting, and academic communities. The Committee is chaired jointly by R. Glenn Hubbard (Emeritus Dean, Columbia Business School) and John L. Thornton (Former Chairman, The Brookings Institution) and is led by Hal S. Scott (Emeritus Nomura Professor of International Financial Systems at Harvard Law School and President of the Program on International Financial Systems). The Committee is an independent and nonpartisan 501(c)(3) research organization, financed by contributions from individuals, foundations, and corporations.

Our letter proceeds in two parts. Part I briefly summarizes the Proposal. Part II presents our analysis and discussion of negative repercussions of the Proposal's novel asymmetric speed bump on options markets, including that it would promote false liquidity and result in severe harm to options markets due to unique aspects of options market structure. We conclude by recommending that the SEC disapprove the Proposal.

---

[1] Self-Regulatory Organizations: Investors Exchange LLC; Notice of Filing of Amendment No. 3 to a Proposed Rule Change To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options, 90 Fed. Reg. 26,865 (June 24, 2025) [hereinafter "Proposal"]; *see also* Self-Regulatory Organizations; Investors Exchange LLC; Order Instituting Proceedings to Determine Whether to Approve or Disapprove a Proposed Rule Change, as Modified by Amendment No. 1, to Adopt Rules to Govern the Trading of Options on the Exchange for a New Facility Called IEX Options, 90 Fed. Reg. 17,474.

## I.    The IEX Options Proposal

IEX proposes to establish a new fully automated options exchange with an asymmetric speed bump. In particular, all incoming orders would be subject to a 350-microsecond "**speed bump**" – an intentional time-delay between the receipt of an order by an exchange and its execution. However, IEX's Proposal would be asymmetric as it would not apply to all market participants. This is because IEX's Proposal couples the speed bump with an Options Risk Parameter ("**ORP**") – available only to market makers – that would effectively exempt the cancelation of certain quotes from the speed bump. Under the ORP, IEX would use the speed bump "to obtain the most accurate view of the market prior to processing orders and quotes,"[2] and automatically cancel or reprice market maker quotes that would be affected by "an imminent adverse price change."[3] IEX claims that the ORP is "designed to protect market makers from excessive risk due to execution of quotes at stale prices."[4]

## II.    Analysis of the Proposal

In Part II we highlight critical problems with IEX's Proposal that warrant disapproval by the SEC.

### a.    The Proposal Would Promote False Liquidity

The IEX asymmetric speed bump would enable select market makers to cancel their displayed quotes *immediately* while incoming orders from other market participants are *artificially delayed* and prevented from executing, thereby giving the illusion of liquidity that disappears before quotes can be accessed.[5] This is best explained with an example. Suppose an investor were to submit an order on the IEX options exchange to purchase options contracts for Apple stock at the current ask price (e.g., $100 per contract). IEX's options exchange would hold the investor's order for 350 microseconds before attempting to match it with resting quotes on the IEX marketplace. During the 350-microsecond delay period, the investor cannot cancel or modify the order; however, due to the asymmetric speed bump, an IEX market maker would be able to cancel or modify its resting quotes to adjust for price movements during the 350-microsecond window. If market prices increase above $100 per contract, then the market maker's $100 quote would be automatically cancelled or repriced to increase the ask price. This may result in market participants routing orders to the IEX options exchange only to find that their orders cannot be filled or can only be filled at an inferior price.

This problem is particularly pronounced because market participants would be required to route orders to IEX where IEX displays the best quotations, even if a market participant believes they would achieve better execution on another exchange. This is because all options exchanges participate in the Options Order Protection and Locked/Cross Market Plan, under which each exchange must establish, maintain, and enforce written policies and procedures that are reasonably

---

[2] Proposal, *supra* note 1, at 26,866.
[3] *Id.* at 26,879.
[4] *Id.* at 26,885.
[5] COMMITTEE ON CAPITAL MARKETS REGULATION, *Nothing But the Facts: Asymmetric Speed Bumps in U.S. Equity Markets* (2019), https://capmktsreg.org/wp-content/uploads/2019/12/Nothing-But-The-Facts-Asymmetric-Speed-Bumps.pdf.

designed to prevent trade-throughs of "protected quotations."[6] Protected quotations are the best displayed quotations on each exchange. The best protected quotations for an options series across all exchanges are often referred to as the "national best bid and offer" ("**NBBO**"). The plan thus restricts order execution at a price worse than the NBBO. IEX's options exchange would participate in the Options Order Protection and Locked/Cross Market Plan and its best displayed quotations would be "protected." Due to the novel subsidy to market makers offered by the ORP, IEX may often display quotes which set the NBBO but are routinely inaccessible, compelling all other market participants to chase fleeting liquidity.

### b. Options Market Structure Amplifies the Proposal's Problems

The Committee opposed IEX's asymmetric speed bump in equities markets,[7] which the SEC approved in 2020. As of today, IEX's equities exchange constitutes approximately 2% of overall trading volume in equities markets[8] and thus IEX's limited market share has mitigated negative market-wide effects in equities markets. However, IEX's Proposal for options markets would risk greater harm for three reasons.

First, all trading in listed options is conducted on exchange, compared to just over half of the daily trading volume in equities.[9] Thus, while equities market participants have the opportunity to seek better execution off-exchange, one hundred percent of options transactions will be subject to the potential quote cancelations and inferior execution issues discussed above.

Second, there are over 1,000,000 listed options contracts compared to approximately 10,000 listed stocks.[10] This is because each options series on an underlying stock is tied to a different strike price and expiration date. For example, Apple stock alone can be associated with hundreds of different options series on any given day.[11] Options markets therefore involve more daily quotations than equities markets and there are greater opportunities for quote cancelations associated with the Proposal degrading execution and market quality.

Third, unlike in equities markets, investors in options markets are often able to obtain price improvement through intra-day auctions. For the most commonly traded options, approximately 23% of volume is executed in auctions, resulting in price improvement of approximately 50%.[12]

---

[6] Options Order Protection and Locked/Cross Market Plan (Aug. 14, 2009), *available at* https://www.theocc.com/getmedia/7fc629d9-4e54-4b99-9f11-c0e4db1a2266/options_order_protection_plan.pdf.

[7] *See* Letter from the Committee on Capital Markets Regulation to Vanessa A. Countryman, SEC (Apr. 23, 2020), https://capmktsreg.org/wp-content/uploads/2023/03/CCMR-Comment-Letter-to-SEC-IEX-D-Limit-Order-Proposal-04.23.2020.pdf.

[8] *Last Trading Day*, IEX EXCHANGE, https://iextrading.com/stats/ (last visited June 30, 2025).

[9] Katherine Doherty, *Wall Street Enters Darker Age with Most Stock Trading Hidden*, BLOOMBERG (Jan. 24, 2025, 10:48 AM), https://www.bloomberg.com/news/articles/2025-01-24/wall-street-enters-darker-age-with-most-stock-trading-now-hidden.

[10] SEC, Staff Report on Equity and Options Market Structure Conditions in Early 2021 4 (Oct. 14, 2021), https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf ("there are more than 10,000 listed stocks in the National Market System ('NMS stocks') and more than 1,000,000 options series.").

[11] *See Apple Inc. Common Stock (AAPL) Option Chain*, NASDAQ, https://www.nasdaq.com/market-activity/stocks/aapl/option-chain (last visited June 30, 2025).

[12] Terrence Hendershott et al., *Options Auctions* 1 (2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4110516.

If IEX's Proposal is approved, then it is likely to reduce the frequency of auctions in options markets thereby reducing the opportunities for price improvement.

This is because, as we have explained above, market makers on IEX may often display the NBBO, but those displayed prices will often be too good to be true, as they can be cancelled before they are accessible to other market participants. However, in order to trigger an auction, a market marker on another exchange, like Nasdaq or Cboe, must be willing to trade at a price that matches or improves upon the NBBO across all exchanges.[13] Market makers will be less willing to do so if IEX is displaying an artificial NBBO. Therefore, market makers will trigger fewer auctions and there will be fewer opportunities for price improvement in options markets.

**Conclusion**

The Committee recommends that the SEC should not approve IEX's Proposal as it would harm options market quality by promoting false liquidity and negatively impacting execution and market quality.

\* \* \*

Thank you very much for your consideration of the Committee's position. Should you have any questions or concerns, please do not hesitate to contact the Committee's President, Professor Hal S. Scott (hscott@capmktsreg.org) or its Executive Director, John Gulliver (jgulliver@capmktsreg.org) at your convenience.

Respectfully submitted,

| | | |
|---|---|---|
| John L. Thornton | Hal S. Scott | R. Glenn Hubbard |
| CO-CHAIR | PRESIDENT | CO-CHAIR |

---

[13] *See, e.g., Price Improvement XL (PIXL) Frequently Asked Questions*, NASDAQ, https://www.nasdaqtrader.com/content/phlx/pixlfaqs.pdf (last visited June 30, 2025); *Crossing Order Handling*, CBOE, https://www.cboe.com/us/options/trading/crossing_orders/ (last visited June 30, 2025).

4

# ADMINISTRATIVE RECORD REFERENCE NO. 120

H U D S O N   R I V E R   T R A D I N G   L L C

August 8, 2025

Vanessa Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549

Re: Investors Exchange LLC; Notice of Filing of a Proposed Rule Change to Adopt Rules to Govern the Trading of Options on the Exchange for a New Facility Called IEX Options (Release No. 34-102190; File No. SR-IEX-2025-02)

Dear Ms. Countryman:

Hudson River Trading LLC[1] ("Hudson River Trading") appreciates the opportunity to comment to the Securities and Exchange Commission ("Commission") in response to the Proposed Rule Change to Adopt Rules to Govern the Trading of Options on the Exchange for a New Facility Called IEX Options ("IEX Options Proposal")

The Commission should not approve the IEX Options Proposal for many of the same reasons it should not have approved the IEX equities exchange application[2], primarily driven by IEX's artificial delay and the fact that IEX does not apply this artificial delay to certain IEX features and order types. In fact, the IEX Options Proposal itself points to the low quality of its equities quotes as they have chosen not to include them in the best bid and offer it uses in its Options Quote Indicator[3] that is used to inform the Options Risk Parameter - a mechanism designed to requote at an inferior price when IEX forecasts a price change. While we agree with IEX's decision not to include its equities quotes in the algorithm, as basing the Options Risk Parameter on a delayed quote would be ineffective or counterproductive, it is indicative of the burden placed on other market participants that are required to use IEX's delayed prices in their operations. Yet IEX is asking the Commission to require all options exchanges to use its delayed options quotes as a critical input to the operation of their exchanges that may limit their ability to execute orders. Other commenters[4] have raised concerns specific to the options market of

---

[1] Hudson River Trading is a multi-asset class quantitative trading firm that provides liquidity on global markets and directly to its clients. Its two broker-dealer subsidiaries (HRT Financial LP and HRT Execution Services LLC) are registered with the Commission pursuant to Section 15 of the Exchange Act and are both members of FINRA and various exchanges.

[2] *See* Investors' Exchange LLC Form 1 Application and Exhibits (Release No. 34-75925, File No. 10-222); Letter from Adam Nunes, Head of Business Development, Hudson River Trading LLC to Brent J. Fields, Secretary, SEC, dated December 4, 2015; and Letter from Adam Nunes, Head of Business Development, Hudson River Trading LLC to Brent J. Fields, Secretary, SEC, dated January 7, 2016.

[3] *See* IEX Rule 11.190(g).

[4] *See* Letter from Joanna Mallers, Secretary, FIA Principal Traders Group to Vanessa Countryman, Secretary, SEC, dated February 26, 2025; Letter from R. Glenn Hubbard, Co-Chair, John L. Thornton, Co-Chair, and Hal S. Scott, President, Committee on Capital Markets Regulation to Vanessa Countryman, Secretary, SEC, dated July 8, 2025;

introducing quotes that are artificially delayed such as the prevalence of on exchange price improvement auctions, and the same issues that it presented for equities markets will remain present in options markets.

Beyond this, the IEX Options Proposal, like the equities exchange application, points to a broader issue common to both the US equities and options markets. Rules 610 and 611 of Regulation NMS and the similar rules in place under the Options NMS Plan[5] require broker dealers that could otherwise ignore a market with features such as intentional delays that do not fit their business to neither lock or cross, nor to trade through its intentionally delayed prices. Rather, these participants are effectively required to route orders to exchanges with artificial delays even if it is to their detriment[6]. Similarly, these rules require competing exchanges to conform their operations, including delaying price discovery, around delayed quotes. Hudson River Trading supports innovation in the markets, but the current market structure creates an unnecessary tension where one market's innovation may inflict negative externalities on many other market participants. The solution is evident. Reforming Regulation NMS will allow innovative concepts to move forward for those market participants that chose to adopt them, while providing others the freedom to choose the exchanges that fit their business models.

Hudson River Trading appreciates the opportunity to submit these comments and would be pleased to meet with the Commission to further discuss them or to respond to any questions.

Sincerely,
/s/ Adam Nunes
Adam Nunes
Head of Risk

---

and Letter from Andrew Stevens, Global General Counsel, IMC; Jeff Starr, Managing Director, Head of Operations, Charles Schwab & Co., Inc. to Vanessa Countryman, Secretary, SEC, dated June 4, 2025.

[5] Joint Industry Plan; Order Approving the National Market System Plan Relating to Options Order Protection and Locked/Crossed Markets, 74 Fed. Reg. 39362, 39365 (Aug. 6, 2009), https://www.sec.gov/files/rules/sro/nms/2009/34-60405.pdf ("Options NMS Plan").

[6] The requirement to route orders and refrain from trading through or locking or crossing an exchange's quote effectively requires firms to become exchange members, pay various membership fees, purchase connectivity, ports, and market data, which provides a revenue foundation for new exchanges. More broadly, this obligation creates a burden on market participants to build systems that capture and store quote snapshots to demonstrate that they have neither traded through nor locked or crossed a quote and has led to a proliferation of order types to help firms ensure compliance with these rules.

# ADMINISTRATIVE RECORD REFERENCE NO. 123

**CITADEL | Securities**

August 12, 2025

Ms. Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549–1090

**Re:　　IEX Options (File No. SR-IEX-2025-02)**

Dear Ms. Countryman:

Our first letter exposed that IEX seeks approval for an unprecedented quote-canceling scheme in the U.S. options market, a scheme that seeks to enrich IEX's owners and its select cadre of market makers at the expense of millions of American investors. Even worse, IEX wants to *compel* all investors to route orders to its exchange whether they like it or not, forcibly subjecting them to its "last look" scheme. This is the exact opposite of free market competition on the merits. The Commission should reject the proposal as it violates multiple provisions of the Exchange Act and the Administrative Procedure Act, both procedurally and substantively.

IEX seeks to expand the Commission's "order protection rule" in an unprecedented way to cover non-firm quotes that are subject to cancellation *after* an investor order has arrived at IEX. However, the Commission recently announced a comprehensive review of the "order protection rule"—the very mechanism IEX seeks to exploit to compel all investors to use its exchange—with Chair Atkins stating that this mechanism "ha[s] not served investors or broker-dealers well, given the market distortion and resulting gamesmanship by those that seek to take advantage of the Reg NMS structure."[1] That is exactly what IEX is doing here, and it would thus be arbitrary and capricious for the Commission to approve a sweeping and unlawful expansion of the order protection rule in the U.S. options market while conducting its review.

In the balance of this letter, we detail how IEX's scheme is unlawful, specifically because:

- Rather than compete on the merits, IEX seeks to forcibly subject investors to its scheme;

- IEX's scheme is not "narrowly-tailored" and will harm all types of investors, including retail investors;

- IEX avoids providing necessary data;

- IEX's "last look" options scheme is unprecedented;

- Experience in the equities market further supports rejecting this IEX scheme; and

- IEX's filings do not comply with the Exchange Act.

---

[1] "SEC Announces Roundtable on Trade-Through Prohibitions" (July 21, 2025), available at:
https://www.sec.gov/newsroom/press-releases/2025-99-sec-announces-roundtable-trade-through-prohibitions.

CITADEL | Securities

## I.   IEX's Scheme Is Unlawful

### 1.   Rather than compete on the merits, IEX seeks to forcibly subject investors to its scheme

IEX characterizes its proposal as an "innovation" that "promotes fair competition among trading venues."[2]  In reality, the proposal undermines free market competition by compelling all investors to send orders to IEX—subjecting them to its "last look"[3] quote cancellation scheme— even if they believe doing so will be harmful.[4]  IEX's attempt to expand the order protection rule to cover its deceptive quotes—cancelable after an investor order arrives at IEX[5]—would require investors, under threat of regulatory sanction, to interact with "maybe" quotations that are subject to cancellation by IEX.  The Commission should reject this outcome.  It can do so either by (i) clarifying that IEX's deceptive quotations should be considered "non-firm," and therefore not protected, under the Options NMS Plan or (ii) amending the Options NMS Plan pursuant to Commission Rule 608 to specifically exclude such quotes from the privileges of order protection.

Expanding the order protection rule to cover IEX's non-firm prices would be a drastic and unlawful expansion.  Even for clearly firm and accessible quotations, Chair Atkins has stated that the rule has "not served investors or broker-dealers well," prompting the Commission to launch a comprehensive review.[6]  If IEX genuinely believed its proposal would improve investor outcomes, it could simply allow investors to choose whether to trade on its exchange.

In addition, while the legal framework for options differs from equities, it is notable that asymmetric intentional delays proposed by equities exchanges have not been granted order protection.[7]  As the record reflects,[8] the IEX scheme is clearly an asymmetric intentional delay (notwithstanding IEX's disingenuous claims to the contrary) because:

---

[2] *See* Letter from John Ramsay (June 19, 2025) at 7, available at: https://www.sec.gov/comments/sr-iex-2025-02/sriex202502-615827-1806874.pdf ("IEX Response").

[3] IEX seeks to introduce the *economic equivalent* of "last look" functionality in the options market by selectively canceling quotes on behalf of its market markets when it is in the best interests of the IEX market maker (and not in the best interests of an incoming investor order).

[4] Market participants are required to interact with "protected" quotes in a variety of different execution scenarios, including when sweeping top-of-book liquidity as part of executing a larger order.

[5] IEX will be able to cancel market maker quotes during the time between (a) when an investor order *arrives* at its "point of presence" and (b) when an investor order reaches its matching engine, as the investor order navigates IEX's intentional delay.

[6] *Supra* note 1.

[7] *See* Release No. 34-88261 (Feb. 21, 2020), available at: https://www.sec.gov/rules/sro/cboeedga/2020/34-88261.pdf (the "EDGA Disapproval Order").

[8] *See* Letter from All Options equating this proposal to the Eurex "Passive Liquidity Protection" mechanism, which is indisputably an asymmetric intentional delay. *See* https://www.sec.gov/comments/sr-iex-2025-02/sriex202502-612247-1793634.pdf ("European markets have already embraced passive liquidity protection (PLP) mechanisms similar to those proposed by IEX") and https://www.eurex.com/ex-en/trade/market-models/eurex-plp ("With PLP activated, all *aggressive* orders [. . .] will be delayed") (emphasis added).

≋ CITADEL | Securities

(i)    The intentional delay stops incoming orders from executing against market maker quotes.

(ii)    The quote cancellation algorithm operates without any delay to *immediately* cancel market maker quotes while the incoming orders are halted.

This asymmetry—where market maker quotes can be canceled *after* an investor order has arrived at IEX—is fundamentally different than geographic delays caused by physical distance. It is not only the length of the intentional delay that matters, but also what is permitted to happen during the delay (i.e., IEX uses the latest market data to determine, on behalf of its market makers, whether to remain firm or cancel a displayed quote—in essence, a "last look" mechanism). The Commission cannot simply point to the length of the delay and purport to conclude that there is no difference between this mechanism and geographic latencies. If the IEX scheme were truly analogous to geographic latency, there would be no reason why its market makers could offer "tighter and deeper quotes"[9] on IEX versus other exchanges.

Finally, the Commission should not be in the business of picking winners and losers; rather, its role is to ensure a level competitive playing field. The regulatory framework must remain neutral, fostering competition in the spirit of making markets more transparent and efficient, with lower costs to trade. Approving a rule that structurally advantages a single exchange by mandating interaction with its deceptive and inaccessible quotes thwarts the pro-competitive transformation that has taken place in the U.S. options market over the last several decades. It would effectively grant IEX (and its owners) a meaningful regulatory subsidy, allowing it to attract order flow not because it offers superior execution quality, but because investors are legally compelled to route orders to its "last look" market, at their peril.

### 2. IEX's scheme is not "narrowly-tailored" and will harm all types of investors, including retail investors

IEX wrongly asserts that its quote canceling scheme is "narrowly-tailored to cancel or adjust quotes during only a minuscule fraction of the trading day" and will not "harm retail investors in any way."[10] This is patently false—while the IEX algorithm may cancel market maker quotes in the blink of an eye, those prices are then *gone forever* for subsequent incoming orders, including orders sent by retail investors.

To illustrate the real-world impact:

- A news event causes the price of Amazon stock to move.

- A retail investor submits an order to buy an Amazon call option, which is routed to IEX because it is displaying what appears to be the best price—$10 per options contract.

---

[9] 90 FR 26865, available at: https://www.govinfo.gov/content/pkg/FR-2025-06-24/pdf/2025-11525.pdf ("June IEX Filing") at 49.

[10] IEX Response at 7 and 20.

- Due to IEX's intentional delay, the retail order is prevented from executing against the displayed $10 quote.

- As the price of Amazon continues to move, IEX's quote cancellation algorithm determines that the cancellation of the $10 quote is in the *best interests of the IEX market maker* (not the retail investor).

- By the time the retail order is released from the intentional delay, the $10 quote has vanished, and the retail investor now has to pay more for the same option. Further, if the retail investor placed an "immediate or cancel" order with a limit of $10, their order would be canceled with no fill. This poor execution quality must be considered across millions of retail investors.

This example underscores that the harm to investors cannot be measured by how quickly IEX cancels market maker quotes. Instead, IEX must provide data on how many incoming orders will be prevented from executing at the originally displayed price due to the quote cancellation scheme. IEX has failed to provide any data on this critical point—particularly with respect to retail investors.

This omission is especially troubling given that, unlike in equities, *all* options orders—including those of millions of retail investors—must be executed on-exchange. The Commission must not rely on IEX's unsupported assurances and must undertake its own independent analysis, using the data at its disposal, and should not approve this proposal unless and until it has affirmative evidence that investors will not be harmed.

### 3. IEX avoids providing relevant data

IEX relies almost exclusively on data purporting to show that its scheme will cancel market maker quotes during "a minuscule fraction of the trading day" in aggregate.[11] But as discussed above, the speed of cancellation is not the relevant metric. Once a quote is canceled—even instantaneously—it is gone forever for all subsequent incoming orders, including those from retail investors.

To properly assess the impact of the quote canceling scheme, the Commission must consider:

(i)    how many market maker quotations will be canceled as a result of the scheme,

(ii)   how many incoming orders will be prevented from executing against those canceled quotes, and

(iii)  the types of market participants sending those incoming orders that are prevented from executing (e.g. retail, institutions, etc.).

---

[11] *Id.* at 7.

4

≡ CITADEL | Securities

Related questions posed in our first letter, such as the estimated value of this scheme from the perspective of IEX's market makers, also remain unanswered. Without providing this data, IEX cannot meet its burden under the Exchange Act.

Moreover, requiring IEX to provide this data would expose the complete fallacy behind its related claim that its scheme targets only those purportedly "engaging in latency arbitrage."[12] In IEX's initial filing in January, the phrase "latency arbitrage" only appeared a single time, in passing on the second-to-last page.[13] Now, when facing serious concerns from a broad and diverse group of market participants, IEX has suddenly pivoted to invoking this alarmist phrase 61 times in its June rebuttal letter alone.[14] This rhetorical shift underscores that "latency arbitrage" is nothing more than a pretext for IEX's true objectives: to gain market share (and enrich its owners) by doling out immensely valuable favors to its market makers, all at the expense of investors.

The Commission should demand clarity on:

(i) how IEX actually defines purported "latency arbitrage" and evidences its existence with data;[15] and

(ii) data demonstrating that its quote canceling scheme will not adversely impact the functioning of the U.S. options market.

We note that Citadel Securities provides more displayed quotes in the U.S. options market than any other firm—sending over 25 billion quotes per day on average[16]—and would be more exposed to the risk of purported "latency arbitrage" than anyone else. Yet we strongly oppose the proposal for the simple reason that it undermines market integrity and harms investors.

### 4. IEX's "last look" options scheme is unprecedented

IEX makes half-hearted attempts to equate its novel quote canceling scheme with longstanding exchange risk controls,[17] but this fails under basic scrutiny. For example:

---

[12] *Id.* at 4.

[13] 90 FR 7205, available at: https://www.govinfo.gov/content/pkg/FR-2025-01-21/pdf/2025-01290.pdf ("Initial IEX Filing") at 7226.

[14] *See* IEX Response. For years, IEX has relied upon this phrase in the pursuit of regulatory subsidies, but IEX's de minimis market share in equities demonstrates how little their fear-mongering translates into actual market demand.

[15] We note that IEX appears to be describing "latency arbitrage" in a different, and broader, way than in its prior equities filings, which focused on predicting imminent changes to the NBBO in a particular security. *Compare* https://www.govinfo.gov/content/pkg/FR-2019-12-30/pdf/2019-28024.pdf at 71997 and IEX Response at 2. IEX's latest description appears to cover all trading occurring while prices are moving in the opposite direction of a displayed quote.

[16] *See* https://www.citadelsecurities.com/what-we-do/options/.

[17] IEX Response at 9-10.

- A market maker completely loses queue priority when employing a "purge port" to cancel quotes (unlike IEX's opportunistic canceling and repricing of quotes that is explicitly designed to maintain queue priority and increase market maker profitability); and

- "Activity-based risk limits" do not kick-in unless the market maker actually honors its displayed quotes by executing trades (unlike IEX's scheme which cancels quotes without requiring any trades to be executed).

IEX ultimately gives up the ghost by acknowledging that its market makers will be able to provide "tighter and deeper quotes" [18] on IEX due to the quote canceling scheme. If IEX's mechanism was truly the same as longstanding risk controls on other exchanges, then there would be no reason that IEX market makers would be able to provide "tighter and deeper quotes" on IEX versus other exchanges. In truth, IEX's scheme grants its market makers a new and unprecedented economic benefit—including a drastic and unlawful expansion of the order protection rule— without requiring any additional commensurate obligation, which the Commission typically requires under the Exchange Act when approving a new benefit designed solely for market makers. IEX has failed to explain why the Commission should depart from this longstanding legal requirement when considering whether this proposal results in unfair discrimination under the Exchange Act. [19]

### 5. Experience in the equities market further supports rejecting this IEX scheme

Unable to find any legal or regulatory precedent for this proposal in the U.S. options market, IEX seeks to distract by claiming that another mechanism offered in an entirely different asset class "has proven extremely successful."[20] But the structural differences between the equities and options markets are substantial. Options trading requires all orders to be executed on-exchange and involves a vastly larger number of distinct options series and associated quotes. In addition, IEX's equities mechanism was not limited to solely market makers. These differences make the equities analogy not only inapposite but also counterproductive to IEX's case.

In fact, data from the equities market reinforces the need to reject IEX's options proposal. Consider the D-Limit order type on the IEX equities exchange:

- **Only market makers benefit, not investors:** IEX provides data suggesting that, from the perspective of an IEX market maker, mark-outs have improved, meaning that adverse price movements are less likely to occur immediately after an execution.[21] This is entirely consistent with the observation that IEX's scheme is explicitly designed to increase market maker profitability by enabling the opportunistic canceling and

---

[18] June IEX Filing at 26879.

