**25-13631-CC**

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

———————————————————

CITADEL SECURITIES, LLC,

*Petitioner,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

———————————————————

INVESTORS EXCHANGE LLC,

*Intervenor.*

———————————————————

On Petitions for Review of a Final Order of the
United States Securities and Exchange Commission

## UNOPPOSED MOTION BY NYSE ARCA, INC., NYSE AMERICAN LLC, AND MEMX LLC FOR LEAVE TO FILE BRIEF OUT OF TIME[1] AS *AMICI CURIAE* IN SUPPORT OF PETITIONER

Jonathan H Kaskel
  *Counsel of Record*
DENTONS US LLP
1 Alhambra Plaza Penthouse
Miami, Florida 33134
(305) 537-0009

Douglas W. Henkin
(*motion for admission forthcoming*)
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700
douglas.henkin@dentons.com

*Counsel for NYSE Arca, Inc., NYSE American LLC, and MEMX LLC as Amici Curiae*

*Citadel Securities LLC v. U.S. Securities & Exchange Commission*
No. 25-13631-CC
C-1 of C-3

# <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-1, *Amici Curiae* NYSE Arca, Inc., NYSE American LLC, and MEMX LLC provide the following certificate of interested persons:

1. **Citadel Securities GP LLC**, indirect, ultimate controlling entity of Citadel Securities LLC.

2. **Citadel Securities LLC**, Petitioner.

3. **Dentons US LLP,** counsel for *Amici Curiae*.

4. **Doumani, Tala**, counsel for Intervenor Investors Exchange LLC.

5. **Gibson, Dunn & Crutcher LLP**, counsel for Petitioner Citadel Securities LLC.

6. **Henkin, Douglas W.,** counsel for *Amici Curiae*.

7. **Kaskel, Jonathan H,** counsel for *Amici Curiae*.

8. **Investors Exchange LLC**, Intervenor.

9. **MEMX LLC,** *Amicus Curiae* supporting Petitioner Citadel Securities LLC.

10. **NYSE American LLC**, *Amicus Curiae* supporting Petitioner Citadel Securities LLC.

11. **NYSE Arca, Inc.**, *Amicus Curiae* supporting Petitioner Citadel Securities LLC.

12. **Parise, Emily True**, counsel for Respondent Securities and Exchange Commission.

13. **Richman, Brian A.**, counsel for Petitioner Citadel Securities LLC.

14. **Savitt, William**, counsel for Intervenor Investors Exchange LLC.

*Citadel Securities LLC v. U.S. Securities & Exchange Commission*
No. 25-13631-CC
C-2 of C-3

15. **Scalia, Eugene**, counsel for Petitioner Citadel Securities LLC.

16. **Securities and Exchange Commission**, Respondent.

17. **Shin, Won S.**, counsel for Intervenor Investors Exchange LLC.

18. **Tienken, John W.**, counsel for Petitioner Citadel Securities LLC.

19. **Wachtell, Lipton, Rosen & Katz**, counsel for Intervenor Investors Exchange LLC.

20. **Wagner, Brooke**, counsel for Respondent Securities and Exchange Commission.

21. **Walker, Helgi C.**, counsel for Petitioner Citadel Securities LLC.

22. **Wolf, Brandon**, counsel for Petitioner Citadel Securities LLC

No publicly traded company or corporation has an interest in the outcome of the case. *Amici Curiae* will file an amended certificate of interested persons should they become aware of a change in interests that would affect the disclosures as required by Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-4.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, *Amici Curiae* NYSE Arca, Inc. and NYSE American LLC state that they are both registered national securities exchanges, each of which is an indirect wholly-owned subsidiary of Intercontinental Exchange, Inc., a public company trading

*Citadel Securities LLC v. U.S. Securities & Exchange Commission*
No. 25-13631-CC
C-3 of C-3

under the ticker "ICE" that has no shareholders owning more than 10% of its shares as of the date of this disclosure.

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, *Amicus Curiae* MEMX LLC states that it is a registered national securities exchange. It is wholly owned by MEMX Holdings, LLC, a privately-held company, in which no publicly held company owns 10 percent or more of the stock.

Dated: January 15, 2026

/s/ Jonathan H Kaskel
Jonathan H Kaskel
  *Counsel of Record*
DENTONS US LLP
1 Alhambra Plaza, Penthouse
Miami, Florida 33134
(305) 537-0009
jonathan.kaskel@dentons.com

Douglas W. Henkin
(*motion for admission forthcoming*)
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700
douglas.henkin@dentons.com

*Counsel for NYSE Arca, Inc., NYSE American LLC, and MEMX LLC as Amici Curiae*

NYSE Arca, Inc., NYSE American LLC, and MEMX LLC (the "*Amici* Exchanges*") respectfully move this Court to grant leave to file the attached brief amicus curiae out of time[1] (the "Amicus Brief") *nunc pro tunc* to January 8, 2026.

