**No. 25-13631**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

CITADEL SECURITIES LLC,
*Petitioner*,

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent*,

INVESTORS EXCHANGE, LLC,
*Intervenor.*

---

On Petition for Review of an Order
of the Securities and Exchange Commission

---

## BRIEF OF THE SECURITIES AND EXCHANGE
## COMMISSION, RESPONDENT

---

J. RUSSELL MCGRANAHAN
*General Counsel*

JEFFERY B. FINNELL
*Deputy General Counsel*

TRACEY A. HARDIN
*Solicitor*

EMILY TRUE PARISE
*Assistant General Counsel*

BROOKE WAGNER
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-5292
wagnerbr@sec.gov

## STATEMENT REGARDING ORAL ARGUMENT

The Commission stands ready to present oral argument if it would assist the Court.

**TABLE OF CONTENTS**

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ...........................................................................1

COUNTERSTATEMENT OF ISSUES PRESENTED...............................................4

STATEMENT OF THE CASE.................................................................4

    A.    Nature of the Case ...........................................................4

    B.    Statutory and Regulatory Scheme ..........................................5

        1.    National Securities Exchanges ..........................................5

        2.    The National Market System...........................................7

        3.    Order Protection .........................................................8

    C.    Market Structure.............................................................9

        1.    Exchange Competition ..................................................9

        2.    Options Trading...........................................................10

        3.    Latency Arbitrage........................................................12

    D.    IEX ...........................................................................14

        1.    IEX's Model ...............................................................14

        2.    The Commission Approves D-Limit................................16

        3.    The D.C. Circuit Affirms ..............................................17

    E.    Proceedings Before the Commission ....................................19

        1.    IEX's Proposal............................................................19

2.   Comments on IEX's Proposal ........................................................21

3.   The Commission's Order ...........................................................23

STANDARD OF REVIEW .................................................................31

SUMMARY OF ARGUMENT ...........................................................31

ARGUMENT ....................................................................................32

I.   The Commission reasonably concluded that IEX's proposal was
     consistent with the Exchange Act...............................................33

     A.   The proposal was not unfairly discriminatory. ...................33

     B.   The proposal did not impose a burden on competition not
          necessary or appropriate in furtherance of the Act. ...........38

II.  Substantial evidence supports the Commission's conclusions. ...................43

     A.   Substantial evidence supports the Commission's assessment of
          latency arbitrage. ..................................................................44

     B.   Substantial evidence supports the Commission's assessment
          of the ORP's impact. .............................................................48

III. The Commission reasonably determined that IEX Options quotes
     would be "protected." ................................................................53

CONCLUSION .................................................................................58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Am. Equity Inv. Life Ins. Co. v. SEC,*
  613 F.3d 166 (D.C. Cir. 2010) ............................................................... 40

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
  833 F.3d 1274 (11th Cir. 2016) .................................................... 31, 58

*Bradford Nat'l Clearing Corp. v. SEC,*
  590 F.2d 1085 (D.C. Cir. 1978) ............................................................. 43

*Cboe Glob. Mkts., Inc. v. SEC,*
  155 F.4th 704 (D.C. Cir. 2025) ............................................................ 5, 7

*Chamber of Com. v. SEC*,
  412 F.3d 133 (D.C. Cir. 2005) ............................................................... 46

*Chi. Bd. Options Exch., Inc. v. SEC,*
  889 F.3d 837 (7th Cir. 2018) ................................................................. 11

*\*Citadel Sec. LLC v. SEC,*
  45 F.4th 27 (D.C. Cir. 2022)...3, 12–15, 18, 19, 35, 36, 42, 44, 49–52, 54, 56, 57

*Credit Suisse Sec. (USA), LLC,*
  2016 WL 683553 (Jan. 31, 2016) ........................................................ 37

*Dow Jones & Co. v. Int'l Sec. Exch., Inc.*,
  451 F.3d 295 (2d Cir. 2006) .................................................................... 5

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ............................................................................... 52

*Ga. Dep't of Educ. v. U.S. Dep't of Educ.*,
  883 F.3d 1311 (11th Cir. 2018) ............................................................. 44

*Moore v. Barnhart,*
  405 F.3d 1208 (11th Cir. 2005) ............................................................. 52

*Nasdaq Stock Mkt. LLC v. SEC,*
  34 F.4th 1105 (D.C. Cir. 2022) ............................................................. 43

*Nasdaq Stock Mkt., LLC v. SEC,*
  38 F.4th 1126 (D.C. Cir. 2022) ............................................................. 46

*Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*,
    835 F.3d 1377 (11th Cir. 2016) ............................................................. 43

*NetCoalition v. SEC*,
    615 F.3d 525 (D.C. Cir. 2010) ............................................................. 5

*NYSE LLC v. SEC*,
    2 F.4th 989 (D.C. Cir. 2021) ............................................................. 8

*Susquehanna International Group, LLP v. SEC*,
    866 F.3d 442 (D.C. Cir. 2017) ............................................................. 49

*Timpinaro v. SEC*,
    2 F.3d 453 (D.C. Cir. 1993) ............................................................. 33

*United States v. Am. Stock Exch., LLC*,
    2000 WL 33400154 (D.D.C. Sept. 26, 2000) ............................................. 9–10

## Statutes

5 U.S.C. 706(2)(A) ............................................................................. 31

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq*.

    Section 3(a)(1), 15 U.S.C. 78c(a)(1) ................................................... 5

    Section 3(a)(26), 15 U.S.C. 78c(a)(26) ................................................. 6

    Section 5, 15 U.S.C. 78e ................................................................. 5

    Section 6, 15 U.S.C 78f ................................................................. 6

    Section 6(b)(5), 15 U.S.C. 78f(b)(5) ................................................... 6, 33

    Section 6(b)(8), 15 U.S.C. 78f(b)(8) ................................................... 6, 38–39

    Section 11A, 15 U.S.C. 78k-1 ............................................................ 1

    Section 11A(a)(1)(C), 15 U.S.C. 78k-1(a)(1)(C) ......................................... 7

    Section 11A(a)(2), 15 U.S.C. 78k-1(a)(2) ............................................... 7, 8

    Section 11A(a)(2), 15 U.S.C. 78k-1(a)(3)(B) ............................................ 8

    Section 19(a), 15 U.S.C. 78s(a) ......................................................... 6

    Section 19(b), 15 U.S.C. 78s(b) ......................................................... 6, 40

    Section 19(b)(2)(C)(i), 15 U.S.C. 78s(b)(2)(C)(i) ...................................... 6

v

Section 19(b)(2)(C)(ii), 15 U.S.C. 78s(b)(2)(C)(ii)................................................. 6

Section 19(c), 15 U.S.C. 78s(c) ....................................................................... 41

**Rules and Regulations**

Rules Under the Securities Exchange Act of 1934, 17 C.F.R. 240.01, *et seq.*

Rule 602(b), 17 C.F.R. 242.602(b) ................................................................. 37

Rule 608, 17 C.F.R. 242.608 ........................................................................... 8

Rule 611, 17 C.F.R. 242.611 ...................................................... 8, 9, 15, 18, 29

**Commission Releases**

*Regulation NMS*,
70 Fed. Reg. 37496 (June 29, 2005) ....................................... 7, 8–9, 10

*Order Approving the National Market System Plan Relating to Options Order Protection and Locked/Crossed Markets*,
74 Fed. Reg. 39362 (Aug. 6, 2009) ................................. 9, 29, 32, 53, 54–57

*Concept Release on Equity Market Structure*,
75 Fed. Reg. 3594 (Jan. 21, 2010) ........................................................ 1

*Commission Interpretation Regarding Automated Quotations Under Regulation NMS*, 81 Fed. Reg. 40785 (June 23, 2016) .............................. 15–16

*In the Matter of the Application of: Investors' Exchange, LLC for Registration as a National Securities Exchange*,
81 Fed. Reg. 41142 (June 23, 2016) ................................................... 15

*Regulation NMS: Minimum Pricing Increments, Access Fees, and Transparency of Better Priced Orders*,
89 Fed. Reg. 81620 (Oct. 8, 2024) .................................................... 9

*Order Approving a Proposed Rule Change, as Modified by Amendment No. 3, To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options*,
90 Fed. Reg. 45861 (Sept. 23, 2025) .................................................... 2

**Other Authorities**

IEX Rules 17.100, 23.150(d), *available at*
    https://www.sec.gov/files/rules/sro/iex/2025/34-103290-ex5.pdf  ................... 53

MIAX, MIAX Risk Protections Guide (2025), *available at*
    https://www.miaxglobal.com/miax_exchange_group_options_risk
    _guide.pdf  .......................................................................................................38

NYSE, NYSE Pillar Risk Controls (2026), *available at*
    https://www.nyse.com/publicdocs/nyse/NYSE_Pillar_Risk_Controls.pdf  ......38

SEC, *Staff Report on Equity and Options Market Structure Conditions
    in Early 2021* (Oct. 14, 2021), *available at* https://www.sec.gov/
    files/staff-report-equity-options-market-struction-conditions-early-
    2021.pdf  .................................................................................................. 10, 11

**INTRODUCTION**

In 1975, Congress directed the Securities and Exchange Commission ("Commission") to facilitate the establishment of a national market system that promotes fair competition among markets, price transparency, investor protection, and capital formation. *See* Section 11A of the Securities Exchange Act of 1934 ("Exchange Act" or "Act"), 15 U.S.C. 78k-1. Since then, a "dispersed and complex" market structure has developed in which "many highly automated trading centers" compete for order flow in the same securities and offer "a wide range of services ... designed to attract different types of market participants with varying trading needs." *Concept Release on Equity Market Structure*, 75 Fed. Reg. 3594, 3594 (Jan. 21, 2010). The evolution of technology has "dramatically improved the speed, capacity, and sophistication of the trading functions that are available to market participants." *Id.* And the increased speed and automation of markets has created opportunities for market participants to exploit technology to the disadvantage of others.

