No. 25-13631

# In the United States Court of Appeals for the Eleventh Circuit

CITADEL SECURITIES LLC,
*Petitioner*,

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent*,

INVESTORS EXCHANGE LLC,
*Intervenor.*

On Petition for Review of a Rule of the
United States Securities and Exchange Commission

**BRIEF OF HEALTHY MARKETS ASSOCATION AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENT AND INTERVENOR**

Thomas A. Burns
BURNS, P.A.
301 West Platt Street, Suite 137
Tampa, FL 33606
(813) 642-6350
tburns@burnslawpa.com

*Counsel for amicus curiae*

*Citadel Secs. LLC v. SEC*, No. 25-13631

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 and 26.1-3, the following

is an alphabetical list of the trial judges, attorneys, persons, and firms

with any known interest in the outcome of this case.

1.  Bradley, Keith (of Squire Patton Boggs (US) LLP in Denver, Colorado) – Counsel for *amicus curiae* Prof. J.W. Verret;

2.  Burns, Thomas A. (of Burns, P.A. in Tampa, Florida) – Counsel for *amicus curiae* Healthy Markets Association;

3.  Citadel Securities GP LLC – Indirect, ultimate controlling entity of Citadel Securities LLC;

4.  Citadel Securities LLC – Petitioner;

5.  CTC, LLC – *Amicus curiae* supporting Respondent and Intervenor;

6.  Doumani, Tala (of Wachtell, Lipton, Rosen & Katz LLP in New York, New York) – Counsel for Intervenor Investors Exchange LLC;

7.  Glickstein, Jed W. (of Kaplan & Grady LLC in Chicago, Illinois) – Counsel for *amicus curiae* CTC, LLC;

8.  Healthy Markets Association – *Amicus curiae* supporting Respondent and Intervenor;

9.  Henkin, Douglas W. (of Dentons US LLP in New York, New York) – Counsel for *amici curiae* MEMX LLC, NYSE American LLC, and NYSE Arca, Inc.;

10.  Investors Exchange LLC – Intervenor;

11.  Kaskel, Jonathan H. (of Dentons US LLP in Miami, Florida) – Counsel for *amici curiae* MEMX LLC, NYSE American LLC, and NYSE Arca, Inc.;

C-1

USCA11 Case: 25-13631    Document: 45    Date Filed: 02/06/2026    Page: 3 of 35

*Citadel Secs. LLC v. SEC*, No. 25-13631

12.   MEMX LLC – *Amicus curiae* supporting Petitioner;

13.   NYSE American LLC – *Amicus curiae* supporting Petitioner;

14.   NYSE Arca, Inc. – *Amicus curiae* supporting Petitioner;

15.   Parise, Emily True (of the Securities and Exchange Commission in Washington, D.C.) – Counsel for Respondent;

16.   Richman, Brian A. (of Gibson, Dunn & Crutcher, LLP in Dallas, Texas) – Counsel for Petitioner;

17.   Savitt, William (of Wachtell, Lipton, Rosen & Katz LLP in New York, New York) – Counsel for Intervenor;

18.   Scalia, Eugene (of Gibson, Dunn & Crutcher, LLP in Washington, D.C.) - Counsel for Petitioner;

19.   Securities and Exchange Commission – Respondent;

20.   Shin, Won S. (of Wachtell, Lipton, Rosen & Katz LLP in New York, New York) – Counsel for Intervenor;

21.   Tienken, John W. (of Gibson, Dunn & Crutcher, LLP in Washington, D.C.) – Counsel for Petitioner;

22.   Verret, Prof. J.W. – *Amicus curiae* supporting Respondent and Intervenor;

23.   Wagner, Brooke (of the Securities and Exchange Commission in Washington, D.C.) – Counsel for Respondent;

24.   Walker, Helgi C. (of Gibson, Dunn & Crutcher, LLP in Washington, D.C.) –  Counsel for Petitioner;

25.   Wolf, Brandon (of Gibson, Dunn & Crutcher, LLP in Washington, D.C.) – Counsel for Petitioner.

No publicly traded company or corporation has an interest in the outcome of this appeal.

*Citadel Secs. LLC v. SEC*, No. 25-13631

February 6, 2026                    /s/ Thomas Burns

                                   Thomas A. Burns

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS........................................C-1

TABLE OF CITATIONS ............................................................................ii

INTEREST OF *AMICUS CURIAE* ......................................................... 1

ARGUMENT AND CITATIONS OF AUTHORITY.................................. 2

I.  Just like D-Limit, the ORP seeks to protect investors from high-frequency traders and latency arbitrage................................. 4

    A.  High-speed traders often prey upon investors in the equities and options markets ...................................................... 4

    B.  Investment firms (including members of Healthy Markets Association) acting "on behalf of" actual investors and beneficiaries support of the ORP ..................................... 9

    C.  Even if the ORP discriminates between market makers and other market participants, that isn't "unfair"............... 13

