**No. 25-13631**

IN THE

# United States Court of Appeals

FOR THE ELEVENTH CIRCUIT

➤➤◄◄

CITADEL SECURITIES LLC,

*Petitioner,*

*against*

U.S. SECURITIES AND EXCHANGE COMMISSION,

*Respondent,*

INVESTORS EXCHANGE, LLC,

*Intervenor.*

_____

*On Petition for Review of an Order
of the Securities and Exchange Commission*

## BRIEF FOR INTERVENOR

William Savitt
Won. S. Shin
Tala A. Doumani
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
212-403-1000

*Attorneys for Intervenor
Investors Exchange LLC*

 (212) 719-0990
appeals@phpny.com

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Intervenor Investors Exchange LLC states that it is wholly owned by IEX Group, Inc., and no publicly held corporation owns 10% or more of its stock.

Dated:  February 6, 2026                               /s/ William Savitt

                                                                                William Savitt

## STATEMENT REGARDING ORAL ARGUMENT

Intervenor Investors Exchange LLC respectfully requests oral argument, which will materially assist the Court in resolving the issues presented by the petition for review.

# TABLE OF CONTENTS

Page

STATEMENT REGARDING ORAL ARGUMENT ...................................................i

TABLE OF CONTENTS....................................................................................... ii

TABLE OF CITATIONS ....................................................................................iv

INTRODUCTION ..............................................................................................1

STATEMENT OF THE ISSUES...........................................................................7

STATEMENT OF THE CASE..............................................................................7

    A.    Adverse Selection from Latency Arbitrage............................................7

    B.    IEX's Exchange............................................................................9

    C.    Prior SEC Approvals of IEX................................................................10

    D.    SEC Approval of IEX Options.........................................................13

        1.    IEX's Application .............................................................13

        2.    Comments on the IEX Options Proposal................................15

        3.    The Commission's Approval Order.......................................17

    E.    This Proceeding.............................................................................20

STANDARD OF REVIEW .................................................................................21

SUMMARY OF THE ARGUMENT .....................................................................22

ARGUMENT ..................................................................................................24

I.    CITADEL MISCHARACTERIZES HOW IEX OPTIONS WILL OPERATE ..............................................................................................24

II.    SUBSTANTIAL EVIDENCE SUPPORTS THE ORDER APPROVING IEX OPTIONS....................................................................27

A.    Substantial Evidence Shows that Latency Arbitrage Exists in the Options Market. ................................................................27

B.    Substantial Evidence Shows that IEX Options Is Narrowly Tailored to Address Latency Arbitrage. ...............................................33

III.    THE COMMISSION REASONABLY CONCLUDED THAT IEX OPTIONS IS CONSISTENT WITH THE EXCHANGE ACT ....................38

A.    The Commission Reasonably Concluded that IEX Options Is Not Designed to Permit Unfair Discrimination. ................................39

B.    The Commission Reasonably Concluded that IEX Options Does Not Unnecessarily or Inappropriately Burden Competition. ........................................................................44

IV.    THE COMMISSION REASONABLY CONCLUDED THAT IEX OPTIONS QUOTATIONS ARE PROTECTED QUOTATIONS ...............49

V.    IF THE COURT REMANDS, IT SHOULD DO SO WITHOUT VACATUR ........................................................................54

CONCLUSION ........................................................................56

CERTIFICATE OF COMPLIANCE ................................................57

CERTIFICATE OF SERVICE .......................................................58

## TABLE OF CITATIONS

**Page(s)**

**Cases**

*Amoco Prod. Co.* v. *Vill. of Gambell, Alaska*,
480 U.S. 531 (1987)...................................................................................55

*Belenke* v. *SEC*,
606 F.2d 193 (7th Cir. 1979) ........................................................ 44-48

*Black Warrior Riverkeeper, Inc.* v. *U.S. Army Corps of Eng'rs*,
781 F.3d 1271 (11th Cir. 2015) ................................................... 54-55

*Bloomberg L.P.* v. *SEC*,
45 F.4th 462 (D.C. Cir. 2022).................................................................47

*Bradford Nat'l Clearing Corp.* v. *SEC*,
590 F.2d 1085 (D.C. Cir. 1978)..................................................... 44, 49

*Cboe Glob. Mkts., Inc.* v. *SEC*,
155 F.4th 704 (D.C. Cir. 2025).................................. 21, 31, 45, 48-49

*Chamber of Com.* v. *SEC*,
85 F.4th 760 (5th Cir. 2023) ...................................................................37

*\*Citadel Sec. LLC* v. *SEC*,
45 F.4th 27 (D.C. Cir. 2022) 2-4, 6, 8-12, 24-26, 28, 34-36, 42, 44-45, 47, 51-52

*City of N. Miami* v. *FAA*,
47 F.4th 1257 (11th Cir. 2022) ............................................................. 21

*DeKalb Cnty.* v. *United States DOL*,
812 F.3d 1015 (11th Cir. 2016) .............................................................22

*Domestic Secs., Inc.* v. *SEC*,
333 F.3d 239 (D.C. Cir. 2003)..................................................... 35, 48

*Exch. Servs., Inc.* v. *SEC*,
797 F.2d 188 (4th Cir. 1986) .................................................................44

*FCC* v. *Prometheus Radio Project*,
592 U.S. 414 (2021)........................................................... 32, 37-39

*Gordon* v. *N.Y. Stock Exch., Inc.*,
422 U.S. 659 (1975)........................................................................44

*In re Credit Suisse Sec. (USA) LLC*,
2016 WL 683553 (Feb. 1, 2016) ................................................ 53-54

*Meisel* v. *SEC*,
97 F.4th 755 (11th Cir. 2024) ........................................................21

*Nasdaq Stock Mkt. LLC* v. *SEC*,
34 F.4th 1105 (D.C. Cir. 2022)...................................................30, 46

*NetCoalition* v. *SEC*,
615 F.3d 525 (D.C. Cir. 2010).......................................................49

*Sapuppo* v. *Allstate Floridian Ins. Co.*,
739 F.3d 678 (11th Cir. 2014) .......................................................49

*Sorenson Commc'ns, Inc.* v. *FCC*,
765 F.3d 37 (D.C. Cir. 2014)........................................................52

*Stilwell* v. *Office of Thrift Supervision*,
569 F.3d 514 (D.C. Cir. 2009)................................................ 30, 37-38

*Susquehanna Int'l Grp., LLP* v. *SEC*,
866 F.3d 442 (D.C. Cir. 2017).......................................................35

*Timpinaro* v. *SEC*,
2 F.3d 453 (D.C. Cir. 1993).......................................39-40, 43, 45-46

**Statutes**

5 U.S.C. § 706.................................................................................21

15 U.S.C.

    § 78f(b).................................................................................38, 44
    § 78y(a) ............................................................................21, 26, 31
    § 78y(c) .................................................................................51

**Regulations**

17 C.F.R.

§ 242.600(b) ..................................................................................50

§ 242.602(b) ..................................................................................54

**Commission Releases**

81 Fed. Reg. 41,142 (June 23, 2016) ................................................. 9-11

85 Fed. Reg. 54,438 (Sept. 1, 2020) ........................................7-9, 11-12, 25, 42, 45

87 Fed. Reg. 5,592 (Feb. 1, 2022) ...................................................41

90 Fed. Reg. 7,205 (Jan. 21, 2025) .....................................13-14, 31-32

90 Fed. Reg. 17,474 (Apr. 25, 2025) ...............................................14, 35

90 Fed. Reg. 26,865 (June 24, 2025) ....................................... 14-15, 25, 35

90 Fed. Reg. 45,861 (Sept. 23, 2025) ............... 3, 5, 15-20, 24-34, 36, 38-50, 52-55

**Other Authorities**

American Securities Association Letter (July 9, 2025),
    https://www.sec.gov/comments/sr-iex-2025-02/sriex202502-
    622827-1826974.pdf...............................................................30

Announcement: Introducing MEMX (Jan. 7, 2019),
    https://memx.com/insights/introducing-memx...............................16

Designated Market Maker (DMM),
    https://www.citadelsecurities.com/what-we-do/equities/designated-
    market-maker-dmm/ ..............................................................16

Eighth Amended & Restated LLC Agreement of MEMX Holdings
    LLC (July 29, 2025), https://info.memxtrading.com/wp-
    content/uploads/2025/10/MEMX-Holdings-LLC-8th-AR-LLC-
    Agreement-10.9.25.pdf ...........................................................16

Oral Argument, *Citadel Sec. LLC* v. *SEC*, 45 F.4th 27 (D.C. Cir.
    2022) (No. 20-1424), https://media.cadc.uscourts.gov/recordings/
    docs/2021/10/20-1424.mp3 .................................................. 12-13

Select Vantage Letter (July 8, 2025), https://www.sec.gov/comments/
    sr-iex-202502-/sriex2025021825574-621929-.pdf...........................19

**INTRODUCTION**

Investors Exchange LLC ("IEX") is a national securities exchange that combats the predatory trading practice called "latency arbitrage." Over the past decade, IEX has introduced tools that protect investors, enhance competition, and improve liquidity by reducing the abuses of latency arbitrage on its exchange. Its innovations have been repeatedly approved by the Securities and Exchange Commission and endorsed by market participants—and upheld by the D.C. Circuit. At issue in this case is whether Citadel Securities—an entrenched market player that has taken advantage of latency arbitrage to reap windfall profits—can succeed in stifling IEX innovation and continue to exploit its unfair market advantage.

Citadel is among a small subset of high-speed traders that leverage their speed advantages to engage in latency arbitrage. They learn of a change in the market price of a security fractions of a second before others in the market. They then exploit those information asymmetries to target liquidity providers—those that offer to sell or buy securities at a quoted price. These high-speed traders use their momentary advantage to trade at the stale price, microseconds before liquidity providers can update their quotes. The end result? Latency arbitrageurs extract profits for themselves at the expense of others, including retail and institutional investors. The risk of losses from latency arbitrage also deters others from providing liquidity in the first place, further harming the market overall.

