**No. 25-13631-C**

# United States Court of Appeals for the Eleventh Circuit

———————————————

CITADEL SECURITIES LLC,

*Petitioner*,

v.

U.S. SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

———————————————

On Petition for Review of an Order of the
Securities and Exchange Commission

## REPLY BRIEF FOR PETITIONER

| | |
|---|---|
| Brian A. Richman | Eugene Scalia |
| GIBSON, DUNN & CRUTCHER LLP | *Counsel of Record* |
| 2001 Ross Avenue, Suite 2100 | Helgi C. Walker |
| Dallas, TX  75201-2923 | John W. Tienken |
| (214) 698-3100 | Brandon Wolf |
| | GIBSON, DUNN & CRUTCHER LLP |
| | 1700 M Street, N.W. |
| | Washington, D.C.  20036 |
| | (202) 955-8500 |
| | EScalia@gibsondunn.com |

*Counsel for Petitioner*

February 20, 2026

## TABLE OF CONTENTS

Page

TABLE OF CITATIONS ...................................................................................iv

INTRODUCTION.............................................................................................1

ARGUMENT ...................................................................................................3

I.    The Commission's Order Violates the Exchange Act and Is
      Arbitrary and Capricious. ..........................................................................3

      A.    The Commission and IEX Essentially Concede That
            the IEX Options Rule Is Designed to Discriminate ...............4

      B.    The Commission Cannot Establish Its Principal
            Defense—That the IEX Exchange's Discrimination Is
            "Fair" .......................................................................................6

      C.    The Commission's Latency Arbitrage Rationale Is
            Unsupported by the Administrative Record and the
            Commission's Own Precedents .............................................16

            1.    The Commission Cannot Invoke *IEX
                  Equities Rule* While Abandoning the
                  Evidentiary Framework That Was Central
                  to That Court's Holding. ...................................17

            2.    The Commission's "0.001%" Statistic Masks
                  How Often Real Trades Are Disrupted ..............19

            3.    The Commission Refused to Examine the
                  Very Data That Would Confirm or Refute
                  Its Assumptions. ...............................................23

      D.    The Commission's Decision to Adopt a Compulsory,
            Anti-Competitive Design Instead of Less
            Discriminatory Alternatives Was Unreasonable and
            Unlawful.................................................................................27

1.    The Commission Cannot Treat Disappearing Quotations as "Protected" Under the Options Plan .......................................28

2.    The Commission Still Fails to Explain Why Mandatory Routing Is Necessary or Appropriate. .......................................30

II.    The Proper Remedy Is Vacatur.......................................33

CONCLUSION .................................................................35

# TABLE OF CITATIONS

Page(s)

## Cases

*Am. Equity Inv. Life Ins. Co. v. SEC*,
613 F.3d 166 (D.C. Cir. 2010) ............................................................ 29

*Am. Great Lakes Ports Ass'n v. Schultz*,
962 F.3d 510 (D.C. Cir. 2020) ............................................................ 34

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
22 F.4th 1018 (D.C. Cir. 2022) ........................................................... 23

*\*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of
Eng'rs*,
781 F.3d 1271 (11th Cir. 2015) .................................................... 33, 34

*Bloomberg L.P. v. SEC*,
45 F.4th 462 (D.C. Cir. 2022) ............................................................ 25

*\*Chamber of Com. v. SEC*,
85 F.4th 760 (5th Cir. 2023) .............................................................. 24

*Cigar Ass'n of Am. v. FDA*,
132 F.4th 535 (D.C. Cir. 2025) ........................................................... 11

*Citadel Secs. LLC v. SEC*,
45 F.4th 27 (D.C. Cir. 2022) ............................................... 2, 9, 18, 30

*Columbia Broad. Sys., Inc. v. United States*,
316 U.S. 407 (1942) ............................................................................. 6

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ........................................................................... 24

*FEC v. Wis. Right To Life, Inc.*,
551 U.S. 449 (2007) ........................................................................... 26

*\*Grayscale Invs., LLC v. SEC*,
82 F.4th 1239 (D.C. Cir. 2023) .................................................... 17, 18

*Ins. Mktg. Coal. Ltd. v. FCC*,
    127 F.4th 303 (11th Cir. 2025) ........................................................ 3

*LeBlanc v. Unifund CCR Partners*,
    601 F.3d 1185 (11th Cir. 2010) ....................................................... 6

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
    60 F.4th 956 (5th Cir. 2023) ......................................................... 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................ 15

*Nat'l Fuel Gas Supply Corp. v. FERC*,
    468 F.3d 831 (D.C. Cir. 2006) ...................................................... 35

*Physicians for Soc. Resp. v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020) ........................................................ 8

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ................................................................ 25, 32

*Silver v. N.Y. Stock Exch.*,
    373 U.S. 341 (1963) .................................................................... 5, 8

*Timpinaro v. SEC*,
    2 F.3d 453 (D.C. Cir. 1993) ............................................... 10, 13, 24

*United States v. Ross*,
    848 F.3d 1129 (D.C. Cir. 2017) .................................................... 32

*U.S. Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ...................................................................... 14

**Statutes**

15 U.S.C.

    § 78c................................................................................................ 13

    § 78f............................................................................ 2, 3, 11, 30, 32

    § 78s ................................................................................................ 3

v

## Regulations

17 C.F.R.

    § 201.700 ................................................................................ 3