[19] *See* EDGA Disapproval Order, *supra* note 7 at 36-7 ("The Exchange also has not explained why providing a benefit without a corresponding obligation (e.g., quoting or enhanced quoting obligations) to liquidity providers is consistent with the Act when the proposed rule permits discrimination against liquidity takers.").

[20] IEX Response at 5.

[21] *Id.* at A-2.

CITADEL | Securities

repricing of displayed quotes to avoid "bad" executions from the perspective of the market maker.  However, the scheme hurts everyone else.[22]

- **Increased quoting, but not trading:** IEX provides data suggesting that quoting activity by market makers on its equities exchange has increased, causing IEX to vault above other exchanges in terms of market share for quoting.[23]  This is entirely consistent with the observation that IEX's scheme leads to artificially attractive but deceptive quotes that can disappear just when an investor wishes to trade.  Importantly, the increased quoting activity has not resulted in a corresponding increase in actual *trading* activity on IEX, as IEX continues to languish near the back of the pack in terms of market share when it comes to executed volume.[24]  This disconnect can be explained by the nature of the IEX scheme—it enriches IEX's owners and its market makers through the capture of quoting-related revenues (such as SIP revenue), but the often inaccessible quotes do not result in better execution outcomes for investors.[25]  This is not innovative or beneficial for investors and underscores why the Commission must reject expanding the order protection rule to cover IEX's non-firm quotes in options.

- **Misleading metrics on quote accessibility:** IEX provides data attempting to show that its scheme will not reduce the accessibility of its quotes by inventing a new term "Quote Targeting Fill Rate"[26] that makes little sense—cherry-picking a 6 month period in 2020 (from five years ago) and including small equities orders that will not trigger IEX's quote cancellation algorithm.[27]  Put simply, the claim that IEX's quote canceling scheme has not resulted in quotes becoming less accessible is simply false.  When sweeping top-of-book liquidity across equities exchanges, we find that IEX is consistently in the bottom two of all exchanges in terms of fill rates, with routed orders failing to execute against the IEX displayed quote a significant percentage of the time.

By law, the Commission must perform its own analysis instead of blindly accepting IEX's self-interested claims.  For example, the Commission must use the vast data at its disposal to analyze the implications of IEX's current proposal for options market structure and the negative impact of

---

[22] This observation also explains why nearly all of the support for the IEX options scheme comes from market making firms.

[23] IEX Response at A-1.

[24] *See* https://www.cboe.com/us/equities/market_share/.

[25] *See, e.g.,* "IEX is All-In on Data Revenues, Quote Fade and (Virtual) Rebates," Nasdaq (Apr. 1, 2021), available at: https://www.nasdaq.com/articles/iex-is-all-in-on-data-revenues-quote-fade-and-virtual-rebates-2021-04-01 ("Based on Q4 2020 SIP reports, IEX looks set to earn more than $16 million per year more in additional quote revenues, thanks to D-Limit").  The Commission should review and modify how SIP revenue is shared with exchanges to remove any artificial economic incentive to adopt this type of scheme by increasing the weight of trade executions (versus quotations).

[26] IEX Response at A-3.

[27] IEX's newly-invented analysis even finds that there were no material changes to the fill rates of proprietary trading firms before-and-after the implementation of D-Limit, even though IEX accused these firms of being responsible for massive amounts of "latency arbitrage" that D-Limit would eradicate.  IEX fails to explain this disconnect—was "latency arbitrage" just a myth?  *See, e.g.,* https://www.sec.gov/files/rules/sro/iex/2019/34-87814.pdf at 18-19.

**CITADEL | Securities**

D-Limit in the equities market.  The Commission should also ensure that equivalent data is being made public regarding IEX compared to other exchanges—we note that the "metrics by exchange" data published by the Commission, such as cancel-to-trade ratio, curiously appear to currently leave out IEX.[28]

## II.  IEX's Filings Do Not Comply With The Exchange Act

IEX's proposal to implement its quote canceling scheme was published in the Federal Register on January 21, 2025.[29]  Under Section 19 of the Exchange Act, the Commission—or its staff under delegated authority—must approve or reject the proposed rule change within 240 days of publication.[30]  However, more than 150 days following its initial filing —and following two separate comment periods during which market participants provided feedback[31]—IEX materially altered its proposal.  The changes included revisions to how key variables in its quote cancellation algorithm are determined.[32]

Such a material modification requires more than a simple amendment; it necessitates withdrawal of the original filing and the commencement of a new review period under Section 19. This procedural safeguard ensures that market participants have a meaningful opportunity to evaluate the revised proposal and that the Commission has adequate time to assess its implications. Allowing exchanges to make significant changes late in the review period would undermine the deliberative process Congress established—effectively enabling last-minute "cramdowns" of impactful rule changes with insufficient scrutiny.

Moreover, the public cannot be expected to comment meaningfully on a moving target.  IEX's midstream revisions altered the scope and operation of the proposal in ways that directly affect investor outcomes.  Market participants submitted comments based on the original filing, not the materially revised version.  Proceeding without a new full review period deprives the public of a fair opportunity to evaluate and respond to the actual proposal under consideration.

Notably, when IEX submitted its amended filing in June, the Commission's website initially indicated the January filing had been withdrawn:

---

[28] *See* https://www.sec.gov/securities-topics/market-structure-analytics/market-activity-data-visualizations.

[29] *Supra* note 13.

[30] 15 U.S.C. § 78s.

[31] *See* Initial IEX Filing at 7227 and 90 FR 17474, 17478, available at: https://www.govinfo.gov/content/pkg/FR-2025-04-25/pdf/2025-07105.pdf

[32] *Supra* note 9.

**CITADEL | Securities**

| 34-102190 ⬇ | Jan 14, 2025 | SR-IEX-2025-02 | Investors Exchange LLC (IEX) | WITHDRAWN on 06/17/2025: Notice of Filing of a Proposed Rule Change to Adopt Rules to Govern the Trading of Options on the Exchange for a New Facility Called IEX Options<br>*Comments Due:* May 16, 2025<br>*Rebuttal Comments Due:* May 30, 2025<br>View Received Comments<br>See Also - Exhibit 5 ⬇<br>Submit a Comment on SR-IEX-2025-02 |

It now appears that the Commission reversed this position without explanation. We urge the Commission to adhere to the procedural requirements of Section 19 and treat IEX's materially revised June filing as a new proposal subject to its own full review period. This Commission should not continue the past practice of showing regulatory favoritism to IEX and should not rush to approve a novel and controversial market structure change—especially one that could harm retail investors—without first ensuring that the procedural and substantive requirements of the Exchange Act and Administrative Procedure Act are fully satisfied.

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

IEX's proposal to expand the Commission's "order protection rule" in an unprecedented way to cover non-firm quotes that are subject to cancellation *after* an investor order has arrived at IEX is the exact opposite of free market competition on the merits and cannot be allowed in the U.S. options market. A broad and diverse group of market participants have expressed serious concerns and IEX has failed to provide adequate data and analysis in response. IEX must compete on the merits with its offering instead of seeking to rely on recycled and disproven narratives. The Commission should reject the IEX proposal in full and instead complete its review of the order protection rule.

We thank the Commission for considering our comments.

Please feel free to call the undersigned with any questions regarding these comments.

> Respectfully,
> /s/ Stephen John Berger
> Managing Director
> Global Head of Government & Regulatory Policy

9

# ADMINISTRATIVE RECORD REFERENCE NO. 124



August 14, 2025

Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

Re: Comments on IEX Rulemaking – File No. SR-IEX-2025-02

Dear Ms. Countryman,

Maven Securities ("Maven" or "we") appreciates the opportunity to comment on the proposal by Investors Exchange LLC ("IEX" or "Exchange") to adopt rules to govern the trading of options on IEX Options LLC ("IEX Options"). We support this proposal, particularly regarding the de minimis delay and Options Risk Parameter ("ORP").

## 1. Maven's Background

Maven has operated in the options market-making business since 2011, primarily in European Equity Index and Fixed Income Options markets. In 2022 we expanded operations into U.S. options markets. We currently provide liquidity on two U.S. exchanges: the Chicago Mercantile Exchange ("CME") and Chicago Board Options Exchange ("CBOE"). We are also making significant investments to expand our presence to additional U.S. equity options exchanges, while hiring U.S. based personnel and investing heavily in U.S. infrastructure.

We therefore believe that we are in a unique position to comment on the state of the U.S. options markets, given we are a new, but experienced entrant in an otherwise shrinking pool of liquidity providers in the options markets. As we have navigated entering these markets, we have observed various structural impediments to our ability to compete with incumbents, which others must also undoubtedly face.

It is already a significant undertaking to build an options market-making business, and is made much more complex and costly due to the presence of latency arbitrage. Whilst our strategy is simple, in that we aim to provide real liquidity to end users at the best possible prices and are compensated for this service via the bid-ask spread, Maven has had to add tremendous complexity to combat predatory latency arbitrage. When an option's underlying instrument (e.g. stock or future) changes in value, our systems must continuously and immediately update or cancel our option

1

quotes. If our systems are too slow (for example, more than a millionth of a second reaction time), then our quotes are traded before the exchange can process our updates. These trades are known as "pickoffs". These trades happen very frequently and, in aggregate, are very costly.

## 2. Impact of Latency Arbitrage

The impact of predatory latency arbitrage is significant and detrimental to the vast majority of liquidity providers who seek to make the markets more efficient for end users. Its presence forces us to both widen and reduce the size of our quotes. We are working to build ultra fast defensive systems to manage this predatory behaviour, but the necessary technology requires annual investments in the area of $5 million, which we project will at least *double* once we complete our expansion to the remaining US equity option exchanges. With this level of investment we are able to reduce the frequency of pickoffs, but not fully eliminate them. Considering every market-making firm needs this expensive technology *as a minimum*, it is hardly surprising that the pool of market-makers is shrinking as the *avoidable* barriers to entry grow ever larger; simply put, the current trajectory is turning the noble aim of making markets more efficient into a monopoly of the few, reducing competition and ultimately harming end users. The public (e.g. retail and institutional end users) are ultimately paying the price in the form of wider than necessary spreads and less available liquidity.

## 3. Protecting Passive Liquidity

Our experience leads us to believe that protecting passive liquidity is essential to supporting fair and orderly markets. Doing so has the potential to both greatly reduce the 'technology tax' imposed by the presence of latency arbitrage, as well as improve the overall quality of the markets. Such protection allows market-makers to tighten bid-ask spreads and increase the size of their quotes without the risk of being 'picked-off'. Eliminating latency arbitrage would allow market-makers to build simpler and more robust systems and ultimately reduce operational risk. It would improve system integrity, and minimize the chance of adverse market reactions to liquidity vacuums. Our strong belief is that IEX's innovative de minimis delay and ORP technology seems to accomplish all of these goals.

## 4. Precedent

While the de minimis delay and ORP are considered novel for a *U.S.* options exchange, similar mechanisms are already available in other jurisdictions. For example, in the E.U. in 2019, Eurex introduced Passive Liquidity Protection ("PLP") to accomplish the same goal as IEX's proposal. PLP has proven its success by eliminating latency arbitrage and allowing market-makers to tighten and increase the size of their quotes.[1]

## 5. Industry Impact

We believe that the combination of the proposed de minimis delay and the ORP will level the playing field, both in terms of Equal Access to market moving signals and delivering a better

---

[1] https://www.sciencedirect.com/science/article/pii/S1042443125000356

service to the public. IEX notes in their most recent response that the *"technology is designed to protect all participants, including liquidity providers, from latency arbitrage…and manage such risks…and promote fairer markets and mitigate speed-based advantages on its platform".*[2] It does so by focusing on the predatory behaviors of certain firms who are taking part in latency arbitrage strategies, rather than punish end investors seeking liquidity. This aligns with our experience with the successful roll out of Eurex's PLP.

We also believe the new proposals to protect participants from latency arbitrage will not adversely impact the NBBO. Regardless of how it is achieved (exchange initiated via ORP, or market-maker initiated via explicit cancel request), when the price of the underlying changes, market-makers will cancel their quotes as necessary. IEX Options will send the updated market-data to OPRA without delay and the NBBO will reflect the changes instantly. This is identical to what currently happens on all exchanges.

The markets disseminated by IEX Options will be fully available for end users to trade, with the exception of the few fractions of a second after the underlying changes while market-maker quotes are being cancelled/updated. These few fractions of a second when quotes are displayed in the NBBO but are unavailable for trading happen regularly on every market, even today. The only difference on IEX Options will be that the de minimis delay will prevent aggressive orders from trading during the period after the underlying price has moved, but before market-makers quotes have been cancelled/updated. This 0.000350 second window is big enough to prevent predatory latency arbitrage, and yet small enough to minimise the chance that a real end user's order arrives at the exchange within the same window.

In the unlikely event that an end user's order *does* arrive during this window, it will be delayed by a *fraction* of a second and then proceed to execute as normal. The latency overhead of an end user without direct market access sending their order via a broker's systems is usually measured in milliseconds, a few orders of magnitude larger than the 350 microsecond de minimis delay proposed by IEX. The extra de minimis delay should have no impact on any real end user's orders, but it will have a big impact on the market-maker's ability to provide liquidity.

## 6. Incentives

It is in the best interests of a select few monopolistic market participants to prevent the approval of IEX Options as proposed, including the de minimis delay and ORP. The same self-serving firms would prefer to maintain the status quo, to protect their advantage and delay or prevent the evolution of the marketplace to become fairer for all participants. These firms are generally the ones profiting from latency arbitrage and internalization via payment for order flow ("PFOF"). Exchanges are similarly incentivized, as these "latency arbitrage" trades generate additional fees that wouldn't otherwise exist without the aforementioned predatory behavior.

In our opinion, the most likely outcome from the approval of IEX Options is the eventual tightening of the NBBO on IEX Options, initiated by market makers who would normally be subject to pickoffs, but are now protected thanks to the de minimis delay and ORP.

---

[2] https://www.sec.gov/files/rules/sro/iex/2025/34-103290.pdf

Due to Rule 611 of Regulation NMS[3], any incoming order that would normally execute on another exchange would instead be forced to execute on IEX Options because of the improved price. Naturally, competing exchanges will want to defend their share of trading volumes, and may be more likely to implement similar speed bumps of their own. This would eventually result in tighter markets on all US Option exchanges, ultimately benefiting the marketplace and making it more efficient by offering better pricing and deeper liquidity pools. Tighter spreads mean market-makers would be unwilling to pay wholesalers and brokers as much for order flow (PFOF). Rather, the customer order flow will naturally receive improved pricing thanks to renewed, fair, competition between market-makers. The PFOF model may therefore become less important for the market as a whole. This, in turn, would result in an improved customer experience and a truly competitive experience for market-makers.

## 7. Conclusion

We hope these comments are helpful as the Commission considers this matter. Please do not hesitate to contact us should you have any questions or require any further information.

Sincerely,

James Cosentino (Aug 14, 2025 10:16:40 CDT)

James Cosentino
Head of Trading, Chicago
Maven Securities
444 W Lake Street, Suite 4650
Chicago, IL 60606
(312) 216-0272
https://www.mavensecurities.com

---

[3] https://www.sec.gov/spotlight/emsac/memo-rule-611-regulation-nms.pdf

4

# ADMINISTRATIVE RECORD REFERENCE NO. 140

*Paper Comments*

• Send paper comments in triplicate to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090.

All submissions should refer to file number SR–MRX–2025–20. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*https://www.sec.gov/rules/sro.shtml*). Copies of the filing will be available for inspection and copying at the principal office of the Exchange. Do not include personal identifiable information in submissions; you should submit only information that you wish to make available publicly. We may redact in part or withhold entirely from publication submitted material that is obscene or subject to copyright protection. All submissions should refer to file number SR–MRX–2025–20 and should be submitted on or before October 14, 2025.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[33]

**Sherry R. Haywood,**

*Assistant Secretary.*

[FR Doc. 2025–18369 Filed 9–22–25; 8:45 am]

**BILLING CODE 8011–01–P**

---

## SECURITIES AND EXCHANGE COMMISSION

**[Investment Company Act Release No. 35750; File No. 812–15835]**

### 26North BDC, Inc., et al.

September 19, 2025.

**AGENCY:** Securities and Exchange Commission ("Commission" or "SEC").

**ACTION:** Notice.

Notice of application for an order under sections 17(d) and 57(i) of the Investment Company Act of 1940 (the "Act") and rule 17d–1 under the Act to permit certain joint transactions otherwise prohibited by sections 17(d) and 57(a)(4) of the Act and rule 17d–1 under the Act.

**SUMMARY OF APPLICATION:** Applicants request an order to permit certain business development companies ("BDCs") and closed-end management investment companies to co-invest in portfolio companies with each other and with certain affiliated investment entities.

---

[33] 17 CFR 200.30–3(a)(12).

**APPLICANTS:** 26North BDC, Inc., 26North Direct Lending LP, 26North Direct Lending II LP, and certain of their affiliated entities as described in Schedule A to the application.

**FILING DATES:** The application was filed on June 17, 2025, and amended on September 18, 2025.

**HEARING OR NOTIFICATION OF HEARING:** An order granting the requested relief will be issued unless the Commission orders a hearing. Interested persons may request a hearing on any application by emailing the SEC's Secretary at *Secretarys-Office@sec.gov* and serving the Applicants with a copy of the request by email, if an email address is listed for the relevant Applicant below, or personally or by mail, if a physical address is listed for the relevant Applicant below. Hearing requests should be received by the Commission by 5:30 p.m. on October 14, 2025, and should be accompanied by proof of service on the Applicants, in the form of an affidavit or, for lawyers, a certificate of service. Pursuant to rule 0–5 under the Act, hearing requests should state the nature of the writer's interest, any facts bearing upon the desirability of a hearing on the matter, the reason for the request, and the issues contested. Persons who wish to be notified of a hearing may request notification by emailing the Commission's Secretary at *Secretarys-Office@sec.gov.*

**ADDRESSES:** The Commission: *Secretarys-Office@sec.gov.* Applicants: Wendy Modlin, 26North Direct Lending LP, *wmodlin@26n.com;* Nicole M. Runyan, P.C. and Brad A. Green, P.C., Kirkland & Ellis LLP, *nicole.runyan@kirkland.com* and *brad.green@kirkland.com.*

**FOR FURTHER INFORMATION CONTACT:** Adam Large, Senior Special Counsel, Kris Easter Guidroz, Senior Counsel, or Daniele Marchesani, Assistant Chief Counsel, at (202) 551–6825 (Division of Investment Management, Chief Counsel's Office).

**SUPPLEMENTARY INFORMATION:** For Applicants' representations, legal analysis, and conditions, please refer to Applicants' first amended application, filed September 18, 2025, which may be obtained via the Commission's website by searching for the file number at the top of this document, or for an Applicant using the Company name search field, on the SEC's EDGAR system.

The SEC's EDGAR system may be searched at *https://www.sec.gov/edgar/searchedgar/companysearch.html.* You may also call the SEC's Office of Investor Education and Advocacy at (202) 551–8090.

For the Commission, by the Division of Investment Management, under delegated authority.

**Sherry R. Haywood,**

*Assistant Secretary.*

[FR Doc. 2025–18434 Filed 9–22–25; 8:45 am]

**BILLING CODE 8011–01–P**

---

## SECURITIES AND EXCHANGE COMMISSION

**[Release No. 34–103998; File No. SR–IEX–2025–02]**

### Self-Regulatory Organizations; Investors Exchange LLC; Order Approving a Proposed Rule Change, as Modified by Amendment No. 3, To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options

September 18, 2025.

### I. Introduction

On January 10, 2025, the Investors Exchange LLC ("IEX" or "Exchange") filed with the Securities and Exchange Commission ("Commission"), pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act")[1] and Rule 19b–4 thereunder,[2] a proposed rule change to adopt rules to govern the trading of options on IEX Options LLC ("IEX Options"). The proposed rule change was published for comment in the **Federal Register** on January 21, 2025.[3] On March 6, 2025, the Commission designated a longer period within which to approve the proposed rule change, disapprove the proposed rule change, or institute proceedings to determine whether to disapprove the proposed rule change.[4] On March 12, 2025, the Exchange filed Amendment No. 1 to the proposed rule change, which superseded and replaced the original proposal in its entirety.[5] The proposed rule change, as modified by Amendment No. 1, was published for comment in the **Federal Register** on March 19, 2025.[6] On April 21, 2025, the Commission instituted proceedings to determine whether to approve or disapprove the proposed rule change, as

---

[1] 15 U.S.C. 78s(b)(1).

[2] 17 CFR 240.19b–4.

[3] *See* Securities Exchange Act Release No. 102190 (Jan. 14, 2025), 90 FR 7205.

[4] *See* Securities Exchange Act Release No. 102536, 90 FR 11866 (Mar. 12, 2025). The Commission designated Apr. 21, 2025, as the date by which the Commission shall approve or disapprove, or institute proceedings to determine whether to disapprove, the proposed rule change.

[5] *See infra* note 6 (citing the release that published notice of Amendment No. 1, which includes a description of Amendment No. 1).

[6] *See* Securities Exchange Act Release No. 102663 (Mar. 13, 2025), 90 FR 12890 ("Amendment No. 1").

modified by Amendment No. 1.[7] On June 13, 2025, the Exchange filed Amendment No. 2 to the proposed rule change, which superseded and replaced Amendment No. 1 in its entirety. On June 17, 2025, the Exchange withdrew Amendment No. 2 and filed Amendment No. 3, which replaced and superseded Amendment No. 1 in its entirety. The proposed rule change, as modified by Amendment No. 3, was published for comment in the **Federal Register** on June 24, 2025.[8] On July 17, 2025, the Commission designated a longer period within which to approve or disapprove the proposed rule change.[9] The Commission has received comments on the proposal.[10] This order approves the proposed rule change, as modified by Amendment No. 3.

## II. Description of the Proposed Rule Change, as Modified by Amendment No. 3 [11]

The Exchange's proposal sets forth rules in connection with its launch of IEX Options, which will be "a fully automated trading system built on the core functionality of the Exchange's approved equities platform" for the listing and trading of options issued by the Options Clearing Corporation.[12] As discussed in the proposal, as modified by Amendment No. 3, the Exchange proposes to operate IEX Options as a pro-rata options market with a latency mechanism.[13] Specifically, IEX proposes "to utilize a de minimis delay on incoming order and quote messages designed to enable IEX to obtain the most accurate view of the market prior

to processing orders and quotes" ("access delay") to support an optional Options Risk Parameter ("ORP") that is "designed to protect [registered market makers on IEX] from excessive risk due to execution of quotes at stale prices . . . ." [14]

The Exchange's rules applicable to the IEX equities market, contained in Chapters 1 through 16 of its rulebook, will apply to Options Members unless a proposed rule in proposed Chapters 17 through 29, applicable to the IEX Options market, applies or the context otherwise requires.[15] With the exception of the access delay and ORP, the proposed rules for IEX Options are all substantially similar or substantively identical to the rules of other options exchanges.[16]

### Definitions

The Exchange proposes to define relevant terms in proposed Rule 17.100, which terms are either identical or substantially similar to definitions included in MEMX Options Rule 16.1 or rules of Cboe, MIAX, or NYSE Amex.[17]

### Chapters 18 Through 21

In Chapter 18, the Exchange proposes to set forth rules governing participation on IEX Options.[18]

Specifically, the Exchange will authorize any Exchange Member that meets certain qualifications and their Sponsored Participants to obtain access to and transact business on IEX Options.[19] To accomplish this, the Exchange is adding new categories of trading permits for a new type of member called "Options Member" that

can participate as an Options Order Entry Firm, Options Market Maker, or Clearing Member.[20] An Options Member that represents Customer Orders as agent on IEX Options or that conducts proprietary trading as a non-Options Market Maker will be referred to as an Options Order Entry Firm ("OEF").[21] Options Market Makers are Options Members registered, pursuant to Rule 23.100, as either a "Registered Market Maker" or a "Specialist." [22]

Only Options Members and their Sponsored Participants [23] may transact business on IEX Options via IEX Options' trading system (the "System").[24] Options Members may trade options for their own proprietary accounts or, if authorized to do so under applicable law, and consistent with these Rules and with applicable law and SEC rules and regulations, may conduct business on behalf of Customers.[25]

The Exchange will authorize any Exchange Member that meets certain enumerated qualification requirements and any Options Member's Sponsored Participants to obtain access to, and transact business on, IEX Options.[26] Among other things, OEFs and other Options Members that transact business with Public Customers must be

---

[7] *See* Securities Exchange Act Release No. 102895, 90 FR 17474 (Apr. 25, 2025).

[8] *See* Securities Exchange Act Release No. 103290 (June 18, 2025), 90 FR 26865 ("Amendment No. 3"). Amendment No. 3 is identical to withdrawn Amendment No. 2 except Amendment 3 corrects the nonsubstantive pagination issue in Amendment No. 2. Amendment No. 3, among other things, codified in proposed Rule 23.150(h), Supplementary Material .04 (1)(q), the initial Delta Bound Band of 0–1 and in proposed Rule 23.150(h), Supplementary Material .04 (2)(e), the initial Quote Instability Threshold of 0.1%; stated that if IEX seeks to change either of these values within the ranges stated in the proposed rules, it will file with the Commission a proposed rule change; and provided analysis demonstrating that the proposed Options Risk Parameter will only have a de minimis impact on market maker quotes on IEX.

[9] *See* Securities Exchange Act Release No. 103480, 90 FR 34532 (July 22, 2025). The Commission designated Sept. 18, 2025, as the date by which the Commission shall approve or disapprove the proposed rule change.

[10] Comments on the proposed rule change are available at *https://www.sec.gov/comments/sr-iex-2025-02/sriex202502.htm.*

[11] Capitalized terms not defined in this order are defined in Amendment No. 3, *supra* note 8.

[12] Amendment No. 3, *supra* note 8, at 26866.

[13] *See id. See also infra* notes 46–48 and accompanying text (discussing pro-rata priority).

[14] Amendment No. 3, *supra* note 8, at 26866.

[15] *See, e.g.,* Exchange Rules 2.160 and 2.220.

[16] Specifically, the proposed rules for IEX Options are substantially similar or substantively identical to rules of MEMX LLC ("MEMX Options"), Cboe Exchange, Inc. ("Cboe"), Miami International Securities Exchange, LLC ("MIAX"), NYSE American LLC ("NYSE Amex") and NYSE Arca, Inc. ("NYSE Arca") options exchanges, with material differences discussed in Amendment No. 3. In the proposal, as modified by Amendment No. 3, when the Exchange describes a proposed rule as being "substantively identical" to a rule of another exchange, the Exchange states that it means that the substance of the proposed IEX Options rule is identical to the referenced rule of the other exchange, with differences only to reflect terminology and numbering. *See* Amendment No. 3, *supra* note 8, at 26866, n.21. When it describes a proposed rule as "substantially similar" to a rule of another exchange, the proposal describes the relevant differences. *See id.*

[17] In Amendment No. 3, IEX sets forth all defined terms and notes the rule(s) from MEMX Option, Cboe, MIAX, and/or NYSE Amex from which the proposed definition is derived. *See id.* at 26869–72.

[18] *See id.* at 26867.

[19] *See* proposed Rules 18.100, 18.110, 18.120, 18.130, and 18.140. In Amendment No. 3, IEX describes these proposed rules. *See* Amendment No. 3, *supra* note 8, at 26867.