1.      On November 10, 2025, Petitioner, Respondent, and Intervenor jointly filed the "Response to Time-Sensitive Motion to Expedite and Joint Motion to Set Agreed-Upon Briefing Schedule,"  Dkt. No. 17.  In that filing, Petitioner, Respondent, and Intervenor jointly proposed an agreed-upon schedule that set the date for amicus briefs in support of Petitioner to be filed on January 8, 2026 and set the date for amicus briefs in support of Respondent (and Intervenor's brief) to be due on February 6, 2026.

2.      On November 17, 2025, this Court entered an Order stating, in pertinent part, that "Respondent's unopposed motion to set a briefing schedule is GRANTED … ."  *See* Dkt. No. 21.  Although that Order went on to discuss only dates for briefs by Petitioner and Respondent, the parties and the *Amici* Exchanges believed that when the Court "GRANTED" "Respondent's unopposed motion to set a briefing schedule," it granted the entirety of that motion (which was made in relevant part by

---

[1] The motion has been styled as one to file the Amicus Brief "out of time" at the Clerk's direction.  *See* January 15, 2026 Text Docket Notice.  However, as described herein, the *Amici* Exchanges believed and understood that the filing of the Amicus Brief on January 8, 2026 was timely based on the Court's grant of the parties' joint scheduling motion.

Plaintiff, Respondent, and Intervenor together, *see* Dkt. No. 17 at 2 ("the parties hereby jointly and respectfully request the Court enter the following agreed-upon case schedule")), including the dates set forth for filings by amici on both sides.

3.      When the *Amici* Exchanges sought the parties' consent to file the Amicus Brief, the parties granted that consent, with no party's counsel asserting that they believed the Amicus Brief to be untimely and with counsel for Intervenor specifically stating that its consent was contingent upon the filing of the Amicus Brief being consistent with the schedule that had been agreed to by Petitioner, Respondent, and Intervenor (i.e., on January 8, 2026).  The *Amici* Exchanges, who wish to submit the Amicus Brief for the reasons set forth on pages 1-3 of the Amicus Brief, filed the Amicus Brief on January 8, 2026.

4.      In preparing this motion, counsel for the *Amici* Exchanges reconfirmed with counsel for Petitioner, Respondent, and Intervenor that they believed that the Amicus Brief was due on January 8, 2026 and confirmed that they do not oppose the relief sought in this motion (the filing of the Amicus Brief *nunc pro tunc* to January 8, 2026).  Counsel for Petitioner, Respondent, and Intervenor reviewed and approved this motion before its filing.

## **CONCLUSION**

For all the reasons stated above, this Court should grant the *Amici* Exchanges'

motion for leave to file the Amicus Brief *nunc pro tunc* to January 8, 2026.

Dated: January 15, 2026

Jonathan H Kaskel
  *Counsel of Record*
DENTONS US LLP
1 Alhambra Plaza Penthouse
Miami, Florida 33134
(305) 537-0009
jonathan.kaskel@dentons.com

Douglas W. Henkin
(*motion for admission forthcoming*)
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700
douglas.henkin@dentons.com

*Counsel for NYSE Arca, Inc., NYSE*
*American LLC, and MEMX LLC as*
*Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.      The undersigned counsel for *amici curiae* certifies pursuant to Federal Rule of Appellate Procedure 27(d)(2) that the foregoing motion contains 499 words, excluding the parts of the motion exempted by the Appendix to 11th Cir. R. (citing Fed. R. App. P. 32(f)), according to the word count feature of Microsoft Office 365.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-pt. Times New Roman font.

January 15, 2026

/s/  Jonathan H Kaskel
Jonathan H Kaskel
*Counsel for Amici Curiae*

## CERTIFICATE OF CONFERRAL

I certify that counsel for all parties have conferred and agree with the relief sought in this motion.

*/s/ Jonathan H Kaskel*

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing will be served on all parties via the

Court's CM/ECF system on this 15th day of January, 2026.

> */s/*  Jonathan H Kaskel
> Jonathan H Kaskel
> *Counsel for Amici Curiae*

**25-13631-CC**

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

_____

CITADEL SECURITIES, LLC,

*Petitioner,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

_____

INVESTORS EXCHANGE LLC,

*Intervenor.*

_____

On Petitions for Review of a Final Order of the
United States Securities and Exchange Commission

## BRIEF OF NYSE ARCA, INC., NYSE AMERICAN LLC, AND MEMX LLC AS *AMICI CURIAE* IN SUPPORT OF PETITIONER, SUPPORTING VACATUR OF THE ORDER SUBJECT TO REVIEW

Jonathan H Kaskel
  *Counsel of Record*
DENTONS US LLP
1 Alhambra Plaza Penthouse
Miami, Florida 33134
(305) 537-0009

Douglas W. Henkin
(*motion for admission forthcoming*)
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700
douglas.henkin@dentons.com

*Counsel for NYSE Arca, Inc., NYSE American LLC, and MEMX LLC as Amici Curiae*

*Citadel Securities LLC v. U.S. Securities & Exchange Commission*
No. 25-13631-CC
C-1 of C-3

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-1, *Amici Curiae* NYSE Arca, Inc., NYSE American LLC, and MEMX LLC provide the following certificate of interested persons:

1. **Citadel Securities GP LLC**, indirect, ultimate controlling entity of Citadel Securities LLC.