Intervenor Investors Exchange, LLC ("IEX") entered the competitive exchange marketplace in 2016 with the aim of providing a platform to combat latency arbitrage, a practice in which high-frequency traders use their speed advantage to trade at outdated prices before slower market participants can adjust, profiting from imminent price transitions at the expense of long-term investors. To

limit latency arbitrage on its equities market, IEX utilizes a "speedbump," a 38-mile-long wire coil that all incoming orders must traverse.  The 350 microseconds it takes orders to travel the speedbump allows IEX to assess market data and update certain orders in moments of price transition before high-frequency traders can take them at stale prices, blunting the impact of the speed advantage.

Securities exchanges like IEX are required to register with, and submit any proposed rule changes to, the Commission.  In the order under review, the Commission approved IEX's proposal to launch an options exchange, "IEX Options," that would deploy the same tools used to address latency arbitrage on its equities exchange.  *Order Approving a Proposed Rule Change, as Modified by Amendment No. 3, To Adopt Rules To Govern the Trading of Options on the Exchange for a New Facility Called IEX Options*, 90 Fed. Reg. 45861 (Sept. 23, 2025).  After considering the proposal and the robust record, the Commission reasonably concluded that IEX's proposal was consistent with the Exchange Act, was not unfairly discriminatory, and did not impose an unnecessary or inappropriate burden on competition.

Citadel—a high-frequency trader—challenges the Commission's approval, just as it earlier challenged IEX's use of these mechanisms on its equities exchange.  In that earlier challenge, the D.C. Circuit affirmed the Commission's conclusion that IEX's decision "to innovate … in a way that offers new

opportunities to long-term investors" was consistent with the Exchange Act and would "benefit[] all market participants by thwarting latency arbitrage." *Citadel Sec. LLC v. SEC*, 45 F.4th 27, 32, 34 (D.C. Cir. 2022) (citation modified).  The same is true here.  As the Commission explained, the reasons that supported IEX's equities innovation apply equally to its options proposal and, in fact, "[t]hose reasons are even more appropriate in the options context."  A150.

Citadel and amici provide no reason to disregard this well-supported conclusion.  At the outset, they mischaracterize both the nature of the Commission's action and the question before the Court.  The Commission has not adopted a "federal rule" as a regulatory intervention to solve a market problem. Rather, the Commission approved a proposal made by one exchange to innovate on its own platform and distinguish itself from competitors.  The question is therefore not whether the Commission affirmatively regulated beyond the bounds of its statutory authority but, rather, whether the Commission reasonably concluded that IEX's proposed innovation was consistent with the statutory requirements for national securities exchanges.

Citadel and amici would have this Court conclude that it did not—and instead freeze the status quo—based on their insistence that IEX's proposal unfairly favors one group of participants (market-making liquidity providers) over others and that the Commission's conclusions were unsupported by substantial

evidence. These assertions are wrong. The Commission reasonably concluded that IEX's proposal to encourage liquidity and benefit long-term investors was a permissible innovation that could benefit the market as a whole. And, contrary to Citadel's contentions, the Commission's conclusion is amply supported by substantial record evidence. Because Citadel and amici merely seek to substitute their preference for IEX's legitimate business choices, the Commission's order should be affirmed.

## COUNTERSTATEMENT OF ISSUES PRESENTED

1.    Whether the Commission reasonably determined that IEX Options would not unfairly discriminate or impose an undue burden on competition in violation of the Exchange Act.

2.    Whether the Commission's determinations were supported by substantial evidence.

3.    Whether the Commission reasonably determined that IEX Options quotes would be "protected."

## STATEMENT OF THE CASE

**A.    Nature of the Case**

Citadel petitions for review of the Commission's order approving a proposed rule change by IEX to adopt rules to govern an options trading platform on its exchange.

### B.    Statutory and Regulatory Scheme

### 1.    National Securities Exchanges

"Exchanges provide markets where investors can buy securities from other investors." *Cboe Glob. Mkts., Inc. v. SEC*, 155 F.4th 704, 711 (D.C. Cir. 2025). These securities include both equities and options, which are "contracts which give the purchaser of the option the right, but not the obligation, to buy or sell a security at a specified price." *Dow Jones & Co. v. Int'l Sec. Exch., Inc.*, 451 F.3d 295, 298 (2d Cir. 2006). "Investors submit orders to buy and sell [these securities]. Exchanges, in turn, rank, display, and match those orders.[1] Some investors participate by posting bids to buy (or offers to sell) a security. In doing so, these investors create opportunities for trading—they 'make' liquidity in the market. Other investors then 'take' liquidity by accepting these standing bids to buy (or offers to sell). Exchanges coordinate and regulate this activity." *Cboe*, 155 F.4th at 711 (citation modified).

The Exchange Act requires an exchange to register with the Commission as a "national securities exchange" or seek an exemption. 15 U.S.C. 78c(a)(1), 78e. Once registered, a national securities exchange becomes a self-regulatory

---

[1] Exchanges offer different order types, including "market order[s]," which "offer to immediately trade at the prevailing market price," and "limit order[s]," which "offer to trade a certain amount of a security at a specific price." *NetCoalition v. SEC*, 615 F.3d 525, 530 (D.C. Cir. 2010) (citation modified).

organization ("SRO") subject to Commission oversight and regulation. *See id.* 78c(a)(26). The Commission approves registration only if it determines that an exchange meets the requirements in Section 6(b) of the Act, including that the exchange have and enforce rules "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, … to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers." *Id.* 78f(b)(5). The exchange's rules must also "not impose any burden on competition not necessary or appropriate in furtherance of the purposes of" the Exchange Act. *Id.* 78f(b)(8).

After registering, a national securities exchange must file any proposed rule or rule change with the Commission. With exceptions not relevant here, the Commission must, after notice and comment, approve or disapprove the proposal by written order. *Id.* 78f, 78s(a)-(b). The Commission "shall approve a proposed rule change … if it finds that such proposed rule change is consistent with the requirements of [the Exchange Act] and the rules and regulations issued [thereunder] that are applicable to [the SRO]." *Id*. 78s(b)(2)(C)(i). If the Commission does not make such a finding, it shall disapprove the proposed rule change. *Id*. 78s(b)(2)(C)(ii).

## 2. The National Market System

National securities exchanges are also subject to laws and regulations designed to support a national market system ("NMS") for securities trading. "The NMS is premised on promoting fair competition among individual markets, while at the same time assuring that all of these markets are linked together … in a unified system that promotes interaction among the orders of buyers and sellers." *Regulation NMS*, 70 Fed. Reg. 37496, 37498 (June 29, 2005).

Expecting that "new data-processing and communications technologies would connect securities markets nationwide," *Cboe*, 155 F.4th at 711, Congress in 1975 enacted Section 11A of the Exchange Act, which directed the Commission "to facilitate the establishment of a national market system," 15 U.S.C. 78k-1(a)(2), and "gave the Commission intentionally broad and clear power, plus discretion, to shape the development of that system," *Cboe*, 155 F.4th at 711 (citation modified). Congress found it "in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure" certain objectives for the national market system, including: (i) the economically efficient execution of securities transactions; (ii) fair competition among markets; (iii) price transparency; (iv) the practicability of best execution of investors' orders; and (v) "an opportunity ... for investors' orders to be executed without the participation of a dealer." 15 U.S.C. 78k-1(a)(1)(C). It then directed

7

the Commission to "use its authority" to "carry out" these objectives. *Id.* 78k-1(a)(2).

Congress also empowered the Commission to "authorize or require [exchanges and other SROs] to act jointly with respect to matters as to which they share authority … in planning, developing, operating, or regulating a national market system." *Id.* 78k-1(a)(3)(B). Commission Rule 608 governs the process for such joint action, accomplished through "NMS plans" entered into by multiple SROs. 17 C.F.R. 242.608; *see, e.g.*, *NYSE LLC v. SEC*, 2 F.4th 989, 990–91 (D.C. Cir. 2021).

### 3.    Order Protection

As the number of trading venues has grown, so has the possibility that one trading center will execute an order at a price worse than that displayed by another to the investor's detriment, a practice known as a "trade-through." *See* 70 Fed. Reg. at 37501. To protect against this, "order protection" rules are designed to ensure that every order displaying the best price, at any trading center, must be taken before an order can be filled at a trading center offering an inferior price. *Id.* at 37505.

For equity markets, Commission Rule 611, the "Order Protection Rule," provides intermarket protection for automated quotations that reflect the national best bid or offer, which are considered "protected" quotes. 17 C.F.R. 242.611; 70

Fed. Reg. at 37501.  For options, instead of a Commission rule, the "Options Order Protection and Locked/Crossed Market Plan"—an NMS plan proposed and joined by the options exchanges—includes an order-protection provision that is "virtually identical to the requirement in Rule 611(a)."  Supp. App. ("SA") 4 (*Order Approving the National Market System Plan Relating to Options Order Protection and Locked/Crossed Markets*, 74 Fed. Reg. 39362, 39365 (Aug. 6, 2009) ("Options Plan")).  As in Rule 611, that provision aims to prevent trade-throughs for protected quotations, with exceptions for certain transactions.  *Id.*  One such exception is for transactions involving "Non-Firm" quotations, a term defined by individual exchanges.  SA9, 6 ("Participants should not be required to protect the price of an away market when that market identifies its quotes as 'Non-Firm.'").

## C.  Market Structure

### 1.  Exchange Competition

There are currently 29 registered exchanges.  Each exchange develops its own rules and trading model to compete against one another for order flow and market share.  Exchanges compete through, *inter alia*, "the rules that dictate how orders routed to them interact" and the cost of trading on their market.  *Regulation NMS: Minimum Pricing Increments, Access Fees, and Transparency of Better Priced Orders*, 89 Fed. Reg. 81620, 81701 (Oct. 8, 2024).  They also compete by offering "quicker execution and greater liquidity[] than their competitors," *United*

9

*States v. Am. Stock Exch., LLC*, 2000 WL 33400154, at \*7 (D.D.C. Sept. 26, 2000), and innovate to attract liquidity at the best prices.  This diversification of exchange offerings is essential to the "[v]igorous competition among markets" at the heart of the NMS.  *See* 70 Fed. Reg. at 37498–99.