II. As a market maker that serves its clients and also is a proprietary trading firm that trades exclusively for its own account, Citadel doesn't trade "on behalf of" retail investors...................... 17

III. Citadel failed to administratively exhaust an argument about latency arbitrage that it now raises for the first time in this Court ...................................................................................... 19

*Summary*.................................................................................................. 24

CONCLUSION ......................................................................................... 24

CERTIFICATE OF COMPLIANCE ........................................................ 26

CERTIFICATE OF SERVICE ................................................................. 27

# TABLE OF CITATIONS

**Cases**                                                                                          **Page(s)**

*Bates v. Sec'y, Dep't of Corr.*,
  964 F.3d 1326 (11th Cir. 2020).......................................................... 23

*Bloomberg LP v. SEC*,
  45 F.4th 462 (D.C. Cir. 2022) ............................................................. 2

*Cboe Global Mkts., Inc. v. SEC*,
  155 F.4th 704 (D.C. Cir. 2025) ........................................................... 2

*\*Citadel Secs. LLC v. SEC*,
  45 F.4th 27 (D.C. Cir. 2022) ................................................. 2, 4, 14–18

*Darby v. Cisneros*,
  509 U.S. 137 (1993)............................................................................ 21

*Dimanche v. Brown*,
  783 F.3d 1204 (11th Cir. 2015).......................................................... 23

*Esslinger v. Davis*,
  44 F.3d 1515 (11th Cir. 1995)............................................................ 22

*Fed. Power Comm'n v. Colo. Interstate Gas Co.*,
  348 U.S. 492 (1955)............................................................................ 21

*In re Barclays Liquidity Cross & High-Frequency Trading Litig.*,
  126 F. Supp. 3d 342 (S.D.N.Y. 2015) .............................................. 5, 9

*In re Citadel Secs. LLC*,
  No. 3-17772 (SEC Jan. 13, 2017),
  *at* https://tinyurl.com/s4tnxuay (visited Feb. 6, 2026) ................. 18–19

*In re NYSE Specialists Sec. Litig.*,
  503 F.3d 89 (2d Cir. 2007) ................................................................... 5

*Nat'l Mining Ass'n v. Dep't of Labor*,
  292 F.3d 849 (D.C. Cir. 2002)....................................................... 21–22

*Nat'l Wildlife Fed'n v. EPA*,
  286 F.3d 554 (D.C. Cir. 2002) .............................................................. 22

*Sapuppo v. Allstate Floridian Ins. Co.*,
  739 F.3d 678 (11th Cir. 2014) ............................................................. 21

*Thompson v. DEA*,
  492 F. 3d 428 (D.C. Cir. 2007) ........................................................... 23

***Timpinaro v. SEC*,**
  2 F.3d 453 (D.C. Cir. 1993),
  *as amended on denial of reh'g* (Nov. 9, 1993) ............................... 14–16

*Turner v. Burnside*,
  541 F.3d 1077 (11th Cir. 2008) ........................................................... 23

*Woodford v. Ngo*,
  548 U.S. 81 (2006) ............................................................................... 24

| **Statutes** | **Page(s)** |
|---|---|

5 U.S.C. §§ 551–559 ............................................................................. 21

15 U.S.C. § 77i ..................................................................................... 20

15 U.S.C. § 78y ............................................................................... 20–21

| **Rules and regulations** | **Page(s)** |
|---|---|

17 C.F.R. § 242.611 ................................................................................ 7

63 Fed. Reg. 70844 (Dec. 22, 1998) ...................................................... 6

**Other authorities**                                                        **Page(s)**

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Hearing Before the House Committee on Financial Services,*
117th Cong. (Feb. 18, 2021)
(Statement of Kenneth C. Griffin, Founder and CEO of Citadel and Founder and Principal Shareholder of Citadel Securities),
*at* https://tinyurl.com/yevvfzvs (visited Feb. 6, 2026) ........................ 17

Lewis, Michael,
*Flash Boys: A Wall Street Revolt* (2014). ........................................ 8, 19

Osipovich, Alexander,
*High-Frequency Traders Eye Satellites for Ultimate Speed Boost,*
Wall St. J., Apr. 1, 2021,
*at* https://tinyurl.com/762k47za (visited Feb. 6, 2026) ...................... 10

Sapien, Brendan,
Note, *Financial Weapons of Mass Destruction: From Bucket Shops to Credit Default Swaps,*
19 S. Cal. Interdisc. L.J. 411 (2010)..................................................... 6

SEC,
*Concept Release on Equity Market Structure* (Jan. 14, 2010),
*at* https://tinyurl.com/2na2u4pn (visited Feb. 6, 2026)........................ 9

*Zero-fee trading helps Citadel Securities cash in on retail boom,*
Financial Times, June 21, 2020,
*at* https://tinyurl.com/5nk3j7jc (visited Feb. 6, 2026) ........................ 19

## **INTEREST OF *AMICUS CURIAE***[1]

Healthy Markets Association (https://healthymarkets.org) is an investor-focused nonprofit coalition that provides independent information and analysis to investors and regulators so as to promote transparency, minimize conflicts of interest, and ultimately reduce investors' trading costs. Its members manage retirement savings for millions of North Americans, including U.S. and Canadian pensions and asset managers with trillions of dollars in assets under management.[2] In addition, it also has working group members, including leading brokers, data and technology providers, and execution venues.[3] Its staff and board include a former senior official of the Commission, current and former senior industry

---

[1] No person or entity other than *amicus*, its members, or its counsel authored this brief, in whole or in part, or made a monetary contribution to this brief's preparation or submission. *Amicus* timely notified the parties of its intent to file its brief, and all parties consented. All of *amicus*'s positions are taken by the organization itself and may not reflect individual members' specific interests or positions.