IEX "combat[s] latency arbitrage on its exchange." *Citadel Sec. LLC* v. *SEC*, 45 F.4th 27, 31 (D.C. Cir. 2022). Since its inception, IEX has applied a publicly disclosed formula, triggered by market price transition, that automatically updates liquidity providers' quoted prices on its exchange for certain types of equity orders. To give the formula time to operate, all incoming orders (including those from high-speed traders) traverse a 350-microsecond hardware "speedbump" before reaching IEX. These tools are designed to level the playing field. They protect liquidity providers from latency arbitrageurs that exploit speed advantages to pick off stale quotes before they can be updated. As a result, liquidity providers are more willing to provide competitive quotes (*i.e.*, at narrower spreads with more volume), improving liquidity as a whole—to the benefit of all market participants.

Citadel is a leading high-speed trader that "employ[s] latency arbitrage tactics." *Id.* at 34. Recognizing that IEX's innovations limit its ability to extract arbitrage profits at the expense of ordinary investors, Citadel has sought to thwart IEX at every turn. Citadel first opposed IEX's registration as a national securities exchange, which the SEC approved upon finding that IEX's efforts to combat latency arbitrage would protect investors and the public interest. Citadel then opposed IEX's effort to expand its coverage to reach additional equity order types, which the Commission again approved in the interest of investor protection and improving liquidity. Over Citadel's objection, the D.C. Circuit affirmed the SEC's

conclusion that IEX "benefits all market participants by thwarting latency arbitrage."
*Id.* at 32.

Here, Citadel continues its campaign to preserve its speed-based advantages and accompanying profits. At issue is IEX's proposed launch of IEX Options LLC ("IEX Options"), a trading platform designed to protect liquidity providers in the options market from latency arbitrage and thereby encourage more competition and increased liquidity in options trading. Like IEX's previously approved equities exchange, IEX Options will use an algorithm triggered by market price transition, in this case known as the Options Risk Parameter (the "ORP"), that automatically cancels or updates liquidity providers' quotes; and all inbound orders to IEX Options will traverse the identical 350-microsecond speedbump before reaching IEX.

After carefully considering the evidence and the views of market commenters, the SEC approved IEX's proposal. A143 (*Order Approving IEX Options*, 90 Fed. Reg. 45,861 (Sept. 23, 2025) (the "Order")). The Commission found that IEX Options is narrowly tailored to combat latency arbitrage in the options market, enhance competition among market makers (the primary liquidity providers for options), and improve the provision of liquidity—all to the benefit of the overall options market. The SEC thus concluded that IEX Options is consistent with the Exchange Act in that it will promote investor protection without resulting in unfair discrimination or unduly burdening competition. The Commission's 89-page Order

- 3 -

exhaustively addressed the objections raised by opponents of the proposal, including Citadel and its amici.

Citadel now petitions for review of the Order. The petition is built on misdirection and mischaracterization. Citadel suggests that commenters largely favored its position, but the opposite is true. Market makers, pension plans, institutional investors, and individual investors all agreed that IEX Options would be effective in addressing latency arbitrage in the options market, while latency-arbitrage profit-takers like Citadel and certain competing options exchanges opposed. Citadel pretends that the analysis in this options-market case is entirely different from the case already approving IEX in the equities market. But the opposite is true: there is no analytical daylight between this case and the case Citadel already litigated and lost in the D.C. Circuit. Citadel claims that IEX Options will allow certain investors to profit unfairly. But the opposite is true: IEX allows, and IEX Options will allow, the rest of the market to benefit from the reduced efficacy of Citadel's latency arbitrage strategies—"tactics that actually harm the market." *Citadel*, 45 F.4th at 37.

So Citadel's unflattering analogies—"pause and peek," "last look," rigged poker games, Lucy pulling away the football—all attempt to confuse what IEX actually does. Citadel seeks to create the illusion that IEX Options will receive an incoming order, hold it to compare with a market maker's quote, and then decide

- 4 -

based on that comparison whether to cancel or reprice the quote or instead allow the incoming order to execute. That is not how IEX Options will operate. A market maker will decide, at the time it submits a quote, whether to opt-in to the ORP for that quote and whether the ORP will cancel or reprice the quote if activated. The ORP will then only be triggered by market price instability based on a transparent, predetermined formula, at which point it will automatically cancel or reprice the quote. The ORP will thus operate independently of any incoming orders that may be traversing the speedbump at the time. The SEC accordingly found, in rejecting Citadel's "last look" argument before the Commission, that the ORP does not give market makers or IEX any control or judgment over which incoming orders to execute against. A153 (Order 45,871). That finding, which Citadel does not dispute is supported by substantial evidence, is conclusive.

Equally conclusive are the Commission's findings that (i) latency arbitrage exists in the options market and (ii) IEX Options is narrowly tailored to address the problem without significantly affecting the trades of non-arbitrageurs, both of which are supported by substantial evidence. The former point was undisputed before the Commission, which had before it the settled precedent establishing that latency arbitrage exists in the equities market; comments from options market makers, institutional investors, pension funds, and others confirming from firsthand experience that latency arbitrage exists in the options market; and its own expertise

regarding market characteristics that make the problem more acute for options. The SEC's finding of narrow tailoring was amply supported by data estimating that the ORP will impact options quotes substantially less than 1% of the trading day on average. Similar data established substantial evidence in Citadel's prior challenge in the equities market. *Citadel*, 45 F.4th at 33.

Finally, the Commission correctly determined that IEX Options is consistent with the Exchange Act. Based on its evaluation of the evidence and expertise in the securities markets, the SEC concluded that the options market as a whole will benefit from an innovative exchange designed to blunt the speed advantage that latency arbitrageurs currently exploit—just as the equities market has for years benefited from similar IEX protections. Citadel may disagree with that assessment, but the Exchange Act does not force securities exchanges to sit idly by as arbitrageurs harm liquidity providers and ordinary investors, much less prevent the SEC from approving an exchange proposal to limit these abusive practices for the benefit of all market participants. The SEC reasonably decided to once again "allow IEX to innovate . . . in a way that offers new opportunities to long-term investors." *Id.* at 32. Congress entrusted such policy judgments to the Commission, and courts do not second-guess them. The petition for review should be denied.

## STATEMENT OF THE ISSUES

1.    Whether substantial evidence supports the Commission's findings that latency arbitrage exists in the options market and that IEX Options is narrowly tailored to address that problem.

2.    Whether the Commission reasonably concluded that IEX Options is not designed to permit unfair discrimination and does not impose an unnecessary or inappropriate burden on competition.

3.    Whether the Commission reasonably concluded that quotations on IEX Options are protected quotations.

4.    Whether, if the Court remands for further Commission review, it should do so without vacatur.

## STATEMENT OF THE CASE

### A.    Adverse Selection from Latency Arbitrage

Market participants that offer to sell or bid to buy securities are liquidity providers. Participants that accept providers' offers and bids are liquidity takers. When market prices move, "a race condition exists between liquidity providers who want to reprice their . . . liquidity to reflect the changing market prices and the liquidity takers who want to take before those updates can occur." SA30 (*Order Approving D-Limit*, 85 Fed. Reg. 54,438, 54,442 (Sept. 1, 2020)).[1] Each race lasts

---

[1] "Citadel Br." refers to Citadel's brief; "A" refers to the appendix filed with Citadel's brief; "SEC Br." refers to the Commission's brief; "SA" refers to the

only the miniscule fraction of a second it takes for a pricing update to reach exchanges located in different geographical areas.

But the race exploits investors and liquidity providers. Some high-speed traders engage in predatory trading strategies that see and react to price changes more quickly through costly "low-latency systems, connectivity, and data sources." SA37 (85 Fed. Reg. at 54,449). They use their advantages for latency arbitrage: they take liquidity "at old, stale prices—just before updated prices reach the exchanges—and then turn around and trade those securities at the newly updated [price]." *Citadel*, 45 F.4th at 30-31. For example:

> A stock price may be in the process of changing from $10.00 to $10.01 across different exchanges. A high-speed trader might swoop in and buy at $10.00 from an investor that cannot update its quote fast enough, and then sell at $10.01—the price the investor could have received microseconds later if the arbitrageur had not intervened. That penny that would have gone to the investor goes instead to the arbitrageur.

*Id.* at 31 (quotation marks omitted). Ordinary liquidity providers are thus subject to the risk of "adverse selection" by arbitrageurs "when prices move and they are not able to see or react as fast." SA30 (85 Fed. Reg. at 54,442). The "extreme short-term investors" engaged in latency arbitrage extract profits that would accrue to liquidity

---

supplemental appendix filed with the Commission's brief; and "NYSE/MEMX Br." refers to the amicus brief filed in support of Citadel. Unless otherwise noted, quotations omit internal quotation marks, citations, alterations, and footnotes.

providers and long-term retail and institutional investors. *Citadel*, 45 F.4th at 31. Arbitrageurs effectively impose a "surcharge" on other market participants, "harm[ing] the market" as a whole. *Id.* at 37.

Citadel is a leading high-speed trader that makes no bones about its use of expensive "low-latency systems" to win the "race" against other market participants. Citadel Br. 57-58. Citadel leverages this speed advantage to "employ latency arbitrage tactics," targeting the precise moments when it can maximally profit by picking off orders at stale prices. *Citadel*, 45 F.4th at 34; SA28 (85 Fed. Reg. at 54,440 n.38).

## B.     IEX's Exchange

IEX uses two tools that work together to counter latency arbitrage for certain equity orders and protect investors from the risk of orders executing at stale prices. *Order Approving IEX Exchange*, 81 Fed. Reg. 41,142, 41,150 (June 23, 2016).

First, IEX uses a publicly disclosed formula, the crumbling quote indicator, that detects when market prices are in transition based on publicly available data. When the crumbling quote indicator is "on" for a particular security, for up to two milliseconds at a time, IEX automatically updates the price of the liquidity provider's order. *Citadel*, 45 F.4th at 31.

Second, inbound orders from traders go through a "speedbump," consisting of a coiled optical fiber, before reaching IEX. 81 Fed. Reg. at 41,150, 41,154.