    § 242.600 .............................................................................. 29

## Other Authorities

81 Fed. Reg. 84,696 (Nov. 23, 2016) ...................................... 25

85 Fed. Reg. 54,438 (Sept. 1, 2020) ................................... 9, 12

88 Fed. Reg. 62,628 (Sept. 12, 2023) ...................................... 32

H.R. Rep. No. 73-1383 (1934) ................................................. 8

## INTRODUCTION

The Commission approved a rule that is "designed to permit unfair discrimination" in violation of Section 6(b)(5) of the Exchange Act. The IEX Options Rule purposely grants IEX's market-making members a unilateral repricing or withdrawal privilege when market conditions move against them, while compelling all other market participants to route orders to IEX and trade on those terms. Citadel Br. 30-39. That is the discrimination the statute forbids.

Unable to justify that one-sided privilege on the merits, the Commission and IEX recast it in semantic terms—asserting there is no "pause," no "peek," and no discretion because the mechanism is implemented through a fixed delay and automated algorithm. SEC Br. 24-25, 36-37; IEX Br. 25, 37. Those labels do not change the substance of what the rule does: It gives one class of members the benefit of intervening information before being bound, while requiring everyone else to commit without that opportunity. IEX's large, market-making members benefit; retail investors and others are denied that privilege and forced to transact on the exchange's loaded terms.

The agency invokes *Citadel Securities LLC v. SEC*, 45 F.4th 27 (D.C. Cir. 2022) ("*IEX Equities Rule*"), but that decision involved a different rule, a different product, and—critically—a materially different evidentiary record. Here, the Commission admits that the record lacks the quantitative evidence the D.C. Circuit treated as essential in that case. SEC Br. 46; SA36. Instead, the Commission relies on statistics—"0.001% of the trading day"—that do not reflect the hundreds of millions of quotes canceled per day, especially when activations cluster during volatile periods. SEC Br. 48-51. And it refused to consult readily available data that could have tested its central assumptions, including Consolidated Audit Trail data reflecting the impact on retail investors. *Id.* at 51-52.

The Order is unlawful for other reasons. By treating the quotations at issue as "protected," the Commission conferred protected status on quotations that are non-firm under the Options Plan's definition and then imposed mandatory routing market-wide without explaining why that compulsion is "necessary or appropriate" under Section 6(b)(8). Options Plan § 2(11); 15 U.S.C. § 78f(b)(8).

Because the Order violates the Exchange Act and is arbitrary and capricious, it should be vacated.

## ARGUMENT

### I.    The Commission's Order Violates the Exchange Act and Is Arbitrary and Capricious.

Under Section 19(b), the burden rests on IEX to demonstrate—and on the Commission to find—that the proposed rule is consistent with the Exchange Act, including the Act's prohibition on unfair discrimination and requirement that any burden on competition be "necessary or appropriate." 15 U.S.C. §§ 78f(b)(5), (8), 78s(b); 17 C.F.R. § 201.700(b)(3). That burden was not met.

All parties agree that the new IEX exchange is discriminatory. While the SEC and IEX quibble—erroneously—about aspects of the exchange's operation, their defenses reduce to the claim that the Options Rule is not *unfairly* discriminatory. That is false. The exchange favors market-maker insiders to attract their business and boost IEX's revenues, yet the record shows non-discriminatory alternative measures to be readily available to address so-called "latency arbitrage" in options markets, even assuming it exists; moreover, the new IEX exchange is materially different than the precedents and practices the SEC cites in support. The Commission also did not develop the evidence the court

3

treated as essential in *IEX Equities Rule*, and it refused to consult additional data that would have tested its assumption about the impact on retail investors.

### A.    The Commission and IEX Essentially Concede That the IEX Options Rule Is Designed to Discriminate

The IEX Options Rule gives IEX's market-making members the unilateral ability to have their displayed quotes withdrawn or repriced when the market moves against them, while requiring all other market participants to trade against those disappearing quotes through mandatory routing.  If the price movement favors IEX market-maker members, they transact; if the movement favors parties seeking to trade with them, the quote is scuttled or repriced.

In their briefs, the Commission and IEX do not dispute that structure.  They confirm it.  Both acknowledge that IEX's repricing privilege is available exclusively to IEX's registered market makers.  SEC Br. 28, 35; IEX Br. 39.  Both acknowledge that this privilege allows those market makers—and no one else—to avoid execution when prices move against them.  SEC Br. 28, 36-37; IEX Br. 24-25.  And both acknowledge that quotations subject to that privilege are nonetheless "protected," meaning

that brokers nationwide are compelled by regulation to route orders to IEX and trade on those terms.  SEC Br. 41; IEX Br. 49-50.

Those concessions establish discrimination.  All parties now agree the rule grants IEX's preferred members a one-sided execution privilege while forcing all other participants to bear the full risk of market move-ment.  And the new exchange does so for an avowedly self-aggrandizing purpose.  To "distinguish itself from competitors" (SEC Br. 3)—*aka,* to gain a competitive advantage—IEX allows its members to post aggres-sively priced quotes without being bound to honor them, thereby making its exchange "attract[ive]" to market makers (SEC Br. 14) and capturing additional order flow through mandatory routing.  The predictable result is increased fee revenue for IEX.  That business objective matters be-cause—as the SEC and IEX tacitly admit—securities exchanges are meant to be neutral forums, not "private clubs" structured to advance the interests of their members. *Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 351 (1963).