[20] *See* proposed Rule 17.100 (defining "Options Member"). *See also* proposed Rule 18.140 and proposed Rule 17.100 (defining "Trading Permit"). Clearing Members will be those Options Members that have been admitted to membership in the Options Clearing Corporation pursuant to the provisions of the Rules of the Options Clearing Corporation and are self-clearing or that clear IEX Options Transactions for other Options Members. *See* proposed Rule 17.100 (defining "Clearing Member").

[21] *See* proposed Rule 17.100 (defining "Customer" as a Public Customer or a broker-dealer; defining "Public Customer" as a person that is not a broker or dealer in securities; defining "Customer Order" as an agency order for the account of a Customer; and defining "Options Order Entry Firm, Order Entry Firm, and OEF" to mean those Options Members representing as agent Customer Orders on IEX Options and those non-Market Maker Members conducting proprietary trading).

[22] *See* proposed Rule 17.100 (defining "Market Makers (and Options Market Makers)"). The term "Registered Market Maker" means an Options Member registered with the Exchange for the purpose of making markets in securities traded on the Exchange, who is vested with the rights and responsibilities specified in Chapter 23 of these Rules with respect to Registered Market Makers. The term "Specialist" means a Market Maker appointed by the Exchange to act as the primary lead Market Maker for the purpose of making markets in securities traded on the Exchange. The Specialist is vested with the rights and responsibilities specified in Chapter 23 of these Rules with respect to Specialists.

[23] *See* Amendment No. 3, *supra* note 8, at 26869. *See also* IEX Rule 11.130.

[24] *See* proposed Rule 18.100(a).

[25] *Id.*

[26] *See* Amendment No. 3, *supra* note 8, at 26867. *See also* proposed Rules 18.100, 18.110, 18.120, and 18.130.

members of the Financial Industry Regulatory Authority ("FINRA").[27] An Options Member also must maintain membership in another registered options exchange that is not registered solely under Section 6(g) of the Act (15 U.S.C. 78f(g)) or in FINRA.[28] Every Options Member also will be required to have at least one registered Options Principal with responsibility for the overall oversight of the Options Member's options-related activities on the Exchange.[29] Proposed Rules 18.100, 18.110, 18.120, 18.130 are substantially similar to the analogous rules on MEMX Options, and proposed Rule 18.140 is similar to the analogous rule on Cboe.[30]

In addition, the Exchange proposes to adopt rules in Chapter 19 regarding business conduct that are substantively identical to MEMX Options rules.[31]

In Chapter 20, the Exchange proposes to adopt rules regarding listing standards for options traded on IEX Options that are substantively identical to MEMX Options rules[32] and in Chapter 21, to adopt rules that are substantially similar to MEMX Options rules regarding regulation of trading, including rules addressing halts, unusual market conditions, extraordinary market volatility, obvious errors, audit trail, and rules regarding prohibited and permissible transfers of options positions off the Exchange.[33]

Chapter 22—Trading Systems

The Exchange proposes to adopt rules in Chapter 22 regarding the System.[34]

IEX Options will not have a physical trading floor.

IEX Options will be open on normal business days and will accept orders and quotes beginning at 8:00 a.m. Eastern time until 4:00 p.m. except for options contracts on Fund Shares and options contracts on exchange-traded notes including Index-Linked Securities, which may close as of 4:15 p.m.[35] IEX Options will accept quotes, Market orders, and Limit orders with a Time-in-Force ("TIF") of Day for inclusion in the opening process.[36] The Exchange will conduct its opening auction for each series after the primary market for the underlying security first disseminates both a two-sided quote and a trade of any size at or within the quote (or, after a Regulatory Halt, notification that the underlying stock is no longer halted), after which it will transition to continuous trading.[37]

The Exchange's minimum quotation and trading increment will be the same as on other exchanges[38] and the

minimum trading increment will be one cent for all series.[39] In addition, the Exchange's Penny Interval Program is substantially similar to the penny programs of other exchanges, which includes minimum quoting requirements for options classes listed under the Penny Interval Program.[40]

IEX Options will offer standard order types and handling instructions including Book Only, Post Only, and Intermarket Sweep Orders.[41] In addition, for certain processes, IEX Options may allow a User[42] to optionally mark an order as "attributable" to that User's MPID, resulting in the order displaying the User's MPID for purposes of trading on the Exchange.[43]

IEX Options will allow Users to specify TIF designations on their orders and quotes of Immediate or Cancel ("IOC") or Day.[44] Like other options exchanges, IEX Options will offer a re-pricing Price Adjust mechanism to comply with applicable order protection and trade through restrictions that will offer a single price adjustment.[45] As with its equities market, the Exchange will allow Users to use certain Anti-Internalization Qualifier ("AIQ") modifiers to prevent execution of orders originating from the same identifier including: AIQ Cancel Newest, AIQ Cancel Oldest, AIQ Cancel Both, and AIQ Cancel Smallest.[46]

---

[27] *See* proposed Rule 18.110(g).

[28] *See* proposed Rule 18.110(g).

[29] *See* proposed Rule 18.110(h).

[30] *See* Amendment No. 3, *supra* note 8, at 26867. According to the Exchange, a broker-dealer applying to be a Trading Permit Holder on Cboe must qualify as a participant or member of that exchange. IEX explains that its proposed rule differs from Cboe Rule 3.1 because the proposed rule does not include the membership qualification-related provisions that are addressed elsewhere in proposed Chapter 18. In addition, Cboe's rule includes limitations on the number of trading permits that Cboe may issue, while IEX has not proposed to adopt such limitations. *Id.* at 26867, n.34.

[31] *See* proposed Rules 19.100, 19.110, 19.120, 19.130, 19.140, 19.150, 19.160, 19.170, 19.180, 19.190, 19.200, 19.210, 19.220, and 19.230. *See also* Amendment No. 3, *supra* note 8, at 26881–82.

[32] *See* proposed Rules 20.100, 20.110, 20.120, 20.130, 20.140, 20.150, and 20.160. *See also* Amendment No. 3, *supra* note 8, at 26881. Proposed Rule 20.130, Supplementary Material .01, and proposed Rule 20.140, Supplementary Material .02, are based on MIAX rules.

[33] *See* proposed Rules 21.100, 21.110, 21.120, 21.130, 21.140, 21.150, 21.160, 21.170, 21.180, 21.190, 21.200, 21.210, and 21.220. *See also* Amendment No. 3, *supra* note 8, at 26883.

[34] *See* proposed Rules 22.100, 22.110, 22.120, 22.130, 22.140, 22.150, 22.160, 22.170, 22.180, 22.190, 22.200, 22.210, 22.220, 22.230, 22.240, 22.250, 22.260, and 22.270. The proposed rule change, as modified by Amendment No. 3, replaces

the proposed definition of "Trading System" with the proposed definition of "System" which is "the automated trading system used by IEX Options for the trading of options contracts, as described in Rule 22.100(a)." *See* proposed Rule 17.100 (defining "System"). The proposed definition of "Trading System" and the proposed definition of "System" are identical. Additionally, references throughout the proposed rule change to "Trading System" were changed to "System" by Amendment No. 3. In addition, in Amendment No. 3, IEX explains the operation of Chapter 22 and notes the rule(s) from MEMX Options, NYSE Amex, NYSE Arca, Cboe, and MIAX from which the proposed rules in Chapter 22 are derived. *See* Amendment No. 3, *supra* note 8, at 26872–78.

[35] *See* proposed Rule 22.110(a).

[36] *See* proposed Rule 22.160(a)(13).

[37] *See* proposed Rule 22.160. The participation entitlements to a Directed Market Maker or Specialist specified in proposed Rule 22.170(f)(2)-(3) will not be available during an Auction. *See* proposed Rule 22.160(b)(3). The proposed market opening procedures are substantially similar to the market opening procedures specified in NYSE Arca Options Rule 6.64P–O, except that any imbalance would be allocated on a pro rata basis (*see* proposed Rule 22.160(b)); IEX will begin accepting orders for the opening auction at 8:00 a.m. compared to 6:00 a.m. for NYSE Arca (*see* proposed Rule 22.160(a)(13)(A) and NYSE Arca Options Rule 6.64P–O(a)(12)(A)); IEX will begin disseminating Auction Imbalance Information at 8:30 a.m. compared to 8:00 a.m. for NYSE Arca (*see* proposed Rule 22.160(c)(1) and NYSE Arca Options Rule 6.64P–O(c)(1)); and IEX does not have a Far Clearing Price because it does not propose to have Auction Only orders to which the Far Clearing Price relates.

[38] *See* proposed Rule 22.140. *See also, e.g.,* MEMX Options Rules 21.5(a) and (b). Specifically, the Exchange will have the following standard quotation increments: if the options series is trading at less than $3.00, five (5) cents; if the options series is trading at $3.00 or higher, ten (10) cents; and if the options series is trading pursuant to the Penny Interval Program one (1) cent if the options series is trading at less than $3.00, five (5) cents if the options series is trading at $3.00 or higher, except for QQQ, SPY, or IWM where the minimum quoting increment will be one (1) cent for all series.

[39] *See* proposed Rule 22.140(b).

[40] *See* proposed Rule 22.140(c) and Amendment No. 3, *supra* note 8, at 26873.

[41] *See* proposed Rule 22.100(e). *See also* Amendment No. 3, *supra* note 8, at 26873.

[42] The proposed rule change, as modified by Amendment No. 3, defines a "User" as "any Options Member or Sponsored Participant who is authorized to obtain access to the System pursuant to Rule 11.130 (Access)." *See* proposed Rule 17.100 (defining "User").

[43] *See* Amendment No. 3, *supra* note 8, at 26873; proposed Rule 22.100(d)(3). Attributable orders may not be available for all Exchange processes. The Exchange will distribute a circular to Options Members specifying the processes for which the attributable order type will be available. An MPID is a unique market participant identifier assigned to an Options Member. *See* proposed Rule 17.100 (defining "MPID").

[44] *See* proposed Rule 22.100(g). Unless cancelled earlier, once these time periods expire, the order (or the unexecuted portion thereof) is returned to the entering party. The Exchange states that its proposed TIF designations are substantially similar to what MEMX offers, except MEMX allows bulk messages to have a TIF of IOC while IEX will only allow bulk messages to have a TIF of Day so that they do not take liquidity when entered. *See* Amendment No. 3, *supra* note 8, at 26873–74 and proposed Rule 22.100(l)(3) (stating that "bulk messages are implicitly designated as Post Only").

[45] *See* proposed Rule 22.100(i); MEMX Rule 21.1(i); and Cboe Rule 5.32(b)(2)(A) (single price adjust).

[46] *See* proposed Rule 22.100(h) and MEMX Rule 21.1(h) (Match Trade Prevention). The first three

Continued

IEX Options will have a pro-rata allocation model with execution priority dependent on the size and capacity of an order.[47] Resting quotes and orders will be prioritized according to price, after which contracts will be allocated proportionally according to size (in a pro-rata fashion), rounded down to the nearest whole contract.[48] Residual options contracts will be filled one at a time based on price-size-time priority.[49]

IEX Options will support priority overlays, which the Exchange may make available on a class-by-class basis.[50] The Priority Customer overlay will provide resting interest from Priority Customers with priority over all non-Priority Customer interest at the same price and will always take priority over all other priority overlays.[51] The Specialist Participation Entitlement overlay will provide a Specialist with priority over interest from other non-Priority Customers for a certain percentage of contracts allocated at the same price (entitling Specialists to a 60% allocation if there is one other non-Priority Customer at the National Best Bid or National Best Offer ("NBBO") or 40% if there are two or more other non-Priority Customers at the NBBO [52]) when quoting at the NBBO, inclusive of the case in which the order is directed to Specialists.[53] The Directed Market Maker Participation Entitlement overlay [54] will provide a Directed Market Maker with priority over interest from other non-Priority Customers for a certain percentage of contracts allocated at the same price (entitling the Directed Market Maker to a 60% allocation if there is one other non-Priority Customer at the NBBO or 40% if there are two or more other non-Priority Customers at

the NBBO [55]) when quoting at the NBBO, and always applies in place of the Specialist Participation Entitlement overlay when both are in effect and the order is directed to a Directed Market Maker other than the Specialist.[56] The Small-Size Order Entitlement overlay [57] will provide a Specialist quoting at the NBBO with priority to execute against the entire size of an order or quote of five or fewer contracts that does not first execute against any Priority Customer orders at that price. However, if an order that is subject to the Small-Size Order Entitlement is directed to a Directed Market Maker who is not the Specialist quoting at the NBBO, and the Directed Market Maker priority overlay is enabled in the series, then the Directed Market Maker Participation Entitlement priority overlay will apply instead of the Small-Size Order Entitlement priority overlay.[58] In the case that an order subject to the Small-Size Order Entitlement is directed to the Specialist, the Small-Size Order Entitlement priority overlay will apply while the Specialist Participation Entitlement and Directed Market Maker Entitlement overlays will not.[59]

IEX Options will offer an optional Step Up Mechanism ("SUM") in designated classes that is substantively identical to functionality offered by Cboe, except that IEX will not offer all or none orders.[60] If elected, SUM will expose a routable order and initiate an auction when the order is not immediately eligible for execution on IEX because IEX is not at the NBBO.[61] Any remaining portion of the order will be routed to other exchanges.[62]

To facilitate compliance with applicable regulations, including the

Options Order Protection and Locked/Crossed Market Plan, IEX Options will offer an optional service to route orders to away exchanges when the Exchange is not at the NBBO via IEX Services LLC ("IEX Services"), which is subject to regulation as a facility of the Exchange. IEX Services will transmit such orders to other options exchanges via one or more routing brokers that are not affiliated with the Exchange ("Routing Services").[63] Users that do not wish to use Routing Services can designate their orders as not available for routing.[64] Orders that have been routed by the System to other options exchanges are not ranked and maintained in the IEX Options Book. If a routed order is subsequently returned, in whole or in part, that order, or its remainder, will receive a new time stamp reflecting the time of its return to the System.[65]

The Exchange will offer three proprietary data feeds: (1) IEX Options DEEP (depth of book quotations and execution information based on options orders entered into the System); (2) IEX Options TOPS (top of book quotations and execution information based on options orders entered into the System); and (3) DROP (regarding the options trading activity of a User).[66]

The proposed rules in Chapter 22 are substantially similar or substantively identical to rules from MEMX Options, NYSE Amex, NYSE Arca, Cboe, and MIAX.

Chapter 23—Market Participants

Chapter 23 will govern registration and obligations of market participants.[67]

An Options Member will be able to apply to register with the Exchange as an Options Market Maker (or "Market Maker") for the purpose of making transactions as a dealer-specialist in one or more classes of options.[68] A Market Maker can participate as a Registered Market Maker or seek an appointment as a Specialist in a particular class by qualifying through the Exchange's

---

AIQ modifiers are substantially similar to the modifiers available on MEMX Options, except IEX will not allow AIQ modifiers on bulk messages because they cannot remove liquidity. See proposed Rule 22.100(l)(3). MEMX does not offer an AIQ Cancel Smallest modifier, but it is offered by other exchanges such as Cboe. See Cboe Rule 5.6 (Match Trade Prevention Modifier—MTP Cancel Smallest).

[47] See Amendment No. 3, *supra* note 8, at 26872. The proposed pro-rata model is similar to the MIAX and NYSE Amex options exchanges. *See id.*

[48] See id. at 26875.

[49] See id.

[50] See proposed Rule 22.170(f); Amendment No. 3, *supra* note 8, at 26876.

[51] See proposed Rule 22.170(f)(1).

[52] These allocation entitlements are based on MIAX Rule 514(h)(1), after accounting for the additional priorities afforded to market makers on MIAX, as set forth in MIAX Rule 514(e). See Amendment No. 3, *supra* note 8, at 26876, n.113.

[53] See proposed Rule 22.170(f)(2). This overlay may only be in effect if the Priority Customer overlay is also in effect. See proposed Rule 22.170(f).

[54] See proposed Rule 22.170(f)(2). This overlay may only be in effect if the Priority Customer overlay is also in effect. See proposed Rule 22.170(f).

[55] See supra note 52.

[56] Prioritizing the Directed Market Maker entitlement over the Specialist entitlement in these circumstances is the same functionality offered by several other exchanges. *See, e.g.,* NYSE Amex Options Rule 964NYP(h)(1).

[57] See proposed Rule 22.170(f)(3).

[58] See proposed Rule 22.170(f)(3)(A). Proposed Rule 22.170(f) is substantially similar to Cboe Rule 5.32(a)(2), except that, unlike Cboe, in the event that a small-size order is directed to a Specialist, it will apply the Small-Size Order Entitlement to the order and not the Directed Order guarantee, meaning the Specialist will have priority to execute against the entire size of the order that does not execute against any Priority Customer orders at that price. See Amendment No. 3, *supra* note 8, at 26876, n.110.

[59] See proposed Rule 22.170(f)(3)(B). This is functionally identical to how NYSE Amex Options allocates small-size Directed Orders that are directed to a Specialist. See Amendment No. 3, *supra* note 8, at 26876; NYSE Amex Options Rule 965NYP(h)(2)(B).

[60] See proposed Rule 22.270 and Amendment No. 3, *supra* note 8, at 26876.

[61] See proposed Rule 22.270.

[62] See id.

[63] See proposed Rule 22.180(d) and Amendment No. 3, *supra* note 8, at 26875.

[64] See proposed Rule 22.180(d).

[65] See proposed Rule 22.180(b). *See also* proposed Rule 22.180(e) (concerning IEX Services' policies and procedures to mitigate the financial and regulatory risks associated with Routing Services) and MEMX Rule 21.9(f) (concerning market access for MEMX Execution Services).

[66] See proposed Rule 22.240(b).

[67] See proposed Rules 23.100, 23.110, 23.120, 23.130, 23.140, 23.150, 23.160, 23.170, 23.180, 23.190, and 23.200. *See generally* Amendment No. 3, *supra* note 8, at 26868–69.

[68] See proposed Rule 23.100(a) and proposed Rule 17.100 (defining "Market Makers (and Options Market Makers)" as referring collectively to Options Members registered as either a Registered Market Maker or as a Specialist).

Specialist Qualification Process.[69] While the Exchange may appoint multiple Registered Market Makers to a particular class of options contracts,[70] only one Specialist will be appointed to an options class.[71]

Each Options Market Maker must employ Registered Options Traders (''ROTs'') to submit Options Market Maker quotations and orders to the System solely for the account of the Market Maker with which it is associated. ROTs may be individual Options Members registered with the Exchange as Market Makers, or officers, partners, employees, or associated persons of Options Members that are registered with the Exchange as Market Makers.[72]

Quotations may only be entered by a Market Maker and only in its appointed classes.[73] Market Makers can submit ''bulk messages'' in their appointed classes, which are a single electronic message to enter, modify, or cancel up to a specified number of bids and offers. The System handles a bulk message in the same manner as it handles an order or quote, unless the Exchange Rules specify otherwise. Bulk messages will have a default TIF of Day and a default designation of Post Only. As proposed, the System will cancel, reject, or reprice a Post Only bulk message bid (offer) with a price that locks or crosses the Exchange best offer (bid) or away best offer (away best bid).[74]

Both Registered Market Makers and Specialists will be vested with certain rights and responsibilities and will be required to electronically engage in a course of dealing reasonably calculated to contribute to the maintenance of fair and orderly markets.[75] Specialists will be subject to obligations in addition to those applicable to Registered Market Makers.[76]

Among other things, a Registered Market Maker must provide continuous two-sided quotations throughout the trading day in its appointed issues for 60% of the time the Exchange is open for trading in each issue,[77] while a Specialist must provide continuous two-sided quotations throughout the trading day in its appointed issues for 90% of the time the Exchange is open for trading in each issue,[78] provided in both instances that the options classes have a time to expiration of less than nine months.[79] In addition, Market Maker quotes must be firm quotes that comply with enumerated price and size rules[80] and Market Makers must maintain minimum net capital in accordance with applicable rules.[81]

Both Specialists and Registered Market Makers may also participate as Directed Market Makers that can receive Directed Orders[82] entered into the System on behalf of Priority Customers.[83] Directed Market Makers will be subject to enhanced quoting obligations compared to Registered Market Makers.[84]

In exchange for accepting these obligations, Registered Market Makers, Specialists, and Directed Market Makers are provided certain benefits such as credit from lenders without regard to the restrictions in Regulation T of the Board of Governors of the Federal Reserve System if the credit is to be used to finance the broker-dealer's activities as a specialist or market maker on a national securities exchange.[85] Another benefit is that Specialists and Directed Market Makers will be granted participation entitlements. As discussed above, Specialists will receive the Specialist Participation Entitlement overlay[86] and the Small-Size Order Entitlement priority overlay,[87] and Directed Market Makers will receive the Directed Market Maker Participation Entitlement overlay, subject to certain conditions.[88]

The Exchange will periodically evaluate Options Market Makers to determine whether each has fulfilled the Exchange's performance standards for Registered Market Makers or Specialists,

[69] *See* proposed Rule 23.130(b)(1). *See also* proposed Rule 17.100 (defining ''Registered Market Maker''; defining ''Specialist''), and proposed Rule 23.130(b)(1) (governing Specialists).

[70] The Exchange will not place any limit on the number of entities that may become Options Market Makers, the number of appointments an Options Market Maker may have, or the number of Options Market Makers that may have appointments in a class unless the Exchange determines to impose any such limit based on system constraints, capacity restrictions, or other factors relevant to protecting the integrity of the System. The Exchange will not impose any such limitations until it has submitted objective standards for imposing the limits to the Commission for its review and approval. *See* Amendment No. 3, *supra* note 8, at 26868.

[71] *See* proposed Rule 23.130(g)(1)(A).

[72] *See* proposed Rule 23.110(a) and (b).

[73] *See* proposed Rule 23.150(a). Market Makers may submit orders in classes of options contracts to which the Market Makers are appointed, which shall constitute quotes. *See* proposed Rule 17.100 (defining ''Quote'' to include orders entered by a Market Maker in the option series to which such Market Maker is registered). Market Makers with an OEF trading permit may submit orders in classes to which they are not appointed provided that the total number of such orders executed by a Market Maker does not exceed 25% of all contracts the Market Maker executes on the Exchange in any calendar quarter. *See* proposed Rule 23.150(g).

[74] *See* proposed Rule 22.100. *See also, e.g.,* MEMX Rule 21.1(l). IEX states that the ability of the System to cancel or reject a post only order submitted on a bulk port with a price that locks or crosses the Exchange best offer (bid) or away best

offer (away best bid) is substantively identical to MEMX Rule 21.1(l)(3). IEX will also allow the System to reprice a post only order submitted on a bulk port with a price that locks or crosses the Exchange best offer (bid) or away best offer (away best bid), which is substantively identical to the functionality in Cboe Rule 5.32(b)(1)(B). *See* Amendment No. 3, *supra* note 8, at 26874, n.93.

[75] *See* proposed Rule 23.140(a).

[76] *See* Amendment No. 3, *supra* note 8, at 26868–69. *See also* proposed Rule 23.150(c).

[77] *See* proposed Rule 23.150(e)(2)(A).

[78] *See* proposed Rule 23.150(e)(1)(A).

[79] *See* proposed Rule 23.150, Supplementary Material .01; Amendment No. 3, *supra* note 8, at 26868. In their appointed issues, a Registered Market Maker and a Specialist must also: engage, to a reasonable degree under the existing circumstances, in dealings for his own account when there exists, or it is reasonably anticipated that there will exist, a lack of price continuity, a temporary disparity between the supply of and demand for a particular options contract, or a temporary distortion of the price relationships between options contracts of the same class; compete with other Market Makers to improve the market in all series of options classes to which the Market Maker is appointed; make markets that, absent changed market conditions, will be honored for the number of contracts entered into the System in all series of options classes to which the Market Maker is appointed; update market quotations in response to changed market conditions in all series of options classes to which the Market Maker is appointed; and price options contracts fairly by, among other things, bidding and offering so as to create differences of no more than $5 between the bid and offer (''bid/ask differentials'') following the opening rotation in an equity options contract (with certain exceptions). *See* proposed Rule 23.140(b).

[80] *See* proposed Rule 23.150(b) and (d).

[81] *See* proposed Rule 23.180 ($200,000 net capital requirement for Registered Market Makers), which is substantively identical to MEMX Rule 22.9, and proposed Rule 23.130(c)(1)(H) ($1,000,000 net capital requirement for Specialists), which is substantively identical to NYSE Amex Options Rule 927NY(c)(10).

[82] A Directed Order is an order entered on behalf of a Priority Customer that is entered into the System by an Options Member with a designation for a Market Maker in that class (the Directed Market Maker). *See* proposed Rule 17.100 (defining ''Directed Order''). A Priority Customer is any person or entity that is neither a broker or dealer in securities nor a Professional. *See* proposed Rule 17.100 (defining ''Priority Customer and Priority Customer Order''). A Professional is any person or entity that (A) is not a broker or dealer in securities; and (B) places more than 390 orders in listed options per day on average during a calendar month for its own beneficial account(s). *See* proposed Rule 17.100 (defining ''Professional'').

[83] *See* proposed Rule 17.100 (defining ''Directed Order'').

[84] *See* Amendment No. 3, *supra* note 8, at 26867, n.32. While a Registered Market Maker must provide continuous two-sided quotations throughout the trading day in its appointed issues for 60% of the time the Exchange is open for trading in each issue, a Directed Market Maker must provide continuous two-sided quotations throughout the trading day in issues for which it receives Directed Orders for 90% of the time the Exchange is open for trading in each issue. This is different from the Specialist quoting obligation as a Specialist must provide continuous two-sided quotations throughout the trading day in its appointed issues for 90% of the time the Exchange is open for trading in each issue. *See* proposed Rule 23.150(e)(1), (2) and (3).

[85] *See* Amendment No. 3, *supra* note 8, at 26869.

[86] *See supra* notes 52–53 and accompanying text.

[87] *See supra* notes 57–59 and accompanying text.

[88] *See supra* notes 54–56 and accompanying text.

as applicable.[89] Substantial or continued failure by a Registered Market Maker to meet any of its obligations and duties may subject the Registered Market Maker to disciplinary action, suspension, or revocation of its registration as such or its appointment in one or more of its appointed options classes.[90] For Specialists, a finding by the Exchange that a Specialist has failed to meet minimum performance standards may result in one or more of the following actions: a moratorium on the allocation of new options issues, a reallocation of existing options, and other disciplinary actions as deemed appropriate under the rules of the Exchange.[91]

Options Risk Parameter

The Exchange will offer the ORP as an additional optional risk tool in addition to the standard risk tools it will make available to Options Market Makers.[92] According to IEX, ''[t]he ORP is designed to enable Market Makers to provide tighter and deeper quotes on IEX by providing protection from execution against quotes at stale prices by identifying when the best Protected Bid or best Protected Offer of the Away Markets (as defined in proposed Rule 22.160(a)(8)) in a particular options series is sufficiently dislocated from the price of the underlying security to indicate that the best Protected Bid or best Protected Offer of the Away Markets in the options series is likely in transition.'' [93] The Exchange will offer the ORP on a class-by-class basis and may not offer the ORP in all classes.