2. **Citadel Securities LLC**, Petitioner.

3. **Dentons US LLP,** counsel for *Amici Curiae*.

4. **Doumani, Tala**, counsel for Intervenor Investors Exchange LLC.

5. **Gibson, Dunn & Crutcher LLP**, counsel for Petitioner Citadel Securities LLC.

6. **Henkin, Douglas W.,** counsel for *Amici Curiae*.

7. **Kaskel, Jonathan H,** counsel for *Amici Curiae*.

8. **Investors Exchange LLC**, Intervenor.

9. **MEMX LLC,** *Amicus Curiae* supporting Petitioner Citadel Securities LLC.

10. **NYSE American LLC**, *Amicus Curiae* supporting Petitioner Citadel Securities LLC.

11. **NYSE Arca, Inc.**, *Amicus Curiae* supporting Petitioner Citadel Securities LLC.

12. **Parise, Emily True**, counsel for Respondent Securities and Exchange Commission.

13. **Richman, Brian A.**, counsel for Petitioner Citadel Securities LLC.

14. **Savitt, William**, counsel for Intervenor Investors Exchange LLC.

*Citadel Securities LLC v. U.S. Securities & Exchange Commission*
No. 25-13631-CC
C-2 of C-3

15. **Scalia, Eugene**, counsel for Petitioner Citadel Securities LLC.

16. **Securities and Exchange Commission**, Respondent.

17. **Shin, Won S.**, counsel for Intervenor Investors Exchange LLC.

18. **Tienken, John W.**, counsel for Petitioner Citadel Securities LLC.

19. **Wachtell, Lipton, Rosen & Katz**, counsel for Intervenor Investors Exchange LLC.

20. **Wagner, Brooke**, counsel for Respondent Securities and Exchange Commission.

21. **Walker, Helgi C.**, counsel for Petitioner Citadel Securities LLC.

22. **Wolf, Brandon**, counsel for Petitioner Citadel Securities LLC

No publicly traded company or corporation has an interest in the outcome of the case. *Amici Curiae* will file an amended certificate of interested persons should they become aware of a change in interests that would affect the disclosures as required by Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-4.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, *Amici Curiae* NYSE Arca, Inc. and NYSE American LLC state that they are both registered national securities exchanges, each of which is an indirect wholly-owned subsidiary of Intercontinental Exchange, Inc., a public company trading

*Citadel Securities LLC v. U.S. Securities & Exchange Commission*
No. 25-13631-CC
C-3 of C-3

under the ticker "ICE" that has no shareholders owning more than 10% of its shares

as of the date of this disclosure.

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule

26.1-2, *Amicus Curiae* MEMX LLC states that it is a registered national securities

exchange.  It is wholly owned by MEMX Holdings, LLC, a privately-held company,

in which no publicly held company owns 10 percent or more of the stock.

/s/ Jonathan H Kaskel
Jonathan H Kaskel
   *Counsel of Record*
DENTONS US LLP
1 Alhambra Plaza, Penthouse
Miami, Florida 33134
(305) 537-0009
jonathan.kaskel@dentons.com

Douglas W. Henkin
(*motion for admission forthcoming*)
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700
douglas.henkin@dentons.com

*Counsel for NYSE Arca, Inc., NYSE
American LLC, and MEMX LLC as
Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTEREST OF *AMICI CURIAE* .............................................................. 1

STATEMENT OF THE ISSUES.................................................................. 3

SUMMARY OF THE ARGUMENT ............................................................ 3

ARGUMENT ........................................................................................... 4

    I.  THE ORDER VIOLATES THE EXCHANGE ACT .................................. 6

        A.  How The ORP Operates ........................................................ 7

        B.  The Order Is Inconsistent With The Firm Quote Rule ........... 9

        C.  The Order Distorts Competition Through Regulatory Compulsion ..... 10

        D.  The Order Undermines Principles of Fair Access and Non-Discrimination ............................................................... 13

    II.  THE ORDER IS PREMISED ON AN INCOMPLETE ANALYSIS .............. 13

        A.  The Record Does Not Support The Conclusion That There Is A Problem In The Options Markets For The ORP To Fix ....... 14

        B.  The Commission Failed to Critically Evaluate the Limited Data Analysis Offered by IEX, Data that Obfuscates Rather than Clarifies the Impact of the ORP ........................................ 16

CONCLUSION ..................................................................................... 21

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Equity Investment Life Insurance Co. v. SEC*,
613 F.3d 166 (D.C. Cir. 2010) ...............................................................12

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ................................................................................15

*In re Credit Suisse Securities (USA) LLC (Light Pool)*,
2016 WL 683553 (SEC Feb. 1, 2016) ...................................................10

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ................................................................................10

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ................................................................................15

*New York Stock Exchange LLC v. SEC*,
962 F.3d 541 (D.C. Cir. 2020) ....................................................14, 15, 20

*Simmons v. Block*,
782 F.2d 1545 (11th Cir. 1986) ..............................................................10

*Susquehanna Int'l Grp., LLP v. SEC*,
866 F.3d 442 (D.C. Cir. 2017) ...............................................................16