### 2.    Options Trading

Options provide "the right either to buy or to sell a specified amount or value of a particular underlying interest (equity security, stock indices, government debt securities or foreign currencies) at a fixed exercise price by exercising the option before its specified expiration date."  *Am. Stock Exch.*, 2000 WL 33400154, at \*6.  For example, an option might provide a buyer the right (but not the obligation) to buy 100 shares of ABC stock at $10 by January 1, regardless of the then-current price of ABC stock.  *See* SEC, *Staff Report on Equity and Options Market Structure Conditions in Early 2021*, 4 n.5 (Oct. 14, 2021) ("2021 Staff Report"), *available at* https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf.[2]

Trading in options differs from equities trading in certain key respects.  First, while equities trade at both exchanges and non-exchange venues (such as alternative trading systems and broker-dealers' internal systems), options trade

---

[2] Options are listed by "class," representing the underlying security (*e.g.,* ABC stock), and by "series," representing the options type ("call" (buy) or "put" (sell)), strike price, and expiration date.  2021 Staff Report at 4 n.5.

10

only at exchanges. A157; 2021 Staff Report at 11. Second, compared to around 10,000 NMS-listed stocks, there are more than one million options series, with potentially dozens or hundreds of series for each underlying stock. A152 & n.176, A157; 2021 Staff Report at 4. The large number of listed options, in turn, renders the options market much more dependent on market makers[3] to provide liquidity, as other market participants are less likely to provide resting orders across the many series in the many options classes. A152, A157.

Third, options, unlike equities, are "derivative securities, which means their quoted price is derived in substantial part from the price of the underlying security or securities upon which they are based." A152. That means options prices need to move when the price of the underlying security moves. A153 (market makers "quoting the option will correspondingly update their options quote" when the price of the underlying security moves "to maintain that derivative pricing relationship").

The combination of these factors exposes options market makers to considerable risk. A157. "Unlike a single stock for which an equities market maker maintains a single quote, an options market maker quoting options on that

---

[3] "A market maker is a broker-dealer firm that … create[s] liquidity by being continuously willing to buy and sell the security in which [it is] making a market." *Chi. Bd. Options Exch., Inc. v. SEC,* 889 F.3d 837, 838 n.2 (7th Cir. 2018) (citation modified).

11

same stock may be quoting dozens of series.  When the market moves, the stock market maker only has to update one quote, but the options market maker needs to update many quotes"—on both sides of the market—"and is exposed to risk of loss across more products as a result."  A160 n.267.

Options exchanges accordingly compete in part by offering market makers different risk mitigation tools, or "risk controls," to manage the risks associated with their quoting obligations.  Such risk controls allow market makers to "have the exchange automatically cancel their quotes and orders when certain triggers specified by the market participant are met."  A150; *see, e.g.*, A159–60 & n.266.

### 3.    Latency Arbitrage

Options market makers are also acutely exposed to "latency arbitrage," through which technologically sophisticated traders exploit a speed advantage to pick off "stale" quotes before they can be updated to a new price.

"Today, securities exchanges are electronic, and orders move at the speed of light."  *Citadel*, 45 F.4th at 29.  Advances in technology mean trading is now measured in microseconds—millionths of a second—and trending toward nanoseconds.  Still, a trader's ability to take in market data and update its order is "not instantaneous.  It takes a moment for an update to reach exchanges all over the country.  That moment is called 'latency.'"  *Id.* at 30.

Certain firms capitalize on this latency, employing sophisticated technology, proprietary market data, and special connectivity to identify and act on moments of price transition before others—who have not invested in these "expensive and uncommon" enhancements—can.  A153; *see also* SA37.  These firms seize on "securities at old, stale prices—just before updated prices reach the exchanges—and then turn around and trade those securities at the newly updated" prices. *Citadel*, 45 F.4th at 30–31.  "That practice is called 'latency arbitrage.'"  t*Id.* at 31; *see also* SA30 (describing the "race condition" "between liquidity providers who want to reprice" their quotes "to reflect the changing market prices and the liquidity takers who want to take before those updates can occur"); *accord* A152–53.

In the options market, latency arbitrage can cause economic losses for market makers unable to update their quotes to reflect price changes in the options' underlying securities before those quotes are exploited by faster counterparties. A153.  This "potential for major losses" can in turn disincentivize market makers from posting liquidity or offering quotes at the best possible price.  A157, A160; *cf.* SA30–31; *see also infra* D.2 (describing negative impacts of latency arbitrage on options market).

### D.    IEX

#### 1.    IEX's Model

"From the beginning, IEX has sought to attract business from liquidity providers by combating latency arbitrage on its exchange." *Citadel*, 45 F.4th at 31. To do so, IEX developed "two tools: a thirty-eight-mile-long coil of wire called the 'speedbump' and a publicly available algorithm called the 'crumbling quote indicator,' which predicts imminent changes to the national best bid or offer." *Id*. The speedbump and indicator work in tandem to protect certain orders from latency arbitrage during moments of price transition.

"Here's how they work.  All *orders* going to IEX must traverse the speedbump," a trip that takes 350 microseconds (about 1/11th the blink of an eye).[4] *Id.*  IEX's connection to market data feeds, however, does not traverse the speedbump, allowing IEX to get information on exchange trading activity just before it receives orders.  *Id.*  That information goes into the indicator's algorithm to determine whether the national best bid or offer for a particular security is about to change.  *Id.*  If the algorithm predicts an imminent price change, IEX "updates the security's price to reflect the changing national best bid or offer.  And the update happens while incoming orders from liquidity takers, including [latency

---

[4] The time to traverse the speedbump is equivalent to the time transmissions take to travel approximately 38 miles, or the distance between the Nasdaq and NYSE data centers in Carteret and Mahwah, N.J.  SA29 n.49.

arbitrageurs], are stuck in the speedbump," allowing the securities to avoid being picked off at stale prices. *Id.* at 32 ("If IEX's strategy works as intended, orders protected by it are less likely to fall prey to latency arbitrage [because w]hen the short-term investor's order reaches IEX, the order will not execute if the new market price is too low or too high to satisfy a short-term investor who is only interested in taking when providers' bids and offers are stale.").

The Commission approved IEX's registration as a securities exchange, with the speedbump and indicator applied to certain non-displayed orders, in 2016. In doing so, the Commission rejected arguments raised by Citadel that a delay that permitted an exchange to reprice certain orders would unfairly discriminate, instead concluding that its protections against latency arbitrage benefited all investors. *In the Matter of the Application of: Investors' Exchange, LLC for Registration as a National Securities Exchange*, 81 Fed. Reg. 41142, 41156 & n.217, 41157 (June 23, 2016). It also concluded that IEX's quotations qualified as "automated" and therefore "protected" quotations under Rule 611, despite undergoing the speedbump's 350-microsecond delay, because that delay was no greater than the delays already faced by traders sending orders to exchanges in different locations and was therefore de minimis (i.e., "so short as to not frustrate the purposes of Rule 611 by impairing fair and efficient access to an exchange's quotations"). *Id.* at 41156 n.215, 41161–62; *Commission Interpretation Regarding*

*Automated Quotations Under Regulation NMS*, 81 Fed. Reg. 40785, 40792 (June 23, 2016).

### 2.     The Commission Approves D-Limit

In 2020, the Commission approved a proposal by IEX to apply these tools to a new displayed order type, "D-Limit."  The Commission first determined that "latency arbitrage is occurring on IEX and it is a problem for liquidity providers on IEX," citing data showing stark discrepancies between the very short times IEX's algorithm identified an imminent price change and the volume of orders executed during those windows.  SA36 & n.133.  Because most broker-dealers cannot target such precise milliseconds, the disparities demonstrated that latency arbitrageurs were targeting these moments of price transition.  SA30, SA37.

The Commission then found D-Limit's protections against latency arbitrage consistent with the Exchange Act.  Noting that the indicator was triggered for less than 0.2% of the trading day, the Commission explained that IEX's proposal would not result in harmful "quote fading" (i.e., the perceived inability of a liquidity taker to execute against a displayed order).  Rather, for "virtually the entire regular trading hours session," "a D-Limit order is simply a regular limit order and thus will be as equally accessible as any other limit order on IEX."  SA34.  And "[f]or the small part of the day when the [indicator] is on, market participants that are not engaging in latency arbitrage trading strategies are unlikely to be seeking to trade

16

with a D-Limit order precisely when it is in the process of being repriced by IEX." *Id.*; *see also* SA35.

The Commission then concluded that D-Limit did not unfairly discriminate among customers, issuers, brokers, or dealers, because its "narrowly focused protection" was "calibrated to impact only the small number of liquidity takers that engage in latency arbitrage," while helping to "incentivize liquidity providers to post orders for the benefit of all market participants." SA37; *see also id.* (while D-Limit would "negatively impact liquidity takers that employ latency arbitrage strategies," "that is the specific harm against which IEX is seeking to protect liquidity providers"). Nor did it impose an undue burden on competition, instead presenting an "innovat[ive]" and "competitive response to mitigate current competitive imbalances between liquidity providers and latency arbitrage liquidity takers." SA39. Finally, the Commission rejected the contention that D-Limit should fall outside the order protection rule. SA35.

### 3. The D.C. Circuit Affirms

Citadel challenged the Commission's approval order, and the D.C. Circuit affirmed the Commission. As that court explained, the central issue was "whether the SEC may allow IEX to innovate, with the D-Limit order, in a way that offers new opportunities to long-term investors," even as "companies like Citadel [continue to] seek advantages in the market by using advanced technology and

17

ingenious trading strategies." *Citadel*, 45 F.4th at 32. Because Citadel could not "regulate [its] way into a market victory," Oral Argument Tr. at 48:7–12, *Citadel Sec. LLC v. SEC*, No. 20-1424 (D.C. Cir. Oct. 25, 2021) (Walker, J.), by opposing such innovation, the D.C. Circuit affirmed.