[2] HMA's buyside members include the Arizona State Retirement System, Brandes Investment Partners, CalPERS, Colorado PERA, The London Company of Virginia, PSP Investments, and Sands Capital Management. Collectively, HMA's buyside members control the retirement accounts of millions of Americans and currently have trillions of dollars in assets under management.

[3] HMA's working group members include Bloomberg LP, BMO Capital Markets, Investors Exchange LLC, Minneapolis Grain Exchange, MIAX, and Trumid.

officials, and two leading securities regulation law professors. It frequently opines by invitation in congressional testimony, regulatory panels, industry events, and the press; it often submits comment letters in agency rulemaking proceedings, which regulators' proposed and final rules have cited hundreds of times; and it routinely submits *amicus* briefs in major securities regulation cases, such as *Cboe Global Mkts., Inc. v. SEC*, 155 F.4th 704 (D.C. Cir. 2025) (Regulation NMS's fee-cap and access-fee amendments), *Bloomberg LP v. SEC*, 45 F.4th 462 (D.C. Cir. 2022) (FINRA bond core reference data service), and *Citadel Securities LLC v. SEC*, 45 F.4th 27 (D.C. Cir. 2022) (D-Limit).

*Amicus* is keenly interested in this case given its longstanding interest in protecting investors from predatory trading.

## ARGUMENT AND CITATIONS OF AUTHORITY

Finance and securities regulation aren't easy, they're hard. Even for the pros, it can be all too easy to get tied up in details and miss the forest for the trees. To that end, instead of recasting the litigants' argument about how to interpret statutes, regulations, or caselaw in different terms, this brief seeks to draw the Court's attention to the big picture: investors have long been concerned with predatory trading, and just as

IEX designed the D-Limit order type for equities markets to protect investors, IEX Options designed the ORP for the options market for the same reason. That is why the vast majority of commenters supported the ORP, and that's why the Commission approved the rule.

To flesh out that big picture, this brief makes three discrete points. First, it explains how the post-Regulation NMS regulatory environment unwittingly created a kill zone for high-frequency traders to engage in latency arbitrage in equities markets, describes how the D.C. Circuit affirmed the Commission's approval of IEX's D-Limit order type in *Citadel Securities*, and explains why there's nothing "unfair" about extending ORP protection to market makers in options markets. *See infra* Argument I. Second, it notes that Citadel is both a market maker that serves its clients and also is a proprietary trading firm that trades exclusively for its own account, so unlike traditional broker-dealers, it generally doesn't trade options "on behalf of" retail investors. *See infra* Argument II. Third, it points out that Citadel didn't administratively exhaust one of its arguments about how latency arbitrage is supposedly different in the equities markets than it is in the options markets. *See infra* Argument III. Thus, the Court should deny the petition.

## I.    Just like D-Limit, the ORP seeks to protect investors from high-frequency traders and latency arbitrage

The post-Regulation NMS regulatory environment created an opportunity for predatory high-frequency traders (also sometimes called latency arbitrageurs), the D.C. Circuit has already approved IEX's D-Limit order type intended to protect against such traders in *Citadel Securities*, and there's nothing "unfair" about extending that type of protection to the options markets.

### A.    High-speed traders often prey upon investors in the equities and options markets

Automated trading, the proliferation of multiple exchanges with potentially different prices, and order-routing rules unintentionally created a kill zone for high-speed traders in equities and options markets. Since the 1980s, regulators have accelerated the automation of trading (to promote efficiency), allowed multiple exchanges and dark pools with potentially different stock prices to proliferate (to promote competition), and defined rules about how orders are sliced up and routed (to ensure orders are executed at best prices). Unfortunately, these well-intentioned regulatory moves have had the unintended consequence of creating a fertile

4

hunting ground for high-speed, predatory traders engaging in latency ar-

bitrage to profit at the expense of slower-moving, long-term investors.

One of the major drivers of the reforms was competition. In the late 1900s, many investors and brokers were concerned with trading abuses at the then-dominant trading centers. For example, many investors were concerned that market makers or specialists would self-deal by getting in the middle of trades. *See, e.g., In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 93 (2d Cir. 2007) (discussing civil litigation, SEC enforcement proceedings, and criminal prosecutions concerning NYSE specialists who had engaged in self-dealing by interpositioning, trading ahead, freezing the book, and manipulating the tick).