Passage through the speedbump takes just 350 microseconds—about 1/11th the blink of an eye. *Citadel*, 45 F.4th at 31. Market data from other exchanges, however, do not go through the speedbump before reaching IEX. "The upshot is that IEX gets information from other exchanges about imminent changes to the [price] for securities a bit before it receives orders from traders." *Id.*

The time interval involved in these mechanisms is tiny. But the ability of these tools to facilitate market fairness is substantial. When the system works as intended, a liquidity provider's offer will no longer be at the "stale" price by the time a latency arbitrageur's order reaches IEX. *Id.* at 32. IEX accordingly makes it less likely that long-term investors and liquidity providers will "fall prey to latency arbitrage." *Id.*

### C.    Prior SEC Approvals of IEX

In 2016, the SEC approved IEX as a national securities exchange over Citadel's opposition. The Commission received numerous comments from market participants attesting to the existence of, and the ability of IEX to "help counter," latency arbitrage. 81 Fed. Reg. at 41,150 & n.142. Consistent with that support, the SEC found that IEX's tools are designed to guard against adverse selection by arbitrageurs when market prices are in transition, and thus IEX would provide "protection" against "latency arbitrage by those market participants using very sophisticated latency-sensitive technology, who can rapidly aggregate market data feeds and react faster." *Id.* at 41,155, 41,157. The SEC thus concluded that IEX's

- 10 -

exchange rules are designed to protect investors and the public interest, are not unfairly discriminatory, and do not impose an unnecessary or inappropriate burden on competition. *Id.*

In 2019, IEX proposed to expand its service to a new order type called D-Limit that would protect displayed orders. The purpose of this change was to combat latency arbitrage to reduce the risk that displayed orders on IEX execute at stale prices, and thereby "encourage its members to submit more displayed limit orders to IEX." SA26, 28 (85 Fed. Reg. at 54,438, 54,440). IEX received broad support from "a diverse group of agency brokers, institutional traders, asset managers, and pension funds that collectively manage trillions of dollars' worth of investor assets." SA36 (85 Fed. Reg. at 54,448). They confirmed that latency arbitrage "affects their trading and can dissuade them from posting liquidity." *Id.*; *see also* SA39 (85 Fed. Reg. at 54,451) (noting institutional traders' reluctance to post displayed liquidity because of experience with being "adversely selected by latency arbitrage traders with whom they cannot reasonably compete").

In 2020, the SEC approved IEX's proposal, again over Citadel's opposition. The SEC concluded that by guarding against adverse selection resulting from latency arbitrage, the proposal "promotes the interest of long term investors in a narrowly tailored manner that will inure to the benefit of displayed markets, leading to increased displayed liquidity from which all market participants ultimately will

benefit," and thus protects investors and the public interest. SA31 (85 Fed. Reg. at 54,443). The Commission also determined that it is not unfairly discriminatory for an exchange to address latency arbitrage in a narrowly tailored manner, and that it does not impose an unnecessary or inappropriate burden on competition because it responds to "competitive imbalances between liquidity providers and latency arbitrage liquidity takers." SA37, 39 (85 Fed. Reg. at 54,449, 54,451).

Citadel challenged the SEC order in the D.C. Circuit, which unanimously denied the petition for review. The Court held that substantial evidence supported the Commission's finding that the crumbling quote indicator accurately identifies latency arbitrage instead of normal trading activity. *Citadel*, 45 F.4th at 33. The Court affirmed the SEC's determination that D-Limit does not unfairly discriminate against liquidity takers or unduly burden competition because it "benefits all market participants by narrowly targeting latency arbitrage," concluding that the findings were reasonable and supported by substantial evidence. *Id.* at 32, 34. The Court also upheld the SEC's decisionmaking process, ruling that it independently analyzed "ample data" from IEX and commenters. *Id.* at 34. The D.C. Circuit thus resoundingly affirmed that IEX may "innovate . . . in a way that offers new opportunities to long-term investors." *Id.* at 32.[2]

_____

[2] As Judge Walker observed at oral argument, by arguing that the SEC should have prevented IEX from innovating to combat latency arbitrage, Citadel was effectively "trying to . . . regulate [its] way into a market victory." Oral Argument at 55:35-

### D.    SEC Approval of IEX Options

#### 1.    IEX's Application

In 2025, IEX proposed rules for a planned options trading platform, IEX Options. As IEX explained, a key difference between the options and equities markets is the far greater number of tradeable instruments in the options market: about 1.5 million options series compared to about 11,000 listed equity securities. A14 (90 Fed. Reg. 7,205, 7,218). Market makers play an essential role in providing liquidity in the options market. *Id.* They provide—and indeed are required by exchange rules to provide—continuous quotes for large numbers of options series. *Id.* Market makers account for over 99% of all open orders in the options market. A14 (90 Fed. Reg. at 7,218 & n.135).

IEX submitted that options market makers "have greater exposure to latency arbitrage" than liquidity providers in the equities market because of their continuous quoting obligations. A22 (90 Fed. Reg. at 7,226). Because they maintain hundreds or even thousands of quotes on options for a single underlying security, they need to update hundreds or even thousands of quotes when the price of the underlying security suddenly moves. A14 (90 Fed. Reg. at 7,218). Liquidity takers using "speed-based trading strategies"—latency arbitrageurs—can take advantage of those

---

56:02, *Citadel Sec. LLC* v. *SEC*, 45 F.4th 27 (D.C. Cir. 2022) (No. 20-1424), https://media.cadc.uscourts.gov/recordings/docs/2021/10/20-1424.mp3.

moments by targeting stale quotes before the market maker can update them, exposing it to potentially major losses. A20-21 (90 Fed. Reg. at 7,224 n.173, 7,225). That risk makes it more likely that market makers will "widen their spreads, show less liquidity, or simply exit the market." A14 (90 Fed. Reg. at 7,218).

IEX proposed to protect market makers from the risk of quote execution at stale prices by combating latency arbitrage in options trading as it has done for years in equities trading—with (i) an optional and publicly disclosed feature, the Options Risk Parameter (the "ORP"), that will automatically reprice or cancel a liquidity provider's quote in moments of price instability, and (ii) a 350-microsecond speedbump that incoming orders traverse before reaching IEX. A7, 13-15 (90 Fed. Reg. at 7,211, 7,217-19); *see also* A1-2, 7, 13-14, 19-22 (90 Fed. Reg. at 7,205-06, 7,211, 7,217-18, 7,223-26) (explaining that IEX Options is designed to protect market makers from the risk of execution of stale quotes targeted by liquidity takers with speed advantages).

After IEX filed its initial application, the Commission requested "[a]dditional information about the ORP's operation," including an estimate of the "expected frequency" with which it would operate. A52 (90 Fed. Reg. 17,474, 17,477). IEX responded in an amended filing that described its analysis of data from the Options Price Reporting Authority "for all series of over a thousand options classes of varying levels of volume and activity for various dates in February 2025." A116 (90

Fed. Reg. 26,865, 26,889). The analysis showed that even if the ORP parameters were set "to their most aggressive to maximize potential impact," the ORP would be active "on average per series significantly less than 0.001% of the trading day." *Id.* IEX thus submitted that the ORP was "designed to be nearly imperceptible to all market participants who are not specifically seeking to engage in latency arbitrage to execute against a market maker's quote at a stale price." *Id.* IEX later submitted the results of an additional analysis showing the same results for additional dates in July 2025. SA79 (IEX Response at 10).

## 2.    Comments on the IEX Options Proposal

IEX's proposal received widespread support from market participants, including options market makers, pension plans, institutional investors, and individual investors. Options market makers commented that IEX Options would help address the problem of latency arbitrage, allow "a larger universe of market makers to participate" in the options market, and "add[] new liquidity to the market," which would be available to all market participants. A154, 158 (Order 45,872 & n.192, 45,876 & n.246); *see* A71, 74, 139; SA51, 68. Pension plans and institutional investors said that IEX Options "will result in fairer and more efficient options markets by reducing barriers to entry and encouraging price competition, which will

- 15 -

directly benefit investors." A158 (Order 45,876 & n.234); *see* SA83, 93.[3] Nonprofit groups, academics, and U.S. Senators also wrote in support. *E.g.*, SA40, 61, 66. And hundreds of individual investors wrote in support of IEX Options to make clear that opponents of the proposal, who claimed to be representing the interests of retail investors, do not represent their interests. A157 (Order 45,875 & n.231).

The Commission received fewer than a dozen comment letters in opposition. Three letters were signed by Citadel itself, and a fourth by an industry group of principal trading firms that counts Citadel among its members (and a Citadel executive among its directors). A68, 81, 130. Three more letters were submitted by operators of competing options exchanges with significant ties to Citadel, including MEMX[4] and NYSE,[5] which have filed an amicus brief in this Court. A54, 60, 78.

---

[3] *See also* SA94 (T. Rowe Price at 2) (by reducing latency arbitrage, IEX Options will "benefit the funds and accounts using listed options that T. Rowe Price manages as a fiduciary on behalf of institutional and retail investors").

[4] Citadel is a founder of MEMX and retains an ownership interest and board seat. Announcement: Introducing MEMX (Jan. 7, 2019), https://memx.com/insights/introducing-memx; Eighth Amended & Restated LLC Agreement of MEMX Holdings LLC at 6 & Ex. B (July 29, 2025), https://info.memxtrading.com/wp-content/uploads/2025/10/MEMX-Holdings-LLC-8th-AR-LLC-Agreement-10.9.25.pdf.

[5] Citadel touts that as the "leading" NYSE market maker, it "represent[s] ~62% of all NYSE listings" and has been selected for more than 80% of NYSE IPOs. Designated Market Maker (DMM), Citadel Securities, https://www.citadelsecurities.com/what-we-do/equities/designated-market-maker-dmm/.

### 3.    The Commission's Approval Order

After carefully reviewing the publicly filed comments and other evidence in the record, the Commission approved IEX's proposal in an exhaustive 89-page ruling issued September 18, 2025. The SEC identified the problem of latency arbitrage in the options market. As the Commission explained, the quoted price of an option is derived from the price of the underlying security on which it is based. A152 (Order 45,870). In the moments when the price of an underlying equity security has changed, "a race condition exists between a market maker that needs to update and reprice its option quotes" and "high-speed liquidity takers that seek . . . [to] trad[e] against those options quotes before the market maker's quote update can occur." A152-53 (Order 45,870-71). Some liquidity takers are able to leverage costly technological advantages "to react faster to changing market prices than others (including the market maker that posted the quote)" and ultimately "execute against the old 'stale' price before the market maker can update it." A153 (Order 45,871). This is latency arbitrage, and it "results in economic losses for options market makers." *Id.*

The SEC found that the existence of latency arbitrage in the options market was "uncontroverted" and supported by the comments of options market makers confirming that it presented a "legitimate disadvantage"—namely, that "a faster market participant is able to execute against the old 'stale' price before the market

- 17 -

maker can update it." A153-54 (Order 45,871-72). The SEC also found that the problem "is especially acute for options compared to equities." A157 (Order 45,875). For example, the greater number of securities listed in the options market creates more opportunities for arbitrageurs to exploit price movements and adversely select against liquidity providers. A156-57 (Order 45,874-75). And the lack of off-exchange trading for options means that market makers cannot avoid latency arbitrage through other venues as they can for equities. A157 (Order 45,875).