## B.    The Commission Cannot Establish Its Principal Defense—That the IEX Exchange's Discrimination Is "Fair"

While conceding the Rule discriminates, the SEC and IEX mount their defense at an improbable juncture:  The rule discriminates, they maintain, but that discrimination is fair.

That is false.  The Rule, in purpose and effect, is "marked by . . . partiality" toward IEX's market-making members (and IEX itself), which this Court has identified as the hallmark of "unfair[ness]."  *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1200 (11th Cir. 2010).

1.    The SEC (Br. 37) and IEX (Br. 24-27) attempt, *first*, to defend IEX's discriminatory exchange through semantics and misdirection. They insist incoming orders are never "paused" because they are routed into—and continue to traverse—a 38-mile coil of fiber-optic cable admittedly engineered to "delay" their arrival.  SEC Br. 2, 15, 24-25; IEX Br. 37.  Administrative law is concerned with "the substance of what the Commission . . . has done," not "[t]he particular label placed upon" the action.  *Columbia Broad. Sys., Inc. v. United States*, 316 U.S. 407, 416 (1942).  Here, there is no practical difference between a "pause" and "delay" because the entire point is to hold incoming orders long enough for

6

the exchange to assess the market's movement and adjust displayed quotes. This is why the SEC, while claiming there is no pause, cannot help describing orders as "*stuck* in the speedbump." SEC Br. 15 (emphasis added).

Trading in today's markets is a competition to secure the best price, all agree. SEC Br. 42; IEX Br. 7, 8, 17. Whether an order forcibly routed to IEX's exchange is made to stand and wait, jog in place, or run around the block, the impact is the same: The order is halted, while the exchange conducts a market review to determine what is in the best interest of its market-maker member.

IEX also repeatedly insists its exchange does not "peek" because it does not examine the contents of the incoming *order*. IEX Br. 4, 24-25, 27; SEC Br. 37. That argument is a diversion; Citadel never said the order was being peeked at. The exchange is "peek[ing]," Citadel explained, at the broader market to assess whether it is moving in a direction favorable to the IEX member. Citadel Br. 31; *see* IEX Br. 27 (acknowledging Citadel is referring to a "peek" intended to "detect a price movement"). If this "peek" at the market indicates it is moving against

the market maker who provided the quote, the exchange withdraws or reprices its member's quote.

The SEC and IEX insist that the market maker *itself* does not "peek," because any cancellation or repricing is carried out "automatically" by IEX's algorithm.  SEC Br. 37; IEX Br. 25.  That, too, is a "distinction without a difference." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 647 (D.C. Cir. 2020).  The algorithm is purpose-built to withdraw or reprice quotations when doing so benefits IEX's market-making members—and *only* those members.  Exchanges are required to be neutral venues, *Silver*, 373 U.S. at 351, so the fact IEX's exchange is programmed to favor "the interests of [its] members" when the markets move against them only makes matters worse—and confirms the Rule is unfairly discriminatory, H.R. Rep. No. 73-1383, at 15 (1934).

**2.**    The Commission attempts, *second*, to defend this discrimination by invoking the D.C. Circuit's decision in *IEX Equities Rule* (which permitted IEX's equities exchange).  That defense is unavailing because the new options exchange differs in ways that go to the heart of the SEC's action in that case and the D.C. Circuit's rationale upholding it.

In approving the D-Limit order, the Commission emphasized that "[D]-Limit orders will be available for use by *any market participant* and will *not* entitle the user to any additional benefits." 85 Fed. Reg. 54,438, 54,450 n.152 (Sept. 1, 2020) (emphases added). The Commission's briefs in *IEX Equities Rule* repeated the point, stressing that the order type "was available to all market participants" and did not confer a "special benefit" on a subset of firms. Br. of SEC 54 n.12, *Citadel Secs., LLC v. SEC*, No. 20-1424 (D.C. Cir. May 26, 2021).

The D.C. Circuit upheld the approval on that record, rejecting an unfair-discrimination challenge to a mechanism that *any* liquidity provider could elect to use. 45 F.4th at 32. The IEX options mechanism, by contrast, is categorically unavailable to the vast majority of firms who can quote on the exchange, including customers. The Commission cannot invoke the equities exchange as precedent while discarding the equal access that justified its approval. Moreover, the data that *IEX Equities Rule* deemed "substantial evidence" to justify the equities rule is evidence the Commission entirely neglected to adduce here. *See infra* 17-19.

A D.C. Circuit decision that differed in two such material respects is a precedent *against* IEX's discriminatory rule, not for it.

9

The Commission's and IEX's reliance on *Timpinaro v. SEC* fares no better. *Timpinaro* involved a voluntary bilateral opt-out agreed to by both counterparties. As the court said: "It would be peculiar indeed to force upon the market maker and its customer . . . a grace period that neither party wants." 2 F.3d 453, 457 (D.C. Cir. 1993). Here, by contrast, the repricing privilege is mandatory, unilaterally favors exchange insiders, and is enforced through federal routing rules.

**3.** IEX's indisputably discriminatory exchange is "unfair" for the further reason that—even supposing there is "latency arbitrage" (*but see infra* 17-19)—the Rule is an arbitrary and improper means to address it.