To support the ORP, IEX Options will employ a hardware-based latency mechanism that adds 350 microseconds of additional latency to each incoming order and quote message from any User, like it does for its equities platform.[94] This latency mechanism provides the Exchange with a very short amount of time to ''obtain the most accurate view of the market prior to processing orders

and quotes'' as it takes in current market data, performs the calculations that inform the ORP, and then cancels or adjusts quotes that have elected to use the ORP.[95]

The ORP will be informed by the Options Quote Indicator (''Indicator'') based on the Black-Scholes options pricing model, which will ''assess the materiality of an imminent change to the current best Protected Bid of the Away Markets to a lower price or of an imminent change to the current best Protected Offer of the Away Markets to a higher price for a particular listed options series (*i.e.,* an imminent adverse price change).'' [96] To perform this assessment, the Indicator will use both real time relative quoting activity of protected quotations from eleven exchanges [97] and a proprietary quote instability calculation.[98]

According to the Exchange, when the quote instability calculation ''identifies an imminent adverse price change to the best Protected Bid and/or best Protected Offer of the Away Markets in a particular listed options series, it will generate a quote instability determination'' that ''may only be generated at least 200 microseconds after a prior quote instability determination for a particular options series on the same side of the market (*i.e.,* affecting resting bids or offers).'' [99] The 200-microsecond waiting period ensures that the ORP does not trigger repeatedly in rapid succession, which helps to narrowly tailor the effect that the ORP could have when it cancels or reprices quotes.[100] Once triggered, ''[i]f a quote instability determination is generated for an options series quoted by a Market Maker and the quote is above (below) the price level of the quote instability determination, the quote will be either cancelled or repriced to the price level of the quote instability determination, as instructed by the Market Maker'' in advance on its quote.[101]

Subject to a proposed rule change filing, the Exchange can adjust within prescribed ranges three aspects of the

Indicator's formula—the frequency of calculation of implied volatility,[102] the Quote Instability Threshold,[103] and the Delta Bound Band that determines which series are eligible for the ORP.[104] For each of these three aspects, the Exchange specifies in the rule text the possible ranges or values it may use and also specifies in the rule text the applicable range or value that is in effect.[105] The applicable rule text reflects that the Exchange will submit a proposed rule change under Rule 19b–4 for any changes to the applicable ranges or values that are in effect.[106] When determining to modify values within the specified range for the Quote Instability Threshold and the Delta Bound Band, the Exchange states that it would consider ''the distribution of quote instability determinations, the precision of quote instability determinations, system capacity and performance, fill rates, markout data, and client feedback.'' [107]

The Exchange also proposes to require Options Members to expose their customers' orders on the Exchange for at least one second under certain circumstances before trading against such orders. The Exchange explains that this is consistent with the rules of other

---

[89] *See* proposed Rule 23.120(f); proposed Rule 23.130(f).

[90] *See* proposed Rule 23.120(f) and Amendment No. 3, *supra* note 8, at 26869. *See also* IEX Rule Series 9.500 (concerning procedures for persons aggrieved by adverse action).

[91] *See* proposed Rule 23.130(f). *See also* proposed Rule 23.130(b)(2), (f)(3)(A), and (g)(2)(B); IEX Rule Series 9.500.

[92] *See* Amendment No. 3, *supra* note 8, at 26878–81.

[93] *Id.* at 26879.

[94] *See id.* at 26872. *See also* proposed Rule 22.100(n). As it does for equities, the Exchange will use coiled optical fiber for the access delay latency mechanism. *See* Rule 11.510(a). *See also* Amendment No. 3, *supra* note 8, at 26872, n.78; and IEX Rule 11.510 Supplementary Material .02 (concerning force majeure events and acts of third parties).

[95] *See* Amendment No. 3, *supra* note 8, at 26872. *See also infra* notes 97–99 and accompanying text for a discussion of the quote instability calculation.

[96] *See* Amendment No. 3, *supra* note 8, at 26872.

[97] IEX refers to these exchanges as ''Signal Exchanges.'' *See* IEX Rule 11.190(g).

[98] *See* Amendment No. 3, *supra* note 8, at 26879.

[99] *Id.*

[100] *See* Amendment No. 3, *supra* note 8, at 26887 (explaining that, unlike the crumbling quote indicator on its equities platform, the ORP ''would reprice the quote to the price level of the quote instability determination or cancel the impacted quote and not remain 'on' for a period of time after triggering.'').

[101] *Id.*

[102] *See* proposed Rule 23.150(h)(1), Supplementary Material .05. The frequency of calculation of implied volatility, which is used to calculate the delta, will be calculated each half-hour of system operation. *See* Amendment No. 3, *supra* note 8, at 26879.

[103] *See* proposed Rule 23.150(h)(1), Supplementary Material .04(2)(e). As proposed, the possible Quote Instability Threshold range will be within a range of 0%–100%. If the Quote Instability Threshold is set at 100%, the expected change in the national best bid (''NBB'')/national best offer (''NBO'') of the option resulting from price movement in the underlying must be at least 100% of the current value of the NBB/NBO of the option for the ORP to trigger. If the Quote Instability Threshold is set at 0%, the ORP would trigger if there is any expected change to the NBB/NBO of the option resulting from price movement in the underlying. As proposed, the initial value for the Quote Instability Threshold would be 0.1%. When triggered, the ORP will only result in the repricing or cancellation of quotes if the change to the NBB/NBO of the option resulting from price movement in the underlying is to a different price level than the current NBB/NBO after rounding to the nearest minimum price variation. *See* Amendment No. 3, *supra* note 8, at 26879, n.159.

[104] *See* proposed Rule 23.150(h)(1), Supplementary Material .04(1)(q). Delta is a key metric in options trading that measures the sensitivity of an option's price to changes in the price of the underlying asset. As proposed, the Delta Bound Band would restrict the ORP from triggering unless the option's delta is within the specific band. The initial value for the Delta Bound Band would be between 0–1, with the possible range of values between 0–1. *See* Amendment No. 3, *supra* note 8, at 26879, n.158.

[105] *See* Amendment No. 3, *supra* note 8, at 26879.

[106] *See id.*

[107] *Id.*

options exchanges [108] and therefore would allow members of such other options exchanges to comply with proposed Rule 23.200 without having to program separate time parameters into their systems for compliance or order entry purposes.[109]

The proposed rules within Chapter 23 are substantially similar or substantively identical to rules from MIAX, NYSE Amex, MEMX Options, and Cboe, with the exception of the proposed ORP.

Chapters 24 Through 29

The Exchange also proposes to adopt the following chapters: (i) Chapter 24 regarding exercises and deliveries; [110] (ii) Chapter 25 regarding records, reports, and audits; [111] (iii) Chapter 26 regarding discipline and summary suspension; [112] (iv) Chapter 27 regarding doing business with the public; [113] (v) Chapter 28 regarding options order protection and locked and crossed markets; [114] and (vi) Chapter 29 regarding margin requirements.[115] The proposed rules within these chapters are substantively identical to MEMX Options rules.

Other Provisions

Before commencing operations, IEX Options will become a member of the Options Price Reporting Authority ("OPRA").[116] As a member of OPRA, IEX Options will disseminate to OPRA its highest bid and its lowest offer and aggregate quotation size in accordance with Rule 602 of Regulation NMS.[117] IEX Options also will become an exchange member of the Options Clearing Corporation ("OCC") and will be linked to OCC to transmit locked-in trades for clearance and settlement.

With respect to options regulation, the Exchange's Chief Regulatory Officer,

---

[108] See, e.g., MEMX Rule 22.11; Cboe Rule 5.9; and MIAX Options Rule 520(b).

[109] See Amendment No. 3, supra note 8, at 26881.

[110] See proposed Rules 24.100, 24.110, and 24.120. See also Amendment No. 3, supra note 8, at 26881.

[111] See proposed Rules 25.100, 25.110, 25.120, 25.130, 25.140, and 25.150. See also Amendment No. 3, supra note 8, at 26881.

[112] See proposed Rules 26.100, 26.110, and 26.120. See also Amendment No. 3, supra note 8, at 26881.

[113] See proposed Rules 27.100, 27.110, 27.120, 27.130, 27.140, 27.150, 27.160, 27.170, 27.180, 27.190, 27.200, 27.210, 27.220, 27.230, 27.240, 27.250, and 27.260. See also Amendment No. 3, supra note 8, at 26881.

[114] See proposed Rules 28.100, 28.110, and 28.120. See also Amendment No. 3, supra note 8, at 26881.

[115] See proposed Rules 29.100, 29.110, 29.120, and 29.130. See also Amendment No. 3, supra note 8, at 26881.

[116] See Amendment No. 3, supra note 8, at 26882.

[117] 17 CFR 242.602. See also proposed Rule 22.240(a).

who reports to the Regulatory Oversight Committee of the Exchange's board of directors, will supervise the regulatory operations of IEX Options, including surveillance, examination, and enforcement functions and will administer regulatory services agreements applicable to IEX Options. The Exchange's existing Regulatory Oversight Committee will be responsible for overseeing the adequacy and effectiveness of the Exchange's regulatory and self-regulatory organization responsibilities, including those applicable to IEX Options. The Exchange proposes to amend its Minor Rule Violation Plan ("MRVP") to add rules related to the operation of IEX Options consistent with other options exchanges.[118]

As discussed in more detail in its filing, the Exchange will join the Options Order Protection and Locked/Crossed Market Plan, the multiparty plans under Rule 17d–2 applicable to options, a bilateral Rule 17d–2 plan with FINRA as well as a Regulatory Services Agreement with FINRA, the Options Regulatory Surveillance Authority ("ORSA"), and the Options Listing Procedures Plan ("OLPP").[119]

Finally, the Exchange proposes to modify several existing rules to accommodate IEX Options including Exchange Rule 2.160(i) (concerning registration of Principals), Exchange Rule 2.220 (concerning routing by IEX Services), and Exchange Rule 9.208 (concerning minor rule violations) as well as adopt new Rule 21.220 (concerning limitation of liability) into the options portion of its rulebook that corresponds to Rule 11.260 in the equities portion of its rulebook. These rule amendments are designed to accommodate options trading on IEX Options in a manner similar to existing options exchanges.[120]

**III. Discussion and Commission Findings**

After careful review, the Commission finds that the Exchange's proposal, as modified by Amendment No. 3, is consistent with the requirements of the Act and the rules and regulations thereunder applicable to a national securities exchange.[121] In particular, the Commission finds that the proposed

---

[118] See Amendment No. 3, supra note 8, at 26881, 26883–84 (providing a discussion of the MRVP program and noting that it specifies the uncontested minor rule violations that have sanctions not exceeding $2,500).

[119] See Amendment No. 3, supra note 8, at 26882.

[120] See id. at 26884.

[121] In approving this proposed rule change, the Commission has considered the proposed rule's impact on efficiency, competition, and capital formation. See 15 U.S.C. 78c(f).

rule change, as modified by Amendment No. 3, is consistent with Section 6 including, among others, Sections 6(b)(1),[122] 6(b)(5),[123] and 6(b)(8) [124] of the Act. Section 6(b)(1) of the Act requires that an exchange be so organized and have the capacity to be able to carry out the purposes of the Act and to comply and enforce compliance by its members and persons associated with its members with the provisions of the Act, the rules and regulations thereunder, and the rules of the Exchange. Section 6(b)(5) of the Act requires that the rules of a national securities exchange be designed, among other things, to promote just and equitable principles of trade, to remove impediments to and perfect the mechanism of a free and open market and a national market system and, in general, to protect investors and the public interest, and not be designed to permit unfair discrimination between customers, issuers, brokers, or dealers. Section 6(b)(8) of the Act requires that the rules of a national securities exchange not impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act.[125]

---

[122] 15 U.S.C. 78f(b)(1).

[123] 15 U.S.C. 78f(b)(5).

[124] 15 U.S.C. 78f(b)(8).

[125] One commenter stated that IEX's proposal did not comply with the Exchange Act. See Letter from Stephen John Berger, Managing Director, Citadel, dated Aug. 12, 2025 ("Citadel Letter II"), at 8. First, the commenter criticized the filing of Amendment No. 3 and claimed the amendment contained "material modification[s]," including "revisions to how key variables in its quote cancellation are determined" which should necessitate withdrawal of the proposal. Amendment No. 3 did not contain material revisions to variables in the ORP formula. Rather, it codified in the rule text the initial value for each of the three variables used in the ORP: Delta Bound Band; Quote Instability Threshold; and the frequency of the calculation of implied volatility. It also specified that if IEX determines to change any of the codified values within the specified ranges or values, it will do so by submitting a proposed rule change filing. Exchanges may amend open filings, which is common, and IEX has complied with all applicable filing requirements in doing so. Second, the commenter questioned whether the Commission "reversed" an effort by IEX to withdraw the filing. See id. Exchanges may withdraw open filings or amendments thereto solely at their discretion. IEX filed Amendment No. 3 on June 17 after withdrawing Amendment No. 2 because of a technical page formatting issue. The Commission's website momentarily displayed an incorrect notation of withdrawal (only Amendment No. 2 was withdrawn, not the entire proposal), which was promptly corrected and had no effect on the status of the filing. Finally, the commenter urges the Commission to "not rush to approve" the proposal "without first ensuring that the procedural and substantive requirements of the Exchange Act and Administrative Procedure Act are fully satisfied." Id. at 9. The Commission is acting on IEX's proposal at the end of the 240-day statutory review period after noticing the proposal, instituting proceedings,

Continued

USCA11 Case: 25-13631    Document: 27    Date Filed: 12/19/2025    Page: 186 of 205 **A150**

As detailed above, most of IEX Options' proposed rules are substantially similar or substantively identical to those of other exchanges and do not raise any novel issues.

The proposed ORP, together with the access delay that effectuates it, are novel for an options exchange and were the focus of commenters. However, as discussed below, an access delay paired with a mechanism to cancel or reprice orders is not novel for trading on an exchange in general as IEX already operates its equities market with the exact same access delay and an order type (D-Limit order) that can be repriced or cancelled by the Exchange.

As discussed below, the ORP is a new type of options market maker risk protection designed to protect options market makers from latency arbitrage when they need to update their option quotes following a change in the price of the security underlying the option. Options exchanges commonly offer optional risk mitigation functionality (also called risk controls) that allow market makers and others to have the exchange automatically cancel their quotes and orders when certain triggers specified by the market participant are met.[126] The material differences between existing options risk mitigation functionality and the ORP, discussed further below, are that (1) the ORP can *reprice* a quote whereas existing risk mitigation functionality will only cancel quotes and orders and (2) the ORP is effectuated by a de minimis access delay on all incoming messages and orders to enable the Exchange to operate it during periods where latency arbitrage may be present.

The same reasons the Commission approved the D-Limit order type effectuated by the 350-microsecond access delay for the IEX equities market also apply to the options context for the ORP effectuated by an identical 350-microsecond access delay, as explained below.[127] Those reasons are even more

appropriate in the options context, as discussed below.

*A. Exchange Members*

As described above, only Options Members and their Sponsored Participants will be permitted to transact on the System.[128] The Exchange also proposes rules governing member operations and member conduct, all of which are substantively identical to the rules of other exchanges, including MEMX Options. Those rules include recordkeeping and reporting requirements,[129] discipline,[130] margin requirements,[131] and requirements applicable to doing business with the public.[132]

The rules applicable to qualification, registration, member operations, and use of IEX Options are substantially similar to those of other options exchanges. For the same reasons provided by the Commission in its order approving MEMX Options,[133] the proposed qualification, registration, member operations, and use of IEX Options requirements provide the Exchange with the capacity to carry out the purposes of the Exchange Act and enforce compliance by its members and persons associated with its members with the provisions of the Exchange Act, the rules and regulations thereunder, and the rules of the Exchange, provide that registered broker-dealers can become members and have access to IEX Options, and ensure that Options Members and their associated persons can be appropriately disciplined for violations of the Act, the rules and regulations thereunder, and Exchange rules.[134]

Additionally, for the same reasons provided by the Commission in its order approving the MIAX exchange registration application,[135] the proposed Options Market Maker registration and qualification requirements provide an objective process by which an Options Member could become a Market Maker

on IEX, and provide for continued oversight by the Exchange to monitor for continued compliance by Market Makers with the terms of their application for such status.[136] The proposed registration and qualification requirements are also substantially similar to those of other options exchanges, such as MIAX and NYSE Amex.[137]

The proposed Options Market Maker participation requirements provide that Market Makers receive certain benefits for carrying out their responsibilities.[138] At the same time, the proposed IEX Options Market Maker participation requirements impose affirmative obligations on Market Makers that balance the benefits afforded to such participants.[139] In addition, the continuous quoting obligations for Market Makers are designed to contribute to the maintenance of a fair and orderly market. Further, IEX Options' Market Maker participation requirements are substantially similar to the participation requirements of other exchanges that the Commission has previously approved.[140]

*B. IEX Options Market Structure and Trading Rules*

With the exception of the ORP and the access delay that effectuates it, the functionalities and features of IEX Options are based on the functionalities and features previously approved for other options exchanges and do not raise novel issues. Among other things, IEX's proposed rules provide for a simple, orderly opening process for an exchange that only trades multiply listed options and an orderly re-opening process following the conclusion of a trading halt. Further, the rules provide for the electronic display and execution of orders using a pro-rata allocation model with execution priority dependent on the size and capacity of an order. IEX Options will only utilize the two industry standard order types (Limit orders and Market orders) and will offer a limited suite of order handling instructions that are substantially similar to the rules of other options exchanges, all of which are well-established in both the equities and

noticing Amendment No. 3, and conducting three rounds of comment that attracted many comment letters. The Commission has followed all procedural and substantive requirements and is taking final action as required by the Act. *See also* Letter from John Ramsay, Chief Market Policy Officer, IEX, dated Aug, 20, 2025 (stating that the commenter's procedural arguments ''lack merit'') (''IEX Response II'').

[126] For example, an exchange might cancel quotes based on preexisting instructions from a market maker when a certain number of executions occur against its quotes. *See, e.g.,* Nasdaq Phlx Rule Options 3, section 15(c); MIAX Rule 612; MEMX Rule 21.16; Nasdaq GEMX Rule Options 3, section 15(a)(3).

[127] *See* Securities Exchange Act Release No. 89686 (Aug. 26, 2020), 85 FR 54438 (Sept. 1, 2020) (SR–IEX–2019–15) (''D-Limit Approval Order''). *See also* Citadel Sec. *LLC* v. *SEC*, 45 F.4th 27, 458 U.S.

App. DC 268 (D.C. Cir. 2022), *available at https:// media.cadc.uscourts.gov/opinions/docs/2022/07/ 20-1424-1956972.pdf.*

[128] *See* proposed Rule 18.100(a).

[129] *See* proposed Chapter 25 (Records, Reports and Audits).

[130] *See* proposed Chapter 26 (Discipline and Summary Suspensions).

[131] *See* proposed Chapter 29 (Margin Requirements).

[132] *See* proposed Chapter 27 (Doing Business with the Public).

[133] *See* Securities Exchange Act Release No. 95445 (Aug. 8, 2022), 87 FR 49894, 49902 (Aug. 12, 2022) (approving rules governing MEMX Options) (''MEMX Options Order'').

[134] *See* 15 U.S.C. 78f(b)(1), (b)(2) and (b)(6).

[135] *See* Securities Exchange Act Release No. 68341 (Dec. 3, 2012), 77 FR 73065, 73075 (Dec. 7, 2012).

[136] *See supra* notes 67–70 and 88–90 and accompanying text. *See also* Amendment No. 3, *supra* note 8, at 26867–68.

[137] *See* MIAX Rules 600, 602; NYSE Amex Rule 927.1NY.

[138] *See supra* notes 85–88 and accompanying text. *See also* Amendment No. 3, *supra* note 8, at 26868–69.

[139] *See supra* notes 75–86 and accompanying text.

[140] *See* MIAX Rules 603–604; NYSE Amex Options Rule 927NY. The benefit the ORP conveys to Market Makers is discussed below in section III.B.1.e.

options markets. The rules also provide an optional SUM that would initiate an auction for orders that are not immediately executable on the Exchange.[141] For the same reasons provided by the Commission in its orders approving other similar options exchange rules, the proposed execution priority rules and order types are designed to promote just and equitable principles of trade and are not designed to permit unfair discrimination between customers, issuers, brokers or dealers.[142]

1. Access Delay and the Options Risk Parameter

As it does for equities, IEX will operate IEX Options subject to a physical latency mechanism that applies an access delay of 350 microseconds on all incoming quote and order messages from all Users. IEX explains that the delay is intended to ''support IEX's ability to accurately account for contemporaneous market data'' by providing a de minimis amount of time for ''IEX to obtain the most accurate view of market data prior to executing an order or quote.''[143] Specifically, the delay ''supports operation of the ORP'' by providing ''adequate time for the IEX System to obtain the most accurate view of market data to enable it to accurately price orders as well as to perform the Indicator calculation with current market data.''[144]

The ORP is an optional risk parameter available to Market Makers for their displayed quotes in certain classes. The ORP will identify when the price of an option on specified Away Markets[145] ''is sufficiently dislocated from the price of the underlying security to indicate that the best Protected Bid or best Protected Offer of the Away Markets in the options series is likely in transition.''[146] An options quote would be sufficiently dislocated from the price of its underlying stock if, *e.g.,* the stock price moved by a large enough amount that the price of the option on it is now mispriced or ''stale'' (*i.e.,* not yet updated to reflect the current market price of the underlying security). When the quote instability calculation identifies an unstable quote for a specific options series where a Market Maker is quoting and has the ORP

enabled for its quote, IEX will effectuate the Market Maker's preexisting instructions to either: (1) cancel the quote or (2) reprice the quote to the price level of the quote instability determination.[147] The access delay, which enables the System to perform the Indicator calculation with current market data, supports the ORP. IEX believes that this protection will ''encourage market makers to post aggressively priced and/or deeper quotes on [IEX Options] which will benefit all market participants'' who will have access to that liquidity.[148]

IEX may not offer the ORP in all options classes. Rather, it will determine on a class-by-class basis whether to make the ORP available.[149] Specifically, the Exchange will ''focus its technology resources in an impactful manner'' by offering the ORP in classes where it is likely to ''achieve its intended purpose, while excluding its use where it would likely provide minimal incremental value (for example, for classes with nonstandard characteristics).''[150] Additionally, the ORP is optional. For the ORP to apply, a Market Maker has to designate which quotes will be subject to the ORP.[151] Thus, not all quotes on IEX will be subject to being cancelled or repriced by the ORP as some classes may not be eligible for the ORP and a Market Maker may or may not elect to use the ORP when it is available.

Some commenters oppose the proposed access delay and the ORP for the reasons discussed below while other commenters support the proposal, as also discussed below.[152]

a. Quote Fading Concerns

From the perspective of the liquidity taker, quote fading refers to the lack of ability to execute against a displayed quote. The ability of any market participant to successfully execute against any particular displayed quote is subject to a number of factors and is not guaranteed on any market, as at any time any market participant can be seeking to execute against an order that is being repriced, changed, cancelled, or

executed by a different market participant.[153]

Several commenters expressed concern that the ORP together with the access delay will lead to quote fading that could affect liquidity takers.[154] For example, one commenter expressed concern that the ORP ''will lead to increased quote fading and a less reliable displayed NBBO'' and stated that it ''believe[s] that designating intentionally delayed quotes as protected and requiring market participants to route orders to a delayed exchange whenever that exchange displays the best price—including when such price is stale and no longer accessible, results in inferior executions.''[155] Another commenter characterized quotes subject to the ORP as ''maybe quotations'' that would be ''inaccessible'' and stated that IEX failed to back up with data its assertion that the ORP would be narrowly tailored.[156] Similarly, one commenter stated that the proposal could result in order routers experiencing more cancels and lower fill rates because ''firms will be forced to route to IEX as if it were a typical firm quote to avoid trade-through and best execution violations.''[157] The commenter distinguished the ORP from other options risk protection mechanisms, stating that ''ORP is designed to protect the IEX market maker from market movements by not requiring the market maker to be firm. . . .''[158]

[141] *See supra* notes 60–62 and accompanying text.

[142] *See* Securities Exchange Act Release No. 100539 (July 15, 2024), 89 FR 58848, 58859–60 (July 19, 2024) (registration of MIAX Sapphire) and MEMX Options Order, *supra* note 133, at 49902–03.

[143] Amendment No. 3, *supra* note 8, at 26885.

[144] *Id.* at 26886.

[145] *See* proposed Rule 22.160(a)(8).

[146] Amendment No. 3, *supra* note 8, at 26879.

[147] *See* proposed Rule 23.150(h)(1)(C).

[148] Amendment No. 3, *supra* note 8, at 26885.

[149] *See* proposed Rule 23.150(h)(1). The Exchange will communicate its determination by Trading Alert. *See id.* Other exchanges also make certain determinations pursuant to their rules on a class-by-class basis. *See, e.g.,* Cboe Chapter 1, section B, Rule 1.5 (Exchange Determinations) and Cboe Rule 5.32(a) (concerning determining base allocation algorithms and overlays on a class-by-class basis).

[150] Amendment No. 3, *supra* note 8, at 26889.

[151] *See id.* at 26880–81. *See also* proposed Rule 23.150(h).

[152] *See infra* sections III.B.1.a–i.

[153] *See* D-Limit Approval Order, *supra* note 127, at 54445.

[154] *See* Letter from Joanna Mallers, Secretary, FIA Principal Traders Group, dated Feb. 26, 2025 (''FIA PTG Letter''), at 1–2; Letter from Adrian Griffiths, Head of Market Structure, MEMX LLC, dated May 14, 2025 (''MEMX Letter''), at 1, 2–3, 5, 6; Letter from Angela Dunn, Principal Associate General Counsel, Nasdaq, dated May 20, 2025 (''Nasdaq Letter''), at 3, 5. *See also* D-Limit Approval Order, *supra* note 127, at 54445–47 (discussing quote fading and phantom liquidity, which refers to the ability of the liquidity taker to successfully execute against any particular displayed quote without the liquidity provider ''fading'' (*i.e.,* cancelling or repricing to a worse price) the quote).

[155] FIA PTG Letter at 1–2. The commenter mentioned its previously stated opposition to IEX's equities access delay. The commenter pointed out that, unlike equities, standardized listed options must execute on an exchange.

[156] MEMX Letter at 1, 2–3, 5, 6. *See infra* section III.B.1.i for a discussion of the data IEX provided in Amendment No. 3.

[157] Nasdaq Letter at 3.