**Rules & Statutes**

17 C.F.R. § 242.602(b) ...................................................................................9

15 U.S.C. § 78f(b) ...........................................................................................6

15 U.S.C. § 78f(b)(5) ..................................................................................7, 8

15 U.S.C. § 78f(b)(8) ..................................................................................6, 8

ii

## INTEREST OF *AMICI CURIAE*[1]

Each of NYSE Arca, Inc., NYSE American LLC, and MEMX LLC (the *"Amici* Exchanges") is a national securities exchange registered with the Securities and Exchange Commission (the "Commission") that operates an options trading facility that competes with IEX Options.[2]  The options trading facilities operated by NYSE Arca, Inc. and NYSE American LLC are among the longest operating options trading facilities, whereas the facility operated by MEMX LLC launched in September 2023.  Collectively, the *Amici* Exchanges account for approximately 20% of U.S. options trading volume and handle millions of traded options contracts each trading day across approximately 1.8 million listed series of options.

The *Amici* Exchanges have decades of experience operating options trading systems, a deep understanding of what it takes to maintain real-time pricing for more than 1.8 million options series, knowledge of the infrastructure required to incorporate implied volatility adjustments for real-time events that impact those options prices, and are well-positioned to assist the Court in evaluating IEX Options'

---

[1]  Pursuant to Fed. R. App. P. 29(a)(4)(E), the *Amici* Exchanges affirm that no counsel for a party authored this brief in whole or in part and no person other than the *Amici* Exchanges and their counsel made a monetary contribution to the preparation or submission of this brief.  All parties and the Intervenor have consented to the *Amici* Exchanges filing this brief.  *See* Fed. R. App. P. 29(a)(2).

[2]  Terms not defined herein have the meanings set forth in the Opening Brief for Petitioner ("Petitioner's Brief").

unproven market structure claims and the Commission's failure to demand appropriate validation of those claims. They are also direct competitors of IEX Options in the options trading market, are subject to the same Securities Exchange Act of 1934 ("Exchange Act") requirements regarding firm quotes, must compete against the regulatory advantage conferred on IEX Options by the order challenged here[3] (protected quote status without firm-quote obligations), can provide firsthand explanation of how non-firm protected quotations would distort competition, and have an interest in ensuring that exchanges compete on execution quality, technology, and service rather than regulatory arbitrage.

Whereas Citadel challenges the Order as a broker-dealer and market maker, the *Amici* Exchanges object as competing venues and can also assist the Court in understanding the negative impact the Order would have on other options market participants, something the Commission did not consider at all. The *Amici* Exchanges submitted comment letters to the Commission prior to the issuance of the Order. *See* A54-59 & A78-80. The *Amici* Exchanges present this brief from the perspective of exchanges that are subject to the same regulatory requirements as IEX

---

[3]    Investors Exchange LLC; Approving a Proposed Rule Change, as Modified by Amendment No. 3, To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options, Exchange Act Release No. 103998 (Sept. 18, 2025), 90 Fed. Reg. 45861 (Sept. 23, 2025) (A143-168) (the "Order").

Options, compete with IEX Options, and have a continuing interest in the fair, consistent, and reliable application of the Exchange Act and regulations promulgated thereunder (that is, as stewards of both their own options venues and the larger marketplace in which they operate).

## STATEMENT OF THE ISSUES

1.      Whether the Commission's approval of the IEX Options ORP mechanism violates the Exchange Act and is otherwise arbitrary and capricious under the Administrative Procedure Act.

2.      Whether the Order should be vacated.

## SUMMARY OF THE ARGUMENT

1.      The Order violates the Exchange Act for at least three reasons, all of which stem from a failure to address what the ORP does. *First*, it is inconsistent with the "firm quote" rule because it allows quotations that can be canceled or repriced by operation of the ORP to be treated as protected and thus to drive order flow to IEX Options. *Second*, the Order distorts competition by permitting IEX Options to drive order flow through regulatory compulsion: Market participants will be required to route orders to IEX Options despite the fact that those orders may, by operation of the ORP, be repriced or canceled. *Third*, the Order undermines the principles of fair access and non-discrimination that are fundamental to the options markets. This is because the operation of the ORP would benefit one group (IEX

3

Options market making members) to the disadvantage of all other market participants.

2.      The Order is premised on an incomplete analysis.  The record presented by IEX Options was insufficient to permit the Commission (or anyone else) to determine what sort of impact the ORP would have on the options markets.  On the one hand, the record does not even support the conclusion that there is a problem in the options markets that the ORP is needed to improve.  On the other hand, the Commission did not critically evaluate what little data analysis IEX Options offered in support of the ORP.

## ARGUMENT

There are a number of different ways to view the flaws in the Order.