The court first concluded that trading disparities identified by IEX offered "substantial evidence [of] latency arbitrage during the same small increments of time that the [indicator] turns on." *Citadel*, 45 F.4th at 33 (citation modified); *see also id.* at 35. "That substantial evidence" also supported "the SEC's conclusion" that D-Limit "narrowly targets latency arbitrage" and would not impede normal trading. *Id.* at 33 ("[T]rading during the two-millisecond moments that the … indicator is on requires either incredible chance or incredible technological advantages that permit timing orders down to the microsecond. The SEC reasonably concluded that the latter explanation is correct …."). By "narrowly target[ing]" and "thwarting latency arbitrage," D-Limit could "help the market" and "benefit[] all market participants." *Id.* at 34–35, 37 (citation modified). The court thus affirmed the Commission's conclusion that D-Limit did not unfairly discriminate or unduly burden competition in violation of the Exchange Act. *Id.* at 34.

The D.C. Circuit also sustained the Commission's determination that D-Limit orders qualified as "protected quotations" under Rule 611. The court

18

confirmed that "D-Limit orders are subject to nothing more than a de minimis delay" and "take no longer to execute than other [protected] orders that execute 'immediately' on IEX despite having to traverse the speedbump." *Id*. at 37. The court rejected Citadel's suggestion that D-Limit's repricing should affect the determination of whether its orders were "protected." In particular, the court rejected Citadel's argument that the delay, when combined with a repricing mechanism, could not be "de minimis because it has a substantial effect on the market" by "thwart[ing] 24% of trades." *Id.* Rather, those "thwarted" trades "involve latency arbitrage tactics that actually harm the market," making them "less like an actual trade than a surcharge imposed on market participants …. So regardless of how many 'trades' the D-Limit order may affect, the SEC still reasonably concluded that [D-Limit] will not hinder fair and efficient market access" and its quotations remain "protected." *Id.* (citation modified).

### E.    Proceedings Before the Commission

#### 1.    IEX's Proposal

In January 2025, IEX proposed to launch "IEX Options," an options trading platform that would apply the tools from its equity exchange—the speedbump and a fixed-formula indicator—to combat latency arbitrage in the options market.

In its proposal and subsequent amendments, IEX explained that options trading depends on market makers to provide liquidity. *See, e.g.*, A14, A22. Yet

"structural challenges" leave those market makers facing "greater exposure to latency arbitrage" and "more related capital charges than other liquidity providers." A13, A22; *see, e.g.*, A14, A94, A113–14. "Without robust liquidity protection mechanisms to protect against these risks," options market makers are liable to "widen their spreads, show less liquidity, or simply exit the market," leading "market quality [to] deteriorate" and "investors [to] suffer." A14.

IEX accordingly proposed an exchange with an optional Options Risk Parameter ("ORP") "designed to protect registered market makers on IEX from excessive risk due to execution of quotes at stale prices." A144 (citation modified); *see also* A13. As on its equity exchange, incoming orders would traverse the speedbump while IEX used its "Options Quote Indicator"—a fixed formula specified in IEX's rules—to assess market data and obtain the most accurate view of the market prior to processing the orders. A148. When the Indicator identified a material imminent adverse price change for a particular options series, quotes subject to the ORP would not match at that imminently stale price; instead, IEX would cancel or reprice the quote, as elected by the market maker in advance. *Id.* The ORP, like D-Limit, would thus help avoid stale executions during microseconds of price transition. A150.

IEX proposed to offer the ORP on a class-by-class basis as an optional tool to supplement the risk controls already available to market makers. A114.

Through this tool, IEX hoped to "encourage market makers to post aggressively priced and/or deeper quotes on [IEX]," which would ultimately "benefit all market participants." A19. Aside from its deployment of the speedbump and ORP, IEX's proposed rules were "substantially similar or substantively identical to the rules of other options exchanges." A144.

### 2.    Comments on IEX's Proposal

The Commission received dozens of comments on IEX's proposal, with the vast majority in favor. A wide range of market participants—including options market makers, asset managers, institutional investors, retail investors, and Senators from both political parties—supported the proposal as "a carefully tailored, positive innovation" facilitating "fairer and more efficient options markets by reducing barriers to entry and encouraging price competition." SA84; *see also,* *e.g.*, SA66–67 (lauding the proposal as "a market-based response" to a "structural inefficiency" that "builds on IEX's success in [D-Limit]" and "leverages technology and design to encourage competition, empower market participants, and enhance investor outcomes"); SA52; SA93; A74.

Several commenters detailed the impact of latency arbitrage in options trading, emphasizing the "staggering" costs of "maintaining latency competitiveness" and the ensuing "wider spreads," "thinner markets," and firms exiting the market. SA68; *see also* SA94; A140; SA52; SA61. By helping to

21

"reduce latency arbitrage costs" "in a thoughtful and deliberate way," IEX's proposal promised to "foster a fairer marketplace with superior liquidity provision and tighter bid-ask spreads," the "ultimate benefit of [which would] go to the investing public." SA53; *see also* SA93.

Certain commenters, such as Citadel and competitor exchanges, again objected to IEX's proposal. *See, e.g.*, A68, A81, A130, A54, A78. While these commenters did not meaningfully dispute the impact of latency arbitrage, they reprised several previous criticisms of D-Limit, including that the ORP would result in "maybe quotations" that did not warrant order protection. A68; A87. They also argued, *inter alia*, that the ORP provided an unfair advantage to market makers, and that IEX had not provided sufficient data to assess the ORP's anticipated impact. A68; A82–87.

IEX responded with additional letters and data, including an analysis showing that, for various dates in February and July 2025, the ORP would have affected quotes on average per series significantly less than 0.001% of the trading day and would have affected quotes for the most active options class for less than 0.2% of the trading day. SA78–79; A163–64. Given that "the ORP would not affect quotes during more than a miniscule proportion of the trading day"—and given that quotes in the options markets are already routinely repriced or cancelled before a counterparty can execute against them—IEX countered that the ORP

22

would not cause quote fading or negatively impact investors.  SA78–79 (noting

that this data was "the same type of data and analysis the Commission and court

used to conclude that D-Limit quotes would be accessible by investors").  Instead,

the "ORP closely track[ed] the approach IEX has used with great success" "with its

D-Limit order type" "to strengthen competition among more market makers and

improve price quality for investors."  SA71–72.

### 3.    The Commission's Order

The Commission approved IEX's proposal in September 2025.  A149.  As

the Commission explained, IEX Options resembled existing options exchanges and

raised no novel issues except for the ORP.  A150.  But even the ORP was "not

novel for trading on an exchange," "as IEX already operates its equities market

with the exact same access delay and an order type (D-Limit order) that can be

repriced or cancelled by the Exchange."  *Id.*  Concluding that "[t]he same reasons

the Commission approved the D-Limit order type effectuated by the [speedbump]

for the IEX equities market also apply to the options context for the ORP

effectuated by an identical [speedbump]," and are in fact "even more appropriate in

the options context," the Commission approved.  *Id.*

> a. *The Commission found the ORP narrowly tailored to mitigate
> latency arbitrage in the options market.*

"As was the case for D-Limit," the Commission first found that IEX had

"identifie[d] a legitimate disadvantage in latency arbitrage faced by market

23

makers" on options exchanges, many of whom "lack the expensive low-latency systems, connectivity, and data sources used by those engaged in such strategies." A154. "The existence of this problem," the Commission noted, "is uncontroverted and supported by [multiple] comment letters saying how latency arbitrage is a problem that negatively affects [market makers] and how IEX's proposal addresses the problem in a manner that could result in them … adding new liquidity to the market." *Id.*; *see also* A152–53 (describing latency arbitrage in the options context). Indeed, this problem is "especially acute for options compared to equities," given "the far greater number of quoted options securities and the critical role that options market makers play in providing that liquidity on multiple exchanges across a vast number of related instruments." A157 ("the substantially greater number of securities listed, the lack of an over-the-counter market, and the derivative nature of an option that requires expeditious repricing when the underlying security changes price" amplify the "risks and costs presented by latency arbitrage and the corresponding disincentive those risks and costs impose on [such necessary] liquidity providers").

As with D-Limit, the Commission found that the ORP offered an "objective, transparent, [and] narrowly tailored" tool to "address the latency arbitrage impact on options market makers." A153–54. As the Commission detailed, the ORP "will infrequently result in the cancelling or repricing of a displayed quote on IEX

in response to a very targeted and specific pre-defined signal that suggests a high potential for latency arbitrage." *Id*. It will impact a "quote so infrequently"—"considerably less than 1% of regular trading hours"—"that only a small number of market participants are capable of detecting and acting upon those conditions that trigger it." A154 (citation modified); *see also, e.g.*, A153 ("[T]he ORP is not repricing or cancelling a quote … virtually the entire regular trading hours session …. For the small part of the day when the ORP does reprice or cancel a quote, market participants that are not engaging in latency arbitrage trading strategies are unlikely to be seeking to trade with the quote precisely when it is in the process of being repriced."). Thus, "the ORP will not result in needless missed executions for most traders, though it will make it more difficult for a few latency arbitrage traders to profit by taking advantage of idiosyncrasies in market structure to trade with stale-price displayed quotes on IEX." A154.

In reaching this conclusion, the Commission rejected Citadel's claim that additional data was necessary. A163–64. In particular, the Commission explained that the time-based data provided by IEX—the "same type of data" persuasive to the Commission and D.C. Circuit in evaluating D-Limit—was "most relevant to analyze the ORP" by showing its effect on all investors over the trading day. A164 & n.336. By contrast, the data suggested by Citadel (e.g., volume of orders affected or fill rates) "would be misleading to evaluate the impact of a risk

25

protection mechanism that targets latency arbitrage," because "higher impacted volume and lower fill rates would be evidence that a tool designed to protect liquidity providers against latency arbitrage is working exactly as intended.   It would not provide evidence that firms *not engaged in latency arbitrage* are impacted and unable to access quotes on IEX during regular trading hours."  A164 (emphasis added).  IEX's data accordingly demonstrated that the ORP was not "overbroad in its application," but rather was "designed to address th[e] problem [of latency arbitrage] in a very narrowly tailored manner," "to the benefit of all investors."  A156, A164.

Indeed, the ORP was more narrowly tailored and less likely to harm liquidity than existing risk controls.  Among other things, the Commission explained, "the ORP … will only reprice or cancel a specific series in a class whereas options risk mitigation functionality typically will cancel all quotes and orders in all series across a class."  A159; *see also* A160.  And "while other exchanges' options risk protection mechanisms cancel quotes when triggered," the ORP acts "to either cancel *or reprice* the quote," which "keeps that liquidity continuously available to the market (albeit at the new price)."  A155 (emphasis added).