Regulators responded to these concerns by seeking to promote competition between trading centers. Regulation ATS (short for Alternative Trading Systems) and the demutualization of exchanges, amongst other reforms, promoted competition for trading venues and led to the proliferation of multiple public exchanges and dozens of dark pools. *See In re Barclays Liquidity Cross & High-Frequency Trading Litig.*, 126 F. Supp. 3d 342, 349 (S.D.N.Y. 2015) ("In 1998, in response to the growth of trading over electronic platforms and other emerging technologies, the

SEC authorized electronic platforms to register as national exchanges."
(citing Regulation of Exchanges and Alternative Trading Systems, SEC
Release No. 34-40760, 63 Fed. Reg. 70844 (Dec. 22, 1998))). Today, equi-
ties are traded on many national securities exchanges (*e.g.*, NYSE,
Nasdaq, BATS, IEX, etc.), and private exchange-like venues (also called
dark pools), often run by large financial institutions such as Goldman
Sachs, Credit Suisse, and others. Similarly, options are traded on multi-
ple national exchanges (*e.g.*, Cboe, NYSE, Nasdaq, etc.), but they can't be
traded off exchange. *See* SEC Br. 10–11 (citing A157).[4]

This competition amongst trading venues, however, had exacer-
bated a long-standing problem for investors and their brokers: identify-
ing where they may obtain the best available prices. Although brokers
are required generally to seek out the best available prices for their cus-
tomers under the circumstances, what prices those brokers see is often a
function of where they look. An investor wanting to buy 1,000 shares of

---

[4] In finance lingo, an entity that trades unregistered options off ex-
change would be akin to a bucket shop, which is a bad thing. *See generally*
Brendan Sapien, Note, *Financial Weapons of Mass Destruction: From
Bucket Shops to Credit Default Swaps*, 19 S. Cal. Interdisc. L.J. 411
(2010) (describing calamitous history of 19th century bucket shops).

stock who looks at NYSE may see a price of $10 per share, but one who looks at Nasdaq may see a price of $9.98 per share.

Regulators wanted to make sure customers could get the benefit of better available prices, wherever those prices may be. As a result, the SEC adopted the Order Protection Rule for equities (sometimes called Rule 611), which essentially commands exchanges to adopt policies reasonably designed to avoid executing orders at prices that are inferior to protected quotes that are available on other exchanges, and route orders to those exchanges offering the best-displayed price.[5] 17 C.F.R. § 242.611.

Combined, these rules were intended to help investors obtain better prices for trading, without the risks of market makers from exchanges exploiting their privileged positions. And in some ways, this worked.

But this regulatory environment also created a fertile hunting ground for high-speed traders. By proliferating many different venues

---

[5] Rule 611 was adopted to essentially provide teeth to the SEC brokers' longstanding requirements to seek "best execution" for their customers. But the often nebulous standard for "best execution" often afforded brokers too much discretion, frequently resulting in brokers' customers receiving prices inferior to those available at major market centers, like exchanges. Rule 611 applies only to so-called "protected quotations," which generally concern only those orders on exchanges for 100 shares or more. Options are traded pursuant to an order-protection provision that is "virtually identical to the requirement in Rule 611(a)." SA4.

with potentially varying prices, regulators gave an advantage to any trader that could identify and trade based on the price differences between the different venues. Such a trader, in a split second, can earn instant profits by buying on one exchange at a lower price and selling it at a higher one on another exchange. That practice, often called latency arbitrage, can be viewed as a tax on slower-moving investors.

> To illustrate how stupid routing can be, say you have told your Wall Street broker—to whom you are paying a commission—that you wish to buy 100,000 shares of Company XYZ at $25 and now, conveniently, there are 100,0000 shares for sale at $25, 10,000 on each of ten different exchange, all of which will charge the broker to trade on your behalf (though far less than the commission you have paid to him). There are, however, another 100 shares for sale, also at $25, on the BATS exchange—which will pay the broker for the trade. The sequential cost-effective router will go first to BATS and buy the 100 shares—and cause the other 100,000 shares to vanish into the paws of high-frequency traders (in the bargain relieving the broker of the obligation to pay to trade). The high-frequency traders can then turn around and sell the shares of Company XYZ at a higher price, or hold onto the shares for a few seconds more, while you, the investor, chase Company XYZ's shares even higher. In either case, the result is unappealing to the original buyer of Company XYZ's shares.

Michael Lewis, *Flash Boys: A Wall Street Revolt* 75–76 (2014).

Put simply, high-speed traders now use "computer-driven algorithms to rapidly move in and out of stock positions, faster than the blink of an eye making money by arbitraging small differences in stock prices—

often across different exchanges—rather than by holding the stocks for an appreciable period of time." *In re Barclays*, 126 F. Supp. 3d at 349; *accord* SEC, *Concept Release on Equity Market Structure* (Jan. 14, 2010), *at* https://tinyurl.com/2na2u4pn (visited Feb. 6, 2026).