The SEC found that IEX Options will address this problem, as it is designed to "avoid stale quotes by updating or cancelling quotes when latency arbitrage conditions are present." A153 (Order 45,871). The proposal will, moreover, "facilitate competition between market makers by allowing [market] makers with less access to the most latency-sensitive technology to provide more liquidity at competitive prices alongside those market makers that have such access." A154 (Order 45,872). The Commission further found that the proposal's benefits to market makers "are focused and not overbroad and are intended to specifically address the disincentive to be a market maker that latency arbitrage can present to many firms." A160 (Order 45,878). The SEC thus concluded that "the ORP and the access delay that effectuates it are designed" to protect investors and the public interest, are not designed to unfairly discriminate, and will increase competition and the provision of liquidity in the options market. A155, 160 (Order 45,873, 45,878). The SEC also

found that the data analysis IEX had submitted in response to the Commission's request was "relevant and persuasive" to show that the ORP "will not be overbroad in its application" and "generally should not affect market participants not engaged in latency arbitrage." A164 (Order 45,882).

The SEC carefully considered the views of the proposal's opponents but found them to be unpersuasive. For example, the Commission rejected Citadel's unfounded accusation that IEX's proposal is an "unprecedented quote-canceling scheme." A81, 130. As the SEC explained, existing options exchanges have long offered "risk mitigation" functionality that "allow[s] market makers and others to have the exchange automatically cancel their quotes and orders" based on certain triggers and market conditions. A150 (Order 45,868 & n.126).[6] The SEC determined that IEX's proposal is more narrowly tailored than other risk-mitigation tools because it will only reprice or cancel a specific series, while other mechanisms may cancel quotes across all series in a class. A159-60 (Order 45,877-78). The Commission also recognized that while other risk-mitigation tools use non-transparent settings, the ORP methodology is codified in IEX's rulebook and therefore is "fully transparent

---

[6] As one commenter observed, Citadel stated in 2020 that high cancellation rates in electronic markets are "'integral to the proper functioning of modern markets, resulting in greater efficiency, narrower bid-ask spreads, and more robust price discovery." Select Vantage Letter at 2 (July 8, 2025), https://www.sec.gov/comments/sr-iex-2025-02/sriex202502-621929-1825574.pdf.

to the public." A154, 160 (Order 45,872, 45,878). Furthermore, as the SEC recognized—following the D.C. Circuit's reasoning—"an access delay paired with a mechanism to cancel or reprice orders is not novel for trading on an exchange in general as IEX already operates its equities market with the exact same access delay and an order type (D-Limit order) that can be repriced or cancelled by the Exchange." A150 (Order 45,868).

To take another example, the SEC also considered but rejected Citadel's claim that IEX Options would harm retail investors. A157 (Order 45,875 & nn.225-26). As other commenters observed, retail investors do not trade in the "microsecond timeframes during which IEX's protections operate," and IEX's proposal would prevent a "wealth transfer from retail investors to high-frequency traders." A157-58 (Order 45,875-76 & nn.228-29, 232-33). The SEC found that there was only a 1 in 100,000 chance that a retail order would arrive while the ORP was on, and thus IEX would "make it more difficult for latency sensitive professional traders" but not for retail investors. A158 (Order 45,876).

### E.    This Proceeding

On October 17, 2025, Citadel filed a petition for review of the Order. Instead of returning to the D.C. Circuit, which unanimously denied Citadel's previous challenge to an SEC order approving IEX's rules to combat latency arbitrage in equity securities, Citadel filed its petition in this Court.

Citadel, the SEC, and IEX have jointly requested a decision in this case by June 15, 2026 in light of the planned launch of IEX Options in the third quarter of 2026.

## STANDARD OF REVIEW

The Order may be set aside only if, as relevant here, it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or is "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E).

The "arbitrary and capricious" standard "is exceedingly deferential and provides the reviewing court with limited discretion to reverse an agency's decision." *City of N. Miami* v. *FAA*, 47 F.4th 1257, 1266 (11th Cir. 2022). "The reviewing court may not substitute its own judgment for that of the agency but must, instead, generally defer to the agency's technical expertise." *Id.*; *see also Cboe Glob. Mkts., Inc.* v. *SEC*, 155 F.4th 704, 716 (D.C. Cir. 2025) ("It is particularly deferential in a case like this, which implicates competing policy choices, technical expertise, and predictive market judgments.").

The Commission's factual findings, "if supported by substantial evidence, are conclusive." 15 U.S.C. § 78y(a)(4). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Meisel* v. *SEC*, 97 F.4th 755, 761 (11th Cir. 2024). The threshold "is not high": it requires "more than a scintilla" but "less than a preponderance." *Id.* "The substantial evidence

standard limits the reviewing court from deciding the facts anew, making credibility determinations, or re-weighing the evidence." *DeKalb Cnty.* v. *United States DOL*, 812 F.3d 1015, 1020 (11th Cir. 2016). Under this standard of review, this Court "will reverse such findings only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough." *Id.*

## SUMMARY OF THE ARGUMENT

The petition for review should be denied.

1.      The Court should reject Citadel's repeated attempts to mischaracterize how IEX Options will operate. The Commission made well-supported findings regarding how the exchange will actually work. Citadel does not challenge those findings on substantial-evidence grounds, so they are conclusive.

2(a).  Substantial evidence supports the Commission's finding that latency arbitrage exists in the options market given the existence of the problem in the equities market, the uncontroverted evidence in the record that latency arbitrage creates a disadvantage for options market makers, and the characteristics of the options market that make the issue even more acute than in the equities market.

2(b).  Substantial evidence supports the Commission's finding that IEX Options is narrowly tailored to address the problem of latency arbitrage. The SEC considered data showing that the ORP is designed to activate during fleeting moments of price instability when latency arbitrageurs use their speed advantages to

- 22 -

target and pick off stale quotes, and is not likely to affect the trades of non-arbitrageurs.

3(a). The Commission reasonably concluded that IEX Options is not designed to permit unfair discrimination. Because of their continuous quoting obligations for a large number of options series, market makers are uniquely exposed to a greater risk of losses from latency arbitrage. IEX Options is designed to fairly provide market makers with a benefit—protection from latency arbitrage—that is commensurate with that risk.

3(b). The Commission reasonably concluded that IEX Options does not impose any unnecessary or inappropriate burden on competition. It is designed to protect options market makers from latency arbitrage, encouraging them to provide competitive quotes (*i.e.*, at narrower spreads with more volume). Improving competition among market makers and enhancing the provision of liquidity in the options market will benefit all market participants.

4. The Commission reasonably concluded that quotations subject to the ORP are protected quotations under the rules governing options exchanges, that the access delay associated with IEX's speedbump is de minimis, and that IEX Options does not permit market makers to "back away" from matched orders.

5. Finally, if the Court remands for further agency review, it should do so without vacatur because delaying the launch of IEX Options will impose harms on

IEX and deprive the investing public of an options exchange that the SEC found will protect investors and the public interest.

## ARGUMENT

### I.    CITADEL MISCHARACTERIZES HOW IEX OPTIONS WILL OPERATE

Citadel's opening brief is replete with mischaracterizations of how IEX Options will function. Because Citadel's legal claims rely so heavily on these obfuscations, it is critical that the Court first understand—and reject—Citadel's attempts to confuse.

Citadel asserts, for example, that IEX Options will "hold[]" an incoming order and use a "pause-and-peek" to allow it to make a "choice" to cancel or "change at will" the price of a market maker's quote. Citadel Br. 31. Citadel is creating a strawman—an illusion that IEX Options will receive the incoming order, compare it to the market maker's quote, and decide whether to cancel or reprice the quote based on that comparison. But that is not how IEX's tools to combat latency arbitrage have ever worked, and it is not how IEX Options will work. *See* A153 (Order 45,871) ("The ORP . . . does not offer Market Makers control over who they execute against or when."); *Citadel*, 45 F.4th at 36 (D-Limit is "automatic" and "involves no manual discretion").

As Citadel well knows, IEX does not "hold" incoming orders. Rather, incoming orders traverse the speedbump "before reaching IEX." *Citadel*, 45 F.4th at

31. IEX does not and cannot "peek" at the contents of the incoming order while it is traversing the speedbump because it has not yet reached IEX's trading system. *See* SA29 (85 Fed. Reg. at 54,441 & n.49) (explaining that an incoming order traverses the speedbump and then "travels an additional physical distance to the IEX trading system" and "IEX's matching engine").

Furthermore, the ORP will be triggered by price instability in the market, as detected by "a fixed formula specified transparently in IEX's rules" using publicly available pricing data from other exchanges. A106 (90 Fed. Reg. at 26,879). Thus, the ORP will operate automatically based on market conditions, not based on the presence (or contents) of an incoming order. *See* A153 (Order 45,871) ("[T]he ORP . . . only take[s] action when there is a sufficient dislocation between the price of the underlying stock and the price of the option."). That is why the SEC correctly rejected the same objection when Citadel raised it before the agency. *Id.* (concluding that the ORP "will not offer a 'last look' to a Market Maker by allowing it to back away from a quote when presented with an incoming order, as one commenter [*i.e.*, Citadel] claimed"). As the Commission explained, a market maker "will have no ability to influence the operation of the ORP (other than to opt into it or not for each quote it submits to IEX) or to choose which incoming orders to execute against (or not execute against), and IEX will effectuate the ORP without exercising subjective judgment or taking into account the [market maker's] interests." *Id.* Citadel does not

contend that these findings are unsupported by substantial evidence, so they are conclusive. 15 U.S.C. § 78y(a)(4).