As noted, the Commission and IEX acknowledge that trading in today's markets involves a competition to secure the best price. SEC Br. 42; IEX Br. 7-8, 17. The premise of IEX's exchange is that some market participants invest in technology that makes them more competitive. IEX's solution? To hobble those firms and thereby strip them of the benefit of their investment so they compete on par with a handful of peers who (in the SEC's words) are "unable" or "unwilling" to make their own technology investments. SEC Br. 26.

For an agency charged with securing "competit[ive]" markets, 15 U.S.C. § 78f(b)(8), depriving participants of the benefit of their competitive investment is a peculiar—and presumptively arbitrary—way to proceed. Recall the caliber of firms who are the exclusive beneficiaries of this anti-competitive preference: IEX's market-maker members are such major players that they can offer to both buy and sell not merely hundreds, but *thousands* of series of options contracts on a continuous basis. SEC Br. 35-36 & n.5. The undisputed record evidence is that the investment these firms would need to make to address purported latency arbitrage is $5-10 million annually. A157; SEC Br. 42. While the Commission *suggested* these firms "may" be "unable" to make this investment, A157, it made no such finding and in any event such a finding would not be credible. Certainly no substantial evidence supports this dubious suggestion. *Cigar Ass'n of Am. v. FDA*, 132 F.4th 535, 540 (D.C. Cir. 2025) (justification for rule arbitrary and capricious when based on "factual premise . . . unsupported" by record).

Worse, the Commission did not bother to discern whether IEX's preferred members were "unable" or merely "unwilling" to make the investment. A157. Citadel pressed that point in its opening brief (at 58), yet

the Commission offers no response. For an agency charged with furthering competition—and with barring unfair discrimination—it is irrational to approve an admittedly discriminatory rule on the ground that some of the world's wealthiest traders would rather compete by tying the hands of the competition than by making their own modest investment.

That rationale bears little resemblance to the one the Commission advanced in the equities context. There, the Commission invoked long-term investors and other liquidity providers who "*cannot* reasonably compete" with other participants' high-speed systems. 85 Fed. Reg. at 54,451 (emphasis added). Here, by contrast, the sole beneficiaries are professional options market makers fully capable of investing in the technology to compete, and the Commission never found otherwise.

The Commission's own *amici* explain how the Commission's Order facilitates anti-competitive behavior: Firms "would be better off if they could collectively commit not to invest in speed," they admit, although "it is in each firm's private interest to invest." CTC Amicus Br. 10. Enter IEX to facilitate this anti-competitive restraint, and the SEC to approve it without the scrutiny it deserved.

12

This is an appropriate juncture to appraise one of the Commission's other claims: that IEX's exchange furthers innovation. SEC Br. 29. As Judge Ginsburg observed in *Timpinaro*, when a market maker "monitor[s] the market more closely and thus updat[es] its quotations more quickly," there is "a gain in market pricing efficiency." 2 F.3d at 457-58. The IEX Options Rule purposely makes the market *less* efficient—contrary to the Commission's mandate, 15 U.S.C. § 78c(f)—by slowing trading and discouraging investments that would yield efficiencies. Seeking to deprive a rival of its competitive advantage is not innovative. Nor is a government order that discourages firms from investing in technology.

4.    Unable to defend the IEX's discriminatory exchange on its own terms, the Commission and IEX attempt to justify its operation as a risk control measure—a benefit purportedly "commensurate with the risk uniquely undertaken by Market Makers." SEC Br. 28; *see* IEX Br. 40. But if a putative "risk" faced by large financial institutions can be averted by investing a few million a year in technology, no discrimination is "commensurate" to that risk, least of all the nakedly opportunistic discrimination fostered on IEX's exchange.

13

Further, the record does not support the Commission's premise that market makers are "uniquely" vulnerable to trading against "stale prices." SEC Br. 28, 47. Market makers deploy sophisticated pricing models, receive multiple proprietary data feeds, maintain co-located or low-latency connections, and update quotes automatically in response to movements in underlying securities. A64 & n.19. By contrast, the comment record shows that retail investors providing quotes—who lack co-location, ultra-low-latency networks, and direct market access—are structurally far more susceptible to being "picked off" (SEC Br. 15) during the microseconds when latency arbitrage allegedly occurs. SA62. Yet those participants receive *none* of the exchange's protections, confirming that the rule is not tailored to preventing stale-quote risk at all, but instead confers a selective, "direct benefit" (SEC Br. 28) on IEX's market-maker members—a "significant mismatch between the decision the [Commission] made and the rationale [it] provided." *U.S. Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019).

The Commission's assertion (Br. 38) that IEX's mechanism is narrower than traditional risk controls misses the point. The comparison must begin with the nature of the risk being addressed—an "important

14

aspect of the problem" the Commission fails to confront. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). None of those controls address the "risk" that a party, having offered a price that attracted a buyer (or seller), regrets it when it becomes apparent it could have set a better price. Instead, traditional controls cancel "all quotes" when predefined risk thresholds are breached because they address aggregate exposure across a portfolio. SEC Br. 37-38. No other risk control measure permits a market maker to cancel an offer that a liquidity taker is trying to accept because the price has been determined, on a trade-specific basis, to be more advantageous to the "taker" than to the market maker. And unlike activity-based risk controls, this measure is an exclusive privilege reserved for IEX's market-making members and enforced through mandatory routing rules against everyone else.