[158] *Id.* at 5. The commenter also stated that the access delay will result in IEX displaying stale quotes. The commenter stated that the access delay ''may result in a less reliable displayed NBBO'' due to ''a delay in transmitting quotation updates to [OPRA]'' and that IEX may thus find itself alone at the NBBO as its ''quotes become stale due to'' the access delay. Nasdaq Letter at 3. However, IEX states in its filing that it ''will not apply [the inbound delay] to other communications between
Continued

Other commenters stated that the ORP and the access delay would not cause quote fading.[159] For example, one commenter stated that the ORP "in no way offers a 'last look' or opportunity for market makers to 'change their mind' about a quote by examining inbound orders in some nefarious way. . . ." but rather "[t]he chance of missing a fill by the blink of an eye has always—and will always—exist."[160] The commenter stated that options risk mitigation functionality offers "irrefutable precedent" for similar mechanisms that "have been in place for about 20 years" where exchange functionality "prevent[s] execution of otherwise-marketable orders that may already be in flight to the exchange, or even already queued up for execution in the exchange matching engine."[161] Another commenter stated that "the concept of absolute quote firmness that opponents invoke simply does not reflect current practice in modern options markets" because "[o]ptions markets are characterized by ubiquitous repricing and canceling, with market makers employing sophisticated risk controls precisely because the alternative—maintaining stale quotes in rapidly moving markets—would be economically ruinous."[162] Another commenter stated that "[o]rders sent to every exchange are always at risk of missing the market due to a cancel that may already be in flight . . . or an order update from another participant with a faster connection . . . or a shorter geographic distance to the relevant exchange data center."[163] One commenter stated that "[t]he markets disseminated by IEX Options will be fully available for end users to trade, with the exception of the few fractions of a second after the underlying changes while market-maker quotes are being cancelled/updated. These few fractions of a second when quotes are displayed

in the NBBO but are unavailable for trading happen regularly on every market, even today."[164] Another commenter, a former US equity options market making firm, stated that "[q]uote availability is already limited by frequent and necessary bulk cancellations as a means of risk control. Market makers regularly cancel entire swaths of quotes in response to volatility or systemic risk."[165] The commenter also stated that, with respect to quote availability, "quote fragmentation, latency asymmetries, and differing exchange protocols contribute to periods of unavailability. These issues are well known to practitioners and are exacerbated during volatile market conditions."[166]

In response to comments, IEX stated that the ORP would not prevent investors from accessing liquidity on IEX Options because the ORP would operate to protect resting orders in microsecond increments that would "add up to a miniscule percentage of the trading day" and since "investors are not attempting to time their orders in the way latency arbitrageurs do, they will be able to access IEX quotes that are subject to the ORP to the same extent as any other exchange quotes."[167] IEX estimated that the ORP would affect quotes less than 0.001% of the trading day, on average,[168] and stated that "because market makers' systems are designed to react as quickly as possible to price changes in underlying stocks, any moments in which their quotes are substantially misaligned from these prices are necessarily extremely ephemeral, *i.e.,* lasting microseconds."[169] According to IEX, the commenters that argued that the ORP would make quotes inaccessible or undermine the integrity of the NBBO lack support for their allegations and repeat similar arguments made when IEX's D-Limit order type was proposed, and ultimately approved by the Commission, for its equities market.[170] IEX also cited as precedent options purge ports that provide an expedited way for market makers to "mass cancel"

their quotes in bulk across classes and series simultaneously as well as options risk mitigation functionality in place at most options exchanges—activity-based risk limits, arbitrage checks, and intrinsic value checks—that allow market makers to direct an exchange to cancel their quotes or reject orders based on various triggers, and that such risk controls "have never been viewed as allowing 'quote fading' by an exchange or the market makers that choose to use them."[171] In contrast to these existing exchange risk controls, IEX stated that the ORP is transparent and predictable as it is triggered by price changes in the underlying securities, while "the circumstances in which other risk limits will be employed may be known only by the market maker and are not transparent to the broader market."[172] IEX further states that it is "providing a very high level of transparency to all aspects of the ORP."[173]

For the same reasons the Commission found that IEX's D-Limit order for equities will not impair access to IEX's quotation, the ORP and the access delay that effectuates it will not impair access to IEX Options' quotation.[174]

Unlike equities, options are derivative securities, which means their quoted price is derived in substantial part from the price of the underlying security or securities upon which they are based.[175] Options quotes are primarily provided by options market makers who are the primary liquidity providers of displayed quotes for options because the large number of quoted options products, compared to equities, makes natural liquidity from other market participants less common across the many series across so many options classes.[176] In those moments when the price of an underlying equity security has changed,

---

the Exchange and Users, Away Markets, data feeds, order processing and order execution on the IEX Options Book, and outbound communications to the Exchange's proprietary data feeds and OPRA." Amendment No. 3, *supra* note 8, at 26886. The purpose of the access delay and ORP is to allow IEX to update or cancel a quote as quickly as possible to protect Market Makers against latency arbitrage to avoid their quotes on IEX becoming stale after the price of the underlying security has moved and the option, by its nature as a derivative security, is expected to follow.

[159] *See* Letter from Steve Crutchfield, Head of Business Development, CTC, LLC, dated June 28, 2025 ("CTC Letter"), at 3–4, 5. *See also* Letter from J.W. Verret, Associate Professor, George Mason University Antonin Scalia Law School, dated June 24, 2025 ("Verret Letter"), at 3.

[160] CTC Letter at 5.

[161] *Id.* at 3–4.

[162] Verret Letter at 3.

[163] CTC Letter at 5.

[164] *See* Letter from James Cosentino, Head of Trading, Chicago, Maven Securities, dated Aug. 14, 2025 ("Maven Letter"), at 3.

[165] *See* Letter from Brian P. Donnelly, Founder, Volant Trading, dated Aug. 8, 2025 ("Volant Letter"), at 2.

[166] *Id.*

[167] *See* Letter from John Ramsay, Chief Market Policy Officer, IEX, dated June 19, 2025 ("IEX Response I"), at 3.

[168] IEX Response I at 20. *See also infra* section III.B.1.i (discussing the data provided in Amendment No. 3).

[169] IEX Response I at 12.

[170] *See id.* at 14. *See also* D-Limit Approval Order, *supra* note 127.

[171] IEX Response I at 10.

[172] *Id.*

[173] *Id.* at 12. IEX provides a summary of how the ORP is narrowly tailored to meet its purpose as well as the data IEX analyzed to further validate that the ORP will be narrowly tailored, which IEX notes is also described in Amendment No. 3. *See id.* at 11–13.

[174] *See* D-Limit Approval Order, *supra* note 127, at 54446–47.

[175] *See, e.g.,* Investor Bulletin: An Introduction to Options, *available at: https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-63;* and Derivatives, *available at: https://www.investor.gov/introduction-investing/investing-basics/glossary/derivatives* (defining "derivatives").

[176] Amendment No. 3, *supra* note 8, at 26880 (noting the affirmative obligations of market makers to provide two-sided options quotes and the "sheer difference in magnitude of tradeable instruments in listed options as compared to equities (approximately 1.5 million listed options series compared to approximately 11,000 listed equity securities)").

a race condition exists between a market maker that needs to update and reprice its option quotes to reflect the changed market price of the underlying security and high-speed liquidity takers that seek the short term opportunity presented by trading against those option quotes before the market maker's quote update can occur.[177] Some liquidity takers that are technologically sophisticated are able to minimize latencies in seeing and reacting to market data through use of low-latency systems and technology, as well as connectivity and proprietary market data purchased from exchanges, may, as a result, be able to react faster to changing market prices than others (including the market maker that posted the quote) that have not purchased those same low-latency systems, connectivity, and data sources, which can be expensive.[178] This scenario is ''latency arbitrage'' and results in economic losses for options market makers when they are unable to update the quoted price of their options derivative securities to correspond to a change in the price of the underlying security because a faster market participant is able to execute against the old ''stale'' price before the market maker can update it.

To help minimize the risk that its option quote may trade immediately following a price change in the underlying equity security before it is able to update its options quote, a market maker may find utility in an exchange risk protection tool that enables it to more efficiently and expeditiously effectuate options quote updates or take down a quote without the delay that results from it having to send in additional separate messages to instruct the exchange to do so. While some market makers may not need or want such exchange-offered risk protections because they have their own cutting-edge systems, connectivity, and data to minimize latencies and model price movements, other market makers that lack those items might benefit from functionality that minimizes latencies in effectuating quote updates. Updating or cancelling options quotes in response to a change in the price of the underlying equity security is part of the price discovery process for options and activity that a market maker is constantly doing as part of its continuous quoting requirement. The access delay and the ORP together speed up that quote update or cancel process by fractions of a millisecond (because

the market maker will not have to send in a separate message to update or cancel its quote) while simultaneously slowing down by those same fractions of a millisecond a market participant attempting to access that quote while the Exchange updates or cancels it.[179] On account of that small delay, after which a quote could be repriced or cancelled, some commenters assert that the ORP will lead to quote fading because a market participant may not be able to successfully execute against the quote it had seen and thus from the market participant's perspective it may appear as if the quote had faded or disappeared.

First, not all classes will be eligible for the ORP and, for those classes that are eligible, some Market Makers may choose not to use it. When it is used, based on the data provided by IEX discussed in detail below, IEX states that the ORP will infrequently result in the cancelling or repricing of a displayed quote on IEX in response to a very targeted and specific pre-defined signal that suggests a high potential for latency arbitrage—considerably less than 1% of regular trading hours.[180] This is because the ORP is narrowly tailored to only take action when there is a sufficient dislocation between the price of the underlying stock and the price of the option. When the ORP is not repricing or cancelling a quote, which is virtually the entire regular trading hours session, an options quote subject to the ORP will be as equally accessible as any other quote or order on IEX Options. For the small part of the day when the ORP does reprice or cancel a quote, market participants that are not engaging in latency arbitrage trading strategies are unlikely to be seeking to trade with the quote precisely when it is in the process of being repriced. As noted by several commenters, investors do not typically trade in microseconds and even sophisticated market makers face challenges when competing with the small number of firms that purchase the necessary systems, connectivity, and exchange proprietary market data to target their trading to those precise periods options quotes are temporarily mispriced.[181]

The ORP attempts to address the latency arbitrage impact on options market makers using a predetermined, transparent, and codified rules-based optional tool.[182] That tool will cancel or update a quote after the underlying security changes price to reflect that price change. By their nature as derivative securities, options prices are derived in substantial part from the price of the security underlying the option, so market participants expect the price of a derivative to be determined in substantial part by the price of the underlying security.[183] In the absence of the ORP, when the underlying security changes price, Market Makers quoting the option will correspondingly update their options quote to maintain that derivative pricing relationship. IEX's ORP, if available and opted into, will allow the options quote update process to take effect more promptly than if the Market Maker had to send in separate messages to effect that change itself. While one commenter stated that for ''the first time, an exchange will adjust prices of a quote in one asset class using inputs from another asset class,'' [184] that fact simply reflects that options are derivative securities whose prices are substantially and directly correlated with the price of their underlying security. Since the ORP is designed to reprice (or cancel) a quote to minimize latency arbitrage, IEX needs to use the security price for an input. The ORP will not offer a ''last look'' to a Market Maker by allowing it to back away from a quote when presented with an incoming order, as one commenter claimed.[185] The Market Maker will have no ability to influence the operation of the ORP (other than to opt into it or not for each quote it submits to IEX) or to choose which incoming orders to execute against (or not execute against), and IEX will effectuate the ORP without exercising subjective judgment or taking into account the interests of the Market Maker. The ORP is designed to avoid stale quotes by updating or cancelling quotes when latency arbitrage conditions are present following a price change in the underlying security and does not offer Market Makers control over who they execute against or when.

As discussed above, the ORP assesses the probability and materiality of an imminent adverse price change to the

---

[177] *See generally* D-Limit Approval Order, *supra* note 127, at 54442 (discussing the race condition between liquidity providers and liquidity takers).

[178] *See id.* at 54449 (discussing latency arbitrage).

[179] The IEX Options access delay will be 350 microseconds. There are 1 million microseconds in a second and 1,000 microseconds in a millisecond.

[180] *See infra* section III.B.1.i (discussing an analysis provided by IEX demonstrating the expected ORP activation frequency).

[181] *See, e.g.,* Letter from Stephen Sikes, CEO of Open to the Public Investing, Inc., dated July 9, 2025; Letter from Kelli McMorrow, Chief Advocacy Officer, American Securities Association, dated July 9, 2025; and Letter from Gregory Bayard, Electronic Options Market Making, HAP Trading LLC, dated June 16, 2025 (''HAP Trading Letter''), at 3.

[182] IEX has encoded the totality of the ORP's operation in its rulebook and any changes to it will require IEX to submit a proposed rule change under section 19(b) of the Act. 15 U.S.C. 78s(b).

[183] *See, e.g.,* CTC Letter at 7 (''It is an undisputed fact that equities market activity is the underlying driver of the entire options market. . . .'').

[184] FIA PTG Letter at 2.

[185] *See* Citadel Letter II at 2.

options quoted NBBO for each individual series using a formula (the ''Indicator''). When the formula generates this ''quote instability'' determination for an options series, it calculates the appropriate price for the options in light of the new price for the underlying security based on the Black-Scholes options pricing model. IEX then looks to see if the Market Maker's quote for that series (when the Market Maker elected to use the ORP) is above (below) that price level. If it is, IEX will either cancel the quote or reprice it to the level of the quote instability determination (as instructed in advance by the Market Maker). Also, as discussed above, the formula contains a few variables that are set by IEX and can be changed only through a proposed rule change filing, including the Quote Instability Threshold and the Delta Bound Band. The Quote Instability Threshold, set within a range of 0% to 100%, will trigger the ORP to reprice or cancel a quote. The initial value is set at 0.1% meaning the ORP will trigger to cancel or reprice a specific quote when the expected change in the options NBB/NBO is 0.01% of the current value of the NBB/NBO (rounded to the nearest minimum price variation).[186] The Delta Bound Band, with a range of 0 to 1, reflects an option's delta, which refers to the sensitivity of the options price to changes in the price of the underlying security with higher values indicating greater sensitivity.[187] The Exchange has no discretion to determine whether it will cancel or reprice a quote subject to the ORP, as the entire process is governed by the formula and methodology contained in the rulebook which is fully transparent to the public and can only be changed through a proposed rule change filing. Because the formula is codified in IEX's rulebook, it is fully transparent and commenters had the opportunity to review IEX's material and critique it and submit their own analysis.

In general, market participants have no guarantee that they will be successful in trading with a quote they see because intervening factors are always present, such as another broker-dealer being faster to access the quote or the market maker that posted it may already have cancelled or repriced it.[188] The fastest

market participants with the most latency sensitive systems, connectivity, and data needed to achieve the necessary speed to act upon the information asymmetries that underlie latency arbitrage have the advantage in that speed race, and may be accustomed to higher fill rates as a result, but those items may be prohibitively expensive for many market participants and even with those items the race still is a winner-take-all scenario where the absolute fastest takes the quote. By slightly increasing the speed at which market makers are able to update their quotes when the underlying security changes price, the ORP will accelerate the quote update process and therein will facilitate competition between market makers by allowing maker makers with less access to the most latency-sensitive technology to provide more liquidity at competitive prices alongside those market makers that have such access.

If such functionality is successful and results in IEX attracting more market makers to quote on its platform, then that additional liquidity, at potentially better prices if a market maker decides to quote more aggressively given the protection against latency arbitrage the ORP provides, will be available to all investors including those whose investment decisions are not informed by sub-millisecond dislocations in the price of a derivative security. Even when the ORP results in a quote being cancelled, which commonly occurs with exchange risk mitigation functionality and purge ports as discussed above, because market makers are subject to an obligation to provide continuous quotes, the ORP should not result in less liquidity because market makers will promptly reenter quotes at the updated prices.[189] In this way, exchange-provided functionality that carries out a market maker's instructions to cancel or reprice an options quote in specific conditions, where such functionality is objective, transparent, narrowly tailored, and not overbroad in its application as proposed here, can have a beneficial effect on the options market by attracting more market makers to make markets. The result should be an increase in displayed liquidity at competitive prices, which facilitates fair competition and economically efficient executions for investors.[190] Similar to IEX's D-Limit order, the ORP will result

in the repricing or cancelling of a quote so infrequently (i.e., considerably less than 1% of regular trading hours as discussed above) ''that only a small number of market participants are capable of detecting and acting upon'' those conditions that trigger it such that the ORP will ''not result in needless missed executions for most traders, though it will make it more difficult for a few latency arbitrage traders to profit by taking advantage of idiosyncrasies in market structure to trade with stale-price displayed quotes on IEX.''[191]

As was the case for D-Limit, IEX's proposal identifies a legitimate disadvantage in latency arbitrage faced by market makers that may lack the expensive low-latency systems, connectivity, and data sources used by those engaged in such strategies. The existence of this problem is uncontroverted and supported by the several options market makers that submitted comment letters saying how latency arbitrage is a problem that negatively affects them and how IEX's proposal addresses the problem in a manner that could result in them becoming Options Market Makers on IEX and adding new liquidity to the market.[192] Given how narrowly tailored the ORP is in addressing latency arbitrage and how infrequently it activates, it will not result in the average market participant being unduly frustrated when trying to take liquidity on IEX Options and thus will not contribute to inaccessible quotes or a less reliable NBBO if IEX is at the NBB or NBO or result in inferior executions for traders not engaged in latency arbitrage; however, as discussed above, it will by design affect speed traders engaging in latency arbitrage.[193] By protecting Market Makers in this narrowly tailored way, IEX may attract additional liquidity, including from new market makers, which will promote more displayed liquidity that will be available to all market participants. The ORP and the access delay are a competitive response from IEX to mitigate competitive imbalances between liquidity providers and latency arbitrage liquidity takers in the same manner as IEX's D-Limit proposal, which is designed to encourage

---

[186] See Supplementary Material .04(2)(e) to proposed Rule 23.150(h).

[187] See Supplementary Material .04(1)(q) to proposed Rule 23.150(h).

[188] See, e.g., D-Limit Approval Order, supra note 127, at 54445 (''The ability of any market participant to successfully execute against any particular displayed quote is subject to a number of factors and is not guaranteed on any market, as at any time any market participant can be seeking to

execute against an order that is being repriced, changed, cancelled, or executed by a different market participant.'').

[189] See, e.g., proposed Rule 23.150(e) (concerning continuous quote obligations of Market Makers).

[190] See 15 U.S.C 78k–1. See also, e.g., D-Limit Approval Order, supra note 127, at 54443.

[191] D-Limit Approval Order, supra note 127, at 54444. See also infra section III.B.1.i (discussing an analysis provided by IEX demonstrating the expected ORP activation frequency).

[192] See, e.g., HAP Trading Letter; CTC Letter. See also Letter from Benjamin Schiffrin, Director of Securities Policy, Better Markets, Inc., dated July 18, 2025 (''Better Markets Letter''), at 2 (citing to studies that estimate the profit potential from latency arbitrage and the cost of it to investors).

[193] See, e.g., D-Limit Approval Order, supra note 127, at 54447.

liquidity provision to the benefit of investors.[194] Accordingly, the ORP and the access delay that effectuates it are designed to promote just and equitable principles of trade, to remove impediments to and perfect the mechanism of a free and open market and a national market system and, in general, to protect investors and the public interest.

Further, while other exchanges' options risk protection mechanisms cancel quotes when triggered, IEX's ORP allows a Market Maker to either cancel or reprice the quote. While this is a difference for a risk protection mechanism, a repriced quote keeps that liquidity continuously available to the market (albeit at the new price) whereas a cancelled quote removes that liquidity from the market temporarily pending the market maker resubmitting a quote to comply with its continuous quote obligations. Market participants seeking to trade with a quote that is repriced by the ORP (instead of cancelled) can still get a fill using a market order or an aggressively priced limit order instead of missing an execution or being routed away if that liquidity was entirely cancelled. Given how infrequently the ORP will likely affect a quote, the ability to reprice in addition to cancelling should not detract from fair and orderly markets by making IEX's quote inaccessible or non-firm. As discussed above, long-standing options risk protection functionality and purge port functionality, which are non-transparent in their settings and customized by each firm compared to the transparent and fixed-formula ORP, have never been viewed as allowing quote fading nor have they been viewed as making quotes that can be cancelled non-firm.[195] Rather, they have been considered as tools to enable market makers to better manage risk in support of their ability to provide continuous quotes. In addition, some existing order types on exchanges, including IEX's market maker peg order for equities, involve an exchange continually updating quotes for market makers based on an offset to a reference price, and those have also not been viewed as allowing quote fading or making quotes non-firm.[196]

Accordingly, the ability of the ORP to reprice a quote is designed to promote just and equitable principles of trade, to remove impediments to and perfect the mechanism of a free and open market and a national market system and, in general, to protect investors and the public interest.

b. Protected Quote Status

Several commenters opposed treating IEX Options' quotes as protected under the Options Order Protection and Locked/Crossed Market Plan [197] because of the access delay that IEX will impose on all incoming messages.[198] One commenter stated that "designating intentionally delayed quotes as protected and requiring market participants to route orders to a delayed exchange whenever that exchange displays the best price—including when such price is stale and no longer accessible, results in inferior

_____

Existing risk controls can enable them to quote at tighter spreads or in greater size than if those controls did not exist. If the ORP reduces costs from latency arbitrage that other controls do not address, those reduced costs can also affect the instruments market makers quote in and how they set their quotes." IEX Response II at 8.

[197] In the options markets, under the Options Order Protection and Locked/Crossed Market Plan, a protected quotation is a bid or offer in an options series that (a) is displayed by an exchange that is a participant of the OCC and a party to the OPRA Plan (or a participant in another plan that provides for comparable Trade-Through and Locked and Crossed Market protection) ("Eligible Exchange"); (b) is disseminated pursuant to the OPRA Plan, and (c) is the best bid or best offer, respectively, of an Eligible Exchange. *See* Options Order Protection and Locked/Crossed Market Plan, *available at: https://www.theocc.com/getmedia/7fc629d9-4e54-4b99-9f11-c0e4db1a2266/options_order_protection_plan.pdf,* at section 2 (defining "Protected Quotation" and " 'Protected Bid' or 'Protected Offer' ").

[198] *See, e.g.,* Letter from Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities, dated June 23, 2025 ("Citadel Letter I") at 7–8. *See also* Options Order Protection and Locked/Crossed Market Plan, *supra* note 197. Among other things, section 5 (Order Protection) of that Plan requires exchange participant members to "establish, maintain and enforce written policies and procedures that are reasonably designed to prevent Trade-Throughs in that Participant's market in Eligible Options Classes that do not fall within an exception . . ." *Id.* at section 5. The Plan defines Trade-Through as "a transaction in an options series, either as principal or agent, at a price that is lower than a Protected Bid or higher than a Protected Offer" where Protected Bid/Offer is defined as a bid or offer displayed and disseminated by OPRA that is the best bid/offer of an exchange. *See id.* at section 2(21) and (17). The commenter stated that "it is notable that asymmetric intentional delays proposed by equities exchanges have not been granted order protection" and cited to one proposal from the Cboe EDGA exchange. Citadel Letter II at 2. That proposal, which differed substantially from what IEX proposes herein and involved a 4-millisecond access delay, was distinguished by the Commission as not raising the same issues as IEX's access delay. *See* D-Limit Approval Order, *supra* note 127, at 54449–50.

executions." [199] Another commenter stated that this requirement could require market participants to route orders to IEX "even if a market participant believes they would achieve better execution on another exchange" and suggested that "IEX may often display quotes which set the NBBO but are routinely inaccessible, compelling all other market participants to chase fleeting liquidity." [200] One commenter stated that market participants will be "effectively required to route orders to exchanges with artificial delays even if it is to their detriment." [201]

Commenters that supported treating IEX Options quotes as protected pointed out that options exchanges already protect quotes that can be automatically and expeditiously cancelled by an exchange due to non-transparent activity-based risk mitigation protections and bulk quote cancel functionality, none of which are related to any observable change in the underlying security price.[202] One commenter explained that "options markets are full of risk tools exchanges use to automatically cancel [quotes]" but that IEX's ORP is "more narrowly drawn than other risk tools to focus specifically on risks from latency arbitrage." [203] Another commenter contrasted the ORP with existing risk mitigation functionality by explaining that the ORP is "transparent, predictable, and designed to address the specific problem of latency arbitrage." [204]

In response, IEX stated that "the argument that a quote cannot be considered protected if it is subject to any intentional delay, regardless of the length of the delay or its purpose or effect, should be put to bed" because "[t]he Commission has rejected that argument twice" including in an order that was upheld by the United States Court of Appeals for the District of Columbia Circuit.[205] IEX also explained that "the debate on whether minimally-delayed equities quotes can be protected arose entirely because of specific

_____

[199] FIA PTG Letter at 2.

[200] *See* Letter from John L. Thornton, Co-Chair, Hal S. Scott, President, and R. Glenn Hubbard, Co-Chair, Committee on Capital Markets Regulation, dated July 8, 2025 ("Committee on Capital Markets Letter"), at 2–3.

[201] *See* Letter from Adam Nunes, Head of Risk, Hudson River Trading LLC, dated Aug. 8, 2025, at 2.

[202] *See, e.g.,* HAP Trading Letter at 2; CTC Letter at 4.

[203] *See* Letter from Daniel Schlaepfer, President, and Mario Josipovic, Vice President, Regulatory Affairs and General Counsel, Select Vantage, dated July 8, 2025 ("Select Vantage Letter"), at 2.

[204] Verret Letter at 4.

[205] IEX Response I at 19.

_____

[194] *See id.* at 54451.

[195] *See infra* note 259 and accompanying text.

[196] *See, e.g.,* IEX Rule 11.190(b)(17) and Nasdaq Equity 4 section 4702(b)(7)(A). One commenter stated that "[i]f IEX's mechanism was truly the same as longstanding risk controls on other exchanges, then there would be no reason that IEX market makers would be able to provide 'tighter and deeper quotes' on IEX versus other exchanges." Citadel Letter II at 6. The Exchange responded by stating "[m]arket makers set their quotes based on competitive pressures and the need to compensate for the various risks involved in their business.

language in the definition of ''automated quotation'' under Regulation NMS, which is not used in the options definition of protected quotation under the Options Order Protection and Locked/Crossed Market Plan.''[206]

The concept of an ''automated'' quotation that can be executed ''immediately and automatically'' in a manner that ''precludes any . . . type of intentional device that would delay the action taken with respect to a quotation'' is part of Regulation NMS that applies only to equities.[207] The Options Order Protection and Locked/Crossed Market Plan does not contain any concept of an ''automated'' quotation or contain any provision that addresses delays in actions taken with respect to quotations. In 2016, the Commission addressed the interpretation of the word ''immediate'' in the context of Regulation NMS as ''not precluding a de minimis intentional delay—*i.e.,* a delay so short as to not frustrate the purposes of Rule 611 by impairing fair and efficient access to an exchange's quotations.''[208] While that interpretation does not apply by its terms to options because the options plan does not contain the automated quotation concept, the remaining provisions in the Options Order Protection and Locked/Crossed Market Plan are substantially similar to the remaining provisions in Regulation NMS such that the Commission's interpretation also is relevant for options. As was the case for IEX's equities market, where the Commission previously determined that IEX can maintain a protected quotation when it

approved IEX's exchange registration, the ORP and the access delay that effectuates it are a response to the specific problem of latency arbitrage and are designed to address that problem in a very narrowly tailored manner that promotes competition among market makers to the benefit of all investors without impeding fair and efficient access to quotes as the potential for the ORP to affect an investor is remote.[209] IEX proposes to apply to its new options trading facility an access delay based on a speed bump that is identical to what it uses for its equities facility. Accordingly, IEX can maintain a ''protected quotation'' as defined by the Options Order Protection and Locked/Crossed Market Plan even if IEX's quote contains an individual quote that is subject to the ORP because IEX's best bid or best offer will meet the three conditions of the term ''protected quotation'' by (1) IEX (a participant of the OCC and a party to the OPRA Plan) displaying the quote, (2) IEX disseminating it pursuant to the OPRA Plan, and (3) being the best bid or best offer of IEX. Accordingly, IEX Option's quote will not be considered non-firm under the Plan.