*First*, the Order misunderstands how the IEX Options ORP would impact the trading of listed options.  Specifically, it ignores what the ORP would actually do, how it would do it, and the effect that it would have on the way options markets compete, the way orders are routed, and the expectations of market participants—especially liquidity takers, such as retail and institutional investors—who would be forced to interact with non-firm protected quotations displayed by IEX Options.[4]  To

---

[4]      Listed options markets are fundamentally different from equities markets in a number of ways.  For example, all listed options trades must occur on an exchange, whereas equities trades can occur on an exchange, in a dark pool, or through internalization by a broker-dealer.  *See generally* A113 (90 Fed.

encourage more "aggressive" quoting, the ORP would shift the risk associated with that quoting from market makers that choose to quote on IEX Options (IEX Options market making members) to investors that are required to route orders to the market with the best displayed quote under the Options Plan.

*Second*, the Commission did not consider the multiple alternate ways IEX Options could have chosen to "market test" its proposed structural change without having it change the way the entire options market works immediately if the Order goes into effect.  Putting to the side that its justification—supposed "latency arbitrage"—may or may not exist in the options markets and in any event was not the original justification for the ORP, the Commission ignored that there were several ways IEX Options could have proposed to launch its market in a way that would have allowed for examination of the ORP's effects without forcing the entire options market to adopt it immediately.[5]  The Commission and commenters would then have had more meaningful information with which to evaluate the proposal.

---

Reg. at 26,886) (acknowledging "the structural differences between equities and listed options markets")  Indeed, IEX Options itself recognized "the unique risks" faced by options market makers.  *See* A115 (90 Fed. Reg. at 26,888).

[5]    IEX Options could have chosen to (a) begin operating as an exchange or Alternative Trading System (ATS), with the ORP mechanism in place but without its quotes being subject to the Options Plan (IEX initially operated its equities market as an ATS before later transitioning to becoming an exchange) or (b) begin operating as an exchange with protected quotations but without utilizing the ORP to cancel or reprice those quotations.

For example, the SEC and commenters could have evaluated whether protected status was appropriate for quotes based on (a) the effects of the ORP in the real world and (b) the actual demand for it.  Instead the Commission chose "damn the torpedoes, full speed ahead."

*Third*, the Order approves a disruptive new structure for the options markets while ignoring the lack of substantive evidence submitted by IEX Options (particularly in the context of the existing options market structure) and failing to meaningfully analyze what little evidence was submitted.

## I.    THE ORDER VIOLATES THE EXCHANGE ACT

The Commission cannot approve the rules of a national securities exchange unless those rules comply with the Exchange Act and the regulations adopted thereunder.  *See* 15 U.S.C. § 78f(b) (an exchange "shall not be registered as a national securities exchange unless the Commission determines that …").  Among the Exchange Act's statutory requirements is that the Commission foster competition between exchanges, not obstruct or restrict it, unless the latter is "necessary or appropriate." *See* 15 U.S.C. § 78f(b)(8).  However, rather than promote competition, the Order undermines it by conferring special privileges to IEX Options that are inconsistent with the rules applicable to national securities exchanges.

### A.    How The ORP Operates

It is critical to analyze the Order from the perspective of what the ORP is designed to do, how it is designed to do it, and what the effects of that operation would be for the broader U.S. options market.  The *Amici* Exchanges start with the options markets as they exist today without the ORP:  For every quote on every options market, the firm quote rule requires that if an incoming order matches that quote upon receipt by the exchange, it executes against that quote.  *See* Petitioner's Brief 24.  The market participant that submitted the quote gets the economic bargain it intended when it submitted the quote (including the quote being protected if it satisfies the requirements of the Options Plan, i.e., is the "best" quote).  Likewise, the market participant that accesses or "hits" that quote gets the economic bargain it intended when it saw the quote and routed an order to interact with it.

As IEX Options intends, the ORP would operate differently.  During the ORP's 350 microsecond delay, IEX Options systems would monitor market data relating to the price of the underlying security to determine whether options prices are about to change and then protect IEX Options market making members (but no one else) from the risk that their quotes could be executed at unfavorable prices.  If following a change in the price of the underlying, the quote is no longer posted at a price that is favorable to the IEX Options market making member, the ORP would automatically cancel or re-price that quote before contra-side investor orders can

7

traverse the speed bump and execute against it. *See* A144 (90 Fed. Reg. at 45,862). The ORP does not let IEX Options members pause, think, and consider repricing their quotes, it acts automatically: It guarantees that if the market moves against a quote, the IEX Options market making member is relieved of the risk it took while the market participant who would have interacted with its quotation is deprived of the trade it tried to access.

How would IEX Options do this? IEX Options first takes direct real-time market data feeds from equities exchanges (including the equities trading facilities of the *Amici* Exchanges and affiliates) that all equities exchanges are required to provide to IEX Options[6] and uses that data along with the Black-Scholes option pricing formula to determine whether trades at the price quoted on IEX Options are likely to be favorable or unfavorable to the IEX Options market making member that entered the quotation. It would then cancel or re-price any quotes from IEX Options market making members *only*, giving *those* quotes the benefit of what the ORP determined to be a better price. The idea is simple if it works: IEX Options market making members can quote more aggressively, with the priority and order protection

---

[6]     As with other exchange rules, the rules under which exchanges (including IEX) sell market data are required to not permit unfair discrimination and not impose any unnecessary or inappropriate burden on competition. *See* 15 U.S.C. § 78f(b)(5) & (8). This means that all exchanges must sell their market data to all other exchanges.

benefits that come with that, knowing that the ORP will protect them and *only them* from unfavorable executions.  *See* A160 (90 Fed. Reg. at 45,878).