"By protecting Market Makers in this narrowly tailored way," the Commission concluded, the ORP "may attract additional liquidity, including from new market makers" or those previously "unable or unwilling to spend the

considerable amount of money needed to invest in the technology necessary" to combat latency arbitrage. A154, A157. The "result should be an increase in displayed liquidity at competitive prices, which facilitates fair competition," "economically efficient executions for investors," and an overall "beneficial effect on the options market." A154.

> #### b. The Commission found the ORP consistent with the Exchange Act.

The Commission further determined that the ORP was consistent with the Exchange Act and rules and regulations thereunder.

In doing so, it rejected concerns that the ORP would cause deleterious "quote fading" or missed executions for the average investor. A151–55. As the Commission explained, market participants already "have no guarantee that they will be successful in trading with a quote they see because intervening factors"— like latency arbitrage and existing risk controls —"are always present." A154 (explaining that a quote may be inaccessible because, *inter alia*, it has been seized by a faster trader or the market maker has repriced or canceled it). The ORP is no different. Rather, "[g]iven how narrowly tailored the ORP is in addressing latency arbitrage and how infrequently it activates, it will not result in the average market participant being unduly frustrated when trying to take liquidity on IEX Options and thus will not contribute to inaccessible quotes or … inferior executions for

traders not engaged in latency arbitrage; however, as discussed above, it will by design affect speed traders engaging in latency arbitrage." *Id*.

The Commission next determined that the ORP did not unfairly advantage IEX's market makers. A158–60. While the ORP would "confer a direct benefit to Market Makers and not other[s]," that benefit was "commensurate with the risk uniquely undertaken by Market Makers" in options trading. A160. Because the options market is so "dependent on options market makers to set prices and provide liquidity," "it is crucial for options market quality to encourage options market makers to continue to quote and provide liquidity so that market participants, including retail investors, have access to liquidity at favorable prices." *Id.* The protections afforded by the ORP—which were "not overbroad and [instead] intended to specifically address the disincentive to be a market maker that latency arbitrage can present to many firms"—thus reasonably served "to incentivize market makers to quote with additional depth at potentially improved prices, which directly benefits all market participants." Its benefits, moreover, were "commensurate with the benefits provided to market makers by other risk mitigation functionality" without imposition of countervailing obligations or burdens. *Id.* The Commission accordingly found that the ORP's protections for market makers were "not designed to permit unfair discrimination," but instead would "contribute[] to fair and orderly markets and the protection of investors

28

through increased competition and liquidity provision by the primary source of options liquidity to the market." *Id.*

The Commission similarly determined that IEX's proposal would not impose an undue burden on competition. A160–61. It would "not require a broker-dealer to preference any particular exchange over another" and would "not impede the ability of other exchanges to compete through functionality, fees, or otherwise." A161. To the extent the ORP proved attractive, exchanges were free to adopt their own such functionality, as occurred following IEX's launch. *Id.* More generally, the Commission explained, the ORP represented "a competitive response from IEX to mitigate competitive imbalances between liquidity providers and latency arbitrage liquidity takers in the same manner as IEX's D-Limit proposal, which is designed to encourage liquidity provision to the benefit of [all] investors." A154–55. It thus did not unduly burden competition to "allow IEX to innovate [with ORP] in a way that offers new opportunities to long-term investors." A161.

### c. *The Commission found IEX Options quotes "protected."*

Finally, the Commission rejected the suggestion that IEX Options quotes should not be treated as "protected" under the Options Plan. A155–56. At the outset, the Commission noted that many comments on this issue focused on language specific to Rule 611 that was absent from the Options Plan. *Id.*

29

(explaining that the Commission interpretation concerning "immediate" and "automated" quotations "does not apply by its terms to options because the options plan does not contain the automated quotation concept"). Nevertheless, because "the remaining provisions in the Options [Plan we]re substantially similar to the remaining provisions in Regulation NMS," the Commission found its prior analysis instructive. A156

Namely, in finding D-Limit protected, both the Commission and the D.C. Circuit concluded that because D-Limit narrowly targeted latency arbitrage, its functionality—repricing effectuated by the de minimis speedbump—would not "hinder fair and efficient market access" and so render the speedbump's delay more than de minimis. *See supra*. That logic applied equally to the ORP's repricing effectuated by the speedbump. A156. The Commission also observed that various options risk protocols and order types already permitted an exchange to cancel or continuously update a market maker's quotes, yet those had "never been viewed as allowing quote fading … or making quotes non-firm." A155. The Commission accordingly determined that IEX Options quotes remained "'protected quotation[s]' as defined by the Options [Plan and] will not be considered non-firm under the Plan." A156.

**STANDARD OF REVIEW**

The Commission's order may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). Under that "highly deferential" standard, the Court may not "substitute [its] judgment for that of the agency as long as the agency's conclusions are rational and reasonably explained." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 833 F.3d 1274, 1285 (11th Cir. 2016).

**SUMMARY OF ARGUMENT**

1. The Commission reasonably found IEX Options consistent with the Exchange Act. In particular, the Commission reasonably concluded that the proposal was not unfairly discriminatory, nor did it burden competition in a way that was not necessary or appropriate in furtherance of the Act. Rather, as the Commission found, the proposal would disadvantage only those market participants engaged in latency arbitrage while benefitting the market as a whole. In arguing to the contrary, Citadel and amici incorrectly describe IEX's proposal as a "pause and peek" repricing mechanism. But the ORP does not allow market makers to pick and choose which quotes are executed. Instead, it allows them to opt into a system that provides sufficient time for the exchange to implement price changes for quotes that are automatically determined to be in a moment of price transition. Citadel and amici also incorrectly claim that the Commission failed to

31

consider numerous arguments that it clearly considered and rejected. At bottom, they simply dislike IEX's proposal. But the Commission reasonably concluded that the proposed rule change was consistent with the Act, and that it was therefore required to approve it.

2.    Substantial evidence supports the Commission's conclusions that latency arbitrage poses a problem for the options market and that IEX's proposal offers a narrowly tailored mechanism for mitigating that problem. Citadel and amici misdescribe the record before the Commission, but they provide no basis to find the Commission's determinations arbitrary or capricious.

3.    The Commission reasonably concluded that IEX Options quotes qualify as "protected quotations" under the Options Plan. Citadel and amici's objections to this conclusion misunderstand the operation of IEX's proposal and misconceive the narrow terms of the Commission's determination.

## ARGUMENT

The Commission reasonably concluded that IEX Options would offer a narrowly tailored tool to address latency arbitrage and encourage liquidity provision to the benefit of all options market participants. Seeking to thwart this tool and entrench their competitive position, Citadel and amici challenge the evidence and analysis underlying this conclusion. The Commission, however,

32

reasonably assessed the fulsome record and determined that IEX's proposal presented a permissible competitive response to a competitive imbalance.

**I.    The Commission reasonably concluded that IEX's proposal was consistent with the Exchange Act.**

**A.    The proposal was not unfairly discriminatory.**

Section 6(b)(5) of the Exchange Act requires, among other things, that exchange rules not be designed to permit unfair discrimination between customers, issuers, brokers, or dealers.  15 U.S.C 78f(b)(5).  As courts have recognized, this provision does not prohibit rules that treat market participants differently; rather, it prohibits *unfair* discrimination between market participants.  *Timpinaro v. SEC*, 2 F.3d 453, 456 (D.C. Cir. 1993) ("The [Exchange Act] prohibits 'unfair discrimination,' not 'discrimination' *simpliciter* …..").  The Commission here reasonably concluded that the "benefits provided to Market Makers by IEX's proposal" did not unfairly discriminate because those "benefits are focused," "not overbroad," "intended to specifically address the disincentive to be a market maker that latency arbitrage can present to many firms," and "commensurate with the benefits provided to market makers by other risk mitigation functionality."  A160.

*First*, the Commission reasonably found IEX's proposal narrowly tailored to address the problem of latency arbitrage.  *See infra* II.A, B.  As the Commission explained, the ORP will impact a "quote so infrequently"—"considerably less than 1% of regular trading hours"— "that only a small number of market participants

can detect and act upon those conditions that trigger it." A154 (citation modified). As a result, "the ORP will not result in needless missed executions for most traders, though it will make it more difficult for a few latency arbitrage traders to profit by taking advantage of idiosyncrasies in market structure to trade with stale-price displayed quotes on IEX." *Id*.

*Second*, the Commission found that the ORP's benefit was in line with benefits already afforded market makers by other exchanges' options risk controls. A159–60. In fact, as the Commission noted, "the ORP is more narrowly tailored than other options risk mitigation functionality because it will only reprice or cancel a specific series in a class whereas options risk mitigation functionality typically will cancel all quotes and orders in all series across a class." A159; *see also* A160. And "while other exchanges' options risk protection mechanisms cancel quotes when triggered," the ORP will "either cancel *or reprice* the quote," which "keeps that liquidity continuously available to the market (albeit at the new price)." A155 (emphasis added).

The ORP's risk mitigation function, moreover, stood to benefit the entire market. "By protecting Market Makers in this narrowly tailored way," the ORP "may attract additional liquidity, including from new market makers" or those previously "unable or unwilling to spend the considerable amount of money needed to invest in the technology necessary" to combat latency arbitrage. A154,

34

A157. The "result should be an increase in displayed liquidity at competitive prices, which facilitates fair competition," "economically efficient executions for investors," and an overall "beneficial effect on the options market." A154. By encouraging liquidity to the benefit of the entire market, while disadvantaging only those engaged in latency arbitrage, the Commission reasonably concluded that the ORP's targeted benefit for market makers did not unfairly discriminate.

Citadel and amici's arguments to the contrary are without merit. Recognizing that the D.C. Circuit rejected Citadel's nearly identical claim of unfair discrimination with respect to D-Limit, *see Citadel*, 45 F.4th at 32–33, Citadel attempts to distinguish this proposal by arguing that the ORP is available "only to IEX's registered market-making members" whereas D-Limit was open to "all market participants." Br. 34–35. Citadel's distinction finds no support in the D.C. Circuit's opinion. But even if it did, this difference is not a reflection of unfair discrimination, but simply a feature of how the options market works.