Just as high-speed traders engaging in latency arbitrage prey on slower traders in the stock markets, they also do so in the options markets as well. The Commission addresses this extensively in its brief, and it explains why the underlying pricing mechanisms for stocks and options don't make a difference for latency arbitrage purposes. *See* SEC Br. 47. That is, in either equities or options markets, high-speed traders engaging in latency arbitrage are looking to pick off stale quotes so they can lock in a riskless profit.

### B. Investment firms (including members of Healthy Markets Association) acting "on behalf of" actual investors and beneficiaries support of the ORP

By contrast, pension funds and asset managers, including members of Healthy Markets Association, who do, as a matter of law, act "on behalf of" actual investors and beneficiaries (*e.g.*, servicemen and servicewomen, teachers, firefighters, policemen, and government employees) are

concerned with high-speed, predatory trading practices, and have expressed support for the IEX's attempts to mitigate the effects of those practices.

Unlike high-speed traders and latency arbitrageurs, pensions and asset managers generally aren't in the business of building technological infrastructure to make trading decisions measured in nanoseconds (*i.e.*, billionths of a second). Instead, these investment fiduciaries are generally trying to make wise investment allocation decisions to best grow and protect assets for their millions of customers and beneficiaries. And they use options to reduce hedge against portfolio risk and reduce volatility. Additionally, pensions and asset managers generally lack the resources and expertise to engage in the technological arms race for trading speed that rapidly moved from telephone lines, to microwave towers, to lasers, to space. *See* Alexander Osipovich, *High-Frequency Traders Eye Satellites for Ultimate Speed Boost*, Wall St. J., Apr. 1, 2021, *at* https://tinyurl.com/762k47za (visited Feb. 6, 2026). Institutional investors are often the victims of high-speed predatory trading strategies, which is why they have been so vocal about supporting efforts to combat latency

arbitrage, and have expressed such strong support for IEX's ORP. *See, e.g.*, SA68; *see also* SA94; A140; SA52; SA61.

For instance, a Healthy Markets member (the Arizona State Retirement System) joined a letter with other public pensions and institutional investors with over $1.7 trillion in collective assets under management to argue in favor of ORP. *See* SA83–92. In particular, they argued that technological and regulatory advances had "created efficiencies" but "also brought increasing complexity and unintended consequences." SA83. Specifically, "[o]ne such consequence is the ability of a small number of the fastest trading firms to leverage increasingly small speed advantages to determine execution outcomes." SA83. But when high-speed traders "with the most sophisticated technology" systematically pick off liquidity providers, "the costs act as a tax on liquidity." SA83. Alas, that "naturally reduces the incentive of firms to act as liquidity providers, and can lead to those that remain to widen their bid-offer spreads." SA83. Ultimately, investors bear those "added costs." SA83. Moreover, in the options markets, those added costs can push out the market makers who provide liquidity and on which public pensions and institutional investors rely: "the number of firms competing in the options markets has steadily

declined, a point punctuated by the recent departure of one of the most well-capitalized financial services firms in this space." SA84.

Similarly, Volant Trading, a former registered market maker on multiple options exchanges, explained how it had been forced to exit that line of business "due to the escalating costs and arms race associated with maintaining latency competitiveness." SA68. It decried how "[t]he playing field has increasingly tilted toward a small number of firms with the financial and technological resources and economies of scale to operate at the bleeding edge of latency-sensitive infrastructure." SA68. And it fretted whether those developments had "created unsustainable barriers to entry and reduced the diversity of liquidity providers, ultimately harming market quality for end investors." SA68.

Other institutional asset managers also are concerned. T. Rowe Price, which has over $1.7 trillion in assets under management, submitted a letter that explained how latency arbitrage's negative effects in equity markets were 'well-documented," whereas options markets were "even more vulnerable to these risks." SA94. That's because the "number of listed options series dwarfs the universe of listed equity securities, and options market makers are constantly trying to keep up with price

changes in equities so that they can refresh their options quotes." SA94. ORP's automatic repricing or cancellation of market maker's quotes during "moments of dislocation" would give them "greater confidence their quotes will not be adversely selected." SA94. In turn, that would "encourage more firms to act as market makers, tighten their spreads, increase their frequency of quoting, and quote for a broader range of options." SA94. And ultimately, that would benefit the institutional and retail investors whose funds and accounts involve listed options that T. Rowe Price manages as a fiduciary. SA94.

These investment firms with fiduciary obligations to their customers and beneficiaries, not Citadel, are acting on behalf of investors.