For much the same reason, Citadel's repeated intonations that the ORP will operate at the "moment of execution," like Lucy pulling away the football because Charlie Brown is about to kick, are misleading. *E.g.*, Citadel Br. 2, 35, 38. As noted, a market maker will decide, at the time it submits a quote, whether to opt-in to the ORP for that quote, and the ORP will be activated by price dislocations in the market, irrespective of the presence of incoming orders. *See* A153 (Order 45,871). Indeed, the ORP will be triggered by price instability even when there are *no* incoming orders traversing the speedbump. And the ORP will automatically cancel or reprice the quote based on settings chosen back at the time the quote was submitted. A148 (Order 45,866) (settings chosen by market maker "in advance on its quote"). To the extent the moments of ORP activation coincide with the arrival of incoming orders, that will be so because of what latency arbitrageurs are doing—trying to take advantage of the momentary price dislocations by using their speed advantages to target quotes at stale prices before they can be updated. *See Citadel*, 45 F.4th at 34 (observing that Citadel "controls the timing and routing methods of [its] orders"). It does not mean, however, that the market maker or IEX will make a decision to cancel or reprice a quote at the so-called "moment of execution."

Citadel's poker analogy is likewise flawed. Citadel suggests that IEX Options will be "a rigged game" because IEX will "peek[] at the next card" (*i.e.*, detect a price movement) for the benefit of its favored players. Citadel Br. 32. As discussed above, IEX has no ability to "peek" at incoming orders before they arrive at IEX's matching system. Moreover, Citadel's analogy ignores the presence of latency arbitrageurs, whose speed advantages allow them to "peek at the next card" by learning of price changes before other market participants. It is latency arbitrageurs who "rig" the game by making decisions based on new pricing information to pick off trades at stale prices before slower market makers have a chance to receive the same information and update their quotes accordingly. IEX Options will help to "level the playing field" by blunting the speed advantage that latency arbitrageurs currently exploit, making the options market more fair as a result while also encouraging greater competition and liquidity provision. A159 (Order 45,877).

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE ORDER APPROVING IEX OPTIONS

### A. Substantial Evidence Shows that Latency Arbitrage Exists in the Options Market.

The SEC found that options market makers face "a legitimate disadvantage in latency arbitrage." A154 (Order 45,872). The Commission's finding is supported by ample evidence.

Citadel argues that the SEC "never established that latency arbitrage exists in the options market" and instead "simply assumed the problem was genuine" because IEX said so. Citadel Br. 40. The record conclusively rebuts this claim. Of course, the Commission had before it the prior approvals of IEX's registration and of D-Limit. In each proceeding, numerous market participants submitted comments confirming that latency arbitrage exists and causes harm in the securities markets. *See supra* at 10-11. Nothing about the practice suggests that it is unique to the equities market, and there is nothing inherent in the options market that makes it immune to the problem. To the contrary, the root cause of latency arbitrage is the latency advantage that high-speed traders have relative to other market participants—and that speed advantage can be wielded in both equities and options markets.[7] Thus, the SEC reasonably could have concluded from its prior orders that latency arbitrage exists in the options market.

But the Commission also considered options-specific evidence, citing comment letters from options market makers describing "how latency arbitrage is a problem that negatively affects them." A154 (Order 45,872). They explained that some options market participants use "expensive speed advantages . . . and

---

[7] Citadel, for example, "employ[s] latency arbitrage tactics" in the equities market. *Citadel*, 45 F.4th at 34. Yet it also uses "low-latency systems" to win the "race" in the options market. Citadel Br. 57-58.

customized hardware . . . to both take liquidity from slower market makers and cancel their own quotes before other participants can access them in the existing ecosystem." A75 (HAP Trading at 2). The existence of latency arbitrage in the options market creates pressure on market makers to "invest progressively greater sums" in technologies designed "to avoid being 'picked off.'" SA52 (CTC at 2). Maintaining systems to defend against latency arbitrage required investments of $5 to $10 million per year, and even that level of spending would "merely reduce, but not eliminate, 'pickoff' trades from latency arbitrageurs." A159 (Order 45,877 & n.260) (quoting A140 (Maven at 2)); *see also* SA68 (Volant at 1) (describing cost of "ultra-low latency" data feeds). Indeed, one former options market maker was "forced to exit the business due to the escalating costs and arms race associated with maintaining latency competitiveness." A159 (Order 45,877 & n.256) (quoting Volant at 1).[8]

Thus, the Commission had evidence of options market makers' "firsthand experience" with latency arbitrage. A158 (Order 45,876). The existence of latency arbitrage in the options market was further confirmed in comments submitted by large institutional investors and pension funds that collectively managed trillions of

---

[8] Another options market maker with experience in both the European and U.S. options markets confirmed that latency arbitrage exists on Europe's largest derivatives exchange, and was significantly reduced during a pilot program of "mechanisms similar to those proposed by IEX." A71-72 (All Options at 1-2).

dollars in investor assets, as well as other market participants and observers. SA84 (Teacher Retirement System of Texas et al. at 2); SA94 (T. Rowe Price at 2); SA48 (Verret at 9).[9] These comments were more than enough evidence to support the Commission's finding. *See Stilwell* v. *Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) (substantial evidence established by "various comments submitted in response to the proposed rule"); *Nasdaq Stock Mkt. LLC* v. *SEC*, 34 F.4th 1105, 1113 (D.C. Cir. 2022) (agency "need not base its every action upon empirical data").

But there was still more. The Commission also identified differences between the equities and options markets that made the latency arbitrage problem "especially acute for options compared to equities." A157 (Order 45,875). For example, because multiple series of options can be tied to the same underlying stock, a "far greater number" of securities are listed in the options market than in the equities market. *Id.*; *see also* A152 (Order 45,870 n.176) (observing that there are approximately 1.5 million listed options series and 11,000 listed equity securities). This creates more opportunities for arbitrageurs to exploit price movements and adversely select against options market makers. A156-57 (Order 45,874-75); *see also* A160 (Order

---

[9] *See also* American Securities Association Letter at 2 (July 9, 2025) ("Latency arbitrage basically imposes a tax on firms that provide liquidity in both equity and options markets."), https://www.sec.gov/comments/sr-iex-2025-02/sriex202502-622827-1826974.pdf.

45,878 n.267) ("When the market moves, the stock market maker only has to update one quote, but the options market maker needs to update many quotes and is exposed to risk of loss across more products as a result."). Moreover, the lack of off-exchange trading for options means that market makers cannot avoid latency arbitrage through other venues as they can for equities. A157 (Order 45,875). The Commission's consideration of these differences, based on its technical expertise and evaluation of market conditions, warrants "particularly deferential" review. *Cboe Glob. Mkts.*, 155 F.4th at 716.

Citadel does not confront—or even acknowledge—this evidence in its substantial-evidence argument. Instead, Citadel and its amici fault IEX for using the phrase "latency arbitrage" only once in its initial filing proposing IEX Options before making a purported "sudden shift" in later filings. Citadel Br. 41; *see also* NYSE/MEMX Br. 15. This argument is puzzling, as the subject of this Court's review is the SEC's final order, 15 U.S.C. § 78y(a)(1), not IEX's filings (let alone IEX's initial filing in isolation).

Citadel's critique lacks merit in any event. While IEX's initial filing used the term "latency arbitrage" once, observing that options market makers "have greater exposure to latency arbitrage" than other liquidity providers, A22 (90 Fed. Reg. at 7,226), it also discussed repeatedly and at length the substance of latency arbitrage, *i.e.*, that IEX Options is designed to protect market makers from the risk of execution

of stale quotes targeted by liquidity takers with speed advantages. A1-2, 7, 13-14, 19-22 (90 Fed. Reg. at 7,205-06, 7,211, 7,217-18, 7,223-26). IEX explained, for example, that "adverse selection" can occur when "a liquidity providing order is executed at a price that was about to become stale as a result of certain speed-based trading strategies." A20 (90 Fed. Reg. at 7,224 n.173). Furthermore, IEX was proposing to use an approach that it has successfully used in the equities market to combat latency arbitrage. No reasonable observer could mistake that the IEX Options proposal was designed to address latency arbitrage in the options market.

The SEC reasonably found, based on the evidentiary record, that the existence of latency arbitrage in the options market is "uncontroverted." A154 (Order 45,872). Neither Citadel nor any other opponent of the IEX Options proposal disputed the evidence before the Commission; nor did they offer any evidence to disprove the existence of latency arbitrage. *See FCC* v. *Prometheus Radio Project*, 592 U.S. 414, 425 (2021) (agency reasonably relied on "the data it had" and "the absence of any countervailing evidence"). And in this Court, Citadel fails to offer any reason why the Commission could not rely on the evidence before it to support its finding.[10]

---

[10] In light of this unrebutted evidence of latency arbitrage, the cases cited by Citadel—granting petitions for review where there was "no evidence" of the problems to be addressed—are inapposite. Citadel Br. 40, 43.

**B.    Substantial Evidence Shows that IEX Options Is Narrowly Tailored to Address Latency Arbitrage.**

In approving the IEX Options proposal, the SEC considered analyses of options data submitted by IEX to show that its approach is narrowly tailored to address latency arbitrage while not significantly impacting trades of non-arbitrageurs. In particular, IEX analyzed data from the Options Price Reporting Authority "for all series of over a thousand options classes of varying levels of volume and activity for various dates" in February and July 2025. A163-64 (Order 45,881-82). Based on these studies, IEX estimated that the ORP will impact quotes "on average per series significantly less than 0.001% of the trading day during regular trading hours." A163 (Order 45,881). Citadel criticizes the Commission's reliance on this data, but its critiques are unpersuasive.