\* \* \*

All parties agree that IEX's new platform discriminates, and the arguments offered in its defense fail. Unlike the IEX equities exchange, this new options exchange is purpose-built to grant a unilateral repricing privilege to a select class of exchange members—allowing their quotations to be changed, trade by trade, when prices move against them, and

forces all other players to participate.  In markets where speed and price are critical, this Rule discriminates in both.  Making one party to a transaction tread water while the counterparty gets to swim ahead and see how the tide is turning is not "fair."  If such a mechanism is not essential—if conventional, non-discriminatory alternatives exist, including technology investment—then this discrimination is neither necessary nor fair.  Finally, none of the risk controls cited by the Commission has been reviewed and upheld under Section 6(b)(5).  The IEX platform must be evaluated on its own terms, and it cannot pass that test.

### C.    The Commission's Latency Arbitrage Rationale Is Unsupported by the Administrative Record and the Commission's Own Precedents

As shown above, even supposing the Commission had established latency arbitrage in the options markets, the mechanism IEX proffers to address it discriminates unfairly in violation of the Exchange Act.  But the Commission's evidence of latency arbitrage is deficient.  The Commission declares that latency arbitrage in options is "uncontroverted," A154, it relies on a "0.001% of the trading day" statistic to claim narrow tailoring, A163, and it insists that no further data were necessary.  The Commission is wrong on all counts.  That compels vacatur.

### 1. The Commission Cannot Invoke *IEX Equities Rule* While Abandoning the Evidentiary Framework That Was Central to That Court's Holding.

The claim that latency arbitrage in the options market was "uncontroverted" is central to the Commission's defense. SEC Br. 45. It is the Commission's justification for abandoning the evidentiary framework it treated as essential in the *IEX Equities Rule* proceeding. Because the claim is false, the Commission's reliance on *IEX Equities Rule* collapses too.

The governing principle is settled. Agencies must "treat like cases alike," and "dissimilar treatment of evidently identical cases" is "the quintessence of arbitrariness and caprice." *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023). The Commission invokes *IEX Equities Rule* as its primary justification for approving IEX's repricing mechanism. SEC Br. 3, 12-15, 18-19, 35-36, 42, 44, 49-52, 54, 56-57. But in that case, the SEC did not assume latency arbitrage existed; it "first determined" (SEC Br. 16) that there was concrete evidence demonstrating a measurable concentration of executions within the brief windows when IEX's algorithm detected imminent price changes. The D.C. Circuit upheld the SEC's approval precisely on that ground, emphasizing that

17

IEX had "produced evidence of latency arbitrage on its exchange." *IEX Equities Rule*, 45 F.4th at 35.

The Commission concedes that the "first" determination it made in *IEX Equities Rule* is a determination it never made here—it does "not have the same quantitative data" demonstrating latency arbitrage. SEC Br. 46. Ascertaining the presence, nature, and extent of any latency arbitrage was even more important here, because—as the Commission tacitly admits—price differences in options markets result from changes in the actual value of underlying securities, not merely differences in prices posted on separate options exchanges. Citadel Br. 42-43. Yet rather than develop order-level evidence as it did for the IEX equities exchange, the Commission simply assumed the existence of latency arbitrage and approved a discriminatory mechanism anyway. If the Commission is to rely on *IEX Equities Rule* while discarding the evidentiary approach that undergirded the court's decision, it must offer a "reasonable and coherent explanation" for the departure. *Grayscale*, 82 F.4th at 1245. It offers none. Either the Commission chose not to look at the evidence it once deemed indispensable, or it looked and chose not to disclose what it found. The APA permits neither.

18

The Commission's only retort is that latency arbitrage in options was "uncontroverted." SEC Br. 45-46. That is wrong. Citadel expressly challenged the existence of "purported latency arbitrage" in the options market and urged the Commission to require empirical proof rather than accept IEX's assertions at face value. A134. The Commission attempts to distinguish this record from *IEX Equities Rule* on the ground that commenters there questioned "purported latency arbitrage." SEC Br. 46. Yet Citadel used that exact phrase here—it questioned "purported latency arbitrage." *Id.* Characterizing a disputed record as undisputed is precisely the sort of "duck[ing] [of] hard questions" the APA forbids. *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023).

### 2. The Commission's "0.001%" Statistic Masks How Often Real Trades Are Disrupted

The Commission's brief does not cure another flaw running through its Order: the unsupported claim that IEX's repricing mechanism is "narrowly tailored." To sustain that finding, the Commission relies entirely on a single statistic—that the mechanism would operate for "less than 0.001% of the trading day." SEC Br. 48. IEX now suggests (Br. 36 n.11) that it supplied all data the Commission requested. But the Commission sought information about the Rule's practical impact—"how often the

19

[mechanism] would be expected to cancel or change quotes," A52—and IEX responded only with a time-based statistic, A92; SA79. It did not provide any data showing how many incoming trade orders would fall victim to quotes being cancelled or repriced during those activation windows. From that time-based fraction, the Commission simply inferred that the mechanism has a "less than 1 in 100,000" chance of affecting retail investors' orders, A158—because 0.001% equals 1 out of 100,000 and the Commission assumed orders are evenly distributed throughout the trading day. Again, the Commission's metric avoids the relevant inquiry: The question is not what percent of the day the mechanism is active, but how often it alters actual executions.