### c. Options Markets Are Different

A few commenters stated that, while the Commission has previously approved an access delay coupled with an order type that allows an exchange to cancel or reprice orders, options markets are different from equities markets such that the Commission should disapprove IEX's similar proposal for options.[210] For example, one commenter stated that ''unlike the US equities market, all [options] orders must be executed on exchange'' and that ''the combination of far more options quotations (given the number of unique series) and far more repricing opportunities (given that IEX's quote fading mechanism is based on price movements in the underlying security)

means that overall quote fading may be far more damaging compared to equities if this type of mechanism were implemented. . . .''[211]

Other commenters stated that the benefits of an access delay coupled with functionality that allows an exchange to cancel or reprice orders is even more appropriate for options given the differences between equities and options market structure. For example, one commenter stated that ''[t]he characteristics that distinguish options markets from equities markets make them particularly vulnerable to the latency arbitrage that IEX's protections address.''[212] In particular, the ''complete reliance on exchange-based trading means that options markets cannot benefit from the off-exchange mechanisms that provide some latency arbitrage protection in equities markets'' as the options market structure ''creates a more rigid environment where latency arbitrageurs can systematically exploit temporary pricing dislocations without the competitive pressure that off-exchange venues provide in equities.''[213] The commenter stated that ''[t]he relationship between options prices and underlying securities creates additional vulnerabilities that do not exist in single-asset markets'' because ''Market Makers must continuously update quotes across hundreds or thousands of series as underlying stock prices change, creating numerous opportunities for latency arbitrageurs to exploit temporary pricing misalignments'' where ''[a] single movement in an underlying stock can trigger arbitrage opportunities across multiple strikes and expirations, multiplying the potential for systematic adverse selection.''[214]

An options market maker commenter stated that regulatory continuous quoting obligations across many series for each options class exposes market makers to a risk of significant loss due to instantaneous adverse selection across those many quotes, which results from professional high-frequency trading firms with systems that are ''faster than a market maker's by tiny, otherwise insignificant fractions of a second'' that ''can be a significant source of such adverse selection'' for market maker quotes.[215] The commenter described this as a technological ''arms race'' between professional traders and market makers where the ''[i]ncreased risk of instantaneous adverse selection,

[206] *Id.*

[207] *See* Securities Exchange Act Release No. 51808 (June 9, 2005) 70 FR 37496, 37534 (June 29, 2005) (''Regulation NMS Adopting Release''). The smallest time increment for distinguishing between manual and automated quotations suggested by commenters at the time Regulation NMS was adopted was 250 milliseconds. *See id.* at 37518. The Commission also discussed the distinction between ''automated quotations'' and ''manual quotations'' where ''[t]he difference in speed between automated and manual markets often is the difference between a 1-second response and a 15-second response. . . .'' *See id.* at 37500 n.21.

[208] *See* Securities Exchange Act Release No. 78102 (June 17, 2016), 81 FR 40785, 40786 (June 23, 2016). Commission staff guidance stated that ''delays of less than a millisecond are at a *de minimis* level that would not impair fair and efficient access to a quotation.'' Staff Guidance on Automated Quotations under Regulation NMS, *available at: https://www.sec.gov/rules-regulations/staff-guidance/trading-markets-frequently-asked-questions-2.* The Commission staff guidance represent the views of the staff of the Division of Trading and Markets. It is not a rule, regulation, or statement of the Commission. The Commission has neither approved nor disapproved its content. This staff statement, like all staff statements, has no legal force or effect: it does not alter or amend applicable law, and it creates no new or additional obligations for any person.

[209] *See* Securities Exchange Act Release No. 78102, (June 17, 2016), 81 FR 40785, 41162 (June 23, 2016) (File No. S7–03–16). *See also* IEX Response I at 20 (''. . . based on the estimate that the ORP would affect quotes less than 0.001% of the day on average, the chance that a retail order would by chance arrive while a quote has been affected by the ORP is *less than 1 in 100,000.*'') (emphasis in original).

[210] *See, e.g.,* Letter from Joseph Corcoran, Managing Director and Associate General Counsel, and Gerald O'Hara, Vice President and Assistant General Counsel, The Securities Industry and Financial Markets Association, dated June 30, 2025 (''SIFMA Letter''); Letter from Andrew Stevens, Global General Counsel, IMC, Jeff Starr, Managing Director, Head of Operations, Charles Schwab & Co., Inc., and Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities, dated June 4, 2025 (''IMC Schwab Citadel Letter'').

[211] IMC Schwab Citadel Letter at 3.

[212] Verret Letter at 10.

[213] *Id.*

[214] *Id.*

[215] CTC Letter at 2.

and the increased infrastructure cost necessary to mitigate that risk, is therefore a direct cause of market makers' quoting wider spreads and/or smaller size in order to generate sufficient risk-adjusted returns—thereby increasing costs for investors.'' [216] The commenter stated that ''[t]hese technology expenditures by all parties serve only to protect professional market participants from one another (and, perhaps, to generate a profit for purveyors of market data and trading infrastructure), and do not fill any expressed need for additional speed on the part of end users.'' [217]

Responding to comments, IEX stated that the latency arbitrage problem ''is even more acute in options markets than in equities because the structure of the options markets means that market makers are even less able to protect themselves.'' [218] The Exchange stated that ''the fact that standardized options must be traded on exchanges reinforces the point that in options, market makers have even more significant need for protection from latency arbitrage strategies because they cannot avoid them through other venues whose design limits the effectiveness of such strategies.'' [219] As a consequence, IEX stated that ''competition in options markets has declined.'' [220] Specifically, IEX stated that the ''burden on liquidity provision has contributed to a sharp decrease over time in the number of competing market makers'' (noting the recent exit of Morgan Stanley from the options market making business) which has reduced competition and ''contributed to a decrease in displayed liquidity per instrument, while market maker spreads have nearly doubled in the past decade.'' [221] Further, ''as the number of instruments has also nearly doubled alongside a sharp decrease in the number of market makers, risks to the supply of liquidity in the options markets have grown.'' [222]

In prior orders, the Commission acknowledged the risks and costs presented by latency arbitrage and the disincentive it imposes on some liquidity providers. [223] This problem is especially acute for options compared to equities given the far greater number of

quoted options securities and the critical role that options market makers play in providing that liquidity on multiple exchanges across a vast number of related instruments. The differences between equities and options (*i.e.,* for options, the substantially greater number of securities listed, the lack of an over-the-counter market, and the derivative nature of an option that requires expeditious repricing when the underlying security changes price) means the risks and costs presented by latency arbitrage and the corresponding disincentive those risks and costs impose on some liquidity providers may be greater for options than for equities. Accordingly, the protections from latency arbitrage offered by IEX Options will be appropriate and impactful for those affected market makers to the extent they can help reduce the risks and costs that the Market Makers experience from latency arbitrage. Further, the narrowly tailored character of the ORP, which is expected to impact quotes less than 1% of regular trading hours, [224] shows how the proposal will not be over broad in its application but rather will offer protection against latency arbitrage to Options Market Makers providing liquidity without being disruptive to investors seeking that liquidity, which is supported by several commenters that represent options market makers as well as institutions that trade on behalf of investors. The ORP should incentivize more Market Makers to become Options Market Makers on IEX thus adding those quotes to the national market system, including those market makers (and some commenters on the proposal) that may previously have been unable or unwilling to spend the considerable amount of money needed to invest in the technology necessary to conduct operations within microseconds-level timeframes that are imperceptible to many market participants.

d. Impact on Price Improvement Auctions

A few commenters expressed concern that the ORP could harm investors by disrupting the ability to initiate auctions on other exchanges. For example, one commenter stated that ''[r]etail investor orders typically receive price improvement above and beyond the market-wide best price through 'price improvement auctions' '' that require a market participant to initiate the auction

at the NBBO or better. [225] The problem the commenter identified is that ''to the extent the market-wide best price is set by a Market Maker on IEX (and is a better price because of the quote fading mechanism available to the Market Maker on IEX), liquidity providers on other exchanges will be less likely to be willing (or able) to provide retail investors with additional price improvement (as the market-wide best price is already artificially aggressive). . . [a]nd yet the IEX price may not actually be accessible in practice.'' [226] Similarly, another commenter stated that the proposal has ''the potential to prevent intra-day price improvement auctions on other option exchanges as well as other intraday auctions from commencing due to a better displayed quote on IEX that may not be accessible once an order is routed to IEX.'' [227]

Other commenters stated that ORP would not impact retail investors. [228] For example, one commenter stated that ''[r]etail investors simply do not trade within the microsecond timeframes during which IEX's protections operate.'' [229] Another commenter stated that ''this argument seems to be that a tighter NBBO on one exchange would be problematic because it means market makers will have to display better prices elsewhere too,'' which the commenter stated ''is similar to claiming that a company should refrain from introducing innovative features to its products because doing so would increase competitive pressure on its rivals.'' [230] A large number of individual commenters stated that certain broker-dealers (including those who commented in opposition to IEX's proposal) do not necessarily represent their interests especially when they give or accept payment for order flow. [231] Additionally, one commenter stated that the proposal would benefit retail investors because it would protect them from high-frequency traders who act on information faster than retail investors and profit at their expense. [232] The commenter stated that the proposal would prevent a ''wealth transfer from retail investors to high-frequency traders by reducing latency arbitrage'' so that

[216] *Id.*

[217] *Id.*

[218] IEX Response I at 3.

[219] *Id.* at 21–22. Accordingly, the Exchange stated that ''exchanges must be allowed to provide market makers a way to defend against latency arbitrage.'' *Id.*

[220] *Id.*

[221] *Id.* at 5–6.

[222] *Id.* at 6.

[223] *See, e.g.,* D-Limit Approval Order, *supra* note 127, at 54442–43, 54449.

[224] *See infra* note 322 and accompanying text. *See generally* section III.B.1.i for a discussion of the expected frequency at which ORP will be triggered.

[225] IMC Schwab Citadel Letter at 2.

[226] *Id.*

[227] Nasdaq Letter at 6.

[228] *See, e.g.,* Verret Letter at 3; CTC Letter at 9; Letters Type B.

[229] Verret Letter at 3.

[230] CTC Letter at 9.

[231] *See, e.g.,* Letters Type A; Letters Type B; Letter from Kevin S., Norwegian retail investor; Letter from ''Bodysurf'' Dan Ault; Letter from Edward Neill.

[232] *See* Better Markets Letter at 1.

''retail investors are not left behind as high-frequency traders prosper.'' [233] Several pension plans and institutional investors similarly stated that IEX's proposal ''will result in fairer and more efficient options markets by reducing barriers to entry and encouraging price competition,'' which will ''directly benefit[ ] investors. . . .'' [234]

In response, IEX stated that ''the chance that a retail order would by chance arrive while a quote has been affected by the ORP is *less than 1 in 100,000*'' and so ''[t]he assertion that retail price improvement auctions will be 'disrupted' rests on the premise that any better-priced IEX quote will not be accessible'' but ''IEX quotes will be as fully accessible to retail orders as any better priced quotes appearing on any other exchange.'' [235] IEX further stated that ''[a] retail investor stands to benefit from the availability of the ORP in one of two ways: the investor's order can benefit if her order executes directly against the better priced IEX quote; or, the investor will benefit if the better-priced quote creates a better starting reference price for the auction.'' [236]

The ORP is designed to protect investors and will not materially disrupt price improvement auctions. The ORP will make it more difficult for latency sensitive professional traders to trade against Market Maker quotes during the less-than-1% of the regular trading day when the ORP may reprice or cancel those quotes.[237] However, other than the

1 in 100,000 chance that a retail order would arrive while a quote has been affected by the ORP, a quote displayed on IEX Options will still be accessible to market participants, including to retail traders whose trading decisions typically are not informed or effected on a microsecond timescale smaller than the technological, geographic, and OPRA latencies that they encounter.[238] To the extent IEX Options' quote is alone at the NBBO, investors will have access to that better price and will benefit either by being able to trade with it or by having their order auctioned on another exchange at that price (or better).

e. Unfair Advantage for Market Makers

Some commenters stated that IEX proposes to convey a significant benefit to its Market Makers through the ORP without requiring any new obligations in return.[239] One commenter explained that market makers, the only options exchange members that can quote, are subject to rigorous quoting obligations on options exchanges, and in return are rewarded by exchanges with enhanced allocations and more favorable pricing compared to other non-customer market participants who are not subject to such obligations.[240] The commenter stated that IEX's ORP would protect IEX Market Makers while not requiring them to provide firm quotes,[241] and that ''[r]ewarding IEX market makers with enhanced allocations for stale quotes does not align with the risk/reward models in place at other options markets.'' [242] The commenter stated that ''counting quotes toward market maker obligations where the quotes become

stale due to the [access delay], or were marketable and cancelled due to the ORP, does not meet the intent of the quoting obligations.'' [243] Other commenters stated that the proposal could favor IEX Market Makers at the expense of other market participants.[244] One commenter suggested that, when cancelling or repricing a quote, the ORP ''is explicitly designed to maintain queue priority'' unlike ''purge ports'' where a market maker ''completely loses queue priority'' when it cancels its quotes.[245]

Three options market maker commenters stated that the ORP will allow a larger universe of market makers to participate on IEX and provide liquidity on the basis of price competitiveness rather than speed.[246] One such commenter stated that, ''[b]y reducing the advantage of speed, it broadens access to a wider range of liquidity providers, resulting in deeper markets and tighter spreads'' and ''[c]rucially, it enables new market maker entrants like ourselves to participate on the basis of price competitiveness rather than speed alone.'' [247] Another market maker commenter stated that options exchanges ''continue to be characterized by a race for speed as desired by the largest market participants to increase their internalization, reduce existing competition, and prevent new entrants.'' [248] The commenter stated that it ''has firsthand experience with this market evolution and our firm's ability to improve markets and stay on the

---

[233] *Id.* at 2, 3.

[234] *See* Joint Letter from Jaime Llano (Techer Retirement System of Texas), Sam Masoudi (Wyoming Retirement System), Zachary Paris (Janus Henderson Investors), Michael C. Viteri (Arizona State Retirement System), Anthony W. Godonis (Copeland Capital Management, LLC), Adam Conn (Baillie Gifford Overseas LTD), Myrian Deslandes (La Caisse), and Kevin Duggan (Ontario Teachers' Pension Plan), dated Sept. 3, 2025, at 2.

[235] IEX Response I at 20 (emphasis in original).

[236] *Id.*

[237] One commenter stated that ''[a]lthough the aggregate total amount of time when the ORP would trigger in a single options series may be de minimis compared with the entire trading day, the number of quotes cancelled and the number of resulting missed contract fills during these windows could still be meaningful depending on when the cancellations occur (*e.g.,* if the windows happen at the open or close, when volumes are typically higher, or during periods of high volatility when the ORP likely would trigger more frequently).'' SIFMA Letter at 2. IEX presented data in Amendment No. 3 from an analysis of several days of trading in February 2025. Based on this data, and using aggressive assumptions, IEX ''estimates that the ORP would impact IEX Market Maker quotes on average per series significantly less than 0.001% of the trading day during regular trading hours.'' *See infra* section III.B.1.i for a discussion of this data and the expected frequency at which ORP will be triggered. While the ORP will infrequently cause quotes to cancel or reprice, when it does do so it will be on account of it detecting latency arbitrage conditions. The key feature of the ORP is to protect

Market Makers from latency arbitrage when quotes are being repriced. Accordingly, the ORP will result in quotes being cancelled and fills being missed because that is the objective of the ORP—to *not* fill at stale prices orders from latency arbitragers. The impact on retail and institutional investors that are not engaged in latency arbitrage would be expected to be materially different than the impact on professional traders that are engaged in latency arbitrage, as shown by IEX in a table showing quote-targeting fill rate by firm type for its equities market. IEX estimates that institutional brokers experience fill rates around 90% (with some around 99%) while proprietary trading firms experience fill rates around 35%, a difference that could be explained by the likelihood—in terms of time—of the firm attempting to take liquidity during latency arbitrage conditions. *See* IEX Response I at A–3.

[238] *See, e.g.,* HAP Trading Letter at 1; CTC Letter at 5 (stating that ''the OPRA NBBO is *already* stale by more than 350 microseconds'') (emphasis in original).

[239] *See* Nasdaq Letter at 4; Citadel Letter I at 9–10. *See also* SIFMA Letter at 2–3.

[240] *See* Nasdaq Letter at 4. *See also id.* at 5, nn.19–21 (describing the market maker obligations of the Nasdaq affiliate exchanges).

[241] *See* Nasdaq Letter at 5. *See also supra* note 157 and accompanying text.

[242] Nasdaq Letter at 4.

[243] *Id.*

[244] *See* SIFMA Letter at 2–3; Citadel Letter I at 9–10 (stating that the proposal would promote unfair discrimination by providing an unfair advantage for IEX Market Makers over other market participants).

[245] Citadel Letter II at 6. The Exchange stated that the commenter is ''wrong on the facts'' because ''[i]f an IEX quote using the ORP is repriced, it will be assigned a new timestamp and will have no advantage over other orders that are already resting at the new price. In addition, because IEX is proposing to operate as a 'pro rata' market, a feature that is clearly disclosed in the [proposal], quotes for a given series at a single price level do not gain priority solely based on the time they arrive. . . .'' IEX Response II at 7.

[246] *See, e.g.,* HAP Trading Letter; CTC Letter; Letter from Mathieu Boivin Carrier, Director, All Options USA LLC, dated June 12, 2025 (''All Options Letter''), at 1. Another options market maker commenter stated that ''protecting passive liquidity is essential to supporting fair and orderly markets. Doing so has the potential to both greatly reduce the 'technology tax' imposed by the presence of latency arbitrage, as well as improve the overall quality of the markets.'' Maven Letter at 2.

[247] All Options Letter at 1. The commenter further stated ''[o]ur competitive edge lies in pricing proficiency, and we are committed to delivering the best possible prices to end-investors'' and that ''[w]e believe this approach benefits the broader market, unlike the speed race, which increases the cost of liquidity and reduces competition.'' *Id.*

[248] HAP Trading Letter at 3.

inside of the market have been reduced significantly over the last decade.'' [249] The commenter further stated that ''IEX is proposing a new model which seeks to cap the technical costs of speed and encourage new market-making participants to compete on price and size rather than speed,'' which ''would cause us to reinvest in our competitive quoting efforts, set more new NBBOs, and spend more time using our quote to augment available liquidity at the inside of the market.'' [250] Another commenter stated that the proposal is ''explicitly pro-competitive'' in that ''[u]sing an exchange-controlled mechanism to mitigate 'pick-off' risk that could otherwise only be addressed through massive technology expenditures will lower technological barriers to entry and allow more firms—including those unwilling or unable to spend giant sums to build a microsecond-latency trading platform—to become competitive at providing liquidity, and empower many existing liquidity providers to quote more aggressively.'' [251] The commenter observed that ''the two largest U.S. equities options market making wholesalers have commented opposing the filing, while three comparatively smaller ones (including CTC) have all commented in support (including one international firm which we understand to be a new entrant to US options market making)—implying the Proposal may support/encourage more upstart competitors in the market making space.'' [252] The commenter further stated that the proposal ''still allows for benefits to those who choose to invest in higher-performance trading systems since, under the Proposal, the first liquidity-taker to pass through the speedbump will uniquely be able to execute against the entire remaining posted size, if desired—even if he or she beats out other would-be takers by only a single nanosecond.'' [253] One commenter stated that the costs of competing with high-frequency traders have disincentivized meaningful participation in the markets by major market participants, which makes ''prices less reflective of fundamental information.'' [254] The commenter stated that the proposal will ''level the playing field'' between high-frequency traders and other market participants by allowing market participants to better compete with high-frequency traders.[255]

Another commenter, a former US equity options market making firm, stated that it was ''ultimately forced to exit the business due to the escalating costs and arms race associated with maintaining latency competitiveness.'' [256] The commenter stated that ''the playing field has increasingly tilted toward a small number of firms with the financial and technological resources and economies of scale to operate at the bleeding edge of latency-sensitive infrastructure. These developments have created unsustainable barriers to entry and reduced the diversity of liquidity providers, ultimately harming market quality for end investors.'' [257] The commenter further stated that ''the IEX mechanism offers a precise, event driven tool that . . . does not inhibit access or confer unfair advantages—it levels the playing field. By helping reduce the dependency on expensive infrastructure and allowing market makers to quote more competitively without being exposed to asymmetric risks, the proposal will enhance liquidity, improve price discovery, and ultimately benefit all investors.'' [258]

Finally, one commenter, an options market making firm, stated that it has had to ''add tremendous complexity to combat predatory latency arbitrage,'' and that ''if our systems are too slow (for example, more than a millionth of a second reaction time), then our quotes are traded before the exchange can process our updates. . . these trades happen very frequently and, in the aggregate, are very costly.'' [259] The commenter stated that defending against latency arbitrage ''requires annual investments in the area of $5 million, which we project will at least double once we complete our expansion to the remaining US equity option exchanges''

to merely reduce, but not eliminate, ''pickoff'' trades from latency arbitrageurs.[260] The commenter stated that all market makers need this technology at a minimum, describing this as ''avoidable barriers to entry'' that ''grow ever larger.'' [261] The commenter added that retail and institutional end users are ''paying the price in the form of wider than necessary spreads and less available liquidity.'' [262] The commenter stated that the proposal would likely result in a tightened NBBO on IEX Options by Market Makers protected by the access delay and the ORP.[263]

Responding to comments, the Exchange stated that the ORP is ''narrowly-targeted'' to ''limit costs from latency arbitrage,'' which ''can help to induce market makers to compete in more options classes, potentially with greater size and tighter spreads.'' [264] In turn, the Exchange stated that ''[t]hese are all effects that benefit public investors and other participants by increasing liquidity and improving price and choice in options markets.'' [265]

The ORP is a new type of optional risk mitigation protection and thus will confer a benefit to Market Makers trading on the Exchange in their assigned classes when they elect to use it. IEX has not, however, proposed to subject Market Makers to additional quoting requirements as a condition for using the ORP. Other exchanges offer risk mitigation functionality to members, including to market makers, some of which is far broader in its application than the ORP, and similarly do not impose additional quoting requirements on market makers as a condition for using it.[266] In particular, the ORP is more narrowly tailored than other options risk mitigation functionality because it will only reprice or cancel a specific series in a class whereas options risk mitigation functionality typically will cancel all quotes and orders in all series across a class.

---

[249] Id.

[250] Id.

[251] CTC Letter at 3.

[252] Id.

[253] Id.

[254] See Better Markets Letter at 3–4.

[255] Id. at 4.

---

[256] Volant Letter at 1. The commenter stated that latency arbitrage ''arises from a structural mismatch while option prices are highly sensitive to movements in their underlying equities, there are unavoidable delays in how exchanges and market participants receive and process those underlying price updates.'' Id. The commenter further stated that ''[s]ophisticated firms exploit this latency gap by executing against stale option quotes before slower market makers can adjust their prices. The result is a one-sided dynamic where passive liquidity providers are routinely 'picked off' at prices that no longer reflect fair value. This leads to defensive quoting behavior, wider spreads, and thinner markets. Firms with deep expertise in option pricing and risk management—those best positioned to provide tight spreads and meaningful size—are often pushed out due to the steep technical demands required merely to remain competitive.'' Id. The commenter stated that the ''costs of maintaining latency competitiveness are staggering.'' Id.

[257] Id.

[258] Id. at 2.

[259] Maven Letter at 1–2.

---

[260] Id. at 2.

[261] Id.

[262] Id.

[263] Id. at 3–4.

[264] IEX Response I at 9.

[265] Id.

[266] See, e.g., Nasdaq Phlx Rule Options 3, section 15 (Simple Order Risk Protections). Paragraph (c)(2) of that rule (called ''Automated Quotation Adjustments'') provides exchange functionality that market makers use to cancel all quotes in all series in a class (not just for a single series like ORP) over a period not to exceed 15 seconds. See Nasdaq Phlx Rule Options 3, section 15(c)(3). That provision is only available for use by market makers and does not impose any heightened quoting standards on market makers in return for its use. See also MIAX Options Rule 612 and Interpretations and Policies .02 to MIAX Options Rule 612.

Only market makers are subject to continuous quoting requirements, and they take on considerable financial risk when they quote large numbers of series simultaneously.[267] While the ORP will provide a valuable protection to Market Makers, it is narrowly tailored to affect quotes during an exceptionally small portion of the trading day. While that effect occurs at important points when options prices are in transition and orders from high frequency traders may attempt to take quotes before they can be repriced, the ORP is ''off'' (*i.e.,* not cancelling or repricing a quote) over 99% of regular trading hours where IEX will not cancel or reprice Market Maker quotes during that time. In contrast, risk mitigation functionality and bulk cancel functionality is not so narrowly tailored and can more frequently result in cancelled quotes across all series in a class at any point during trading hours based on non-transparent settings specific to each individual market-maker using the functionality.[268] Yet other exchanges do not impose additional obligations on market makers in return for the benefits conferred to market makers when they use their risk mitigation and bulk cancel functionality.[269]

While the ORP will confer a direct benefit to Market Makers and not other types of market participants that post orders on IEX Options, that protection contributes to fair and orderly markets and the protection of investors through increased competition and liquidity provision by the primary source of options liquidity to the market.[270] Market Makers are continuously managing the risk associated with their continuous quoting and thus are particularly focused on very short term movements in prices and the dislocations they can cause for derivatively-priced securities like options.[271] As the Exchange stated in

the filing, options market makers must ''maintain hundreds (and sometimes thousands) of quotes on options for an underlying security at any one time'' and sudden market moves in the securities underlying their quoted options can leave them vulnerable to latency arbitrage if they cannot adjust quotes quickly enough to reflect the price changes of the underlying securities.[272] This potential for major losses resulting from latency arbitrage can cause options market makers to be less willing to quote their best possible price in the largest number of contracts they might otherwise display and that aversion to loss and inability to compete with the most technologically sophisticated firms can lead to market makers decreasing the number of options classes that they quote or leaving the business entirely.[273] Because the options markets are quote-driven, they are dependent on options market makers to set prices and provide liquidity, and therefore it is crucial for options market quality to encourage options market makers to continue to quote and provide liquidity so that market participants, including retail investors, have access to liquidity at favorable prices. Limiting the ORP to Market Makers is commensurate with the risk uniquely undertaken by Market Makers by the continuous quoting obligations that apply to the multitude of series within each assigned class, which risk is not present for other market participants when they only post one or a few limit orders in specific series and are not required to provide continuous quotes as are market makers. The protections afforded to market makers through risk mitigation functionality, including the ORP, are intended to incentivize market makers to quote with additional depth at potentially improved prices, which directly benefits all market participants when that liquidity is available to the market.

Accordingly, the benefits provided to Market Makers by IEX's proposal are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers. Those benefits are focused and not overbroad and are intended to specifically address the disincentive to be a market maker that latency arbitrage can present to many firms. Further, those benefits are commensurate with the benefits provided to market makers by other risk

mitigation functionality and is consistent with prior precedent with other exchange options risk mitigation rules that have not imposed additional requirements on market makers for using risk mitigation functionality.[274] The benefits provided to Market Makers by IEX's proposal also do not impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act.[275]

f. Intermarket Competition

Several commenters stated that the proposal would impose a burden on competition between IEX Options and other options exchanges.[276] One commenter stated that intra-day auctions on other options exchanges would be unable to commence if there were a better displayed quote on IEX that, due to the ORP, may be a stale quote or a quote that is cancelled by the ORP in the interim.[277] The commenter stated that ''[p]reventing other options markets from commencing auctions by displaying liquidity that isn't firm or accessible creates an inter-market burden on competition.''[278] Another commenter stated that ''the speed bump would incentivize market participants to interact with IEX first before trading on other markets triggers IEX to fade its existing quote.''[279] One commenter stated that ''the ORP mechanism would also have significant implications for competing exchanges as firms are forced to direct their orders to IEX Options when better execution opportunities may in fact exist on other exchanges.''[280]

Responding to the comments about burdens on competition with other exchanges, IEX stated that the ORP ''promotes fair competition among trading venues, consistent with the Commission's prior approvals, by allowing an exchange to innovate to provide a specific solution to a specific problem.''[281] IEX also stated that IEX

---

[267] Unlike a single stock for which an equities market maker maintains a single quote, an options market maker quoting options on that same stock may be quoting dozens of series. When the market moves, the stock market maker only has to update one quote, but the options market maker needs to update many quotes and is exposed to risk of loss across more products as a result.