Put differently, those more "aggressive" quotes will only result in trades when the ORP determines that that result is better for the IEX Options market making members who submitted those quotes.  But because of the operation of the ORP, the market participant on the other side of that trade—who would have had no choice but to route to IEX Options under the Options Plan—may have been better off executing against a "less aggressive" quote on another market because that quote is truly firm and therefore offers a higher likelihood of execution.[7]  IEX Options is thus using the *Amici* Exchanges' and other exchanges' market data to disadvantage both trading on those other exchanges and the market participants who try to interact with any quotes that are protected against unfavorable executions by the ORP.

### B.    The Order Is Inconsistent With The Firm Quote Rule

The options market "firm quote" rule has two components:  Only firm, immediately executable quotes can be considered "protected."  *See* Options Plan § 2(15).  And if someone displays a quote on an options exchange, they cannot back away from it, which is referred to as "quote fading."  *See* 17 C.F.R. § 242.602(b) (exchanges must enforce displayed quotations at quoted price and size once

---

[7]    The length of the "speed bump" component of the Order is thus irrelevant. What matters is that a delay happens to allow a specified set of quotes to evade the firm quote rule through repricing or cancellation.

executable matching orders arrive); *In re Credit Suisse Securities (USA) LLC (Light Pool)*, 2016 WL 683553 (SEC Feb. 1, 2016) (fining broker-dealer for canceling rather than executing displayed quotations when market moved against it). The Commission offered no reasoned explanation for how the Order could be consistent with the firm quote rule. *Compare FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency that chooses to depart from its regulations must acknowledge that it is doing so and explain why) *with* A156 (90 Fed. Reg. at 45,874) (trying to dodge the issue by omitting firmness from the three requirements for a quotation to be protected). The Order simply dodges how a quote could ever be considered "protected" when, as the ORP is designed to work, it could never be considered "firm." The Commission's failure to comply with its own regulations renders the Order arbitrary and capricious. *See Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986).

## C.    The Order Distorts Competition Through Regulatory Compulsion

The Order puts the Commission's thumb on the scale with respect to a key question for market participants—how to route their options orders.

The *Amici* Exchanges (indeed, all options venues other than IEX Options) offer immediately accessible, firm quotes. If the Order goes into effect, certain IEX Options quotes (those submitted by IEX Options market making members) will be subject to repricing or cancellation by operation of the ORP during the time period

10

where investor orders that seek to interact with those quotes are delayed by the speed bump. Those quotations would be considered "protected," and brokers would be required to route orders to IEX whenever it displays the best price (A56 & 62), even though execution may be uncertain due to the operation of the ORP. This uncertainty of execution creates artificial routing mandates for market participants.

This creates several Exchange Act problems. *First*, if the Order goes into effect it will give IEX Options an unearned competitive advantage (such as through unearned transaction and market data fees, A129). In that scenario, IEX Options market making members would be able to submit protected quotes that the ORP would allow them to back away from if the market moves against them. IEX Options, which has no execution quality history, clearly designed the ORP to capture order flow immediately through regulatory mandate rather than evidence of superior execution.

*Second*, the lack of any meaningful data regarding the value of the ORP and the potential harm to investors and other market participants creates a fog around the Order. IEX Options has demanded that quotes subject to the ORP should be protected. Yet this is a formulation entirely different than all other options exchanges (including the *Amici* Exchanges). There is no data in the record to support the contention that quotes subject to the ORP should be considered the same for regulatory purposes as quotes displayed by other exchanges that comply with the

11

firm quote rule. In fact, the ORP is explicitly designed to enable IEX Options market making members to quote as aggressively as they would like while avoiding the risk of unfavorable trades that are better for investors but worse for the member that entered the quotation. If ORP-enabled quotes are so beneficial for the options markets, why is IEX Options afraid of letting them operate without protected status to let the market decide how valuable they are without compulsory routing?

*Third*, the burdens on competition the Order would impose are neither necessary nor appropriate. Determining whether a new burden on competition, like the one the Order would impose, is "necessary or appropriate" under Exchange Act Section 6(b)(8) requires determining what competitive conditions there are already. *See generally American Equity Investment Life Insurance Co. v. SEC*, 613 F.3d 166, 178 (D.C. Cir. 2010) (vacating rule because Commission did not assess competitive baseline before acting). The U.S. options market is one of the most competitive in existence, with the 18 current exchanges always adjusting fees, services, rebates, and technology to attract market share. *See* A59. It is undisputed that the options market has experienced unprecedented growth over the past five years without the system IEX Options now seeks to force on the market; indeed, that growth in volumes was facilitated by both growth in the number of exchanges competing against each other and robust and resilient exchange systems operating under a national market system with clear and clearly understood rules of

engagement. *See* A80. And yet, the Order presumed it was necessary and appropriate to disrupt that functioning, competitive market without any evidence of need or market failure, and while ignoring significant concerns expressed by commenters about the implications of this novel mechanism. That satisfies neither the Exchange Act's specific requirements nor the APA's reasoning and analysis requirements.