As explained *supra* C.2, the options market, unlike equities, depends on market makers to provide liquidity. *See* A152; *see also* A107 n.163. And those market makers—who may be responsible for hundreds of quotes across dozens of series in each class they quote—are especially vulnerable to latency arbitrage as underlying security prices move. The ORP is accordingly available only to market makers because it addresses a risk they disproportionately bear. *Contra* Br. 5. The

35

Commission thus reasonably concluded that while the ORP would "confer a direct benefit to Market Makers and not other[s]," that benefit did not constitute unfair discrimination.  To the contrary, it was "commensurate with the risk uniquely undertaken by Market Makers" in options trading.[5]  A160.

Citadel and amici further argue that IEX's proposal confers an unfair advantage by improperly allowing market makers to "back[] away" from orders. Br. 36.  The Commission, however, reasonably concluded that the ORP does not permit "backing away," a practice in which a market participant cancels a trade *after* it matches with another order.[6]  As the Commission explained, the ORP affords market makers no "control over who they execute against or when," and does not allow them to "back away from a quote when presented with an incoming order," A153.  Rather, while orders from latency arbitrageurs (like all others) traverse the speedbump's coiled fiber, IEX automatically adjusts quotes subject to the ORP before a match can occur at a stale price.  *Cf. Citadel*, 45 F.4th at 31 (explaining that IEX updates quotes "while incoming orders from liquidity takers … are stuck in the speedbump" so that "the order will not execute").  Because the

---

[5] Market makers also have continuous quoting obligations that apply to the multitude of series within each assigned class, "which risk is not present for other market participants when they only post one or a few limit orders in specific series and are not required to provide continuous quotes."  A160.

[6] Citadel incorrectly claims that the Commission "never addressed" this argument (Br. 36–37).  *See* A153 & n.185.

ORP updates prices before incoming orders are presented, it simply does not implicate "backing away." *Contra* Br. 53 (citing *Credit Suisse Sec. (USA), LLC,* 2016 WL 683553 (Jan. 31, 2016) (finding broker-dealer violated Rule 602(b) by "backing away" when it "did not execute [displayed quotes] *after they were matched* on" exchange (emphasis added))). Indeed, market makers regularly seek to avoid quote executions (including through risk mitigation functionality) before they can complete quote updates. A150, A155.

Citadel's repeated description of the ORP as an unfair "pause-and-peek" mechanism, *e.g.*, Br. 6, 25, 31, 51–52, rests on a similar misconception. Nothing is "paused" under IEX's proposal; rather, as on IEX's equities exchange, incoming orders simply take 350 microseconds longer to arrive, allowing IEX time to update quote prices to reflect relevant market data. Nor are any market participants given a "peek" at incoming orders. Instead, the exchange utilizes a transparent, codified formula to automatically cancel or reprice certain orders when the price of the underlying security has moved such that the price of the order is no longer accurate. The market maker opts into this mechanism before seeing any individual order and has "no ability to influence the operation of the ORP" "or to choose which incoming orders to execute against (or not execute against)." A153.

Finally, Citadel and amici claim that the Commission erred in analogizing IEX's risk controls to "traditional" risk controls, which they claim are used only to

37

"prevent catastrophic error or system failure." Br. 37. Not so. While some risks controls target such events, other risk controls are broader and "commensurate with the benefits provided to market makers" in IEX's proposal. A160. For example, amici NYSE has mandatory risk controls that give market makers on its options exchanges the ability to cancel open orders or quotes when certain transaction-based, volume-based, or percentage-based thresholds are met.[7] Similarly, the MIAX exchange has an aggregate risk manager that measures the number of contracts traded as a percentage of what the market maker is quoting and, if the threshold is breached, all quotes in all series of the affected class are purged.[8] As the Commission noted, the ORP fits comfortably within this risk-mitigation framework, especially given that it is more transparent and would only cancel or reprice a single series, while these other mechanisms may cancel all quotes across all series in a class. A159.

**B.    The proposal did not impose a burden on competition not necessary or appropriate in furtherance of the Act.**

Section 6(b)(8) of the Exchange Act requires that exchange rules not impose any burden on competition that is not necessary or appropriate in furtherance of the

---

[7] NYSE, NYSE Pillar Risk Controls, Section 6.9 (2026), *available at* https://www.nyse.com/publicdocs/nyse/NYSE_Pillar_Risk_Controls.pdf.

[8] MIAX, MIAX Risk Protections Guide, 25 (2025), *available at* https://www.miaxglobal.com/miax_exchange_group_options_risk_guide.pdf.

38

purposes of Act.  15 U.S.C. 78f(b)(8).  The Commission reasonably concluded that IEX's proposal was consistent with this standard because any burden on competition was targeted to those engaging in latency arbitrage on IEX and appropriate in light of the benefits to the market as a whole.

As the Commission explained, the ORP represented "a competitive response from IEX to mitigate competitive imbalances between liquidity providers and latency arbitrage liquidity takers in the same manner as IEX's D-Limit proposal, which is designed to encourage liquidity provision to the benefit of investors." A154–55.  As with D-Limit, it thus did not unduly burden competition to "allow IEX to innovate [with ORP] in a way that offers new opportunities to long-term investors."  A161 (citation modified).  This was especially so given that IEX's proposal would "not require a broker-dealer to preference any particular exchange over another" and would "not impede the ability of other exchanges to compete through functionality, fees, or otherwise."  *Id.*  And to the extent the ORP functionality proved attractive, other exchanges were free to adopt their own, as occurred following IEX's launch.  *Id.*

Citadel and amici's contention to the contrary relies on distortions of the governing law and factual record.  As an initial matter, Citadel repeatedly misquotes the applicable standard, *e.g.*, Br. 27, 56–61, claiming that the Commission was required to find that the proposal's burden on competition was

39

"necessary" when in fact the Commission must find it "necessary *or appropriate*" in furtherance of the Act.

Similarly, Citadel faults the Commission for failing to identify a market failure, Br. 56–57, but the case Citadel cites for imposing that requirement involves the Commission's own rulemaking. *See Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010). There is no requirement for the Commission to establish a market failure when evaluating SRO rules; rather, if the Commission determines that the proposal is consistent with the Exchange Act, it must be approved. *See supra* B.1. Here, the Commission appropriately evaluated the record evidence and reasonably concluded that the burdens on competition for latency arbitrageurs were necessary or appropriate in light of the competitive benefits to the market as a whole.

Citadel and amici next criticize the Commission for failing to consider supposedly "less intrusive" alternatives that they preferred, such as approving IEX Options but deeming its quotes non-protected. Again, they apply the wrong framework for review. Br. 51–56. When an SRO proposes a rule or rule change, Section 19 of the Exchange Act provides that the Commission "shall" approve if it finds that the proposal is consistent with the Act or "shall" disapprove if it does not make that finding. 15 U.S.C. 78s(b). It cannot selectively approve parts of the proposal or create "alternative" rules by rewriting the proposal itself. To do that, it

40

would need to engage in a separate rulemaking process of its own. *Id.* 78s(c). In any event, Citadel and amici have not established that their suggested alternatives render any burden on competition from IEX's proposal "inappropriate" in furtherance of the Act, *see infra*.

Substantively, Citadel's claims of competitive harm are based on a fundamentally flawed premise of "regulatory compulsion" and "compulsory" routing to IEX. Br. 13, 14, 24, 27, 33, 50, 58, 61. That Citadel may at times be unable to trade elsewhere, at prices worse than those displayed on IEX, is not the result of some special benefit bestowed on IEX, but simply a reflection of how the order protection rules imposed by the options exchanges operate in the NMS. *See supra* B.3. Among other things, Citadel elides the fact that participants will only be required to route to IEX when IEX is *alone* at the best price in the market. If IEX is alone at the best price in the market, then market participants *should* be routed to IEX—as they would to any other exchange—to receive the best price available.[9]

Finally, Citadel and amici claim that the Commission erred by relying on "market makers' preference to avoid new investments," which Citadel claims cost

---

[9] Citadel's insistence that traders should not be "forced" to route to IEX Options, as they would to other exchanges, rests on the premise that IEX Options quotes are "vanishing" or "not firm" and thus unlike other exchanges' quotes. Br. 50–51. As the Commission made clear, that premise is mistaken. *See supra* D.3.b.

41

"as little as $5 million," to upgrade speed technology.  Br. 58–59.  While Citadel highlights the $5 million figure from a market maker's comment, that commenter explained that its efforts to combat latency arbitrage, on only certain options exchanges, required "*annual* investments in the area of $5 million," which it expected to "at least double once we complete our expansion" to additional exchanges.  A159 (emphasis added); *see also* A159 n.256 ("costs of maintaining latency competitiveness are staggering").  That competitive cost, moreover, would "merely reduce, but not eliminate, 'pickoff' trades from latency arbitrageurs." A159.  The Commission thus reasonably concluded both that competing with latency arbitrageurs "may be prohibitively expensive for many market participants," and *also* that *even if* market participants make those investments in speed technology, "the race still is a winner-take-all scenario where the absolute fastest takes the quote," which may disincentivize market makers from undertaking such investments and from offering liquidity.  A154.

More fundamentally, the Court should reject Citadel's suggestion (Br. 18, 58–59) that the Commission must compel market participants to invest significant sums in this costly speed race as the only acceptable means of fostering competition consistent with the Act.  As the D.C. Circuit found, Citadel may not entrench its market advantage by preventing market participants from innovating in any area except those in which Citadel is already ahead.  *Citadel*, 45 F.4th at 32.

42

The relevant inquiry under the Exchange Act concerns the burden on competition *in the market*, not on the competitive position of a single market participant or group of market participants. *Nasdaq Stock Mkt. LLC v. SEC*, 34 F.4th 1105, 1113 (D.C. Cir. 2022) ("Petitioners [erroneously] equate competition with their own competitive position."). Nor does the Act prevent exchanges from making rule changes that will have *any* burden on competition. *Cf. Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085, 1105 (D.C. Cir. 1978) ("[O]nly if some action's anticompetitive impact outweighs in importance the product of the 1975 Amendments' other objectives and the likelihood that the action will achieve those objectives, is the Commission prohibited from taking that action."). Instead, the Commission is required to find that any such burden is necessary or appropriate in furtherance of the purposes of the Act. The Commission's conclusion that IEX's proposal meets that standard was reasonable and well-supported.