## C.    Even if the ORP discriminates between market makers and other market participants, that isn't "unfair"

Citadel complains (Citadel Br. 30–39) that the ORP is "designed to permit *unfair discrimination* between customers, issuers, brokers, or dealers" within the meaning of 15 U.S.C. § 78f(b)(5) (emphasis added). It's wrong. As the Commission explains, just because a proposed rule might result in some sort of "discrimination" between customers, issuers, brokers, or dealers, that doesn't mean the Commission is barred from reasonably concluding it still complies with the Exchange Act—instead,

the relevant question is whether such supposed discrimination is actually "unfair." *See* SEC Br. 33–38. And on that front, precedent has long held that the Exchange Act merely "prohibits 'unfair discrimination,' not 'discrimination' *simpliciter*.'" *Timpinaro v. SEC*, 2 F.3d 453, 456 (D.C. Cir. 1993), *as amended on denial of reh'g* (Nov. 9, 1993). Citadel, however, seems to disavow that limitation when it misdescribes the holdings of *Timpinaro* and *Citadel Securities*. *See* Citadel Br. 30–39.

*Timpinaro* approved a NASDAQ rulemaking that was designed to prevent latency arbitrage. 2 F.3d at 456–57. In particular, *Timpinaro* approved a NASDAQ rule that gave only market makers—not other market participants—a 15-second grace period to reset a stale price to buy or sell securities before a second automated trade could execute against its posted liquidity. *Id.* But the NASDAQ rule allowed market makers to enter into preferencing agreements with specific broker-dealers, which would allow further automatic executions between that market maker and a designated broker-dealer without a 15-second grace period. *Id.*

Several broker-dealers and their customers (*i.e.*, folks who were not market makers) challenged the NASDAQ rule's exemption for preferencing agreements as unfair. *Id.* But *Timpinaro* denied their petition. *Id.* It

14

held, "petitioners have not shown that it is in any way unfair for a market maker to waive the protection of the 15-second grace period" for two reasons. *Id.* First, it was "designed to protect the market maker from having to make an involuntary second trade at an untimely inside quotation." *Id.* Second, it constituted a nonprice volume discount, which was an "everyday feature of business" about which "nothing" was "inherently 'unfair.'" *Id.* at 457. That's because, by waiving the grace period, "a market maker can give a broker-dealer immediate execution in exchange for a higher volume of the broker-dealer's trading business," which effectively was a mere "volume discount in the form of immediate execution." *Id.*

Thus, *Timpinaro* did not base its holding, as Citadel incorrectly contends, on the notion that "*all market participants* were free to accept or decline the 15-second period as they chose." Citadel Br. 34 (emphasis added). Rather, the rule at issue there had conferred that right exclusively to market makers, who could exercise it however they pleased. *See Timpinaro*, 2 F.3d at 456–57.

Citadel's misconception of its own loss in *Citadel Securities*—which it renames as "*IEX Equity Rule*"—is equally perplexing. *See* Citadel Br. 34. Namely, according to Citadel, it lost *Citadel Securities* "because the

[D-Limit] mechanism was equally available to everyone." Citadel Br. 34. But for starters, Citadel misquotes the original source when it writes "'*All* market participants' could use the D-Limit order type on the same terms" while citing *Citadel Securities* with a "see" signal. *See* Citadel Br. 34. In fact, *Citadel Securities* had explained, "The SEC then took that data, analyzed it for itself, and reasonably concluded that the D-Limit order *benefits* 'all market participants' by thwarting latency arbitrage." *Citadel Secs.*, 45 F.4th at 34 (emphasis added). That is, *Citadel Securities* said D-Limit "benefits" all market participants—it didn't say it was "available" to all market participants. *See id.* And in reality, as the D.C. Circuit held, D-Limit wasn't and isn't available to all market participants; instead, it's available only to liquidity providers, not to liquidity takers. *See Citadel Secs.*, 45 F.4th at 32, 35 n.6.

Ultimately, Citadel misdescribes *Timpinaro* and *Citadel Securities* as having involved "rules available to all participants." Citadel Br. 34. That's wrong, because both cases involved rules that were limited to one type of market participant in each case: market makers in *Timpinaro* and liquidity providers in *Citadel Securities*.

16

## II.　As a market maker that serves its clients and also is a proprietary trading firm that trades exclusively for its own account, Citadel doesn't trade "on behalf of" retail investors

Citadel asserts it is a broker-dealer that trades "on behalf of" retail investors. Citadel Br. 6–7. Similarly, in a hearing of the House Committee on Financial Services, Citadel's CEO had testified that his firm "executes more trades on behalf of retail investors than any other firm." *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Hearing Before the House Committee on Financial Services*, 117th Cong. (Feb. 18, 2021) (Statement of Kenneth C. Griffin, Founder and CEO of Citadel and Founder and Principal Shareholder of Citadel Securities), *at* https://tinyurl.com/yevvfzvs (visited Feb. 6, 2026). But those contrived self-portraits disguise how Citadel actually makes money from so-called retail orders.

It has made these claims before. When Citadel was briefing the D-Limit row in the D.C. Circuit, its brief brazenly asserted—nine times, no less—that it acted "on behalf of" retail investors. *See* Citadel Br. 3, 15, 20, 26, 30, 33, 34, 38, *Citadel Secs. LLC v. SEC*, 45 F.4th 27 (D.C. Cir. 2022) (No. 20-1424). That wasn't accurate, as Healthy Markets' *amicus*

17

brief in that case made clear. HMA *Amicus* Br. 4–5, *Citadel Secs. LLC v. SEC*, 45 F.4th 27 (D.C. Cir. 2022) (No. 20-1424).