Citadel first points out that the IEX data showed that the ORP will turn on more frequently than 0.001% of the trading day for more heavily traded options. Citadel Br. 44. But the SEC explicitly recognized that the "less than 0.001%" figure represented an "average" rather than a maximum percentage or constant rate for all options. A163 (Order 45,881). As the Commission explained, IEX had estimated, based on its analysis of the data, that the ORP will turn on more frequently for some options (but still less than 0.2% of the trading day for the most active options class) and less frequently for others. *Id.*

Citadel next argues that the SEC should have demanded data on the number of times the ORP will activate each day rather than the percentage of the trading day in which it will be active. Citadel Br. 48. But the Commission reasonably concluded that "[t]ime-based data is most relevant to analyze the ORP because it shows the impact on investors of the ORP, which is a tool designed to target latency arbitrage conditions that are infrequent." A164 (Order 45,882). Indeed, in upholding D-Limit, the D.C. Circuit relied on IEX data that similarly showed that the crumbling quote indicator turns on an average of 0.007% of the trading day. *Citadel*, 45 F.4th at 33.

Furthermore, as the SEC explained, volume information would have been "misleading to evaluate" the unintended impact of the ORP on non-arbitrageurs' trades because "higher impacted volume and lower fill rates would be evidence that a tool designed to protect liquidity providers against latency arbitrage is working exactly as intended." A164 (Order 45,882). Such volume data "would not provide evidence that firms not engaged in latency arbitrage are impacted and unable to access quotes on IEX during regular trading hours." *Id.* This reasoning was supported by commenters who observed that retail investors do not trade in the "microsecond timeframes during which IEX's protections operate," A157 (Order 45,875 & nn.228-29), and thus those timeframes were "big enough to prevent predatory latency arbitrage, and yet small enough to minimise the chance that a real end user's order arrives at the exchange within the same window," A162 (Order

45,880 & n.302). That Citadel would have drawn an "inconsistent conclusion" from the evidence "does not prevent [the Commission's] finding from being supported by substantial evidence." *Domestic Secs., Inc.* v. *SEC*, 333 F.3d 239, 249 (D.C. Cir. 2003). Indeed, the D.C. Circuit held that it was reasonable for the SEC to conclude that IEX's similar approach in the equities market is "unlikely to affect normal trading activity during the small part of the day that it is on," based on commenters' views that "only a small set of high-frequency traders have the technological ability to target those precise moments." *Citadel*, 45 F.4th at 33.

This case is therefore nothing like *Susquehanna Int'l Grp., LLP* v. *SEC*, 866 F.3d 442 (D.C. Cir. 2017) (cited at Citadel Br. 48). There, the Court rejected a rule change where the Commission demonstrated "unquestioning reliance" on a regulated entity's conclusions without knowing "what analysis" the entity conducted. *Id.* at 448-49. Here, the SEC did not rely on IEX's conclusions unquestioningly. To the contrary, after IEX filed its initial application, the Commission specifically requested "[a]dditional information about the ORP's operation," including an estimate of the "expected frequency" with which it would operate. A52 (90 Fed. Reg. at 17,477). IEX responded in an amended filing that transparently described its analysis of data showing that the ORP would be active for a miniscule percentage of the trading day and thus was "designed to be nearly imperceptible" to non-arbitrageurs. A116 (90 Fed. Reg. at 26,889). IEX also

provided a confirmatory analysis of additional data in a subsequent response to comments. SA79 (IEX Response at 10).[11] The SEC then "analyzed [information from IEX and commenters] for itself, and reasonably concluded that [IEX Options] benefits all market participants by thwarting latency arbitrage" and increasing competition among market makers. *Citadel*, 45 F.4th at 34 (distinguishing *Susquehanna*).

Citadel next contends that by relying on the 0.001% figure from IEX's analysis, the SEC erroneously "treated the ORP's activations as though they would be randomly scattered across" the trading day, rather than "at specific moments that coincide with intense trading activity." Citadel Br. 45. Not so. The SEC recognized that the ORP will activate in discrete moments of price instability when high-speed traders are most likely to engage in latency arbitrage—that is the entire point of the tool. *See, e.g.*, A164 (Order 45,882) (ORP is "designed to target latency arbitrage conditions that are infrequent").

---

[11] Citadel's statement of the case quotes the SEC's request for additional information in a paragraph *after* Citadel describes the data that IEX submitted in response—an out-of-sequence narrative that seems aimed at creating the impression that IEX "failed to provide the requested data." Citadel Br. 20-21. But as the record makes clear, the Commission sought additional information (A49), and IEX responded by providing data (A92, SA79). IEX did not fail to provide the SEC with any requested data.

Citadel likewise mixes up arbitrageurs and ordinary investors when it argues that the ORP is not narrowly tailored because "it fires at the very times investors are most active." Citadel Br. 46. Citadel is wrong. The ORP will be activated by market price instability—fleeting moments when *latency arbitrageurs* are most active, not when non-arbitrageurs (or investors generally) are most active.

Finally, Citadel faults the SEC for failing to examine data from the Consolidated Audit Trail ("CAT"). Citadel Br. 46-47. But Citadel fails to explain how the SEC should have analyzed the raw CAT data to assess the ORP. SEC Br. 52. Moreover, Citadel invokes the CAT database merely to repeat its argument that the Commission should have examined volume data rather than time-based data—which the SEC reasonably rejected. In any event, neither the Administrative Procedure Act nor the Exchange Act requires the SEC to "produce empirical evidence," *Stilwell*, 569 F.3d at 519, or otherwise "conduct its own empirical or statistical studies before exercising its discretion," *Prometheus Radio Project*, 592 U.S. at 427. It was permissible for the SEC to make "a reasonable predictive judgment based on the evidence it had" and "the absence of any countervailing evidence." *Id.* at 425, 427.[12]

---

[12] Citadel's reliance on *Chamber of Com.* v. *SEC*, 85 F.4th 760 (5th Cir. 2023) (cited at Citadel Br. 48), is misplaced. The fact that made "all the difference" in that case was that the SEC ignored data that it "*did* receive." *Id.* at 775-76 (emphasis in original). Here, Citadel points to no data analysis in the administrative record that the SEC ignored. Moreover, Citadel had the opportunity to submit its own data analysis, A154 (Order 45,872), but it chose not to.

## III.    THE COMMISSION REASONABLY CONCLUDED THAT IEX OPTIONS IS CONSISTENT WITH THE EXCHANGE ACT

The Exchange Act requires that the rules of a national securities exchange "are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers" and "do not impose any burden on competition not necessary or appropriate in furtherance of the purposes of" the Act. 15 U.S.C. § 78f(b)(5), (8). The SEC concluded that IEX Options is not designed to permit unfair discrimination and does not impose any unnecessary or inappropriate burden on competition because the proposal's benefits to market makers "are focused and not overbroad and are intended to specifically address the disincentive to be a market maker that latency arbitrage can present to many firms." A160 (Order 45,878). That conclusion was amply supported by the record and well "within a zone of reasonableness" that must be upheld on arbitrary-and-capricious review. *Prometheus Radio Project*, 592 U.S. at 423.

The Exchange Act calls upon the Commission to "balance" the interests of different market participants "to achieve its multiple regulatory objectives." *Stilwell*, 569 F.3d at 520. The SEC struck that balance here by allowing IEX to use its innovations to protect market makers from predatory arbitrage tactics in the interests of enhancing competition and improving liquidity. Citadel's arguments challenging the Order represent nothing more than "quibble[s] with the balance struck by" the Commission. *Id.* But that is not a basis to grant Citadel's petition for review, for "a

- 38 -

court may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423.

### A. The Commission Reasonably Concluded that IEX Options Is Not Designed to Permit Unfair Discrimination.

The SEC acknowledged that the ORP "will confer a direct benefit to Market Makers"—namely "a valuable protection" against latency arbitrage—but will "not [provide that benefit to] other types of market participants that post orders on IEX Options." A160 (Order 45,878). Citadel and its amici claim that IEX Options "discriminates on its face in violation of clear statutory language" because only market makers will receive the benefit of the ORP. Citadel Br. 30-33, 40; *see also* NYSE/MEMX Br. 13. This argument ignores the statutory text and settled case law, both of which make plain that the Exchange Act "prohibits 'unfair discrimination,' not 'discrimination' *simpliciter*." *Timpinaro* v. *SEC*, 2 F.3d 453, 456 (D.C. Cir. 1993). Thus, the Commission reasonably concluded that IEX Options is not designed to permit unfair discrimination.

An exchange rule designed to protect market makers is not unfair, because they play a critical role in providing liquidity for investors across 1.5 million options series and, as a result, face significant risks that other participants in the options market do not. As the SEC explained, "[o]nly market makers are subject to continuous quoting requirements, and they take on considerable financial risk when

they quote large numbers of series simultaneously." A160 (Order 45,878).[13] Because of their quoting obligations, options market makers face unique risks of losses resulting from latency arbitrage. *See id.* (risk of adverse selection by latency arbitrageurs "is not present for other market participants when they only post one or a few limit orders in specific series and are not required to provide continuous quotes as are market makers"). Thus, the SEC reasonably concluded that providing options market makers with the protective benefit of the ORP "is commensurate with the risk uniquely undertaken by [them]." *Id.*; *see Timpinaro*, 2 F.3d at 457 (rejecting unfair-discrimination challenge to exchange rule "designed to protect the market maker from having to make an involuntary second trade at an untimely inside quotation").

Further supporting the SEC's finding that IEX Options is not designed to unfairly discriminate is the fact that the benefits conferred by the ORP "are commensurate with the benefits provided to market makers by other risk mitigation functionality." A160 (Order 45,878). As the Commission explained, other exchanges "offer risk mitigation functionality to members, including to market makers." A159 (Order 45,877). Such tools "allow market makers and others to have

---

[13] Market makers on IEX Options generally will be required to provide continuous quotations for 60% to 90% of the trading day. A147 (Order 45,865). These requirements are "substantially similar or substantively identical to the rules of other options exchanges." A144 (Order 45,862).

the exchange automatically cancel their quotes and orders" based on certain triggers and market conditions. A150 (Order 45,868 & n.126). But as the SEC found, the ORP is more narrowly tailored than other risk mitigation tools because it is designed to reprice or cancel a specific series, while other mechanisms may cancel quotes across all series in a class. A159-60 (Order 45,877-78). Moreover, the ORP's ability to reprice instead of cancel helps maintain liquidity on the market. A155 (Order 45,873) (noting that "a repriced quote keeps that liquidity continuously available to the market (albeit at the new price)" such that a market participant "can still get a fill").