Citadel explained that IEX's time-based percentage conceals how often investors actually encounter cancellations and repricings. A86. The Commission does not dispute that point. Nor does it dispute Citadel's showing that, for actively traded options series such as SPY, IEX's mechanism would trigger orders of magnitude more frequently than the headline 0.001% figure suggests. Instead, the Commission simply repeats that even 0.2% is "considerably less than 1% of regular trading hours." SEC Br. 48.

20

As an initial matter, the activation rate the Commission acknowledges—"0.2% of the trading day"—translates into thousands of triggers *per second*. As illustrated below, the IEX repricing mechanism could activate 2,000 times per second yet still be described as operating only "0.2% of the time" when measured at the microsecond level.



Over a trading day, 2,000 activations per second equates to hundreds of millions of quote cancellations across heavily traded options. That is not "infrequen[t]." *Id.*

More to the point, the Commission's statistic is non-responsive to the question it purports to answer. The "0.2% of the trading day" figure says nothing about how often retail orders are affected. Even if every activation coincided with a retail order—and even if 100% of those orders

were cancelled or repriced—the percentage of the trading day would remain 0.2%. The metric does not vary with harm. It varies only with elapsed time. Measuring seconds instead of consequences cannot establish narrow tailoring.

Measuring elapsed time rather than execution impact is like saying Lucy pulls the football only "0.2% of the day." What matters is whether it is pulled when Charlie Brown actually runs to kick.

The Commission's treatment of clustering compounds the problem. The mechanism is designed to activate when prices are moving—during the busiest periods of trading. The Commission acknowledges that the mechanism operates at "important points when options prices are in transition." SEC Br. 50. Yet it continues to rely on an estimate that assumes even distribution across the trading day. A rule designed to trigger thousands of times per second during *peak* trading cannot be found "narrowly tailored" by averaging those activations across the billions of microseconds in the whole trading day. And the fact the SEC *knew* the mechanism "will activate in discrete moments of price instability," IEX Br. 36, but assumed an even distribution throughout the day in evaluating the tool, is the essence of arbitrariness and caprice. *Am. Pub.*

22

*Gas Ass'n v. U.S. Dep't of Energy*, 22 F.4th 1018, 1027 (D.C. Cir. 2022) (vacating rule where agency relied on a random-distribution model that disregarded real-world behavior).

### 3. The Commission Refused to Examine the Very Data That Would Confirm or Refute Its Assumptions.

The Commission did not merely rely on inapposite data and omit data it consulted previously; it also refused to consult readily-available data (which was not at issue in the earlier case).

The Consolidated Audit Trail (CAT)—which captures every options order and identifies whether an order is retail—provided a straightforward way to test the Commission's central premise. The agency could have identified when IEX's mechanism would trigger and then queried whether a retail order was being routed around that moment. That simple cross-reference would have definitively answered the question the Commission claims to resolve: how often retail investors would actually be affected.

The Commission does not dispute that CAT data could answer that question. It simply chose not to look—and failed to provide any explana-

tion for that refusal.  Instead, it relied on IEX's estimate that retail investors would encounter IEX's mechanism in less than "1 in 100,000" orders—the same repackaged time-based statistic discussed above, rather than an analysis built on actual order-level evidence.  Where a dataset exists that directly identifies retail orders and records execution timing, an agency may not substitute conjecture for measurement.  The "apparent feasibility of such a study only "reinforces [the] conviction that the SEC has not adequately substantiated" its claim.  *Timpinaro*, 2 F.3d at 458.

The Commission now argues it had no obligation to conduct a "detailed market-structure analysis" or "build its own model" using CAT data.  SEC Br. 52 (citing *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021)).  But *Prometheus* "stands for the" unremarkable "proposition that an agency need not create data that doesn't already exist." *Chamber of Com. v. SEC*, 85 F.4th 760, 776 (5th Cir. 2023).  The case "offers no support for the SEC's decision to . . . ignore . . . already-existing data it did not want to consider," *id*.—especially data the agency itself has described as a "critical market oversight tool," Citadel Br. 22.  In any event, the

24

Commission's protestations that CAT analysis was unnecessary or infeasible appear for the first time in this Court.  Under *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), the Commission cannot advance a *post hoc* rationale that its Order never invoked.

No complex model was required here.  The CAT already records (1) every options order, (2) whether that order is retail, and (3) precise execution timestamps.  It also includes a dedicated analytical tool to facilitate Commission access to the data.  81 Fed. Reg. 84,696, 84,964 (Nov. 23, 2016).  The Commission needed only to compare activation windows against those records to determine whether and how often retail orders were affected.  That is not "building a model."  It is basic verification.  The APA and the Exchange Act require the Commission "to determine as best as it can the economic implications" of a proposed regulation.  *Bloomberg L.P. v. SEC*, 45 F.4th 462, 474-75 (D.C. Cir. 2022) (cited at IEX Br. 47).  Here, it refused.

The Commission's fallback position is worse.  It asserts CAT data "would not have advanced its analysis" because any outcome would support approval.  SEC Br. 51.  That is not reasoned decisionmaking; it is a

25

"heads I win, tails you lose" approach that insulates the agency from evidence. *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 471 (2007). Under the Commission's logic, if few retail orders coincided with activations of the IEX mechanism, that would confirm narrow tailoring. If many did, that would simply demonstrate the prevalence of latency arbitrage and thus justify the rule. In other words, no possible empirical result could undermine the Commission's conclusion.