[268] For example, if a class has 100 series, a risk mitigation functionality might cancel all 100 series in response to a triggering event. In contrast, the ORP would only cancel those series that are impacted, thus having no effect on the remaining series in the class.

[269] *See, e.g.,* Securities Exchange Act Release No. 94072 (Jan. 26, 2022), 87 FR 5592 (Feb. 1, 2022) (SR–NYSEARCA–2021–47).

[270] IEX states that ''Market makers play a central role in the options market and account for over 99% of all open orders and quotes.'' Amendment No. 3, *supra* note 8, at 26888.

[271] *See id.* (stating that ''market makers typically manage their financial exposure risks resulting from

their continuous quoting obligations in very short-term time frames, often measured in micro-seconds'').

[272] *See id.* at 26880.

[273] *Id.*

[274] *See supra* note 266 and accompanying text.

[275] 15 U.S.C. 78f(b)(8).

[276] *See, e.g.,* Nasdaq Letter at 1; MEMX Letter at 3; Letter from Jaime Klima, General Counsel, New York Stock Exchange, dated June 17, 2025 (''NYSE American and NYSE Arca Letter''), at 2.

[277] *See* Nasdaq Letter at 1, 6. The commenter also objected to a representation by IEX that most of its proposed rulebook is ''substantially similar'' to the rules of other options exchanges because those other options exchanges do not have an access delay on incoming messages, so the commenter recommended that IEX analyze the impact of the delay on these rules and on other options exchanges. *See id.* at 3. The access delay affects the System as discussed herein, but does not affect other rules like membership rules, member conduct rules, or listing rules.

[278] Nasdaq Letter at 6.

[279] NYSE American and NYSE Arca Letter at 2.

[280] MEMX Letter at 3.

[281] IEX Response I at 7.

Options' quotes would be accessible and reiterated that the point of the ORP is to reduce stale quotes so that IEX quotes would be just as current as quotes on other exchanges.[282] Additionally, IEX stated that the ORP is intended to ''counteract orders sent as part of latency arbitrage strategies and is designed not to impact other orders seeking to access market maker quotes.''[283] Finally, IEX stated that ''participants can easily account for the speed bump in routing to IEX's equities market'' so ''there is no reason to expect they would have any greater difficulty accounting for the identical speed bump when routing to the IEX Options market.''[284]

The proposal, including the ORP and the access delay that effectuates it, does not impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act.[285] Consistent with the Commission's approval of IEX's exchange registration, the proposed access delay for options ''is designed to ensure that [quotes] on IEX operate as designed and as reflected in IEX's rules'' and that Market Makers on IEX can better achieve their goals when their quotes operate efficiently.[286] Similarly, options market participants will not necessarily need to interact with IEX first to avoid triggering the ORP (which reacts to changes in the underlying security). As with the IEX equities market, order routing that seeks ''to achieve simultaneous arrival and executions across multiple exchanges in a coordinated manner'' does not require a broker-dealer to preference any particular exchange over another because broker-dealers can and generally do account for geographic differences when routing and these ''routing adjustments do not constitute 'preferencing' of IEX because the adjustments do not mean a market

participant has to arrive and trade first on IEX.''[287]

Further, the Exchange's proposal does not impede the ability of other exchanges to compete through functionality, fees, or otherwise. As occurred following the adoption of the access delay on the IEX equities market, at least one other exchange adopted its own access delay.[288] IEX's equities exchange market share is around 3%, indicating that other exchanges are successfully competing for volume.[289] Given the identical access delay on both the IEX equities and options markets, and the similar functionality that utilizes it to cancel or update quotes as a protection against latency arbitrage on both markets, the ORP and options access delay will not impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act as this same structure has not done so in the case of the IEX equities market.

In denying a petition challenging the Commission's approval of IEX's D-Limit order type for equities, the United States Court of Appeals for the District of Columbia Circuit summarized the core issue as whether the Commission ''may allow IEX to innovate . . . in a way that offers new opportunities to long-term investors.''[290] IEX Options presents that same core issue. The ORP and access delay that effectuates it are narrowly tailored to address latency arbitrage when options reprice based on changes in the underlying stock price. The ORP will only infrequently cancel or reprice quotes so market participants not engaged in latency arbitrage will rarely be impacted by it.[291] All market participants may benefit if IEX Options attracts more firms to become Options Market Makers and provide more liquidity, potentially at improved prices, and investors will have fair and efficient access to those quotes.[292] Because IEX Options presents the same issues that the Commission and the United States Court of Appeals for the District of Columbia Circuit addressed

in the IEX D-Limit matter, and because the ORP and access delay for IEX Options addresses those same issues in the same narrowly tailored manner, there is substantial evidence to find that IEX's proposal does not impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Act.

g. Length of the Delay

One commenter objected to the length of the proposed access delay, explaining that, although the Commission approved a 350-microsecond delay for IEX's equities market in 2016, applying the same length delay today for options is inappropriate, unfairly discriminatory, and inconsistent with the Act, because the markets operate faster now due to changes in market technology and options market structure.[293]

Other commenters stated that a 350 microsecond delay is still presently de minimis and within or less than other technical and geographic latencies experienced today.[294] One commenter stated that ''geographical latencies have not changed. . . .''[295] That commenter also stated that '' 'jitter' or random noise in exchange matching engines and market data technology routinely exceeds the duration of the proposed speedbump'' and mentioned as an example ''the difference between reported OPRA 10th and 99th percentile latencies has ranged from hundreds of microseconds to over 2,870 microseconds since 2021.''[296] The commenter also stated that ''the OPRA NBBO is already stale by more than 350 microseconds'' and that ''the aggregation, calculation, and round-trip transmission times to (for example) Nasdaq's data center'' are approximately 500 microseconds.[297]

Another commenter stated that it ''observe[s] similar delays and quote inaccessibility resulting from the current market structure.''[298] The commenter provided an example of a quote from an exchange located in Carteret disseminating through OPRA with ''a total latency of about 525 microseconds (albeit this is often exceeded significantly in practice).''[299]

---

[282] *See id.* at 21.

[283] *Id.*

[284] *Id.* at 16. IEX added that ''[t]his is especially so because options participants are already accustomed to the potential for mass cancelation of market maker quotes in circumstances that are not related to observable differences in equities prices.'' *Id.*

[285] 15 U.S.C. 78f(b)(8).

[286] Securities Exchange Act Release No. 78101 (June 17, 2016), 81 FR 41142, 41157 (June 23, 2016) (File No. 10–222). As the Commission explained when it granted IEX's exchange registration, to ensure that certain order types that are designed to reprice operate as designed and as reflected in IEX's rules, IEX slows down incoming order messages by 350 microseconds to allow IEX to take in current market data and update certain orders based on that data when the NBBO changes to ensure that those orders accurately reflect the current market as they are designed to do. *See id.* at 41157.

[287] D-Limit Approval Order, *supra* note 127, at 54441.

[288] *See, e.g.,* Securities Exchange Act Release No. 80700 (May 16, 2017), 82 FR 23381 (May 22, 2017) (SR–NYSEMKT–2017–05) (order approving a 350-microsecond access delay for NYSE MKT).

[289] Current market share statistics are available at *https://www.cboe.com/us/equities/market_share/*.

[290] *See Citadel Sec. LLC* v. *SEC*, 45 F.4th 27, 458 U.S. App. DC 268 (D.C. Cir. 2022), *available at https://media.cadc.uscourts.gov/opinions/docs/2022/07/20-1424-1956972.pdf*.

[291] *See infra* section III.B.1.i (discussing IEX's data analysis on the expected frequency with which it estimates that the ORP would impact a quote on IEX).

[292] *See supra* note 190 and accompanying text.

[293] *See* Nasdaq Letter at 2, 7.

[294] *See, e.g.,* HAP Trading Letter at 1; CTC Letter at 9.

[295] CTC Letter at 9.

[296] *Id.* at 8.

[297] *Id.* at 5–6.

[298] HAP Trading Letter at 1.

[299] *Id.* at 1. The commenter stated that ''[f]aster paths such as microwaves and lasers are generally not used to transmit option data by order handlers such as wholesalers due to their expense and the

Continued

The commenter further stated that its ''observations suggest retail brokers take well beyond 100 times more time than the speedbump to process and route a retail order instruction.'' [300] Another commenter stated that ''[r]etail investors simply do not trade within the microsecond timeframes during which IEX's protections operate.'' [301] One commenter stated that ''[t]his 0.000350 second window is big enough to prevent predatory latency arbitrage, and yet small enough to minimise the chance that a real end user's order arrives at the exchange within the same window'' [302] and that ''[t]he latency overhead of an end user without direct market access sending their order via a broker's systems is usually measured in milliseconds, a few orders of magnitude larger than the 350 microsecond de minimis delay . . . the extra de minimis delay should have no impact on any real end user's order, but it will have a big impact on the market-maker's ability to provide liquidity.'' [303]

Responding to the comment about the length of the access delay, IEX stated that ''[c]ertain tools—microwave technology, for example—in combination with the fastest proprietary data, can reduce transmission and reaction time, but they can't overcome the laws of physics,'' and that such ''tools have long been available to some but are not available to many participants.'' [304] Further, IEX stated that participants have no trouble accounting for the same speed bump in IEX's equities market, so they should not have any problems accounting for it when routing to IEX Options, ''especially so because options participants are already accustomed to the potential for mass cancelation of market maker quotes in circumstances that are not related to observable differences in equities prices.'' [305] IEX stated that the length of the delay is ''well within the geographic delays that exist among and between the data centers that IEX Options Members and other options exchanges use and is consistent with the naturally occurring time indeterminism that exists in order processing.'' [306] IEX also stated that the

latency between and among the data centers located in New Jersey is similar. [307]

The Commission has considered the comments stating that a 350-microsecond access delay is unsuitable in the current trading environment, [308] as well as those comments that consider it to still be de minimis. [309] The commenters that supported the length of the delay stated that it was within or shorter than delays currently experienced by market participants as a result of exchange matching engine ''noise'' and OPRA aggregation, calculation, and dissemination latencies, [310] as well as vastly shorter than the time it takes retail brokers, retail investors, and market participants without direct market access to transmit an order. [311] The commenter that objected to the length of the access delay stated that the delay ''is not within geographic and technological latencies experienced today for options'' and stated that it has observed a ''50% improvement in end to end quote message roundtrip time between 2016 and 2024 within its system'' and linked to its study on transmission times between exchanges. [312] The Commission examined data showing OPRA's metrics

from June 2025 which stated that its average message latency was 36.9 microseconds, its 10th percentile latency was 14 microseconds and its 99th percentile latency was 479 microseconds. [313] These latencies do not include the time to transmit a quote from an exchange to OPRA for consolidation and back, which, according to available public data, would take between approximately 185 microseconds and 341 microseconds in one direction, based on travel times between data centers used by exchanges and the Mahwah data center used by OPRA: between Secaucus and Mahwah and between Carteret and Mahwah, respectively. [314] Using OPRA processing times as a reference, which will be in addition to the time it takes market participants to receive that OPRA market data, process it, make a trading decision, and then route an order to an exchange, the proposed 350-microsecond access delay appears to be within or less than geographic and technological latencies that options market participants experience today, consistent with the Commission's approval of the IEX exchange in 2016 in which the Commission explained that IEX's speed bump is ''well within the range of geographic and technological latencies that market participants experience today'' such that ''latency to and from IEX will be comparable to—and even less than—delays attributable to other markets that currently are included in the NBBO.'' [315] Though the commenter observed a 50% improvement in roundtrip message time within its system, additional latencies also exist and need to be accounted for when trading, including the time associated with the aggregation and dissemination of market data and order processing times. Because of the vastly larger number of classes and series for options compared to equities, faster communication infrastructure may be impractical and prohibitively expensive

---

vast bandwidth required for options data relative to equities or futures data.'' *Id.*

[300] *Id.* at 3.

[301] Verret Letter at 3.

[302] Maven Letter at 3.

[303] *Id.*

[304] IEX Response I at 16.

[305] *Id.*

[306] *See* Amendment No. 3, *supra* note 8, at 26885 (internal cites omitted). While the Commission's interpretation of ''automated quotations'' does not concern options because that concept applies only to equities, it nevertheless is instructive that the

Commission found a de minimis delay to not impair fair and efficient access to an exchange's protected quotation. *See* Securities Exchange Act Release No. 78102 (June 17, 2016), 81 FR 40785 (June 23, 2016) (File No. S7–03–16).

[307] IEX states that ''latency between and among the data centers located in New Jersey range up to several hundred microseconds, with additional latency introduced by technology processing on both sides of an order or quote route between these data centers.'' *See* Amendment No. 3, *supra* note 8, at 26886. *See also, e.g.,* Securities Exchange Act Release No. 78101 (June 17, 2016), 81 FR 41142 (June 23, 2016) (File No. 10–222), at n.270 (comparing the distance between NYSE's data center and Nasdaq's data center). When it approved IEX's initial exchange registration, the Commission stated that the latency to and from IEX would be comparable to, or even less than, delays attributable to other markets included in the NBBO, and cited a statement from IEX referring to the geographic distance that an order had to travel between one exchange's trading systems located in Chicago and its data center in New Jersey. *See id.*

[308] *See* Nasdaq Letter at 7.

[309] *See, e.g.,* HAP Trading Letter at 1; CTC Letter at 9; Maven Letter at 3. *See also* IEX Response I at 16.

[310] *See* CTC Letter at 8, 9; HAP Trading Letter at 1.

[311] *See* HAP Trading Letter at 3; Verret Letter at 3; Maven Letter at 3.

[312] *See* Nasdaq Letter at 7. The commenter cited to its study that looked at fiber optic cables versus radio wave communications and the time for messages to travel between exchanges (*e.g.,* advertised 320 microseconds between Nasdaq and NYSE and 150 microseconds between Nasdaq and IEX). That study stated ''[i]n the real world, it also takes time to process and retransmit data—so actual times are likely a little slower.'' *See* Nasdaq, How Trades Speed Between Venues, *available at: https://www.nasdaq.com/articles/how-trades-speed-between-venues.*

[313] *See* Key Operating Metrics of U.S. Options Securities Information Processor (OPRA SIP), *available at https://cdn.opraplan.com/documents/OPRA_SIP_Metrics.pdf* (last accessed Aug. 19, 2025).

[314] *See* ICE Global Network Factsheet, *available at https://www.ice.com/publicdocs/ICE_Global_Network_Factsheet.pdf* (last accessed Aug. 19, 2025), at 2. A separate site provided similar transmission latencies using fiber optic cable. *See* Nasdaq, How Trades Speed Between Venues, *available at: https://www.nasdaq.com/articles/how-trades-speed-between-venues* (last accessed Aug. 19, 2025). One commenter stated that options order handlers tend to not use wireless (microwave or laser) connectivity to transmit option data due to the expense and the required bandwidth for options data. *See supra* note 299.

[315] *See* Securities Exchange Act Release No. 78101 (June 17, 2016), 81 FR 41142, 41161 (June 23, 2016).

for wider use. Accordingly, the latencies experienced as a result of the geographic distance between data centers, between brokers and customers, and within consolidated options market data processing and the technology that handles voluminous amounts of options market data still exceed for the average market participant the proposed 350 microsecond delay such that IEX's proposed options delay will be de minimis and will not impair fair and efficient access to options quotes on IEX.

Further, one commenter stated that "[i]t is not only the length of the intentional delay that matters, but also what is permitted to happen during the delay (*i.e.,* IEX uses the latest market data to determine, on behalf of its market makers, whether to remain firm or cancel a displayed quote—in essence a 'last look' mechanism)." [316] This is not a novel regulatory issue because the access delay proposed for IEX Options is identical to the access delay currently in place for IEX's equities marketplace, where IEX uses the delay to take in current market data to inform whether to reprice or cancel D-Limit orders and manage other types of midpoint orders.[317] The access delay allows IEX to give effect to the protections it offers against latency arbitrage without which those protections might be ineffective because IEX would not have sufficient time to take in data, perform the necessary calculations, and take the actions required by its rules before high-speed traders are able to remove that liquidity.

h. Rule Change Required

Two commenters expressed concern that the proposal would allow IEX the discretion to set and modify parameters in the ORP calculation without the need to file proposed rule changes under Section 19 of the Act.[318] One commenter, noting that "several key parameters used in the ORP calculation are not provided in the filing," questioned whether IEX knows how ORP will operate in practice given those missing values and criticized how those parameters would be communicated in a Trading Alert and not be subject to Commission review when changed.[319] Another commenter cautioned that the proposal would give IEX control over

"parameters that could vastly amend the operation of the ORP" without requiring a proposed rule change filing.[320]

Responding to the comments about the need for proposed rule change filings to amend the rule, IEX amended its proposal in Amendment No. 3 to require it to submit a proposed rule change filing whenever it proposes to change the Delta Bound Band, the Quote Instability Threshold, and the frequency of the calculation of implied volatility in the ORP formula. Accordingly, IEX has fully addressed the commenters' concern by ensuring full and complete transparency in the rules of IEX concerning those material terms of the ORP formula and committing to follow the proposed rule change filing process under Section 19 of the Act.[321]

i. Lack of Data

Several commenters criticized IEX for not providing sufficient data in its initial filing to support its proposal.[322] One commenter stated that IEX should provide more data to show how often the ORP would be expected to cancel or change quotes [323] such as the "volume and depth" of Market Maker quotes cancelled or repriced and the "impact on fill rates as a result of those cancellations or repricings." [324] Another commenter stated that "IEX does not provide data demonstrating that the delay will not cause market participants to miss favorable pricing opportunities" or otherwise assess the impact on market participants and questioned whether IEX "has the ability to incorporate real-time, intra-day events and news that drive the theoretical implied volatility surfaces of all optionable underlying instruments." [325] One commenter stated that "IEX's filing would introduce a novel exchange with no data whatsoever that would allow the Commission to evaluate whether its purportedly firm quotations would in fact be firm." [326]

In Amendment No. 3, IEX provided "data analysis estimating that the ORP would only have a de minimis impact on market maker quotes on IEX thus evidencing that its benefit is designed to be narrowly tailored to protect against latency arbitrage strategies." [327] Specifically, "IEX conducted data

analysis on the expected frequency with which it estimates that the ORP would impact a quote on IEX" using OPRA data "for all series of over a thousand options classes of varying levels of volume and activity for various dates in February 2025." [328] In selecting dates for its analysis, IEX chose: "the day with the highest volume, the day with the lowest volume, the day with the highest CBOE Volatility Index ('VIX') level, the two days with the largest interday change in VIX, and Fridays with monthly and non-monthly settlements." [329] Significantly, IEX set the ORP parameters [330] for its analysis at their most aggressive to assume facts that would trigger the ORP as often as possible, which resulted in the Exchange estimating the maximum possible impact of the ORP, and which, in a real world live environment, would have less of an effect because the parameters would not be as extreme.[331]

Based on this analysis, IEX "estimates that the ORP would impact IEX Market Maker quotes on average per series significantly less than 0.001% of the trading day during regular trading hours." [332] For Penny Interval Program classes (that quote in pennies instead of larger increments) IEX estimated an impact of "on average less than 0.01%" and for classes not in the Penny Interval Program the estimate was 0.0005%.[333] For "the most active options class, the SPDR S&P 500 ETF Trust ("SPY"), the ORP would impact an IEX Market Maker's quote for less than 0.2% of the trading day." [334] In light of these results, IEX concluded that the ORP "is designed to be nearly imperceptible to all market participants who are not specifically seeking to engage in latency arbitrage to execute against a market maker's quote at a stale price, based on its speed-based advantage that enables the most technologically low-latency view of market prices." [335] In a response to comments, IEX stated that "[t]o further validate [its] analysis," it

---

[316] Citadel Letter II at 3.

[317] *See, e.g.,* D-Limit Approval Order, *supra* note 127.

[318] *See* MEMX Letter at 5–6; Nasdaq Letter at 6.

[319] *See* MEMX Letter at 5–6. *See also id.* at 6 (explaining that "[t]his is akin to advertising tailored shirts with a disclaimer that actual sizes will vary within a range between XS and XXL at the discretion of the tailor").

[320] Nasdaq Letter at 6.

[321] 15 U.S.C. 78s.

[322] *See, e.g.,* SIFMA Letter at 2; NYSE American and NYSE Arca Letter at 1; MEMX Letter at 2; IMC Schwab Citadel Letter I at 3.

[323] SIFMA Letter at 2–3.

[324] *Id.* at 3.

[325] NYSE American and NYSE Arca Letter at 1, 3.

[326] MEMX Letter at 2.

[327] Amendment No. 3, *supra* note 8, at 26866.

[328] *Id.* at 26889.

[329] *Id.*

[330] *See supra* notes 102–107 and accompanying text for a discussion of the Quote Instability Threshold and the Delta Bound Band.

[331] *See* Amendment No. 3, *supra* note 8, at 26889. Specifically, IEX "set the Quote Instability Threshold to 0, the Delta Bound Band to its full range of 0–1, and assumed ORP was enabled across all options classes." *Id.* In addition, "the analysis assumed that: (1) IEX's displayed quote in the options classes assessed was at the NBBO 100% of the time, (2) IEX's displayed quote in such options classes was composed exclusively of Market Maker quotes, and (3) all of those Market Maker quotes were enabled to be subject to ORP." *Id.*

[332] *Id.*

[333] *Id.*

[334] *Id.*

[335] *Id.*

repeated that analysis for ''the last full week of July 2025 (July 21 through July 25), using the same parameters and assumptions used in the earlier evaluation,'' which analysis ''confirmed the Exchange's evaluation from February, as the July results were within all of the previously stated values for each category outlined in the February analysis.'' [336]

Responding to comments about its ability to perform the ORP calculations, IEX stated that ''IEX is not proposing to take over the market maker's role or to take account of all the factors a market maker may consider in performing it'' but rather has the limited purpose to ''(i) use the specific elements specified in the ORP formula to judge when option quote and underlying prices are fundamentally misaligned; and (ii) when they are, to take specific actions specified by the market maker.'' [337]

The data contained in Amendment No. 3 is relevant and persuasive. Time-based data is most relevant to analyze the ORP because it shows the impact on investors of the ORP, which is a tool designed to target latency arbitrage conditions that are infrequent. Volume of incoming orders affected, fill rates, and the number of market maker quotes repriced or cancelled would be misleading to evaluate the impact of a risk protection mechanism that targets latency arbitrage because higher impacted volume and lower fill rates would be evidence that a tool designed to protect liquidity providers against latency arbitrage is working exactly as intended. It would not provide evidence that firms not engaged in latency arbitrage are impacted and unable to access quotes on IEX during regular trading hours. The tool is reasonably designed to target firms engaged in latency arbitrage. IEX's analysis clearly shows that the ORP will not be overbroad in its application and, as explained above, generally should not affect market participants not engaged in latency arbitrage or adversely affect the functioning of the options market but rather will remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest.

*C. Other Rules*

IEX will list and trade options already listed on other options exchanges.[338] The Exchange has represented that it will join the OLPP [339] and will become an exchange member of OCC.[340] IEX's listing standards for options trading on IEX Options are substantively similar to those utilized by other exchanges including MEMX Options.[341] For the same reasons the Commission provided in its order approving rules governing MEMX Options, the Exchange's proposed listing standards are designed to protect investors and the public interest and promote just and equitable principles of trade.[342]

Further, IEX proposes operational rules that are substantively identical to the rules of other options exchanges, such as MEMX Options, including rules applicable to exercise and deliveries.[343] Those rules adopt the common set of options exchange requirements applicable to exercise notices and applicable cut-off times for submission of exercise-related notices, the assignment of exercise notices, and delivery and payment requirements. For the same reasons the Commission provided in its order approving MEMX Options, these rules are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest, and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers.[344]

Based on the foregoing, the proposed functionalities and features of IEX Options' overall structure and trading operations are designed to promote just and equitable principles of trade, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest, and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers.

*D. Options Order Protection, Locked/ Crossed Market Plan, and Outbound Routing Risk Monitoring and Protection*

The IEX Options rules are designed to comply with applicable federal securities laws and regulations and the obligations of the Options Order Protection and Locked/Crossed Market Plan. Specifically, the rules are designed to ensure that an order is not executed at a price that would trade through another options exchange. In this regard, IEX Options will be required under Rule 608(c) of Regulation NMS [345] to comply with and enforce compliance by its Options Members with the Options Order Protection and Locked/ Crossed Market Plan once it joins that plan, including the requirement to avoid trading through better prices available on other markets. Any order designated by an Options Member as routable will be routed by IEX in compliance with applicable trade-through restrictions, and any order entered with a price that would lock or cross a Protected Quotation that is not eligible for either routing or the Price Adjust process in Rule 22.100(i) will be cancelled. Additionally, as discussed above, IEX Options will route orders in options via IEX Services, the Outbound Router of the Exchange, to routing brokers that are not affiliated with the Exchange to other options exchanges.[346] Furthermore, IEX Services has, pursuant to Rule 15c3–5 under the Act,[347] implemented certain tests designed to mitigate the financial and regulatory risks associated with providing the Exchange's Users with access to such away options exchanges.[348] Pursuant to the policies and procedures developed by IEX Services to comply with Rule 15c3–5, if an order or series of orders are deemed to be erroneous or duplicative, would cause the entering User's credit exposure to exceed a preset credit threshold, or are non-compliant with applicable pre-trade regulatory requirements (as defined in Rule 15c3–5), IEX Services will reject such orders prior to routing and/or seek to cancel any orders that have been routed. This is consistent with the routing implementation of other options exchanges.[349] For the same reasons the Commission provided in its order approving rules governing MEMX

---

[336] *See* IEX Response II at 10. IEX stated that ''no data of any type has ever been required to justify the use of existing risk controls.'' *Id.* The Exchange also stated that ''[i]n considering the claim that retail or other investor orders will fail to trade with a quote solely because the ORP has triggered, the relevant data and analysis is the data and analysis we have provided. And it is the same type of data and analysis the Commission and court used to conclude that D-Limit quotes would be accessible by investors.'' *Id.*

[337] IEX Response I at 22.

[338] *See* Amendment No. 3, *supra* note 8, at 26881.
[339] *See id.*
[340] *See id.* at 26872.
[341] *See id.* at 26881.
[342] *See* MEMX Options Order, *supra* note 133.
[343] *See* proposed Chapter 24 (Exercises and Deliveries).
[344] *See* MEMX Options Order, *supra* note 133.

[345] *See* 17 CFR 242.608(c).
[346] The Outbound Router is subject to regulation as a facility of the Exchange, including the requirement to file proposed rule changes under section 19 of the Act. 15 U.S.C. 78s.
[347] 17 CFR 240.15c3–5.
[348] See proposed Rule 22.180(e).
[349] IEX states that proposed Rule 22.180(e) is substantively identical to MEMX Rule 21.9(f).

Options, the Exchange's proposed order protection rules and outbound routing rules are designed to promote just and equitable principles of trade, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, protect investors and the public interest.[350]

Before commencing operations, IEX represents that it will join the Options Order Protection and Locked/Crossed Market Plan. To meet their regulatory responsibilities under the Options Order Protection and Locked/Crossed Market Plan, including the requirement to avoid trading through better-priced protected quotations available on other markets, other options exchanges that are participants of the Options Order Protection and Locked/Crossed Market Plan must have sufficient notice of new protected quotations, as well as all necessary information (such as final technical specifications). Therefore, it would be a reasonable policy and procedure under the Options Order Protection and Locked/Crossed Market Plan for industry participants to begin treating IEX Options' best bid and best offer as a protected quotation no later than 60 days after the date of this order or such later date as IEX Options begins operation.