### D.    The Order Undermines Principles of Fair Access and Non-Discrimination

The existing options market structure provides clear, tested, and validated rules of engagement for all market participants. The ORP mechanism would benefit only one group (IEX Options market making members) while disadvantaging all other market participants. This violates the principle that exchanges safeguard fair markets for the benefit of market participants generally, not to promote rules that benefit small groups of market participants at the expense of other groups. And part of that stewardship involves promoting stability and avoiding disruptions, which is inconsistent with the Commission approving a rule a self-regulatory organization represents solves a problem for which it has presented an incomplete and non-compelling analysis.

## II.    THE ORDER IS PREMISED ON AN INCOMPLETE ANALYSIS

One of the key questions presented by IEX Options' proposal to introduce the novel ORP mechanism is how much of an impact it would have on the market—for

example, how often would the ORP be triggered, and what would the impact be for investors and other market participants when it does trigger? The SEC itself recognized this (A52, 90 Fed. Reg. at 17,477) and asked IEX to include additional information in the record to justify its claim that the ORP would have minimal impact (*id.*). The claim of minimal impact was itself strange: Presumably the ORP will either be triggered a lot (in which case it would have a significant impact on the options markets) or in a "minimal" way (in which case one wonders what its true benefit to the options markets would be). In any event, IEX did not provide the requested data (instead submitting facially dubious estimates) and the Commission went along without it in approving the Order. That was error for multiple reasons.

A. **The Record Does Not Support The Conclusion That There Is A Problem In The Options Markets For The ORP To Fix**

Although the ORP is an exchange proposal, the Commission justifies the Order approving it in a way that resembles its ill-fated transaction fee "Pilot Program," which the D.C. Circuit vacated in *New York Stock Exchange LLC v. SEC*, 962 F.3d 541 (D.C. Cir. 2020). In that case, the Commission enacted a rule to test the effects of certain shocks to the existing equities securities market so it could determine whether there was something that needed to be fixed, an issue about which there was "fundamental disagreement" among market participants. *See id.* at 545-46. Among other things, the D.C. Circuit noted that the Commission adopted the

14

rule there at issue "without explaining what problems with the existing regulatory requirements it meant for the Rule to correct" and faced with conflicting comments about whether it would harm efficiency, competition, and capital formation. *See id*. at 554-55. Because the Commission relied heavily on its claim to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984) (which the D.C. Circuit rejected), that decision is even more important now in light of *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). If the transaction fee "Pilot Program" could not survive *Chevron* review, the Order certainly cannot survive review now that *Loper Bright* has extinguished *Chevron* deference.

On the one hand, the Commission relied on the notion that the ORP would fix "latency arbitrage" in the options markets. *See* A154 (90 Fed. Reg. at 45,872). But that was not the basis on which the ORP was originally proposed, and it became IEX Options' support for the ORP only after significant objection to the proposal. *See* Petitioner's Brief 41. And even so, the record contains no evidence that what IEX Options and the Commission call "latency arbitrage" in the options market is anything other than the normal operation of derivative markets where price changes in the underlying security will necessarily result in changes to the prices of associated options contracts. *See id*. 41-42. The record relied on by the Commission does not even attempt to distinguish between so-called "latency arbitrage" and

15

ordinary repricing activity and thus cannot support "latency arbitrage" as a basis for the Order.

> **B.      The Commission Failed to Critically Evaluate the Limited Data Analysis Offered by IEX, Data that Obfuscates Rather than Clarifies the Impact of the ORP**

As an initial matter, an exchange that proposes a rule for Commission approval bears the burden of proving that the rule complies with the relevant requirements, and the Commission must do the work of analyzing whether the proponent has met that burden of proof, not just take the proponent's word. *See Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017). Here, the Commission relied on IEX Options' late and at best dubious statistical estimates of the effect of the ORP without doing the work to determine whether those estimates accurately reflect the impact of the ORP on the U.S. options market. *See* A121, A156, A158. Petitioner Citadel explains some of the flaws in what little data IEX Options submitted and what the Commission drew from it (Petitioner's Brief 43-46), but there is more:

Notably, the ORP mechanism works by doing two things. *First*, IEX Options determines whether the price of the underlying stock is moving and, if so, calculates the expected size of price movement in each associated options contract based on the Black-Scholes options pricing model. *Second*, IEX Options compares the price determined in the first step with the price of any quotation posted by IEX Options

16

market making members that have elected to use the ORP. If IEX Options determines that the price of the market maker's quotation is too aggressive relative to the new price it calculated, then the market maker's quotation would be canceled or re-priced, preventing investors from accessing supposedly "firm" (and therefore "protected") liquidity displayed at that price to market participants. As IEX Options' filing stated, "[i]f a quote instability determination is generated for an options series being quoted by a Market Maker and the quote is above (below) the price level of the quote instability determination, the quote will be cancelled or repriced to the price level of the quote instability determination, as selected by the Market Maker." A25 (90 Fed. Reg. at 12,891).