## II.    Substantial evidence supports the Commission's conclusions.

Citadel next contends that the Commission lacked sufficient evidence to support certain conclusions, rendering its order arbitrary and capricious. The court's review of this challenge is "exceedingly deferential," asking only "whether the record contains substantial evidence in support of [the] agency decision." *Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*, 835 F.3d 1377, 1384 (11th Cir. 2016). "Substantial evidence" is "such relevant evidence as a reasonable

person would accept as adequate to support a conclusion," "more than a scintilla, but less than a preponderance." *Ga. Dep't of Educ. v. U.S. Dep't of Educ.*, 883 F.3d 1311, 1314 (11th Cir. 2018) (citation modified). The Commission more than satisfied those standards.

### A. Substantial evidence supports the Commission's assessment of latency arbitrage.

Citadel first argues that the Commission failed to "support [its] federal rule" because it "never established that latency arbitrage exists in the options market," "simply assum[ing] the problem was genuine, because IEX (belatedly) said so." Br. 40. That argument fails on multiple levels.

First, Citadel again misrepresents the nature of the agency action at issue, conflating the Commission's review of an SRO proposal under Section 19(b) with the Commission's independent rulemaking. Contrary to Citadel's insinuations, the Commission here did not propound "a federal rule" "to address [the] problem" of latency arbitrage. Br. 40. Rather, the issue before the Commission was "whether [to] allow" a single exchange "to innovate, with the [ORP], in a way that offers new opportunities to long-term investors." *Citadel*, 45 F.4th at 32; *see also* A153–55.[10]

---

[10] For this reason—among many—the Commission's order approving IEX's proposal bears no resemblance to the Transaction Fee Pilot, an experimental data-gathering initiative adopted *by the Commission* to inform its regulation of exchange fee-and-rebate models. *Contra* Amici 14–15.

In any event, the Commission reasonably determined that latency arbitrage poses a "legitimate disadvantage" to options market makers, which the ORP stood to mitigate.  A154.  Having previously "acknowledged the risks and costs presented by latency arbitrage and the disincentive it imposes on some liquidity providers" in approving D-Limit, the Commission found the "existence of this problem" for options market makers "uncontroverted" in the record before it. A154, A157.  This finding was supported by numerous comment letters, including from "several options market makers … saying how latency arbitrage is a problem that negatively affects them and how IEX's proposal addresses the problem in a manner that could result in them … adding new liquidity to the market."  A154; *see, e.g.*, SA68 (detailing how former options market maker "was ultimately forced to exit the business to the escalating costs" and "harmful effects of latency arbitrage in the U.S. equity options markets"); A139 (describing "tremendous complexity" and cost borne by options market makers to "combat predatory latency arbitrage"); SA52; A76; *see also, e.g.*, SA66 (citing "[t]he recent exit of a major market participant" "from options market making" as evidence of "the real-world impact of [latency arbitrage's] structural inefficiency"); SA61; SA94; SA42.[11]

---

[11] Citadel's assertion that latency arbitrage was merely a "belated" "pretext" (Br. 40–41) is baseless.  Putting aside that IEX's entire model is premised on combatting latency arbitrage, its filings repeatedly referenced both latency

45

Citadel complains that the Commission did not have the same quantitative data demonstrating latency arbitrage that it considered in approving D-Limit.  Br. 41–42.  But an agency "need not … base its every action upon empirical data," *Nasdaq Stock Mkt., LLC v. SEC*, 38 F.4th 1126, 1142–43 (D.C. Cir. 2022) (citation modified), particularly where, as here, its absence reflects the absence of a meaningful dispute—a stark contrast to the D-Limit record, where commenters directly questioned the existence of "purported 'latency arbitrage.'"  SA11; A154. The Commission thus reasonably determined—based on its understanding of market structure, logic, and comments from a wide range of market participants— that latency arbitrage affects the options market.  *See, e.g.*, *Nasdaq*, 38 F.4th at 1142–43 (agency experience and industry comments constitute substantial evidence); *Chamber of Com. v. SEC*, 412 F.3d 133, 142 (D.C. Cir. 2005) (same).

Tellingly, Citadel cites no data or evidence demonstrating that latency arbitrage is not a problem for the options market—nor could it.  The Commission already found that latency arbitrage poses a problem for liquidity providers in the equity market, a finding upheld by the D.C. Circuit.  It then explained at length how market conditions continue to enable latency arbitrage and how the

---

arbitrage and "excessive risk due to execution of stale quotes," *see, e.g.*, A1, A2, A7, A19–22, such that commenters clearly understood IEX had proposed the ORP as a "latency arbitrage mitigation tool," A76.

characteristics of the options market leave it particularly vulnerable to the practice. *See* A153, A154, A157.

Unable to make the implausible assertion that the options market is somehow immune to latency arbitrage, Citadel pivots to the contention that "what IEX characterizes as latency arbitrage in the options market" differs from latency arbitrage in the equities context because the price change being exploited by speedy traders derives in the equity market from "price discrepancies in the same security" and in the options market from price changes in the underlying security. Br. 42. But the genesis of the microsecond price discrepancy (in the security itself or the underlying reference asset price) is a distinction without a difference. In both cases, latency arbitrage refers to the "high-speed trading strategy that exploits microsecond resolution differences in market data dissemination and trade reaction times" to "execute rapidly against … quotes at outdated 'stale' prices" "before a liquidity provider has had a fair opportunity to [update them] to reflect updated market conditions." A93; *accord* A153, SA26. And in both cases, it creates a "legitimate disadvantage" for liquidity providers who lack the expensive technology to head off traders seeking to exploit such microsecond price discrepancies. Citadel's efforts at misdirection provide no basis for finding the Commission lacked substantial evidence for its conclusions.

47

B.      **Substantial evidence supports the Commission's assessment of the ORP's impact.**

Citadel next erroneously contends that the Commission lacked sufficient evidence to conclude that the ORP was "narrowly tailored." Br. 43. In particular, Citadel criticizes the data provided by IEX—showing that the ORP would affect quotes less than 0.2% of the trading day and, on average, less than 0.001% of the trading day[12]—and maintains that additional data on different metrics, such as volume of orders affected, was needed to analyze the ORP's impact. Br. 43–46.

The Commission reasonably determined that the data provided by IEX confirmed that the ORP—set at the most aggressive parameters to assume maximum triggering—would impact a "quote so infrequently (*i.e.*, considerably less than 1% of regular trading hours as discussed above) that only a small number of market participants are capable of detecting and acting upon those conditions that trigger it." A154 (citation modified); *see also* A153 ("As noted by several commenters, investors do not typically trade in microseconds and even sophisticated market makers face challenges when competing with the small number of firms that purchase the necessary systems, connectivity, and exchange proprietary market data to target their trading to those precise periods options quotes are temporarily mispriced."). Thus, the ORP was "designed to target firms

---

[12] In providing these estimates, IEX distinguished between all options series and the most active options class, *contra* Amici 19.

48

engaged in latency arbitrage" and would "not be overbroad in its application" or adversely "affect market participants not engaged in latency arbitrage." A163–64. The Commission explained that the ORP's transparent, fixed formula, based on the Black-Scholes options pricing model, was "narrowly tailored to only take action when there is a sufficient dislocation between the price of the underlying stock and the price of the option," such that it would "infrequently result in the cancelling or repricing of a displayed quote on IEX in response to a very targeted and specific pre-defined signal that suggests a high potential for latency arbitrage." A153.

IEX's time-based data thus indicated that the ORP was appropriately targeting the microseconds of price transition sought by latency arbitrageurs and would not disrupt ordinary trading. Such data and analysis, moreover, was the "same type of data and analysis the Commission and [D.C. Circuit] used" in finding D-Limit narrowly tailored to address latency arbitrage.[13] A164 n.336; *compare, e.g.*, A153 ("For the small part of the day when the ORP does reprice or cancel a quote, market participants that are not engaging in latency arbitrage trading strategies are unlikely to be seeking to trade with the quote precisely when

---

[13] The Court should accordingly reject Citadel's contention that the Commission failed to analyze IEX's data (Br. 48), just as the D.C. Circuit did. *Citadel*, 45 F.4th at 34 (rejecting Citadel's attempt to analogize D-Limit to *Susquehanna International Group, LLP v. SEC*, because "IEX and many commenters provided ample data showing the D-Limit order's effect" and "[t]he SEC then took that data, analyzed it for itself, and reasonably concluded that the D-Limit order benefits all market participants by thwarting latency arbitrage" (citation modified)).

49

it is in the process of being repriced."), *with, e.g.*, *Citadel*, 45 F.4th at 33 ("[T]rading during the two-millisecond moments that the [indicator] is on requires either incredible chance or incredible technological advantages that permit timing orders down to the microsecond. The SEC reasonably concluded that the latter explanation is correct [and that the indicator] is unlikely to affect normal trading … [because] only a small set of high-frequency traders have the technological ability to target those precise moments.").

In citing these figures, the Commission did not assume that the ORP would activate randomly throughout the day. *Contra* Br. 45. Rather, the Commission specifically acknowledged that the ORP would impact quotes at "important points when options prices are in transition," because those moments are precisely when "high frequency traders may attempt to take quotes before they can be repriced." A160, *see also* A158 n.237 ("While the ORP will infrequently cause quotes to cancel or reprice, when it does do so it will be on account of it detecting latency arbitrage conditions."). As discussed, however, these moments are so miniscule— and take up such a miniscule portion of the trading day—that investors not specifically aiming or able to trade on such microsecond price discrepancies should not be affected. *See, e.g.*, A158 (those "whose trading decisions typically are not informed or effected on a microsecond timescale smaller than the technological,

50

geographic, and OPRA latencies that they encounter" face a "1 in 100,000 chance" of being affected by the ORP); *cf. Citadel*, 45 F.4th at 33.