Citadel's claim that it is acting "on behalf of" retail customers is still wrong. *See* Citadel Br. 7. Far from trading "on behalf of" retail customers, Citadel's business is trading *against other parties' retail customers*.

Brokers, such as Robinhood or Charles Schwab, are the ones who have the actual relationships with retail customers. They have customer agreements, names, and contact information. They have "know your customer" obligations and have detailed regulatorily and contractually imposed obligations to those retail customers.

Modern market makers like Citadel, in contrast, generally do not have any relationship with retail investors, but instead have relationships with the brokers.

Citadel does not have customer or contractual relationship with the broker's retail clients, and it generally does not communicate with them. *See In re Citadel Secs. LLC*, No. 3-17772, at 10 n.14 (SEC Jan. 13, 2017) (ordering Citadel to pay $5.2 million disgorgement, $1.5 million prejudgment interest, and $16 million fine while observing it "did not have direct communications with the retail customers who placed orders with [its]

retail broker-dealer clients"), *at* https://tinyurl.com/s4tnxuay (visited Feb. 6, 2026).

Citadel doesn't know who the retail brokers' customers are, much less have any explicit contractual relationship with them. Rather, "Citadel Securities pays hundreds of millions of dollars [to brokerages like Charles Schwab] for this [retail] order flow and makes money by automatically taking the other side of the order, then returning to the market to flip the trade." *Zero-fee trading helps Citadel Securities cash in on retail boom*, Financial Times, June 21, 2020, *at* https://tinyurl.com/5nk3j7jc (visited Feb. 6, 2026); *see also* Lewis, *supra*, at 107–12 (describing hypothetical with Scalpers Inc.).

*None* of Citadel's trades are "on behalf of" retail customers. Citadel is either taking the opposite side of customers' trades or routing them elsewhere for execution.

## III. Citadel failed to administratively exhaust an argument about latency arbitrage that it now raises for the first time in this Court

During the rulemaking, Citadel never took the position that latency arbitrage in the equities and options markets were different because the former refers to firms' ability to react to timing gaps between pricing in

19

identical instruments, whereas the latter involves ordinary price movements in one product (underlying stocks) that affects pricing in another product. *See* A68–70, A81–91, A130–38. Instead, in this Court, Citadel raises that position for the first time. *See* Citadel Br. 42. But by sandbagging that argument until now, Citadel failed to administratively exhaust it. And in any event, that position lacks substantive merit as well, as the Commission already argued. *See* SEC Br. 47.

The Securities Exchange Act of 1934, as amended in 1975, *see* Pub. L. No. 94-29 § 20, 89 Stat. 159 (1975), provides: "No objection to an order or rule of the Commission, for which review is sought under this section, may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so." 15 U.S.C. § 78y(c)(1).[6] Here, Citadel has identified no place in the administrative record where it preserved any objection that latency arbitrage in equities and options markets means different things. And typically, it would be

---

[6] The Securities Act of 1933 contains a similar administrative-exhaustion requirement: "No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission." 15 U.S.C. § 77i(a). But unlike the Securities Exchange Act of 1934, it uses the phrase "order of" and lacks the phrase "or rule," which could limit its administrative exhaustion requirement to adjudications, not rulemakings.

too late to present a new argument why "there was a reasonable ground for failure to do so," 15 U.S.C. § 78y(c)(1),  in a reply brief. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014). Moreover, nothing in the Administrative Procedure Act, 5 U.S.C. §§ 551–559, "require[s] a different result" because it "purports to strengthen, rather than to weaken, the principle requiring the exhaustion of administrative remedies before permitting court review." *Fed. Power Comm'n v. Colo. Interstate Gas Co.*, 348 U.S. 492, 499–500 (1955).

For instance, in *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 874 (D.C. Cir. 2002), the D.C. Circuit rejected a challenge to agency's rulemaking because the appellants "failed to raise it during the notice-and-comment period." *Id.* It so held because the appellants' "general claim falls well short of providing the agency with the required 'adequate notice' of [their] specific claim." *Id.* Additionally, it again distinguished *Darby v. Cisneros*, 509 U.S. 137 (1993), which involved a debarment adjudication as opposed to a rulemaking,[7] because it "'addresses exhaustion

---

[7] Unlike challenges to rulemakings under the Securities Exchange Act of 1934, 15 U.S.C. § 78y(c)(1), *Darby* also involved a regulatory scheme in which "neither the statute nor agency rules specifically mandate exhaustion as a prerequisite to judicial review." 509 U.S. at 139.

of remedies, not waiver of claims, and is thus wholly inapposite' to the latter issue." *Nat'l Mining Ass'n*, 292 F.3d at 874 (quoting *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002)). If anything, it would be fairer to apply the doctrine to regulated entities (which are typically represented by sophisticated counsel) than it is to apply it to *pro se* litigants (who lack counsel) or criminal defendants (whose counsel often lack the wherewithal or resources to adequately represent their interests).