Citadel dismisses this rationale by claiming that options exchanges' risk mitigation tools are limited to preventing "catastrophic error or system failure" through the use of "purge ports" and "kill switches." Citadel Br. 37. But Citadel conspicuously ignores the use of "activity-based" risk controls, which the Commission specifically identified in its discussion of exchanges' risk mitigation functionality. A152, 155 (Order 45,870, 45,873). For example, NYSE Arca offers tools that automatically cancel market maker quotes when the volume or percentage of executed orders in a time window exceeds limits set by the market maker. 87 Fed. Reg. 5,592, 5,625 (Feb. 1, 2022) (approving NYSE Arca's proposed activity-based risk controls); *see also* SEC Br. 38 (describing similar MIAX risk control). Notwithstanding Citadel's attempt to ignore them, such tools are very much "part of

ordinary execution" at options exchanges, Citadel Br. 38, and the ORP is "commensurate" with them. A160 (Order 45,878).

Citadel nevertheless insists that exchange rules are unfairly discriminatory unless they are "available to all participants." Citadel Br. 34. Citadel claims, for example, that the D.C. Circuit upheld the SEC's order approving D-Limit "because the mechanism was equally available to everyone." *Id.* This argument mischaracterizes the Court's holding, which turned not on whether D-Limit was *available* to all market participants but to whether it *benefited* all market participants by combating latency arbitrage. The D.C. Circuit upheld the SEC's determination that "because the D-Limit order benefits 'all market participants' by 'narrowly' targeting latency arbitrage, it does not unfairly discriminate against liquidity takers or unduly burden competition." *Citadel*, 45 F.4th at 32, 34 (quoting 85 Fed. Reg. at 54,451). Here, the SEC similarly concluded that IEX Options is designed to combat latency arbitrage in the options market and thereby encourage market makers to quote "with additional depth at potentially improved prices, which directly benefits all market participants when that liquidity is available to the market." A160 (Order 45,878).

Nor does *Timpinaro* support Citadel's argument that IEX Options is "unfairly discriminatory" because "[t]he ORP is available only to IEX's registered market-making members." Citadel Br. 34-35. The rule upheld in that case gave market

- 42 -

makers a 15-second grace period between automated executions so that they could update their quotations to prevent arbitrageurs from "profit[ing] handsomely at the expense of the market maker." *Timpinaro*, 2 F.3d at 455-56. The rule permitted market makers to waive the grace period as to particular broker-dealers pursuant to preferencing agreements, which precipitated the petitioners' claim that the rule "discriminates between those who have a 'preferencing agreement' and all others." *Id.* at 456. The Court concluded there was no showing that the rule, which was available only to market makers and was specifically "designed to protect" them, was "in any way unfair." *Id.* at 456-57. Nor was it unfair that only some broker-dealers would benefit from waivers of the grace period, as such preferential arrangements were common business practice. *Id.* at 457. Thus, far from supporting Citadel's unfair discrimination claim, *Timpinaro* confirms that there is "nothing inherently 'unfair' about" an exchange rule that is only available to some market participants. *Id.*

Citadel's true complaint is that IEX Options will counter the "higher fill rates" to which Citadel and other latency arbitrageurs are "accustomed" because they exploit liquidity providers using their speed advantages. A154 (Order 45,872). But the Exchange Act does not entitle arbitrageurs to those structural advantages in perpetuity. Thus, the Act does not bar IEX from innovating to "mitigate competitive imbalances between liquidity providers and latency arbitrage liquidity takers." *Id.*

- 43 -

Nor does it bar the SEC from approving exchange innovations that "offer[] new opportunities to long-term investors." *Citadel*, 45 F.4th at 32.

### B. The Commission Reasonably Concluded that IEX Options Does Not Unnecessarily or Inappropriately Burden Competition.

"[C]ompetition is only one of many Congressional goals exchange regulations are required to pursue." *Belenke* v. *SEC*, 606 F.2d 193, 200 (7th Cir. 1979); *see also Gordon* v. *N.Y. Stock Exch., Inc.*, 422 U.S. 659, 689 (1975) ("[T]he SEC must consider, in addition [to competition], the economic health of the investors, the exchanges, and the securities industry."). The purposes of the Exchange Act include ensuring that the rules of a national securities exchange are designed to "promote just and equitable principles of trade," "remove impediments to . . . a free and open market," and "protect investors and the public interest." 15 U.S.C. § 78f(b)(5). The SEC is tasked with balancing competition and the "other equally important express purposes of the [Exchange] Act," and it can reasonably conclude that burdens on competition are outweighed by the need to promote those other purposes. *Bradford Nat'l Clearing Corp.* v. *SEC*, 590 F.2d 1085, 1105-06 (D.C. Cir. 1978); *see, e.g.*, *Exch. Servs., Inc.* v. *SEC*, 797 F.2d 188, 191 (4th Cir. 1986) (SEC reasonably concluded that any burden on competition created by self-regulatory organization's decision was "outweighed by the necessity for public interest protection").

Citadel asserts that the SEC "fail[ed] to examine the conditions of competition in the options market." Citadel Br. 57. But the record contradicts that assertion. The

SEC considered evidence that the risk of significant losses resulting from latency arbitrage had caused options market makers to quote fewer options classes and at worse prices, or to leave the market altogether. A160 (Order 45,878). The Commission determined that it is "crucial for options market quality to encourage options market makers to continue to quote and provide liquidity so that market participants, including retail investors, have access to liquidity at favorable prices." *Id.* And it found that the ORP is designed to do just that by incentivizing market makers "to quote with additional depth at potentially improved prices, which directly benefits all market participants when that liquidity is available to the market." *Id.* Thus, the Commission determined that IEX Options is designed to create broader benefits for the market as a whole through "increased competition and liquidity provision by the primary source of options liquidity to the market." *Id.* Such "predictive, policy-oriented determinations" about competitive effects implicate "the expertise of the agency" and thus warrant particular deference. *Belenke*, 606 F.2d at 199; *accord Cboe Glob. Mkts.*, 155 F.4th at 716. The D.C. Circuit similarly upheld the SEC's finding that D-Limit does not unduly burden competition because it "benefits 'all market participants' by 'narrowly' targeting latency arbitrage." *Citadel*, 45 F.4th at 32, 34 (quoting 85 Fed. Reg. at 54,451).[14]

---

[14] The Commission's findings regarding competition also confirm that IEX Options is not designed to permit unfair discrimination. There is "nothing inherently 'unfair'

Citadel next argues that IEX Options will unnecessarily burden competition by favoring "market makers that decline to modernize" over "leading market makers"—like Citadel itself—that have made investments to "build and maintain low-latency systems to update their quotes and manage exposure." Citadel Br. 57-59. Of course, as a dominant market maker—a status cemented when it bought Morgan Stanley's market-making business last year (SA72)—Citadel stands to win by maintaining the status quo, and it stands to lose if other market makers become more competitive as a result of IEX Options. But Citadel's "own competitive position" is not the test for undue burden under the Exchange Act. *Nasdaq*, 34 F.4th at 1113. Moreover, it is settled that "competition can be promoted by permitting a competitor to improve its efficiency." *Belenke*, 606 F.2d at 201. Options market makers are "constantly" updating or cancelling their quotes as part of their continuous quoting obligations, and IEX Options will enable market makers to quote "more efficiently and expeditiously." A153 (Order 45,871). While some market makers may not need or want to use the ORP because they have their own "cutting-edge systems," other market makers will benefit from a tool that "minimizes latencies in effectuating quote updates." *Id.*

---

about" exchange rules that directly benefit particular parties but are designed to have overall "pro-competitive effect[s]." *Timpinaro*, 2 F.3d at 457.

Citadel suggests that market makers do not merit protection from latency arbitrage if they are unwilling to pay "technology upgrades costing as little as $5 million." Citadel Br. 58. Citadel understates the cost, which was estimated to be $5 to $10 million *annually*, and will "merely reduce, but not eliminate 'pickoff' trades from latency arbitrageurs." A159 (Order 45,877). In any event, the Commission was not required to endorse a continued "technological 'arms race' between professional traders and market makers" that increases costs for investors. A156-57 (Order 45,874-75). The SEC considered evidence that a market maker had recently exited the business due to "the escalating costs and arms race associated with maintaining latency competitiveness," A159 (Order 45,877 & n.256) (quoting Volant at 1), as well as evidence that IEX Options will lower barriers to entry and permit a larger number of market makers to compete in the provision of liquidity in the options market. A158-59 (Order 45,876-77); SA53 (CTC at 3). The fact that certain firms might lose a portion of their structural latency-related advantage does not mean that competition itself is burdened, let alone unnecessarily or inappropriately so. *See Bloomberg L.P.* v. *SEC*, 45 F.4th 462, 474-75 (D.C. Cir. 2022) (upholding determination that burden on competition outweighed by benefits of "alleviating the information asymmetry that disadvantages many market participants"); *Belenke*, 606 F.2d at 201 (upholding determination that permitting an exchange to improve its systems to catch up with other exchanges would promote competition).

Citadel and its amici also contend that IEX Options will unnecessarily burden competition among options exchanges. Citadel Br. 59-60; NYSE/MEMX Br. 11. But the SEC determined that IEX Options will "not impede the ability of other exchanges to compete through functionality, fees, or otherwise." A161 (Order 45,879). As the Commission noted, at least one other exchange adopted its own access delay after IEX's registration was approved, and the market share of IEX's equities exchange indicated that other exchanges are competing successfully. *Id.* Thus, the SEC reasonably concluded that IEX Options will not impose an undue burden on competition among exchanges, "as th[e] same structure has not done so in the case of the IEX equities market." *Id.* The Commission's predictive determinations about competition among options exchanges, which are policy decisions based on the Commission's technical expertise and evaluation of market conditions, warrant particular deference. *Cboe Glob. Mkts.*, 155 F.4th at 716; *Belenke*, 606 F.2d at 199; *see also Domestic Secs.*, 333 F.3d at 249 ("The making of policy decisions and the resolution of conflicting evidence is for the Commission, not the court.").

Finally, Citadel asserts—each time in a single sentence without elaboration— that the SEC exceeded its statutory or legal authority by approving IEX Options. Citadel Br. 5, 26, 51. As an initial matter, Citadel fails to develop any argument on

this issue and accordingly has abandoned it. *See Sapuppo* v. *Allstate Floridian Ins. Co.*, 739 F.3d 678, 681-82 (11th Cir. 2014).