In truth, CAT would have provided a definitive answer to the retail-impact question the Commission purported to resolve. If retail orders rarely overlapped with activations of IEX's mechanism, the agency could have demonstrated that fact. If they frequently overlapped, the "1 in 100,000" claim would have been disproved. By refusing to examine the one dataset that could falsify its premise, the Commission improperly shielded its narrow-tailoring assertion from review.

\* \* \*

With its new options exchange, IEX seeks to institute a patently more discriminatory trading platform than the court allowed in *IEX Equities Rule*. Yet the Commission approved it without gathering what the court found to be critical "substantial evidence" in that earlier case. And

26

the agency declared the mechanism "narrowly tailored" while ignoring record evidence that the repricing function would trigger hundreds of millions of quote cancellations per day in actively traded classes, and while declining to examine readily available CAT data that was not at issue in *IEX Equities Rule* and would have revealed how often investors' orders were actually affected.  This was arbitrary and capricious.

### D.    The Commission's Decision to Adopt a Compulsory, Anti-Competitive Design Instead of Less Discriminatory Alternatives Was Unreasonable and Unlawful.

Citadel's opening brief explained that the Commission's approval Order fails for two additional reasons.  First, quotations on IEX are not "firm" under the Options Plan's definition and therefore cannot lawfully be treated as "protected."  Second, even if protected status were permissible, the Commission never explains why compelling the entire market to route orders to cancelable quotes is "necessary or appropriate," rather than leaving routing decisions to individual investors.

The Commission's brief does not resolve either problem.  It relabels non-firm quotes as protected and disclaims any responsibility to consider non-mandatory routing.  Neither response cures the defects.

## 1. The Commission Cannot Treat Disappearing Quotations as "Protected" Under the Options Plan

The Commission does not identify any lawful basis for treating quotes on IEX as "protected." It argues that such quotations remain "protected" because firmness is defined by each exchange, and IEX has chosen to treat these quotations as firm. SEC Br. 53-56. That argument fails under the plain terms of the Options Plan that concededly governs options exchanges.

The Plan provides that a quotation is "non-firm" if the quoting party is "relieved of its obligations under [the exchange's] firm-quote rule." Options Plan § 2(11). Rule 23.150(d) is IEX's firm-quote rule; it obligates market makers to execute a displayed bid or offer for the stated number of contracts at the posted price. That obligation is what makes a quotation "firm." But IEX's new Rule authorizes those same quotations to be cancelled or repriced when IEX's repricing mechanism is triggered—"reliev[ing]" the market maker "of its obligation," to quote Options Plan § 2(11), and therefore making the quote non-firm under the Plan's terms.

28

The Commission has no effective response to this. It contends there is no conflict with its "backing away" precedent because on IEX's platform, cancellation occurs before orders are formally "presented." SEC Br. 36-37. But there is no principled difference between backing away after an executable interest has been matched and engineering an intentional delay so the match is held at bay while the quote is re-evaluated and withdrawn. If a quote may be withdrawn when it becomes disadvantageous at execution, the firm-quote obligation has been lifted.

The Commission's reliance on Regulation NMS does not rescue its position. Even though Reg NMS governs equities by its terms, the Commission invoked that regulation's immediacy framework in assessing IEX's Rule. Having invoked that standard, the Commission was required to satisfy it. *Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 177 (D.C. Cir. 2010) (even supposing statutory standard was inapplicable, it had to be satisfied once Commission invoked it).

Under Reg NMS, a quotation is eligible for protected status only if it executes "[i]mmediately." 17 C.F.R. § 242.600(b)(6), (70). "Immediate" means "without delay," Citadel Br. 55, yet the Commission concedes the

29

IEX platform imposes delay, SEC Br. 57.  As a matter of plain language, quotes on the platform should not have been treated as protected.

To be sure, in *IEX Equities Rule*, the D.C. Circuit accepted what it viewed as a *de minimis* delay.  45 F.4th at 36-37.  This Court, however, does not require another's guidance to understand whether something that is intentionally delayed occurs immediately.  Moreover, the delay here is not "*de minimis*"; it is designed to be long enough to allow IEX's mechanism to achieve its discriminatory goal; even IEX says the delay has a "substantial" impact.  Citadel Br. 55 n.*.  And unlike the delay in *IEX Equities Rule*, which was available to all liquidity providers, this delay is facially discriminatory.  It is engineered to create a unilateral re-pricing privilege for IEX insiders at the expense of their counterparties.

### 2. The Commission Still Fails to Explain Why Mandatory Routing Is Necessary or Appropriate.

By designating IEX's cancellable quotes "protected," the Commission compelled the entire options market to route orders to IEX regardless whether brokers believe those quotes will execute.  The Commission was required to explain why that compulsion is "necessary or appropriate."  15 U.S.C. § 78f(b)(8).  It never did so.  Citadel explained in its opening brief that the Commission conducted no analysis of the competitive

30

baseline in the options market.  *See* Citadel Br. 56-57.  The Commission offers no response.