*E. Risk Controls and Price Protection Mechanisms*

In addition to the ORP discussed above, IEX Options will offer several optional types of risk controls used by other exchanges that are designed to offer protection from entering orders outside of certain size and price parameters, as well as certain standard or Exchange-established parameters based on order type and market conditions. These include pre-trade risk controls, activity-based risk controls, and global risk controls.[351] The Exchange will apply certain automated breach actions if the proposed risk controls are breached,[352] and will allow Options Members to direct the Exchange to engage in ''Kill Switch Actions'' to either cancel all unexecuted orders and quotes on the Exchange's order book, or

block new orders and quote messages from being entered, or both.[353]

The Exchange also will offer price protection mechanisms that are based on the rules of NYSE Arca and Cboe, such as Limit Order Price Protection—in which the System will reject an order or quote upon entry, or cancel at the conclusion of an auction, if its price exceeds a pre-established, Exchange-defined ''specified threshold'' amount above or below a reference price [354]—and drill-through protection, which will prevent an order from executing beyond a ''buffer amount'' determined based on a drill-through price.[355] The Exchange also will apply price reasonability checks that are based on the rules of NYSE Arca to most limit orders and quotes, which will reject order or quote messages if the price of an order meets certain parameters.[356]

The proposed risk protections for IEX Options are reasonably designed to provide liquidity providers with protections to help them manage risk and efficiently use capital when trading options. These protections are in addition to, and do not take the place of, members' required market access controls, vigilant oversight of trading and algorithms, and overall risk management. For example, these mechanisms are intended to provide Market Makers with optional supplemental tools as an additional layer of protection to assist them in managing risk and utilize available capital in leveraged options securities. To the extent they achieve that intended objective, liquidity providers would be incentivized to quote more contracts at potentially better prices, thus benefitting investors through the availability of that liquidity. Accordingly, the proposed risk protections for IEX Options are designed to, among other things, promote just and equitable principles of trade and protect investors and the public interest.

*F. Participation in Multiparty Options-Related Plans*

The Exchange represents that it will become a participant in the various applicable multiparty plans for options trading. Specifically, the Exchange represents that IEX Options will become a member of OPRA, the Options Order Protection and Locked/Crossed Market Plan, the ORSA, and the OLPP prior to commencing operations.[357] Doing so will integrate IEX Options into the national market system for standardized listed options.

*G. Regulation*

The Exchange represents that it will leverage many of the structures it established to operate its equities market, which involve the following three elements: (i) the Exchange will join the existing options industry agreements pursuant to Section 17(d) of the Exchange Act,[358] as it did with respect to equities; (ii) the Exchange's Regulatory Services Agreement (''RSA'') with FINRA will be amended to govern many aspects of the regulation and discipline of Options Members, just as it does for equities;[359] and (iii) the Exchange will perform options listing regulation, as well as authorize Options Members to trade on IEX Options, and will monitor trading on IEX Options, both through internal reports and FINRA surveillances. Furthermore, IEX proposes to amend its MRVP to encompass IEX Options in a manner that is substantially similar to and

[350] *See* MEMX Options Order, *supra* note 133.

[351] *See* proposed Rules 22.250(a)(1)–(3). The Exchange represents that these rules are substantively identical to rules of NYSE Arca Options Rules 6.40P–O(a)(2), P–O(a)(3), and P–O(a)(4), respectively. *See* Amendment No. 3, *supra* note 8, at 26877, nn.131, 132, 134.

[352] *See* proposed Rule 22.250(c). The Exchange represents that this rule is substantively identical to NYSE Arca Options Rule 6.40P–O(c). *See* Amendment No. 3, *supra* note 8, at 26877, n.135.

[353] *See* proposed Rule 22.250(e). The Exchange represents that this rule is substantively identical to NYSE Arca Options Rule 6.40P–O(e). *See* Amendment No. 3, *supra* note 8, at 26878, n.138.

[354] *See* proposed Rule 22.260(a). the Exchange represents that this rule is substantively identical to NYSE Arca Options Rule 6.62P–O(e). *See* Amendment No. 3, *supra* note 8, at 26878, n.139.

[355] *See* proposed Rule 22.260(e). The Exchange represents that this rule is based upon and is substantially similar to Cboe Rule 5.34(a)(4), except IEX's drill-through protection will have a finite number of iterations that will be communicated by a trading Alert with at least 30 days prior notice. *See* Amendment No. 3, *supra* note 8, at 26878.

[356] *See* proposed Rule 22.260(d), (d)(2), (d)(3). The Exchange represents that these rules are substantively identical to NYSE Arca Options Rule 6.41P–O, P–O(b) and P–O(c), respectively. *See* Amendment No. 3, *supra* note 8, at 26878, nn.143–145 and accompanying text.

[357] *See* Amendment No. 3, *supra* note 8, at 26882.

[358] 15 U.S.C. 78q(d) and 17 CFR 240.17d–2. There are three 17d–2 plans that apply to options: the Options-Related Sales Practice Plan (File No. S7–966), the Options-Related Market Surveillance Plan (File No. 4–551), and the Regulation NMS/CAT Rules Plan (File No. 4–618). IEX is already a member of the Regulation NMS/CAT Rules Plan.

[359] Importantly, unless relieved by the Commission of its responsibility pursuant to Rule 17d–2, the Exchange bears the responsibility for its self-regulatory obligations and primary liability for self-regulatory failures, not the self-regulatory organization (''SRO'') retained to perform regulatory functions on the Exchange's behalf. *See* section 17(d)(1) of the Act and Rule 17d–2 thereunder (15 U.S.C. 78q(d)(1) and 17 CFR 240.17d–2). In performing these functions as agent for IEX, however, FINRA may nonetheless bear liability for causing or aiding and abetting the failure of the Exchange to perform its regulatory functions. Accordingly, although FINRA will not act on its own behalf under its self-regulatory organization responsibilities in carrying out these regulatory services for the Exchange relating to the operation of IEX Options, FINRA may have secondary liability if, for example, the Commission finds the contracted functions are being performed so inadequately as to cause a violation of the federal securities laws by the Exchange. *See, e.g.,* Securities Exchange Act Release No. 53128 (Jan. 13, 2006), 71 FR 3550 (Jan. 23, 2006) (File No. 10–131) (''Nasdaq Exchange Registration Order'').

consistent with the analogous rules and plans on other options exchanges.

Also, as explained above, consistent with the Exchange's existing regulatory structure, the Exchange's Chief Regulatory Officer will have general supervision of the regulatory operations of IEX Options, including responsibility for overseeing the surveillance, examination, and enforcement functions and for administering all regulatory services agreements applicable to IEX Options. Similarly, the Exchange's existing Regulatory Oversight Committee will be responsible for overseeing the adequacy and effectiveness of the Exchange's regulatory and self-regulatory organization responsibilities, including those applicable to IEX Options.

As it does with its equities market, the Exchange will monitor trading on IEX Options, both through internal reports and FINRA surveillances for the purpose of maintaining a fair and orderly market. Also, as it does with its equities market, the Exchange will monitor IEX Options to identify unusual trading patterns and determine whether particular trading activity requires further regulatory investigation by FINRA.

In addition, the Exchange will oversee the process for determining and implementing trade halts, identifying and responding to unusual market conditions, and administering the Exchange's process for identifying and remediating "obvious errors" by and among its Options Members. The proposed rules in Chapter 21 (Regulation of Trading on IEX Options) regarding halts,[360] unusual market conditions, extraordinary market volatility, obvious errors, audit trail, and rules regarding prohibited and permissible transfers of options positions off the Exchange are substantively identical to the approved rules of MEMX Options.[361]

Based on the foregoing, the Exchange's proposed rules and regulatory structure with respect to IEX Options provide that the Exchange will be so organized and have the capacity to be able to carry out the purposes of the Act and to comply and to enforce compliance by its members and persons associated with its members with the Act, the rules and regulations

thereunder, and the rules of the Exchange, and will provide fair procedures for the discipline of members and persons associated with members. Further, it is consistent with the Act to allow the Exchange to contract with FINRA to perform functions relating to the regulation and discipline of members and the regulation of IEX Options.[362] These functions are fundamental elements to a regulatory program and constitute core self-regulatory functions. FINRA has the expertise and experience to perform these functions on behalf of the Exchange.[363]

The amended MRVP will provide the Exchange with the capacity to enforce compliance with, and provide appropriate discipline for, violations of the rules of the Exchange and the federal securities laws. As existing IEX Rule 9.216(b) will continue to offer procedural rights to a person sanctioned for a violation listed in proposed Rule 26.120, the Exchange's rules provide a fair procedure for the disciplining of members and associated persons.[364] For the same reasons provided by the Commission in its order approving MEMX Options, the MRVP changes should strengthen the Exchange's ability to carry out its oversight and enforcement responsibilities as an SRO in cases where full disciplinary proceedings are unsuitable in view of the minor nature of the particular violation.[365]

In approving the proposed change to the Exchange's MRVP, the Commission in no way minimizes the importance of compliance with the Exchange's rules and all other rules subject to the imposition of fines under the Exchange's MRVP. The violation of any SRO rules, as well as the federal securities laws, is a serious matter. However, the Exchange's MRVP provides a reasonable means of addressing rule violations that do not rise to the level of requiring formal disciplinary proceedings, while providing flexibility in handling certain

violations. The Exchange represents that it will continue to conduct surveillance with due diligence and make a determination based on its findings, on a case-by-case basis, whether a fine of more or less than the recommended amount is appropriate for a violation under the Exchange's MRVP or whether a violation requires a formal disciplinary action.[366]

*H. Section 11(a) of the Act*

Section 11(a)(1) of the Act [367] prohibits a member of a national securities exchange from effecting transactions on that exchange for its own account, the account of an associated person, or an account over which it or its associated person exercises investment discretion (collectively, "covered accounts"), unless an exception applies. Rule 11a2–2(T) under the Act,[368] known as the "effect versus execute" rule, provides exchange members with an exemption from the Section 11(a)(1) prohibition. Rule 11a2–2(T) permits an exchange member, subject to certain conditions, to effect transactions for covered accounts by arranging for an unaffiliated member to execute transactions on the exchange. To comply with Rule 11a2–2(T)'s conditions, a member: (i) must transmit the order from off the exchange floor; (ii) may not participate in the execution of the transaction once it has been transmitted to the member performing the execution; [369] (iii) may not be affiliated with the executing member; and (iv) with respect to an account over which the member or an associated person has investment discretion, neither the member nor its associated person may retain any compensation in connection with effecting the transaction except as provided in the Rule.

In a letter to the Commission, the Exchange requests that the Commission concur with the Exchange's conclusion that Options Members that enter orders into the proposed System satisfy the requirements of Rule 11a2–2(T).[370] For the reasons set forth below, orders entered into the System could satisfy the requirements of Rule 11a2–2(T).

The Rule's first requirement is that orders for covered accounts be

---

[360] According to proposed Rule 21.120(b), during a trading halt, the Exchange shall process new and existing orders and quotes in a series in accordance with proposed Rule 22.160(g). The Exchange represents that proposed Rule 22.160(g) is substantively identical to NYSE Arca Options Rule 6.64P–O(g). *See* Amendment No. 3, *supra* note 8, at 26883, n.185.

[361] *See id.* at 26883.

[362] *See, e.g.,* Regulation of Exchanges and Alternative Trading Systems, Securities Exchange Act Release No. 40760 (Dec. 8, 1998), 63 FR 70844 (Dec. 22, 1998). *See also, e.g.,* Securities Exchange Act Release Nos. 50122 (July 29, 2004), 69 FR 47962 (Aug. 6, 2004) (SR-Amex-2004–32) (approving rule that allowed Amex to contract with another self-regulatory organization for regulatory services).

[363] The RSA is not before the Commission and, therefore, the Commission is not acting on it.

[364] 15 U.S.C. 78f(b)(7). The Exchange states that the rule violations in proposed Rule 26.120 are the same as the rule violations included in the MRVPs of other options exchanges, such as MEMX Chapter 25. See Amendment No. 3, supra note 8, at 26883, n.191 and accompanying text.

[365] 17 CFR 240.19b–1(c)(2); *See* MEMX Options Order, *supra* note 133.

[366] *See* Amendment No. 3, *supra* note 8, at 26884.

[367] 15 U.S.C. 78k(a)(1).

[368] 17 CFR 240.11a2–2(T).

[369] This prohibition also applies to associated persons. The member may, however, participate in clearing and settling the transaction.

[370] *See* Letter from Claudia Crowley, Chief Regulatory Officer, IEX, to Vanessa Countryman, Secretary, and Richard R. Holley III, Assistant Director, Division of Trading and Markets, Commission, dated Aug. 1, 2025 ("IEX 11(a) Letter").

transmitted from off the exchange floor. In the context of automated trading systems, the Commission has found that the off-floor transmission requirement is met if a covered account order is transmitted from a remote location directly to an exchange's floor by electronic means.[371] IEX has represented that it does not have a physical trading floor, and the System will receive orders from Options Members electronically through remote terminals or computer-to-computer interfaces.[372] The System satisfies this off-floor transmission requirement.

Second, the Rule requires that the member and any associated person not participate in the execution of its order after the order has been transmitted. IEX represented that at no time following the submission of an order is an Options Member or an associated person of the Options Member allowed to acquire control or influence over the result or timing of the order's execution.[373] According to the Exchange, the execution of an Options Member's order is determined solely by what quotes and orders are present in the System at the time the Options Member submits the order, and the order priority based on

IEX rules.[374] Accordingly, an Options Member and its associated persons do not participate in the execution of an order submitted to the System.[375]

Third, Rule 11a2–2(T) requires that the order be executed by an exchange member who is unaffiliated with the member initiating the order. The Commission has stated that this requirement is satisfied when automated exchange facilities, such as the System, are used as long as the design of these systems ensures that members do not possess any special or unique trading advantages in handling their orders after transmitting them to the exchange.[376] The Exchange has represented that the design of the System ensures that no Options Member has any special or unique trading advantages in the handling of its orders after transmitting its orders to the Exchange.[377] Based on the Exchange's representation, the System satisfies this condition.

Fourth, in the case of a transaction effected for an account with respect to which the initiating member or an associated person thereof exercises investment discretion, neither the initiating member nor any associated person thereof may retain any compensation in connection with effecting the transaction, unless the person authorized to transact business for the account has expressly provided otherwise by written contract referring to Section 11(a) of the Act and Rule 11a2–2(T) thereunder.[378] Options

Members trading for covered accounts over which they exercise investment discretion must comply with this condition in order to rely on the rule's exemption.[379]

## IV. Exemption From Section 19(b) of the Act With Regard to Cboe, NYSE, and FINRA Rules Incorporated by Reference

The Exchange proposes to incorporate by reference as IEX Options rules certain rules of Cboe, the New York Stock Exchange ("NYSE"), and FINRA.[380] Thus, for certain IEX Options rules, Exchange members will comply with a IEX Options rule by complying with the Cboe, NYSE, or FINRA rule referenced. In connection with its proposal to incorporate Cboe, NYSE and FINRA rules by reference, the Exchange requests, pursuant to Rule 240.0–12 under the Act,[381] an exemption under Section 36 of the Act[382] from the rule filing requirements of Section 19(b) of the Act for changes to those IEX Options rules that are effected solely by virtue of a change to a cross-referenced Cboe, NYSE, or FINRA rule.[383] The Exchange proposes to incorporate by reference categories of rules (rather than individual rules within a category) that are not trading rules. The Exchange agrees to provide written notice to Options Members prior to the launch of IEX Options of the specific Cboe, NYSE, and FINRA rules that it will incorporate

[371] *See, e.g.,* MEMX Options Order, *supra* note 133, and Securities Exchange Act Release Nos. 85828 (May 10, 2019), 84 FR 21841 (May 15, 2019) (registration of Long-Term Stock Exchange); 75760 (Aug. 7, 2015) 80 FR 48600 (Aug. 13, 2015) (SR–EDGX–2015–18); 61419 (Jan. 26, 2010), 75 FR 5157 (Feb. 1, 2010) (SR–BATS–2009–031) (approving BATS options trading); 59154 (Dec. 23, 2008), 73 FR 80468 (Dec. 31, 2008) (SR–BSE–2008–48) (approving equity securities listing and trading on BSE); 57478 (Mar. 12, 2008), 73 FR 14521 (Mar. 18, 2008) (SR–NASDAQ–2007–004 and SR–NASDAQ–2007–080) (approving NOM options trading); 53128 (Jan. 13, 2006), 71 FR 3550, 3553 (Jan. 23, 2006) (File No. 10–131) (granting the exchange registration of Nasdaq Stock Market, Inc.); 44983 (Oct. 25, 2001), 66 FR 55225 (Nov. 1, 2001) (SR–PCX–00–25) (approving Archipelago Exchange); 29237 (May 24, 1991), 56 FR 24853 (May 31, 1991) (SR–NYSE–90–52 and SR–NYSE–90–53) (approving NYSE's Off-Hours Trading Facility); and 15533 (Jan. 29, 1979), 44 FR 6084 (Jan. 31, 1979) ("1979 Release").

[372] *See* IEX 11(a) Letter, *supra* note 370, at 3.

[373] *See id.* at 4. IEX notes that Rule 11a2–2(T) does not preclude members from canceling or modifying orders, or from modifying instructions for executing orders, after they have been transmitted, provided that such cancellations or modifications are transmitted from off an exchange floor. *See id.* The Commission has stated that the non-participation requirement is satisfied under such circumstances so long as such modifications or cancellations are also transmitted from off the floor. *See* Securities Exchange Act Release No. 14563 (Mar. 14, 1978), 43 FR 11542 (Mar. 17, 1978) ("1978 Release") (stating that the "non-participation requirement does not prevent initiating members from canceling or modifying orders (or the instructions pursuant to which the initiating member wishes orders to be executed) after the orders have been transmitted to the executing member, provided that any such instructions are also transmitted from off the floor").

[374] *See* IEX 11(a) Letter, *supra* note 370, at 4. IEX proposes rules for the registration, obligations, and operation of market makers on IEX Options. IEX has represented that market makers will submit quotes in classes of options contracts to which they are appointed.

[375] *See, e.g.,* Securities Exchange Act Release Nos. 58375 (Aug. 18, 2008), 73 FR 49498, 49505 (Aug. 21, 2008) (File No. 10–182) (order granting the registration of BATS Exchange, Inc.) and 61698 (Mar. 12, 2010), 75 FR 13151, 13164 (Mar. 18, 2010) (File Nos. 10–194 and 10–196) (order approving DirectEdge exchanges).

[376] *See, e.g.,* Securities Exchange Act Release Nos. 58375 (Aug. 18, 2008), 73 FR 49498, 49505 (Aug. 21, 2008) (File No. 10–182) and 61698 (Mar. 12, 2010), 75 FR 13151, 13164 (Mar. 18, 2010) (File Nos. 10–194 and 10–196). In considering the operation of automated execution systems operated by an exchange, the Commission stated that, while there is not an independent executing exchange member, the execution of an order is automatic once it has been transmitted into the system. Because the design of these systems ensures that members do not possess any special or unique trading advantages in handling their orders after transmitting them to the exchange, the Commission has stated that executions obtained through these systems satisfy the independent execution requirement of Rule 11a2–2(T). *See* 1979 Release, *supra* note 371.

[377] *See* IEX 11(a) Letter, *supra* note 370, at 4.

[378] *See* Securities Exchange Act Release Nos. 58375 (Aug. 18, 2008), 73 FR 49498, 49505 (Aug. 21, 2008) (File No. 10–182) and 61698 (Mar. 12,

2010), 75 FR 13151, 13164 (Mar. 18, 2010) (File Nos. 10–194 and 10–196). In addition, Rule 11a2–2(T)(d) requires a member or associated person authorized by written contract to retain compensation, in connection with effecting transactions for covered accounts over which such member or associated persons thereof exercises investment discretion, to furnish at least annually to the person authorized to transact business for the account a statement setting forth the total amount of compensation retained by the member or any associated person thereof in connection with effecting transactions for the account during the period covered by the statement. *See* 17 CFR 240.11a2–2(T)(d). *See also* 1978 Release, *supra* note 373 (stating "[t]he contractual and disclosure requirements are designed to assure that accounts electing to permit transaction-related compensation do so only after deciding that such arrangements are suitable to their interests").

[379] *See* IEX 11(a) Letter, *supra* note 370, at 4–5. The Exchange represented that it will advise its membership through the issuance of an Information Circular that those Options Members trading for covered accounts over which they exercise investment discretion must comply with this condition in order to rely on the rule's exemption. *See id.* at 5.

[380] Specifically, proposed Rule 27.250 proposes to incorporate by reference the applicable rules of FINRA with respect to Communications with Public Customers, and proposed Rule 29.120 proposes to incorporate by reference initial and maintenance margin requirements of either Cboe or NYSE.

[381] 17 CFR 240.0–12.

[382] 15 U.S.C. 78mm.

[383] *See* Amendment No. 3, *supra* note 8, at 26884.

by reference.[384] In addition, the Exchange will notify Options Members whenever Cboe, NYSE, or FINRA proposes a change to a cross-referenced Cboe, NYSE, or FINRA rule.[385]

Using its authority under Section 36 of the Act, the Commission previously exempted certain SROs from the requirement to file proposed rule changes under Section 19(b) of the Act.[386] Each such exempt SRO agreed to be governed by the incorporated rules, as amended from time to time, but has not been required to file a separate proposed rule change with the Commission each time the SRO whose rules are incorporated by reference seeks to modify its rules. Each exempt SRO had procedures in place to provide written notice to its members each time a change is proposed to the incorporated rules of another SRO in order to provide its members with notice of a proposed rule change that affects their interests, so that they would have an opportunity to comment on it.

The Commission is granting the Exchange's request for an exemption, pursuant to Section 36 of the Act, from the rule filing requirements of Section 19(b) of the Act with respect to the rules that the Exchange proposes to incorporate by reference into the rules of IEX Options. This exemption is appropriate in the public interest and consistent with the protection of investors because it will promote more efficient use of Commission and SRO resources by avoiding duplicative rule filings based on simultaneous changes to identical rule text sought by more than one SRO. Consequently, the Commission grants the Exchange's exemption request for IEX Options. This exemption is conditioned upon the Exchange providing written notice to Options Members whenever Cboe, NYSE or FINRA proposes to change a rule that IEX Options has incorporated by reference.

---

[384] See id.

[385] The Exchange represents that it will provide such notice through a posting on the same website location where the Exchange will post its own rule filings pursuant to Rule 19b-4(l) under Act, within the time frame required by that rule. The website posting will include a link to the location on the Cboe, NYSE, or FINRA websites where the proposed rule change is posted. See id. at 26884, n.199.

[386] See, e.g., MEMX Options Order, supra note 133 (granting an application by MEMX LLC for an exemption pursuant to section 36(a) under the Act) and Securities Exchange Act Release No. 91877 (May 12, 2021), 86 FR 26997 (May 18, 2021) (granting an application for an exemption pursuant to section 36(a) under the Act by Nasdaq PHLX LLC).

## V. Conclusion

For the foregoing reasons, the Commission finds that the proposal, as modified by Amendment No. 3, is consistent with the Act and the rules and regulations thereunder applicable to a national securities exchange.

*It is therefore ordered,* pursuant to Section 19(b)(2) of the Act, that the proposed rule change, as modified by Amendment No. 3 (SR–IEX–2025–02) be, and it hereby is, approved.

*It is further ordered,* pursuant to Section 36 of the Act,[387] that IEX shall be exempted from the rule filing requirements of Section 19(b) of the Act [388] with respect to the Cboe, FINRA, and NYSE rules that IEX proposes to incorporate by reference in IEX Rules 27.250 and 29.120, subject to the conditions specified in this order.

By the Commission.

**Vanessa A. Countryman,**
*Secretary.*

[FR Doc. 2025–18380 Filed 9–22–25; 8:45 am]

**BILLING CODE 8011–01–P**

---

## SMALL BUSINESS ADMINISTRATION

**[Disaster Declaration #21303; WASHINGTON Disaster Number WA–20021 Declaration of Economic Injury]**

## Administrative Declaration of an Economic Injury Disaster for the State of Washington

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Notice.

---

**SUMMARY:** This is notice of an Economic Injury Disaster Loan (EIDL) declaration for the State of Washington dated September 19, 2025.

*Incident:* White River Bridge Closure.

**DATES:** Issued on September 19, 2025.

*Incident Period:* August 18, 2025 and continuing.

*Economic Injury (EIDL) Loan Application Deadline Date:* June 22, 2026.

**ADDRESSES:** *Visit the MySBA Loan Portal at https://lending.sba.gov* to apply for a disaster assistance loan.

**FOR FURTHER INFORMATION CONTACT:** Sharon Henderson, Office of Disaster Recovery and Resilience, U.S. Small Business Administration, 409 3rd Street SW, Suite 6050, Washington, DC 20416, (202) 205–6734.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given as a result of the Administrator's EIDL declaration,

---

[387] See 15 U.S.C. 78mm.

[388] 15 U.S.C. 78s(b).

applications for disaster loans may be submitted online using the MySBA Loan Portal *https://lending.sba.gov* or in person at other locally announced locations. Please contact the SBA disaster assistance customer service center by email at *disastercustomerservice@sba.gov* or by phone at 1–800–659–2955 for further assistance.

The following areas have been determined to be adversely affected by the disaster:

*Primary Counties:* King, Pierce.
*Contiguous Counties:*
  Washington: Chelan, Kitsap, Kittitas, Lewis, Mason, Snohomish, Thurston, Yakima.
  The Interest Rates are:

|  | Percent |
|---|---|
| Business and Small Agricultural Cooperatives without Credit Available Elsewhere .................. | 4.000 |
| Non-Profit Organizations without Credit Available Elsewhere ....... | 3.625 |

The number assigned to this disaster for economic injury is 213030.

The State which received an EIDL Declaration is Washington.

(Catalog of Federal Domestic Assistance Number 59008)

(Authority: 13 CFR 123.3(b).)

**James Stallings,**
*Associate Administrator, Office of Disaster Recovery and Resilience.*

[FR Doc. 2025–18444 Filed 9–22–25; 8:45 am]

**BILLING CODE 8026–09–P**

---

## DEPARTMENT OF STATE

**[Public Notice: 12826]**

## Notice of Determinations; Culturally Significant Object Being Imported for Exhibition—Determinations: "Art in Public Spaces: Walden Pond Installation" Exhibition

**SUMMARY:** Notice is hereby given of the following determinations: I hereby determine that a certain object being imported from abroad pursuant to an agreement with its foreign owner or custodian for temporary display in the exhibition ''Art in Public Spaces: Walden Pond Installation'' at the Harvard Art Museums, Cambridge, Massachusetts, and at possible additional exhibitions or venues yet to be determined, is of cultural significance, and, further, that its temporary exhibition or display within the United States as aforementioned is in the national interest. I have ordered that Public Notice of these

## CERTIFICATE OF SERVICE

I hereby certify that, on this 19th day of December 2025, a true and correct copy of the foregoing Appendix was filed electronically and served on all counsel through this Court's CM/ECF system.

/s/ Eugene Scalia
_____
Eugene Scalia

*Counsel for Petitioner*
*Citadel Securities LLC*