Because of the way the ORP operates, one important input into whether it triggers is how aggressively IEX Options market making members have chosen to quote. IEX Options argued, and the Commission accepted, that the ORP is intended to encourage additional liquidity "at potentially *better* prices if a market maker decides to quote *more aggressively* given the protection … the ORP provides." A154 (90 Fed. Reg. at 45,872) (emphasis added)  This is key to IEX Options' argument that the ORP mechanism benefits investors and does not unfairly discriminate in favor of IEX Options market making members. However, IEX Options' limited analysis assumed that IEX Options market making members would submit quotes equivalent to the best prices in the market 100% of the time but would

17

*never* improve the existing market-wide best quote. This assumption by IEX Options is unfounded and the Commission itself approved the proposal on the assumption that IEX Options market making members would be incentivized to post more aggressive quotations if they know that they can avoid unfavorable trades due to the operation of the ORP.

Thus, the most the Commission could have concluded from IEX Options' data was that if IEX Options market making members quoted on IEX Options the same way that they quoted on other markets, they would not need the ORP mechanism. The Commission failed to assess whether the more aggressive quotations the ORP mechanism was designed to attract would also cause more frequent quote cancellations that negatively impact investors seeking to take liquidity on IEX Options. The Commission cannot have it both ways, assuming on the one hand that the ORP mechanism would benefit investors by encouraging more aggressive quoting but at the same time would not harm those investors through impermissible quote fading under the assumption that IEX market making members would *not* quote more aggressively than they do today on other U.S. options exchanges. It is precisely these "maybe quotations," priced more aggressively than quotations on other markets only because of the downside risk protection created by the ORP, that commenters indicated were likely to be subject to quote fading. Almost by

18

definition, quotations posted at the same price as quotations on existing options exchanges are unlikely to need the protection that ORP provides.

This also highlights another failing in IEX Options' analysis of the data, which the Commission improperly relied on in the Order. For the same reason that more aggressive quotations encouraged by the ORP may cause additional triggering of the ORP, there is also likely to be a significant difference in how often ORP triggers in connection with different instruments. IEX Options provided only basic top line estimates of the impact of the ORP. However, these estimates spread the impact across 1.8 million plus options instruments, the majority of which do not trade at all on any given day. Because the instruments that do trade more volume are generally quoted with tighter spreads, the ORP is more likely to trigger in those instruments than with less liquid instruments, which make up the bulk of listed options but the minority of options trading volume. There are currently more than 1.8 million series of listed options. A proper statistical analysis should have addressed how many of those series actually trade on a given day, how those series make up the volume of trading (for example, do a small number of series account for a large part of the total volume), and how materially different trading characteristics in series that investors do or do not trade would impact the operation of the ORP (for example, would the ORP be impacted by a significant difference in spreads or volatility characteristics between the highly liquid series that account for most options volume and the illiquid

19

series that make up the majority of options listings).  It was IEX Options' obligation

to put sufficient data into the record to allow this sort of analysis, which it failed to

do.  *See* A116 (90 Fed. Reg. at 26,889).  IEX Options' failure to analyze, or provide

data sufficient to allow others to analyze, the impact of the ORP beyond broad

averages that likely hides the significance of that impact in the instruments investors

are actually trading is significant.[8]

For all these reasons, the ORP is the same type of solution in search of a

problem that the D.C. Circuit found improper in *New York Stock Exchange LLC v.*

*SEC*, and the Order should thus also be vacated.

---

[8]    IEX Options also ignored the fact that the most liquid options (indices such
as SPY and QQQ) now have daily expiring series, vastly multiplying the
contribution they make to trading-related statistics.  It likewise ignored
0DTE (0 days to expiry) options, an area of the market that has exploded in
volume in the last two years.  Because the volume of 0DTE options trading
has risen so quickly and their prices are so much more volatile than those of
weekly or monthly expiry options, the ORP would be expected to behave
much differently for them than for other even highly liquid options.

## CONCLUSION

For all the reasons stated above and in Petitioner's Brief, this Court should vacate the Order.

Jonathan H Kaskel
  *Counsel of Record*
DENTONS US LLP
1 Alhambra Plaza Penthouse
Miami, Florida 33134
(305) 537-0009
jonathan.kaskel@dentons.com

Douglas W. Henkin
(*motion for admission forthcoming*)
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700
douglas.henkin@dentons.com

*Counsel for NYSE Arca, Inc., NYSE American LLC, and MEMX LLC as Amici Curiae*

21

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.      The undersigned counsel certifies pursuant to Fed. R. App. P. 29(a)(4)(G), 32(a)(7) and 32(g)(1) that the foregoing brief contains 4,900 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4, according to the word count feature of Microsoft Office 365.

2.      The undersigned counsel further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-pt. Times New Roman font.

*/s/* Jonathan H Kaskel
Jonathan H Kaskel
*Counsel for Amici Curiae*

22

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing will be served on all parties via

the Court's CM/ECF system on this 15th day of January, 2026.

> */s/* Jonathan H Kaskel
> Jonathan H Kaskel
> *Counsel for Amici Curiae*