For the same reason, the Commission explained why the additional data demanded by Citadel would not have advanced its analysis. *Contra* Br. 48–49. Namely, metrics such as "[v]olume of incoming orders affected, fill rates, and the number of market maker quotes repriced or cancelled would be misleading to evaluate the impact of a risk protection mechanism that targets latency arbitrage," because "higher impacted volume and lower fill rates would be evidence that a tool designed to protect liquidity providers against latency arbitrage is working." A164; *see also* A158 n.237 ("[T]he ORP will result in quotes being cancelled and fills being missed because that is the objective of the ORP—to *not* fill at stale prices orders from latency arbitragers."). Such metrics "would not provide evidence that firms *not* engaged in latency arbitrage"—i.e., the many traders who lack the technology needed to target the precise microseconds the ORP is active— "are impacted and unable to access quotes on IEX during regular trading hours." A164 (emphasis added). IEX's time-based data instead offered the "most relevant" evidence of the ORP's "impact on [all] investors." *Id.*

This "relevant and persuasive" data, in conjunction with the robust comment file and Commission's experience, amply supports the Commission's determination that the ORP is "narrowly tailored" to address latency arbitrage.

51

*See, e.g.*, *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam) (agency decisions must be "supported by substantial evidence," which "is less than a preponderance, but [merely] such relevant evidence as a reasonable person would accept as adequate to support a conclusion"); *Citadel*, 45 F.4th at 34.

Citadel nevertheless incorrectly contends that the Commission was somehow required to undertake its own "detailed market-structure analysis" of raw market data generated by the Consolidated Audit Trail ("CAT") (Br. 46–47) before approving IEX's proposal. The CAT is a repository of trade and order data "processing over 400 billion records daily," SEC Br., *Am. Sec. Ass'n v. SEC*, No. 23-13396, 2024 WL 1714603, at *4 (11th Cir. Apr. 15, 2024). Citadel would require the Commission to take that raw data and build its own model of how the ORP would have operated for "every options order across all exchanges" before reaching any conclusion on the proposal. Br. 46. But "[t]he APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies" to justify their own rules, let alone to evaluate an SRO rule proposal. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021). The mere fact that CAT data exists does not alter that principle or undermine the substantial evidence supporting the Commission's conclusions.

**III.    The Commission reasonably determined that IEX Options quotes would be "protected."**

Finally, the Court should reject Citadel and amici's misguided efforts to undermine the Commission's order protection analysis.

The Commission reasonably determined that IEX Options quotes qualified as "protected" under the Options Plan. That Plan defines a "protected quotation" as any bid or offer in an options series that is (1) displayed by an eligible exchange; (2) disseminated pursuant to the Options Price Reporting Authority plan; and (3) the best bid or best offer of that exchange—requirements that IEX's quotes indisputably met. A156; *see* SA9. The Plan also includes an exception to its prohibition against trade-throughs for, *inter alia*, "non-firm" quotes. SA10. But what constitutes a "non-firm quote" is defined by each individual exchange. SA9 ("'Non-Firm' means … that members of a Participant are relieved of their obligations under that Participant's firm quote rule …."); *see also* SA6 ("Participants should not be required to protect the price of an away market when *that market identifies* its quotes as 'Non-Firm.'" (emphasis added)). And IEX's rules reasonably did not propose to treat quotes subject to the ORP as non-firm. *See* IEX Rules 17.100, 23.150(d), *available at* https://www.sec.gov/files/rules/sro/iex/2025/34-103290-ex5.pdf (IEX quotes are firm unless, *inter alia*, system malfunctions or abnormal market conditions impede IEX's functionality). The

53

Commission accordingly concluded that IEX Options quotes would be "protected." A156.

In reaching this conclusion, the Commission observed that some commenters had used the Commission's prior interpretation of "immediate," "automated," and "protected" quotations under Regulation NMS to argue that IEX Options quotes should not be protected. A155–56. That prior interpretation, however, did "not apply by its terms to options" because options are subject to the Options Plan, not Regulation NMS, and that Plan "does not contain" the terms "automated" and "immediate" that were at issue in Regulation NMS and the corresponding interpretation. A156.

Nevertheless, given commenters' invocation of Regulation NMS and given that "the remaining provisions in the Options Order Protection [Plan] are substantially similar to the remaining provisions in Regulation NMS," the Commission explained why its earlier reasoning supported its determination here. *Id.* Namely, in finding D-Limit protected, both the Commission and the D.C. Circuit had concluded that because D-Limit narrowly targeted latency arbitrage, its functionality—repricing orders prior to execution with the aid of the de minimis speedbump and indicator—would not "hinder fair and efficient market access" (and thereby impact the standards for order protection under Regulation NMS), even if it resulted in certain orders being "thwarted." *Citadel*, 45 F.4th at 37; *see*

54

*supra* C.2, 3. That rationale applied equally to the ORP's equivalent functionality. A156 ("As was the case for IEX's equities market … the ORP and the access delay that effectuates it are a response to the specific problem of latency arbitrage and are designed to address that problem in a very narrowly tailored manner that promotes competition among market makers to the benefit of all investors without impeding fair and efficient access to quotes as the potential for the ORP to affect an investor is remote."); *see also* A155 ("Given how infrequently the ORP will likely affect a quote, the ability to reprice … should not detract from fair and orderly markets by making IEX's quote inaccessible or non-firm."). Moreover, the Commission noted, other options exchanges offer functionality that similarly results in orders failing to execute, yet such offerings have "never been viewed as" hindering fair market access or "making quotes non-firm." *Id*. The Commission therefore approved IEX's proposal to maintain "protected quotation[s] as defined by the [Options Plan]." A156.

Dissatisfied with this conclusion, Citadel claims the Commission "erred" "by invoking the wrong regulatory framework." Br. 54. That argument is specious. The record clearly reflects that the Commission analyzed IEX's proposal under the terms of the Options Plan, while also considering what relevance its equities interpretation might hold—the very analysis Citadel itself urged the Commission to undertake. *See* A87 (encouraging the Commission to "take into

55

account the order protection rule for equities" "when considering the Options NMS Plan").

To the contrary, it is Citadel and amici who repeatedly misstate the governing regulatory framework, ignoring the actual terms of the Options Plan in favor of their own inventions. Among other things, they import a requirement of "immediacy" from Regulation NMS that has no basis in the Plan. *Compare* Br. 26 (only "immediately executable quotes may be 'protected'"), *and* Amici 9, *with* A156 (immediacy element applies only to equities).[14] They create definitions of "firm" and "non-firm" out of whole cloth. *Compare, e.g.*, Br. 52–53 (claiming quotes are "non-firm under the Plan's own definition" if they are "not reliable or accessible"), *with* SA9 ("Non-Firm" is defined by each exchange).

More fundamentally, Citadel and amici conflate the Options Plan's specific provisions with distinct and broader concepts of quote firmness, backing away, and quote fading. *See, e.g.*, Amici 9 (claiming that the "options market firm quote rule" forbids "back[ing] away from" a displayed quote, "which is referred to as 'quote fading'" (citation modified)). Whether IEX's proposal would enable

---

[14] Citadel's assertion that quotes subject to the ORP do not execute "immediately" (Br. 55) is thus irrelevant. It is also already answered by the D.C. Circuit's determination that quotes subject to repricing effectuated by the speedbump execute "immediately" because they are subject to only a de minimis delay. *Citadel*, 45 F.4th at 37; *see also id.* (rejecting argument that speedbump's delay "is not de minimis because it has a substantial effect on the market").

backing away, or quote fading, or some other imagined harm, however, is not relevant to the narrow question of whether IEX Options quotes qualify as "protected" under the Options Plan. Rather, such concerns go to whether IEX's proposal is consistent with the Exchange Act; for the reasons discussed *supra* I, the Commission reasonably found that it was.

These concepts invoked by Citadel and amici also do not reflect how the ORP actually works. For example, Citadel and amici suggest that IEX Options quotes cannot be "firm," and therefore "protected," because the ORP permits market makers to "back away" from quotes. Br. 51–53; Amici 9–10. Putting aside, again, that the Options Plan nowhere defines "firm" or speaks of "backing away," the argument is factually incorrect, as discussed above. *See supra*. And the contention that IEX Options quotes cannot be "firm" because the ORP enables "vanishing quotes" and "quote fading" (Br. 51; Amici 9) is equally meritless. The Commission explained at length why, as with D-Limit, "the ORP and the access delay that effectuates it will not impair access to IEX Options' quotations," because they are narrowly tailored to address latency arbitrage without disrupting ordinary trading. A152; *see also, e.g.*, A154; *supra* II.B; *cf. Citadel*, 45 F.4th at 33, 37. Citadel and amici thus fail to undermine the Commission's reasonable conclusion that IEX Options quotes are "protected."

* * *

The Court should reject Citadel and amici's arguments for all the reasons discussed above.  But were the Court to find that the Commission did not adequately explain its approval of IEX's proposal, the Court should remand without vacatur because "it is not at all clear" that any such error "tainted the agency's decisionmaking process."  *Black Warrior Riverkeeper*, 781 F.3d at 1290.

## CONCLUSION

The petition for review should be denied.

Respectfully submitted,

J. RUSSELL MCGRANAHAN
*General Counsel*

*/s/ Brooke Wagner*
BROOKE WAGNER
*Appellate Counsel*

JEFFERY B. FINNELL
*Deputy General Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-5292
wagnerbr@sec.gov

TRACEY A. HARDIN
*Solicitor*

EMILY TRUE PARISE
*Assistant General Counsel*

January 30, 2026

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the type-volume limitation set forth in Fed. R. App. P. 27 because it contains 12,989 words, and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally-spaced Times New Roman 14-point typeface.

/s/ Brooke Wagner
BROOKE WAGNER
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-5292
wagnerbr@sec.gov

January 30, 2026

**CERTIFICATE OF SERVICE**

I certify that on January 30, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the Court's CM/ECF system. Service will be accomplished by the CM/ECF system.

/s/ Brooke Wagner
BROOKE WAGNER
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-5292
wagnerbr@sec.gov