Holding Citadel to its *statutory* administrative-exhaustion obligations is also consistent with public policy for at least four reasons.

First, it would discourage regulated entities from engaging in sandbagging and gamesmanship in administrative proceedings as a prelude to litigation. *See Esslinger v. Davis*, 44 F.3d 1515, 1525 n.36 (11th Cir. 1995) (administrative-exhaustion requirements "also deter 'sandbagging,' the withholding of claims in an effort to get more than 'one bite of the apple'").

Second, the public, private, and judicial inefficiencies of allowing petitioners challenging administrative actions to evade administrative exhaustion can be astronomical. Here, this question about latency arbitrage being different in equities and options markets could've been

22

resolved conclusively at the agency level instead of sandbagging it until litigation here, where a government agency, two well-heeled enterprises, and multiple *amici*—along with their lawyers—have presented briefs for this Court's consideration.

Third, requiring administrative exhaustion of challenges to Securities Exchange Act rulemakings wouldn't be unduly burdensome. Citadel is a sophisticated entity that rakes in billions of dollars each year. Both at the rulemaking and appellate stages, it has the sophistication and resources to hire counsel at the pinnacle of the profession.[8]

Fourth, requiring administrative exhaustion would also help this Court and sister circuits expeditiously resolve and control the size of their administrative dockets. The primary purposes of administrative exhaustion are to solve problems "without having to file a lawsuit," *Turner v. Burnside*, 541 F.3d 1077, 1084 (11th Cir. 2008), to "improve[] the quality

---

[8] Put otherwise, this isn't a situation where Congress or courts are requiring administrative issues of national significance to turn on whether *pro se* litigants have the wherewithal to administratively exhaust claims for creamy peanut butter instead of chunky. *See Thompson v. DEA*, 492 F. 3d 428, 430 (D.C. Cir. 2007). Although even *pro se* inmates must administratively exhaust their claims, *e.g.*, *Dimanche v. Brown*, 783 F.3d 1204, 1207 (11th Cir. 2015) (prisoner exhausted grievance), or solve other procedural dilemmas, *e.g.*, *Bates v. Sec'y, Dep't of Corr.*, 964 F.3d 1326, 1327 (11th Cir. 2020) (habeas petition was timely).

of" cases "that are eventually filed," and to create "an administrative record that is helpful to the court," *Woodford v. Ngo*, 548 U.S. 81, 95 (2006). In other words, agency rulemakings and administrative exhaustion aren't meaningless kabuki theaters that serve as empty preludes to pre-ordained, inevitable litigation; rather, they exist to allow this Court and sister circuits to efficiently sift through their dockets to separate the wheat (meritorious claims) from the chaff (unmeritorious ones).

Thus, Citadel's administrative-exhaustion failure reflects its argument's shortcomings. *See* SEC Br. 47. And by withholding it until petitioning here, Citadel deprived both the Commission and other commenters the opportunity to address it at the rulemaking stage.

### *Summary*

As before, Citadel continues to cloak itself in the name of investors to argue directly against the interests of those who actually do trade "on behalf of" millions of American families and businesses. But the disguise is flimsy, and the Court should see through it.

### CONCLUSION

The petition should be denied.

24

Respectfully submitted,

/s/ Thomas Burns

Thomas A. Burns
BURNS, P.A.
301 West Platt Street, Suite 137
Tampa, FL 33606
(813) 642-6350
tburns@burnslawpa.com

*Counsel for amicus curiae*

25

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B)'s type-volume requirement. As determined by Microsoft Word 2010's word-count function, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and 11th Circuit Rule 32-4, this brief contains 4,950 words.

2.      This brief further complies with Federal Rule of Appellate Procedure 32(a)(5)'s typeface requirements and with Federal Rule of Appellate Procedure 32(a)(6)'s type-style requirements. Its text has been prepared in a proportionally spaced serif typeface in roman style using Microsoft Word 2010's 14-point Century Schoolbook font.

February 6, 2026                              /s/ Thomas Burns
                                             Thomas A. Burns

26

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I filed the original of the foregoing brief with the Clerk of Court via CM/ECF on February 6, 2026, to:

> David J. Smith, Clerk of Court
> U.S. COURT OF APPEALS FOR THE
>    ELEVENTH CIRCUIT
> 56 Forsyth Street N.W.
> Atlanta, GA 30303

I FURTHER CERTIFY that I served a true and correct copy of the foregoing brief via CM/ECF on February 6, 2026, to all counsel of record, including:

Eugene Scalia
Helgi C. Walker
Brian Richman
John W. Tienken
Brandon Wolf
*Counsel for petitioner*

William Savitt
Won S. Shin
Tala Doumani
*Counsel for intervenor*

Emily True Parise
Brooke Wagner
*Counsel for respondent*

February 6, 2026

/s/ Thomas Burns
Thomas A. Burns

27