Citadel's argument lacks merit in any event. "Congress has expressly delegated to the Commission the power to determine, after notice and comment, whether a proposed rule change is consistent with the Exchange Act." *NetCoalition* v. *SEC*, 615 F.3d 525, 533 (D.C. Cir. 2010). Congress has conferred "broad, discretionary authority" on the SEC to "ensure that exchanges have rules designed to promote" the purposes of the Act, *see Cboe Glob. Mkts.*, 155 F.4th at 713, and to balance competition and the "other equally important express purposes of the Act," *Bradford Nat'l Clearing*, 590 F.2d at 1105-06. Citadel has failed to offer any argument independent of its meritless substantial-evidence and arbitrary-and-capricious claims, let alone show that the Commission exceeded the boundaries of its broad discretionary authority. *See Cboe Glob. Mkts.*, 155 F.4th at 713.

## IV.    THE COMMISSION REASONABLY CONCLUDED THAT IEX OPTIONS QUOTATIONS ARE PROTECTED QUOTATIONS

Under the Options Order Protection and Locked/Crossed Market Plan (the "Options Plan"), a "protected quotation" is a bid or offer that (a) is displayed by an eligible exchange; (b) is disseminated pursuant to the OPRA Plan; and (c) is the best bid or best offer, respectively, of an eligible exchange. A155 (Order 45,873 n.197 (citing Options Plan § 2)). The SEC concluded that IEX Options can maintain a

protected quotation under this definition even if a quote is subject to the ORP. A156 (Order 45,874).

The Commission considered comments that opposed treating IEX Options' quotes as protected because of the access delay associated with the speedbump. A155 (Order 45,873). As the SEC explained, however, that argument invoked the Regulation NMS definition of a protected quotation in the equities context, which requires the quotation to be "automated," a term that in turn requires the quotation to be executed "immediately and automatically." A156 (Order 45,874); *see* 17 C.F.R. § 242.600(b)(6) & (81). While the Options Plan "does not contain the automated quotation concept," the Commission deemed it "relevant for options" and concluded that even with the de minimis delay of the speedbump, IEX Options would satisfy the immediacy requirement under the SEC's interpretation of Regulation NMS. A156 (Order 45,874).

Citadel argues that the SEC erred by "conflating" the Options Plan and Regulation NMS, applying the latter "[r]ather than" the former. Citadel Br. 54. Citadel is wrong. The SEC expressly acknowledged that "the concept of an 'automated' quotation" is "part of Regulation NMS that applies only to equities," and thus the Commission's interpretation of Regulation NMS "does not apply by its terms to options because the options plan does not contain the automated quotation concept." A156 (Order 45,874). The SEC nevertheless recognized that other Options

- 50 -

Plan provisions "are substantially similar to the remaining provisions in Regulation NMS such that the Commission's interpretation also is relevant for options." *Id.* It is an ordinary mode of legal analysis to recognize that an authority is not controlling yet consider it to be relevant or persuasive. There was no conflation of standards by the SEC in noting that Regulation NMS does not apply by its terms to options, while still considering interpretations regarding de minimis delays in equities trading to be relevant to the similar question of de minimis delays in options trading.

The SEC's consideration of Regulation NMS in the options context is, moreover, consistent with what Citadel urged before the Commission. In a comment letter to the SEC, Citadel asserted that "when considering the Options NMS Plan," it was "important to take into account the order protection rule for equities." A87. Thus, Citadel's claim of conflated standards is not only meritless but waived. *See* 15 U.S.C. § 78y(c)(1) (objection "may be considered by the court" only if "it was urged before the Commission or there was reasonable ground for failure to do so").

Citadel next contends that even if Regulation NMS is considered, IEX Options does not satisfy the definition of a protected quotation because a quote subject to the speedbump will not "immediately" execute. Citadel Br. 55. Citadel reluctantly admits (albeit buried in a footnote) that "the D.C. Circuit concluded that 'D-Limit orders execute immediately because they are subject to only a de minimis delay'" of 350 microseconds. Citadel Br. 55 n.* (quoting *Citadel*, 45 F.4th at 36-

- 51 -

37). It is undisputed that IEX Options will use the same speedbump that was at issue in the D-Limit case, resulting in "an identical 350-microsecond access delay." A150 (Order 45,868). Thus, the D.C. Circuit's holding precludes Citadel's attempt to relitigate whether Regulation NMS's "immediate" execution requirement is satisfied when IEX Options uses the same speedbump and same access delay. *See Sorenson Commc'ns, Inc.* v. *FCC*, 765 F.3d 37, 44-45 (D.C. Cir. 2014) (issue preclusion applies to "successive challenge to the application of an established" standard unless petitioner shows "circumstances have changed in a way that required the agency to reconsider").

Even if the D.C. Circuit's decision does not have preclusive effect on the Regulation NMS issue, it is persuasive and should be followed to reject Citadel's argument. The Court concluded that "an order can be executed 'immediately' even if it is subject to a de minimis delay," such as a speedbump of 350 microseconds— far less than the blink of an eye. *Citadel*, 45 F.4th at 36-37. Citadel argues that quotes are not executed immediately if they are "intentionally paused." Citadel Br. 55. But as the D.C. Circuit explained, "'immediately' describes a matter of time, not intent." *Citadel*, 45 F.4th at 37. Thus, an exchange that intentionally delays incoming orders "still offers immediate execution if the delay it imposes is so small that it fails to impede fair and efficient market access." *Id.*

- 52 -

Finally, Citadel claims that IEX Options quotes are non-firm because the ORP permits "backing away" from quotes. Citadel Br. 51-53. As the SEC explains, Citadel's definition of "firm" is created "out of whole cloth." SEC Br. 56. In any event, the ORP does not permit "backing away" as Citadel contends. Risk mitigation tools used by options exchanges "have never been viewed" as "making quotes that can be cancelled non-firm." A155 (Order 45,873). Moreover, the ability of a liquidity taker to successfully execute against a displayed quote "is not guaranteed on any market." A151 (Order 45,869). There is "always" a possibility that the market maker that posted a quote "may already have cancelled or repriced it" before an order reaches an exchange matching engine for execution. A154 (Order 45,872). The cancellation or repricing of a market maker's quote by the ORP is no different in kind—all it does is allow market makers' quotes to be updated more efficiently and thereby protect against losses from arbitrageurs trading against "stale" quotes. A153-54 (Order 45,871-72).

*In re Credit Suisse Sec. (USA) LLC*, 2016 WL 683553 (Feb. 1, 2016) (cited at Citadel Br. 53; NYSE/MEMX Br. 10), confirms the point. In *Credit Suisse*, the broker-dealer "backed away" from quotes in violation of Regulation NMS by failing to execute orders "after they were matched" by the exchange. *Id.* at *3, *8-*9. Here, in contrast, the ORP will not cause the market maker (or IEX on the market maker's behalf) to cancel or reprice a quote after an order is matched; instead, the ORP will

operate based on preexisting criteria to automatically cancel or reprice a quote before an order is matched. A153 (Order 45,871). *Credit Suisse* itself contemplates that such conduct is permissible, as it notes that a broker-dealer "is not obligated to execute a transaction in a subject security if, before an order is presented, it has communicated a revised bid or offer for the subject security to the exchange." 2016 WL 683553, at *8 n.9 (citing 17 C.F.R. § 242.602(b)(3)(ii)).

## V.    IF THE COURT REMANDS, IT SHOULD DO SO WITHOUT VACATUR

Citadel's petition should be denied. If the Court determines that further Commission review is necessary, however, it should remand without vacatur.

When considering whether to vacate an agency action or remand without vacatur, this Court "balance[s] the equities." *Black Warrior Riverkeeper, Inc.* v. *U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015). The equities here weigh strongly against vacating the Order.

First, Citadel's arguments, to the extent any have merit, can be adequately addressed on remand. The existing evidence, widespread support for IEX Options, and prior administrative and judicial approvals of IEX's approach in the equities market all suggest it is "not at all clear" that the Commission's decisionmaking process was "incurably tainted." *Id.*

Furthermore, the harm that vacating the Order would cause IEX weighs heavily against vacatur. IEX has made substantial investments to develop IEX

- 54 -

Options, which it plans to launch in the third quarter of 2026. Delaying the launch would impede IEX's ability to recover the costs of that investment. *See id.* (appropriate to consider that vacatur would cause "disruptive consequences to the mining industry"); *cf. Amoco Prod. Co.* v. *Vill. of Gambell, Alaska*, 480 U.S. 531, 545 (1987) (denying injunction where companies "would have lost [$70 million investment]" if venture were enjoined). Moreover, vacatur would give competitors more time to work on copying IEX's differentiated features. *See* A161 (Order 45,879 & n.288) (noting that "at least one other exchange adopted its own access delay" in 2017—less than one year after IEX's registration as a national securities exchange).

Finally, the public interest counsels strongly against vacatur. The Commission found that IEX Options is designed to address the problem of latency arbitrage in the options market, facilitate competition among market makers, and increase the provision of liquidity—and thus protect investors and the public interest. Vacatur would deprive the market of these benefits—and benefit latency arbitrageurs instead. *See Black Warrior Riverkeeper*, 781 F.3d at 1290 (appropriate to consider public harm "that might continue unabated" after vacatur).

## CONCLUSION

For the foregoing reasons, and those in the Commission's brief, the petition should be denied.

Dated:  February 6, 2026

Respectfully submitted,

/s/ William Savitt
William Savitt
Won S. Shin
Tala A. Doumani
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Attorneys for Intervenor*
*Investors Exchange LLC*

- 56 -

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 12,973 words.

This response complies with the typeface and style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Times New Roman 14-point font.

Dated:  February 6, 2026                    /s/ William Savitt
                                                    William Savitt

**CERTIFICATE OF SERVICE**

I hereby certify that on February 6, 2026, I caused the foregoing document to be filed electronically with the Clerk of Court of the United States Court of Appeals for the Eleventh Circuit via the CM/ECF system and that as a result, service was accomplished on all counsel of record by the CM/ECF system.

Dated:  February 6, 2026                        /s/ William Savitt
                                                William Savitt