The Commission also repeatedly characterizes the Order as merely allowing a "single exchange" to innovate.  SEC Br. 3, 44.  That framing is specious.  The IEX options exchange affects *all* brokers and *all* exchanges.  When the IEX exchange displays the best price, all brokers must route orders there, in preference to other exchanges offering a slightly lower (or higher) price that the broker knows is not subject to being canceled or changed while the client's order is "stuck in the speed-bump."  SEC Br. 15.

The Commission's rhetoric about competition deepens the contradiction.  It suggests other exchanges can compete if market participants find IEX's approach "attractive."  SEC Br. 39.  But routing to IEX is not a matter of what participants find attractive—it is mandatory under the IEX Options Rule and the governing federal regulatory regime.  Other exchanges cannot compete with a venue that may post a better price, change it when an order arrives, and then rely on mandatory routing to capture the order anyway—except by copying the same repricing privilege.

The Commission contends (Br. 40) it faced a binary choice—approve or reject IEX's proposal—and that the existence of less intrusive alternatives therefore does not matter. Here, again, the Order did not rely on those grounds and may not be upheld on that basis. *Chenery*, 332 U.S. at 196.

In all events, the Commission does not act as a rubber stamp. It must determine whether a proposed rule is consistent with the Exchange Act—including whether any burdens on competition are "necessary or appropriate." 15 U.S.C. § 78f(b)(8). In making that determination, the Commission routinely considers alternatives and market impact. *E.g.*, 88 Fed. Reg. 62,628, 62,638 (Sept. 12, 2023). When a less intrusive alternative exists—such as permitting IEX to operate its repricing mechanism without conferring protected status—that alternative is relevant to whether mandatory routing is "appropriate." The Commission failed to consider it. And to the extent the Commission did not consider alternatives because it erroneously believed it *could not*, that itself requires vacatur. "Where a statute grants an agency discretion but the agency erroneously believes it is bound to a specific decision," its action cannot stand. *United States v. Ross*, 848 F.3d 1129, 1134 (D.C. Cir. 2017).

Compulsion is not an unavoidable "reflection" of the regulatory scheme, as the Commission suggests.  Brokers are required to route to IEX only because the Commission chose to treat IEX's cancelable quotations as "protected."  The order-protection rules do not independently mandate routing to non-firm quotes; that consequence flows from the Commission's decision.  Having created the compulsion, the Commission cannot disclaim responsibility.

## II.     The Proper Remedy Is Vacatur.

The Commission does not meaningfully argue for remand without vacatur.  Nor could it.  Vacatur is the "ordinary APA remedy."  *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015).  It is appropriate here based on "the disruptive consequences of an interim change that may itself be changed," and "the seriousness of the order's deficiencies."  *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, 317 (11th Cir. 2025).

Vacating the Commission's order would cause no disruption.  IEX notes (Br. 55) its investment in preparing to launch the exchange, but sunk costs of a private party do not justify leaving an unlawful rule in

place. "[R]emand without vacatur [is] an *exceptional* remedy," appropriate only in limited circumstances—for example, when "vacatur would disrupt *settled* transactions" or when "an agency cannot easily unravel a *past* transaction." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) (emphases added). There is no risk of disruptive unwinding here; the proposal has not yet taken effect. Vacatur would preserve the status quo.

That distinguishes this case from *Black Warrior*, on which IEX relies (Br. 55). There, the permit at issue authorized mining projects that were already underway, such that vacatur would have disrupted active operations. 781 F.3d at 1290. Here, vacatur maintains the existing market structure. And if, after further proceedings, the proposal is (properly) approved, IEX can launch then and recoup its investment. But if operation is permitted now, investors will never recoup their lost revenue.

Vacatur is also warranted because the Commission's order rests on multiple errors that "incurably tainted the agency's decisionmaking." *Id.* When an agency gives multiple reasons for its action without identifying them as independently adequate, an error in any compels vacatur. *Nat'l*

34

*Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (Kavanaugh, J.). The defects here are manifold and cannot be cured on remand; IEX's proposal is discriminatory by design.

Vacatur is warranted.

## CONCLUSION

This Court should grant the petition for review and vacate the order on review.

Dated: February 20, 2026

| | |
|---|---|
| | */s/ Eugene Scalia* |
| Brian A. Richman | Eugene Scalia |
| GIBSON, DUNN & CRUTCHER LLP | Helgi C. Walker |
| 2001 Ross Avenue, Suite 2100 | John W. Tienken |
| Dallas, TX 75201 | Brandon Wolf |
| (214) 698-3100 | GIBSON, DUNN & CRUTCHER LLP |
| | 1700 M Street, N.W. |
| | Washington, D.C. 20036 |
| | (202) 955-8500 |
| | escalia@gibsondunn.com |

*Counsel for Petitioner*
*Citadel Securities LLC*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

**1.    Type Volume**

__X__    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 6,498 words (including 25 words in the figure on page 21).

**2.    Typeface and Type Style**

__X__    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Word 2019 in 14-point, New Century Schoolbook font.

Dated:  February 20, 2026                    _/s/ Eugene Scalia_

Eugene Scalia

36

# CERTIFICATE OF SERVICE

I hereby certify that, on this 20th day of February 2026, a true and correct copy of the foregoing was filed electronically and served on all counsel through this Court's CM/ECF system.

/s/ *Eugene Scalia*
Eugene Scalia